UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MORTON A. BENDER                     )
1025 Connecticut Avenue, N.W.        )
Suite 606                            )
Washington, DC 20036                 )
                                     )
        and                          )
                                     )
GRACE M. BENDER                      )
1025 Connecticut Avenue, N.W.        )
Suite 606                            )
Washington, DC 20036,                )
                                     )   C.A. No. _____
                                     )
                                     )   JURY TRIAL DEMANDED
        Plaintiffs,                  )
                                     )
    v.                               )
                                     )
CAROLYN D. JORDAN                    )
702 Leightonwood Lane                )
Silver Spring, MD 20910,             )
                                     )
DAVID WILMOT                         )
1653 Kalmia Road, N.W.               )
Washington, D.C.  20015,             )
                                     )
MICHAEL J. COBB                      )
7816 Morningside Drive, N.W.         )
Washington, D.C.  20012,             )
                                     )
WILLIAM B. FITZGERALD, IV            )
3138 Quesada Street, N.W.            )
Washington, D.C.  20015             )
                                     )
EUGENE K. YOUNGENTOB                 )
1041 Strathmore Park Court           )
Apt. 41                              )
North Bethesda, MD 20852             )
                                     )
THOMAS L. BATTIES                    )
1452 Primrose Road                   )
Washington, DC 20012-1224            )
and                                  )
                                     )

**INDEPENDENCE FEDERAL SAVINGS BANK**  )
**1229 Connecticut Avenue, N.W.**          )
**Washington, DC 20036,**                       )
                                                            )
   **Defendants**                    )
_____  )

## VERIFIED COMPLAINT

Plaintiffs Morton A. Bender and Grace M. Bender, by and through their undersigned counsel, hereby bring this action against Defendants Carolyn D. Jordan, David Wilmot, Michael J. Cobb, William B. Fitzgerald, IV, Eugene K. Youngentob, Thomas Batties and Independence Federal Savings Bank, and state as follows:

## JURISDICTION

1.  This action arises under Section 13(d) of the Exchange Act, 15 U.S.C. §78m(d), Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and the rules and regulations promulgated thereunder; 12 C.F.R. § 569; and 12 C.F.R. §545.121.  Subject matter jurisdiction is conferred by Section 27 of the Exchange Act, 15 U.S.C. §78aa, and  28 U.S.C. §1331.  Jurisdiction of common law claims is based on 28 U.S.C.  §1367 and pendent jurisdiction.

2.  Venue in this district is proper under 28 U.S.C. §1391(b).

2

**PARTIES**

3.   Plaintiffs Morton A. Bender ("Bender") and Grace M. Bender ("Grace Bender") are residents of the District of Columbia.  Plaintiffs, as joint tenants, are the beneficial owners of 326,000 shares of common stock of Defendant Independence Federal Savings Bank, and thereby jointly own approximately 21% of the outstanding stock of the Bank.  Grace Bender is not an active participant in the matters relevant to this litigation and she is a party solely in her capacity as a joint tenant shareholder with Bender.

4.   Independence Federal Savings Bank ("IFSB" or the "Bank") is a federally-chartered savings bank, with its principal place of business in the District of Columbia.  The Bank operates four branches in the District of Columbia and one branch in Chevy Chase, Maryland.  Its stock is publicly traded on the NASDAQ Stock Exchange and it is under the regulatory jurisdiction of the Office of Thrift Supervision ("OTS").

5.   Defendant Carolyn D. Jordan ("Jordan") is a resident of the state of Maryland.  Jordan is a member of the Bank's Board of Directors, and is its Chairman.

6.   Defendant David Wilmot ("Wilmot") is a resident of the District of Columbia.  Wilmot is a member of the Bank's Board of Directors.

7.  Defendant Michael J. Cobb ("Cobb") is a resident of the District of Columbia.  Cobb is a member of the Bank's Board of Directors, and is Secretary of the Board.

8.  Defendant William B. Fitzgerald, IV ("Fitzgerald") is a resident of the District of Columbia.  Fitzgerald is a member of the Bank's Board of Directors.

9.  Defendant Eugene K. Youngentob ("Youngentob") is a resident of Montgomery County, Maryland.  Youngentob is a member of the Bank's Board of Directors.

10.  Defendants Jordan, Wilmot, Cobb, Fitzgerald, and Youngentob are hereinafter collectively referred to as the "Director Defendants."

11.  Defendant Thomas L. Batties ("Batties") is a resident of the District of Columbia.  Batties is President and Chief Executive Officer of the Bank.

## FACTUAL BACKGROUND

### *The Delays of the Shareholders' Meeting and Materials Sent to the Shareholders*

12.  The Bank's fiscal year ends on December 31 each year. On April 6, 2004, the Board of Directors of IFSB voted to amend Article II, Section 2 of the Bank's bylaws to set the date of the Bank's annual meeting "within 150 days after the end of the savings bank's fiscal year on the third Wednesday of April . . . or at such other date and time within such 150-day period as the board of directors may determine."  The regulations of the OTS

4

require that a Bank's annual meeting be held within 150 days of the end of its fiscal year. 12 C.F.R. §552.6(a). Thus, the annual meeting should have been held April 20, 2005 (the third Wednesday in April 2005), but in no event later than May 31, 2005 (one day after Memorial Day which was the 150th day after the close of the Bank's fiscal year on December 31, 2004). The 2005 annual meeting was not scheduled to take place before April 20, 2005, but a Special Meeting in lieu of the Annual Meeting of Shareholders was scheduled for May 11, 2005, prior to the May 31, 2005 corporate and regulatory annual shareholder meeting deadline.

13. In anticipation of the scheduled May 11, 2005 meeting, at which three directors would be elected to the Bank's Board, Bender sent a letter, dated April 26, 2005, to the Bank's corporate secretary giving notice that Bender was nominating two persons for election to the Board. On May 2, 2005, Bender sent a letter to the shareholders setting forth his positions regarding the Bank's performance, and information regarding his nominees.

14. A few days prior to the May 11th meeting, a letter dated May 4, 2005 was sent to shareholders allegedly on behalf of "the Committee to Save Independence Federal Savings Bank." Upon information and belief, this letter was drafted by, or with the assistance of, Defendant Batties (and/or one or more of the Director Defendants), as the level of detail set forth in the letter leads to the inescapable conclusion that it was written

by, or in consultation with, Bank management.  Some of the
information contained in the letter could only have come from
confidential OTS examination reports, which are maintained in the
Bank's file.  The letter is full of faulty and misleading
statements, coupled with undisguised character assassination
("Morton Bender's Background").

15.  By letter dated May 10, 2005, the OTS suggested that
the Bank adjourn the meeting for a brief period due to the Bender
correspondence to the shareholders, and the "Committee to Save"
correspondence referred to in the foregoing paragraph.  The 2005
annual meeting was convened on May 11, 2005; pursuant to the OTS
suggestion, however, no business was conducted at the meeting and
the meeting was adjourned.

16.  The shareholders meeting was then scheduled to
reconvene on June 8, 2005.  On May 31, 2005, just a week prior to
the date of the reconvened shareholders' meeting, the Bank issued
a press release stating that the meeting would not be reconvened
on June 8, 2005, and that the Bank's Board of Directors would
meet to determine a new date for the shareholders' meeting.

17.  By its notice to shareholders dated August 25, 2005,
the Bank announced that the Special Meeting in lieu of Annual
Meeting of Shareholders would take place September 14, 2005.  On
September 7, 2005, Defendant Jordan notified the Board members
that a Special Meeting of the Board of Directors would be held on
September 9, 2005 "[t]o consider matters related to disclosures

6

contained in two recent 13D filing made last week on behalf of
Morton Bender and how such disclosed information may impact the
Bank." At its September 9, 2005 special meeting, the Board again
postponed the meeting scheduled for September 14, 2005, "for the
shareholders to be presented with the information regarding
Bender's plans prior to their voting on the matters to be
considered at the meeting." The Board rescheduled the "Special
Meeting in lieu of an Annual Meeting of the Shareholders" of IFSB
to be held on October 26, 2005 at 11 a.m., at the Mayflower Hotel
in Washington, D.C. ("Shareholders Meeting").

18. Bender's nominees for directors to be elected at the
Shareholders Meeting were Osborne George and John Silvaneous
Wilson, Jr. ("Bender Nominees").

19. On or about October 3, 2005, Bender sent a letter to
the IFSB Shareholders, which *inter alia* identified the Bender
Nominees, and explained that the only way to vote for the Bender
Nominees was to attend the meeting in person, or to send someone
with a legal proxy. The letter also specifically instructed that
Bender was not soliciting proxies, and was not able to vote any
shares other than his own.

20. On October 4, 2005, the Director Defendants and
Defendant Batties submitted the Bank's proxy materials to the
Shareholders ("Proxy Materials"). These Proxy Materials included
the Banks Proxy Statement ("Proxy Statement") with ten
appendices, a "Notice of Postponement and Rescheduling of Special

7

Meeting of Shareholders," as well as a letter signed by Defendants Jordan and Batties entitled "Update to Our Shareholders" ("Update"). Both the Update and the Proxy Statement contained inaccurate and misleading information about the Bender Nominees, Bender's regulatory filings, and his intentions to obtain majority ownership and control of the Bank, as set forth in detail below. As such, they violate Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), 12 C.F.R. § 569, and 17 C.F.R. § 240.14a-9.

21. As identified in the Proxy Statement at page 28, the Bank's nominees for directors were: Defendant Fitzgerald, Defendant Wilmot, and Marion O. Greene, Jr. ("Management Nominees").

22. The Update states that "if Bender is successful in electing his two nominees to the Board, the Majority Directors believe that Bender will gain control of Independence Federal without having to purchase any additional shares of Independence Federal Stock."

23. On October 21, 2005, a letter was sent to all IFSB shareholders, purportedly drafted by Catherine McPhail and A. Gilbert Douglas, two shareholders who supported the Management Nominees. This letter contained inaccurate and defamatory statements about Bender and his intentions and, upon information and belief, was based on information provided by the Director Defendants and/or Defendant Batties for the express purpose of

defaming Bender and misinforming the other shareholders.  The
letter makes false allegations of Bender's "record history
involving other banks including a black bank pushed to failure,"
and "severe violations of banking law and illegal practices by
Bender and his Columbo Bank."  The letter also provides "[T]he
only time we are aware we got into U.S. District Court with
Bender – though expensive – Independence Won, Bender Lost!"
These statements (among others in the letter) are untrue.

### Sales of IFSB Stock to Ensure the Election of the Management Nominees

24.  Upon information and belief, in an effort to ensure the
election of the Management Nominees to the Board, the Director
Defendants and Defendant Batties also used the various delays in
the Shareholders' Meeting to arrange for the sale of IFSB stock
to Jeffrey Thompson ("Thompson"), who is the Chairman and Chief
Executive of an accounting firm in which Defendant Cobb is also a
shareholder.

25.  Beginning in early August 2005, and during the 45-day
period immediately prior to the September 26, 2005 Record Date
for the Shareholders' Meeting, Thompson purchased 98,600 shares
of IFSB stock; the 13D filed by Thompson in late September 2005
indicated that he owned 111,600 shares, which is 7.2% of IFSB
stock.  Upon information and belief, approximately 80,000 of the
shares purchased by Thompson had been held by Millenium
Management (or an affiliate).

26.  Upon information and belief, Thompson, at all times relevant herein, was acting in concert with Cobb and the other Director Defendants and Defendant Batties to further their agenda for IFSB, including, but not limited to, electing the Management Nominees, and defeating the Bender Nominees.  It appears that the 13D filed with the OTS on behalf of Thompson in September 2005 was faxed to the OTS by the law firm of Muldoon Murphy Aguggia ("Muldoon Murphy"), the same law firm that is counsel to IFSB.  The 13D filed by Thompson states that the purpose of his stock purchases was "for investment purposes."  13D, Item 4.  Upon information and belief, however, the real reason for the purchases was to consolidate votes for the Management Nominees, and to thwart Bender's efforts to get the Bender Nominees elected.

27.  Upon information and belief, at some time either prior to, or during the vote at the Shareholders' Meeting, Thompson's attorney, Daniel Weitzel, delivered Thompson's proxy to John Hall, an attorney with Muldoon Murphy, counsel for IFSB.  The delivery of the proxy resulted in all 111,600 of Thompson's shares being voted for the Management Nominees.  The delivery of the proxy to Hall was not in compliance with the Bank's own instructions for delivery of proxies set forth in the Proxy Statement, violated IFSB By-laws, and was done for the express purpose of avoiding a fair vote on Bender's candidates.

28.   As of October 25, 2005, the day prior to the Shareholders' Meeting, Harold Doley ("Doley"), along with a group of affiliated persons or entities ("the Doley Group"), owned in excess of 12% of IFSB stock ("the Doley Group Shares").  Upon information and belief, the Doley Group acquired its IFSB shareholdings from Carver Bancorp, Inc. ("Carver").  Despite their combined ownership percentage in excess of 12%, neither Doley nor any other member of the Doley Group has ever filed a Form 13D regarding their IFSB stock ownership with the OTS.

29.   On October 25, 2005, Doley told Bender that he was willing to allow Bender to vote the Doley Group Shares in favor of the Bender Nominees, or would give Bender his proxy.  Bender told Doley he was not allowed to accept proxies, and told Doley he would have to give his proxy to someone else.

30.   Upon information and belief, on October 25, 2005, Doley was contacted by one or more of the Director Defendants or Defendant Batties for the purpose of purchasing the Doley Group Shares.  Upon information and belief, Doley reached an agreement with one or more of these Defendants to sell all of the Doley Group Shares for $17.00 per share.  On that same day, IFSB shares were trading on the open market, and closed at approximately $11.50 per share.

### The Shareholders' Meeting - October 26, 2005

31.   On the morning of October 26, 2005, Bender spoke with Logan Delaney, an associate of Mr. Doley, who told Bender about

the agreement for the purchase of the Doley Group Shares.  Later that morning, Bender again spoke to Doley, who assured Bender that he would vote the Doley Group Shares for the Bender Nominees.  Upon information and belief, the deal for the purchase of the Doley Group Shares was not complete at this time.

32.  The Shareholders' Meeting was scheduled to start at 11 a.m. on October 26, 2005.  Defendant Wilmot postponed the start of the meeting, without any Board resolution or other authority for a postponement.  Defendants Jordan and Wilmot used this delay to continue to gather votes for the Management Nominees, and to take Doley to lunch at the Prime Rib Restaurant.  The purpose of the lunch was to persuade Doley to assign the proxies related to the Doley Group Shares to the Director Defendants, or to complete the deal for the sale of the shares.  Upon information and belief, during the course of their discussions, Jordan and/or Wilmot told Doley that if he voted for the Bender Nominees, there would be a "run on the bank".  Upon information and belief, at some point before the Shareholders Meeting resumed at 3 p.m., Doley finalized his deal with one or more of the Director Defendants to sell the Doley Group Shares at $18.00 per share.  Because the Doley Group Shares represent in excess of 10% of the shares of IFSB, the acquisition of control of IFSB in this matter was in violation of the Change in Bank Control Act, 12 U.S.C. § 1817(j), and OTS regulations thereunder.

33.  Upon information and belief, because the Dooley Group members were the record owners of the stock as of the Record Date (September 26, 2005), the Director Defendants did not complete the purchase of the shares on October 26, 2005, but rather promised Doley a $175,000 down payment.  In exchange for the promise of the down payment, Doley gave the Director Defendants control over the Doley Group Shares, and those shares were subsequently voted for the Management Nominees.  No 13D was filed by any of the Director Defendants indicating their intention to purchase shares or gain control of the Doley Group Shares to vote in favor of the Management Nominees.  Moreover, the above-described acquisition of the Doley Group Shares, or proxies for those shares, was without prior OTS approval required for increasing the Director Defendants' ownership/control of the company over 10%.

34.  The Shareholders' Meeting eventually reconvened at 3 p.m., and lasted a half an hour.  During the course of the meeting, Bender made formal proxy challenges to the Independent Inspector of Election (hereinafter referred to as the "IIOE") based on the counting of uncast votes in favor of the Management Nominees, and the fact that the master ballot (which represented proxies received by Management) was to be voted after the closing of the polls, in violation of Section 45 of Robert's Rules of Order ("Robert's Rules").  Pursuant to the IFSB Amended By-laws

("By-laws"), shareholders' meetings are conducted pursuant to Robert's Rules.

35.  Pursuant to the By-laws, the IFSB Board is required to hold a meeting and vote on how unvoted shares should be voted. No such meeting, or vote of the directors, took place.  When Bender's attorney, Robert Freedman, objected that the unvoted shares could not be voted for the Management Nominees without a prior Board vote, Defendant Jordan ruled Freedman "out of order." In addition, pursuant to the voting procedures set forth in the Proxy Statement, as to those Shareholders who chose not to vote to elect directors, neither their brokers nor any other person could vote in their place.

36.  Nevertheless, in violation of the By-laws requiring a Board vote on the unvoted shares, and the representation in the Proxy Statement as to how proxies were to be voted, approximately 200,000 unvoted shares were voted for the Management Nominees.

37.  In addition, the IIEO told counsel for Bender that the shares/proxies held by IFSB Management were voted before the close of the Shareholders' Meeting.  Contrary to the IIEO's assurances, and Robert's Rules, however, those shares/proxies were voted at a meeting which took place two days after the Shareholders' Meeting.

38.  The failure to comply with the By-laws, the representations set forth in the Proxy Statement, and Robert's

14

Rules was done for the express purpose of denying Bender's rights to have a fair and informed vote on the Bender Nominees.

39. After the meeting, Bender spoke with Doley, who indicated that his share purchase agreement was still being negotiated, but consistent with that agreement, the Doley Group Shares were voted for the Management Nominees.

## COUNT I

### (VIOLATIONS OF SECTION 13(d) OF THE EXCHANGE ACT - DIRECTOR DEFENDANTS AND DEFENDANT BATTIES)

40. Plaintiffs incorporate herein by reference paragraphs 1-39 as if fully set forth herein.

41. Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder provide that any person, and any group acting together for the purpose of acquiring, holding, or voting securities of a company, who acquires, either directly or indirectly, the beneficial ownership of more than 5 percent of a class of securities registered under Section 12 of the Exchange Act must, within ten days, file a statement on Schedule 13D with the company's primary regulator and with any exchange where the security is traded.

42. A Schedule 13D must set forth the purpose of acquiring the issuer's stock, and the acquiring person's plans, intentions and agreements with respect to the issuer.

15

43.  Rule 13d-101 requires "reporting persons" to describe any contacts, arrangements, understandings, or relationships between themselves and any other person with respect to the issuer, "naming the persons with whom such contracts, arrangements, understandings, or relationships have been entered into."

44.  A primary purpose of Section 13(d) is to alert and inform companies, their shareholders and the investing public generally regarding accumulations in stock which might represent a potential shift in corporate control or a potential change in the company's direction, and to compel full disclosure of information critical to shareholders in making informed investment decisions.

45.  Rule 13(d)(1) provides that "when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of Section 13(d) and (g) of the Exchange Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."

46.  By no later than October 26, 2005 and possibly substantially earlier, the Director Defendants and Defendant Batties had agreed to act together as a group with non-parties Thompson and the Doley Group, for the undisclosed purposes of (i)opposing the election of the Bender Nominees, voting the

16

Defendants' IFSB shares, together with the Thompson and Doley Group Shares, against the Bender Nominees, and persuading other shareholders to vote against the Bender Nominees; (ii) depriving those IFSB shareholders who voted in favor of the Bender Nominees the opportunity of a fair election of the Bender Nominees; (iii) supporting the efforts of Jordan to continue controlling the IFSB Board despite a dismal record of mismanagement and negligence.

47.   The Director Defendants and Defendant Batties have violated section 13(d) of the Exchange Act because they have failed to file a Schedule 13D, or any amendments to an existing 13D, setting forth their specific plans and intentions with respect to IFSB, including but not limited to the details of the undisclosed agreement among the Director Defendants and Defendant Batties to seek to acquire the Doley Group Shares by purchase or otherwise; the undisclosed agreement to purchase the Doley Group Shares; the undisclosed agreement with Thompson regarding his votes (or the delivery of his proxies) for the Management Nominees, as more fully described below in Paragraph 57; and the undisclosed agreement with the Doley Group regarding the delivery of their votes (or the delivery of their proxies) for the Management Nominees.

48.   The Defendants' violations of Section 13(d) deprived all IFSB shareholders from information necessary to ensure a fair vote at the Shareholders' Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly considered by

17

all shareholders.  Accordingly, the election of the Management Nominees is irreparably tainted, and the results of the meeting are therefore void.  Plaintiffs (and other shareholders and the investing public) have been, are being, and will continue to be irreparably harmed, in that they are left without material information, to which they are lawfully entitled, regarding the true interests and purposes of Defendants' efforts to control IFSB for their own interests, and to defeat the Bender Nominees. The information which was not provided in any Schedule 13D was essential to informed shareholder decisions with respect to voting IFSB shares at the Shareholder Meeting, and were also material to Bender's own communications with the shareholders.

49.  Plaintiffs have no adequate remedy at law.

## COUNT II

### (VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT and 12 C.F.R. § 569 – DIRECTOR DEFENDANTS AND DEFENDANT BATTIES)

50.  Plaintiffs incorporate herein by reference paragraphs 1-49 as if fully set forth herein.

51.  Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and the rules and regulations promulgated thereunder, as well as 12 C.F.R. § 569, govern the solicitation of proxies in this case. Pursuant to those statutory and regulatory provisions, no solicitation of a proxy shall be made by means which, *inter alia*, contains any statement that is false or misleading with respect

18

to any material fact, or omits to state any material fact. Moreover, pursuant to 17 C.F.R. § 240.14a-9, no solicitation (not limited to proxy materials) may be made by means of any communication which is false or misleading, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

52. Section 14(a) of the Exchange Act, and the rules and regulations promulgated thereunder, demand full and fair disclosure in proxy solicitations, and was enacted to prevent management (or others) from obtaining authorization for corporate action by means of inadequate or misleading disclosures.

53. As set forth above, prior to the Shareholders' Meeting, the Director Defendants and Defendant Batties distributed Proxy Materials to the IFSB shareholders on behalf of IFSB Management. In addition, and upon information and belief, the Defendant Batties and/or the Director Defendants also participated in the communications from at least two groups of shareholders, as described in Paragraphs 14 and 23 above (*i.e.,* the May 4, 2005 letter by "the Committee to Save Independence Federal Savings Bank," and the October 21, 2005 letter signed by Catherine McPhail and A. Gilbert Douglas).

54. As set forth above, the Bank's Proxy Materials included the Update, which was a letter to the IFSB Shareholders, dated October 4, 2005, and signed by Defendants Jordan and Batties.

Page 1 of the Update states, "here is Bender's plan as disclosed in Amendment 18 to his Schedule 13D ... ."  Immediately following that statement, the Update lists the "Banks' Belief of Bender's Intentions" which purports to identify what Bender intends to do, leaving the reader with the mistaken impression that those "beliefs" are taken directly from Bender's 13D Amendment 18.  The "Bank's Beliefs" are attributed to the "Majority Directors," who are described in the Update as the "directors other than the three directors whose elections were primarily attributable to the nomination and/or vote of Morton Bender"; the Majority Directors are specifically identified in the Proxy Statement as Jordan, Cobb, Fitzgerald, Wilmot and Youngentob.

55.  *By way of partial example only*, the Proxy Statement contains the following false and misleading statements, or omissions of material fact:

      a.    "Bender is a substantial reason the price for Independence Federal common stock has fallen to the $11.75 per share price" (page 2);

      b.    "Bender's opposition to the Carver Merger and his other actions are a substantial reason for the failure of the Carver Merger" (page 2);

      c.    the depressed stock is a result of increase expenses, "including a significant portion of legal fees in excess of $3,000,000 alone in 2004,

which Independence Federal incurred in its efforts to protect the Bank and its shareholders from Bender's actions" (page 2);

d.   "Bender has [refused to purchase shares from all shareholders] at a price which is competitive" (page 2);

e.   if the Bender Nominees are elected, Bender will obtain "Controlling Influence" over IFSB "to the Detriment of All Other Shareholders" (page 3);

f.   that Bender has sued the Bank's directors "without citing any factual basis.  These actions and baseless pejorative statements also damage the Bank's reputation in the community" (page 3);

g.   "it is quite possible that Bender desires a merger of Independence Federal and Colombo Bank" (pages 3-4).

h.   Page 20 of the Proxy Statement fails to identify the block of stock owned by the Doley Group in its identification of "groups owning in excess of 5%."

56.  The Proxy Materials are intended to mislead the shareholders that the election of the Bender Nominees will result in a situation where Bender, as the joint owner of 21% of the Bank's shares, will be allowed to dictate its future, to his personal benefit, and the benefit of Colombo Bank, to the detriment of the remaining shareholders, from whom Bender will

21

not purchase stock. The Proxy Materials blame Bender for the failure of the merger with Carver, and virtually every problem at the Bank, including increased operating expenses and decreased stock price. At no place in the Proxy Materials does the Bank Management (*i.e.,* the Director Defendants and Defendant Batties) inform the Shareholders of its own role in the poor performance of the Bank. By way of material omission, it was the Bank's three-pronged attack in May 2004 (lawsuit, poison pill, holding company restructure) that was improper and ill-fated, and expensive to the Bank. All Mr. Bender did to prompt this multi-million dollar legal attack was to voice his objection to the proposed merger with Carver. Despite the picture painted in the Proxy Materials, the Bank's capital was diminished by continuing poor operating performance, notwithstanding its legal expenses. To the extent that the Proxy Statement implies that "a significant portion" of the 2004 legal fees in excess of $3 million were necessary to "protect" the Bank and its shareholders from Bender, the statement is a blatant distortion: legal fees were incurred as a result of three civil lawsuits against the Bank involving the Washington Teachers Union, as well as the litigation instituted in this Court on May 5, 2004 *against* Bender. Not one of those four cases was instituted by Bender, and only one even involved him. In addition, although the Proxy Materials attribute the failure of the Carver Merger to Bender,

22

it was the that OTS denied the application for the Carver merger. Even prior to the OTS denial of the merger application however, Carver demanded a lower price than that which had been agreed to, and the IFSB Board refused.

57. As set forth above, non-party Thompson increased his shareholdings in IFSB by 98,000 shares in the 45 days immediately prior to the September 26, 2005 Record Date, which increased his ownership in IFSB to 7.2%. Upon information and belief, prior to the mailing of Proxy Materials on or about October 4, 2005, the Director Defendants and Defendant Batties had reached an agreement among themselves, and with Thompson, for Thompson to acquire these additional shares, and to vote his shares in favor of the Management Nominees, or to give his proxy to the Director Defendants. This agreement provided the Director Defendants with control of approximately 9% of IFSB, and would have been material information to the IFSB shareholders in deciding whether or not to vote in the election, and how to vote. The agreement with Thompson was not disclosed in the Proxy Materials.

58. As set forth above, upon information and belief, the Director Defendants and/or Defendant Batties also participated in the communications from at least two groups of shareholders, the May 4, 2005 letter by "the Committee to Save Independence Federal Savings Bank," and the October 21, 2005 letter purportedly sent by Catherine McPhail and A. Gilbert Douglas. Pursuant to 17 C.F.R. § 240.14a-9, no solicitation may be made by means of any

23

communication "which is false or misleading," or "which omits to state any material fact necessary in order to make the statements therein not false or misleading." The May 4, 2005 letter and the October 21, 2005 are solicitations subject to 17 C.F.R. § 240.14a-9. Both letters solicit support for board nominees supported by the Director Defendants, and/or against the board nominees supported by Bender.

59. *By way of partial example only,* the May 4, 2005 letter contains the following false and misleading statements, or omissions of material fact:

      a.    "the originally established goals of Independence Federal Savings Bank that have recently been threatened by the personal greed of specific individuals– individuals who have no regard not only for the African American community, small businesses, depositors and local homeowners, but not even for their fellow shareholders in IFSB";

      b.    "Acting separately from IFSB, we aim to expose the motivations of those wishing to harm IFSB's mission";

      c.    "We must prevent the individuals trying to line their own pockets at the expense of IFSB's important mission and rich history";

d.  "urge [the OTS] to exercise their oversight
    responsibilities and prevent individuals who have
    no regard for our community from dismantling
    IFSB";

e.  "Mr. Bender pursues a personal agenda when he
    realizes that his reformer allies ... will not
    allow him to dominate IFSB's affairs.  Mr. Bender
    starts making demands on Management as though he
    is in control of the bank.  Frustrated that he
    cannot dictate policy ... .  He forges ahead with
    this course in utter disregard for fellow
    shareholders. ... he will simply use bully tactics
    and lies ... .  These cronies will then do his
    bidding ... ." (Timeline page 1);

f.  "the OTS ... acquiesces in Mr. Bender's attempt to
    seize control of the bank without offering a fair
    price to shareholders or otherwise disclosing to
    customers that he's trying to control their bank.
    Thus while Bender's bank discriminated with regard
    to credit and lending ... ." (Timeline page 1-2);

g.  "Mr. Bender continues his baseless attacks on this
    new management and the Board" (Timeline page 2);

h.  "the OTS-in a move friendly to Mr. Bender and
    hostile to a minority institution designates IFSB

25

as a 'problem institution' in 'troubled condition'
..." (Timeline page 2);

i.    "Egging by the OTS actions, by December, 2003, Mr.
      Bender is ... engaging in ruinous insurgent
      tactics" (Timeline page 2);

j.    "a U.S. District Court finally rebukes him,
      dismissing his suit and stating that all along it
      was Mr. Bender's strategy to ... scare off other
      potential merger partners like Carver" (Timeline
      page 2);

k.    "Mr. Bender is allowed to continue his war on the
      bank and obtain more stock.  IFSB is even
      prevented from undertaking the most routine
      transactions, such as forming a bank holding
      company without the blessing of large rebel
      shareholders, namely Mr. Bender"  (Timeline page
      2);

l.    "Instead he continues buying shares to vote his
      cronies onto the Board.  IFSB decides to sue
      Bender for intentionally interfering with the
      merger deal, plus other violations of law.  Again,
      the OTS sits back and refuses to help IFSB or rein
      in Mr. Bender despite his own violations of law"
      (Timeline page 3);

m.    "The bank attempts to settle legal action with Mr. Bender ... government officials ... have allowed Mr. Bender and his allies to skirt policies and practices" (Timeline page 3);

n.    "If it were not for the excessive legal fees caused by Bender, IFSB would have shown a net profit for FY2004"  (Timeline page 3);

o.    "Although [Bender's nominees to the Board] are both African Americans, they are mere puppets of Bender's with no apparent ties to banking, required to do what he tells them" (Timeline page 4).

60.    Attached to the May 4th "Committee to Save" letter was a document entitled "Morton Bender's Background."  The entirety of this document is full of false and misleading statements, many repeating the same themes identified above.  Examples of some of the other statements include the following:  Bender "wished to either merge IFSB into his own 'shakily-run' bank, or worse, make it a fiefdom in his local empire, likely with minority faces as fronts, until he can otherwise dispose of it" (Background, third bullet point);  "He has succeeded in degrading IFSB, driving down the value of the bank's shares and attacked the mission of this bank began [sic] in 1968.  With the bank's stock degraded by his activities, he can buy it at a cheaper price" (Background, fourth bullet point);  "He has ... forced IFSB to sue him ... [h]e has

engaged in ruinous insurgent tactics, filed misleading securities
filings with the OTS ... and threatened more lawsuits if he
cannot view secret, private shareholder ballots so he may bully
small and minority shareholders who didn't vote in his favor"
(Background, fifth bullet point).

61.  Similar to the May 4th "Committee to Save" letter, the
October 21, 2005 letter makes false allegations of Bender's
"record history involving other banks including a black bank
pushed to failure," and "severe violations of banking law and
illegal practices by Bender and his Columbo Bank."  The letter
also provides "[T]he only time we are aware we got into U.S.
District Court with Bender – though expensive – Independence Won,
Bender Lost!"  This statement (among others in the letter) is
patently untrue.  Examples of other false and/or misleading
statements are the following: "we can only presume that [the
Bender Nominees'] basic qualification, based on past events, is
to serve Bender loyally to affect his admitted takeover scheme."
"We wonder aloud why OTS has behaved so contrary to banking laws,
security regulations and sound public policy to facilitate
handing **Our Bank** to this Bender character?"

62.  The October 21st letter's repeated references to the
May 9, 2005 letter from the OTS to Bender is misleading in its
blatant omission of (or any reference to) the September 14, 2005
letter from the OTS, attached as Appendix G to the Bank's Proxy

28

Statement.  The September 14th letter advised Bender that "after careful consideration of the relevant facts known to OTS" no enforcement action would be taken with regard to the allegations set forth in the OTS's May 9th letter.

63.  The misrepresentations and omissions made in the foregoing communications were made with knowledge of their falsity.  The Director Defendants and Defendant Batties have violated Section 14(a) of the Exchange Act by their knowing dissemination of materially misleading Proxy Materials, and upon information and belief, as to Defendant Batties, by his participation in the dissemination of the materially misleading May 4, 2005 and October 21, 2005 shareholder letters, as described above.

64.  The Director Defendants and Defendant Batties' violations of Section 14(a) deprived all IFSB shareholders from information necessary to ensure a fair vote at the Shareholders' Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly considered by all shareholders. Accordingly, the election of the Management Nominees is irreparably tainted, and the results of the meeting are therefore void.  Plaintiffs (and other shareholders and the investing public) have been, are being, and will continue to be irreparably harmed, in that they are left without material information, to which they are lawfully entitled, regarding the true interests and purposes of the Director Defendants and Defendant Batties'

efforts to control IFSB for their own interests, and to defeat the Bender Nominees.  The misstatements and omissions in the Proxy Materials and May 4th and October 21st letters were material and were essential to informed shareholder decisions with respect to voting at the Shareholder Meeting.

65.  As a result of the aforesaid violations of Section 14(a) and the regulations thereunder, and 12 C.F.R. § 569, Plaintiffs have suffered substantial monetary damages, including the value of the entirety of their investment in IFSB, and all expenses relating to that investment, including but not limited to funds expended in furtherance of Plaintiffs' efforts to elect the Bender Nominees.

## COUNT III

### (OTHER VIOLATIONS TAINTING ELECTION OF MANAGEMENT NOMINEES – DIRECTOR DEFENDANTS AND DEFENDANT BATTIES)

66.  Paragraphs 1 through 65 are incorporated herein by reference as if fully set forth herein.

67.  As set forth above, the election of the Management Nominees violated the pertinent IFSB By-laws, as well as Robert's Rules of Order, by which the Shareholders' Meeting was governed. As a result, shares in a number material to the outcome of the election were improperly counted in favor of the Management Nominees.

68.  As shareholders, Plaintiffs are entitled to have meetings conducted in accordance with the By-laws, 12 C.F.R. §552.6(a), and Robert's Rules of Order.  Plaintiffs were also entitled to have the Bender Nominees voted on in a fair and orderly manner.

69.  As a result of the Director Defendants' and Defendant Batties' actions in failing and refusing to conduct the election in a fair manner, the Defendants have deprived Plaintiffs and the other shareholders of a fair vote for the election of directors. Accordingly, the election of the Management Nominees is irreparably tainted, and the results of the meeting are therefore void.  Plaintiffs (and other shareholders) have been, are being, and will continue to be irreparably harmed, by the defeat of one of the Bender Nominees (George Osbourne) and the election of the Management Directors in a meeting which failed to be conducted in a proper manner.

## COUNT IV

### (BREACH OF FIDUCIARY DUTY BY DIRECTOR DEFENDANTS AND BATTIES and CONSPIRACY TO BREACH FIDUCIARY DUTY)

70.  Paragraphs 1 through 69 are incorporated herein by reference as if fully set forth herein.

71.  As directors and officers, the Director Defendants and Batties owe a fiduciary duty of care and loyalty to the Bank's shareholders, including the Plaintiffs.

72.  Through their actions set forth above, the Defendant Directors and Defendant Batties have breached their fiduciary duty owed to Plaintiffs, who are minority shareholders of the Bank.  As set forth above, the Defendant Directors and Defendant Batties have provided incomplete and misleading information to the shareholders to defeat the Bender Nominees, and have failed to properly conduct the Shareholders' Meeting and properly count the votes for the election of Directors.

73.  The conduct described in Counts I through III above was for the express purpose of causing the defeat of the two Bender Nominees, and the election of the Management Nominees.  Upon information and belief, and in furtherance of the plan to defeat the Bender Nominees, Defendants Jordan and Wilmot entered into the agreement to purchase the Doley Group Shares, which is in excess of 10% of the Bank's stock.  This purchase was in violation of the Change in Bank Control Act, 12 U.S.C. § 1817(j), and OTS regulations thereunder.

74.  The agreement to purchase the Doley Group Shares was an instrumental part of the agreement of the Director Defendants and Defendant Batties to defeat the Bender Nominees, and was either approved in advance by the other Defendant Directors and Batties, or was ratified by those Defendants at a later time.

75.  In furtherance of their efforts to convince Doley to sell the Doley Group Shares, Jordan and/or Wilmot improperly threatened Doley that if the Bender Nominees were elected, there would be a "run on the bank."

76. In violation of the fiduciary duty owed to the Plaintiffs, the Director Defendants and Batties' sole purpose in engaging in the above-described violations of the federal securities and banking laws, as well as IFSB By-laws and procedures, was to prevent any control of IFSB from passing to Plaintiffs.  As such, the injury suffered by Plaintiffs is an injury not suffered by the corporation or the other shareholders, and Plaintiffs' entire investment in IFSB has been put at risk.

77.  As a result of the aforesaid breaches of fiduciary duty, and conspiracy to breach fiduciary duty, Plaintiffs have suffered substantial monetary damages, including the value of the entirety of their investment in IFSB, and all expenses relating to that investment, including but not limited to funds expended in furtherance of Plaintiffs' efforts to elect the Bender Nominees.

**COUNT V**

**(DEFAMATION AND AIDING AND ABETTING DEFAMATION BY DEFENDANT BATTIES)**

78.  Plaintiffs incorporate herein by reference paragraphs 1-77 as if fully set forth herein.

79.  As set forth above, upon information and belief, Defendant Batties prepared, provided information to, or assisted with the distribution of, the communications set forth in the May 4, 2005 and October 21, 2005 shareholder letters.  Those communications, as described in detail above, were false and defamatory, and intended to injure Bender in his profession, and in the community.

80.  To the extent that Batties was not directly involved in the preparation of the May 4, 2005 and/or October 21, 2005 letters, upon information and belief, he had knowledge of their contents at such time that he, or someone at his direction, made the IFSB shareholder list available to the authors of those letters for distribution to the IFSB shareholder body.  Because Defendant Batties knew that the letters contained false and defamatory statements, yet assisted the authors of the letters in their distribution, Defendant Batties aided and abetted those who published those communications.

81.  Defendant Batties also made the following false and defamatory statements about Bender to the print media:

a.    "'He is attempting to gain control of the institution without paying anything,' Mr. Batties said ... ." (American Banker, November 15, 2005);

b.    "Thomas L. Batties, Independence' president and chief executive officer, blames investor Morton L. Bender for the $2.1 million loss the company posted in 2004.  It

34

would have turned a $900,000 profit if not for legal
fees it ran up in courtroom clashes with Mr. Bender,
the CEO said." (American Banker, May 13, 2005);

c.  "Mr. Batties said that so far this year it has racked
up $4 million of legal expenses, the majority of it
going to the suit against Mr. Bender." (American
Banker, October 22, 2004);

d.  "The $21 per share that Carver is offering is the best
deal for the shareholders, Mr. Batties said, and Mr.
Bender did not pay a 'full and fair price' for the
shares he recently accumulated." (American Banker, May
7, 2004);

e.  "'Mr. Bender is once again continuing his bullying
tactics of Independence Federal and the board,' said
Thomas L. Batties, acting chief executive of
Independence." (Washington Post, October 26, 2005);

f.  "'We have instituted and restructured the entire
institution from stem to stern since I've been here,'"
Batties said.  'The only problems the bank has right
now are the effects of Mr. Bender's actions to
disenfranchise the other shareholders.  It's an
absolute lie that the board and management are trying
to entrench themselves.'  Batties added: 'It's a green
issue.  Mr. Bender wants to take control of this
institution without paying any money for it.  It's a

black and white issue only with respect to the fact
that if Mr. Bender is successful, African Americans and
other minorities will not have a bank to go to that
will perceptive to their unique financial needs.'"
(Washington Post, October 26, 2005);

g.   "Batties continued his criticism of Bender, however,
saying 'he continues to provide false information to
our shareholders.'" (Washington Post, May 12, 2005);

h.   "Batties, however, said that Bender's statements to
shareholders have been false and that he worries Bender
has 'poisoned' the vote." (Washington Post, May 11,
2005).

82.   The communications described above injured Plaintiff
Bender in his profession, and in the community.

83.   Defendant Batties published, and/or assisted in the
publication of, the above-referenced false and defamatory
statements for the express purpose of injuring Bender, and with
actual knowledge, or reckless disregard, of their falsity.

**COUNT VI**

**(DECLARATORY JUDGMENT THAT IFSB BE RESTRAINED FROM INDEMNIFYING
THE OTHER DEFENDANTS FOR COSTS AND ATTORNEYS FEES FOR THIS
ACTION)**

84.   Plaintiffs incorporate herein by reference paragraphs
1-83 as if fully set forth herein.

85.   Indemnification of officers and directors for Federal Savings Associations is governed by 12 C.F.R. §545.121.  Pursuant to that regulation, IFSB may not indemnify its officers and directors "unless the association gives [the OTS] at least 60 days' notice of its intention to make such indemnification."

86.   In Counts I through V above, Plaintiffs bring claims against the Director Defendants and Defendant Batties for causes of action arising out of the wrongful and intentional acts of those Defendants.  Under 12 C.F.R. §545.121, an association may authorize an advance payment of expenses only if "a majority of the directors of a savings association concludes that, in connection with the action, any person ultimately may become entitled to indemnification."  Under the regulation, before making advance payment of expenses, "a majority of the directors" must conclude that the person would ultimately be entitled to indemnification" which involves final judgment on the merits in the person's favor, or if "a majority of the disinterested directors of the savings association determine that he or she was acting in good faith within the scope of his or her employment or authority... ."

87.   The allegations set forth above involve conduct that was wilful and intentional, and not performed in good faith, but rather, for the express purpose of injuring Plaintiffs and defeating the Bender Nominees.  Accordingly, Plaintiffs seek a declaration from this Court that Defendant IFSB be restrained

from indemnifying or otherwise advancing the expenses of the defense of this action to the Director Defendants or Defendant Batties.

### REQUEST FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter an appropriate order granting equitable and monetary relief, and specifically, that the Court:

(A)  grant preliminary and permanent injunctive relief requiring the Director Defendants and Defendant Batties to comply with Section 13(d) of the Exchange Act, and the regulations thereunder, fully disclosing their plans and purposes concerning IFSB;

(B)  grant preliminary and permanent injunctive relief voiding the election results of the October 26, 2005 Shareholders' Meeting;

(C)  grant preliminary injunctive relief preventing the Director Defendants from causing the Bank to hold an Annual or Special Meeting of the Shareholders until further Order of this Court;

(E)  grant preliminary and permanent injunctive relief neutralizing all IFSB shares and/or proxies acquired by any Defendants from the Doley Group, or from Thompson, in any future election of Directors;

(F)  grant preliminary and permanent injunctive relief preventing Defendant IFSB from indemnifying (or making advance payments to) the Director Defendants and Defendant Batties for the expenses of this action;

(G)  enter judgment in favor of Plaintiffs and against the Director Defendants and Defendant Batties, jointly and severally, for compensatory damages in an amount in excess of Ten Million Dollars ($10,000,000), plus pre-judgment interest;

(H)  enter judgment in favor of Plaintiffs and against Defendant Batties for punitive damages in the amount of Ten Million Dollars ($10,000,000);

(I)  award Plaintiffs their attorneys' fees and costs of this action;

(J)  grant such other and further relief as may be appropriate.

**VERIFICATION**

I HEREBY VERIFY, under the penalties of perjury, that, upon personal knowledge or information and belief, the facts set forth in the foregoing Complaint are true and accurate.


_____/s/_____
Morton A. Bender

Respectfully submitted,


COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


                 /s/
_____
Dale A. Cooter, Bar No.227454
Donna S. Mangold, Bar No. 358851
5301 Wisconsin Ave., N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
*Morton A. Bender and Grace M.*
*Bender*

2