# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MORTON A. BENDER, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **C.A. No. 1:06cv00092** |
| **CAROLYN D. JORDAN, et al.,** | ) | **(RMC)** |
| | ) | |
| **Defendants.** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## THE BENDERS' APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiffs Morton A. Bender and Grace M. Bender (the "Benders"), by and through their undersigned counsel, pursuant to Local Rules 65.1(c) of the Rules of Civil Procedure for the United States District Court for the District of Columbia, hereby apply to this Court for Preliminary Injunctive Relief, pursuant to the terms of the proposed Order submitted herewith, and for such other and further relief as may be appropriate. In support hereof, the Benders respectfully refer to and incorporate herein their Verified Complaint and their Memorandum (and Exhibits thereto) supporting in support of their Application for Preliminary Injunctive Relief.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.

_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202) 537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
 *Morton A. Bender and Grace M. Bender*

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MORTON A. BENDER, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **C.A. No. 1:06cv00092** |
| **CAROLYN D. JORDAN, et al.,** | ) | **(RMC)** |
| | ) | |
| **Defendants.** | ) | |
| —————————————————— | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## THE BENDERS' APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202) 537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
 *Morton A. Bender and Grace M. Bender*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.      SUBSTANTIVE REQUIREMENTS FOR PRELIMINARY INJUNCTIVE
           RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.     THERE IS SUBSTANTIAL LIKELIHOOD THAT THE
           BENDERS WILL SUCCEED ON THE MERITS OF THEIR
           CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

           A.     The Defendant Directors and Batties Violated
                   Section 13(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

           B.     The Benders are Likely to Succeed on the Merits of
                   their Claims that the October 26, 2005
                   Shareholders' Meeting was Conducted in a Manner
                   that Violates Rule 14(a) Disclosure Requirements,
                   the Bylaws and Roberts' Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                 1.     The Defendant Directors and Defendant Batties violated
                        the proxy disclosure mandates of Rule 14(a) and its
                        regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                 2.     The way in which the October 26, 2005 Shareholders'
                        Meeting was conducted did not comport with pertinent IFSB
                        Bylaws. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

           C.     The Benders are Likely To Succeed on the Merits of
                     their Claim that the Bank should not Indemnify the
                     Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    III.    BECAUSE OF THE BANK'S ACTIONS, THE BENDERS ARE
           SUFFERING, AND WILL CONTINUE TO SUFFER,
           IRREPARABLE HARM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV.    BALANCING THE HARMS WEIGHS IN FAVOR OF
       GRANTING A PRELIMINARY INJUNCTION ........................ 32

V.     THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING
       THE RELIEF REQUESTED ...................................... 33

CONCLUSION ......................................................... 34

# TABLE OF AUTHORITIES

### FEDERAL CASES

PAGE

*AHI Metnall v. J.C. Nichols Co.,*  891 F. Supp. 1352 (W.D. Mo. 1995) . . . . . . . . . . . . . . . . . . 34

*American General Corp. v. Torchmark Corp.,*  1990 WL 595282  (S.D. Tex. 1990) . . . . . . 32,33

*Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.,*
295 F. Supp. 2d 75 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*C.A. Cavendes, Sociedad Financiera v. National Banks of Florida, Inc.,*
556 F. Supp. 254 (M.D. Fla. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 31, 33

*ER Holdings, Inc. v. Norton Co.,* 735 F. Supp. 1094 (D. Mass. 1990) . . . . . . . . . . . . . . . 32, 34

*General Aircraft Corp. v. Lampert,* 556 F.2d 90 (1st Cir. 1977) . . . . . . . . . . . . . . . . . . . 13,14, 29

*International Banknote Co., Inc. v. Muller,* 713 F. Supp. 612 (S.D.N.Y. 1989) . . . . . . . . . . . . 32

*Lichtenberg v. Besicorp Group Inc.,* 43 F. Supp. 2d 376 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . 29

*Mony Group, Inc. v. Highfileds Capital Management, L.P.,*
368 F.3d 138 (2nd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 30

*Morales  v. Quintel Entertainment, Inc.,* 249 F.3d 115 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . 14

*Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060 (D.C. Cir. 1998) . . . . . . . . . . . . . . . 12

*Standard Financial, Inc. v. LaSalle/Kross Partners, L.P.,*
1997 WL 80946 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,32, 33

*Treco, Inc. v. Land of Lincoln Sav. and Loan,* 572 F. Supp. 1447 (N.D. Ill. 1983) . . . . . . . . . . 34

*Wininger v. SI Management, L.P.,* 33 F.Supp.2d 838 (N.D. Cal. 1998) . . . . . . . . . . . . . . . . . . 29

*Woodward & Lothrop, Inc. v. Schnabel,* 593 F. Supp. 1385 (D.D.C. 1984) . . . . . . . . . . . . 12, 31

## STATE CASES                                                                 PAGE

*Aprahamian v. HBO & Co.*, 531 A.2d 1204 (Del. Ch. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Blasius Industries, Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988) . . . . . . . . . . . . . . . . . . 26

*Carmody v. Toll Bros.*, 723 A.2d 1180 (Del. Ch. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 26,27

*In re Staples, Inc. Shareholders Lit.*, 792 A.2d 934 (Del. Ch. 2001) . . . . . . . . . . . . . . . . . 30, 31

*ODS Technologies, L.P. v. Marshall*, 832 A.2d 1254 (Del. Ch. 2003) . . . . . . . . . . . . . 17, 30, 31

*Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. Supr. 1985) . . . . . . . . . . . . . . . 26, 27


## FEDERAL STATUTES

12 U.S.C. § 1817(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12 U.S.C. §1828(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

15 U.S.C. §§ 78(m),(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

15 U.S.C. §78n(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, *passim*


## FEDERAL REGULATIONS

12 C.F.R. §545.121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

12 C.F.R. §552.6(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24

12 C.F.R. §569 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16

17 C.F.R. §240.14a-9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16, 21

iv

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MORTON A. BENDER, et al.,     )
                                   )
         Plaintiffs,       )
                                   )
     v.                   )
                                   )   **C.A. No. 1:06cv00092**
CAROLYN D. JORDAN, et al.,    )   **(RMC)**
                                   )
        Defendants.     )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE BENDERS' APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

Plaintiffs Morton A. Bender and Grace M. Bender, by and through their undersigned

counsel, submit this Memorandum of Points and Authorities in support of their Application for

Preliminary Injunctive Relief and state as follows:

**INTRODUCTION**

Plaintiffs, Morton Bender ("Bender") and Grace Bender, as joint tenants, are the

beneficial owners of 326,000 shares of common stock of Defendant Independence Federal

Savings Bank ("Independence" or "Bank"), and thereby jointly own approximately 21% of the

outstanding stock of the Bank.[1]  Verified Compl. at ¶3.  Independence is a federally-chartered

savings bank, with its principal place of business in the District of Columbia.  Verified Compl. at

¶4.  Its stock is publicly traded on the NASDAQ Stock Exchange.  Verified Compl. at ¶4.  This

litigation is not the first between these parties.  As the Plaintiffs' share ownership in the Bank has

---

[1]  Grace Bender is not an active participant in the matters relevant to this litigation and
she is a party solely in her capacity as a joint tenant shareholder with Bender.

increased over time, the efforts of the Bank's Board of Directors to thwart Bender have grown correspondingly.

In 2004, the Bank sued the Benders alleging violations of Section 13(d) of the Securities Exchange Act and seeking to sterilize the shares owned by the Benders (*Independence Federal Savings Bank v. Morton Bender, et al.*, C.A. No. 04CV00736, U.S. District Court for the District of Columbia (Collyer, J.) (the "May 2004 Litigation")). In response, the Benders filed a counterclaim seeking injunctive relief to prevent the Bank from enforcing a "poison pill" shareholder rights plan and seeking to compel the Bank to hold an annual shareholders meeting. The Bank's refusal to timely hold its annual meeting of shareholders for the election of directors has been an ongoing tactic since Bender first began to make known his dissatisfaction with the management and direction of the bank.

The most recent case in the dispute between Bender and the Bank was filed by the Benders against the Bank (*Morton Bender et al. v. Independence Federal Savings Bank*, 1:05CV01787, U.S. District Court for the District of Columbia (Collyer, J.) ("September 2005 Litigation)). In response to the Bank's last minute decision to once again postpone the 2005 shareholders' meeting, Bender brought the September 2005 Litigation to force the Bank to hold its much delayed annual shareholders' meeting and Bender sought a preliminary injunction compelling the Bank: to convene on September 14, 2005 the annual meeting of its shareholders which was scheduled for September 14, 2005; to rescind any notices or communications the Bank may have already disseminated advising shareholders that the Directors voted to postpone the September 14, 2005 date for the meeting; and to affirmatively notify the shareholders that the meeting will take place on September 14, 2005. At the hearing on the Bender's related Application for Temporary

2

Restraining Order, the Court ruled that it would take the matter under advisement to give the Office of Thrift Supervision ("OTS") an opportunity to weigh in on the Bank's plan to further postpone the meeting. When the OTS responded that it would permit the Bank to postpone, Bender voluntarily dismissed the September 2005 Litigation. This current litigation arises from the Defendants' conduct in connection with the shareholders' meeting that was finally held October 26, 2005. The events leading up to that meeting, the meeting itself, and the manner in which the votes were counted after the meeting, were fraught with procedural irregularities. Once again, the Bank and its pro- management directors[2] engaged in conduct purposely aimed at shutting Bender out of the democratic process to which all shareholders are entitled and skewing that democratic process in their favor.

**FACTS**

As noted above, Plaintiffs, as joint tenants, are the beneficial owners of 326,000 shares of common stock of Independence, and thereby jointly own approximately 21% of the outstanding stock of the Bank. Verified Compl. at ¶3. The Bank's fiscal year ends on December 31 each year. Verified Compl. at ¶12. On April 6, 2004, the Board of Directors of Independence voted to amend Article II, Section 2 of the Bank's bylaws to set the date of the Bank's annual meeting "within 150 days after the end of the savings bank's fiscal year on the third Wednesday of April . . . or at such other date and time within such 150-day period as the board of directors may determine." A copy of the April 6, 2004 amendment is attached hereto as Exhibit A. The Bank's amended bylaws conform to OTS  regulations which require that a savings association's annual

_____

[2] This litigation is filed against all of the Bank's directors except Nelson Deckelbaum, Elliott Hall, Robert Isard and John Silvaneous Wilson, Jr.

3

meeting be held within 150 days of the end of its fiscal year.  12 C.F.R. §552.6(a). Thus, the

annual meeting of Independence's shareholders should have been held April 20, 2005 (the third

Wednesday in April, 2005),  but in no event later than May 31, 2005 (one day after Memorial Day

which was the 150th day after the close of the Bank's fiscal year on December 31, 2004).   The

2005 annual meeting was not scheduled to take place before April 20, 2005, but a Special Meeting

in lieu of the Annual Meeting of Shareholders was  scheduled for May 11, 2005, prior to the May

31, 2005 corporate and regulatory annual shareholder meeting deadline.   In anticipation of the

scheduled May 11, 2005 meeting, at which three directors would be elected to the Bank's Board,

Bender sent a letter, dated April 26, 2005, to the Bank's corporate secretary giving notice that

Bender was  nominating two persons for election to the Board.  A copy of Bender's April 26,

2005 letter is attached hereto as Exhibit B.    A few days thereafter, a letter dated May 4, 2005

was sent to shareholders allegedly on behalf of "the Committee to Save Independence Federal

Savings Bank."  Verified Compl. at ¶14 (a copy of this letter is attached hereto as Exhibit C). The

letter is filled with faulty and misleading statements, coupled with undisguised character

assassination ("Morton Bender's Background").   Verified Compl. at ¶14.

By letter dated May 10, 2005, the OTS suggested that the Bank adjourn the meeting for a

*brief* period due to information disseminated to the shareholders by Bender and by the May 4,

2005 correspondence from the "Committee to Save."   A copy of the May 10, 2005 OTS letter is

attached hereto as Exhibit D.  The 2005 annual meeting was convened on May 11, 2005;

however, pursuant to the OTS suggestion, no business was conducted at the meeting and the

meeting was adjourned.  Verified Compl. at ¶15.  The Bank then rescheduled the meeting to June

8, 2005.  Verified Compl. at ¶16.  However, on May 31, 2005, just a week prior to the date of the

4

reconvened shareholders' meeting, the Bank issued a press release stating that the meeting would not, in fact, be reconvened on June 8, 2005 and that the Bank's Board of Directors would meet to determine a new date for the shareholders' meeting.  A copy of the May 31, 2005 press release is attached hereto  as Exhibit E.  The new date was eventually set for September 14, 2005.  *See* Page 1 of August 25, 2005 Notice to Shareholders, attached hereto as Exhibit F. The September 14, 2005 meeting was noticed as a Special Meeting in Lieu of Annual Meeting of shareholders.

With the September 14, 2005 annual meeting of shareholders fast approaching, Defendant Carolyn D. Jordan, the chairperson of the Bank's Board of Directors, notified the Board members on September 7, 2005, that a Special Meeting of the Board of Directors would be held on September 9, 2005 "[t]o consider matters related to disclosures contained in two recent 13D filing made last week on behalf of Morton Bender and how such disclosed information may impact the Bank." A copy of Ms. Jordan's September 7, 2005 Notice is attached hereto as Exhibit G.  At that September 9, 2005 special meeting of the Board, the Directors voted to postpone yet again the Shareholders' Meeting.  Verified Compl. at ¶17.  As discussed above, Bender filed the September 2005 Litigation in response to this further postponement of the shareholder's meeting.  Once the OTS advised the Bank that it would allow it to postpone the shareholders' meeting, however, Bender voluntarily dismissed the September 2005 Litigation.

The Special Shareholders meeting was then rescheduled to take place October 26, 2005 at 11 a.m. at the Mayflower Hotel in Washington, D.C.  Verified Compl. at ¶17.  Bender nominated Osborne George and John Silvaneous Wilson, Jr. to be elected directors at the Shareholders Meeting ("Bender Nominees").  Verified Compl. at ¶18.  On or about October 3, 2005, Bender sent a letter to the IFSB Shareholders, which *inter alia* identified the Bender Nominees, and

explained that the only way to vote for the Bender Nominees was to attend the meeting in person, or to send someone with a legal proxy. Verified Compl. at ¶19 (a copy of Bender's October 3, 2005 letter is attached hereto as Exhibit H) . The letter also specifically instructed that Bender was not soliciting proxies, and was not able to vote any shares other than his own. On October 4, 2005, the Defendants submitted the Bank's proxy materials to the Shareholders ("Proxy Materials"). Verified Compl. at ¶20. These Proxy Materials included the Bank's Proxy Statement ("Proxy Statement") and ten appendices, a "Notice of Postponement and Rescheduling of Special Meeting of Shareholders," as well as a letter signed by Defendants Jordan and Batties entitled "Update to Our Shareholders" ("Update"). Verified Compl. at ¶20 (pertinent portions of the Proxy Materials are attached hereto as Exhibit I). Both the Update and the Proxy Statement contained inaccurate and misleading information about the Bender Nominees, Bender's regulatory filings, and his intentions to obtain majority ownership and control of the Bank, as set forth in detail below. Verified Compl. at ¶20. As such, they violate Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and 12 C.F.R. § 569, and 17 C.F.R. § 240.14a-9.

As identified in the Proxy Statement at page 28, the Bank's nominees for directors were: Defendant Fitzgerald, Defendant Wilmot, and Marion O. Greene, Jr. ("Management Nominees"). The Update warned the Shareholders that "if Bender is successful in electing his two nominees to the Board, the Majority Directors believe that Bender will gain control of Independence Federal without having to purchase any additional shares of Independence Federal Stock." Verified Compl. at ¶22; Update at 3. On October 21, 2005, a letter was sent to all IFSB shareholders, purportedly drafted by Catherine McPhail and A. Gilbert Douglas, two shareholders who supported the Management Nominees. Verified Compl. at ¶23 (a copy of this October 21, 2005

6

letter is attached hereto as Exhibit J). This letter contained inaccurate and defamatory statements about Bender and his intentions and, upon information and belief, was based on information provided by the Director Defendants and/or Batties for the express purpose of defaming Bender and misinforming the other shareholders. Verified Compl. at ¶23. The letter makes false allegations of Bender's "record history involving other banks including a black bank pushed to failure," and "severe violations of banking law and illegal practices by Bender and his Columbo Bank." Verified Compl. at ¶23;10/21/05 letter at 2, ¶4. The letter also provides "[T]he only time we are aware we got into U.S. District Court with Bender – though expensive – Independence Won, Bender Lost!" Verified Compl. at ¶23; 10/21/05 letter at 1. This statement (among others in the letter) is patently untrue. Verified Compl. at ¶23.

Upon Bender's information and belief, in an effort to ensure the election of the Management Nominees to the Board, the Defendants also used the various delays in the Shareholders' Meeting to arrange for the sale of IFSB stock to Jeffrey Thompson ("Thompson"), who is the Chairman and Chief Executive of an accounting firm in which Defendant Cobb is also a shareholder. Verified Compl. at ¶24. Beginning in early August 2005, and during the 45 day period immediately prior to the September 26, 2005 Record Date for the Shareholders' Meeting, Thompson purchased 98,600 shares of IFSB stock; the 13D filed by Thompson at that time indicated that after the acquisition he owned 111,600 shares, which is 7.2% of IFSB stock. Verified Compl. at ¶25; 9/28/05 Schedule 13D of Jeffery E. Thompson at 2, ¶11 (a copy of Thompson's September 28, 2005 13D is attached hereto as Exhibit K). Upon information and belief, approximately 80,000 of the shares purchased by Thompson had been held by Millenium Management (or an affiliate). Verified Compl. at ¶25. Upon information and belief, Thompson,

at all times relevant herein, was acting in concert with Cobb and the other Defendants to further

their agenda for IFSB, including, but not limited to, electing the Management Nominees, and

defeating the Bender Nominees.[3]  Verified Compl. at ¶26.  It appears that the 13D filed with the

OTS on behalf of Thompson in September 2005 was faxed to the OTS by the law firm of

Muldoon Murphy Aguggia ("Muldoon Murphy"), the same law firm that is counsel to IFSB.

Verified Compl. at ¶26; 9/28/05 Thompson 13D.   The 13D filed by Thompson states that the

purpose of his stock purchases was "for investment purposes."  13D, Item 4.  Upon information

and belief, however, the real reason for the purchases was to consolidate votes for the

Management Nominees, and to thwart Bender's efforts to get the Bender Nominees elected.

Verified Compl. at ¶26.  Upon information and belief, at some time either prior to, or during the

vote at the Shareholders' Meeting, Thompson's attorney, Daniel Weitzel, delivered Thompson's

proxy to John Hall, an attorney with Muldoon Murphy, counsel for IFSB.  Verified Compl. at ¶26.

The delivery of the proxy resulted in all 111,600 of Thompson's shares being voted for the

Management Nominees. Verified Compl. at ¶27.  The delivery of the proxy to Hall was not in

compliance with the Bank's own instructions for delivery of proxies, violated IFSB by-laws, and

was done for the express purpose of avoiding a fair vote on Bender's candidates.  Verified Compl.

at ¶27. As of October 25, 2005, the day prior to the Shareholders' Meeting, Harold Doley

("Doley"), along with a group of affiliated persons or entities, owned in excess of 12% of IFSB

stock (hereinafter referred to as the "Doley Group Shares").  Verified Compl. at ¶28. Upon

information and belief, the Doley Group acquired their IFSB shareholdings from Carver Bancorp,

Inc. ("Carver").  Verified Compl. at ¶28. Despite their combined ownership percentage in excess

---

[3]  One of the Bender Nominees, Mr. Wilson, was elected.

of 5%, neither Doley nor Delaney has ever filed a Form 13D regarding their IFSB stock

ownership with the OTS. Verified Compl. at ¶28. On October 25, 2005, Doley told Bender that

he was willing to allow Bender to vote the Doley Group Shares in favor of the Bender Nominees,

or would give Bender his proxy. Verified Compl. at ¶29. Bender told Doley he was not allowed

to accept proxies, and told Doley he would have to give his proxy to someone else. Verified

Compl. at ¶29. Upon information and belief, on October 25, 2005, Doley was contacted by one or

more of the Director Defendants or Defendant Batties for the purpose of purchasing the Doley

Group Shares. Verified Compl. at ¶30. Upon information and belief, Doley reached an agreement

with one or more of these Defendants to sell all of the Doley Group Shares for $17.00 per share.

Verified Compl. at ¶30. On that same day, IFSB shares were trading on the open market, and

closed at approximately $11.50 per share. Verified Compl. at ¶30.

On the morning of October 26, 2005, Bender spoke with Logan Delaney, an associate of

Mr. Doley, who told Bender about the agreement for the purchase of the Doley Group Shares.

Verified Compl. at ¶31. Later that morning, Bender again spoke to Doley, who assured Bender

that he would vote the Doley Group Shares for the Bender Nominees. Verified Compl. at ¶31.

Upon information and belief, the deal for the purchase of the Doley Group Shares was not

complete at this time. Verified Compl. at ¶31. The Shareholders' Meeting was scheduled to start

at 11 a.m. on October 26, 2005. Verified Compl. at ¶32. Defendant Wilmot postponed the start of

the meeting, without any Board resolution or other authority for a postponement. Verified Compl.

at ¶32. Defendants Jordan and Wilmot used this delay to continue to gather votes for the

Management Nominees, and to take Doley to lunch at the Prime Rib Restaurant. Verified Compl.

at ¶32. The purpose of the lunch was to persuade Doley to assign the proxies related to the Doley

9

Group Shares to the Director Defendants, or to complete the deal for the sale of the shares.
Verified Compl. at ¶32. Upon information and belief, during the course of their discussions,
Jordan and/or Wilmot told Doley that if he voted for Bender's nominees, there would be a "run on
the bank." Verified Compl. at ¶32. Upon information and belief, at some point before the
Shareholders Meeting resumed at 3 p.m., Doley finalized his deal with one or more of the Director
Defendants to sell the Doley Group Shares at $18.00 per share. Verified Compl. at ¶32. Because
the Doley Group Shares represent in excess of 10% of the shares of IFSB, the acquisition of
control of IFSB in this matter was in violation of the Change in Bank Control Act, 12 U.S.C. §
1817(j), and OTS regulations thereunder. Verified Compl. at ¶32. Upon information and belief,
because Dooley, Delaney and their affiliated investors were the record owners of the stock as of
the Record Date (September 26, 2005), the Director Defendants did not complete the purchase of
the shares on October 26, 2005, but rather promised Doley a $175,000 down payment. Verified
Compl. at ¶33. In exchange for the promise of the down payment, Doley gave the Director
Defendants control over the Doley Group Shares, and those shares were subsequently voted for
the Management Nominees. Verified Compl. at ¶33. No 13D was filed by any of the Director
Defendants indicating their intention to purchase shares or gain control of the Doley Group Shares
to vote in favor of the Management Nominees. Verified Compl. at ¶33. Moreover, the above-
described acquisition of the Doley Group Shares, or proxies for those shares, was without prior
OTS approval required for increasing the Director Defendants' ownership/control of the company
over 10%. Verified Compl. at ¶33.

The Shareholders' Meeting eventually reconvened at 3 p.m., and lasted a half an hour.
Verified Compl. at ¶34. During the course of the meeting, Bender made formal proxy challenges

to the Independent Inspector of Election (hereinafter referred to as the "IIOE") based on the

counting of uncast votes in favor of the Management Nominees, and the fact that the master ballot

(which represented proxies received by Management) was to be voted after the closing of the

polls, in violation of Section 45 of Robert's Rules of Order ("Robert's Rules"). Verified Compl.

at ¶34. Pursuant to the IFSB Amended By-laws ("By-laws"), shareholders' meetings are

conducted pursuant to Robert's Rules. Verified Compl. at ¶34; 4/21/99 Bylaws at §4 (a copy of

the Amended and Restated Bylaws of IFSB is attached hereto as Exhibit L). Pursuant to the By-

laws, the IFSB Board is required to hold a meeting and vote on how unvoted shares should be

voted. Verified Compl. at ¶35; 4/21/99 Bylaws at §9. No such meeting, or vote of the directors,

took place. Verified Compl. at ¶35. When Bender's attorney, Robert Freedman, objected that

the unvoted shares could not be voted for the Management Nominees without a prior Board vote,

Defendant Jordan ruled Freedman "out of order." Verified Compl. at ¶35. In addition, pursuant

to the voting procedures outlined in the Proxy Statement, as to those Shareholders who chose not

to vote to elect directors, neither their brokers nor any other person could vote in their place.

Verified Compl. at ¶35; 10/4/05 Update to Shareholders at 2. Nevertheless, in violation of the

By-laws requiring a Board vote on the unvoted shares, and the representation in the Proxy

Statement as to how proxies were to be voted, approximately 200,000 unvoted shares were voted

for the Management Nominees. Verified Compl. at ¶36. In addition, the IIEO told counsel for

Bender that the shares/proxies held by IFSB Management were voted before the close of the

Shareholders' Meeting. Verified Compl. at ¶37. Contrary to the IIEO's assurances, and Robert's

Rules, those shares/proxies were voted at a meeting which took place two days after the

Shareholders' Meeting. Verified Compl. at ¶37. The failure to comply with the By-laws, the

representations set forth in the Proxy Statement, and Robert's Rules was done for the express

purpose of denying Bender's rights to have a fair and informed vote on the Bender Nominees.

Verified Compl. at ¶38.  After the meeting, Bender spoke with Doley, who indicated that his share

purchase agreement was still being negotiated, but consistent with that agreement, the Doley

Group Shares were voted for the Management Nominees.  Verified Compl. at ¶39.


## ARGUMENT

**I.    SUBSTANTIVE REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF**

"In considering a request for preliminary injunctive relief, a district court must examine

whether '(1) there is a substantial likelihood [movant] will succeed on the merits; (2) [movant]

will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure

the [non-movant]; and (4) the public interest will be furthered by an injunction.'" Atlantic Coast

Airlines Holdings, Inc. v. Mesa Air Group, Inc., 295 F. Supp. 2d 75, 81 (D.D.C. 2003)(Collyer, J.)

(quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360 (D.C. Cir. 1999)).  See Mova

Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  As this Court explained

in its decision in Atlantic Coast, the four factors "'interrelate on a sliding scale' and a particularly

strong showing on one may compensate for a weak showing on another." Atlantic Coast, 295 F.

Supp.2d at 81 (citations omitted).  Injunctive relief is appropriate in matters of corporate

governance.  See Woodward & Lothrop, Inc. v. Schnabel, 593 F. Supp. 1385 (D.D.C. 1984)

(shareholders entitled to temporary restraining order directing that a scheduled shareholder vote

on a proposed merger be enjoined until such time as amended and accurate information regarding

the proposed merger could be disseminated).

## II.     THERE IS SUBSTANTIAL LIKELIHOOD THAT THE BENDERS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS

### A.     The Defendant Directors and Batties Violated Section 13(d)

The Benders seek preliminary injunctive relief requiring the Defendant Directors and Defendant Batties to comply with Section 13(d) of the Exchange Act (15 U.S.C. Section 78(m)(d)), and the regulations thereunder, fully disclosing their plans and purposes concerning IFSB. The Benders also seek an order neutralizing the shares that the Defendant Directors and Batties acquired in violation of their 13(d) obligations. "[I]t may be appropriate for the courts to enjoin the voting of shares rapidly acquired just before a contest for control following a Section 13(d) violation . . . ." General Aircraft Corp. v. Lampert, 556 F.2d 90, 97 (1st Cir. 1977). There is a substantial likelihood that the Plaintiffs will succeed on the merits of this claim. The Director Defendants and Defendant Batties had an obligation to file a Schedule 13D but failed to do so. That failure is a clear violation of Section 13(d).

Section 13D of the Exchange Act (the "Williams Act") provides that "when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of Section 13(d) and (g) of the Exchange Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons." §13(d)(1). Within 10 days of acquiring more than 5% of the issuer's securities, the group is obligated to file a statement on Schedule 13D with the company's primary regulator and with any exchange where the security is traded.[4] A primary purpose of Section 13(d) is to alert and inform

---

[4]     A Schedule 13D must set forth the purpose of acquiring the issuer's stock, and the acquiring person's plans, intentions and agreements with respect to the issuer. Rule 13d-101

companies, their shareholders and the investing public generally regarding accumulations in stock

which might represent a potential shift in corporate control or a potential change in the company's

direction, and to compel full disclosure of information critical to shareholders in making informed

investment decisions. General Aircraft, 556 F.2d at 94-95. Here, there is no question that the

Defendant Directors and Batties did not file a Schedule 13D. Because there was no 13D filing at

all, the issue is not the accuracy of a Schedule 13D but, rather, whether the Defendants were

obligated to file a Schedule 13D. The Benders submit that a Schedule 13D filing was required

because the Defendant Directors and Defendant Batties constituted a "group" that had agreed,

together with Thompson and Doley, to act together to acquire, hold, vote or dispose of stock.

Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 124 (2nd Cir. 2001).

    As explained by the Morales Court, "[t]he agreement may be formal or informal and may

be proved by direct or circumstantial evidence. [citations omitted]. Moreover, the alleged group

members need not be committed to 'acquiring, holding, voting, or disposing of equity securities'

on certain specified terms, but rather they need only have combined to further a common objective

regarding one of the just-recited activities."[5] Morales, 249 F.3d at 124; see also General Aircraft,

556 F.2d at 95 (evidence that three shareholders acquired stock simultaneously in identical

transactions; that one shareholder's stock was held in the name of one of the other two; that a

———————————

requires "reporting persons" to describe any contacts, arrangements, understandings, or
relationships between themselves and any other person with respect to the issuer, "naming the
persons with whom such contracts, arrangements, understandings, or relationships have been
entered into."

    [5] Although the agreement does not have to be an agreement to "gain corporate control or
to influence corporate affair," Morales, 249 F.3d at 124, it appears that the Defendant Directors,
Defendant Batties, Thompson and Doley did agree to influence corporate affairs - they intended
to influence the outcome of the election in the hope that the Bender Nominees would be defeated.

single Schedule 13D was filed on behalf of all three and that correspondence from any one shareholder was sent to the others was sufficient basis on which court could conclude, in action seeking preliminary injunctive relief, that shareholders constituted a "group" for Section 13(d) purposes).   It is likely that the Benders will succeed in demonstrating that the Defendant Directors and Defendant Batties acted as a group and had an agreement amongst them.

By October 26, 2005 the latest,  Defendant Jordan and the other Defendants had agreed to act together with non-parties Thompson and Doley, for the undisclosed purposes of (i)opposing the election of the Bender Nominees, voting the Defendants' IFSB shares, together with the Thompson and Doley shares, against the Bender Nominees, and persuading other shareholders to vote against the Bender Nominees; (ii) depriving those IFSB shareholders who voted in favor of the Bender Nominees the opportunity of a fair election of the Bender Nominees; and (iii) supporting the efforts of Jordan to continue controlling the IFSB Board despite a dismal record of mismanagement and negligence.  The Director Defendants and Defendant Batties have violated section 13(d) of the Exchange Act because they have failed to file a Schedule 13D, or any amendments to an existing 13D, setting forth their specific plans and intentions with respect to IFSB, including but not limited to the details of the undisclosed agreement among the Director Defendants and Defendant Batties to seek to acquire the Doley/Delaney Shares by purchase or otherwise; the undisclosed agreement to purchase the Doley/Delaney Shares; the undisclosed agreement with Thompson regarding his votes (or the delivery of his proxies) for the Management Nominees; and the undisclosed agreement with Doley regarding the delivery of his votes (or the delivery of his proxies) for the Management Nominees.  The information which was not provided

15

in any Schedule 13D was essential to informed shareholder decisions with respect to voting IFSB

shares at the Shareholder Meeting.

> **B.**    **The Benders are Likely to Succeed on the Merits of their**
> **Claims that the October 26, 2005 Shareholders' Meeting was**
> **Conducted in a Manner that Violates Rule 14(a) Disclosure**
> **Requirements, the Bylaws and Roberts' Rules**

There is a substantial likelihood that the Plaintiffs will succeed on the merits of their

claims that the October 26, 2005 shareholders' meeting was mired in procedural irregularity as

well as proxy disclosure violations.   These irregularities and violations tainted the meeting and

the election of directors.  Because the Plaintiffs are likely to prevail, they request that they be

granted the injunctive relief they seek voiding the election results, compelling accurate proxy

disclosures, forbidding any further meetings until the procedural irregularities are resolved, and

compelling adherence to the bylaw procedures and Roberts Rules in any future meetings.

> **1.**    **The Defendant Directors and Defendant Batties violated the proxy**
> **disclosure mandates of Rule 14(a) and its regulations.**

Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and the rules and regulations

promulgated thereunder, as well as 12 C.F.R. § 569, govern the solicitation of proxies in this case.

Pursuant to those statutory and regulatory provisions, no solicitation of a proxy shall be made by

means which, *inter alia*, contains any statement that is false or misleading with respect to any

material fact, or omits to state any material fact.  Moreover, pursuant to 17 C.F.R. § 240.14a-9, no

solicitation (not limited to proxy materials) may be made by means of any communication which

is false or misleading, or which omits to state any material fact necessary in order to make the

statements therein not false or misleading.  The formal proxy materials which Defendants

distributed on behalf of the IFSB Management prior to the October 26, 2005 shareholders'

16

meeting violated these statutory and regulatory provisions, as did Batties' participation in the

communications from at least two groups of shareholders, as described in Paragraphs 14 and 23 of

the Verified Complaint (*i.e.,* the May 4, 2005 letter by "the Committee to Save Independence

Federal Savings Bank," and the October 21, 2005 letter signed by Catherine McPhail and A.

Gilbert Douglas).

      In ODS Technologies, L.P. v. Marshall, 832 A.2d 1254 (Del. Ch. 2003), the Delaware

Chancery Court discussed the standard a court should apply in analyzing whether a movant for

preliminary injunctive relief based on inaccurate or misleading proxy statements has demonstrated

likelihood of success on the merits:

> The basic legal standard used to determine the plaintiff's likelihood of success on
> the merits [of a proxy disclosure claim] is familiar: the defendant directors have the
> duty to disclose in a non-misleading manner all material facts bearing on the
> decision of the [company's] stockholders' (sic) to approve the [issue that is up for
> a vote]. [Footnote omitted]. The test for materiality is as follows: An omitted fact
> is material if there is a substantial likelihood that a reasonable shareholder would
> consider it important in deciding how to vote . . . .It does not require proof of a
> substantial likelihood that disclosure of the omitted fact would have caused a
> reasonable investor to change his vote. What the standard does contemplate is a
> showing of a substantial likelihood that, under all the circumstances, the omitted
> fact would have assumed actual significance in the deliberations of the reasonable
> shareholder. Put another way, there must be a substantial likelihood that the
> disclosure of the omitted fact would have been viewed by the reasonable investor
> as having significantly altered the "total mix" of information.

832 A.2d at 1259-60. When the Bank's Proxy Materials are measured against this standard, it is

likely that the Benders will succeed on the merits of their Rule 14(a) claim.

      The Bank's Proxy Materials included the Update (Exhibit I hereto), which was a letter to

the IFSB Shareholders, dated October 4, 2005, and signed by Defendants Jordan and Batties.

Verified Compl. at ¶54. Page 1 of the Update states, "here is Bender's plan as disclosed in

Amendment 18 to his Schedule 13D ... ."  Immediately following that statement, the Update lists

the "Banks' Belief of Bender's Intentions" which purports to identify what Bender intends to do,

leaving the reader with the mistaken impression that those "beliefs" are taken directly from

Bender's 13D.  Verified Compl. at ¶54; Update at 1-2.  The "Bank's Beliefs" are attributed to the

"Majority Directors," who are described in the Update as the "directors other than the three

directors whose elections were primarily attributable to the nomination and/or vote of Morton

Bender;" the Majority Directors are specifically identified in the Proxy Statement as Jordan,

Cobb, Fitzgerald, Wilmot and Youngentob.  Proxy Statement at 1-2.

  The Proxy Statement contains several false and misleading statements, or omissions of

material fact and therefore violates Rule 14(a).  The misleading statements include the following:

(a)  "Bender is a substantial reason the price for Independence Federal common stock has fallen to

the $11.75 per share price" (page 2); (b) "Bender's opposition to the Carver Merger and his other

actions are a substantial reason for the failure of the Carver Merger" (page 2); (c)  the depressed

stock is a result of increase expenses, "including a significant portion of legal fees in excess of

$3,000,000 alone in 2004, which Independence Federal incurred in its efforts to protect the Bank

and its shareholders from Bender's actions" (page 2); (d) "Bender has [refused to purchase shares

from all shareholders] at a price which is competitive" (page 2); (e) if the Bender Nominees are

elected, Bender will obtain "Controlling Influence" over IFSB "to the Detriment of All Other

Shareholders" (page 3); (f) that Bender has sued the Bank's directors "without citing any factual

basis.  These actions and baseless pejorative statements also damage the Bank's reputation in the

community" (page 3); (g) "it is quite possible that Bender desires a merger of Independence

Federal and Colombo Bank" (pages 3-4); and (h) Page 20 of the Proxy Statement fails to identify

the block of stock owned by Doley Group and their affiliated persons and entities, in its

identification of "groups owning in excess of 5%.

    "The SEC rules promulgated under Section 14(a) are intended to level somewhat the

playing field for proxy contestants and to force disclosures that promote informed shareholder

voting." <u>Mony Group, Inc. v. Highfileds Capital Management, L.P.</u>, 368 F.3d 138, 148 (2nd Cir.

2004).  Here, the playing field was anything but level.  The Proxy Materials distributed by IFSB in

advance of the October 26, 2006 shareholder meeting were intended to mislead the shareholders

into believing that the election of the Bender Nominees will result in a situation where Bender, as

the joint owner of 21% of the Bank's shares, will be allowed to dictate its future, to his personal

benefit, and the benefit of Colombo Bank, to the detriment of the remaining shareholders, from

whom Bender will not purchase stock.  The Proxy Materials blame Bender for the failure of the

merger with Carver, and virtually every problem at the Bank, including increased operating

expenses and decreased stock price.  At no place in the Proxy Materials does the Bank

Management (*i.e.,* the Defendants) inform the Shareholders of its own role in the poor

performance of the Bank.  By way of material omission, it was the Bank's three-pronged attack in

May 2004 (lawsuit, poison pill, holding company restructure) that was improper and ill-fated, and

expensive to the Bank.  All Mr. Bender did was voice his objection to the proposed merger with

Carver.  Although the legal expenses relating to the *Bank-instituted* three-pronged attack

contributed to a decline in the Bank's capital position, the Bank's capital was diminished by

continuing poor operating performance.  Ultimately, the OTS denied the application for the

Carver merger.  Verified Compl. at ¶56 .  Even prior to the OTS denial of the merger application

however, Carver demanded a lower price than that which had been agreed to, and the IFSB Board

19

refused. Verified Compl. at ¶56. None of this is revealed in the Proxy Materials. To the extent

that the Proxy Statement implies that "a significant portion" of the 2004 legal fees in excess of $3

million were necessary to "protect" the Bank and its shareholders from Bender, the statement is a

blatant distortion: legal fees were incurred as a result of three civil lawsuits against the Bank

involving the Washington Teachers Union, as well as the litigation instituted in this Court on May

5, 2004 *against* Bender. Verified Compl. at ¶56. Not one of those four cases was instituted by

Bender, and only one even involved him.

    In addition to the material misstatements identified above, the proxy materials also

violated Rule 14(a) by virtue of their material omissions. The proxy materials failed to disclose

the agreement between the Defendant Directors, Defendant Batties and Thompson to the effect

that Thompson would increase his shareholdings in IFSB by 98,000 shares in the 45 days

immediately prior to the September 26, 2005 Record Date (thereby increasing Thompson's

ownership in IFSB to 7.2%) and that Thompson would vote his shares in favor of the

Management Nominees, or to give his proxy to the Director Defendants. Verified Compl. at ¶57.

This agreement provided the Director Defendants with control of approximately 9% of IFSB, and

would have been material information to the IFSB shareholders in deciding whether or not to vote

in the election, and how to vote. Verified Compl. at ¶57. The agreement with Thompson was not

disclosed in the Proxy Materials. Verified Compl. at ¶57.

    The proxy materials also failed to disclose that the Director Defendants and/or Defendant

Batties participated in the communications from at least two groups of shareholders, the May 4,

2005 letter by "the Committee to Save Independence Federal Savings Bank," and the October 21,

2005 letter purportedly sent by Catherine McPhail and A. Gilbert Douglas. Verified Compl. at

¶58.    Pursuant to 17 C.F.R. § 240.14a-9, no solicitation may be made by means of any

communication "which is false or misleading," or "which omits to state any material fact

necessary in order to make the statements therein not false or misleading." The May 4, 2005 letter

and the October 21, 2005 are solicitations subject to 17 C.F.R. § 240.14a-9. Both letters solicit

support for board nominees supported by the Director Defendants, and/or against the board

nominees supported by Bender. The May 4, 2005 letter (Exhibit C hereto) contains the following

false and misleading statements, or omissions of material fact: (a) "the originally established goals

of Independence Federal Savings Bank that have recently been threatened by the personal greed of

specific individuals– individuals who have no regard not only for the African American

community, small businesses, depositors and local homeowners, but not even for their fellow

shareholders in IFSB;" (b) "Acting separately from IFSB, we aim to expose the motivations of

those wishing to harm IFSB's mission;" (c) "We must prevent the individuals trying to line their

own pockets at the expense of IFSB's important mission and rich history;" (d) "urge [the OTS] to

exercise their oversight responsibilities and prevent individuals who have no regard for our

community from dismantling IFSB;" (e) "Mr. Bender pursues a personal agenda when he realizes

that his reformer allies ... will not allow him to dominate IFSB's affairs. Mr. Bender starts

making demands on Management as though he is in control of the bank. Frustrated that he cannot

dictate policy ... . He forges ahead with this course in utter disregard for fellow shareholders. ...

he will simply use bully tactics and lies ... . These cronies will then do his bidding ... ." (Page 1 of

Timeline attachment to letter); (f) "the OTS ... acquiesces in Mr. Bender's attempt to seize control

of the bank without offering a fair price to shareholders or otherwise disclosing to customers that

he's trying to control their bank. Thus while Bender's bank discriminated with regard to credit

and lending ... ." (Timeline page 1-2); (g) "Mr. Bender continues his baseless attacks on this new

management and the Board" (Timeline page 2); (h) "the OTS-in a move friendly to Mr. Bender

and hostile to a minority institution designates IFSB as a 'problem institution' in 'troubled

condition' ..." (Timeline page 2); (i) "Egging by the OTS actions, by December, 2003, Mr.

Bender is ... engaging in ruinous insurgent tactics" (Timeline page 2); (j) "a U.S. District Court

finally rebukes him, dismissing his suit and stating that all along it was Mr. Bender's strategy to ...

scare off other potential merger partners like Carver" (Timeline page 2); (k) "Mr. Bender is

allowed to continue his war on the bank and obtain more stock. IFSB is even prevented from

undertaking the most routine transactions, such as forming a bank holding company without the

blessing of large rebel shareholders, namely Mr. Bender" (Timeline page 2); (l) "Instead he

continues buying shares to vote his cronies onto the Board. IFSB decides to sue Bender for

intentionally interfering with the merger deal, plus other violations of law. Again, the OTS sits

back and refuses to help IFSB or rein in Mr. Bender despite his own violations of law" (Timeline

page 3); (m) "The bank attempts to settle legal action with Mr. Bender ... government officials ...

have allowed Mr. Bender and his allies to skirt policies and practices" (Timeline page 3); (n) "If it

were not for the excessive legal fees caused by Bender, IFSB would have shown a net profit for

FY2004" (Timeline page 3); and (o) "Although [Bender's nominees to the Board] are both

African Americans, they are mere puppets of Bender's with no apparent ties to banking, required

to do what he tells them" (Timeline page 4). Attached to the May 4[th] "Committee to Save" letter

was a document entitled "Morton Bender's Background." The entirety of this document is full of

false and misleading statements, many repeating the same themes identified above. Examples of

some of the other statements include the following: Bender "wished to either merge IFSB into his

22

own 'shakily-run' bank, or worse, make it a fiefdom in his local empire, likely with minority faces as fronts, until he can otherwise dispose of it" (Background, third bullet point); "He has succeeded in degrading IFSB, driving down the value of the bank's shares and attacked the mission of this bank began [sic] in 1968. With the bank's stock degraded by his activities, he can buy it at a cheaper price" (Background, fourth bullet point); "He has ... forced IFSB to sue him ... [h]e has engaged in ruinous insurgent tactics, filed misleading securities filings with the OTS ... and threatened more lawsuits if he cannot view secret, private shareholder ballots so he may bully small and minority shareholders who didn't vote in his favor" (Background, fifth bullet point).

Similar to the May 4th "Committee to Save" letter, the October 21, 2005 letter (Exhibit J hereto) makes false allegations of Bender's "record history involving other banks including a black bank pushed to failure," and "severe violations of banking law and illegal practices by Bender and his Columbo Bank." The letter also provides "[T]he only time we are aware we got into U.S. District Court with Bender – though expensive -- Independence Won, Bender Lost!" This statement (among others in the letter) is patently untrue. Examples of other false and/or misleading statements are the following: "we can only presume that [the Bender Nominees'] basic qualification, based on past events, is to serve Bender loyally to affect his admitted takeover scheme;" "We wonder aloud why OTS has behaved so contrary to banking laws, security regulations and sound public policy to facilitate handing *Our Bank* to this Bender character?" The October 21st letter's repeated references to the May 9, 2005 letter from the OTS to Bender is misleading in its blatant omission of (or any reference to) the September 14, 2005 letter from the OTS, attached as Appendix G to the Bank's Proxy Statement. The September 14th letter advised

23

Bender that "after careful consideration of the relevant facts known to OTS" no enforcement action would be taken with regard to the allegations set forth in the OTS's May 9th letter.

The Director Defendants and Defendant Batties have violated Section 14(a) of the Exchange Act by their knowing dissemination of materially misleading Proxy Materials, and as to Defendant Batties, his participation in the dissemination of the materially misleading May 4, 2005 and October 21, 2005 shareholder letters, as described above.

2. **The way in which the October 26, 2005 Shareholders' Meeting was conducted did not comport with pertinent IFSB Bylaws.**

The election of the Management Nominees violated the pertinent IFSB Bylaws, as well as Roberts Rules of Order, by which the Shareholders' Meeting was governed. As a result, shares in a number material to the outcome of the election were improperly counted in favor of the Management Nominees. As shareholders, Plaintiffs are entitled to have meetings conducted in accordance with the Bank's bylaws, 12 C.F.R. §552.6(a) and Robert's Rules of Order. Plaintiffs are also entitled to have their nominees voted on in a fair and orderly manner. Because of the meeting irregularities, the Benders are entitled to preliminary injunctive relief voiding the election results; preventing the Director Defendants from causing the Bank to hold an Annual or Special Meeting of the Shareholders until further Order of this Court; and neutralizing all IFSB shares and/or proxies acquired by any Defendants from the Doley Group, or from Thompson, in any future election of Directors.

Injunctive relief may be appropriate where a shareholders' meeting has been conducted in violation of bylaws. C.A. Cavendes, Sociedad Financiera v. National Banks of Florida, Inc., 556 F. Supp. 254, 259 (M.D. Fla. 1982). In Cavendes, shareholders sought injunctive relief

because the special shareholders' meeting was conducted in a manner that violated bylaws.  The

court granted the injunctive relief because to allow the results of the meeting to stand would

"frustrate the policy of free and fair corporate suffrage" underlying the state's corporation code

and the company's bylaws.  Id.  The order granting injunctive relief required that the shareholder

meeting be reconvened and that it be conducted according to the bylaws and Roberts Rules of

Order.  556 F. Supp. at 259.   Here, too, the injunctive relief requested by the Benders - that IFSB

be required to void the election results of the October 26, 2005 Shareholders' Meeting - is

appropriate.

     The propriety of granting an injunction in these circumstances such as occurred here his

well-established:

> The corporate election process, if it is to have any validity, must be conducted with
> scrupulous fairness and without any advantage being conferred or denied to any
> candidate or slate of candidates.  In the interest of corporate democracy, those in
> charge of the election machinery of a corporation must be held to the highest
> standards in providing for and conducting corporate elections.

Aprahamian v. HBO & Co., 531 A.2d 1204, 1206-07 (Del. Ch. 1987).  The importance of a

legitimate shareholder vote was expressed by the Delaware Chancery Court as follows:

> The shareholder franchise is the ideological underpinning upon which the
> legitimacy of directorial power rests.  Generally, shareholders have only two
> protections against perceived inadequate business performance.  They may sell
> their stock . . or they may vote to replace incumbent board members.
>
> It has, for a long time, been conventional to dismiss the stockholder vote as a
> vestige or ritual of little practical importance. [Footnote omitted].  It may be that
> we are now witnessing the emergence of new institutional voices and arrangements
> that will make the stockholder vote a less predictable affair than it has been.  Be
> that as it may, however, whether the vote is seen functionally as an unimportant
> formalism, or as an important tool of discipline, it is clear that it is critical to the
> theory that legitimates the exercise of power by some (directors and officers) over
> vast aggregations of property that they do not own.  Thus, when viewed from a

broad, institutional perspective, it can be seen that matters involving the integrity
of the shareholder voting process involve consideration not present in any other
context in which directors exercise delegated power.

Blasius Industries, Inc. v. Atlas Corp., 564 A.2d 651 , 659 (Del. Ch. 1988).

In addition to the fact that the Defendants' actions surrounding the October 26, 2005

directly violated Section 13(d) and 14(a) of the Exchange Act,  the Defendants' actions cannot

withstand the heightened judicial scrutiny to which they are subject.[6]   In Unocal Corp. v. Mesa

Petroleum Co., 493 A.2d 946 (Del. Supr. 1985), the Delaware Supreme Court set out a two-

pronged test for the evaluation of defensive measures[7] taken by a corporation.  Under that test, the

directors must demonstrate (1) that they had "reasonable grounds for believing that a danger to

corporate policy and effectiveness existed because of another person's stock ownership" and (2)

that the particular defensive mechanism is "reasonable in relation to the threat posed."  493 A.2d

at 955.  Here, the Defendants will not be able to sustain this burden.  Where, as here, the defensive

measure adopted "purposefully disenfranchise[s] shareholders,"[8] the board must satisfy the more

exacting standard set out in Blasius Industries, Inc. v. Atlas Corp., 564 A.2d 651 , 659 (Del. Ch.

1988);  Carmody v. Toll Bros., 723 A.2d 1180, 1193 (Del. Ch. 1998).  The Blasius standard

provides: "A board's unilateral decision to adopt a defensive measure touching 'upon issues of

_____

[6]  The Benders submit that because the Defendants' actions related to the October 26,
2005 meeting are clearly invalid, this court need not even undertake a Unocal analysis.  Out of an
abundance of caution, however, the Benders have included a Unocal discussion.

[7]  That the Defendants actions surrounding the October 26, 2005 meeting were "defensive
measures" is indisputable.

[8]  Here, although shareholders were permitted to vote, they were effectively
disenfranchised due to the manner in which the meeting was held , due to the failure of the
Defendants to file a Schedule 13D and due to the Defendants' proxy and solicitation violations.

26

control' that purposefully disenfranchises its shareholders is strongly suspect under *Unocal*, and cannot be sustained without a 'compelling justification.'" <u>Carmody</u>, 723 A.2d at 1193 (quoting <u>Stroud v. Grace</u>, 606 A.2d 75, 92 n.3 (1972)). The Defendants' actions surrounding the October 26, 2005 meeting are part and parcel of their attempt to preclude the Benders from maximizing their right as shareholders to participate in corporate democracy. Thus, the Benders are likely to succeed on the merits of their claim that the results of the October 26, 2005 meeting should be voided.

**C.      The Benders are Likely To Succeed on the Merits of their Claim**
**that the Bank should not Indemnify the Defendants**

The Benders seek an order granting them preliminary injunctive relief preventing Defendant IFSB from indemnifying (or making advance payments to) the Director Defendants and Defendant Batties for the expenses of this action.   Indemnification of officers and directors for Federal Savings Associations, including IFSB, is governed by 12 C.F.R. §545.121.  Pursuant to that regulation, IFSB may not indemnify its officers and directors "unless the association gives [the OTS] at least 60 days' notice of its intention to make such indemnification."[9]  The  OTS Applications Handbook states that "[c]urrent OTS policy is to deny indemnification provisions that are broader than those provided by 12 C.F.R. §545.121."  OTS Applications Handbook at 410.2 (April 2001).

---

[9] The OTC's Fraud/Insider Abuse Program worksheet used by examiners asks examiners of institutions with a rating of 4 or 5 to "determine if, in possible violation of 12 USC §1828(k), the institution" has "[m]ade, or has entered into an agreement to make, any golden parachute or indemnification payments."  OTS Regulatory Handbook at 360P.4 (Feb. 2002).

In this litigation, the Benders' claims against the Director Defendants and Defendant Batties arise out of the wrongful and intentional acts of those Defendants. Under 12 C.F.R. §545.121, an association may authorize an advance payment of expenses only if "a majority of the directors of a savings association concludes that, in connection with the action, any person ultimately may become entitled to indemnification." Thus, under the regulation, before making advance payment of expenses, "a majority of the directors" must conclude that the person would ultimately be entitled to indemnification" which involves final judgment on the merits in the person's favor, or if "a majority of the disinterested directors of the savings association determine that he or she was acting in good faith within the scope of his or her employment or authority... ."

The allegations in this litigation involve conduct that was wilful and intentional, and not performed in good faith, but rather, for the express purpose of injuring the Benders and defeating the Bender Nominees. The Benders are likely to prevail on the success of their claims against the Defendants, as discussed above. Therefore, it is unlikely that the Defendants will be entitled to indemnification.

## III.    BECAUSE OF THE BANK'S ACTIONS, THE BENDERS ARE SUFFERING, AND WILL CONTINUE TO SUFFER, IRREPARABLE HARM

The irregularities attendant to the October 26, 2005 meeting - the failure of the Defendants to file a Schedule 13D, the violations of Section 14(a), the failure to follow the Bank's bylaws regarding votes, and the violations of Roberts Rules – deprived all IFSB shareholders from information necessary to ensure a fair vote at the Shareholders' Meeting and deprived the Benders from a fair vote on their nominees. Accordingly, the election of the Management Nominees is

irreparably tainted, and the results of the meeting are therefore void. The Benders (and other

shareholders and the investing public) have been, are being, and will continue to be irreparably

harmed, in that they are left without material information, to which they are lawfully entitled,

regarding the true interests and purposes of Defendants' efforts to control IFSB for their own

interests and to defeat the Bender Nominees. <u>Wininger v. SI Management, L.P.</u>, 33 F.Supp.2d

838, 848 (N.D. Cal. 1998) (request for preliminary injunctive relief based on proxy

misrepresentations was not futile where plaintiff would demonstrate irreparable injury if he could

show that the misrepresentations would deprive shareholders of the ability to cast fully informed

vote); <u>Lichtenberg v. Besicorp Group Inc.</u>, 43 F. Supp. 2d 376, 390-91 (S.D.N.Y. 1999)

("'Irreparable injury results from the use of [materially] false and misleading proxies when the

free exercise of shareholders' voting rights will be frustrated'") (alteration in original) (quoting

<u>Krauth v. Executive Telecard, Ltd.</u>, 890 F. Supp. 269, 287 (S.D.N.Y. 1995)). Requiring

Defendants to comply with their Section 13(d) obligations is critical:

> As the very *raison d'etre* of Section 13(d) was thwarted by appellants' continued
> failure to disclose the statutorily required information, we discover no error in the
> decision that irreparable injury would occur to shareholders and the investing
> public if appellants were allowed to continue their activities without correcting and
> amplifying their Schedule 13D. We therefore affirm the order granting the
> preliminary injunction insofar as it enjoined appellants from further violations of
> Section 13(d), from failing to amend their inaccurate Schedule 13D, and from
> acquiring further shares of GAC common stock or soliciting proxies or consents
> from GAC stockholders until the Schedule 13D is amended to reflect accurately
> their intentions.

<u>General Aircraft</u>, 556 F.2d at 96-90

"The failure to comply with Section 13(d) by filing an inaccurate Schedule 13D has been

found to cause irreparable harm to shareholders and the investing public." <u>Standard Financial,</u>

Inc. v. LaSalle/Kross Partners, L.P., 1997 WL 80946 *6 (N.D. Ill. 1997). If an *inaccurate* 13D

causes irreparable harm, then the failure to file *any* 13D when a filing is required may also cause

irreparable harm. See Mony Group, Inc. v. Highfileds Capital Management, L.P., 368 F.3d 138,

147 (2nd Cir. 2004) ("a transaction – particularly a change-of-control transaction – that is

influenced by noncompliance with the disclosure provisions of the various federal securities laws

*can* constitute irreparable harm") (emphasis in original).

    In Mony, the Court found that the "use of duplicate proxy cards [in violation of Rule 14a-

3(a)] to influence this vote therefore is inappropriate and amounts to the sort of irreparable harm

that the securities laws and regulations were intended to prevent." 368 F.3d at 148. Here, too, the

manner in which the meeting was conducted, and the failure of the Defendants to make their

required 13D and Rule 14(a) disclosures, in an effort to influence the election is irreparable harm.

In a case involving inaccurate or misleading proxy statements, irreparable harm flows from the

fact that the inaccurate or misleading disclosure adversely impacts the rights of shareholders to a

fully informed vote and this injury cannot be fully compensated by money damages. ODS

Technologies, L.P. v. Marshall, 832 A.2d 1254, 1262-63 (Del. Ch. 2003); In re Staples, Inc.

Shareholders Lit., 792 A.2d 934, 937, 960 (Del. Ch. 2001) . Monetary damages awarded after the

fact for inaccurate proxy disclosures are inadequate to remedy disclosure deficiencies and

therefore it is appropriate to address such deficiencies through the issuance of a preliminary

injunction that "persists until the problems are corrected. An injunctive remedy of that nature

specifically vindicates the stockholder right at issue – the right to receive fair disclosure of the

material facts necessary to cast a fully informed vote  – in a manner that later monetary damages

cannot and is therefore the preferred remedy, where practicable." Staples, 792 A.2d at 960

(footnote omitted).

      The Benders have also suffered irreparable injury as a result of the Board's failure to

conduct the October meeting in accordance with the bylaws. C.A. Cavendes, Sociedad Financiera

v. Florida National Banks of Florida, Inc., 556 F. Supp. 254, 259 (M.D. Fla. 1982) (failure to

conduct meeting in accordance with bylaws constitutes irreparable injury). Granting an injunction

to delay a shareholder meeting is appropriate relief to address inadequate disclosures to

shareholders as well as meeting irregularities. ODS Technologies, L.P. v. Marshall, 832 A.2d

1254, 1263 n.39 (Del. Ch. 2003) ("courts have recognized the need to enjoin a shareholders

meeting rather than allow a tainted vote to occur"); Staples, 792 A.2d at 937, 960 (Del. Ch. 2001)

(where proxy statement did not fully and fairly disclose all material facts relevant to an upcoming

shareholder vote, a preliminary injunction was granted to delay the shareholder meeting until the

defendants made corrective and supplementary disclosures); Woodward & Lothrop, Inc. v.

Schnabel, 593 F. Supp. 1385 (D.D.C. 1984) (shareholders entitled to temporary restraining order

directing that a scheduled shareholder vote on a proposed merger be enjoined until such time as

amended and accurate information regarding the proposed merger could be disseminated).

      The Benders have suffered irreparable harm as a result of the Defendants' actions in

failing and refusing to conduct the election in a fair manner. The Defendants have deprived

Plaintiffs and the other shareholders of a fair vote for the election of directors. Accordingly, the

election of the Management Nominees is irreparably tainted, and the results of the meeting are

therefore void. Plaintiffs (and other shareholders) have been, are being, and will continue to be

irreparably harmed, by the election of Directors in a meeting which failed to be conducted in a

proper manner.  See International Banknote Co., Inc. v. Muller, 713 F. Supp. 612, 623 (S.D.N.Y.

1989) ("[c]ourts have consistently found that corporate management subjects shareholders to

irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in

their attempt to obtain representation on the board of directors"); ER Holdings, Inc. v. Norton Co.,

735 F. Supp. 1094, 1100, 1101 (D. Mass. 1990) (noting that "one of the most sacred rights of any

shareholder is to participate in corporate democracy").


IV.    **BALANCING THE HARMS WEIGHS IN FAVOR OF GRANTING A
       PRELIMINARY INJUNCTION**

       The balance of harms weighs in favor of granting the Benders the preliminary injunctive

relief they seek.  If the preliminary injunction granting the requested Section 13D and Rule 14(a)

relief is wrongfully denied, the investing public and the Bank's shareholders will suffer great

irreparable harm by being wrongfully denied information to which they are entitled and that is

material to their investment decision regarding whether to buy, sell or hold stock and how to vote

the stock.  See Standard Financial, Inc. v. LaSalle/Kross Partners, L.P., 1997 WL 80946, *6 (N.D.

Ill. 1997).   By contrast, if the injunction is wrongfully granted, Defendants will lose nothing more

than the time and expense it takes to file a Section 13D and  accurate proxy materials.  There is

also no harm to requiring that the Bank conduct its shareholder meetings in a manner which

complies with the Bank's bylaws.   American General Corp. v. Torchmark Corp., 1990 WL

595282, *3, *5  (S.D. Tex. 1990) (where "there is a substantial likelihood that [defendants] failed

to comply with [corporation's] bylaw provisions applicable to the nomination of directors, no

injury, much less irreparable injury, will occur to [defendants] if this Court were to issue the

injunction requested by [plaintiff]" and therefore balance of harm tips in favor of granting

injunction).

## V.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF GRANTING THE RELIEF REQUESTED

The injunctive relief requested by the Benders would further the public's interest in seeing

that directors and shareholders comply with their disclosure obligations under the securities laws

as well as their obligation to abide by corporate bylaws.   "The Williams Act was designed for the

express purpose of protecting shareholders and the investing public.  The investing public may

suffer incalculable harm regarding their ability to make informed investment decisions if an

injunction is improperly denied.  Likewise, if an injunction is wrongfully granted, the investing

public may be subjected to inaccurate information that could affect investment decision.   On

balance, this last factor does not weigh against granting an injunction that causes a party to

disclose more specific information than it has disclosed to date." Standard Financial, Inc. v.

LaSalle/Kross Partners, L.P., 1997 WL 80946, *7  (N.D. Ill. 1997).  An order requiring that the

meeting be reconvened and conducted in accordance with the bylaws would serve the public

interest in fair corporate suffrage.  C.A. Cavendes, Sociedad Financiera v. Florida National Banks

of Florida, Inc., 556 F. Supp. 254, 259 (M.D. Fla. 1982) ; American General Corp. v. Torchmark

Corp., 1990 WL 595282, *3  (S.D. Tex. 1990) ("[t]he public has an interest in ensuring that the

processes of corporate governance are complied with in accordance with a corporation's valid

bylaws").

The public clearly has an interest in the enforcement of corporate bylaws and the

enforcement of federal laws and regulations governing banks - especially a bank that has been

33

found by its regulators to be in "troubled" condition.[10]  The public has "no legitimate interest in

the abrogation of contract rights conferred upon" shareholders.  ER Holdings, Inc. v. Norton Co.,

735 F. Supp. 1094, 1103 (D. Mass. 1990).  An injunction furthers the public interest where it

ensures that "corporate democracy and shareholder participation in the management" of the

corporation is served.  AHI Metnall v. J.C. Nichols Co., 891 F. Supp. 1352, 1360 (W.D. Mo.

1995).  See Treco, Inc. v. Land of Lincoln Sav. and Loan, 572 F. Supp. 1447 (N.D. Ill. 1983).

The public has an interest in the disallowance of corporate machinations which interfere with the

regulatory process.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter the

Preliminary Injunction as requested.

---

[10]  The Court will recall that by letter dated November 4, 2003, the OTS advised the Bank
that the OTS had determined that the Bank is both a "problem association" and in "troubled
condition."

34

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
*Morton A. Bender and Grace M. Bender*

35

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of January, 2006, a copy of the foregoing

Benders' Application for Preliminary Injunctive Relief, Memorandum of Points and Authorities in

support thereof, and proposed Order was mailed, first class mail, postage prepaid, to:

John R. Hall, Esq.
Muldoon Murphy & Aguggia LLP
5101 Wisconsin Avenue, N.W.
Washington, D.C. 20016

Robert Royer, Esq.
Royer & Brooks
925 15th Street
5th Floor
Washington, D.C. 20005

Carolyn D. Jordan
702 Leightonwood Lane
Silver Spring MD 20910

David Wilmot
1653 Kalmia Road N.W.
Washington D.C. 20015

Michael J. Cobb
7816 Morningside Drive N.W.
Washington D.C. 20012

William B. Fitzgerald, IV
3138 Quesada Street N.W.
Washington D.C. 20015

Eugene K. Youngentob
1041 Strathmore Park Court
Apt. 41
North Bethesda MD 20852

36

Thomas L. Batties
1452 Primrose Road
Washington DC 20012-1224

Thomas Batties, President
Independence Federal Savings Bank
1229 Connecticut Avenue, N.W.
Washington, DC 20036

_____/s/_____
Dale A. Cooter