# EXHIBIT I

2171624-1

# *UPDATE TO OUR SHAREHOLDERS*

Filings Services

OCT 07 2005

SNL Financial, LC
1-800-969-4121

October 4, 2005

Dear Shareholder:

Your vote at the shareholders' meeting that has been rescheduled for October 26, 2005 is critically important in determining the future of Independence Federal. We are asking you to support your Board of Directors by voting **"FOR"** the three management nominees for director and **"FOR"** the approval of the plan to reorganize Independence Federal into a holding company structure. The Bank's Majority Directors (those directors other than the three directors whose elections were primarily attributable to the nomination and/or vote of Morton Bender) believe the reasons your support is so critical to Independence Federal and your best interests as a stockholder are clear.

As we previously wrote to you on August 25, 2005, the Majority Directors are convinced that if Bender's nominees are elected Bender will gain operating control of the Bank. Less than a week after our letter and proxy statement were mailed to you, Bender announced his intention to file an application to acquire Independence Federal and he filed an amendment to his Schedule 13D with the Office of Thrift Supervision (OTS) in which he revealed his plan to gain control of Independence Federal by acquiring 51% of the shares of Independence Federal or otherwise controlling the Board through the election of his nominees as directors. Because some of you had actually voted prior to Bender revealing his intentions and because not all of you were aware of Bender's intentions and because your Board believes it is extremely important for you to know this information before you cast your vote, especially in light of Bender's nomination of two individuals for election in opposition to our recommended slate of nominees, the Majority Directors decided to postpone the shareholders' meeting that was originally scheduled for September 14, 2005. In this regard, here is Bender's plan as disclosed in Amendment 18 to his Schedule 13D, filed August 31, 2005, a copy of which is attached to the enclosed Proxy Statement as Appendix D:

### The Bank's Belief of Bender's Intentions

- Obtain up to 51% of the outstanding shares of Independence Federal primarily by negotiating with large shareholders owning 5% or more of the outstanding stock, which may leave many small shareholders relying on Mr. Bender's stated willingness to consider purchasing their shares if they approach him. *The Majority Directors believe this plan will be detrimental, at least to the small shareholders.*

- Have a majority of the Board be Bender's nominees, representatives or persons having similar views as Bender regarding the future of the Bank of which three such nominees, representatives or persons currently serve on Independence Federal's Board. *The Majority Directors are convinced that if Bender's two nominees are elected on October 26, 2005, they, along with current directors Nelson Deckelbaum, Elliott Hall and Robert Isard, who the Majority Directors believe are nominees, representatives or persons having similar views as*

*Bender, will give Bender's representatives significant influence on the Board.*

- Have Independence Federal purchase loans originated by Colombo Bank, Rockville, Maryland ("Colombo"), a savings bank at which Bender is chairman of the board of directors and that is indirectly over 90% owned by Bender and his family, notwithstanding that Colombo has been subject to an OTS Cease and Desist Order (a copy of which is attached to the enclosed proxy statement as Appendix F) for violating more than a dozen laws and regulations, including the Community Reinvestment Act, the Equal Credit Opportunity Act and the Home Mortgage Disclosure Act.

- Seek the voluntary resignation of certain executive officers and influence personnel decisions particularly concerning senior management officials. *The Majority Directors believe this will allow Bender to replace the Bank's officers with individuals of his choosing.*

- Have Independence Federal purchase bookkeeping and accounting services from Colombo and purchase advisory services from the president of Colombo. *The Majority Directors believe this may lead to the termination of Independence Federal employees.*

- Influence decisions about loans made by Independence Federal in addition to exercising influence over other unspecified business matters.

<u>Additional Recent Developments</u>

    The OTS issued two letters dated September 14, 2005, which are attached to the enclosed proxy statement as Appendices G and H, in which it addressed the issues raised in its letters dated May 9, 2005 and May 10, 2005, which are discussed in the enclosed proxy statement and attached to the proxy statement as Appendices B and C, and which had been the basis for postponement of the election of directors at the May 11, 2005 shareholders meeting.  In the September 14, 2005 letters, the OTS stated that it has determined not to pursue enforcement action against Morton Bender or against any party in connection with the matters raised in the May 9, 2005 letter and the May 10, 2005 letter, respectively.  In a letter, dated September 16, 2005, a copy of which is attached to the enclosed Proxy Statement as Appendix I, the OTS notified the Bank that it notified Robert B. Isard that it has completed its review and takes no objection to his service as a director of the Bank.  The OTS also furnished the Bank with a copy of a letter to Mr. Isard, dated September 13, 2005, a copy of which is attached to the enclosed Proxy Statement as Appendix J, regarding a preliminary inquiry by the OTS concerning certain events at the Bank, including whether Mr. Isard and other individuals acted in concert for purposes of attempting to obtain control over the Bank, and based upon the information reviewed by the OTS to the date of the letter, the OTS does not currently intend to take enforcement action against Mr. Isard or any other party in connection with the matter.  The OTS stated that its determination is subject to change, should new information come to the OTS' attention that would alter its conclusions concerning the matter.

In conclusion, if Bender is successful in electing his two nominees to the Board, the Majority Directors believe that Bender will gain control of Independence Federal without having to purchase any additional shares of Independence Federal stock. We hope that you will seriously consider the consequences of supporting Bender's nominees. **The Majority Directors strongly urge you to vote for the three management nominees to the Board and for the formation of a holding company.**

If you have questions or need assistance in voting your shares, please call the Bank's Corporate Secretary Sheila R. Finlayson at (202) 628-5500.

Sincerely,

Carolyn D. Jordan, Esq.
Chairman of the Board

Thomas L. Batties, Esq.
President and Chief Executive Officer

**INDEPENDENCE FEDERAL SAVINGS BANK**
1229 Connecticut Avenue, N.W.
Washington, D.C. 20036

**NOTICE OF**
**POSTPONEMENT AND RESCHEDULING OF SPECIAL MEETING OF SHAREHOLDERS**
originally scheduled for September 14, 2005,
to be held on **October 26, 2005**

NOTICE IS HEREBY GIVEN that the Special Meeting of Shareholders of Independence Federal Savings Bank originally scheduled to be held on September 14, 2005, at 11:00 a.m., local time, at The Mayflower Hotel, 1127 Connecticut Avenue, N.W., Washington, D.C. (the "Original Meeting"), has been postponed and rescheduled (the "Postponement") for October 26, 2005 at the same hour and location (the "Rescheduled Meeting"). The purpose of the Rescheduled Meeting is the same as the purpose of the Original Meeting:

    (1) The election of three Directors of Independence Federal;

    (2) The approval of a Plan of Reorganization to form a holding company, dated May 19, 2004, including the certificate of incorporation and bylaws for the holding company. Pursuant to the Plan of Reorganization to accomplish this holding company structure: (i) Independence Federal will become a wholly-owned subsidiary of Independence Bancorp, Inc., a Delaware corporation; and (ii) each outstanding share of Independence Federal's common stock will be converted into one share of common stock of the new holding company, Independence Bancorp, Inc. This holding company formation is described more fully in the accompanying proxy statement, which includes the Plan of Reorganization as Appendix A; and

    (3) Such other matters as may properly come before the Special Meeting. We do not know of any such other matters.

The Board of Directors believed the Postponement was necessary because the Board recently received information regarding an application filed by Morton A. Bender to increase his percentage ownership in Independence Federal to 51%, which would allow Bender to exercise more control over Independence Federal. The Postponement provides the needed time for shareholders to be presented with information regarding Bender's plans with respect to Independence Federal for their consideration prior to voting on matters to be considered at the meeting.

Any action may be taken on the foregoing proposals at the Special Meeting on the date specified above, or on any date(s) to which the Special Meeting may be adjourned. In the event there are insufficient votes for a quorum at the time of the Special Meeting, the Special Meeting may be adjourned in order to permit further solicitation of proxies by Independence Federal. Only shareholders of record at the close of business on September 26, 2005 are entitled to notice of and to vote at the Special Meeting or any adjournments thereof.

All shareholders are urged to attend the Rescheduled Meeting in person. WHETHER OR NOT YOU NOW PLAN TO ATTEND THE SPECIAL MEETING AND WHETHER OR NOT YOU PREVIOUSLY SUBMITTED A PROXY CARD, YOU ARE REQUESTED TO COMPLETE AND SIGN THE ENCLOSED PROXY CARD, WHICH IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS, AND TO MAIL IT PROMPTLY IN THE ENCLOSED ENVELOPE. ANY PROXY SUBMITTED BEFORE YOU RECEIVED THIS NOTICE WILL NOT BE USED. The proxy will not be used if you attend the Special Meeting and vote in person.

Remember, if your shares are held in the name of a broker or other nominee, only your broker or such other nominee can vote your shares and only after receiving your instructions. Please contact the person responsible for your account and instruct them to execute a proxy card on your behalf. You should also sign, date and mail your proxy card at your earliest convenience.

BY ORDER OF THE BOARD OF DIRECTORS

Michael J. Cobb
Secretary of the Board

Washington, D.C.
October 4, 2005

The Board of Directors of Independence Federal recommends that you vote "FOR" the three Board nominees for director and "FOR" approval of the Holding Company Formation. Your support is appreciated.

# TABLE OF CONTENTS

**Page**

QUESTIONS AND ANSWERS ................................................................................................ 1

SUMMARY .......................................................................................................................... 12

SPECIAL MEETING ............................................................................................................ 15

CORPORATE GOVERNANCE ............................................................................................ 17

STOCK OWNERSHIP .......................................................................................................... 20

PROPOSAL I—ELECTION OF DIRECTORS ...................................................................... 22

PROPOSAL II—HOLDING COMPANY FORMATION ...................................................... 31

INDEPENDENT PUBLIC ACCOUNTANTS ...................................................................... 43

EXECUTIVE COMPENSATION ......................................................................................... 46

OTHER INFORMATION RELATING TO DIRECTORS AND EXECUTIVE OFFICERS ............... 47

NOMINATING/CORPORATE GOVERNANCE COMMITTEE PROCEDURES .............................. 47

FINANCIAL STATEMENTS AND FORM 10-KSB .............................................................. 49

AVAILABLE INFORMATION ............................................................................................. 50

SUBMISSION OF FUTURE SHAREHOLDER PROPOSALS AND NOMINATIONS ...................... 50

SHAREHOLDER COMMUNICATIONS ............................................................................... 51

MISCELLANEOUS .............................................................................................................. 51

APPENDICES
A. Plan of Reorganization, with proposed certificate of incorporation and bylaws
B. Letter, dated May 9, 2005, to Morton A. Bender from the Southeast Regional Director of the Office of Thrift Supervision
C. Letter, dated May 10, 2005, to the Board of Directors of Independence Federal Savings Bank from the Southeast Regional Director of the Office of Thrift Supervision
D. Amendment No. 18 to Schedule 13D, filed by Morton A. Bender with the Office of Thrift Supervision on August 29, 2005
E. Order No.: 2005-35, Issued by the Office of Thrift Supervision on September 12, 2005
F. Stipulation and Consent to the Issuance of an Order to Cease and Desist for Affirmative Relief and an Order of Assessment of Civil Money Penalties, dated August 31, 2004
G. Letter, dated September 14, 2005, to Morton A. Bender from the Southeast Regional Director of the Office of Thrift Supervision
H. Letter, dated September 14, 2005, to the Board of Directors of Independence Federal Savings Bank from the Regional Director of the Office of Thrift Supervision
I. Letter, dated September 16, 2005, to Robert B. Isard from the Southeast Regional Director of the Office of Thrift Supervision
J. Letter, dated September 13, 2005, to Robert B. Isard from the Enforcement Deputy Counsel of the Office of Thrift Supervision

# INDEPENDENCE FEDERAL SAVINGS BANK

## PROXY STATEMENT

### QUESTIONS AND ANSWERS

*The following questions and answers are intended to address briefly questions anticipated to be asked regarding the Special Meeting in lieu of the Annual Meeting of Shareholders of Independence Federal Savings Bank, which we refer to as the "Special Meeting," and the matters to be voted on at that meeting, particularly the reorganization of Independence Federal Savings Bank into a holding company structure, which we refer to as the "Holding Company Formation." These questions and answers may not address all questions that may be important to you as a shareholder of Independence Federal Savings Bank, which we refer to as "Independence Federal" or the "Bank." For additional information, please refer to more detailed information contained elsewhere in this proxy statement, the appendices to this proxy statement and the documents referred to or incorporated by reference in this proxy statement. If you have any questions, please call Sheila R. Finlayson, Esq., the Bank's Corporate Counsel and Secretary, at (202) 628-5500.*

**GENERAL:**

**Q:** **When and where is the Special Meeting to be held?**

**A:** The Special Meeting, originally scheduled to be held on September 14, 2005, has been postponed and rescheduled and will take place at The Mayflower Hotel, 1127 Connecticut Avenue, N.W., Washington, D.C. on October 26, 2005 at 11:00 a.m., local time, and at any adjournments thereof.

**Q:** **Why has the Special Meeting been called?**

**A:** The Special Meeting has been called for shareholders to vote on the following matters:

    (1)    The election of three Directors of Independence Federal; and

    (2)    The approval of a Plan of Reorganization dated May 19, 2004, including the certificate of incorporation and bylaws for the holding company, providing for the establishment of a holding company structure for Independence Federal, which we refer to as the "Holding Company Formation." Pursuant to the Plan of Reorganization: (i) Independence Federal will become a wholly-owned subsidiary of Independence Bancorp, Inc., which we refer to hereafter as the "Holding Company," a to-be-formed Delaware corporation; and (ii) each outstanding share of Independence Federal's common stock will be converted into one share of the Holding Company's common stock, as more fully described under "Proposal II – Holding Company Formation" on page 31, and in the Plan of Reorganization included as Appendix A to this proxy statement.

**Q:** **Why is this Special Meeting so important?**

**A:** FIRST: The five directors of Independence Federal whose election was not primarily attributable to the nomination and/or vote of Morton A. Bender, who we refer to as the "Majority Directors," are convinced that the directors to be elected at this Special Meeting will determine whether Bender obtains operating control over Independence Federal. The Majority Directors are Carolyn

D. Jordan, Chairperson of the Board, Michael J. Cobb, William B. Fitzgerald, IV, David W. Wilmot and Eugene K. Youngentob. We refer to the other three directors, Nelson Deckelbaum, Elliott S. Hall and Robert B. Isard, as "Bender's Directors" although those directors have expressed an objection to that designation and the connotation of control that it may suggest, which the Majority Directors nevertheless believe is appropriate. In a letter, dated September 13, 2005 (See Appendix J of this proxy statement), the OTS wrote to Isard regarding a preliminary inquiry concerning certain events at Independence Federal, including whether Isard and other individuals acted in concert for purposes of attempting to obtain control of the Bank, and based on information reviewed by the OTS to the date of the letter, the OTS does not currently intend to take enforcement action against Isard. **If Bender's nominees are elected, the Majority Directors are convinced Bender will have a controlling influence over the Bank.**

1. **The Majority Directors Believe Bender Has Caused and Continues to Cause Harm To Independence Federal and Its Shareholders.**

   *The Majority Directors are convinced that:*

   - Bender is a substantial reason the price for Independence Federal common stock has fallen to the $11.75 per share closing price of such stock on the Nasdaq SmallCap Market on September 29, 2005.

     – A substantial contributor to that depressed stock price is that shareholders were prevented from receiving $21.00 per share in cash for each of their shares of Independence Federal common stock in the proposed merger transaction with Carver Federal Savings Bank, which we refer to as the "Carver Merger," as well as the opportunity to reinvest that $21.00 per share. Bender's opposition to the Carver Merger and his other actions are a substantial reason for the failure of the Carver Merger.

     – Another contributor to the depressed stock price is the increased expenses, including a significant portion of legal fees in excess of $3,000,000 alone in 2004, which Independence Federal incurred in its efforts to protect the Bank and its shareholders from Bender's actions, including trying to preserve the Carver Merger and the impact of such expenses on the Bank's financial condition and results of operations;

   - Bender has demonstrated his unwillingness, particularly by refusing to submit a bid to acquire Independence Federal in the process that resulted in the Carver Merger agreement, to purchase from all shareholders all of the shares of Independence Federal, through a merger or otherwise, at a price which is competitive with that which shareholders could obtain in an open bidding type process.

   - Bender has acquired a sufficient stock position in Independence Federal, to substantially influence the Bank's ability to engage in merger or acquisition transactions with others who have been or may be willing to purchase all of the shares of Independence Federal.

2

*In the view of the Majority Directors:*

- Bender has already been exercising significant influence and control over Independence Federal:

    – Through the substantial effect his 21% ownership position would have on the Bank's ability to engage in major corporate transactions, such as mergers and acquisitions;

    – Through opposition to the Carver Merger and the adverse effect of Bender's dissident activities on Independence Federal;

    – Through the election of Bender's Directors to the Board and their conduct on the Board as observed by the Majority Directors; and

    – Through hostile tactics against directors, other than Bender's Directors, such as impugning their integrity and competence and instituting a lawsuit seeking to impose personal liability on those Directors, in each case, in the view of the Majority Directors, without citing any reasonable factual basis. These actions and baseless pejorative statements also damage the Bank's reputation in the community.

- Bender ultimately is seeking to acquire Independence Federal as cheaply as possible, which is directly contrary to the best interests of the other shareholders of Independence Federal. As stated in an opinion dated January 15, 2004, by a United States District Court Judge: "Mr. Bender testified quite frankly that he wants to acquire the Bank for the least amount possible. He also agreed that the Board of Directors wants to sell the Bank for the greatest amount possible, for the best benefit to all of the shareholders."

- As a means to acquire Independence Federal as cheaply as possible, Bender is seeking to acquire control by controlling the Board of Directors. As the Judge quoted in the preceding bullet also stated, "the focus of Mr. Bender's request for a special meeting, however, is to remove all but two of the Board members, replace those persons with others of his choosing and gain indirect control of the Bank without spending a *sou* [*i.e.*, a cent] for it."

2.  **The Majority Directors Are Convinced That, If Bender Succeeds in Electing His Two Nominees as Directors at this Special Meeting, He Will Obtain Controlling Influence Over Independence Federal and Will Be in a Position to Fulfill His Goal of Acquiring Ownership of All or At Least a Significantly Increased Ownership Position in Independence Federal at the Cheapest Possible Cost to Himself, to the Detriment of All Other Shareholders.**

    *In the view of the Majority Directors:*

    - If Bender's two Director nominees are elected at the Special Meeting, Bender will have finally accomplished the acquisition of controlling influence over Independence Federal that he has been campaigning to achieve since 2002.

    - Bender would not have engaged in that campaign and incurred its expense if he did not have specific plans for Independence Federal. It is quite possible

3

that Bender desires a merger of Independence Federal and Colombo Bank which is operating under a Cease and Desist Order of the OTS as a result of numerous cited violations of banking laws and regulations. Moreover, Colombo was fined for these violations. Colombo Bank is over 90% owned indirectly by Bender and his family.

SECOND: The Holding Company Formation would mean that Independence Federal's parent holding company will operate in a more flexible structure for operations, growth and raising capital (See "Reasons For and Possible Benefits of Holding Company Formation" on page 34), and that major corporate events, such as the acquisition of Independence Federal by another entity, can be accomplished by the favorable vote of the holders of a majority of Independence Federal outstanding common stock, rather than the two-thirds favorable vote currently required by the OTS for Independence Federal to engage in such a transaction. Independence Federal has no contracts, arrangements, plans or understandings regarding any merger transaction or similar significant corporate transactions. However, Independence Federal has previously tried to engage in a merger transaction, the Carver Merger, and the Majority Directors intend to pursue any similar future opportunity if it is in the best interest of shareholders.

Effectuation of the Holding Company Formation would mean that Bender's stock ownership position, even if it is combined with the stock ownership by Bender's Directors, could not exercise veto power over a significant corporate transaction, such as a merger, if most other shareholders of Independence Federal were in favor of it. In other words, if a more than 50% vote for such transaction could be obtained notwithstanding a contrary vote by Bender. Thus, the Holding Company Formation, in addition to its other benefits, would serve to reduce Bender's control over Independence Federal. If Bender should acquire 51% of the Bank's stock, he would be able to block a proposed merger even if the Holding Company formation is effectuated.

*For additional information on why this Special Meeting is so important, please see the yellow supplement to this proxy statement, which is incorporated herein and which provides an update on Morton Bender's recent activities to increase his ownership in Independence Federal and exercise more control over Independence Federal.*

**Q:    Why is this a Special Meeting rather than a reconvened Annual Meeting?**

A:    The Board has called this Special Meeting to enable shareholders to consider and vote on the Holding Company Formation, in addition to voting to elect directors, which would have occurred at a reconvened Annual Meeting.

The Board originally voted unanimously to reorganize into a holding company structure in 2004; however, the matter was not presented to shareholders prior to the calling of this Special Meeting because in 2004 the OTS, contrary to the anticipation of Independence Federal, advised Independence Federal that the then-proposed Carver Merger was considered a transaction incident to the creation of the Holding Company such that, under OTS Regulations, a favorable two-thirds vote of shareholders was required to approve the Holding Company Formation rather than the favorable majority vote of shareholders.

The Board made the decision to present the Holding Company Formation to the shareholders at this time because, to the knowledge of Independence Federal, there currently are no other pending transactions by Independence Federal requiring OTS approval incident to the creation of the Holding Company. The Board believed that, given the stock ownership position of Bender, Independence Federal would have a realistic possibility of obtaining shareholder approval of the Holding Company Formation, which would justify incurring the cost of seeking shareholder approval, only if approval could be granted by the favorable vote of a majority of the outstanding shares, as opposed to two-thirds of the outstanding shares. Independence Federal has withheld

4

incurring the cost of filing the requisite application for OTS approval of the Holding Company Formation until Independence Federal could determine whether or not shareholders favor it.

In connection with its review of the preliminary proxy statement filed with the OTS, the staff of the OTS advised Independence Federal, "OTS may require a different vote [than the majority vote Independence Federal believed would be required] to approve the holding company reorganization, based on circumstances existing at the time the Association [*i.e.*, Independence Federal] files the holding company application [regarding the Holding Company Formation]. Further, the staff of the OTS stated that "any material changes or information relating to the holding company application, including the vote requirement, not addressed herein [in the proxy statement], may require a re-solicitation of shareholder vote."

Since Independence Federal has already incurred most of the expense of presenting the question of the Holding Company Formation to shareholders, Independence Federal has decided to proceed with a vote on the Holding Company Formation at this time, even though it can give no assurance as to the vote that will be required for approval, other than that a vote of two-thirds of the outstanding shares of common stock will constitute shareholder approval and a majority vote may or may not constitute shareholder approval.

**Q:**    **Why was the Annual Meeting on May 11, 2005 adjourned prior to a vote on the Election of Directors?**

**A:**    On May 9, 2005, the OTS sent a notice of intent to issue a cease and desist order and assess civil money penalties to Bender stating that he had distributed a letter to shareholders that contained disclosures that appeared to the OTS to be false and misleading. (See Appendix B to this proxy statement.) On May 10, 2005, the day before the scheduled May 11, 2005 Annual Meeting, the OTS delivered a letter to the Board of Directors of Independence Federal (see Appendix C to this proxy statement) stating that a community group had also sent a letter with apparent false and misleading statements. Management has advised the OTS that that community group was not associated with the Bank or its management. As a result of these two findings, the OTS stated that it "strongly believes that the Annual Meeting should be postponed to enable the shareholders to receive and evaluate sufficient accurate information to permit each to cast an informed vote."

Independence Federal cooperated with the OTS and furnished the information requested by the OTS in its May 10, 2005 letter. **By letters dated September 14, 2005, the OTS stated that it has determined not to pursue enforcement action with respect to the matters discussed in its letters of May 9 and 10, 2005.**

**Q:**    **Why have the Majority Directors resisted Bender's efforts to have additional nominees elected as directors?**

**A:**    *The Majority Directors are convinced that*:

(1)    Since 2002, Bender has engaged in a campaign to gain control of the Bank for the least possible cost to himself and thus contrary to the best interests of Independence Federal's other shareholders.  That campaign has been conducted primarily by his efforts (i) to gain control of the Bank's Board of Directors and (ii) to block any competing acquirer that would offer all of the Bank's shareholders a fair price for their stock and engaging in other conduct that has resulted in depressing the market price for the Bank's stock.  A depressed stock price also serves to help reduce the cost of future acquisitions of stock by Bender. His campaign has included:

- Joining with Isard to seek a shareholder meeting to remove four of the Bank's directors for cause, based on unsupported and baseless allegations of misconduct;

- Nominating and supporting the election of Deckelbaum and Hall as Bank Directors;

- Seeking to have the Bank pay Bender's personal legal fees, amounting to $406,000, and other expenses supposedly associated with the proxy contest he conducted to elect Deckelbaum and Hall as Bank Directors, but which apparently also include costs he incurred in seeking the regulatory authority to personally purchase stock of the Bank;

- Bringing a lawsuit requesting that the Court force the Bank to schedule a shareholders' meeting to remove for cause the six Bank Directors that were not Bender's nominees, based on unsupported and baseless allegations of misconduct, which request was denied by the U.S. District Court; and

- Voting for the election to the Bank's Board of Isard, which assured Isard's election, whose candidacy was not even generally known to the Bank's shareholders unless they personally attended the 2004 shareholders' meeting.

(2)    In furtherance of his campaign, Bender opposed the Carver Merger, which would have provided Independence Federal shareholders $21.00 for each share of Independence Federal common stock held, and, as stated by the OTS in its May 9, 2005 letter to Bender:

- "it was your [Bender's] opposition to the Carver merger that led the Bank [Independence Federal] to incur a significant portion of the legal fees in an effort to overcome your [Bender's] efforts to stop the merger";

- "Further, the continuing decline in the Bank's capital position resulting largely from those legal expenses [amounting to more than $3 million], with no end in sight, was a factor in the OTS, decision to deny the Carver merger"; and

- "Therefore, in a real sense, you [Bender] played a role in preventing the Carver merger, the direct result of which was a substantial decline in the share price of [Independence Federal] stock."

(3)    Bender is continuing his campaign, utilizing the same kind of tactics he has historically used. Those tactics have included, without factual basis, the making of pejorative allegations against Independence Federal and its management and implying that his efforts are intended to resolve problems at Independence Federal (without acknowledging his responsibility for the problems he identifies). Bender wants to acquire control of Independence Federal for the least possible cost and he is seeking to acquire control through the nomination of directors. Bender's efforts have caused Independence Federal, to its significant detriment, to expend a great amount of money to try to protect the value of Independence Federal for all shareholders.

Q:    **Why was the Special Meeting of Shareholders, originally scheduled for September 14, 2005, postponed and rescheduled to October 26, 2005?**

A:    In early September, the Board of Directors received information that Bender had filed an application to increase his percentage ownership in Independence Federal to 51% and to exercise more control over Independence Federal. On August 29, 2005, Bender also filed Amendment 18 to his Schedule 13D in which he outlined his intent to gain a majority ownership in Independence Federal and his subsequent goals for the Bank, including having a majority of the Board sympathetic to his cause and having the Bank engage in transactions with Colombo Bank (of which Bender and his family own over 90%). A copy of the Schedule 13D Amendment is attached hereto as <u>Appendix D</u>.

Upon learning of Bender's stated intentions, the Board of Directors determined that it was necessary for shareholders to be presented with the information regarding Bender's plans prior to their voting on the matters to be considered at the meeting. The details of Bender's goals are outlined in the yellow supplement to this proxy statement.

OTS regulations, pursuant to 12 C.F.R. § 552.6(a), require that federal stock savings banks like Independence Federal hold their annual meeting for the election of directors within 150 days after the end of its fiscal year. Because October 26, 2005 falls outside of the 150-day window, Independence Federal requested that the OTS waive 12 C.F.R. § 552.6(a) to the extent necessary to permit the Bank to hold its meeting for the election of directors on October 26, 2005. The OTS granted the waiver request in Order No.: 2005-35, which is attached hereto as <u>Appendix E</u>.

## THE HOLDING COMPANY FORMATION:

Q:    **What will happen in the Holding Company Formation?**

A:    At the effective time, the Bank will merge with an interim savings bank, to be chartered by Independence Bancorp, Inc., which will be organized by the Bank, as a direct subsidiary of the Bank, to become the Holding Company for the Bank. The Bank will be the surviving entity in the merger with the interim savings bank and, as a result of that merger, will become a wholly-owned subsidiary of the Holding Company.

**Q:    What will I receive for my shares of common stock of the Bank in the Holding Company Formation?**

A:    If the Holding Company Formation is effected, then as of the date of the Holding Company Formation, each shareholder of the Bank will receive one share of Holding Company common stock for each share of common stock of the Bank then held.

**Q:    What is the structure of ownership of the Bank after the Holding Company Formation?**

A:    If the Holding Company Formation is consummated, then as of the date of the Holding Company Formation, holders of Independence Federal common stock will receive one share of common stock of Independence Bancorp common stock for each share of common stock of Independence Federal then held.  Thus, the shareholders of Independence Federal will become the shareholders of Independence Bancorp, Inc. in the same proportion as their former ownership of Independence Federal.    Independence Bancorp, Inc. then will own 100% of the outstanding stock of Independence Federal.  The following diagram shows the resulting structure:



**Q:    What is the Board of Directors' recommendation regarding the Holding Company Formation?**

A:    The Board of Directors unanimously recommends that shareholders of the Bank vote **"FOR"** the adoption of the Plan of Reorganization for the Holding Company Formation.

**Q:    When is the Holding Company Formation expected to be completed?**

A:    If the shareholders of the Bank approve the Holding Company Formation it will be completed as soon as practicable thereafter.  The Holding Company Formation cannot be completed until a number of conditions are satisfied.  The most important conditions are (i) adoption of the Plan of Reorganization by shareholders of the Bank at the Special Meeting and (ii) receipt of approval of the Holding Company Formation by the OTS.

**Q:**   **What Are the Possible Benefits of the Holding Company Formation?**

**A:**   After the Holding Company Formation is completed, the Bank will operate in the structure adopted by nearly all federal stock savings banks. The structure will be more flexible for operations, growth and raising capital. See "Proposal II–Holding Company Formation," p. 31 of this proxy statement, for additional information.

**Q:**   **Are there additional costs to having a Holding Company?**

**A:**   Yes. The Holding Company would be an additional corporation and, thus, would involve additional costs for shareholders. The Bank intends to contribute approximately $500,000 to the Holding Company which the Bank estimates should cover its costs for three years. A significant portion of that amount, however, relates to costs that the Bank would have to incur anyway, such as compliance by the Holding Company with the requirements of the Securities Exchange Act of 1934.

Initially at least, it is intended that the Holding Company would not engage in any activities other than serving as the Bank's holding company. Thus, the Holding Company would be located at the existing offices of the Bank and management of the Holding Company would also be management of the Bank and would not be paid any greater compensation than would otherwise be paid to them by the Bank.

**Q:**   **Are There Differences in the Rights of Shareholders in the Holding Company compared to the Bank?**

**A:**   As a result of the Holding Company Formation, holders of Bank common stock, whose rights are presently governed by federal law and the OTS' rules and regulations, as well as the Charter and Bylaws of the Bank, will become shareholders of the Holding Company, a to-be-formed Delaware corporation. Accordingly, the General Corporation Law of Delaware, as well as the certificate of incorporation and bylaws of the Holding Company, will govern the rights of the shareholders of the Holding Company.

The proposed certificate of incorporation and bylaws of the Holding Company are attached hereto as Attachments A-1 and A-2, respectively, to the Plan of Reorganization, Appendix A hereto, and should be reviewed for more detailed information.

Major differences in the proposed certificate of incorporation and bylaws of the Holding Company compared to the Bank are:

- A 66 ⅔% favorable vote of shares requirement for amendments to the Holding Company proposed certificate of incorporation regarding the Board of Directors, limits on liability, indemnification and shareholder consent and amendment and for shareholder amendment of the Bylaws, compared to a majority favorable vote of shares required for amendment of the Bank's Charter and Bylaws.

- Cumulative voting is not permitted and special meetings of shareholders may only be called by the Board of Directors under the proposed certificate of incorporation of the Holding Company. The Bank's Charter provides for cumulative voting and the Bank's Bylaws permit holders of 10% of the voting stock to call a special meeting of shareholders.

In addition, shareholders will have differing rights as a matter of law. A majority vote of shareholders generally will be required to approve business combinations under the proposed Holding Company certificate of incorporation. However, certain business combinations with

interested stockholders could require a two-thirds vote. Business combinations involving the Bank generally require a two-thirds vote.

- The Bank's bylaws provide that shareholder nominations for director may be made at least 5 days prior to a meeting and any other business to be transacted at an annual meeting should be filed by a shareholder with the Bank at least 5 days before the annual meeting. The bylaws of the Holding Company allow more preparation time for the Board of Directors, requiring both shareholder nominations for director and any business to be transacted to be submitted at least 90 days before a meeting.

See "Certain Differences in Shareholder Rights" on page 40.

**Q:    What vote is required to adopt the Plan of Reorganization for the Holding Company Formation?**

A:    The Plan of Reorganization will be approved by shareholders if the holders of two-thirds or more of the outstanding shares of common stock of the Bank vote **"FOR"** the adoption of the Plan of Reorganization.

In addition, the Plan of Reorganization may or may not be approved by shareholders if the holders of a majority or more (but less than two-thirds) of the outstanding shares of common stock of the Bank vote **"FOR"** the adoption of the Plan of Reorganization.

The staff of the OTS has advised Independence Federal that the "OTS may require a different vote [than the majority vote Independence Federal believed would be required] to approve the holding company reorganization, based on circumstances existing at the time the Association [*i.e.*, Independence Federal] files the holding company application [regarding the Holding Company Formation]. Further, the staff of the OTS stated that "any material changes or information relating to the holding company application, including the vote requirement, not addressed herein [in the proxy statement], may require a re-solicitation of shareholder vote."

**Q:    Am I entitled to appraisal rights?**

A:    No. Under federal law, shareholders of the Bank are not entitled to dissenters' appraisal rights in connection with the Holding Company Formation.

**Q:    What are the federal income tax consequences of the Holding Company Formation?**

A:    The Holding Company Formation is structured to qualify as a tax-free reorganization so that no gain or loss will be recognized by the shareholders of the Bank as a result of their exchange of shares for holding company shares.

**Q:    Will the Holding Company be a public company that has to file annual, periodic and other reports under the Securities Exchange Act of 1934?**

A:    Yes. Under regulations of the Securities and Exchange Commission, the common stock to be issued by the Holding Company in the Holding Company Formation will be deemed to be registered under the Securities Exchange Act and the Holding Company will have the same public reporting and other requirements under the Securities Exchange Act as the Bank currently has. However, the Holding Company's filings will be required to be made with the Securities and Exchange Commission, rather than the OTS.

**Q:    Should I send in my stock certificates now?**

A:    No. After the Holding Company Formation is completed, your stock certificates for shares of Bank common stock will be deemed to represent certificates for shares in the Holding Company. Please do not send in your stock certificates with your proxy.

**VOTING:**

**Q:    Who is entitled to vote?**

A:    Only shareholders of record at the close of business on September 26, 2005, the record date, are entitled to notice of, and to vote at, the Special Meeting. However, all holders of common stock of the Bank at the time the Holding Company Formation is completed will be entitled to receive shares of the Holding Company in exchange for their shares of Bank common stock.

**Q:    What will happen if I abstain from voting or fail to vote?**

A:    The failure to cast your vote regarding the Plan of Reorganization will have the same effect as voting against the proposal to approve the Plan of Reorganization. If you fail to vote for the election of directors, the votes of those supporting Bender's nominees will have a greater impact in helping Bender gain operating control of the Bank.

**Q:    What do I need to do now?**

A:    After carefully reading and considering the information contained in this proxy statement, please vote your shares of Bank common stock as soon as possible.

**Q:    How do I cast my vote?**

A:    If you are a holder of record, you may vote in person at the Special Meeting or by submitting a proxy for the Special Meeting. You can submit your proxy by completing, signing, dating and returning the enclosed proxy card in the accompanying pre-addressed postage paid envelope. See **page 15 of this proxy statement for an explanation of the vote required for each matter and an explanation of cumulative voting for the election of directors.**

**Q:    If my broker or other nominee holds my shares for me, will my broker or such other nominee vote those shares for me?**

A:    Your broker or other nominee will vote your shares only if you provide instructions on how to vote to your broker or other nominee. You should instruct your broker or other nominee on how to vote your shares, using the procedures provided by your broker or other nominee. **Your broker will not vote your shares without your instructions.**

**Q:    Can I change my vote after I have delivered my proxy?**

A:    Yes. You can change your vote at any time before your proxy is voted at the Special Meeting. You may revoke your proxy by notifying the Secretary of the Bank in writing or by submitting a new proxy, in each case, dated after the date of the proxy being revoked. In addition, your proxy may be revoked by attending the Special Meeting and voting in person. However, simply attending the Special Meeting without voting will not revoke your proxy. If you have instructed a broker to vote your shares, you must follow the instructions received from your broker to change your vote.

# SUMMARY

*The following is a summary of information contained in this proxy statement. This summary may not contain all of the information about the election of directors and the Holding Company Formation that is important to you. For a more complete description of these matters, the Bank encourages you to read carefully this proxy statement, including the attached appendices and exhibits.*

**The Special Meeting**
**(page 15)**

This proxy statement is being furnished to shareholders of the Bank for use at the Special Meeting in connection with the election of three directors and the approval of the Plan of Reorganization for the Holding Company Formation. The Special Meeting will be held at The Mayflower Hotel, 1127 Connecticut Avenue, N.W., Washington, D.C. on October 26, 2005 at 11:00 a.m., local time.

**Election of Directors**
**(page 22)**

You are being asked to elect three directors to the Bank's Board of Directors to serve for three-year terms. The Majority Directors are convinced that this election of directors will determine whether Bender obtains operating control over the Bank.

**The Holding Company Formation**
**(page 31)**

You also are being asked to approve a plan to reorganize Independence Federal into a holding company structure. As a result of the Holding Company Formation, the Bank's parent Holding Company will operate in a more flexible structure for operations, growth and raising capital. For additional information regarding possible benefits of the Holding Company Formation, see "Proposal II–Holding Company Formation" on page 34. Also under Delaware law and the Holding Company's certificate of incorporation, major corporate events, such as the acquisition of Independence Federal proposed by another entity, generally can be accomplished by a favorable vote of holders of a majority of the Holding Company stock, rather than the two-thirds favorable vote currently required by Independence Federal to engage in such a transaction.

**The Companies**
**(page 31)**

***Independence Federal Savings Bank***
*1229 Connecticut Avenue, N.W.*
*Washington, D.C. 20036*
*(202) 628-5500*

Independence Federal is a federally chartered savings bank that operates offices in Northwest Washington, D.C., Chevy Chase, Maryland, and Silver Spring, Maryland. The Bank is primarily engaged in first mortgage and student lending programs. Since its founding in 1968, Independence Federal has been a minority controlled institution that emphasizes service to its entire community.

*Independence Bancorp, Inc.*
*1229 Connecticut Avenue, N.W.*
*Washington, D.C. 20036*
*(202) 628-5500*

Independence Bancorp, Inc. is a to-be-formed Delaware corporation initially to be formed as a subsidiary of Independence Federal. It currently has no operations. If the Holding Company Formation is approved by shareholders, requisite OTS approval is received and other conditions are satisfied, the Bank will form an interim federal savings bank as a subsidiary and the Bank will merge with that interim federal savings bank, with the Bank as the survivor and then as a wholly-owned subsidiary of the Holding Company. The Plan of Reorganization, setting forth the terms of the Holding Company Formation, is attached hereto as <u>Appendix A</u> to this proxy statement. The Bank encourages you to read the Plan of Reorganization in its entirety.

Under the terms of the Plan of Reorganization, upon effectuation of the Holding Company Formation, shareholders of the Bank will be entitled to receive one share of Holding Company common stock for each share of Bank common stock that they held at the effective time.

**Neither the Securities and Exchange Commission, the Office of Thrift Supervision nor any other federal agency or any state securities commission has approved or disapproved or passed upon the adequacy or accuracy of this proxy statement. Any representation to the contrary is a criminal offense.**

**The common stock of the Holding Company will represent non-withdrawable capital. The Holding Company common stock is not a savings or deposit account and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency. The common stock is subject to investment risk, including the possible loss of principal invested.**

**Exchange of Securities**
**(page 37)**

If the Bank effectuates the Holding Company Formation, each share of common stock of the Bank held at the time of the merger of the Bank and the interim savings bank automatically will become a share of common stock of the Holding Company on a one-for-one basis without any further action on the part of the holders thereof.

**Dissenters' Rights**
**(page 37)**

Under federal law, you do not have dissenters' appraisal rights with respect to your shares of common stock of the Bank in the Reorganization.

**Certain Material Federal Income Tax Consequences**
**(page 35)**

The Holding Company Formation is structured to qualify as a tax-free reorganization so that no gain or loss will be recognized by the shareholders of the Bank as a result of their exchange of shares for holding company shares.

**VOTING MATTERS**

**Recommendations of the Board of Directors**
**(pages 23 and 33)**

- "**FOR**" the three nominees of the Board for election as directors and

- "**FOR**" the approval of the Plan of Reorganization.

**Shareholders Entitled to Vote; Vote Required**
**(page 15)**

- You can vote at the Special Meeting if you owned common stock of the Bank at the close of business on September 26, 2005, the record date for the Special Meeting. On that date, there were 1,552,448 shares of common stock of the Bank outstanding and entitled to vote.

- You can cast one vote for each share of common stock of the Bank that you owned on that record date regarding the proposed Holding Company Formation and for each of the nominees for election as a Director. In addition, as explained on page 17 of this proxy statement under "Proposal 1–Election of Three Directors of Independence Federal," you may cumulate your votes for one or more candidates for the election of directors.

- Directors will be elected by a plurality of shares voted.

- The Plan of Reorganization will be approved by shareholders if the holders of two-thirds or more of the outstanding shares of common stock of the Bank vote "**FOR**" the adoption of the Plan of Reorganization.

  In addition, the Plan of Reorganization may or may not be approved by shareholders if the holders of a majority or more (but less than two-thirds) of the outstanding shares of common stock of the Bank vote "**FOR**" the adoption of the Plan of Reorganization.

  The staff of the OTS has advised Independence Federal that the "OTS may require a different vote [than the majority vote Independence Federal believed would be required] to approve the holding company reorganization, based on circumstances existing at the time the Association [*i.e.*, Independence Federal] files the holding company application [regarding the Holding Company Formation]. Further, the staff of the OTS stated that "any material changes or information relating to the holding company application, including the vote requirement, not addressed herein [in the proxy statement], may require a re-solicitation of shareholder vote."

- As of the record date, the Bank's executive officers and directors owned, in the aggregate, approximately 6.32% of the outstanding common stock of the Bank.

# SPECIAL MEETING

## Place, Time and Date

The Special Meeting in lieu of the Annual Meeting of Shareholders will be held at The Mayflower Hotel, 1127 Connecticut Avenue, NW, Washington, D.C. on October 26, 2005 at 11:00 a.m., local time.

## Matters to be Considered

At the Special Meeting, you will be asked to approve the following proposals:

(1)    The election of three directors of Independence Federal;

(2)    The approval of a Plan of Reorganization, including the certificate of incorporation and bylaws for the Holding Company, dated May 19, 2004, providing for a holding company structure for Independence Federal and the exchange of each share of common stock of Independence Federal for one share of Independence Bancorp, Inc. a Delaware corporation, to be formed to serve as the Holding Company for Independence Federal;

(3)    Such other matters as may properly come before the Special Meeting, or any adjournment of postponement thereof. We do not know of any such other matters.

## Who Can Vote at the Meeting

You are entitled to receive notice of and vote your Independence Federal common stock at the Special Meeting and at any adjournments of the Special Meeting only if the records of the Bank show that you held your shares as of the close of business on September 26, 2005. As of the close of business on September 26, 2005, a total of 1,552,448 shares of common stock of the Bank were outstanding and entitled to vote. Each share of common stock has one vote with respect to the proposed Holding Company Formation and each of three nominees for election as a director; however, shareholders may elect to cumulate their votes for the election of directors and allocate their votes for one or more nominees.

## Attending the Meeting

If you are a beneficial owner as of the record date of Independence Federal common stock held by a broker, bank or other nominee (*i.e.*, in "street name"), you will need proof of such ownership to be admitted to the meeting. A recent brokerage statement or letter from a bank or broker is an example of proof of ownership. If you want to vote your shares of Independence Federal common stock held in street name in person or at the meeting, you will have to obtain a written proxy in your name from the broker, bank or other nominee who holds your shares.

## Vote Required

The Special Meeting will be held only if there is a quorum. A quorum exists if a majority of the outstanding shares of common stock entitled to vote is represented at the meeting. If, as a record holder, you return a valid proxy card or attend the meeting in person and vote, your shares will be counted for purposes of determining whether there is a quorum, even if you abstain from voting. Broker non-votes also will be counted for purposes of determining the existence of a quorum. A broker non-vote occurs when a broker, bank or other nominee holding shares for a beneficial owner does not vote on a particular

proposal because the nominee does not have discretionary voting power with respect to that item and has not received voting instructions from the beneficial owner.

**Proposal 1:  Election of Three Directors of Independence Federal.**  Every stockholder entitled to vote has the right to vote the number of shares owned by him or her "FOR" as many persons as there are directors to be elected to a particular class or to cumulate his or her votes by giving one candidate as many votes as the number of such directors to be elected multiplied by the number of shares owned by such stockholder or by distributing such votes on the same principle among any number of candidates. By marking the proxy card "FOR" all or certain of the nominees, the stockholder gives the Board of Directors, as proxy, the right to vote his or her shares for such nominees and to distribute votes among such nominees as the Board of Directors may determine appropriate in its discretion.  However, a stockholder may, by proxy, "WITHHOLD AUTHORITY FOR ALL" from the Board of Directors to vote such proxy for the election of all of the nominees for director.  A stockholder may withhold authority for less than all of the nominees by marking the proxy card "FOR" and striking through the name(s) of the nominee(s) for whom authority to vote is withheld.  Directors will be elected by a plurality of shares voted, without regard to proxies as to which authority to vote for one or more of the nominees being proposed is withheld or the existence of broker non-votes.

**Proposal 2:  The Plan of Reorganization.**  The Plan of Reorganization will be approved by shareholders if the holders of two-thirds or more of the outstanding shares of common stock of the Bank vote "FOR" the adoption of the Plan of Reorganization.

In addition, the Plan of Reorganization may or may not be approved by shareholders if the holders of a majority or more (but less than two-thirds) of the outstanding shares of common stock of the Bank vote "FOR" the adoption of the Plan of Reorganization.

The staff of the OTS has advised Independence Federal that the "OTS may require a different vote [than the majority vote Independence Federal believed would be required] to approve the holding company reorganization, based on circumstances existing at the time the Association [*i.e.*, Independence Federal] files the holding company application [regarding the Holding Company Formation].  Further, the staff of the OTS stated that "any material changes or information relating to the holding company application, including the vote requirement, not addressed herein [in the proxy statement], may require a re-solicitation of shareholder vote."

Under this voting standard, an abstention or failure to vote will have the same effect as a vote "AGAINST" the Plan of Reorganization.  Thus, a broker non-vote will have the same as a vote "AGAINST" the Plan of Reorganization.

### Shares Held by Officers and Directors of Independence Federal

As of the record date, directors and executive officers of Independence Federal owned approximately 6.32% of the shares of Independence Federal common stock entitled to vote at the Special Meeting.

### Voting by Proxy

The Board of Directors of Independence Federal is sending you this proxy statement for the purpose of requesting that you allow your shares of Independence Federal common stock to be represented at the Special Meeting by the persons named on the enclosed proxy card.  All shares of Independence Federal common stock represented at the Special Meeting by properly executed proxies will be voted according to the instructions indicated on the proxy card.  If you sign, date and return a proxy card without giving voting instructions, your shares will be voted as recommended by Independence Federal's Board of Directors.  The 2004 Annual Report to Shareholders, including the

financial statements for the fiscal year ended December 31, 2004, accompanies this proxy statement. See "Financial Statements" for information on how to obtain an additional copy of the Annual Report.

If any matters not described in this proxy statement are properly presented at the Special Meeting, the persons named as proxies on the proxy card will use their own best judgment to determine how to vote your shares. If the Special Meeting is postponed or adjourned, Independence Federal common stock may be voted by the persons named in the proxy card on the adjourned date as well, unless you have revoked your proxy. Independence Federal does not know of any other matters to be presented at the Special Meeting.

It is important that proxies be returned promptly in the enclosed envelope. Any proxy you submitted for use at the meeting scheduled for September 14, 2005, will not be voted because of the change of the record date. You may revoke your proxy at any time before the vote is taken at the meeting. To revoke your proxy, you must either advise the Corporate Secretary of Independence Federal in writing before your common stock has been voted at the meeting, deliver a later dated proxy card or attend the meeting and vote your shares in person. Attendance at the Special Meeting will not in itself constitute revocation of your proxy. If you need assistance in completing your proxy card or have questions regarding the Special Meeting, please contact Sheila R. Finlayson, Corporate Secretary, at (202) 628-5500.

If Independence Federal common stock is held by a broker, bank or other nominee (*i.e.*, in "street name") you will receive instructions from your broker, bank or other nominee that you must follow in order to have your shares voted. Your broker, bank or other nominee may allow you to deliver your voting instructions via the telephone or Internet. Please see the instruction form provided by your broker, bank or other nominee that accompanies this proxy statement.

# CORPORATE GOVERNANCE

## General

Independence Federal periodically reviews its corporate governance policies and procedures to ensure that the Bank meets the highest standards of ethical conduct, reports results with accuracy and transparency and fully complies with the laws, rules and regulations that govern the Bank's operations. As part of this periodic corporate governance review, the Board of Directors reviews and adopts corporate governance policies and practices for the Bank.

## Code of Ethics and Business Conduct

The Bank has adopted a Code of Ethics and Business Conduct, referred to as the "Code of Ethics" that is designed to ensure that the Bank's directors, executive officers and employees meet the highest standards of ethical conduct. The Code of Ethics requires that the Bank's directors, executive officers and employees avoid conflicts of interest, comply with all laws and other legal requirements, conduct business in an honest and ethical manner and otherwise act with integrity and in the Bank's best interest. Under the terms of the Code of Ethics, directors, executive officers and employees are required to report any conduct that they believe in good faith to be an actual or apparent violation of the Code of Ethics.

As a mechanism to encourage compliance with the Code of Ethics, the Bank has established procedures to receive, retain and treat complaints received regarding accounting, internal accounting controls or auditing matters. These procedures ensure that individuals may submit concerns regarding questionable accounting or auditing matters in a confidential and anonymous manner. The Code of Ethics

17

also prohibits the Bank from retaliating against any director, executive officer or employee who reports actual or apparent violations of the Code of Ethics.

## Meetings of the Board of Directors

The Board of Directors of the Bank met 23 times during the year ended December 31, 2004. In carrying out its duties, the Board of Directors has the authority to establish committees and to appoint Board members to serve on these committees. No director attended fewer than 75% of the total meetings of the Board of Directors and committees on which such director served in 2004.

*Attendance at the Annual Meeting.* The Board of Directors encourages each director to attend annual meetings of shareholders. All of the directors attended the 2004 special meeting in lieu of an annual meeting of shareholders and the 2005 annual meeting of shareholders that was adjourned prior to the vote on the election of directors.

## Committees of the Board of Directors

*Executive Committee.* On June 30, 2005, the Board established an Executive Committee of the Board consisting of Carolyn D. Jordan, Esq. (Chair), Eugene K. Youngentob and David W. Wilmot, Esq. The Executive Committee, when the Board is not in session, may exercise all of the authority of the Board except the authority to declare dividends, amend the charter and bylaws of the Bank, or recommend to the shareholders a plan of merger, consolidation, or conversion, the sale, lease or other disposition of all or substantially all of the property and assets of the Bank otherwise than in the usual and regular course of business, a voluntary dissolution of the Bank, a revocation of any of the foregoing, or the approval of a transactions in which any member of the executive committee, directly or indirectly has any material beneficial interest.

*Audit Committee.* The Board of Directors has a separately-designated standing Audit Committee established in accordance with Section 10A(m) of the Securities Exchange Act of 1934. The Audit Committee, consisting of Michael J. Cobb, CPA (Chair), Carolyn D. Jordan, Esq., Eugene K. Youngentob and Robert B. Isard, meets periodically with independent auditors and management to review accounting, auditing, internal control structure and financial reporting matters. Directors are not compensated for service on this committee. This committee met five times during the year ended December 31, 2004. Each member of the Audit Committee has been determined to be independent in accordance with the listing standards of the Nasdaq Stock Market. The Board of Directors has determined that Michael J. Cobb is an audit committee financial expert under the rules of the Securities and Exchange Commission and, as such, he also qualifies as an audit committee member with financial sophistication under the Nasdaq listing standards. The Audit Committee acts under a written certificate of incorporation adopted by the Board of Directors, a copy of which was included as an appendix to the proxy statement for the 2004 special meeting in lieu of an annual meeting of shareholders.

*Compensation Committee.* The Board of Directors has a Compensation Committee to review the compensation for executive officers and employees of the Bank. Nelson Deckelbaum, Esq. (Chair), Michael J. Cobb, CPA, Carolyn D. Jordan, Esq. and Eugene K. Youngentob serve on this committee, which met twice in 2004.

*Nominating Committee.* Pursuant to the Bank's bylaws, which are subject to OTS regulations and oversight, the full Board is required to act as a nominating committee for the selection of the management nominees for election as directors of the Bank. The Bank, however, has also established the Nominating/Corporate Governance Committee, discussed below, to advise the Board regarding nominations of directors. The Board met once in 2004 and three times in 2005 in its capacity as a Nominating Committee with respect to the 2005 Annual Meeting of shareholders and this Special Meeting.

***Nominating/Corporate Governance Committee.*** The Bank's Nominating/Corporate Governance Committee, consisting of Michael J. Cobb, David W. Wilmot, Esq., Carolyn D. Jordan, Esq. (Chair), Nelson Deckelbaum, Esq., Elliott S. Hall, Esq., and Eugene K. Youngentob, assists the Board of Directors in identifying qualified individuals to serve as Board members, in determining the composition of the Board of Directors and its committees, in monitoring a process to assess Board effectiveness and in developing and implementing the Bank's corporate governance guidelines. The Nominating/Corporate Governance Committee also considers and recommends the nominees for director to stand for election at the Bank's annual meeting of shareholders. The Nominating/Corporate Governance Committee met once during 2004 and three times in 2005, to recommend nominees for election as director to the Board of Directors at the Bank's 2005 Annual Meeting of Shareholders and this Special Meeting. Each member of the Nominating/Corporate Governance Committee is independent in accordance with the NASD Manual. The procedures of the Nominating/Corporate Governance Committee required to be disclosed by the rules of the Securities and Exchange Commission are included in this Proxy Statement. See "Nominating/Corporate Governance Committee Procedures." The Nominating/Corporate Governance Committee will consider director candidates recommended by shareholders, which candidates appear to be qualified to serve on the Bank's Board of Directors, as described below in "Nominating/Corporate Governance Committee Procedures." The Nominating/Corporate Governance Committee acts under a written certificate of incorporation adopted by the Board of Directors, a copy of which was included as an appendix to the proxy statement for the 2004 special meeting in lieu of an annual meeting of shareholders.

***Loan Committee.*** In November 2004, Independence Federal's Board of Directors appointed a Loan Committee of directors and executive officers to review and approve certain mortgage and other types of loans, consisting of William B. Fitzgerald, IV (Chair), Robert B. Isard, Thomas L. Batties, Esq., William L. Fuller and E. Leroy Morris. The Loan Committee met three times in 2004. Prior to November 2004, the Loan Committee was comprised only of persons who were not directors.

## Directors' Compensation

***Directors' Fees.*** A fee of $1,650 per regular monthly board meeting attended is paid to each member of the Board of Directors as compensation for services rendered as a director. Attendance at special meetings of the Board is not compensated. Committee members do not receive any fees for service on the Bank's committees. For the year ended December 31, 2004, the Bank paid directors and directors emeritus aggregate fees of $229,350. Members of the Board of Directors of the Bank are also Directors of the Bank's subsidiary, IFC, but they do not receive fees for attending IFC Board meetings. Additionally, pursuant to a resolution adopted by the Board of Directors of the Bank in January 1999, a retirement plan was established for directors who had served on the Bank's Board for a continuous period in excess of 16 years. Upon the mutual agreement of the Board of Directors and an eligible director, at the time of the director's separation from the Board, such director shall be designated a "Director Emeritus." The former director serves the Bank in an advisory capacity and receives as compensation the same monthly fees paid to the current Directors of the Bank, for a period of five years from the Director's separation from the Board. Death and/or disability (the inability to perform as requested) shall terminate the payments to a Director Emeritus. Currently, the Bank has three former Board members serving as directors emeritus: Francis L. Smith, Jeanne Viner Bell and William L. Davis. Mr. Rudolph Arkin's tenure as a Director Emeritus expired in August 2004.

# STOCK OWNERSHIP

Persons and groups owning in excess of 5% of the common stock of Independence Federal are required to file certain reports regarding such ownership with the Bank and the OTS. Based upon filings made with the OTS or other information, the Bank is aware as of September 26, 2005, that the following persons were beneficial owners of more than 5% of the Bank's common stock. A person is considered the beneficial owner of common stock with respect to which such person has or shares voting or investment power or has the right to acquire ownership at any time within 60 days, including, without limitation, through the exercise of a stock option, warrant or right, or the conversion of a security.

| Name and Address of Beneficial Owner | Amount and Nature of Common Stock | Percent of Class |
|---|---|---|
| Morton A. Bender (1) .............................. <br> Grace M. Bender <br>     2838 McGill Terrace, N.W. <br>     Washington, D.C. 20008 | 326,000 shares | 21.00% |
| Faustine Fitzgerald (2) .............................. <br>     7349 Mission Hills Dr. <br>     Las Vegas, Nevada 89113 | 205,639 shares | 13.25% |
| Tontine Financial Partners, L.P. (3) .............. <br> Tontine Management L.L.C. <br> Tontine Overseas Associates, L.L.C. <br> Jeffery L. Gendell <br>     55 Railroad Avenue, 3rd Floor <br>     Greenwich, Connecticut 06830 | 135,689 shares | 8.74% |
| Jeffery E. Thompson (4) ........................... <br> 1101 15th Street, N.W. <br> Suite 400 <br> Washington, D.C. 20005 | 111,600 shares | 7.19% |
| Millenco, L.P. (5).................................... <br> Millennium Management, L.L.C. <br> Israel A. Englander <br>     666 Fifth Avenue <br>     New York, New York 10103 | 66,786 shares | 4.30% |

---

[1] Based on information contained in a Schedule 13D/A filed with the OTS on May 24, 2004, on behalf of Morton A. Bender and Grace M. Bender. Mr. and Mrs. Bender share voting and dispositive power over 326,000 shares. On July 29, 2004, Bender filed Amendment No. 11 to his Schedule 13D disclosing that he received a letter on July 19, 2004 from the OTS ("July 19 OTS Letter"). Bender stated that, pursuant to the OTS Letter, he may not take any action that would increase his level of control over the Bank, including, among other things: acquiring any additional shares of the Bank; proposing a slate of Directors at the meeting of shareholders; or otherwise taking action to remove or replace the management or Directors of the Bank. Bender stated that he intends to comply with the OTS Letter, unless and until the July 19 OTS Letter is rescinded or modified and that he did not know the length of such prohibition. Bender did not disclose the reason(s) the OTS took this action. On October 6, 2004, Bender filed Amendment No. 13 to his Schedule 13D disclosing that the OTS approval of his change in control application will expire on October 14, 2004 and to clarify that the July 19 OTS Letter was issued due to regulatory and compliance concerns. The OTS subsequently issued two formal enforcement orders against Colombo Bank as a result of these regulatory and compliance concerns. On April 13, 2005, Bender filed Amendment No. 14 to his Schedule 13D disclosing that, on April 5, 2005, Bender received a letter from the OTS terminating its July 19, 2004 directive. On April 15, 2005, Bender filed Amendment No. 15 to his Schedule 13D

reporting that on April 15, 2005, Bender received a letter from the OTS stating that it is the opinion of the OTS that Bender may not obtain proxies to vote for directors (including acting in concert with another shareholder to obtain proxies) without OTS approving an extension of his original change in control approval that expired October 14, 2004 or a new change in control application.  On August 29, 2005, Bender filed Amendment No. 18 to his Schedule 13D reporting that he had submitted a new application with the OTS requesting approval to acquire and exercise more control over Independence Federal.  Specifically, Bender disclosed that he wants to increase his ownership in the Bank to 51%, or 791,749 shares.  His stated goal is to have a majority of the Board of Directors be persons who were his nominees, are his representatives or have similar views to his own about the future of Independence Federal.

[2]  Includes 8,950 shares held by Ms. Fitzgerald's daughter.

[3]  Based on information contained in a Schedule 13G/A filed with the OTS dated February 10, 2005, Tontine Financial Partners, L.P. and Tontine Management, L.L.C. share voting and dispositive power over 97,042 shares.  Tontine Overseas Associates, L.L.C. shares voting and dispositive power over 13,842 shares and Jeffery L. Gendell shares voting and dispositive power over 110,884 shares and sole voting and dispositive power over 24,805 shares.

[4]  Based on information contained in a Schedule 13D filed with the OTS dated September 28, 2005.  That Schedule 13D states: "There are no contracts, arrangements, understandings or relationships (legal or otherwise) between Mr. Thompson and any other person with respect to any securities of the Issuer.  Mr. Michael J. Cobb is a member of the Issuer's Board of Directors and is also a 1% stockholder of TCBA [Thompson, Cobb, Bazilio and Associates, P.C., of which Mr. Thompson is Chairman and Chief Executive Officer].  Mr. Thompson has not had any prior discussion or other communication with Mr. Cobb regarding Mr. Thompson's purchase of shares of the common stock."

[5]  Based on information contained in a Schedule 13G filed with the OTS dated September 21, 2005, Millenco, L.P., Millennium  Management, L.L.C. and Israel A. Englander share voting and dispositive power over the shares.  The information is included herein because the shareholder's ownership was more than 5% on the record date for the postponed meeting that was scheduled for September 14, 2005.  The new disclosure indicates that the filer's ownership fell below the 5% level.

# PROPOSAL I - ELECTION OF DIRECTORS

## Adjournment of Annual Meeting on May 11, 2005

On May 9, 2005, the OTS sent a letter to Bender stating that he had distributed a letter to shareholders that contained disclosures that appeared to the OTS to be false and misleading. (See Appendix B to this proxy statement.) On May 10, 2005, the day before the scheduled May 11, 2005 Annual Meeting, the OTS delivered a letter to the Board of Directors of Independence Federal (see Appendix C to this proxy statement) stating that a community group had also sent a letter with apparent false and misleading statements. Management has advised the OTS that that community group was not associated with the Bank or its management. As a result of these two findings, the OTS stated that it "strongly believes that the Annual Meeting should be postponed to enable the shareholders to receive and evaluate sufficient accurate information to permit each to cast an informed vote." After discussions with the staff of the OTS, the Bank's Board of Directors decided to convene the annual meeting on May 11, 2005 for the purpose of ratification of the appointment of the Bank's independent auditors for the fiscal year ending December 31, 2005, and to adjourn the meeting without a vote on the election of directors. After the vote on the ratification of accountants, the Chairman adjourned the meeting and announced that it would be reconvened on June 8, 2005 or such other date as would be subsequently announced.

Following adjournment of the annual meeting, the members of the Bank's Board of Directors unanimously agreed that it would not be practicable to reconvene the annual meeting on June 8, 2005, in view of the time required to address the issues that were the basis for adjourning the meeting, and on May 31, 2005, the Bank sent a notice to shareholders that the annual meeting would not be reconvened on June 8, 2005.

The Bank's Board of Directors cooperated with the OTS and furnished the information requested by the OTS in its May 10, 2005 letter. By letters dated September 14, 2005 (See Appendices G and H of this proxy statement), the OTS stated that it has determined not to pursue enforcement action with respect to the matters discussed in its letters of May 9 and 10, 2005.

Following adjournment of the annual meeting, based on discussions with the OTS, the Bank's Board determined that it would be appropriate to re-institute its plan to reorganize Independence Federal into a holding company structure. The Board had previously determined to seek to implement a holding company formation in 2004, during the period when Independence Federal had entered into an agreement for the Carver Merger; however, the OTS, contrary to the anticipation of the Bank, advised the Bank at that time that, due to the proposed merger, approval of a holding company formation would require approval by a two-thirds shareholder vote. Since the Board believed that such a supermajority vote could not be obtained because of the anticipated opposition of Bender to the Carver Merger and the holding company formation, which could have helped obtain stockholder approval for the Carver Merger, it determined not to propose a holding company formation to the shareholders at that time. Because no merger transaction is currently in progress or under consideration by the Board and the Board is not actively seeking a merger transaction or any other corporate reorganization that would require OTS approval, the Board believed that reorganization into a holding company structure should be approved at this time by a vote of the majority of the outstanding shares of the Bank's common stock

under applicable OTS regulations. The staff of the OTS has advised Independence Federal that the "OTS may require a different vote [than the majority vote Independence Federal believed would be required] to approve the holding company reorganization, based on circumstances existing at the time the Association [*i.e.*, Independence Federal] files the holding company application [regarding the Holding Company Formation]. Further, the staff of the OTS stated, "any material changes or information relating to the holding company application, including the vote requirement, not addressed herein [in the proxy statement], may require a re-solicitation of shareholder vote."

Since Independence Federal has already incurred most of the expense of presenting the question of the Holding Company Formation to shareholders, Independence Federal has decided to proceed with a vote on the Holding Company Formation matter at this time, even though it can give no assurance as to the vote that will be required for approval, other than that a vote of two-thirds of the outstanding shares of common stock will constitute shareholder approval and a majority vote may or may not constitute shareholder approval. As discussed in greater detail later in this document, the Board continues to believe that the holding company structure, which most stock savings banks have adopted, will provide a more flexible form of organization that will have potential benefits for Independence Federal.

### Election of Directors

The Bank's Board of Directors currently is composed of eight members with staggered terms; however, the bylaws of the Bank authorize it to have a Board composed of nine directors. One director position currently is vacant as a result of the resignation on May 23, 2005, of Jeanus B. Parks, Jr. Mr. Parks was scheduled to retire from the Board of Directors, effective as of the annual meeting that was convened on May 11, 2005, but adjourned prior to the election of directors. The Board of Directors had proposed Walter C. Jones for election at the annual meeting to replace Mr. Parks, but following the adjournment of the annual meeting, Mr. Jones requested that his name be withdrawn as a candidate for election as a director.

Three directors will be elected at the Special Meeting for three-year terms, or until their successors are elected and qualified. Such election of three directors will increase the size of the Board to its full compliment of nine directors. The three nominees proposed for election by the Board are William B. Fitzgerald, IV, David W. Wilmot, Esq. and Marion O. Greene. Both Mr. Fitzgerald and Mr. Wilmot are currently directors of the Bank. Mr. Greene is a new Director nominee. All nominees have agreed to serve for a three-year term, or until their respective successors shall have been elected and qualified. No person being nominated by the Board as a director is being proposed for election pursuant to any agreement or understanding between any person and the Bank. Prior to a new director nominated by the Board taking office, the OTS must approve such director. This regulatory approval requirement is the result of the Bank being deemed a "troubled institution" by the OTS pursuant to a letter dated November 4, 2003. Because Mr. Greene is not currently a director, he will be able to serve as a director if elected by shareholders, only with OTS approval. Mr. Greene has filed an application for such approval by the OTS and pursuant to OTS policy the Bank has been notified that the review period for the application was extended until the first business day after OTS receives notification that Mr. Greene has been elected by shareholders. A non-management director of the Bank recommended Mr. Greene to the Nominating/Corporate Governance Committee. The Nominating/Corporate Governance Committee then recommended Mr. Greene's nomination to the full Board of Directors, acting as the Nominating Committee.

**THE BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "FOR" THE ELECTION OF ITS NOMINEES.**

It is intended that the proxies solicited by the Board of Directors will be voted for the election of said nominees or, at the discretion of the Board of Directors, cumulatively voted for any of such nominees, unless the proxy card is marked to indicate that such authorization is expressly withheld. If any nominee is unable to serve, the shares represented by all valid proxies will be voted for the election of such substitute as the Board of Directors may recommend. At this time, subject to qualification of any new directors with the OTS as discussed above, the Board of Directors knows of no reason why any nominee might be unavailable to serve.

## Importance of Election

The Majority Directors are convinced that the Directors to be elected at this Special Meeting will determine whether Bender obtains operating control over Independence Federal. **If Bender's nominees are elected, the Majority Directors are convinced Bender will have full control of the Bank through Bender's Directors.**

1. **The Majority Directors Believe Bender Has Caused and Continues to Cause Harm To Independence Federal and Its Shareholders.**

   The Majority Directors are convinced that:

   - Bender is a substantial reason the price for Independence Federal common stock has fallen to the $11.75 per share closing price of such stock on the Nasdaq SmallCap Market on September 29, 2005.

     − A substantial contributor to that depressed stock price is that stockholders were prevented from receiving $21.00 per share in cash for each of their shares of Independence Federal common stock in the proposed Carver Merger, as well as the opportunity to reinvest that $21.00 per share. Bender's opposition to the Carver Merger and his other actions contributed to the failure of the Carver Merger.

     − Another contributor to the depressed stock price is the increased expenses, including a significant portion of legal fees in excess of $3,000,000 alone in 2004, which Independence Federal incurred in its efforts to protect the Bank and its shareholders from Bender's actions, including trying to preserve the Carver Merger and the impact of such expenses on the Bank's financial condition and results of operations

   - Bender has demonstrated his unwillingness particularly by refusing to submit a bid to acquire Independence Federal in the process that resulted in the Carver Merger agreement, to purchase from all shareholders all of the shares of Independence Federal, through a merger or otherwise, at a price which is competitive with that which shareholders could obtain in an open bidding type process.

24

- Bender has acquired a sufficient stock position in Independence Federal, to significantly affect the Bank's ability to engage in merger or acquisition transactions by others who have been or may be willing to purchase all of the shares of Independence Federal.

*In the view of the Majority Directors:*

- Bender has already been exercising significant influence and control over Independence Federal:

  – Through the substantial effect his 21% ownership position would have on the Bank's ability to engage in major corporate transactions;

  – Through opposition to the Carver Merger and the adverse effect of Bender's activities on Independence Federal;

  – Through the election of Bender's Directors to the Board and their conduct on the Board as observed by the Majority Directors; and

  – Through hostile tactics against Directors, other than Bender's Directors, such as impugning their integrity and competence and instituting a lawsuit seeking to impose personal liability on those Directors, in each case, in the opinion of the Majority Directors, without citing any reasonable factual basis or any basis having relevance to individual directors. These actions and baseless pejorative statements also damage the Bank's reputation in the community.

- Bender is a substantial reason that Independence Federal was not able to accomplish the proposed Carver Merger, which would have provided Independence Federal stockholders $21 per share in cash for each share of Independence Federal common stock held. Further, the failure of the Carver Merger is a substantial contributing factor to the price for Independence Federal common stock falling to the $11.75 per share closing price of such stock on the Nasdaq SmallCap Market on September 29, 2005;

  – The OTS in its May 9, 2005 letter to Bender points out that "in a real sense" Bender "played a role in preventing the Carver Merger, the direct result of which was a substantial decline in the share price of [Independence Federal] stock," as demonstrated by the following quotations:

    (i) "[I]t was your [Bender's] opposition to the Carver merger that led the Bank [Independence Federal] to incur a significant portion of the legal fees in an effort to overcome your [Bender's] efforts to stop the merger";

    (ii) "Further, the continuing decline in the Bank's capital position resulting largely from those legal expenses, with no end in sight, was a factor in the OTS decision to deny the Carver merger"; and

25

(iii) "Therefore, in a real sense, you [Bender] played a role in preventing the Carver merger, the direct result of which was a substantial decline in the share price of [Independence Federal] stock."

- Bender ultimately is seeking to acquire control of Independence Federal as cheaply as possible, which is directly contrary to the best interests of the other shareholders of Independence Federal. As stated by a United States District Court Judge: "Mr. Bender testified quite frankly that he wants to acquire the Bank for the least amount possible. He also agreed that the Board of Directors wants to sell the Bank for the greatest amount possible. For the best benefit to all of the shareholders."

- As a means to acquire Independence Federal as cheaply as possible, Bender is seeking to acquire control by controlling the Board of Directors. As the Judge quoted in the preceding bullet also stated, "the focus of Mr. Bender's request for a special meeting, however, is to remove all but two of the Board members, replace those persons with others of his choosing and gain indirect control of the Bank without spending a *sou* [*i.e.*, a cent] for it."

2. **The Majority Directors Are Convinced that, if Bender Succeeds in Electing His Two Nominees as Directors at this Special Meeting, He Will Obtain a Controlling Influence Over Independence Federal and Will Be in a Position to Fulfill His Goal of Acquiring Control of Independence Federal at the Cheapest Possible Cost to Himself to the Detriment of All the Other Shareholders of Independence Federal.**

   *In the view of the Majority Directors:*

   - If Bender's two director nominees are elected at the Special Meeting, Bender will have finally accomplished the goal that he has been campaigning to achieve since 2002.

   - Bender would not have engaged in that campaign and incurred its expense if he did not have specific plans for Independence Federal. It is quite possible that Bender wants to cause a merger of Independence Federal and Colombo Bank which is operating under a Cease and Desist order of the OTS as a result of numerous cited violations of banking laws and regulations. Moreover, Colombo was fined for these violations. Colombo Bank is over 90% owned indirectly by Bender and his family.

*For additional information regarding the importance of the election, please see the yellow supplement to this proxy statement, which is incorporated herein and which provides an update on Morton Bender's recent activities to increase his ownership in Independence Federal and exercise more control over Independence Federal.*

**Information as to Nominees and Continuing Directors**

The Board of Directors has determined that all of its directors meet the definition of "independent" set forth in Rule 4200(a)(15) of the National Associations of Securities Dealers' Manual (the "NASD Manual"), except for William B. Fitzgerald, IV. Since the common stock of the Bank is quoted on the Nasdaq Stock Market, Inc., the Bank is required to have a majority of its Board of Directors composed of independent directors. The Bank is in compliance with this listing standard and will continue to be in compliance upon the election of the proposed nominees.

The nominees and continuing directors, their ages, position with Independence Federal and principal occupation and employment for the past five years, the year each was first elected as a director of Independence Federal, the year in which their individual term as director expires and the amount of common stock and the percent thereof beneficially owned by each, all as of September 26, 2005, are shown on the following table. **This information is based on information furnished by the nominee or director and information known to the Bank.** The address of each director is in care of Independence Federal, 1229 Connecticut Ave., N.W., Washington, D.C. 20036. A person may be considered to beneficially own any shares of common stock over which he or she has, directly or indirectly, sole or shared voting or investing power.

| Name and Principal Occupation | Age | Director Since | Expiration of Term | Common Stock | |
|---|---|---|---|---|---|
| | | | | Amount and Nature of Beneficial Ownership[1] (Shares) | Percent of Class |
| **Nominees for Director:** | | | | | |
| William B. Fitzgerald, IV | 47 | 1999 | 2005 | 121[2] | * |
|     Real Estate Appraiser/Broker with Long & Foster Companies since 1998 | | | | | |
| David W. Wilmot, Esq. | 60 | 2002 | 2005 | 484 | * |
|     Vice Chairperson since June 2005 and Treasurer of the Board of Directors since 2002 and Attorney, Partner at Harmon, Wilmot & Brown, L.L.P., Washington, D.C., since 1974 | | | | | |
| Marion O. Greene, Jr. | 68 | -- | – | 100 | * |
|     Chief Executive Officer of American Development Corporation, a management consulting firm, since 2002. From 1995 to 2002, Mr. Greene was an Executive Vice President of McKissack & McKissack of Washington, D.C., Inc., an architecture, design and engineering firm | | | | | |
| **Directors Continuing in Office:** | | | | | |
| Nelson Deckelbaum, Esq. | 76 | 2003 | 2006 | 110[3] | * |
|     Attorney, Senior partner in the law firm of Deckelbaum, Ogens and Raftery, Chtd., since 1975 | | | | | |
| Elliott S. Hall, Esq. | 66 | 2003 | 2006 | 110[3] | * |
|     Attorney, Partner with Dykema Gossett, Washington, D.C., since 2002, and Vice President of Ford Motor Co. from 1987 through 2002 | | | | | |
| Eugene K. Youngentob | 74 | 2001 | 2006 | 5,445 | * |
|     Consultant since 2001 and Principal from 1980 to 2001 of Arkin, Youngentob Associates, LLC, Bethesda, Maryland, a firm specializing in executive and employee benefit planning, estate planning and financial analysis | | | | | |
| Carolyn D. Jordan, Esq. | 64 | 2001 | 2007 | 121 | * |
|     Chairperson of the Board of Directors since June 2005 and previously served as Vice Chairperson since 2003, Attorney (retired), Executive Director of the National Credit Union Administration from 1997 to 2001 (Retired 2001) | | | | | |

| Name and Principal Occupation | Age | Director Since | Expiration of Term | Common Stock | |
|---|---|---|---|---|---|
| | | | | Amount and Nature of Beneficial Ownership[1] (Shares) | Percent of Class |
| Michael J. Cobb, CPA Secretary of the Board of Directors since 2000, and Accountant, Partner of Thompson, Cobb, Bazilio & Associates, Washington, D.C. CPA firm, since 1997 | 49 | 2000 | 2007 | 21,708[4] | 1.40% |
| Robert B. Isard Consultant. Formerly, Chief Operating Officer, 2004 to 2005, and prior to that from 2000 to 2004 in other executive positions, including Chief Financial Officer, with McKissack & McKissack, a professional design and construction management firm, Philadelphia, PA[6] | 59 | 2004 | 2007 | 69,904[5] | 4.50% |
| All directors, nominees and executive officers as a group (15 persons) | --- | — | — | 98,270 | 6.33% |

---

[*]   Represents less than 1% of the Bank's voting securities.

[1]   Unless otherwise noted, all shares are owned directly or indirectly by the named individuals or by their spouses and children, over which shares the named individuals effectively exercise sole or shared voting and investment power.

[2]   Includes 121 shares held in trust for Mr. Fitzgerald's son.

[3]   Directors Deckelbaum and Hall were nominated for election and elected as directors by Morton Bender at the annual shareholders' meeting of Independence Federal held on April 30, 2003. Bender filed Amendment No. 3 to his Schedule 13D jointly with Directors Deckelbaum and Hall on April 15, 2003, as a group, reporting beneficial ownership of the shares of common stock of Independence Federal held by Bender, his wife, Grace Bender, and Directors Deckelbaum and Hall. Amendment No. 3 reports that Bender purchased the shares of Independence Federal reported as individually held by Directors Deckelbaum and Hall. The Bank filed a lawsuit against Bender and Directors Deckelbaum and Hall on May 6, 2004. Bender filed Amendment No. 10 to his Schedule 13D on May 24, 2004, which reported that each of Directors Deckelbaum and Hall terminated any participation in a group with Bender and revoked their respective powers of attorney given to Bender to file and execute amendments to his Schedule 13D, by delivery of a letter to Bender on May 24, 2004, terminating the joint filing agreement dated December 19, 2003. Directors Deckelbaum and Hall each have denied that they are participating as a member of a group with Bender for purposes of acquiring, holding or disposing of securities of the Bank. On June 30, 2004, the Bank dismissed its lawsuit as it pertained to Directors Deckelbaum and Hall.

[4]   Includes 21,567 shares over which Mr. Cobb, his mother and his brother share voting power.

[5]   Includes 47,254 shares held by his mother's estate, over which Mr. Isard has voting power, and 986 shares held by his wife.

[6]   By letter, dated, September 16, 2005, a copy of which is attached as Appendix I to this proxy statement, the OTS advised Robert B. Isard that, pursuant to 12 C.F.R. 563.590(b), it had no objection to his service as a director. Mr. Isard has been serving on the board since October 29, 2004.

**Summary of Business Experience of Nominee Who is Not Currently a Director**

*Marion O. Greene, Jr.,* age 68, currently serves as the Chief Executive Officer of American Development Corporation, which provides a variety of problem solving professional support services to publicly traded companies, federal government agencies and state and municipal governments. From 1995 to 2002, Mr. Greene was an Executive Vice President of McKissack & McKissack of Washington, D.C., Inc., where he designed and installed systems and procedures in operations, finance, accounting, personnel and business development.

**Executive Officers Who Are Not Also Directors**

*Thomas L. Batties, Esq.,* age 53, currently serves as President and Chief Executive Officer of the Bank and has held such positions since he joined the Bank in June 2003. Prior to this appointment, he served as the President and Chief Executive Officer of Enterprise Federal Savings Bank from May 1999 to February 2003. Mr. Batties beneficially owns 100 shares of Independence Federal common stock.

*Jacqueline Daughtry-Miller,* age 58, joined Independence Federal in 1985. In August 1999, she was promoted to Senior Vice President of the Student Loan Department. Prior to this appointment, she served as Vice President of Student Loans since March 1988. Ms. Daughtry-Miller beneficially owns 17 shares of Independence Federal common stock.

*Patricia Dennison,* age 60, joined Independence Federal in August 2003 as Senior Vice President of Operations. Prior to that, Ms. Dennison served as Vice President of Operations at Enterprise Federal Savings Bank from November 1994 through June 2003. Ms. Dennison does not own any Independence Federal common stock.

*Sheila R. Finlayson, Esq.,* age 38, currently serves as Counsel and Corporate Secretary of the Bank and has held such positions since March 2004 and March 2002, respectively. Ms. Finlayson is a graduate of the Howard University School of Law. Ms. Finlayson joined Independence Federal in October 1998, serving as Special Assistant to the President. Ms. Finlayson does not own any Independence Federal common stock.

*William L. Fuller,* age 61, currently serves as the Acting Chief Lending Officer of the Bank and has held such position since November 2004. Prior to this appointment, Mr. Fuller served as the Senior Vice President and Chief Lending Officer of Harbor Bank from July 2002 until October 2004 and as the President of Legacy Banc (in organization) from January 2001 until July 2002. Mr. Fuller does not own any Independence Federal common stock.

*Leroy Morris,* age 62, joined Independence Federal in July 2003 as Executive Vice President and Chief Financial Officer of the Bank. Prior to that appointment, Mr. Morris served as the Executive Vice President and Chief Financial Officer of Enterprise Federal Savings Bank from January 1996 through July 2003. Mr. Morris beneficially owns 50 shares of Independence Federal common stock.

## PROPOSAL II – HOLDING COMPANY FORMATION

*The following is a description of the material aspects of the Holding Company Formation. While the Bank believes that the following description covers the material terms of the Holding Company Formation, this description may not contain all of the information that is important to you. The Bank encourages you to read carefully this entire proxy statement, including the Plan of Reorganization for the Holding Company Formation attached to this proxy statement as Appendix A, for a more complete understanding of the Holding Company Formation.*

**General**

The Board of Directors of the Bank has approved, and the Board of Directors of the Bank's to be formed wholly-owned subsidiary, the proposed Holding Company, Independence Bancorp, Inc., a to-be-formed Delaware corporation, will approve the Plan of Reorganization for the Holding Company Formation. If the Holding Company Formation is approved by the requisite vote of the shareholders of the Bank and other required conditions, including the approval of the OTS, are satisfied, then at the effective time, an interim federal savings bank to be chartered by the Holding Company will merge with and into the Bank, with the Bank surviving as a wholly-owned subsidiary of the Holding Company. At the effective time of the Holding Company Formation, each share of common stock of the Bank issued and outstanding immediately prior to the effective time will be exchanged for a share of common stock of the Holding Company without any further action required on the part of any shareholder.

The Plan of Reorganization will be approved by shareholders if the holders of two-thirds or more of the outstanding shares of common stock of the Bank vote **"FOR"** the adoption of the Plan of Reorganization.

In addition, the Plan of Reorganization may or may not be approved by shareholders if the holders of a majority or more (but less than two-thirds) of the outstanding shares of common stock of the Bank vote **"FOR"** the adoption of the Plan of Reorganization.

The staff of the OTS advised Independence Federal, the "OTS may require a different vote [than the majority vote Independence Federal believed would be required] to approve the holding company reorganization, based on circumstances existing at the time the Association [*i.e.*, Independence Federal] files the holding company application [regarding the Holding Company Formation]. Further, the staff of the OTS stated, "any material changes or information relating to the holding company application, including the vote requirement, not addressed herein [in the proxy statement], may require a re-solicitation of shareholder vote."

After the Holding Company Formation, the Bank will continue its existing business and operations as a wholly-owned subsidiary of the Holding Company and the consolidated capitalization, assets, liabilities, income and financial statements, and management of the Holding Company immediately following the Holding Company Formation will be substantially the same as those of the Bank immediately prior to consummation of the Holding Company Formation. The Charter and Bylaws of the Bank will continue in effect and will not be affected in any manner by the Holding Company Formation; however, after the Holding Company Formation, the shareholders of the Bank will become shareholders of the Holding Company and their rights will then be governed by the certificate of incorporation and bylaws of the Holding Company and Delaware law. The name "Independence Federal Savings Bank" will continue to be utilized by the Bank. The corporate existence of the Bank will continue unaffected and unimpaired by the Holding Company Formation, except that all of its outstanding stock will be owned by the Holding Company.

Approval of the Plan of Reorganization for the Holding Company Formation by the holders of the requisite number of the outstanding shares of the Bank's common stock will have the effect of approving the certificate of incorporation and bylaws of the Holding Company. The certificate of incorporation and bylaws of the Holding Company are attached to this proxy statement with the Plan of Reorganization as Appendix A. It may be necessary for the Holding Company to amend its certificate of incorporation and bylaws in order to obtain regulatory approval of the Holding Company Formation. Material changes, if any, may require a resolicitation of shareholder approval by the Bank's shareholders.

**Reasons for and Possible Benefits of the Holding Company Formation**

*General.* The Board of Directors believes that operations of the Bank under a savings and loan holding company structure will be a more flexible environment for operations, growth and raising capital. As a savings and loan holding company, the Holding Company will not be subject to the same regulatory restrictions as are imposed on the Bank, and will be able to engage in a broader range of business activities than are currently permissible for federal savings banks. In addition, the Holding Company may make certain investments, including certain equity investments, which the Bank is not permitted to make. We also believe that having a holding company will increase our visibility and coverage in the market and allow our shareholders and potential investors to obtain information about us more easily. Initially, the Holding Company will be capitalized with $500,000 contributed by the Bank. Thus, operation of the Holding Company and its conduct of any activities will depend on future earnings of the Bank and the ability to dividend portions of such earnings to the Holding Company.

*Facilitate Mergers and Acquisitions.* Reorganizing into a holding company structure will also mean that major corporate events of the Holding Company, such as an acquisition by another entity, can be accomplished by the favorable vote of the holders of a majority of the Holding Company's outstanding common stock, rather than the two-thirds favorable vote required by Independence Federal to engage in such a transaction. The Board originally voted to reorganize into a holding company structure in 2004; however, the matter was not presented to stockholders prior to the calling of this Special Meeting because in 2004 the OTS, contrary to the anticipation of the Bank, advised the Bank that the then-proposed Carver Merger was considered a transaction incident to the creation of the Holding Company such that under OTS Regulations a favorable two-thirds vote of stockholders was required to approve the Holding Company Formation rather than the favorable majority vote of stockholders. Independence Federal currently has no contracts, arrangements, plans or understandings regarding any merger transaction or similar significant corporate transactions. However, the staff of the OTS advised Independence Federal, the "OTS may require a different vote [than the majority vote Independence Federal believed would be required] to approve the holding company reorganization, based on circumstances existing at the time the Association [*i.e.*, Independence Federal] files the holding company application [regarding the Holding Company Formation]. Further, the staff of the OTS stated, "any material changes or information relating to the holding company application, including the vote requirement, not addressed herein [in the proxy statement], may require a re-solicitation of shareholder vote."

Since Independence Federal has already incurred most of the expense of presenting the question of the Holding Company Formation to shareholders, Independence Federal has decided to proceed with a vote on the Holding Company Formation at this time, even though it can give no assurance as to the vote that will be required for approval, other than that a vote of two-thirds of the outstanding shares of common stock will constitute shareholder approval and a majority vote may or may not constitute shareholder approval.

*Enhanced Ability to Invest Through the Holding Company.* Under its existing structure, the Bank is limited by law or regulation in its permissible investment activities. The Holding Company Formation will permit the Holding Company to make certain additional investments, diversify business activities or acquire other financial institutions, for the benefit of all stockholders. No specific investments, new business activities or acquisitions by the Holding Company that would be facilitated by the Holding Company Formation are planned at the present time. Any such activity, of course, would depend, among other things, on available financial resources to the Holding Company.

*Stock Repurchases.* The Holding Company Formation will enable the Holding Company to repurchase Holding Company common stock if the Holding Company obtains financial resources to do so and its Board determines such repurchases are appropriate under the circumstances. In recent years, stock repurchases have been an important means used by bank and savings institution holding companies to enhance stockholder value and invest capital resources.

While the Bank currently is permitted to repurchase its stock, its ability to do so is limited due to adverse tax consequences associated with stock repurchases by a savings bank. Federal tax laws generally require that thrift institutions recapture into income and pay tax on their excess bad debt reserves in the event of certain distributions and redemptions, such as stock repurchases. Accordingly, if the Bank were to repurchase any of its outstanding shares of common stock, it would cause recapture of all or part of its pre-1988 excess tax bad debt reserves. Because distributions or redemptions by entities, such as the Holding Company, that have not used the percentage of taxable income method for computing bad debt reserves are not subject to recapture, the Holding Company will be permitted to repurchase Holding Company stock without causing any recapture of the bad debt reserves.

### Additional Costs of Operating in a Holding Company Structure

The Holding Company would be an additional corporation and, thus, would involve additional costs for shareholders. The Bank intends to contribute approximately $500,000 to the Holding Company which the Bank estimates should cover its costs for three years. A significant portion of that amount, however, relates to costs that the Bank would have to incur anyway, such as compliance by the Holding Company with the requirements of the Securities Exchange Act of 1934.

Initially at least, it is intended that the Holding Company would not engage in any activities other than serving as the Bank's holding company. Thus, the Holding Company would be located at the existing offices of the Bank and management of the Holding Company would also be management of the Bank and would not be paid any greater compensation than would otherwise be paid to them by the Bank.

**The Board of Directors of the Bank unanimously recommends that shareholders of the Bank vote "FOR" the proposal to adopt the Plan of Reorganization for the Holding Company Formation.**

**Description of the Holding Company Formation**

The Holding Company Formation and the establishment of the Holding Company will be accomplished as follows:

1.  The Bank will have organized the Holding Company as a wholly-owned subsidiary;

2.  The Holding Company will organize an interim savings bank as a wholly-owned subsidiary;

3.  The interim savings bank will merge into the Bank, with the Bank as the surviving entity;

4.  In connection with the merger in step 3 above, all of the issued and outstanding shares of Holding Company stock held by the Bank will be canceled, all of the issued and outstanding shares of Bank common stock will be converted by operation of law into an equal number of shares of Holding Company common stock, and the issued and outstanding shares of the interim savings bank, all of which are held by the Holding Company, will automatically be converted by operation of law into common stock of the Bank.

As a result of steps 1 through 4 above, the Bank will become the wholly-owned subsidiary of the Holding Company.  The Bank is entitled to revise the manner of effecting the Holding Company Formation, provided that such revision shall not subject it and the Bank's stockholders to adverse tax consequences.

The Board of Directors of the Bank presently intends to capitalize the Holding Company with up to $500,000 in cash and readily marketable securities, subject to OTS approval.  It is anticipated that such funds initially will be invested by the Holding Company in short-term investment securities, such as U.S. Government and agency obligations.  Future capitalization of the Holding Company will depend upon dividends declared by the Bank based on future earnings, or the raising of additional capital by the Holding Company through a future issuance of securities, debt or by other means.  The Board of Directors of the Holding Company has no present plans or intentions with respect to any future issuance of securities or debt at this time.

**Conditions to the Completion of the Holding Company Formation**

Completion of the Holding Company Formation is subject to various conditions, including:

•  The shareholders of the Bank must approve the Holding Company Formation;

•  The OTS must not disapprove the Holding Company Formation based on an application to be filed with respect to the Holding Company Formation; and

•  The Board of Directors must not have exercised its right to terminate the Holding Company Formation.

If the Bank proceeds to effectuate the Holding Company Formation, it will be completed as soon as is practicable after the shareholder vote approving the Holding Company Formation has been obtained. The Bank does not intend to incur the costs of preparing and filing the requisite application with the OTS until after shareholder approval.

**Regulatory Approvals**

The Holding Company Formation is subject to the prior approval of the OTS, pursuant to the Home Owners' Loan Act and the regulations of the OTS. The Bank has not yet filed an application for Reorganization. It may be necessary for the Holding Company to amend its certificate of incorporation and bylaws in order to obtain regulatory approval. Material changes, if any, may require a resolicitation of approval by the Bank's shareholders.

**Effective Date**

The "Effective Date" of the Holding Company Formation will be the date upon which the Articles of Combination are filed with the OTS, which cannot occur until after approval by the OTS of the application, which the Bank would need to file with the OTS.

**Certain Material Federal Income Tax Consequences**

The Holding Company Formation is structured to qualify as a tax-free reorganization for federal income tax purposes under Section 368(a)(1)(B) of the Internal Revenue Code with the following federal income tax consequences:

- No gain or loss will be recognized by the shareholders of the Bank upon the exchange of their shares of the Bank's common stock for shares of the Holding Company's common stock;

- The aggregate federal income tax basis of the Holding Company's common stock received by each of the Bank's shareholders will be the same as the aggregate federal income tax basis of the shareholder's Bank common stock; and

- The holding period of the shares of holding company's common stock received by each of the Bank's shareholders will include the period for which the exchanged Bank's common stock was held as a capital asset by the Bank shareholder.

Section 1.368-3 of the Treasury Regulations requires that each shareholder who receives the Holding Company's common stock pursuant to the Holding Company Formation attach to such shareholder's federal income tax return for the taxable year in which the Holding Company Formation occurs, a complete statement of all the facts pertinent to the non-recognition of gain or loss upon the Holding Company Formation. Shareholders should consult their own tax advisors regarding the disclosure requirements.

Determining the actual tax consequences to you as an individual taxpayer can be complicated. The overall tax treatment applicable to you will depend on your specific situation and many variables not within our control. You should consult your own tax advisor for a full understanding of the Holding Company Formation's tax consequences to you.

**Accounting Treatment**

      The consolidated capitalization, assets, liabilities, income and financial statements of the Holding Company immediately following the Holding Company Formation will be substantially the same as those of the Bank immediately prior to consummation of the Holding Company Formation, all of which will be shown on the Holding Company's books at their historical recorded values.  See "Financial Statements and Form 10-KSB."

**Consequences Under Federal Securities Laws**

      The Bank's common stock is registered under Section 12 of the Exchange Act as administered by the OTS.  Upon consummation of the Holding Company Formation, the Holding Company common stock will automatically be deemed registered under Section 12 of the Exchange Act as administered by the SEC and the Holding Company will file with the SEC a Form 8-K with respect to the Holding Company Formation.  The Exchange Act will apply to the Holding Company to the same degree that it currently applies to the Bank, except that the powers, functions and duties to administer and enforce the Exchange Act requirements regarding periodic and other reports, proxies, tender offers and short swing profits, and certain other requirements of the Exchange Act that are vested in the OTS with regard to securities of insured savings associations such as the Bank, are vested in the SEC with regard to securities of corporations such as the Holding Company.  Thus, the Holding Company's reports filed with the SEC will be more readily available to the public than are the Bank's reports filed with the OTS because they will be available on the SEC's website.

      Upon consummation of the Holding Company Formation, the Bank will file appropriate documents to deregister its stock with the OTS.

      The Bank believes the issuance of Holding Company common stock in connection with the Holding Company Formation is exempt from registration under the Securities Act.  Section 3(a)(12) of the Securities Act provides an exemption from registration for:

      Any equity security issued in connection with the acquisition by a holding company of a bank under section 3(a) of the Bank Holding Company Act of 1956 or a savings association under section 10(e) of the Home Owners' Loan Act, if —

    (A)    the acquisition occurs solely as part of a reorganization in which security holders exchange their shares of a bank or savings association for shares of a newly formed holding company with no significant assets other than securities of the bank or savings association and the existing subsidiaries of the bank or savings association;

    (B)    the security holders receive, after that reorganization, substantially the same proportional share interests in the holding company as they held in the bank or savings association, except for nominal changes in shareholders' interests resulting from lawful elimination of fractional interests and the exercise of dissenting shareholders' rights under State or Federal law;

    (C)    the rights and interests of security holders in the holding company are substantially the same as those in the bank or savings association prior to the transaction, other than as may be required by law; and

    (D)    the holding company has substantially the same assets and liabilities, on a consolidated basis, as the bank or savings association had prior to the transaction.

Offers for sale of the Holding Company's securities, including the common stock subsequent to the Holding Company Formation, will be subject to the registration requirements of the Securities Act of 1933, whereas the Bank's common stock had an exemption from such registration requirements. Holders of the Holding Company's common stock, unless they are affiliates of the Holding Company, will generally be able to sell and otherwise transfer their shares of Bank common stock in the same manner as they could their shares of Bank common stock. However, persons who may be deemed affiliates of the Holding Company, *i.e.*, controlling, controlling by or under common control with the Holding Company, have to comply with the registration requirements of the Securities Act of 1933 in connection with any of their transfers of the Holding Company's common stock, or have the availability of an exemption from such registration requirements. Rule 144 under the Securities Act of 1933 generally provides an exemption from those registration requirements from sales of the 1% (or possibly more) of the Holding Company's common stock during any three-month period through normal brokerage transactions, and assuming other requirements of Rule 144 are fulfilled. Directors, executive officers and beneficial owners of 10% or more of the Holding Company's voting securities may be considered affiliates of the Holding Company.

**Dissenters' Rights**

The regulations provide that stockholders of a federally chartered savings association with stock that is quoted on the Nasdaq Stock Market are not entitled to exercise dissenters' rights of appraisal if the stockholder is required to accept cash, shares of stock of any association or corporation which at the effective date of the merger will be quoted on the Nasdaq Stock Market, or any combination of such shares of stock and cash. Since the Holding Company Common Stock will be quoted on the Nasdaq Stock Market at the effective date of the Holding Company Formation, the Bank's stockholders will not have dissenters' rights of appraisal in connection with the Holding Company Formation.

**Amendment, Termination or Waiver**

The Board of Directors of the Bank may cause the Plan of Reorganization for the Holding Company Formation to be amended or terminated if the Board determines for any reason that such amendment or termination would be advisable. Such amendment or termination may occur at any time prior to the filing of the Articles of Combination with the OTS, provided that no such amendment may be made to the Plan of Reorganization after stockholder approval if such amendment is deemed to be materially adverse to the stockholders of the Bank. Additionally, any of the terms or conditions of the Plan of Reorganization may be waived by the party which is entitled to the benefit thereof.

**Exchange of Securities**

After the Effective Date, stock certificates evidencing shares of Bank common stock will represent, by operation of law, the same number of shares of Holding Company common stock. Although the Plan of Reorganization references a Rights Agreement that was under consideration at the time the Board approved the Plan, no Rights Agreement is contemplated at this time. You will not be required to exchange your Bank stock certificates for Holding Company stock certificates, but will have the option to do so. If you transfer any of your shares after the closing of the Holding Company Formation, the new certificate you will receive will be a Holding Company certificate. Further, if you would prefer to have Holding Company certificates, you may obtain such certificates *after the closing* by submitting your Bank common stock certificate to our transfer agent, American Stock Transfer & Trust Company, for exchange. **DO NOT SEND YOUR STOCK CERTIFICATES TO THE BANK AT THIS TIME.**

**Trading**

The Bank's common stock is qualified for trading on the Nasdaq SmallCap Market and trades under the symbol "IFSB." The Holding Company expects that the common stock of the Holding Company will be qualified for trading on the Nasdaq SmallCap Market under the same symbol as of the Effective Date of the Holding Company Formation.

## Business of the Holding Company

*General.* Immediately upon consummation of the Holding Company Formation, it is expected that the Holding Company will not engage in any business activity other than to hold all of the voting stock of the Bank. Further, the Holding Company will have very limited financial resources at that time. The Holding Company does not presently have any arrangements or understandings regarding any acquisition or merger opportunities. It is anticipated, however, that in the future the Holding Company may pursue other investment opportunities, including possible diversification through acquisitions and mergers, and may engage in stock repurchases. Any such activity, of course, would depend, among other things, on available financial resources to the Holding Company.

*Property.* The Holding Company is not expected initially to own or lease real or personal property. Instead, it intends to utilize the premises, equipment and furniture of the Bank without the direct payment of any rental fees to the Bank.

*Employees.* At the present time, the Holding Company does not intend to employ any persons other than its management. It will utilize the support staff of the Bank from time to time. If the Holding Company acquires other savings institutions or pursues other lines of business, it may hire additional employees at such time.

*Competition.* It is expected that immediately following the Holding Company Formation, the primary business of the Holding Company will be ownership of the Bank common stock. Therefore, until such time as the Holding Company pursues other investment opportunities, the competitive conditions to be faced by the Holding Company will be the same as those faced by the Bank.

## Management of the Holding Company

*Directors.* The directors of the Holding Company, upon completion of the Holding Company Formation, will be the same persons who now serve as directors of the Bank, each of whom will serve for the same term of office now held by such director of the Bank. The directors will continue to be elected by the shareholders for staggered three-year terms, or until their successors are elected and qualified. For further information on directors, see "Information as to Nominees and Continuing Directors" above.

*Executive Officers.* Executive officers of the Holding Company, upon completion of the Holding Company Formation, will be persons who are currently executive officers of the Bank. For further information on executive officers, see "Information as to Nominees and Continuing Directors" and "Executive Officers Who Are Not Also Directors" above.

*Remuneration.* None of its executive officers or directors has received any remuneration from the Holding Company. It is expected that unless and until the Holding Company becomes actively involved in additional businesses, no compensation will be paid to its directors and executive officers in addition to the compensation paid to them by the Bank. However, the Holding Company may determine that separate and additional compensation is appropriate in the future.

**Description of Holding Company Capital Stock**

*General.* The Holding Company will be authorized to issue 4,000,000 shares of common stock having a par value of $.01 per share and 500,000 shares of preferred stock having a par value of $.01 per share (the "Preferred Stock"). This is the same amount of capital stock that the Bank is authorized to issue. Prior to the effectiveness of the Holding Company Formation, the Holding Company will have 100 shares of common stock outstanding, all of which will be held by the Bank. These 100 shares will be cancelled upon the Holding Company Formation. Upon the effectiveness of the Holding Company Formation, the Holding Company would have outstanding 1,552,450 shares of common stock and no shares of preferred stock, assuming no additional shares of common stock are issued by the Bank. Each share of the Holding Company's common stock will have the same relative rights as, and will be identical in all respects with, each other share of common stock. Upon the effectiveness of the Holding Company Formation, and the exchange of each share of Bank common stock for a share of Holding Company common stock all such stock, of the Holding Company will be duly authorized, fully paid and non-assessable.

**Neither the Securities and Exchange Commission, the Office of Thrift Supervision nor any other federal agency or any state securities commission has approved or disapproved or passed upon the adequacy or accuracy of this proxy statement. Any representation to the contrary is a criminal offense.**

**The common stock of the Holding Company will represent non-withdrawable capital. The Holding Company common stock is not a savings or deposit account and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency. The common stock is subject to investment risk, including the possible loss of principal invested.**

**Common Stock**

*Dividends.* The Holding Company will be able to pay dividends out of statutory surplus or from certain net profits, as permitted under Delaware law, if, as and when declared by its Board of Directors. The payment of dividends by the Holding Company will be subject to limitations that are imposed by law and applicable regulation. The holders of common stock of the Holding Company will be entitled to receive and share equally in such dividends as may be declared by the Board of Directors of the Holding Company out of funds legally available therefore. If the Holding Company issues preferred stock, the holders thereof may have a priority over the holders of the common stock with respect to dividends.

*Voting Rights.* Upon the effectiveness of the Holding Company Formation, the holders of common stock of the Holding Company will possess exclusive voting rights in the Holding Company. They will elect the Holding Company's Board of Directors and act on such other matters as required to be presented to them under Delaware law or the Holding Company's certificate of incorporation or as are otherwise presented to them by the Board of Directors. Each holder of common stock will be entitled to one vote per share and will not have the right to cumulate votes in the election of directors. If the Holding Company issues preferred stock, holders of the preferred stock may also possess voting rights.

*Liquidation.* In the event of any liquidation, dissolution or winding up of the Bank, the Company, as holder of the Bank's capital stock, would be entitled to receive, after payment or provision for payment of all debts and liabilities of the Bank (including all deposit accounts and accrued interest thereon) and after distribution of the balance in the special liquidation account established by the Bank in connection with its conversion from mutual to stock form, all assets of the Bank available for distribution. In the event of liquidation, dissolution or winding up of the Holding Company, the holders of its common stock would be entitled to receive, after payment or provision for payment of all its debts and liabilities, all of the assets of the Holding Company available for distribution. If preferred stock is issued, the

holders thereof may have a priority over the holders of the common stock in the event of liquidation or dissolution.

*Preemptive Rights.*  Holders of the common stock of the Holding Company will not be entitled to preemptive rights with respect to any shares that may be issued.  The common stock is not subject to redemption.

## Preferred Stock

None of the shares of the Holding Company's authorized preferred stock will be issued in the Holding Company Formation. Such stock may be issued with such preferences and designations as the Board of Directors may from time to time determine.  The Board of Directors can, without stockholder approval, issue preferred stock with voting, dividend, liquidation and conversion rights which could dilute the voting strength of the holders of the common stock and may assist management in impeding an unfriendly takeover or attempted change in control.

## Risk Factors

In the opinion of Bank management, there will be no material change in the risk of loss in holding shares of Holding Company common stock than in holding shares of Bank common stock.  However, the Holding Company will be able to engage in certain activities not permitted to the Bank, such as having greater flexibility in repurchasing its own stock, acquiring bank subsidiaries and subsidiaries engaging in activities closely related to banking.

## Certain Differences in Shareholder Rights

*Introduction.*  As a result of the Holding Company Formation, holders of Bank common stock, whose rights are presently governed by federal law and the OTS' rules and regulations, as well as the charter and bylaws of the Bank, will become shareholders of the Holding Company, a to-be-formed Delaware corporation. Accordingly, the General Corporation Law of Delaware, as well as the certificate of incorporation and bylaws of the Holding Company, will govern the rights of the shareholders of the Holding Company.  Under OTS policies, the Holding Company will generally be subject to the same corporate governance regulations as those to which the Bank is subject.

The following discussion is a general summary and comparison of certain provisions of the charter and bylaws of the Bank and the proposed certificate of incorporation and bylaws of the Holding Company that are not identical and certain other statutory and regulatory provisions, some of which might be deemed to have potential anti-takeover effects.  The proposed certificate of incorporation and bylaws of the Holding Company are attached hereto as Attachments A-1 and A-2, respectively, to the Plan of Reorganization, Appendix A to this proxy statement, and should be reviewed for more detailed information.

The proposed certificate of incorporation and bylaws of the Holding Company are substantially similar to those of the Bank. The major differences are as follows:

- **Amendment.** The Bank's charter may be amended by vote of a majority of the Board and shareholders, whereas the proposed certificate of incorporation of the Holding Company has limited exceptions to a majority approval that instead require a 66 2/3% vote of shares.  These amendments requiring a higher vote threshold include articles

addressing the board of directors, limits on liability, indemnification, shareholder consent and amendment. Similarly, the bylaws of the Bank may be amended by a majority vote of shareholders, but the Holding Company bylaws require a 66 2/3% vote.

- **Cumulative Voting, Special Meetings and Action by Written Consent.** The Holding Company's proposed certificate of incorporation does not permit cumulative voting and provides that special meetings of shareholders may be called only by the Board of Directors. The Holding Company's proposed certificate of incorporation also provides that shareholder action must be effected at a duly called meeting of shareholders and may not be effected by any consent in writing by such shareholders. This provision is designed to protect against potential disruptions of the Holding Company's business and operations by requiring shareholders to either present new business for consideration at the annual meeting or to first present such business to the Board for its consideration. The Bank's charter provides for cumulative voting. The Bank's charter does not address shareholder action by written consent; however, the Bank's bylaws, in accordance with OTS Regulations, provide that any shareholder action to be taken at a meeting of shareholders may be taken without a meeting if consent in writing is given by all shareholders entitled to vote, setting forth the action so taken is provided. The requirement for an unanimous written consent by shareholders means that, as a practical matter, such written consent is not possible for a public company. The Bank's bylaws permit shareholders having 10% of outstanding stock to call a special meeting of shareholders.

- **Advance Notice.** The Bank's bylaws provide that shareholder nominations for director may be made at least 5 days prior to a meeting and any other business to be transacted at an annual meeting should be filed by a shareholder with the Bank at least 5 days before the annual meeting. The bylaws of the Holding Company allow more preparation time for the Board of Directors, requiring both shareholder nominations for director and any business to be transacted to be submitted at least 90 days before a meeting.

In addition to the rights provided for in the incorporating documents of the Holding Company and the Bank, shareholders will have differing rights as a matter of law. Shareholders of the Bank currently have those rights set forth in the Home Owners' Loan Act and the regulations of the OTS, but as holders of stock of the Holding Company, the shareholders will have the rights provided by the Delaware General Corporation Law.

## Mergers

Pursuant to the regulations of the OTS, a combination involving a federal savings bank must be approved by the holders of two-thirds of the stock entitled to vote with respect to such combination. In comparison, Delaware General Corporation Law generally provides that mergers involving Delaware corporations need only be approved by the holders of a majority of the stock entitled to vote. However, as discussed immediately below, certain business combinations with interested stockholders could require a two-thirds vote of voting stock not owned by the interested stockholder.

## Business Combinations with Interested Shareholders

The state of Delaware has a statute designed to provide Delaware corporations with additional protection against hostile takeovers. The takeover statute, which is codified in Section 203 of the

Delaware General Corporation Law ("Section 203"), is intended to discourage certain takeover practices by impeding the ability of a hostile acquirer to engage in certain transactions with the target company. In general, Section 203 provides that a "Person" (as defined therein) who owns 15% or more of the outstanding voting stock of a Delaware corporation (an "Interested Stockholder") may not consummate a merger or other business combination transaction with such corporation at any time during the three-year period following the date such "Person" became an Interested Stockholder. The term "business combination" is defined broadly to cover a wide range of corporate transactions including mergers, sales of assets, issuances of stock, transactions with subsidiaries and the receipt of disproportionate financial benefits.

The statute exempts the following transactions from the requirements of Section 203: (i) any business combination if, prior to the date a person became an Interested Stockholder, the Board of Directors approved either the business combination or the transaction which resulted in the stockholder becoming an Interested Stockholder; (ii) any business combination involving a person who acquired at least 85% of the outstanding voting stock in the transaction in which he or she became an Interested Stockholder, with the number of shares outstanding calculated without regard to those shares owned by the corporation's directors who are also officers and by certain employee stock plans; (iii) any business combination with an Interested Stockholder that is approved by the Board of Directors and by a two-thirds vote of the outstanding voting stock not owned by the Interested Stockholder; and (iv) certain business combinations that are proposed after the corporation had received other acquisition proposals and which are approved or not opposed by a majority of certain continuing members of the Board of Directors. A corporation may exempt itself from the requirements of the statute by adopting an amendment to its certificate of incorporation or bylaws electing not to be governed by Section 203. At the present time, the Board of Directors does not intend to propose any such amendment.

**Continued Applicability of Change in Bank Control Act**

Any proposal to acquire more than 10% of any class of equity security of the Holding Company generally would be subject to approval by the OTS under the OTS' Change in Control Regulations. The OTS requires all persons seeking control of a savings institution and, therefore, indirectly its holding company, to obtain regulatory approval prior to offering to obtain control. Federal law generally provides that no "person," acting directly or indirectly or through or in concert with one or more other persons, may acquire directly or indirectly "control," as that term is defined in OTS regulations, of a federally-insured savings institution without giving at least 60 days' written notice to the OTS and providing the OTS an opportunity to disapprove the proposed acquisition. Such acquisitions of control may be disapproved if it is determined, among other things, that (i) the acquisition would substantially lessen competition; (ii) the financial condition of the acquiring person might jeopardize the financial stability of the savings institution or prejudice the interests of its depositors; or (iii) the competency, experience or integrity of the acquiring person or the proposed management personnel indicates that it would not be in the interest of the depositors or the public to permit the acquisition of control by such person. Such change in control restrictions on the acquisition of holding company stock are not limited to three years after conversion, but will apply for as long as the regulations are in effect. Persons holding revocable or irrevocable proxies may be deemed to be beneficial owners of such securities under OTS regulations and therefore prohibited from voting all or the portion of such proxies in excess of the 10% aggregate beneficial ownership limit. Such regulatory restrictions may prevent or inhibit proxy contests for control of the Holding Company or the Bank that have not received prior regulatory approval.

# INDEPENDENT PUBLIC ACCOUNTANTS

BDO Seidman, LLP was selected to be Independence Federal's independent auditors for the 2005 fiscal year at the Annual Meeting of Shareholders held on May 11, 2005. A representative of BDO Seidman, LLP is expected to be present at the Special Meeting to respond to appropriate questions from stockholders and will have the opportunity to make a statement should he or she desire to do so.

## Changes in Certifying Accountant

PricewaterhouseCoopers LLP previously served as the principal accountants for Independence Federal. On December 5, 2003, PricewaterhouseCoopers notified the Board of Directors of Independence Federal that it declined to stand for re-election as the independent accountants for the Bank. In connection with the audit of the fiscal years ended December 31, 2002 and 2001, and through December 5, 2003, there were no disagreements with PricewaterhouseCoopers on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which disagreements if not resolved to their satisfaction would have caused them to make reference to the subject matters of the disagreements in connection with their report. In addition, such financial statements contained no adverse opinion or disclaimer of opinion, and were not qualified or modified as to uncertainty, audit scope or accounting principles.

During the two fiscal years ended December 31, 2002 and 2001, and through December 5, 2003, PricewaterhouseCoopers advised management of Independence Federal and the Audit Committee of the Board of Directors of certain control weaknesses relating primarily to period-end control processes surrounding the preparation of the financial statements and exacerbated by employee turnover in key positions related to the financial reporting process. PricewaterhouseCoopers believed that these matters represented reportable conditions as defined by the American Institute of Certified Public Accountants.

Management of Independence Federal believes it has taken steps to resolve the referenced control matters brought to its attention, including the hiring of experienced personnel in affected areas. On February 27, 2004, the Board of Directors, at the recommendation of the Audit Committee, engaged BDO Seidman, LLP to replace PricewaterhouseCoopers LLP as the independent accountants for the Bank and to audit the Bank's financial statements for the fiscal year ended December 31, 2003. Further, the Board of Directors appointed, and the shareholders ratified, BDO Seidman as the independent accountants for the Bank for the fiscal years ending December 31, 2004 and 2005.

**Audit Fees**

The following table sets forth the fees billed to Independence Federal for the fiscal years ended December 31, 2004 and 2003 by BDO Seidman, LLP and PricewaterhouseCoopers LLP.

| BDO Seidman, LLP | 2004 | 2003 |
|---|---|---|
| Audit Fees.............................................. | $202,000 | $124,000 |
| Audited related fees................................ | N/A | N/A |
| Tax fees[1] .............................................. | 2,500 | 22,000 |
| All other fees ......................................... | N/A | N/A |

| PricewaterhouseCoopers LLP | 2004 | 2003 |
|---|---|---|
| Audit Fees.............................................. | $22,000 | $173,000 |
| Audited related fees [2] ........................... | N/A | 29,000 |
| Tax fees[1] .............................................. | N/A | 28,000 |
| All other fees ......................................... | 8,000 | N/A |

1.    For tax filing and tax related compliance and other advisory services.
2.    Preparation of a scoreboard for internal controls.

**Policy on Audit Committee Pre-Approval of Audit and Permissible Non-Audit Services of Independent Auditors**

The Audit Committee is responsible for appointing and overseeing the work of the independent auditors and setting the independent auditors' compensation. The Audit Committee's charter provides that it will approve in advance any non-audit services permitted by the Exchange Act, including tax services, that the independent auditors of Independence Federal provide to it, unless such prior approval may be waived because of permitted exceptions under the Exchange Act, including but not limited to the 5% *de minimis* exception. During the fiscal year ended December 31, 2004, the Audit Committee approved all of the "audit-related," "tax" and "other fees," respectively, billed by BDO Seidman, LLP to Independence Federal.

**Audit Committee Report**

The Audit Committee of Independence Federal's Board of Directors is composed of four directors and operates under a written charter adopted by the Board of Directors. The Board of Directors of the Bank has determined that each Audit Committee member is independent in accordance with the listing standards of the Nasdaq Stock Market, Inc.

The Bank's Audit Committee is responsible for the supervision of the internal audit function. The internal audit function is conducted by Walker and Company, LLP, an independent public accounting firm. The audit function includes monitoring the Bank's internal control system. The Bank's independent auditors, BDO Seidman, LLP, are responsible for performing an independent audit of the Bank's consolidated financial statements and issuing an opinion on the conformity of those financial statements with generally accepted accounting principles. The Audit Committee oversees the Bank's internal controls and financial reporting process on behalf of the Board of Directors.

In this context, the Audit Committee has met and held discussions with management and the independent auditors. Management represented to the Audit Committee that the Bank's consolidated financial statements were prepared in accordance with generally accepted accounting principles, and the Audit Committee has reviewed and discussed the consolidated financial statements with management and the independent auditors. The Audit Committee discussed with the independent auditors matters required to be discussed by Statement on Auditing Standards No. 61 (Communication With Audit Committees), including the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of the disclosures in the financial statements.

In addition, the Audit Committee has received the written disclosures and the letter from the independent auditors required by the Independence Standards Board Standard No. 1 (Independence Discussions With Audit Committees) and has discussed with the independent auditors the auditors' independence from the Bank and its management. In concluding that the auditors are independent, the Audit Committee considered, among other factors, that no non-audit services were provided by the auditors.

The Audit Committee discussed with the Bank's independent auditors the overall scope and plans for their audit. The Audit Committee meets with the independent auditors, with and without management present, to discuss the results of their examination, their evaluation of the Bank's internal controls and the overall quality of the Bank's financial reporting.

In performing all of these functions, the Audit Committee acts only in an oversight capacity. In its oversight role, the Audit Committee relies on the work and assurances of the Bank's management, which has the primary responsibility for financial statements and reports, and of the independent auditors who, in their report, express an opinion on the conformity of the Bank's financial statements to generally accepted accounting principles. The Audit Committee's oversight does not provide it with an independent basis to determine that management has maintained appropriate accounting and financial reporting principles or policies, or appropriate internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations.

Furthermore, the Audit Committee's considerations and discussions with management and the independent auditors do not assure that the Bank's financial statements are presented in accordance with generally accepted accounting principles, that the audit of the Bank's financial statements has been carried out in accordance with generally accepted auditing standards or that the Bank's independent auditors are in fact "independent."

In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors, and the Board approved, that the audited consolidated financial statements be included in the Bank's Annual Report on Form 10-KSB for the year ended December 31, 2004 for filing with the OTS. The Audit Committee and the Board of Directors also approved, subject to shareholder ratification, the selection of the Bank's independent auditors. Shareholder ratification of the Bank's independent auditors occurred on May 11, 2005, at the Annual Meeting of Shareholders.

**The Audit Committee of the Board of Directors**
**of Independence Federal**

**Michael J. Cobb, CPA, Chairman**
**Carolyn D. Jordan, Esq.**
**Eugene K. Youngentob**
**Robert B. Isard**

## EXECUTIVE COMPENSATION

**Summary Compensation Table**

  The following table sets forth for the years ended December 31, 2004, 2003 and 2002, the cash compensation paid by Independence Federal and its subsidiary, as well as certain other compensation paid or accrued for these years, to the Chief Executive Officer and the Chief Financial Officer (the "Named Executive Officer"). No other executive officer of the Bank received salary and bonus totaling $100,000 or more during the fiscal year ended December 31, 2004.

| | | Annual Compensation | | |
|---|---|---|---|---|
| **Name and Principal Position** | **Year** | **Salary ($)[1]** | **Bonus ($)** | **Other Annual Compensation ($)** |
| Thomas L. Batties[2] | 2004 | $220,000 | $    — | — |
|  Acting President and Chief Executive Officer | 2003 | 118,835 | 60,000[3] | |
| | | | | |
| E. Leroy Morris[4] | 2004 | $  99,388 | $ 2,500 | — |
|  Executive Vice President and Chief Financial Officer | 2003 | 42,530 | — | |

---

[1]  For 2004 and 2003, there were no (a) perquisites over the lesser of $50,000 or 10% of the individual's total salary and bonus for the year; (b) payments of above-market preferential earnings on deferred compensation; (c) payments of earnings with respect to long-term incentive plans prior to settlement or maturation; (d) tax payment reimbursements; or (e) preferential discounts on stock.

[2]  Mr. Batties also received $11,590 as a consultant for the Bank's subsidiary prior to his retention as an officer by the Bank. This compensation is not included in the table above.

[3]  Represents a payment pursuant to the terms of his employment agreement dated July 1, 2003.

[4]  Mr. Morris joined Independence Federal in July 2003.

  *Employment Agreements.*

  The Board has approved a two-year employment agreement for Thomas L. Batties as President and Chief Executive Officer of the Bank, subject to OTS approval. The employment agreement provides for a base annual salary of $220,000. The agreement also provides that Mr. Batties will be entitled to participate in discretionary bonuses or other incentive compensation programs that the Bank may award from time to time to senior management, life insurance coverage in the amount of $500,000, disability insurance coverage, use of an automobile, and all medical, dental, pension, profit sharing and retirement plans as may be approved from time to time by the Bank for the benefit of its employees. In the event Mr. Batties' employment is terminated for reasons other than cause, Mr. Batties would be entitled to receive 6/12ths of the base salary then in effect or the compensation due to him under the remaining term of the agreement.

  The Board has approved a new employment agreement with E. Leroy Morris, Executive Vice President and Chief Financial Officer of the Bank, subject to OTS approval. A previous employment agreement with Mr. Morris, effective July 2, 2003, terminated on July 5, 2005. The new employment agreement, which is substantially similar to the terminated agreement, provides that, commencing on the first anniversary date of the agreement and continuing each anniversary date thereafter, the Bank can extend the agreement for an additional year. The agreement provides Mr. Morris with a base salary of

$100,400. In addition to his base compensation, Mr. Morris would be eligible to participate in all medical, dental, pension, profit sharing and retirement plans sponsored by the Bank. In the event Mr. Morris is terminated for reasons other than cause, Mr. Morris would receive the lesser of six months' salary or his base salary due for the remaining term of the agreement. In addition to his severance pay, for the remaining term of his employment agreement, Mr. Morris would receive benefits under all Bank-sponsored retirement, health and welfare plans. In the event Mr. Morris' employment is terminated for reasons other than cause, Mr. Morris would be subject to a six-month non-compete agreement.

## OTHER INFORMATION RELATING TO DIRECTORS AND EXECUTIVE OFFICERS

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934, the "Exchange Act," requires Independence Federal's officers (as defined in regulations promulgated thereunder) and directors and persons who own more than 10% of a registered class of Independence Federal's equity securities to file reports of ownership and changes in ownership with the OTS. Officers, directors and greater than 10% shareholders are required by such regulations to furnish Independence Federal with copies of all Section 16(a) forms they file.

Based upon a review of Forms 3, 4 and 5 received by Independence Federal in accordance with Rule 16a-3(e) under the Exchange Act, Independence Federal believes that each of its executive officers and directors has timely complied with applicable reporting requirements for transactions in Independence Federal's common stock during the fiscal year ended December 31, 2004, with the following exceptions: the filing of a Form 3 upon becoming an executive officer by Mr. Batties, Mr. Morris, Ms. Finlayson and Ms. Dennison and a Form 4 reporting stock purchases or sales for Mr. Batties, Mr. Fitzgerald and Mr. Cobb.

### Transactions With Management

*Loans to Officers and Directors.* Independence Federal, like many financial institutions, has followed a policy of granting various types of loans to officers, directors and employees in accordance with applicable federal law. The loans have been made in the ordinary course of business and on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with Independence Federal's customers, except for loans made pursuant to programs generally available to all employees, including officers and directors, and do not involve more than the normal risk of collectibility or present other unfavorable features.

*Other Transactions.* Director Nelson Deckelbaum is a senior partner at the law firm of Deckelbaum, Ogens and Raftery, Chtd., which has been retained by the Bank for collection services, including foreclosures, as well as the defense of minor lawsuits. The amount paid by the Bank to the firm for services rendered in 2004 did not exceed five percent of the law firm's gross revenues for its 2004 fiscal year.

## NOMINATING/CORPORATE GOVERNANCE COMMITTEE PROCEDURES

### General

It is the policy of the Nominating/Corporate Governance Committee of the Board of Directors of the Bank to consider Director candidates recommended by shareholders who appear to be qualified to serve on the Bank's Board of Directors. The Nominating/Corporate Governance Committee may choose

not to consider an unsolicited recommendation if no vacancy exists on the Board of Directors and the Nominating/Corporate Governance Committee does not perceive a need to increase the size of the Board of Directors. To avoid the unnecessary use of the Nominating/Corporate Governance Committee's resources, the Nominating/Corporate Governance Committee will consider only those Director candidates recommended in accordance with the procedures set forth below.

## Procedures to be Followed by Shareholders

To submit a recommendation of a director candidate to the Nominating/Corporate Governance Committee, a shareholder should submit the following information in writing, addressed to the Chairman of the Nominating/Corporate Governance Committee, care of the Corporate Secretary, at the main office of the Bank:

1.  The name of the person recommended as a director candidate;

2.  All information relating to such person that is required to be disclosed in solicitations of proxies for election of directors pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended;

3.  The written consent of the person being recommended as a director candidate to being named in the proxy statement as a nominee and to serving as a director if elected;

4.  As to the shareholder making the recommendation, the name and address of such shareholder as they appear on the Bank's books; provided, however, that if the shareholder is not a registered holder of the Bank's common stock, the shareholder should submit his or her name and address along with a current written statement from the record holder of the shares that reflects ownership of the Bank's common stock; and

5.  A statement disclosing whether such shareholder is acting with or on behalf of any other person and, if applicable, the identity of such person.

In order for a director candidate to be considered for nomination at the Bank's annual meeting of shareholders, the recommendation must be received by the Nominating/Corporate Governance Committee at least 120 calendar days prior to the date the Bank's proxy statement was released to shareholders in connection with the previous year's annual meeting, advanced by one year.

## Minimum Qualifications

The Nominating/Corporate Governance Committee has adopted a set of criteria that it considers when it selects individuals to be nominated for election to the Board of Directors. A candidate must meet the eligibility requirements set forth in the Bank's Bylaws, which include a requirement to own shares of Independence Federal common stock. A candidate also must meet any qualification requirements set forth in any Board or committee governing documents.

If the candidate is deemed eligible for election to the Board of Directors, the Nominating/Corporate Governance Committee will then evaluate the prospective nominee to determine if he or she possesses the following qualifications, qualities or skills:

- financial, regulatory and business experience;
- familiarity with and participation in the local community;
- integrity, honesty and reputation;
- dedication to the Bank and its shareholders; and
- independence.

The Nominating/Corporate Governance Committee will also consider any other factors it deems relevant, including age, diversity, size of the Board of Directors and regulatory disclosure obligations.

Director candidates nominated by shareholders, rather than the Board, are not subject to evaluation under the minimum qualifications and the Board cannot give any assurances that such nominees meet those qualifications.

With respect to nominating an existing director for re-election to the Board of Directors, the Nominating/Corporate Governance Committee will consider and review an existing Director's Board and committee attendance and performance; length of Board service; experience, skills and contributions that the existing director brings to the Board and Independence Federal.

**Process for Identifying and Evaluating Nominees**

The process that the Nominating/Corporate Governance Committee follows to identify and evaluate individuals to be nominated for election to the Board of Directors is as follows:

*Identification.*    For purposes of identifying nominees for the Board of Directors, the Nominating/Corporate Governance Committee relies on personal contacts of the committee members and other members of the Board of Directors, as well as its knowledge of members of the communities served by the Bank. The Nominating/Corporate Governance Committee will also consider director candidates recommended by shareholders in accordance with the policy and procedures set forth above. The Nominating/Corporate Governance Committee has not previously used an independent search firm to identify nominees.

*Evaluation.*    In evaluating potential nominees, the Nominating/Corporate Governance Committee determines whether the candidate is eligible and qualified for service on the Board of Directors by evaluating the candidate under certain criteria, which are described above. If such individual fulfills these criteria, the Nominating/Corporate Governance Committee will conduct a check of the individual's background and interview the candidate to further assess the qualities of the prospective nominee and the contributions he or she would make to the Board.

# FINANCIAL STATEMENTS AND FORM 10-KSB

The Independence Federal Annual Report to Shareholders for 2004, which contains its audited financial statements for 2004, prepared in accordance with generally accepted accounting principles in the United States, is being furnished along with this proxy statement to shareholders of record as of September 26, 2005.

Any shareholder may obtain copies of Independence Federal's quarterly financial statements for the quarters ended March 31 and June 30, 2005 on the Bank's website or by calling or writing to Sheila R. Finlayson, Corporate Secretary of Independence Federal, at 1229 Connecticut Avenue, N.W., Washington, D.C. 20036; (202) 628-5500. The requested quarterly financial statements will be furnished promptly, without charge.

A copy of Independence Federal's Form 10-KSB for the fiscal year ended December 31, 2004, as filed with the OTS, will be furnished without charge to persons who were shareholders as of the close of business on September 26, 2005 upon written request to Sheila R. Finlayson, Corporate Secretary, Independence Federal Savings Bank, 1229 Connecticut Avenue, N.W., Washington, D.C. 20036. The Form 10-KSB is also available on the Bank's website.

## AVAILABLE INFORMATION

The Bank is subject to the reporting and proxy statement requirements of the Securities Exchange Act of 1934, and, in accordance therewith, files reports, proxy statements and other information with the OTS. Copies of such materials may be obtained at prescribed rates from the OTS at 1700 G Street, N.W., Washington, D.C. 20552. In addition, the Bank's common stock is quoted on the Nasdaq SmallCap Market under the symbol "IFSB." Reports, proxy statements and other information concerning the Bank may also be inspected at the offices of the National Association of Securities Dealers, Inc., 1735 K Street, N.W., Washington, D.C. 20006.

Upon completion of the Holding Company Formation, the Holding Company will replace the Bank as subject to the informational requirements of the Exchange Act, and in accordance therewith will file reports, proxy statements, information statements and other information with the SEC. Such reports, proxy statements, information statements and other information, when filed, can be inspected and copies obtained, at prescribed rates, at the public reference facilities maintained by the SEC at 100 F Street, N.E., Washington, D.C. 20549. Information on the operation of the Public Reference Section may be obtained by calling the SEC at (800) SEC-0330. Also, the SEC maintains a website that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC. The address of such site is http://www.sec.gov. The Holding Company will undertake to qualify its common stock for quotation on the Nasdaq SmallCap Market under the same symbol "IFSB" as of the effective date of the Holding Company Formation.

**No person is authorized to give any information or to make any representation not contained in this proxy statement, and, if given or made, such information or representation should not be relied upon as having been authorized. This proxy statement does not constitute an offer to sell a security, or a solicitation of a proxy, in any jurisdiction, in any person to whom, it would be unlawful to make such an offer or solicitation. Neither the delivery of this proxy statement nor any distribution of the securities made under this proxy statement shall, under any circumstances, create the implication that there has been no change in the affairs of the Bank since the date of this proxy statement.**

## SUBMISSION OF FUTURE SHAREHOLDER PROPOSALS AND NOMINATIONS

Any new business to be taken up at an annual meeting must be stated in writing and filed with the Bank's Corporate Secretary at least five (5) days before the date of such annual meeting.

In order to be eligible for inclusion in the Bank's proxy materials for next year's annual meeting of shareholders, any shareholder proposal to take action at such meeting should be directed to the care of Sheila R. Finlayson, Corporate Secretary, and received at the Bank's main office at 1229 Connecticut Avenue, N.W., Washington, D.C. 20036, no later than December 9, 2005. Any such proposals shall be subject to the requirements of the proxy rules adopted under the Exchange Act and administered by the OTS.

## SHAREHOLDER COMMUNICATIONS

Independence Federal encourages shareholder communications to the Board of Directors and/or individual directors. All communications from shareholders should be addressed to Independence Federal Savings Bank, 1229 Connecticut Avenue, N.W., Washington, D.C. 20036, ATTN: Corporate Secretary. Communications to the Board of Directors should be in the care of Sheila R. Finlayson, Corporate Secretary. Communications to individual directors should also be sent to such director at the Company's address. Shareholders who wish to communicate with a Committee of the Board should direct their communications to the Chair of the particular committee in care of Sheila R. Finlayson, Corporate Secretary, with a copy to the Chair of the Nominating/Corporate Governance Committee. It will be in the discretion of the Nominating/Corporate Governance Committee whether to bring to the attention of the full Board any communication sent to the full Board.

## MISCELLANEOUS

The cost of solicitation of proxies on behalf of the Board of the Bank will be borne by Independence Federal. Proxies may be solicited personally or by telephone by directors, officers and other employees of Independence Federal without any additional compensation. Independence Federal will also request persons, firms and corporations holding shares in their names, or in the name of their nominees, which are beneficially owned by others, to send proxy material to, and obtain proxies from, the beneficial owners, and will reimburse those record holders for their reasonable expenses in doing so. D.F. King & Co., Inc., a proxy solicitation firm, will be paid a fee of $15,000, plus out-of-pocket expenses, to assist Independence Federal.

Independence Federal's annual report to shareholders is being mailed to persons who were shareholders as of the close of business on September 26, 2005. Any shareholder who has not received a copy of the annual report may obtain a copy from the Bank's website or by writing to the Corporate Secretary of Independence Federal. The annual report is not to be treated as part of the proxy solicitation material or as having been incorporated herein by reference.

By Order of the Board of Directors

Michael J. Cobb
Secretary of the Board

October 4, 2005
Washington, D.C.

**APPENDIX G**

APPENDIX  G

 **Office of Thrift Supervision**
Department of the Treasury

*Regional Director, Southeast*

1475 Peachtree Street, N.E., Atlanta, GA  30309 • Telephone: (404) 888-5619
P.O. Box 105217, Atlanta, GA  30348-5217 • Fax: (404) 888-5634

VIA CERTIFIED MAIL-RETURN RECEIPT
AND FACSIMILE 202.466.6233

September 14, 2005

Mr. Morton A. Bender
1025 Connecticut Avenue, N.W.
Suite 606
Washington, D.C. 20036

Re:   Response to May 9 Letter

Dear Mr. Bender:

On May 9, 2005, I wrote to notify you that the Office of Thrift Supervision (OTS) was considering whether to pursue enforcement action against you for apparently false and misleading statements contained in your May 2, 2005 Definitive Stockholder Letter relating to the 2005 Annual Meeting of Independence Federal Savings Bank, Washington, D.C. (Independence or the Bank) (May 9 Letter).  The May 9 Letter requested that you submit to OTS information relevant to our decision and solicited any facts that you believed would make the pursuit of enforcement action against you inappropriate.  On June 21, 2005, your counsel provided OTS a lengthy response to the May 9 Letter (Response).

I am writing to notify you that, following careful consideration of the relevant facts known by OTS, OTS has determined not to pursue enforcement action against you in this matter. However, be advised that it continues to be the OTS's position that it is always inappropriate for any communication to be made to stockholders without the appropriate OTS clearances.  Further, any future communications between you and the Independence shareholders must receive such clearance prior to the communication being mailed.  Failure to comply with these procedures resulting in communications that contain false or misleading information will be dealt with by OTS utilizing the strongest possible actions.

M. A. Bender
September 14, 2005
Page 2


     If you have questions regarding this matter, please contact Regional Counsel Karen
Bruton at 404.888.8475.

                                Sincerely,

                                John E. Ryan
                                Regional Director


cc:  Dale A. Cooter, Esq.
      Cooter, Mangold, Tompert & Karas, L.L.P.
      5301 Wisconsin Avenue, N.W.
      Suite 500
      Washington, D.C. 20015
      Via First Class Mail and
      Facsimile 202.364.3664