**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MORTON A. BENDER, et al.,     )
    )
    **Plaintiffs,**     )
    )
    **v.**     )
    )   **C.A. No. 1:06cv00092**
CAROLYN D. JORDAN, et al.,     )   **(RMC)**
    )
    **Defendants.**     )
_____)

**[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION**

**FINDINGS OF FACT**

1.  Plaintiffs Morton A. Bender ("Bender") and Grace M. Bender ("Grace Bender") are residents of the District of Columbia.  As joint tenants, they are the beneficial owners of 326,000 shares of common stock of Defendant Independence Federal Savings Bank, and thereby jointly own approximately 21% of the outstanding stock of the Bank.  Grace Bender is not an active participant in the matters relevant to this litigation and she is a party solely in her capacity as a joint tenant shareholder with Bender.

2.  Independence Federal Savings Bank ("IFSB" or the "Bank") is a federally-chartered savings bank, with its principal place of business in the District of Columbia.  The Bank operates four branches in the District of Columbia and one branch in Chevy Chase, Maryland.  Its stock is publicly traded on the NASDAQ Stock Exchange and it is under the regulatory jurisdiction of the Office of Thrift Supervision ("OTS").

3.  Defendant Carolyn D. Jordan ("Jordan")  is a member of the Bank's Board of Directors, and is its Chairman.  Defendants David Wilmot ("Wilmot"),  Michael J. Cobb

("Cobb"), William B. Fitzgerald, IV ("Fitzgerald"), and Eugene K. Youngentob ("Youngentob")
are also members of the Bank's Board of Directors. Defendants Jordan, Wilmot, Cobb,
Fitzgerald, and Youngentob are hereinafter collectively referred to as the "Director Defendants."

    4. Defendant Thomas L. Batties ("Batties") is President and Chief Executive Officer of
the Bank.

    5. The Bank's fiscal year ends on December 31 each year. On April 6, 2004, the Board
of Directors of IFSB voted to amend Article II, Section 2 of the Bank's bylaws to set the date of
the Bank's annual meeting "within 150 days after the end of the savings bank's fiscal year on the
third Wednesday of April . . . or at such other date and time within such 150-day period as the
board of directors may determine." The regulations of the OTS require that a Bank's annual
meeting be held within 150 days of the end of its fiscal year. 12 C.F.R. §552.6(a). Thus, the
annual meeting should have been held April 20, 2005 (the third Wednesday in April 2005), but in
no event later than May 31, 2005 (one day after Memorial Day which was the 150th day after the
close of the Bank's fiscal year on December 31, 2004). The 2005 annual meeting was not
scheduled to take place before April 20, 2005, but a Special Meeting in lieu of the Annual
Meeting of Shareholders was scheduled for May 11, 2005, prior to the May 31, 2005 corporate
and regulatory annual shareholder meeting deadline.

    6. In anticipation of the scheduled May 11, 2005 meeting, at which three directors would
be elected to the Bank's Board, Bender sent a letter, dated April 26, 2005, to the Bank's
corporate secretary giving notice that Bender was nominating two persons for election to the
Board. On May 2, 2005, Bender sent a letter to the shareholders setting forth his positions
regarding the Bank's performance, and information regarding his nominees.

7. A few days prior to the May 11th meeting, a letter dated May 4, 2005 was sent to shareholders allegedly on behalf of "the Committee to Save Independence Federal Savings Bank." This letter was drafted by, or with the assistance of, Defendant Batties (and/or one or more of the Director Defendants), as the level of detail set forth in the letter leads to the inescapable conclusion that it was written by, or in consultation with, Bank management. Some of the information contained in the letter could only have come from confidential OTS examination reports, which are maintained in the Bank's file. The letter is full of faulty and misleading statements ("Morton Bender's Background").

8. *By way of partial example only,* the May 4, 2005 letter contains the following false and misleading statements, or omissions of material fact:

a. "the originally established goals of Independence Federal Savings Bank that have recently been threatened by the personal greed of specific individuals– individuals who have no regard not only for the African American community, small businesses, depositors and local homeowners, but not even for their fellow shareholders in IFSB";

b. "Acting separately from IFSB, we aim to expose the motivations of those wishing to harm IFSB's mission";

c. "We must prevent the individuals trying to line their own pockets at the expense of IFSB's important mission and rich history";

d. "urge [the OTS] to exercise their oversight responsibilities and prevent individuals who have no regard for our community from dismantling IFSB";

e. "Mr. Bender pursues a personal agenda when he realizes that his reformer allies ... will not allow him to dominate IFSB's affairs. Mr. Bender starts making demands on Management as though he is in control of the bank. Frustrated that he cannot dictate policy ... . He forges ahead with this course in utter disregard for fellow shareholders. ... he will simply use bully tactics and lies ... . These cronies will then do his bidding ... ." (Timeline page 1);

3

f.      "the OTS ... acquiesces in Mr. Bender's attempt to seize control of the bank without offering a fair price to shareholders or otherwise disclosing to customers that he's trying to control their bank.  Thus while Bender's bank discriminated with regard to credit and lending ... ." (Timeline page 1-2);

g.      "Mr. Bender continues his baseless attacks on this new management and the Board" (Timeline page 2);

h.      "the OTS-in a move friendly to Mr. Bender and hostile to a minority institution designates IFSB as a 'problem institution' in 'troubled condition' ..." (Timeline page 2);

i.      "Egging by the OTS actions, by December, 2003, Mr. Bender is ... engaging in ruinous insurgent tactics" (Timeline page 2);

j.      "a U.S. District Court finally rebukes him, dismissing his suit and stating that all along it was Mr. Bender's strategy to ... scare off other potential merger partners like Carver" (Timeline page 2);

k.      "Mr. Bender is allowed to continue his war on the bank and obtain more stock.  IFSB is even prevented from undertaking the most routine transactions, such as forming a bank holding company without the blessing of large rebel shareholders, namely Mr. Bender" (Timeline page 2);

l.      "Instead he continues buying shares to vote his cronies onto the Board. IFSB decides to sue Bender for intentionally interfering with the merger deal, plus other violations of law.  Again, the OTS sits back and refuses to help IFSB or rein in Mr. Bender despite his own violations of law" (Timeline page 3);

m.      "The bank attempts to settle legal action with Mr. Bender ... government officials ... have allowed Mr. Bender and his allies to skirt policies and practices" (Timeline page 3);

n.      "If it were not for the excessive legal fees caused by Bender, IFSB would have shown a net profit for FY2004" (Timeline page 3);

o.      "Although [Bender's nominees to the Board] are both African Americans, they are mere puppets of Bender's with no apparent ties to banking, required to do what he tells them" (Timeline page 4).

4

9.  Attached to the May 4th "Committee to Save" letter was a document entitled "Morton Bender's Background." The entirety of this document is full of false and misleading statements, many repeating the same themes identified above. Examples of some of the other statements include the following: Bender "wished to either merge IFSB into his own 'shakily-run' bank, or worse, make it a fiefdom in his local empire, likely with minority faces as fronts, until he can otherwise dispose of it" (Background, third bullet point); "He has succeeded in degrading IFSB, driving down the value of the bank's shares and attacked the mission of this bank began [sic] in 1968. With the bank's stock degraded by his activities, he can buy it at a cheaper price" (Background, fourth bullet point); "He has ... forced IFSB to sue him ... [h]e has engaged in ruinous insurgent tactics, filed misleading securities filings with the OTS ... and threatened more lawsuits if he cannot view secret, private shareholder ballots so he may bully small and minority shareholders who didn't vote in his favor" (Background, fifth bullet point).

10.  Similar to the May 4th "Committee to Save" letter, the October 21, 2005 letter makes false allegations of Bender's "record history involving other banks including a black bank pushed to failure," and "severe violations of banking law and illegal practices by Bender and his Columbo Bank." The letter also provides "[T]he only time we are aware we got into U.S. District Court with Bender – though expensive – Independence Won, Bender Lost!" This statement (among others in the letter) is patently untrue. Examples of other false and/or misleading statements are the following: "we can only presume that [the Bender Nominees'] basic qualification, based on past events, is to serve Bender loyally to affect his admitted takeover scheme." "We wonder aloud why OTS has behaved so contrary to banking laws,

security regulations and sound public policy to facilitate handing *Our Bank* to this Bender

character?"

11.  The October 21st letter's repeated references to the May 9, 2005 letter from the OTS

to Bender is misleading in its blatant omission of (or any reference to) the September 14, 2005

letter from the OTS, attached as Appendix G to the Bank's Proxy Statement.  The September 14th

letter advised Bender that "after careful consideration of the relevant facts known to OTS" no

enforcement action would be taken with regard to the allegations set forth in the OTS's May 9th

letter.

12.  By letter dated May 10, 2005, the OTS suggested that the Bank adjourn the meeting

for a brief period due to the Bender correspondence to the shareholders, and the "Committee to

Save" correspondence referred to in the foregoing paragraph.  The 2005 annual meeting was

convened on May 11, 2005; pursuant to the OTS suggestion, however, no business was

conducted at the meeting and the meeting was adjourned.

13.  The shareholders meeting was then scheduled to reconvene on June 8, 2005.  On

May 31, 2005, just a week prior to the date of the reconvened shareholders' meeting, the Bank

issued a press release stating that the meeting would not be reconvened on June 8, 2005, and that

the Bank's Board of Directors would meet to determine a new date for the shareholders' meeting.

14.  By its notice to shareholders dated August 25, 2005, the Bank announced that the

Special Meeting in lieu of Annual Meeting of Shareholders would take place September 14,

2005.  On September 7, 2005, Defendant Jordan notified the Board members that a Special

Meeting of the Board of Directors would be held on September 9, 2005 "[t]o consider matters

related to disclosures contained in two recent 13D filing made last week on behalf of Morton

Bender and how such disclosed information may impact the Bank." At its September 9, 2005 special meeting, the Board again postponed the meeting scheduled for September 14, 2005, "for the shareholders to be presented with the information regarding Bender's plans prior to their voting on the matters to be considered at the meeting." The Board rescheduled the "Special Meeting in lieu of an Annual Meeting of the Shareholders" of IFSB to be held on October 26, 2005 at 11 a.m., at the Mayflower Hotel in Washington, D.C. ("Shareholders Meeting").

15. Bender's nominees for directors to be elected at the Shareholders Meeting were Osborne George and John Silvaneous Wilson, Jr. ("Bender Nominees").

16. On or about October 3, 2005, Bender sent a letter to the IFSB Shareholders, which *inter alia* identified the Bender Nominees, and explained that the only way to vote for the Bender Nominees was to attend the meeting in person, or to send someone with a legal proxy. The letter also specifically instructed that Bender was not soliciting proxies, and was not able to vote any shares other than his own.

17. On October 4, 2005, the Director Defendants and Defendant Batties submitted the Bank's proxy materials to the Shareholders ("Proxy Materials"). These Proxy Materials included the Banks Proxy Statement ("Proxy Statement") with ten appendices, a "Notice of Postponement and Rescheduling of Special Meeting of Shareholders," as well as a letter signed by Defendants Jordan and Batties entitled "Update to Our Shareholders" ("Update"). Both the Update and the Proxy Statement contained inaccurate and misleading information about the Bender Nominees, Bender's regulatory filings, and his intentions to obtain majority ownership and control of the Bank.

18. As identified in the Proxy Statement at page 28, the Bank's nominees for directors were: Defendant Fitzgerald, Defendant Wilmot, and Marion O. Greene, Jr. ("Management Nominees").

19. The Update states that "if Bender is successful in electing his two nominees to the Board, the Majority Directors believe that Bender will gain control of Independence Federal without having to purchase any additional shares of Independence Federal Stock."

20. The Update, which was a letter to the IFSB Shareholders, dated October 4, 2005, and signed by Defendants Jordan and Batties. Page 1 of the Update states, "here is Bender's plan as disclosed in Amendment 18 to his Schedule 13D ... ." Immediately following that statement, the Update lists the "Banks' Belief of Bender's Intentions" which purports to identify what Bender intends to do, leaving the reader with the mistaken impression that those "beliefs" are taken directly from Bender's 13D Amendment 18. The "Bank's Beliefs" are attributed to the "Majority Directors," who are described in the Update as the "directors other than the three directors whose elections were primarily attributable to the nomination and/or vote of Morton Bender;" the Majority Directors are specifically identified in the Proxy Statement as Jordan, Cobb, Fitzgerald, Wilmot and Youngentob.

21. On October 21, 2005, a letter was sent to all IFSB shareholders, purportedly drafted by Catherine McPhail and A. Gilbert Douglas, two shareholders who supported the Management Nominees. This letter contained inaccurate statements about Bender and his intentions and was based on information provided by the Director Defendants and/or Defendant Batties for the express purpose of misinforming the other shareholders. The letter makes false allegations of Bender's "record history involving other banks including a black bank pushed to failure," and

"severe violations of banking law and illegal practices by Bender and his Columbo Bank." The letter also provides "[T]he only time we are aware we got into U.S. District Court with Bender – though expensive – Independence Won, Bender Lost!" These statements (among others in the letter) are untrue.

22. *By way of partial example only,* the Proxy Statement contains the following false and misleading statements, or omissions of material fact:

a.  "Bender is a substantial reason the price for Independence Federal common stock has fallen to the $11.75 per share price" (page 2);

b.  "Bender's opposition to the Carver Merger and his other actions are a substantial reason for the failure of the Carver Merger" (page 2);

c.  the depressed stock is a result of increase expenses, "including a significant portion of legal fees in excess of $3,000,000 alone in 2004, which Independence Federal incurred in its efforts to protect the Bank and its shareholders from Bender's actions" (page 2);

d.  "Bender has [refused to purchase shares from all shareholders] at a price which is competitive" (page 2);

e.  if the Bender Nominees are elected, Bender will obtain "Controlling Influence" over IFSB "to the Detriment of All Other Shareholders" (page 3);

f.  that Bender has sued the Bank's directors "without citing any factual basis. These actions and baseless pejorative statements also damage the Bank's reputation in the community" (page 3);

g.  "it is quite possible that Bender desires a merger of Independence Federal and Colombo Bank" (pages 3-4).

h.  Page 20 of the Proxy Statement fails to identify the block of stock owned by the Doley Group in its identification of "groups owning in excess of 5%."

23. The Proxy Materials distributed by the Defendants prior to the October 26, 2005 Shareholders' Meeting contained material misstatements and omissions. The Proxy Materials were intended to mislead the shareholders that the election of the Bender Nominees will result in a situation where Bender, as the joint owner of 21% of the Bank's shares, will be allowed to dictate its future, to his personal benefit, and the benefit of Colombo Bank, to the detriment of the remaining shareholders, from whom Bender will not purchase stock. The Proxy Materials blame Bender for the failure of the merger with Carver, and virtually every problem at the Bank, including increased operating expenses and decreased stock price. At no place in the Proxy Materials does the Bank Management (*i.e.*, the Director Defendants and Defendant Batties) inform the Shareholders of its own role in the poor performance of the Bank. By way of material omission, it was the Bank's three-pronged attack in May 2004 (lawsuit, poison pill, holding company restructure) that caused the Bank to incur substantial legal fees and expenses. All Mr. Bender did to prompt this multi-million dollar legal attack was to voice his objection to the proposed merger with Carver. Despite the picture painted in the Proxy Materials, the Bank's capital was diminished by continuing poor operating performance, notwithstanding its legal expenses. To the extent that the Proxy Statement implies that "a significant portion" of the 2004 legal fees in excess of $3 million were necessary to "protect" the Bank and its shareholders from Bender, the statement is a blatant distortion: legal fees were incurred as a result of three civil lawsuits against the Bank involving the Washington Teachers Union, as well as the litigation instituted in this Court on May 5, 2004 *against* Bender. Not one of those four cases was instituted by Bender, and only one even involved him. In addition, although the Proxy Materials attribute the failure of the Carver Merger to Bender, it was that the OTS denied the application

10

for the Carver merger.  Even prior to the OTS denial of the merger application however, Carver demanded a lower price than that which had been agreed to, and the IFSB Board refused.

24.  As set forth above, non-party Thompson increased his shareholdings in IFSB by 98,000 shares in the 45 days immediately prior to the September 26, 2005 Record Date, which increased his ownership in IFSB to 7.2%.  Prior to the mailing of Proxy Materials on or about October 4, 2005, the  Director Defendants and Defendant Batties had reached an agreement among themselves, and with Thompson, for Thompson to acquire these additional shares, and to vote his shares in favor of the Management Nominees, or to give his proxy to the Director Defendants.  This agreement provided the Director Defendants with control of approximately 9% of IFSB, and would have been material information to the IFSB shareholders in deciding whether or not to vote in the election, and how to vote.  The agreement with Thompson was not disclosed in the Proxy Materials.

25.  As set forth above, the Director Defendants and/or Defendant Batties also participated in the communications from at least two groups of shareholders, the May 4, 2005 letter by "the Committee to Save Independence Federal Savings Bank," and the October 21, 2005 letter purportedly sent  by Catherine McPhail and A. Gilbert Douglas.

26.  In an effort to ensure the election of the Management Nominees to the Board, the Director Defendants and Defendant Batties also used the various delays in the Shareholders' Meeting to arrange for the sale of IFSB stock to Jeffrey Thompson ("Thompson"), who is the Chairman and Chief Executive of an accounting firm in which Defendant Cobb is also a shareholder.

27. Beginning in early August 2005, and during the 45-day period immediately prior to the September 26, 2005 Record Date for the Shareholders' Meeting, Thompson purchased 98,600 shares of IFSB stock; the 13D filed by Thompson in late September 2005 indicated that he owned 111,600 shares, which is 7.2% of IFSB stock. Approximately 80,000 of the shares purchased by Thompson had been held by Millenium Management (or an affiliate).

28. Thompson, at all times relevant herein, was acting in concert with Cobb and the other Director Defendants and Defendant Batties to further their agenda for IFSB, including, but not limited to, electing the Management Nominees, and defeating the Bender Nominees. It appears that the 13D filed with the OTS on behalf of Thompson in September 2005 was faxed to the OTS by the law firm of Muldoon Murphy Aguggia ("Muldoon Murphy"), the same law firm that is counsel to IFSB. Although the 13D filed by Thompson states that the purpose of his stock purchases was "for investment purposes," (13D, Item 4), the real reason for the purchases was to consolidate votes for the Management Nominees, and to thwart Bender's efforts to get the Bender Nominees elected.

29. At some time either prior to, or during the vote at the Shareholders' Meeting, Thompson's attorney, Daniel Weitzel, delivered Thompson's proxy to John Hall, an attorney with Muldoon Murphy, counsel for IFSB. The delivery of the proxy resulted in all 111,600 of Thompson's shares being voted for the Management Nominees. The delivery of the proxy to Hall was not in compliance with the Bank's own instructions for delivery of proxies set forth in the Proxy Statement, violated IFSB By-laws, and was done for the express purpose of avoiding a fair vote on Bender's candidates.

30. As of October 25, 2005, the day prior to the Shareholders' Meeting, Harold Doley ("Doley"), along with a group of affiliated persons or entities ("the Doley Group"), owned in excess of 12% of IFSB stock ("the Doley Group Shares"). The Doley Group acquired its IFSB shareholdings from Carver Bancorp, Inc. ("Carver"). Despite their combined ownership percentage in excess of 12%, neither Doley nor any other member of the Doley Group has ever filed a Form 13D regarding their IFSB stock ownership with the OTS.

31. On October 25, 2005, Doley told Bender that he was willing to allow Bender to vote the Doley Group Shares in favor of the Bender Nominees, or would give Bender his proxy. Bender told Doley he was not allowed to accept proxies, and told Doley he would have to give his proxy to someone else.

32. Also on October 25, 2005, Doley was contacted by one or more of the Director Defendants or Defendant Batties for the purpose of purchasing the Doley Group Shares. Doley reached an agreement with one or more of these Defendants to sell all of the Doley Group Shares for $17.00 per share. On that same day, IFSB shares were trading on the open market, and closed at approximately $11.50 per share.

33. On the morning of October 26, 2005, Bender spoke with Logan Delaney, an associate of Mr. Doley, who told Bender about the agreement for the purchase of the Doley Group Shares. Later that morning, Bender again spoke to Doley, who assured Bender that he would vote the Doley Group Shares for the Bender Nominees. The deal for the purchase of the Doley Group Shares was not complete at this time.

34. The Shareholders' Meeting was scheduled to start at 11 a.m. on October 26, 2005. Defendant Wilmot postponed the start of the meeting, without any Board resolution or other

authority for a postponement. Defendants Jordan and Wilmot used this delay to continue to gather votes for the Management Nominees, and to take Doley to lunch at the Prime Rib Restaurant. The purpose of the lunch was to persuade Doley to assign the proxies related to the Doley Group Shares to the Director Defendants, or to complete the deal for the sale of the shares. During the course of their discussions, Jordan and/or Wilmot told Doley that if he voted for the Bender Nominees, there would be a "run on the bank." At some point before the Shareholders Meeting resumed at 3 p.m., Doley finalized his deal with one or more of the Director Defendants to sell the Doley Group Shares at $18.00 per share.

35. Because the Dooley Group members were the record owners of the stock as of the Record Date (September 26, 2005), the Director Defendants did not complete the purchase of the shares on October 26, 2005, but rather promised Doley a $175,000 down payment. In exchange for the promise of the down payment, Doley gave the Director Defendants control over the Doley Group Shares, and those shares were subsequently voted for the Management Nominees. No 13D was filed by any of the Director Defendants indicating their intention to purchase shares or gain control of the Doley Group Shares to vote in favor of the Management Nominees.

36. The above-described acquisition of the Doley Group Shares, or proxies for those shares, was without prior OTS approval required for increasing the Director Defendants' ownership/control of the company over 10%.

37. The Shareholders' Meeting eventually reconvened at 3 p.m., and lasted a half an hour. During the course of the meeting, Bender made formal proxy challenges to the Independent Inspector of Election (hereinafter referred to as the "IIOE") based on the counting of uncast votes in favor of the Management Nominees, and the fact that the master ballot (which

represented proxies received by Management) was to be voted after the closing of the polls, in violation of Section 45 of Robert's Rules of Order ("Robert's Rules"). Pursuant to the IFSB Amended By-laws ("By-laws"), shareholders' meetings are conducted pursuant to Robert's Rules.

38. Pursuant to the By-laws, the IFSB Board is required to hold a meeting and vote on how unvoted shares should be voted. No such meeting, or vote of the directors, took place. When Bender's attorney, Robert Freedman, objected that the unvoted shares could not be voted for the Management Nominees without a prior Board vote, Defendant Jordan ruled Freedman "out of order." In addition, pursuant to the voting procedures set forth in the Proxy Statement, as to those Shareholders who chose not to vote to elect directors, neither their brokers nor any other person could vote in their place.

39. Nevertheless, in violation of the By-laws requiring a Board vote on the unvoted shares, and the representation in the Proxy Statement as to how proxies were to be voted, approximately 200,000 unvoted shares were voted for the Management Nominees.

40. In addition, the IIEO told counsel for Bender that the shares/proxies held by IFSB Management were voted before the close of the Shareholders' Meeting. Contrary to the IIEO's assurances, and Robert's Rules, however, those shares/proxies were voted at a meeting which took place two days after the Shareholders' Meeting.

41. The failure to comply with the By-laws, the representations set forth in the Proxy Statement, and Robert's Rules was done for the express purpose of denying Bender's rights to have a fair and informed vote on the Bender Nominees.

42. After the meeting, Bender spoke with Doley, who indicated that his share purchase agreement was still being negotiated, but consistent with that agreement, the Doley Group Shares were voted for the Management Nominees.

## CONCLUSIONS OF LAW

43. Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder provide that any person, and any group acting together for the purpose of acquiring, holding, or voting securities of a company, who acquires, either directly or indirectly, the beneficial ownership of more than 5 percent of a class of securities registered under Section 12 of the Exchange Act must, within ten days, file a statement on Schedule 13D with the company's primary regulator and with any exchange where the security is traded.

44. A Schedule 13D must set forth the purpose of acquiring the issuer's stock, and the acquiring person's plans, intentions and agreements with respect to the issuer.

45. Rule 13d-101 requires "reporting persons" to describe any contacts, arrangements, understandings, or relationships between themselves and any other person with respect to the issuer, "naming the persons with whom such contracts, arrangements, understandings, or relationships have been entered into."

46. A primary purpose of Section 13(d) is to alert and inform companies, their shareholders and the investing public generally regarding accumulations in stock which might represent a potential shift in corporate control or a potential change in the company's direction,

and to compel full disclosure of information critical to shareholders in making informed investment decisions.

47.  Rule 13(d)(1) provides that "when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of Section 13(d) and (g) of the Exchange Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."

48.  By no later than October 26, 2005 and possibly substantially earlier, the Director Defendants and Defendant Batties had agreed to act together as a group with non-parties Thompson and the Doley Group, for the undisclosed purposes of (i) opposing the election of the Bender Nominees, voting the Defendants' IFSB shares, together with the Thompson and Doley Group Shares, against the Bender Nominees, and persuading other shareholders to vote against the Bender Nominees; (ii) depriving those IFSB shareholders who voted in favor of the Bender Nominees the opportunity of a fair election of the Bender Nominees; (iii) supporting the efforts of Jordan to continue controlling the IFSB Board despite a dismal record of mismanagement and negligence.

49.  The Director Defendants and Defendant Batties have violated section 13(d) of the Exchange Act because they have failed to file a Schedule 13D, or any amendments to an existing 13D, setting forth their specific plans and intentions with respect to IFSB, including but not limited to the details of the undisclosed agreement among the Director Defendants and Defendant Batties to seek to acquire the Doley Group Shares by purchase or otherwise; the undisclosed agreement to purchase the Doley Group Shares; the undisclosed agreement with Thompson

regarding his votes (or the delivery of his proxies) for the Management Nominees; and the

undisclosed agreement with the Doley Group regarding the delivery of their votes (or the delivery

of their proxies) for the Management Nominees.

50.   The Defendants' violations of Section 13(d) deprived all IFSB shareholders,

including the Benders, from information necessary to ensure a fair vote at the Shareholders'

Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly

considered by all shareholders.  Accordingly, the election of the Management Nominees is

irreparably tainted, and the results of the meeting are therefore void.  Plaintiffs (and other

shareholders and the investing public) have been, are being, and will continue to be irreparably

harmed, in that they are left without material information, to which they are lawfully entitled,

regarding the true interests and purposes of Defendants' efforts to control IFSB for their own

interests, and to defeat the Bender Nominees.  The information which was not provided in any

Schedule 13D was essential to informed shareholder decisions with respect to voting IFSB shares

at the Shareholder Meeting, and were also material to Bender's own communications with the

shareholders.

51.   Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and the rules and regulations

promulgated thereunder, as well as 12 C.F.R. § 569, govern the solicitation of proxies in this

case.  Pursuant to those statutory and regulatory provisions, no solicitation of a proxy shall be

made by means which, *inter alia*, contains any statement that is false or misleading with respect

to any material fact, or omits to state any material fact.

52. Pursuant to 17 C.F.R. § 240.14a-9, no solicitation (not limited to proxy materials) may be made by means of any communication which is false or misleading, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

53. Section 14(a) of the Exchange Act, and the rules and regulations promulgated thereunder, demand full and fair disclosure in proxy solicitations, and was enacted to prevent management (or others) from obtaining authorization for corporate action by means of inadequate or misleading disclosures.

54. Pursuant to 17 C.F.R. § 240.14a-9, no solicitation may be made by means of any communication "which is false or misleading," or "which omits to state any material fact necessary in order to make the statements therein not false or misleading." The May 4, 2005 letter and the October 21, 2005 are solicitations subject to 17 C.F.R. § 240.14a-9. Both letters solicit support for board nominees supported by the Director Defendants, and/or against the board nominees supported by Bender.

55. The misrepresentations and omissions made in the Proxy Materials and the solicitations were made with knowledge of their falsity. The Director Defendants and Defendant Batties have violated Section 14(a) of the Exchange Act by their knowing dissemination of materially misleading Proxy Materials, and, as to Defendant Batties, by his participation in the dissemination of the materially misleading May 4, 2005 and October 21, 2005 shareholder letters, as described above.

56. The Director Defendants and Defendant Batties' violations of Section 14(a) deprived all IFSB shareholders from information necessary to ensure a fair vote at the Shareholders' Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly

considered by all shareholders. Accordingly, the election of the Management Nominees is irreparably tainted, and the results of the meeting are therefore void. Plaintiffs (and other shareholders and the investing public) have been, are being, and will continue to be irreparably harmed, in that they are left without material information, to which they are lawfully entitled, regarding the true interests and purposes of the Director Defendants and Defendant Batties' efforts to control IFSB for their own interests, and to defeat the Bender Nominees. The misstatements and omissions in the Proxy Materials and May 4th and October 21st letters were material and were essential to informed shareholder decisions with respect to voting at the Shareholder Meeting.

57. As set forth above, the election of the Management Nominees violated the pertinent IFSB By-laws, as well as Robert's Rules of Order, by which the Shareholders' Meeting was governed. As a result, shares in a number material to the outcome of the election were improperly counted in favor of the Management Nominees.

58. As shareholders, Plaintiffs are entitled to have meetings conducted in accordance with the By-laws, 12 C.F.R. §552.6(a), and Robert's Rules of Order. Plaintiffs were also entitled to have the Bender Nominees voted on in a fair and orderly manner.

59. As a result of the Director Defendants' and Defendant Batties' actions in failing and refusing to conduct the election in a fair manner, the Defendants have deprived Plaintiffs and the other shareholders of a fair vote for the election of directors. Accordingly, the election of the Management Nominees is irreparably tainted, and the results of the meeting are therefore void. Plaintiffs (and other shareholders) have been, are being, and will continue to be irreparably

harmed, by the defeat of one of the Bender Nominees (George Osbourne) and the election of the Management Directors in a meeting which failed to be conducted in a proper manner.

60.  Indemnification of officers and directors for Federal Savings Associations is governed by 12 C.F.R. §545.121.  Pursuant to that regulation, IFSB may not indemnify its officers and directors "unless the association gives [the OTS] at least 60 days' notice of its intention to make such indemnification."

61.  Under 12 C.F.R. §545.121, an association may authorize an advance payment of expenses only if "a majority of the directors of a savings association concludes that, in connection with the action, any person ultimately may become entitled to indemnification." Under the regulation, before making advance payment of expenses, "a majority of the directors" must conclude that the person would ultimately be entitled to indemnification" which involves final judgment on the merits in the person's favor, or if "a majority of the disinterested directors of the savings association determine that he or she was acting in good faith within the scope of his or her employment or authority... ."

62.  The conduct in which the Defendants were involved was wilful and intentional, and not performed in good faith, but rather, for the express purpose of injuring Plaintiffs and defeating the Bender Nominees.  Accordingly, Defendant IFSB is restrained from indemnifying or otherwise advancing the expenses of the defense of this action to the Director Defendants or Defendant Batties.

63.  Both the Update and the Proxy Statement contained inaccurate and misleading information about the Bender Nominees, Bender's regulatory filings, and his intentions to obtain majority ownership and control of the Bank, as set forth in detail below.  As such, they violate

Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), 12 C.F.R. § 569, and 17 C.F.R. § 240.14a-9.

64.  The Plaintiffs are likely to succeed on the merits of their claims.

65.  The Plaintiffs have been and will continue to be, irreparably harmed by the actions of the Defendants and Plaintiffs have no adequate remedy at law for any of the Defendants' conduct.

66.  The Defendants will not be irreparably harmed if the Court grants the preliminary injunctive relief sought by the Plaintiffs.

67.  The public interest weighs in favor of granting the preliminary injunctive relief requested by the Plaintiffs.

Accordingly, it is this ____ day of _____, 2006, hereby

ORDERED, that the Benders' request for preliminary injunctive relief be, and it hereby is, GRANTED; and it is further

ORDERED, that the Director Defendants and Defendant Batties shall comply with Section 13(d) of the Exchange Act, and the regulations thereunder, fully disclosing their plans and purposes concerning IFSB and shall file a Schedule 13D within ten (10) calendar days of the date of this Order; and it is further

ORDERED, that the election results of the October 26, 2005 Shareholders' Meeting be, and they hereby are, voided; and it is further

ORDERED, that the Director Defendants shall not cause the Bank to hold an Annual or Special Meeting of the Shareholders until further Order of this Court; and it is further

ORDERED, that the IFSB shares and/or proxies acquired by any Defendants from the Doley Group, or from Thompson, shall be neutralized in any future election of Directors; and it is further

ORDERED, that Defendant IFSB shall not indemnify or make advance payments to the Director Defendants and Defendant Batties for any expenses or attorneys fees in this action; and it is further

ORDERED that this Order shall be filed forthwith in the Clerk's Office and entered of record.

_____
Rosemary M. Collyer
Judge, U.S. District Court

<u>copies to</u>

Dale A. Cooter, Esq.
Donna S. Mangold, Esq.
Cooter, Mangold, Tompert
 & Karas, L.L.P.
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, DC 20015
efiling@cootermangold.com

John R. Hall, Esq.
Muldoon Murphy & Aguggia LLP
5101 Wisconsin Avenue, N.W.
Washington, D.C. 20016
jhall@muldoonmurphy.com

Robert Royer, Esq.
Royer & Brooks
925 15th Street
5th Floor
Washington, D.C. 20005

Carolyn  D. Jordan
702 Leightonwood Lane
Silver Spring MD 20910

David Wilmot
1653 Kalmia Road N.W.
Washington D.C.  20015

Michael J. Cobb
7816 Morningside Drive N.W.
Washington D.C.  20012

William B. Fitzgerald,  IV
3138 Quesada Street N.W.
Washington D.C.  20015

Eugene K. Youngentob
1041 Strathmore Park Court
Apt. 41
North Bethesda MD 20852

Thomas L. Batties
1452 Primrose Road
Washington DC 20012-1224

Thomas Batties, President
Independence Federal Savings Bank
1229 Connecticut Avenue, N.W.
Washington, DC 20036