# EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MORTON A. BENDER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No. 03-2485 (RMC) |
| | ) |
| JEANUS B. PARKS, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OPINION

Morton A. Bender and Grace M. Bender, shareholders of Independence Federal Savings Bank ("Bank"), seek a preliminary injunction ordering certain members of the Board of Directors ("Board") of the Bank, defendants here, to call a special meeting of the shareholders. The purpose of the special meeting would be to remove the defendants from the Board. Upon consideration of the parties' briefs, the testimony and demeanor of witnesses at the preliminary injunction hearing, and the entire record, the Court will deny the motion. It is unlikely that Mr. and Mrs. Bender can fairly and adequately represent all shareholders in a derivative suit, and unlikely that Mr. Bender complied with the requirements of the Change in Bank Control Act, 12 U.S.C. § 1817(j), and regulations of the Office of Thrift Supervision ("OTS")[1] to allow him to effect such a change in control.

---

[1] *See* Regulations Regarding the Acquisition of Control of Savings Associations ("Control Regulations"), 12 C.F.R. Part 574. Given the Court's findings and conclusions on these two defenses, it will not address the remainder of the parties' arguments.

## BACKGROUND FACTS

The Bank is a federally chartered savings association, with four branches in the District of Columbia and one in Chevy Chase, Maryland. It is chartered under the Home Owners' Loan Act, 12 U.S.C. § 1461 *et seq.*, and is subject to examination and supervision by OTS. Its stock is publicly traded on the Nasdaq Stock Market and is registered under Section 12(g) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("Exchange Act"). Mr. and Mrs. Bender jointly own approximately 13% of the Bank's outstanding shares. Mr. Bender and his family also own over 90% of the shares of Columbo Bancshares, Inc., which owns Columbo Bank in Rockville, Maryland.

The Bank was founded in 1968 by William B. Fitzgerald, III, the father of Donna Shuler. Ms. Shuler became President and CEO of the Bank after Mr. Fitzgerald's death in 1998. The complaint alleges that the Bank's management and fortunes declined under Ms. Shuler, who left the Bank in 2003, and that in the five years since Mr. Fitzgerald's death, the bank has become not profitable.

The Bank's current troubles allegedly stem from various sources. Certain loans and close relationships with some depositors have caused losses in recent years. Most particularly, one of the Bank's institutional checking account holders is the Washington Teachers' Union, Local #6, AFL-CIO ("WTU"). The WTU has recently been engulfed in scandal after it became known that its president, Barbara Bullock, and others embezzled over $5 million of the Union's money. According to an audit conducted by the American Federation of Teachers ("AFT"), Ms. Bullock's personal chauffeur cashed 228 checks at the Bank in the approximate amount of $1,200,000 between late-1998 and mid-2002. It is alleged that some of these checks were forged and/or for amounts just under $10,000 (which would have otherwise required the Bank to report the checks). *See* 31 C.F.R.

§ 103.22. Prior to cashing large checks, the chauffeur would call the Bank to verify that it had enough money on hand. As a result of its involvement with the WTU, it is alleged that the Bank has been under investigation by the United States Attorney and OTS. In addition, it is one of the defendants in *Saunders v. Henderson, et al.*, Case No. 1:02CV02536 (EGS) (D.D.C.), wherein plaintiffs seek relief for the Bank's alleged negligence and its aiding and abetting other defendants in embezzling funds from the WTU.

The Benders have been shareholders of the Bank since March 1999. In the Spring of 2003, Mr. Bender successfully promoted two candidates to the Bank's Board. In March 2003, Mr. Bender and Colombo Bancshares filed an application with OTS for approval of an acquisition, directly or indirectly, of up to 100% of the shares of the Bank. *See* Defs.' Exh. 7 ("Application"). According to the Application, the acquisition would be accomplished by "open market purchases . . ., privately negotiated transactions with individual [Bank] stockholders . . ., [or] a tender offer made to all [Bank] stockholders or through an offered accepted by [Bank] management and recommended to its stockholders." *Id.* at 2. The Application was approved by OTS on October 14, 2003. Then, as an owner of at least 10% of the outstanding shares, on November 10, 2003, Mr. Bender requested a special meeting "for the purpose of voting on . . . the removal for cause of" the defendants from the Bank's Board. *See* complaint, Exh. A.[2]

In the meantime, in August 2003, the Board initiated a process to solicit tentative acquisition offers for the Bank. The bid process included a request for an agreement to confidentiality and "standstill" whereby potential bidders would agree not to acquire additional stock

---

[2] Mr. Bender had initially sought to remove a smaller group of the directors at the end of 2002. He testified that OTS informed him that he needed its approval for a "change of control" before he could proceed so he withdrew his request for the meeting in December 2002.

for a period of time. While other potential bidders agreed to these terms and have engaged in due diligence in anticipation of bidding for the Bank, Mr. Bender has refused to sign the agreement and has received no due diligence information.

During 2002 and 2003, Mr. Bender filed a number of Schedule 13D reports with the OTS to report the acquisition of shares of the Bank. In the first of these, Mr. Bender stated that he "expect[ed] to actively assert shareholder rights . . . with the intent to influence the policies of the" Bank. Pltfs. Exh. 3 at 4. In the Fourth Amended Schedule 13D, Mr. Bender notified OTS that he had delivered an October 27, 2003, letter to the Bank, requesting a special meeting for the purpose of removing five of the eight current directors. *See* Defs.' Exh. 22 at 8; Defs.' Exh. 23 at 8. The letter, attached to the Fourth Amended Schedule 13D, was not actually sent to the Bank. *See* Defs.' Exh. 23, Attachment A. A letter dated November 10, 2003, and attached to the Fifth Amended Schedule 13D filed with the OTS, was sent to the Bank asking for the special meeting. *See* Defs.' Exh. 24 at 8. The November 10 letter sought to remove six of the eight current directors, leaving only those directors promoted by Mr. Bender in the spring of 2003. As stated above, the Bank refused to convene a special meeting.

## HISTORY OF THE LITIGATION

Mr. and Mrs. Bender filed suit in the Superior Court of the District of Columbia on November 26, 2003, seeking a Temporary Restraining Order and a Preliminary Injunction requiring the Board to set a special meeting. Defendants are the six Board members whom Mr. Bender would remove and, nominally, the Bank itself. The lawsuit was removed to federal court on the morning of December 2, 2003. Unaware that removal papers had been filed, which effected the removal, Mr. Bender and counsel appeared before Judge Timothy Murphy in the early afternoon of December 2,

-4-

2003, and were granted a TRO in the absence of the defendants. This Court held a hearing on

December 4, 2003, concerning the status of the case. At that time, the injunction issued by Judge

Murphy was lifted and the matter set for a motions hearing on December 8, 2003. The Court

refused to issue an injunction after the December 8 hearing.

Thereafter, on December 9, 2003, Mr. Bender sent a revised request asking the Board

to set a special meeting, which request was denied on December 29, 2003. The matter was set for

an evidentiary motions hearing on January 8, 2003.

## ANALYSIS

In considering a request for preliminary injunctive relief, a district court must

examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2)

plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will

substantially injure the other party; and (4) the public interest will be furthered by an injunction."

*Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999); *see also Serono Lab.*

*v. Shalala*, 158 F.3d 1313, 1317-1318 (D.C. Cir. 1998). A court balances the four factors and a

particularly strong showing on one or more can outbalance a weaker showing on another.

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Wash.*

*Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843-45 (D.C. Cir. 1977). Even in

light of this balancing test, "[i]t is particularly important for the movant to demonstrate a

substantial likelihood of success on the merits" in order to justify the Court intruding on the

normal processes of the judicial system. *Adair v. England*, 217 F. Supp. 2d 1, 5 (D.D.C. 2002).

Mr. Bender testified quite frankly that he wants to acquire the Bank for the least

amount possible. He also agreed that the Board of Directors wants to sell the Bank for the greatest

amount possible for the best benefit of all of the shareholders. And he acknowledged that a special meeting to depose current Board members might scare off other bidders. This candid testimony strongly suggests that the Benders cannot represent all shareholders as a fiduciary in advancing a derivative claim. For this reason alone, the request for a preliminary injunction must be denied.

Pursuant to FED. R. CIV. P. 23.1, a plaintiff bringing a derivative shareholder action "must be qualified to serve in a fiduciary capacity as a representative of the class of stockholders, whose interest is dependent upon the representative's adequate and fair prosecution of the action." *Emerald Partners v. Berlin*, 564 A.2d 670, 673 (Del. Chan. 1989); *see also* FED. R. CIV. P. 23.1 ("The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation"). In the context of a fiduciary relationship, "one person is under a duty to act for the benefit of the other on matters within the scope of the relationship." BLACK'S LAW DICTIONARY 640 (7th ed.). Where "economic antagonism" exists between a potential derivative plaintiff and other shareholders, courts have disqualified derivative plaintiffs, finding their interests conflict with the interests of similarly situated shareholders. *See Pacemaker Plastics Co. v. AFM Corp.*, 139 F. Supp. 2d 851, 855-56 (N.D. Ohio 2001) (disqualifying as derivative representatives plaintiffs who would benefit in the form of increased ownership of a corporation if derivative suit succeeded); *Torchmark Corp. v. Bixby*, 708 F. Supp. 1070, 1077-78 (W.D. Mo. 1988) (Shareholder tender-offeror was inadequate representative of other shareholders where "plaintiff's primary purpose in instigating this action is the acquisition of a controlling interest in [the corporation]" and his interest in buying the corporation at the lowest price conflicted with other stockholders' interest in selling it for the highest price); *Baron v. Strawbridge & Clothier*, 646 F. Supp. 690, 695-96 (E.D.

-6-

Pa. 1986) (finding that a plaintiff who was a tender-offeror and who had filed a derivative suit seeking to enjoin board of directors from implementing proposals designed to discourage hostile takeovers was an improper derivative representative); see also WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1833 (2nd ed. 1986) ("Perhaps the most important element to be considered is whether plaintiff's interests are antagonistic to those he is seeking to represent.").

The Bank is in the middle of a highly delicate bid process, whereby it hopes to achieve a significant return for its shareholders' investments. The Benders have expressed interest in acquiring the Bank through the bid process, and have yet to fully participate only due to concerns over a confidentiality and standstill agreement. The focus of Mr. Bender's request for a special meeting, however, is to remove all but two of the Board members, replace those persons with others of his choosing, and gain indirect control of the Bank without spending a sou for it. Were the Bank not in the middle of a bid process, the Court might place Mr. Bender's rights as a shareholder[3] above the reluctance of the Board to convene a special meeting to vote on the directors' tenure. Mr. and Mrs. Bender share a common interest with other shareholders in ensuring that the Board follows its own bylaws. In these circumstances, however, there exists a conflict between the Benders' fiduciary duty to act for the benefit of other shareholders and their admitted personal interest in achieving control of the Bank. This apparent conflict almost certainly disqualifies them as derivative

---

[3] The By Laws give a shareholder with 10% of more of the outstanding shares the right to seek a special meeting of the Board. Whether granting such a request is mandatory for the Board, or a matter to be determined in the Board's exercise of its fiduciary duty and business judgment, is an issue that severely separates the parties but does not need to be resolved at this time.

representatives in this matter in spite of their common interest. *See Torchmark*, 708 F. Supp. at 1077.

In addition, the Bank presented significant evidence to suggest that Mr. Bender has not complied with the Change in Bank Control Act or OTS regulations. Defendants presented expert testimony from Rosemary Stewart, Esq., to the effect that an acquiror will be deemed to have acquired "control" of a savings association if the acquirer, among other things, "[c]ontrols in any manner the election of a majority of the directors of the savings association." 12 C.F.R. § 574.4(a)(1)(iv).[4]

> [A] change of control would be deemed to occur if an acquiror were successful in sweeping out of office all the management-nominated directors then running for election. . . . This control factor may also be triggered where the proxy would indirectly result in the election of one-third or more members of the board of directors. An example could be proxies that seek to *remove* some present directors, leaving in place a director or directors, who will fill the vacancies with new directors chosen by the proxy holder.

JULIE L. WILLIAMS, SAVINGS INSTITUTIONS: MERGERS, ACQUISITIONS AND CONVERSIONS, § 4.02[3] at n.187. Since Mr. Bender proposes to remove six of the eight current directors (all but his two

---

[4] Both parties offered expert testimony. The Court disqualified Marianne Roche, Esq. as an expert (the plaintiffs' proposed expert), finding that she was banking counsel to the plaintiffs and was more of an advocate than a neutral expert. This conclusion was premised on Ms. Roche's testimony and most particularly on her unwillingness to answer the Court's repeated question as to whether, in her opinion, the Application was sufficient to communicate Mr. Bender's intentions to use a special meeting to acquire control of the Board rather than stock purchases. From her careful responses, the Court concludes the answer would have been "no," contrary to her client's interest. Mr. Bender argues that the Court should also disqualify Rosemary Stewart, the defendant's expert, because she represented one of the Defendants in an earlier proxy contest related to the Board. The Court finds that Ms. Stewart's testimony in this matter was sufficiently neutral to permit her qualification as an expert. Mr. Bender's objection goes to the weight of Ms. Stewart's testimony, not her expertise.

recent nominees) and to have the remaining directors fill the vacancies with new directors chosen by Mr. Bender, it would appear that the end result of a special shareholders meeting would be to have Mr. Bender acquire indirect control of the Bank. *See* Defs.'s Exh. 41.

Yet it is acknowledged that Mr. Bender gave no official prior notice to OTS of his intention to achieve control of the Bank through the removal and replacement of current Board members. The Application spoke to the purchase or acquisition of Bank shares. *See* Defs.' Exh. 7 at 2. Only in the Fourth Amended Schedule 13D report did Mr. Bender openly tell the OTS of his intention to force a special meeting. *See* Defs.' Exh 22 at 8. Since OTS approved the Application allowing Mr. Bender and/or Columbo Bancshares to purchase or trade for control of the Bank prior to submission of the Fourth Amended Schedule 13D, and did *not* approve a change of control through removal and replacement of Board members, the record indicates that Mr. Bender did not obtain the necessary approval from OTS for a change in control to be effected in this manner.

Mr. Bender argues that OTS has approved the Application and that he can effect a change in control either through stock purchases or through exercising his rights as a 10% shareholder to call a special meeting pursuant to the Bank's By Laws. *See* Plaintiffs' Supplemental Brief at 20 ("The Plaintiffs submit that because they have already been approved to acquire control of the Bank through a stock purchase, and because the OTS is well aware of their intentions to seat a new board of directors, there is nothing 'illegal' about the Plaintiffs doing so.") He cites Item 410.10(a) from the Application as giving notice to the OTS of his intention to use the special meeting process to effect a change in control. To the contrary, Item 410.10(a) was specifically tied to stock acquisition and not a special meeting or a vote to remove Board members. *See* Defs.' Exh. 7 at 21 ("[D]epending on the percentage of [Bank] common stock held by either or both of [the

-9-

Benders or Colombo Bancshares], there would be changes in the individuals who comprise the directors . . . ."). He also argues that Amendments 4, 5 and 6 to the Schedule 13D reports gave OTS notice of his intentions vis-a-vis the members of the Board. Since OTS has not indicated its dissatisfaction with this degree of notice, it is asserted that OTS has no disagreement with Mr. Bender's intentions.

Should the Benders be appropriate fiduciaries to bring a derivative shareholder suit, which this Court finds highly doubtful, they would still have a low likelihood of success on the merits of whether their Application and the Schedule 13D filings fulfill the requirements of the Change in Bank Control Act and its regulations. In reaching this conclusion, the Court does not place itself in the position of regulator, which the Benders resist, but depends on the expert testimony of Ms. Stewart and the entire record to determine if, and only if, a preliminary injunction should issue to require a special meeting of the Bank's Board.

Mr. Bender argues that the "sole question is whether the Plaintiffs have a right to request a special meeting [pursuant to the Bank's By Laws]." Plaintiffs' Supplemental Brief at 29. He answers this question in the affirmative. *Id.* ("They do and the Bank must call it.") Whether the question is posed as Mr. Bender would have it, or in the reverse (Has the Board properly refused to call a special meeting?), the immediate question before the Court is whether a preliminary injunction enforcing Mr. Bender's request should issue.

As is obvious from the preceding discussion, the Court finds that the Benders have a very low likelihood of success on the merits of their suit against the directors and the Bank. Because their interests are so strongly personal, the Benders likely do not constitute proper

-10-

fiduciaries for a derivative suit: whereas the shareholders will be benefitted by a high purchase price for their shares, the Benders will be benefitted by assuming control of the Bank without any monetary payments and/or by paying a low price for an outright acquisition. The evidence of record also supports the conclusion that Mr. Bender has not obtained OTS approval for a change in control effected by the removal and replacement of directors, which is necessary for the special meeting to proceed.

Balancing the harms in this circumstance really means balancing the benefits to shareholder democracy through a special meeting, as sought by Mr. Bender, and the harms caused by disrupting the bid process whereby shareholders might achieve a return on their investments from an institution that is otherwise in troubled status. There is also the balance between shareholder rights under the By Laws and the requirements of the law and regulations enforced by OTS. In either equation, the position advocated by Mr. Bender fails to measure up to the importance of the opposing interest. The public interest similarly weighs in on the side of the bid process and legal compliance.

Lastly, the Court finds that neither side would be irreparably harmed by an injunction or its absence. Should an injunction be issued, the defendants would have the opportunity to explain their management of the Bank and would need to sway only 25% plus 1 of the votes to retain their positions under the Bank's cumulative voting procedures. Should an injunction be withheld, Mr. Bender can either bid for the Bank, acquire its stock in the methods forecast by the Application, or proffer new Board members for the Annual Meeting in the Spring.

The motion for a preliminary injunction requiring the Board of Directors of Independence Bank to call a special shareholders meeting is denied. A separate Order accompanies this Memorandum Opinion.

Dated:  January 15, 2004                                           _____/s/_____
                                                                   ROSEMARY M. COLLYER
                                                                   United States District Judge

-12-