**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MORTON A. BENDER, et al.

Plaintiff,

vs.

CAROLYN D. JORDAN, et al.

Defendant.

Civil Action No. 1:06cv00092

**DEFENDANTS' RESPONSE TO MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE BENDERS' APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF**

Defendants Carolyn D. Jordan, David Wilmot, Michael J. Cobb, William B. Fitzgerald, and Eugene K. Youngentob ("Director Defendants"), and Thomas L. Batties ("Defendant Batties"), and Independence Federal Savings Bank ("IFSB") submit the following Response to Memorandum of Points and Authorities in Support of the Benders' Application for Preliminary Injunctive Relief. Due to the large number of exhibits that are attached to this Brief, A Notice Regarding Exhibit Attachment is attached hereto as Exhibit "A."

## I. INTRODUCTION

Plaintiffs' filed a Complaint relevant to their Application for Preliminary Injunctive Relief alleging in six counts various securities law violations and other common law claims against the Director Defendants, Defendant Batties and IFSB. Plaintiffs seek injunctive relief for Counts I, II, III and VI. Because Plaintiffs do not meet the requirements for injunctive relief, specifically that they are unlikely to succeed on the merits, Plaintiffs' request for injunctive relief should be denied.

## II. FACTS

### Introduction

This is the fifth time these parties have been before this court. The Court has entered Memorandum Opinions relating to disputes between some or all of these parties on at least three prior occasions.[1] (Tabs 1 through 3) In each Memorandum Opinion, the Court has set out background facts as well as the facts relevant to the issues before the court at that time. Rather than reiterate the background facts, we direct the Court to the prior opinions for the background of this litigation.

What follows are the facts specifically relevant to the pending matter. The thread begins with Mr. Bender's attempt to obtain approval for a change in control of IFSB.

### Problems with Colombo Bancshares, Inc. and Colombo Bank Affect Mr. Bender's Plans for IFSB

1. On October 14, 2003, the Office of Thrift Supervision ("OTS") issued its "Approval of Holding Company Acquisition and Related Applications." (See Tab 4). In that document, the OTS gave approval for Plaintiff Morton A. Bender, and related parties, including Colombo Bancshares, Inc, to acquire up to 100% of the common stock of Independence Federal Savings **Bank** ("IFSB") (the "Approval"). Pursuant to the terms of the Approval, the proposed acquisition contemplated by Mr. Bender and his affiliates had to be consummated within one year from the date of the Approval (by October 13, 2004).

2. At all relevant times, Colombo Bancshares, Inc. ("Colombo"), was a savings and loan holding company controlled by Mr. Bender. Colombo Bancshares, Inc. owns and operates Colombo Bank.

---

[1] Memorandum Opinions have been entered in the following cases: *Bender et al. v. Parks et al.,* Civil Action No. 03-2485 (RMC) (Tab 1) (Jan. 15, 2004); *Independence Federal Savings Bank v. Bender et al.,* Civil Action No. 04-736 (RMC) (Tab 2) (July 29, 2004); *Independence Federal Savings Bank v. Bender,* 332 F.Supp. 2d 203 (D.D.C 2004) (Aug. 23, 2004) (Tab 3)

3. On April 26, 2004, the OTS issued a Report of Examination ("ROE") relating to Colombo Bank. In the ROE, the OTS criticized the operation of Colombo Bank in several respects. (See Tab 6).

4. In a letter dated July 19, 2004, the OTS advised Bender of certain restrictions regarding actions previously proposed by Bender relating to Independence Federal Savings Bank ("IFSB"). (See Tab 5). On July 29, 2004, Mr. Bender filed Amendment No. 11 to his Schedule 13D relating to IFSB (Tab 5). In that amendment Mr. Bender made the following statements:

> Pursuant to the OTS Letter, [of July 19, 2004] Bender may not take any action that would increase his level of control over the Issuer until such time as the OTS lifts this prohibition. Bender does not know for what period of time this prohibition will be in effect. Under the prohibition in the OTS Letter, among other things, Bender (and any person or entity controlled by or acting in concert with him) may not acquire any additional shares of the Issuer. In addition, Bender may not propose a slate of directors at the anticipated annual meeting of stockholders of the Issuer nor otherwise take action to remove or replace the management or directors of the Issuer.

As a consequence of the OTS Letter of July 16, 2004, Mr. Bender was precluded from acquiring additional shares of IFSB. He also was precluded from proposing a slate of directors at the 2004 annual meeting of stockholders.

5. On August 31, 2004, Colombo Bank entered into a "Stipulation and Consent to the Issuance of an Order to Cease & Desist for Affirmative Relief and an Order of Assessment of Civil Money Penalties." (The "Cease and Desist Order") (Tab 6). Mr. Bender signed the Cease and Desist Order. The Cease and Desist Order identified violations in 12 separate areas.

6. On October 6, 2004, Mr. Bender filed Amendment No. 12 to his Schedule 13D. (Tab 7). In that amendment, Mr. Bender disclosed the following:

> The purpose of this amendment is to report that the OTS approval of Bender's change in control application will expire on October 14, 2004 and to clarify that Bender is aware of the reasons why the OTS Letter was issued. The OTS will not allow an extension or renewal of the approval because of the OTS Letter (previously disclosed in Amendment No. 11 to this Schedule 13).

The anticipated expiration of the change in control application was in addition to the restrictions set forth in the July 16, 2004 OTS letter to Mr. Bender which precluded him from acquiring additional shares of IFSB Stock.

7. Effective October 14, 2004, the OTS' authorization for Mr. Bender to obtain and change control of IFSB expired. At that time, Mr. Bender became unable, *inter alia*, to purchase additional shares of IFSB stock without prior OTS approval.

8. On October 29, 2004, the 2004 Annual Meeting of shareholders of IFSB was held. Less than one week before the meeting, Mr. Robert Isard was nominated for election to the Board of Directors. The shareholders had no notice of Mr. Isard's candidacy prior to the meeting. Mr. Isard was elected as a member of the board of directors of IFSB primarily by the vote of Mr. Bender.

**Clients of Doley Securities Purchase Shares of IFSB Stock**

9. On information and belief, subsequent to the collapse of the merger discussions with Carver Bank, certain clients of Doley Securities purchased shares of stock in IFSB previously held by Carver Bank.

10. Carver Bank contacted Mr. Batties and asked if he knew of anyone who wanted to buy its shares of IFSB stock. (Jordan Deposition) Mr. Batties asked Ms. Jordan, who suggested Mr. Doley. None of the individual Defendants, and to the best of Defendants'

knowledge, information and belief, no employee, officer, director or agent of IFSB was in any way directly involved in the purchase of the Carver Bank stock described above.

11. On information and belief, Mr. Bender has, from time to time, approached Mr. Doley offering to acquire the shares of IFSB stock owned by the clients of Doley Securities once the OTS prohibitions on him are lifted.

**The July 16, 2004 Restrictions on Mr. Bender are Lifted, but There Is No Change in Control Approved**

12. On April 5, 2005, the OTS sent a letter to Mr. Bender lifting the restrictions previously placed on him pursuant to the OTS Letter of July 16, 2004. (See Tab 8). On April 13, 2005, Mr. Bender filed Amendment No. 14 to his Schedule 13D. (Tab 8) In that amendment, Mr. Bender made the following statements:

> On April 5, 2005, Bender received a letter from the Office of Thrift Supervision ("OTS") terminating its July 19, 2004 directive prohibiting Bender from taking any action would increase his level of control over the Issuer. As a result of this termination, Bender now has the ability to exercise his legally acquired control of the Issuer and intends to do so. . . .

But, the same filing also stated that:

> As previously reported, Bender cannot purchase any additional shares of Issuer's [IFSB's] common stock absent receipt of an extension of his prior control approval or, alternatively, a new control approval from the OTS. (Tab 8)

**The May 11, 2005 Annual Meeting of IFSB Shareholders is Scheduled**

13. The 2005 Annual Meeting of IFSB Shareholders was originally set for May 11, 2005.

**The OTS Prohibits Mr. Bender from Soliciting Proxies for the Annual Meeting**

14. On April 15, 2005, Mr. Bender received a letter from OTS. (See Tab 9). That letter stated in part, "Further, the Benders are reminded that they cannot act in concert with any other shareholder to effect control. Therefore, the Benders may not obtain assistance from or assist another shareholder in a proxy solicitation for board nominees." (Tab 9)

15. On May 4, 2005, Mr. Bender filed Amendment No. 16 to his Schedule 13D. (Tab 10). In that amendment, Mr. Bender disclosed the following with regard to the April 15 letter from the OTS:

> On April 15, 2005, Bender received a letter from the Office of Thrift Supervision ("OTS") stating that it is the opinion of the OTS that Bender may not obtain any proxies to vote for directors (including acting in concert with another shareholder to obtain proxies) without OTS approving an extension of his original control approval or a new control application. Though Bender does not agree with that position, he intends to abide by it.

**Mr. Bender's May 2, 2005 Letter to Shareholders Sent Without OTS Approval**

16. On or about April 21, 2005, Mr. Bender filed a proposed letter to all IFSB shareholders with the OTS. In that filing, Mr. Bender sought OTS review of the letter before sending it to IFSB shareholders. (See Tab 11).

17. In a letter dated May 2, 2005 (Tab 11), the OTS stated that:

> The materials [Mr. Bender's proposed letter to IFSB shareholders] contained a number of assertions that appear as statements of undisputed fact while in actuality they constitute matters of opinion. Care should be taken to insure that all such opinions are properly characterized as such and accommodated by the factual basis they are derived. Further, a broader terminology should be avoided whenever possible.

The OTS Letter then went on to require certain specific changes to Mr. Bender's proposed letter to stockholders.

18. Subsequently, Mr. Bender submitted a revised version of the shareholder letter to the OTS. In a letter dated May 2, 2005 (See Tab 12), the OTS advised Mr. Bender that the revised version of the shareholder letter "did not address a number of comments set forth in the letter dated May 2, 2005." In that same letter, the OTS also advised counsel for Mr. Bender that, "[y]ou indicated that Mr. Bender intends to mail the latest version of the letter without further OTS staff review." Mr. Bender's counsel was advised by the OTS that "failure to respond to this request may result in enforcement action." (Tab 12).

19. Notwithstanding the express concerns and warning of the OTS, on or after May 2, 2005 Mr. Bender sent the letter to IFSB stockholders. (Tab 13). This was the same version of the letter that the OTS had specifically told Mr. Bender not to send.

20. In a letter dated May 9, 2005, the OTS responded to Mr. Bender's mailing of the letter to IFSB shareholders without prior OTS approval. (Tab 14). In that letter the OTS made the following statements:

> The Office of Thrift Supervision (OTS) is considering whether to issue a cease and desist order, and to assess civil money penalties, against you for false and misleading statements contained in the Definitive Stockholder Letter (Def. Letter) relating to the 2005 Annual Meeting of Independence Federal Savings Bank, Washington, D.C. (Independence or the Bank), mailed by you to shareholders on or about May 2, 2005. **The Def. Letter appears to contain false and misleading statements in violation of Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and OTS regulations, 12 C.F.R. Part 569**. . . . (emphasis added)

21. Both IFSB (Tab 15) and the National Bankers Association (Tab 16) objected to Mr. Bender's actions.

**The "Committee to Save Independence Federal Savings Bank" Letter to Shareholders**

22. On May 4, 2005, a group calling itself The "Committee to Save Independence Federal Savings Bank" (The "Committee" and The "Committee Letter") circulated a letter to some or all of the IFSB shareholders. (Tab 17).

23. None of the individual Defendants had any involvement in the preparation or mailing of the letter.

**The May 2005 Annual Meeting of Shareholders is Postponed at the Request of OTS**

24. In the wake of Mr. Bender's unauthorized letter and the Committee letter, on May 10, 2005, the OTS sent a letter to the Board of Directors of IFSB. (Tab 18). In that letter, the OTS voiced concerns regarding the "Committee Letter." The OTS went on to state that, "[i]n light of the above, OTS believes that a prudent course of action is for the board to postpone the annual meeting for some brief period to allow the shareholders an opportunity to received additional clarifying information." (Tab 18).

25. Pursuant to the OTS' strong position, IFSB agreed to reschedule the meeting to allow for the shareholders to receive additional clarifying information.

26. Because the meeting was scheduled to begin less than 24 hours after the OTS letter of May 10, IFSB could not give effective notice to shareholders postponing the meeting. Thus, on May 11, 2005, the annual meeting of IFSB shareholders was convened. At that time, the auditors for the bank were approved. However, at the request of the OTS, the meeting was recessed without the election of board members and the Chair announced that it would be reconvened on June 8, 2005 or such other date as the Board would announce. Mr. Bender attended the meeting and raised no objection to the recess.

27. Subsequent to the May 10, 2005 letter, the OTS initiated investigations of both the letter sent by Mr. Bender on about May 2, 2005 (Tab 13) and the letter sent by the

Committee on or about May 4, 2005 (See Tab 17). IFSB voluntarily cooperated with the OTS in the investigation. No director, officer or employee of the Bank was involved with the Committee letter. (See Tab 19).

**The Rescheduled June 8, 2005 Annual Meeting of Shareholders**

28. On May 23, 2005, IFSB contacted OTS to raise concerns about the annual meeting then scheduled to occur on June 8, 2005. (Tab 20). In particular, IFSB was concerned that matters raised in the OTS letters of May 9 (Tab 14) and May 10 (Tab 18) had not been fully resolved and no additional information was yet available to provide to shareholders.

29. As a consequence of the concerns set forth above, and subsequent to providing notice to the OTS, on May 31, 2005, IFSB announced the annual meeting previously rescheduled from May 8, 2005 to June 8, 2005 would be rescheduled from June 8 to a later date. (Tab 21). In the Press Release, IFSB stated that, "The board of directors has determined that the issues that caused the meeting to be adjourned cannot be addressed prior to that date [June 8, 2005]." (Tab 21). Notice of the change in the date of the meeting was sent to shareholders. (Tab 22).

**The Rescheduled September 2005 Annual Meeting of Shareholders**

30. The annual meeting of IFSB shareholders was rescheduled to September 14, 2005 and notice was sent to IFSB shareholders on August 25, 2005. (Tab 23).

**Mr. Bender Again Seeks Change In Control Authority (and Attempts to Thwart Prohibition on Soliciting Proxies)**

31. On August 29, 2005, Mr. Bender filed Amendment No. 18 to his Schedule 13D. (Tab 24). In that amendment, Mr. Bender made the following statements:

> Bender has submitted a new application with the OTS requesting approval to acquire and exercise more control over Independence pursuant to 12 U.S. § 1467a(e)(4) and 12 C.F.R. § 574.3(a).

> Once he obtains OTS approval, Bender anticipates entering into privately negotiated purchases, conducting a partial tender offer, and/or open market purchases through a broker to increase his level of ownership… Bender has no pending transactions with any existing shareholder of Independence about selling shares to him. He is interested in engaging in privately negotiated transactions for blocks of 5% or more the share of Independence. However, if any shareholder holding less than 5% were to approach Bender regarding a purchase of share, he would consider it.

Mr. Bender made the statements set forth in Amendment No. 18 to his Schedule 13D notwithstanding the fact that the rescheduled annual meeting of IFSB shareholders was little more than two weeks away, and notwithstanding the fact that the OTS had previously precluded him from soliciting proxies. (See Tab 9).

32. On September 8, 2005, the National Bankers Association also objected to the timing and content of Amendment No. 18 to Mr. Bender's Schedule 13D. (Tab 25).

**Bender's Actions Again Require the Rescheduling of the Annual Meeting**

33. On September 9, 2005, the Board of Directors of IFSB met to consider again changing the date of the annual meeting. (Tab 26). At that meeting, the Board considered possible shareholder confusion caused by Mr. Bender's failure to correct information discussed in the OTS' May 10, 2005 Letter and the effect of Mr. Bender's new change in control application, which was filed immediately after the mailing of the proxy statement for the annual meeting.

34. After that meeting, the Board of Directors decided to reschedule the annual meeting to October 26, 2005. Importantly, prior to rescheduling the annual meeting yet again, the Board sought (Tab 27) and received (Tab 28) express OTS approval to reschedule the meeting.

**The OTS Completes Its Investigation of the May Committee Letter and Mr. Bender's May 2 Letter**

35. On September 14, 2005, Mr. Bender received a letter from the OTS. (Tab 29). It was sent as culmination of the OTS' investigation of the May 2, 2005 definitive stockholder letter sent by Mr. Bender. The September 14, 2005 OTS letter to Mr. Bender stated as follows:

> I am writing to notify you that, following careful consideration of the relevant facts known by OTS, OTS has determined not to pursue enforcement action against you in this matter.

36. On September 14, 2005 the Board of Directors of IFSB received a letter from the OTS. (Tab 30). It was sent as culmination of the OTS' investigation of the Committee Letter of May 4, 2005 (Tab 17). The September 14, 2005 OTS letter to the Board of Directors of IFSB stated as follows:

> I am writing to notify you that, following careful consideration of all the available information and facts relevant to the Committee and the Correspondence, OTS has determined not to pursue enforcement action against any party in connection with this matter.

**Mr. Thompson Purchases Shares of IFSB Stock**

37. On or about September 19, 2005, Mr. Jeffrey Thompson, purchased 111,600 shares of IFSB stock on the open market for investment purposes. (See Tab 31).

38. On September 28, 2005, Mr. Thompson filed a Schedule 13D with the OTS. (Tab 31). In his Schedule 13D, Mr. Thompson stated that he, "beneficially owns 111,600 shares of common stock (IFSB) which represents 7.2% of the Issuer common stock." He went on to say "all purchases of common stock reported herein were made in open market transactions on the NASDAQ Small Cap Stock Market." Finally, in his Schedule 13D, Mr. Thompson made the following statement :

> "There are no contracts, arrangements, understandings or relationships (legal or otherwise) between Mr. Thompson and any other person with respect to any securities of the Issuer. Mr. Michael J. Cobb is a member of the Issuer's Board of Directors and is also a 1% stockholder of TCBA [Thompson, Cobb, Bazilio & Acssociates]. Mr. Thompson has not had any prior discussion or other communication with Mr. Cobb regarding Mr. Thompson's purchase of share of the Common Stock."

39. Mr. Thompson's Schedule 13D was publicly available. The Court will note that on the document attached hereto as Tab 26, there is a fax line for Muldoon Murphy Aguggia, IFSB counsel. The appearance of that fax line is no mystery. The law firm was contacted initially by the OTS concerning the Schedule 13D. The OTS the faxed the Schedule 13D to the law firm, which subsequently faxed that copy to IFSB. How Mr. Bender obtained the copy is unknown.

40. Mr. Thompson is a partner in the accounting firm known as Thompson, Cobb, Bazilio & Associates. A Defendant in this matter, Mr. Michael Cobb, is also a partner in that firm. Mr. Cobb has testified as follows as regard to his knowledge of Mr. Thompson's purchase of share of IFSB stock:

> Q: When did you first discuss with him the fact that he had or was going to buy stock?
>
> A: At our October meeting.
>
> Q: So up until the October meeting, you didn't know he had purchased stock?
>
> A: That's correct.
>
> Q: He never discussed it with you?
>
> A: No, ma'am.

(TAB 55, Lines 28:2-10).

**Management's Proxy**

41. On October 4, 2005, the management proxy materials were sent to all IFSB shareholders. (Tab 32). Prior to being sent to IFSB shareholders, those proxy materials had been submitted on more than one occasion to the OTS for review by the OTS. (Tab 33). The OTS ultimately did not object to the proxy materials forwarded to IFSB shareholders. In addition, the OTS forwarded the draft proxy materials to Mr. Bender. Mr. Bender and his counsel had a full opportunity to and did provide comments. (Tab 33)

42. In its proxy materials (Tab 32), the management of the Bank made the following statement:

> "Your broker or other nominee will vote your share only if you provide instructions on how to vote to your broker or other nominee. You should instruct your broker or other nominee on how to vote your shares, using the procedures provided by your broker or other nominee. **Your broker will not vote your share without your instructions."**

Because Mr. Bender had already nominated candidates to run for election as directors, distributed letters to shareholders in support of his candidates, and because the Board believed that Mr. Bender would distribute a proxy statement to shareholders as required by the Proxy Rules, the Board believed that Brokers would not be permitted to use discretion to vote in the contested election under their governing requirements from the National Association of Securities Dealers. Under the Proxy Rules, the Board was obligated to address in its Proxy Statement what voting authority Brokers would have. In fact, the brokerage community did not regard the election as contested, apparently because Mr. Bender never distributed a proxy statement.

**Bender Nominates Potential Directors and Sends a Letter to Shareholders**

43. On October 3, 2005 Mr. Bender nominated Osborne George and John Silvanus Wilson, Jr. for election as directors at the October 26, 2005 meeting. (Tab 34).

44. Also, on October 3, 2005, Mr. Bender sent a letter to IFSB shareholders. (Tab 35).

**The McPhail/Douglass Letter**

45. On or about October 21, 2005, Ms. Catherine McPhail and Mr. Gilbert Douglass sent a letter to IFSB shareholders. (Tab 36) (The "McPhail/Douglass Letter).

46. None of the individual Defendants had any involvement in the preparation or mailing of the McPhail/Douglass letter.

**Mr. Bender and Mr. Isard Solicit Proxies in Violation of OTS Regulations**

47. Prior to the October 26 annual meeting of shareholders, IFSB management became aware that Mr. Bender and Mr. Isard, the board member elected by Mr. Bender's vote in 2004, were soliciting proxies from shareholders and encouraging shareholders to give their proxies to Mr. Isard on Mr. Bender's behalf. (Tab 37). Copies of proxies obtained by Mr. Isard, and actually voted at the annual meeting on October 26, 2005, are attached. (Tab 38). These proxies were solicited notwithstanding the OTS April 15, 2005 letter (Tab 9) which provided that:

> Further, the Benders are reminded that they cannot act in concert with any other shareholder to effect control. Therefore, the Benders may not obtain assistance from or assist another shareholder in a proxy solicitation for board nominees.

**Mr. Doley Indicates a Willingness to Sell IFSB Stock**

48. As of October 25, 2005, and notwithstanding the OTS' prohibiting him from soliciting proxies (Tab 9), Mr. Bender had persuaded Mr. Doley to vote shares of IFSB

stock owned by clients of Doley Securities for Mr. Bender's nominees at the annual meeting of IFSB shareholders. (See Complaint at ¶ 29).

49. During a telephone conference on the evening of October 25, 2005, Mr. Doley advised Mr. David Wilmot, vice chairman of the board of directors of IFSB, of his clients' willingness to sell their shares of IFSB stock for $18 per share. Subsequent to that telephone conversation, Mr. Wilmot advised certain individuals that there were one or more parties were willing to sell their shares of IFSB stock. One of the persons that Mr. Wilmot so advised was Mr. Jeffrey Thompson. (Tab 39). That sale was never consummated.

50. Apparently, representatives of Mr. Doley and representatives of Mr. Thompson subsequently engaged in negotiations toward a possible sale of the IFSB shares held by clients of Doley Securities. (Tab 39).

51. No director, officer, employee or agent of IFSB was directly involved in the negotiations between Mr. Doley and Mr. Thompson.

**The Rescheduled October 26, 2005 Annual Meeting of Shareholders**

52. As set forth above, the rescheduled Annual Meeting of Shareholders was scheduled to begin at 11:00 AM on October 26, 2005.

53. Prior to 11:00 a.m., counsel for Mr. Bender submitted to the Independent Inspector of Election ("IIOE") two formal proxy challenges. (Tabs 40 and 41). Neither of the proxy challenges was on the agenda for the meeting, nor had Mr. Bender sought to have the challenges placed on the agenda.

**The First Challenge – The Allocation of Votes**

54. The first proxy challenge (Tab 40) was properly directed, not to the chairman or the board of directors, but to the IIOE, who had the authority to decide such challenges. In that challenge, Mr. Bender stated that:

> It has come to our attention that the master ballot representing proxies received by the board of directors may not be voted prior to the closing of the polls. Pursuant to Section 45 of Robert's Rules of Order, all votes must be received prior to the polls being closed. …
>
> I ask that the IIOE not allow any master ballot casting votes be submitted or altered after the closing of the polls unless the polls are reopened by a majority vote of shares entitled to vote in accordance with Section 45 of Robert's Rules of Order. (Tab 40).

55. In fact, the master ballot representing proxies received by the Board of Directors was voted during the election and votes were allocated once the IIOE had Tabulated the votes. This was the same process that had been followed in prior elections. Mr. Bender and his attorneys had known about, and not objected to, the process for more than a year. The master ballot was the same form that had been used by IFSB (and Mr. Bender) for years. Yet, Mr. Bender waited until the morning of the election to object to the process. Moreover, the process followed with regard to the voting and allocation of cumulated votes complied with the standard and practice in the industry. (Tab 42)

56. Mr. Bender alleges that the process for voting described above violated Section 9 of the IFSB by-laws. (Tab 43 )

57. The relevant language of Section 9 (Tab 43) of the IFSB by-laws provides that, "Proxies solicited on behalf of management shall be voted as directed by the shareholder or, in the absence of such direction as determined by majority of the board of directors." The master ballot representing proxies received by the board of directors (Tab 44) contains the signatures of five (5) members of the Board of Directors of IFSB, a majority.

58. The rules and regulations regarding the voting of such proxies was described by Mr. Creighton D. Dunlop during the course of his deposition taken in this matter. (See Tab 42). Mr. Dunlop was the representative of IVS present at the 2005 annual meeting. He

was the independent inspector of elections ("IIEO"). By independent, he meant that he did not have an affiliation to IFSB other than to Tabulate the vote and serve as the inspector of elections. (Tab 42, p. 16:12-17; p.17:1).

59. It is well recognized in the securities industry that it would be unwise for management to cumulate and allocate votes before the close of the election. (Tab 42, p.106:10-19; p.107:8-17.) Cumulating and allocating votes prior to the end of the election would mean that management would do so without full information and it would be very easy to make mistakes. *Id.* As a matter of common practice, once the Tabulation of votes is completed, the information is provided to the proxy committee so that they can cumulate their votes. (Tab 42, p.108:16-109:11) It is standard practice in a cumulative voting situation for the parties to wait until they have full information from the inspectors of elections before cumulating their votes. (Tab 42, p.109:12-17.) That is what precisely what occurred here. (Tab 42, p. 109:18-19.) It was entirely proper for management to vote the master ballot prior to the close of voting and then allocate the shares therein represented subsequent to the close of the meeting. (Tab 42, p.114:21-115:21) In fact, Mr. Bender cumulated his shares in exactly this matter after the close of the voting in 2003 when he submitted competing proxy materials and solicited proxies in opposition to management's slate of nominees. (Tab 42, p. 121:13-17.)

60. Mr. Bender also alleges that the process for voting described above violated Section 4 of the IFSB by-laws. That section provides:

> "Section 4. Conduct of Meetings. Annual and special meetings shall be conducted in accordance with the most current edition of Robert's Rules of Order…

61. Mr. Bender complains that this section of the by-laws was violated because Roberts Rules of Order were not followed during the course of the 2005 annual meeting.

Specifically, Mr. Bender claims that Section 45 (Tab 45) of Roberts Rules of Order was not followed. A review of Section 45 of Roberts Rules of Order does not disclose any provision relating to the cumcumstances about which Mr. Bender complains.

**The Second Challenge – The Broker Votes**

62. The second proxy challenge (Tab 41) was also properly directed, not to chairman or the board of directors, but to the Independent Inspector of Election. In that challenge, Mr. Bender stated that:

> This challenge is directed to the Independent Inspector of Election (hereinafter referred to at "IIOE") empowered with the responsibility of officiating the Tabulation of votes in connection with the Special Meeting of Shareholders of Independence Federal Savings Bank scheduled to be held on October 26, 2005.
>
> It has come to our attention that brokers behind ADP had discretionary voting rights which remain intact in connection with this meeting even though a contest for director nominees had been know by management for months.
>
> In management's proxy statement it states on page 11 under the heading "Voting" the following:
>
> Q: If my broker or other nominee holds my shares for me, will my broker or such other nominee vote those share for me?
>
> A: Your broker or other nominee will vote your share only if you provide instructions on how to vote to your broker or other nominee. You should instruct your broker or other nominee on how to vote your shares, using the procedures provided by your broker or other nominee. Your broker will not vote your shares without your instructions.
>
> It is believed that the relevant number of uncast broker non-votes are approximately 200,000 and the voting of such shares will have a material impact on the outcome of the election for directors.
>
> I ask that the IIOE not allow these uncast (by shareholders) discretionary votes (i.e. broker non-votes) be counted in favor of management's nominees since the underlying shareholders did not

> actually cast their votes and their inclusion is directly contrary to the express instructions provided to shareholders in management's proxy statement.

63. Brokerage Houses (brokers) hold shares in "street name" for the beneficial owners who are their customers. The voting of such shares is subject to common practice as well as rules promulgated by the National Association of Securities Dealers.[2] Those rules, through reference to the rules of the New York Stock Exchange, permit the brokers to use discretionary authority to vote shares in certain instances. Pursuant to Rule 452 of the New York Stock Exchange, when a broker receives no instructions from its client, it may give or authorize the giving of a proxy to vote such stock subject to certain limitations. (Tab 46). When the election is viewed by the broker as "uncontested" or "routine" the broker will vote such shares in favor of all management nominees and proposals. The term "contested" is term of art within the securities industries. Elections are contested when there are two or more proxy committees that present proxies in opposition to each other. (Tab 42, p.103:13-104:4) The 2005 annual meeting of shareholders of IFSB was an uncontested meeting in the eyes of the brokers. (Tab 42, p. 104:5-8.) When the Bank prepared its proxy materials, it anticipated that Mr. Bender would file an opposing proxy and the election of directors would be "contested." When Mr. Bender failed to file a proxy, the election became uncontested in the eyes of the brokers. Mr. Bender did not discover this until October 24, 2005. In an e-mail of that date (Tab 46), counsel for Mr. Bender complained to the New York Stock Exchange that ADP, one of the lead brokers, was treating the meeting as a "routine matter for voting purposes." As a consequence, ADP and the other brokers intended to vote shares which they held, and for which they had no instructions from the beneficial owners, in favor of all management nominees and management proposals. Obviously, this was a frustration to Mr. Bender and his counsel. However, notwithstanding the entreaties

[2] Brokers are legally required to be members of the NASD.

from counsel for Mr. Bender to the New York Stock Exchange, both the broker dealers and the New York Stock Exchange continued to maintain that the 2005 annual meeting was uncontested. (See Tab 46). By not sending shareholders a proxy statement, Mr. Bender was responsible for the brokers not regarding the election as contested.

**IFSB Management Considers the Challenges**

64. Recognizing the contentious nature of the relationship between IFSB management and Mr. Bender, the chairman and vice chairman of the Bank conferred with counsel regarding the two challenges. After conferring, Mr. Wilmot directed Bank counsel to telephone the OTS to advise them of the challenges, and the likelihood that, while the meeting might be delayed, it would go forward not changed, and to confirm whether there was any OTS objection. Due to the delay caused by the foregoing discussions, a decision was made to recess the meeting for lunch. When OTS personnel proved to be unavailable by phone, IFSB's regulatory counsel, Mr. Royer, later sent an e-mail to the OTS. (Tab 47).

65. At about noon on October 26, 2005, Mr. Wilmot advised the persons gathered for the annual meeting that there would be a delay, that lunch would be provided, and that the meeting would resume at 3:00 PM. At that time, there was no objection made to the delay. (Tab 39). Logically, Mr. Bender would not have objected to a delay, instead hoping that Mr. Doley, who was delayed in arriving, would attend the meeting and be able to vote his the proxies be held for Mr. Bender's nominees.

66. On information and belief, Mr. Harold Doley missed his plane from New York and was delayed for approximately an hour in arriving at the annual meeting. That delay, however, was not the reason for recess of the annual meeting. (Tab 39; Jordan Deposition).

67. Mr. Doley and Ms. Jordan, who are friends, went to lunch. (Jordan Deposition).[3] Bank counsel, Mr. Royer, accompanied them. Later, Ms. Jordan invited Mr. Wilmot, to join them for lunch, which Mr. Wilmot did. (Tab 39). The voting of the shares for which Mr. Doley held proxies was not discussed at the lunch.

68. At 3:00 PM, the annual meeting resumed. At that time, the voting for directors was commenced and concluded.

69. During the voting on October 26, 2005 the master ballot representing proxies received by the board of directors was cast. (Tab 44). That ballot provided as follows:

> In lieu of voting as provided above, the undersigned vote as per proxies filed, allocating among management nominees to be named by the undersigned, or a duly appointed representative thereof, upon the announcement by the Inspector of Election of the number of votes that the undersigned has power and authority to vote, all of such votes in a manner that will result in the election of as many of such named management nominees as possible. The undersigned acknowledge that this vote is intended to provide a reasonable opportunity for the undersigned as holder of proxies to allocate votes among management nominees based on proxies verified by the Inspector of Elections.

70. The master ballot specifically anticipates that cumulated votes represented by proxies received by the board of directors will be allocated subsequent to the voting process. As set forth above, this same process had been used in previous years, and was known to Mr. Bender and his counsel, but had not been objected to previously.

71. In addition, during the voting, broker votes were cast. The brokers did not consider the election to be "contested" although it was "contentious." (Tab 42). IFSB and the individual Defendants had no control over this decision by the brokers.

72. The meeting was taped recorded. The transcript of what occurred during the remainder of the meeting is attached hereto. (Tab 48).

[3] Carolyn Jordan's deposition took place on March 31, 2006, and has not been transcribed yet.

73. Prior to the vote on the election of directors, counsel for Mr. Bender verbally made the same two (2) challenges that he had previously provided in writing to the IIOE (See Tabs 40 and 41; see also Tab 48).

74. Believing that the objections could only properly be made to the IIOE and not the Chair, and believing that the objections were out of order, the Chairman ruled the objections out of order.

75. The vote was taken and the meeting was then adjourned. The independent inspector of election took the votes back to his place of business for tallying. (Tab 49).

76. The following day, October 27, 2005, the OTS responded to the earlier e-mails sent by counsel for the Bank. (Tab 50).

**The Allocation of the Votes**

77. Subsequent to the meeting, and as provided in its ballot (Tab 44), IFSB allocated votes to elect board nominees. That allocation was in accordance with standard practices and procedures. (Tab 42).

78. On or about October 28, the independent inspector of election completed Tabulation of the votes and advised IFSB the results of its inspection of the proxies and the determination of their validity, including exclusion of double votes. (Tab 51). Those results were as follows:

| Nominees for Three-Year Term | For | Withheld |
|---|---|---|
| Williams B. Fitzgerald, IV | 1,439,155 | 7,037 |
| David W. Wilmot, Esq. | 1,412,322 | 7,037 |
| Marion O. Green, Jr. | 789 | 7,064 |
| Osborne George | 26,269 | -0- |

| John Silvanus Wilson, Jr. | 1,390,246 | -0- |
|---|---|---|

**The Meeting of the Board of Directors Meeting**

79. On October 28, 2005, notice of a special meeting of the board of directors of IFSB was disseminated. (Tab 52). The purpose of that meeting was, "To receive a Report of the election in connection with the Special Meeting of Shareholders conducted on Wednesday, October 26, 2005 and to take appropriate action with respect thereto." (Tab 52).

80. On October 28, 2005, the board of directors of IFSB met. Pursuant to that meeting, the shareholders of IFSB elected three directors – two supported by management (Mr. Fitzgerald and Mr. Wilmot) and one supported by Mr. Bender (Mr. Wilson). (Tab 53).

**Effect of "Neutralizing" Votes as Requested by Plaintiffs**

81. Mr. Bender has asked that certain shares voted at the 2005 annual meeting be "neutralized." The analysis set forth at Tab 54, conclusively demonstrates that the shares related to the issues about which Mr. Bender complains would not have altered the outcome of the election. (Tab 54).

82. On or about February 15, 2006, a majority of the Board passed a Resolution whereby the Bank agreed to provide "advance payment of reasonable costs and expenses, including attorneys fees, arising from the defense of" the present lawsuit. (Tab 55). Such action is consistent with Section 545.121(e) of the Regulations of the Office of Thrift Supervision. In addition, each Defendant is required to repay the Bank if it is "later determined that [he or she is] not entitled to indemnification with respect to the litigation under 12 C.F.R. § 121." (Tab 58).

## III. LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

A preliminary injunction is an extraordinary remedy that will be granted only in extreme cases. *Sampson v. Murray*, 415 U.S. 61, 81 (1974); *Dorfmann v. Boozer*, 414 F.2d 1168, 1173,

134 U.S. App. D.C. 272, 277 (D.C. Cir. 1969). In addition, the Movant, "by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968 (1997). Even when denying a preliminary injunction would harm the Movant, Courts must not grant a preliminary injunction if "it would work a great and potentially irreparable harm to the party enjoined, unless an overwhelming case in the Plaintiff's favor is present on the merits and equities of the controversy." *Dorfmann*, 414 F.2d at 1173, 277.

This Court may issue a preliminary injunction only when the Movant demonstrates: "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will [not] substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Independence Fed. Sav. Bank v. Bender*, 332 F. Supp. 2d 203, 210 (D.D.C. 2004) (citations omitted). The most important factor is "for the movant to demonstrate a substantial likelihood of success on the merits." *Id*. (citations omitted). If the movant "makes a particularly weak showing on one factor...the other factors may not be enough to compensate." *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 63 (D.D.C. 2004). And, although the decision to grant a preliminary injunction is "left largely to the discretion of the trial court, its exercise of that discretion is subject to the Supreme Court's repeated admonition regarding the caution with which the district court should order any injunctive relief." *Sea Containers Ltd. v. Stena Ab*, 890 F.2d 1205, 1208, 281 U.S. App. D.C. 400, 403 (D.C. Cir. 1989).

Finally, Plaintiffs are requesting this Court to void the results of the election and neutralize certain shares. In effect, Plaintiffs are seeking mandatory injunctive relief. Mandatory injunctive relief is an injunction that would "alter, rather than preserve, the status quo by commanding some positive act." *Nat'l. Conference on Ministry to the Armed Forces v. James*,

278 F. Supp. 2d 37, 43 (D.D.C. 2003) (citations omitted). In order to obtain the relief they seek, Plaintiffs "must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *Id.* (citations omitted). A Court should not issue a mandatory injunction "unless the facts and law clearly favor the moving party." *Id.* (citations omitted). Clearly, Plaintiffs have not met this heightened burden.

## IV. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

In order to succeed on an application for preliminary injunctive relief, Plaintiffs have the burden to show they are likely to succeed on the merits for each count upon which they seek injunctive relief. *Bender*, 332 F. Supp. 2d at 210. This is the most important factor, and absent a "substantial indication" of likely success on the merits "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Guam Indus. Services, Inc. v. Rumsfeld*, 383 F. Supp. 2d 112, 115 (D.D.C. 2005). Plaintiffs are unable to show a likelihood of success on the merits for Counts I, II, III, and VI, and, therefore, their Application for Preliminary Injunctive Relief should be denied.

### A. Plaintiffs Will Not Succeed on the Merits of their Section 13(d) Claim

Section 13(d) requires shareholders to file reports when they have acquired 5% or more of outstanding stock. 15 U.S.C.A. § 78m(d) (2002). When a person or a group of persons acting in concert acquires beneficial ownership of more than 5% of any class of equity securities, section 13(d) of the Securities Exchange Act of 1934 (the "Williams Act"), 15 U.S.C. § 78m(d), requires that person or group within ten days to file with the Securities and Exchange Commission a statement, called a Schedule 13D, containing certain information specified by statute and regulation. *See*17 C.F.R. § 240.13d-101. In order to prove that two or more people are a "group" under Section 13(d), Plaintiffs must show two things: 1) Defendants agreed to act

together for a common purpose with respect to the stock; and 2) when Defendants reached such an agreement they owned beneficially more than five percent of the stock. *Fin. Gen. Bankshares, Inc. v. Lance*, No. 78-0276, 1978 WL 1082, *9 (D.D.C.).

Plaintiffs allege that the individual Defendants had an obligation to file a 13D "fully disclosing their plans and purposes concerning IFSB." *See* Application at p. 13. The issue, according to Plaintiffs, "is not the accuracy of the Schedule 13D but, rather, whether the Defendants were obligated to file a Schedule 13D."[4] *See* Application at p. 14. Although Plaintiffs can point to no document in support of their contentions, nor have they attached affidavits in support of their theory, Plaintiffs allege Defendants acted in concert and as a "group" with one another with Mr. Thompson and/or Mr. Doley such that a Schedule13D should have been filed. Plaintiffs request injunctive relief in the form of a requirement that Defendants file a Schedule 13D, as well as an order neutralizing the shares that Defendants "acquired in violation of their 13(d) obligations."[5] *See* Application at p. 13. Plaintiffs are unlikely to succeed on the merits on this count for two reasons. First, Plaintiffs have no private right of action to bring a claim for injunctive relief under Section 13(d). Second, Plaintiffs have no factual basis to support their allegations that Defendants should have filed a Schedule 13D.

1. Plaintiffs Have No Private Right of Action under Section 13(d)

This Circuit has recognized that Section 13(d) of the Exchange Act merely "requires information to be disclosed as prescribed by the Commission. It does not purport to create federal rights in favor of identifiable private parties, or to proscribe any conduct as unlawful, or void." *See Berman v. Metzger*, No. 80-0394, 1981 WL 1596, *2 (D.D.C. Feb. 9, 1981) (internal citations omitted). As set forth in more detail in Defendants' Motion to Dismiss, this Circuit has

4 As a consequence, the alleged wrongful conduct is a technical violation, not a misstatement of fact.

5 There is no proscription on acquiring shares in Section 13(d). The section merely sets up a reporting requirement. The requested relief does not fit with the statute or regulation.

not permitted an individual shareholder from bringing an action for injunctive relief for alleged violations of Section 13(d).[6] Both the legislative history of Section13(d) and case law in this Circuit support Defendants' argument that there is no private right of action for injunctive relief for an individual shareholder. Because Plaintiffs do not have a private right of action under Section 13(d), this Court should not even get to the "merits" of their claim. Even if this Court creates a private right of action for Plaintiffs, Plaintiffs will not succeed on the merits of their Section 13(d) claim.

2. Plaintiffs Have No Factual Basis for their Allegations

Plaintiffs allege that Defendants violated Section 13(d) because they agreed to "act together" with Doley and/or Thompson in order to "to acquire, hold, vote or dispose of stock." *See* Application at p. 14. Plaintiffs can point to no documents in support of their contentions. Furthermore, none of the deposition discovery completed so far has supported Plaintiffs' theory. The reason for this is clear: Defendants never acted as a group with Doley or Thompson.

a. Defendants did not Act in Concert with Thompson

Mr. Thompson acquired approximately 7% of IFSB's outstanding shares on or about September 19, 2005, and filed a Schedule 13D on September 28, 2005, stating that he bought the shares "for investment purposes." (Fact ¶¶ 37-38).[7] He further stated that he did not have any agreement with respect to the securities of the issuer, and that he did not have any discussion with Defendant Michael Cobb, a fellow partner in his accounting firm, regarding his purchase of IFSB stock. *Id.* Mr. Cobb confirmed in his deposition that he had no agreement with Mr. Thompson regarding Mr. Thompson's voting of his shares at the Annual Shareholder's Meeting. (Fact ¶ 40). Defendants Wilmot, Youngentob and Fitzgerald also testified in their depositions

---

[6] This Court has not ruled on Defendants Motion to Dismiss. Therefore, Defendants incorporate by reference their Motion to Dismiss.

[7] References are to the numbered paragraphs or Tabs set forth in the Statement of Facts at II, above.

that they in no way acted as a group with Mr. Thompson in order to defeat the Bender nominees. (Tab 39, p.19:19-21:9; Tab 56, p. 50:6-52:11; Tab 57, p. 30:17-31:9). The remaining Defendants, Ms. Jordan and Mr. Batties, who have not yet been deposed, also will testify to the fact that they in no way "acted in concert" with Mr. Thompson in an effort to defeat the Bender Nominees. Because none of the Defendants acted in concert with Mr. Thompson, Plaintiffs accusations are not supported in any way by the evidence.

b. Defendants did not Act in Concert with Mr. Doley

On information and belief, subsequent to the collapse of the merger discussions with Carver Bank, certain clients of Doley Securities purchased shares of stock in IFSB previously held by Carver Bank. (Fact ¶ 9). After Ms. Jordan suggested to Carver that Doley Securitites might be a potential buyer, none of the Defendants, and to the best of Defendants' knowledge, information and belief, no employee, officer, director or agent of IFSB was in any way involved in the purchase. (Fact ¶ 10). Defendants Wilmot, Cobb, Youngentob and Fitzgerald also testified in their depositions that they in no way "acted in concert" with Mr. Doley in order to work together to defeat the Bender Nominees. (Tab 39, p.62:21-63:3; Tab 55, p.53:17-22; Tab 56, p.70:2-71:3; Tab 57, p.17:17-18:1). The remaining Defendants, Ms. Jordan and Mr. Batties, who have not yet been deposed, will also testify to the fact that they in no way "acted in concert" with Mr. Doley in an effort to defeat the Bender Nominees.

In addition, the individual Defendants in no way attempted to buy any Doley shares or any shares owned by Doley Securities' clients. (Jordan Deposition). Mr. Doley and Mr. Thompson were involved in negotiations towards a possible sale of IFSB shares. (Tab 39, p.74:1-7). None of the individual Defendants, or any employee or agent of IFSB was directly involved in negotiations between Mr. Doley and Mr. Thompson. (Jordan Deposition).

Because of the above, Plaintiffs have not met their burden of persuasion to prove likelihood of success on the merits regarding Count I.

B. **Plaintiffs Will Not Succeed on the Merits of their Section 14(a) Claim**

Pursuant to 15 U.S.C. § 78n(a), the SEC promulgated Rule 14a-9, which states in pertinent part that:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading

17 C.F.R. § 240.14a-9(a). In order to prevail on the merits of a Section 14(a) claim, Plaintiffs must prove each of the following elements: 1) a proxy statement contained a material misrepresentation or omission; 2) the material misrepresentation caused the plaintiff injury; and 3) that the proxy solicitation was an essential link in the accomplishment of the transaction. *Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group*, 295 F. Supp. 2d 75, 81-82 (D.D.C. 2003).

Plaintiffs seek injunctive relief "voiding the election results, compelling accurate proxy disclosures, [and] forbidding any further meetings until the procedural irregularities are resolved." *See* Application at p. 16. Plaintiffs allege that Defendants' Proxy Materials contain "false and misleading statements, or omissions of material fact" that "are intended to mislead the shareholders," and deprive shareholders of "information necessary to ensure a fair vote at the Shareholders' Meeting." *See* Complaint at ¶¶ 55, 56, 64. Plaintiffs' allegations stem from three different communications: 1) the Proxy Materials disseminated by the individual Defendants (Fact ¶¶ 41, 42); 2) a May 4, 2005 letter entitled "Committee to Save Independence Federal Savings Bank (Fact ¶¶ 22, 23); and 3) an October 21, 2005 letter written to shareholders by Catherine McPhail and A. Gilbert Douglas (Fact ¶¶ 45, 46). Plaintiffs are unlikely to succeed on

the merits for alleged violations of Section 14(a) for three reasons. First, Plaintiffs did not plead, and cannot prove, reliance, which is an element of a Section 14(a) violation. Second, the May 4th and October 21st letters were not authored by the individual Defendants. Third, the Proxy Materials are not materially misleading nor do they omit material facts.

1. Plaintiffs Fail to State a Claim Upon Which Relief Can be Granted

In order to show that the proxy solicitation was an essential link in the accomplishment of the transaction, the Complaint must allege shareholder reliance. *Berg v. First Am. Bankshares, Inc*., No. 83-3887, 1985 WL 2232, *7 (D.D.C. Apr. 17, 1985). A plaintiff bringing a claim directly, as opposed to derivatively, under Section 14(a) does not have to show his own individual reliance in order to have standing where he claims injury as a consequence of the deception of others. *Id*. at 427-28. When a non-relying plaintiff brings a direct action that is not a class action, he or she must allege that other shareholders relied upon the allegedly misleading proxy statements in order to state a claim upon which relief can be granted. *Id.* As set forth in more detail in Defendants' Motion to Dismiss, Plaintiffs have not alleged that they relied on the allegedly misleading proxy materials nor have they alleged that any other shareholder relied on the allegedly misleading proxy materials.[8] Because Plaintiffs' Complaint is legally insufficient, it should be dismissed, and this Court should not even get to the merits of Plaintiffs allegations.[9]

2. The Proxy Materials do not Contain False or Misleading Statements

Even if Plaintiffs' claims alleging violations of Section 14(a) survive a motion to dismiss, Plaintiffs will not succeed on the merits of their claim. The Proxy Materials were not false or misleading, and therefore, did not violate Section 14(a). Plaintiffs identify several statements

---

8 Defendants incorporate by reference their Motion to Dismiss.

9 Plaintiffs have presented no evidence showing that any shareholder relied upon the allegedly misleading Proxy Materials. As far as Defendants are aware, Plaintiffs are not planning on putting on any evidence tending to show shareholder reliance. So, even if their claims survive a motion to dismiss, they cannot get past a motion for summary judgment, and thus, are not likely to succeed on the merits.

that they allege are false and/or misleading. *See* Application at p. 18. Generally, and without factual support, Plaintiffs allege that the Defendant Directors have made materially false and misleading statements about the beliefs, intentions, and past behavior of Mr. Bender. *Id*. While they set forth what they contend are false and misleading statements, Plaintiffs have put forth no evidence tending to support their claims that any of the statements about Mr. Bender are false or misleading. For example, Plaintiffs claim the following statement is false: "if the Bender Nominees are elected, Bender will obtain 'controlling influence' over IFSB 'to the detriment of All Other Shareholders."

First, Plaintiffs have not met their burden to show how this statement is false. Second, this statement is true, as is evidenced in Mr. Bender's Schedule 13D, Amendment 18, wherein he sets forth his plan to take over the Bank. (Fact ¶31) ("Bender seeks to have the ability to take all of the following additional control actions with respect to Independence: proffer and seek the election of his own director nominees in opposition to management nominees...Request the voluntary resignation of certain directors and executive officers of Independence..."). Clearly, Plaintiffs' intentions are contrary to the interests of the other shareholders. Even this Court agreed that Mr. Bender's intentions are contrary to the best interests of the rest of the shareholders. (*See* Tab 1) ("Mr. Bender testified quite frankly that he wants to acquire the Bank for the least amount possible. He also agreed that the Board of Directors wants to sell the Bank for the greatest amount possible for the best benefit of all of the shareholders...The candid testimony strongly suggests that the Benders cannot represent all shareholders as a fiduciary in advancing a derivative claim."). This is just one example of how Plaintiffs accusations against Defendants lack any merit. Absent a "clear showing" that each of the alleged statements is indeed false, Plaintiffs will not meet their burden to show that the Proxy Statement contained

false and/or misleading statements regarding Mr. Bender. Mere allegations, without record support, are insufficient.

Plaintiffs also allege that the Proxy Materials "violated Rule 14(a) by virtue of their materials omissions" by failing to disclose the agreement between the Defendant Directors, Defendant Batties and Thompson to act as a group and vote their shares in favor of Management Nominees. *See* Application at p. 20. As set forth above, Defendants did not act in concert with either Mr. Thompson or Mr. Doley for any reason. Therefore, Defendants had no reason to include such a statement in their Proxy Statement, and cannot be in violation under Section 14(a).

3. <u>The May 4, 2005 and October 21, 2005 Letters Were not Authored by Defendant Batties or Defendant Directors</u>

Plaintiffs incorrectly allege that the individual Defendants were somehow involved in the May 4, 2005 and October 21, 2005 letters. Plaintiffs further allege that several of the statements contained in the letters were false and misleading, or omitted material facts. *See* Application at p. 21. Although both letters generally support Management's positions, they were neither authored nor supported by any of the Defendants. (Tab 56, p.44:6-45:11). The remaining Defendants will testify that they were not involved in any way in authoring either letter. Because the letters were not authored by Defendants, Plaintiffs allegations regarding these letters are unfounded. Therefore, Plaintiffs are unlikely to succeed on the merits of their claims against Defendants as they relate to the May 4, 2005 and October 21, 2005 letters.

4. <u>The Alleged Misrepresentations and Omissions Are not Material</u>

Even if it is determined that the Proxy Materials contained false and misleading information, none of it was materially misleading.[10] An omitted fact or misrepresentation is considered material "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757, 766 (1976).

Looking at the "total mix" of the information available to all IFSB shareholders, none of the alleged statements or omissions contained in the proxy materials are material. It is no secret that Plaintiffs are seeking to take control of the Bank, and that Defendants are trying to prevent this from happening. Plaintiffs recent letters to the shareholders explicitly state this, as does Plaintiffs' latest 13D filing. (Fact ¶¶ 20, 31). And, the shareholders undoubtedly are aware of the tension between Mr. Bender and the Defendants. Moreover, Plaintiffs have no evidence that any shareholder did, in fact, rely on anything contained in the proxy materials.

In addition, OTS reviewed and commented on the Proxy Materials. (Fact ¶41). IFSB incorporated OTS's comments. (Fact ¶41). At the conclusion of the process, OTS did not object to the Proxy Materials. (Fact ¶41). Moreover, Plaintiffs' counsel received and reviewed the drafts of IFSB's proxy materials as well and voiced their concerns. (Fact ¶41).

### C. **<u>Plaintiffs Will Not Succeed on the Merits of their Claim that Defendants Violated IFSB By-laws and Robert's Rules of Order</u>**

Plaintiffs allege that "the election of the management nominees violated the pertinent IFSB Bylaws, as well as Robert's Rules of Order ("Robert's Rules"), by which the Shareholders' Meeting was governed." *See* Application at p. 24. Plaintiffs seek injunctive relief "voiding the

---

[10] This argument assumes materiality can be used as "constructive reliance" in an individual claim as opposed to a class action. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970). Defendants argue that "constructive reliance" is not available outside the class action context. This issue was briefed and argued in connection with Defendants' Motion to Dismiss. .

election results; preventing the Director Defendants from causing the Bank to hold an Annual or Special Meeting of the Shareholders until further Order of this Court; and neutralizing all IFSB shares and/or proxies acquired by any Defendants from the Doley Group, or from Thompson, in any future election of Directors." *Id.* Plaintiffs are unlikely to succeed on the merits of their claim. First, Plaintiffs have no standing to bring this claim individually because alleged violations of corporate mismanagement must be maintained derivatively.[11] Second, Plaintiffs have no factual basis for their claims that Defendant Directors violated any IFSB by-laws or Robert's Rules.

1. Plaintiffs are Required to Bring By-law Claims Derivatively

Although there is no case law directly on point, allegations for violating by-laws or Robert's Rules of Order ultimately involve a question of improper management. Claims seeking injunctive relief for "improper management" belong to the corporation and not to the shareholders. *Cowin v. Bresler*, 741 F.2d 410, 414 (D.D.C. 1984). This conclusion is supported by "both case law and sound public policy." *Id.* When an injury "'falls equally upon all stockholders' then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively on behalf of the corporation." *Id.* (citations omitted). Plaintiffs, however, did not bring a derivative action. Therefore, Plaintiffs have failed to state a claim upon which relief may be granted for alleged violations of by-laws and Robert's Rules of Order.

2. Plaintiffs Have no Factual Basis for Their Claims

Plaintiffs allege that Defendants violated Sections 4 and 9 of IFSB By-laws, as well as Section 45 of Robert's Rules. Section 9 provides " [p]roxies solicited on behalf of the management shall be voted as directed by the shareholder or, in the absence of such direction, as

[11] Defendants briefed this issue in their Motion to Dismiss which they incorporate by reference.

determined by a majority of the board of directors." Section 4 of IFSB By-laws provides "[a]nnual and special meetings shall be conducted in accordance with the most current edition of Robert's Rules unless otherwise prescribed by regulations of the OTS or these bylaws...." *See* Application at Exhibit L.[12]

Plaintiffs allege Defendants violated Section 9 of the IFSB by-laws because they failed to "hold a meeting and vote on how unvoted shares should be voted." *See* Application at p. 11. The violations alleged by Plaintiffs do not violate Section 9 of the IFSB by-laws because Section 9 does not require Defendants to "hold a meeting and vote" in order to determine how to vote the "unvoted" shares. All Section 9 requires is for a majority of the board to "determine" how to vote their shares for which there were no directions. (Tab 44). In fact, pursuant to Section 9 of IFSB by-laws, the majority of the Board determined they would vote the proxies in favor of the Management Nominees. (Tab 44).

Plaintiffs also allege Defendants violated Section 4 of the IFSB by-laws, and, in turn, violated Section 45 of Robert's Rules, which governs voting procedures, because the "master ballot (which represented proxies received by Management) was… voted after the closing of the polls." *See* Application at p. 10-11. This is factually incorrect. The master ballot was cast during the annual meeting in accordance with industry and IFSB practice. (Fact ¶55). The cumulative votes were allocated afterwards. (Fact ¶55).

Moreover, Plaintiffs do not point to which provision within Section 45 of Robert's Rules Defendant Directors violated. In fact, the allegations set forth by Plaintiffs do not establish a

---

12 The By-laws upon which Plaintiffs rely are not the most recent IFSB by-laws. Section 4 of the most recent by-laws provides: "Annual and special meetings shall be conducted in accordance with the most current edition of Robert's Rules of Order unless otherwise prescribed by regulations of the OTS or these bylaws or the board of directors adopts another written procedure for the conduct of meetings. The board of directors shall designate, when present, either the chairman of the board or president to preside at such meetings."

violation of any IFSB by-law or Section 45 of Robert's Rules. Even Plaintiffs' securities lawyer, Robert Freedman, admitted that this was not a violation of any IFSB By-law so long as the Master Ballot was cast prior to the close of the Shareholder meeting.[13]

None of the allegations in Plaintiffs' Application were in violation of any IFSB by-laws or Robert's Rules. Therefore, Plaintiffs are unlikely to succeed on the merits of their claim that Defendant Directors violated pertinent IFSB by-laws and Robert's Rules.

### D. Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits for Count VI for a Number of Reasons

#### 1. This Court has no Jurisdiction over Count VI because No Case or Controversy Exists, the Issue is Not Ripe, and Plaintiffs Do Not have Standing to Assert it.[14]

Before a party has standing to have its case heard by a federal court, the party must show that three criteria have been met:

(1) the party must prove that it has suffered some actual or threatened injury;

(2) the injury must be "fairly traceable" to the alleged illegal conduct (the "causation requirement"); and

(3) it must be likely that the injury will be redressed by the requested relief (the "redressability requirement").

*Allen v. Wright*, 468 U.S. 737, 104 S. Ct. 3315, 3325 (1984). The Article III case or controversy limitation on a court's power requires that the plaintiff have suffered a "distinct and palpable" injury that gives him a personal stake in the outcome of the litigation. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). This injury must be more than conjectural or hypothetical; it cannot be a generalized grievance shared by all or a large class of citizens. *Id.* at 499, 95 S.Ct. at 2205.

The Benders have failed to allege underline injury with regard to its request that this Court enjoin the Bank from indemnifying or advancing expenses. In its Application for

---

13 Because Mr. Freedman's deposition took place only a few days ago, we do not have a transcript, and therefore, cannot point to the particular line wherein he admits to this.

14 Defendants again incorporate their motion to dismiss this count by reference.

Preliminary Injunctive Relief, the Benders address the issue of injury in Section III. (*See* Application, at 28). The Benders do not even mention Count VI, much less any type of injury or irreparable harm. In fact, nowhere in the entire Application do the Benders allege an injury arising from the issues of indemnification or the advancement of expenses. (*See generally* Application). The same is true for their Complaint—not one mention of any injury or threatened injury related to Count VI. (*See generally* Complaint). Under the Supreme Court's precedent in *Allen* and *Warth*, this Court has no jurisdiction to hear the Benders' allegations in Count VI because there is no alleged injury and, therefore, no case or controversy.

Moreover, the only damage that the Benders can plead with regard to Count VI is too speculative or conjectural to be "fairly traceable" to the alleged illegal conduct. *Allen v. Wright*, 104 S. Ct. at 3325. The Benders have argued in their Opposition to the Bank's Motion to Dismiss Count VI that their investment in the Bank could be injured if equiTable relief is not granted. In other words, the Benders are afraid the price of the stock they own in the Bank will drop, diminishing the value of their investment. An infinite number of factors could affect the stock price between now and the time when the indemnification issue is ripe, so there is no way to fairly trace such price changes to the indemnification. In fact, no one knows whether the price, in fact, will be lower at that time. Because the contingency of an injurious price change might not occur as anticipated or might not occur at all, the issue of indemnification is not fit for judicial review and not ripe. *Texas v. United States*, 523 U.S. 296, 300 (1998); *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C.Cir.1996) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

Finally, as argued at length in the Bank's Motion to Dismiss Count VI, the Benders do not have standing to raise such a claim because such generalized injury, potentially

visited proportionally on all shareholders, belongs the Bank derivatively. *Cowin v. Bresler*, 741 F.2d 410, 414 (D.D.C. 1984).

For all these reasons, this Court lacks jurisdiction to hear Count VI and Plaintiffs cannot demonstrate a likelihood of success on that Count.

**2. Even if the Court Applied the Preliminary Injunction Analysis, Plaintiffs Cannot Show a Likelihood of Success on the Merits because there is No Such Cause of Action, Defendants will Likely Win Counts I through V, and this Court Cannot Divine How Disinterested Directors Would Vote if Such a Vote Were Necessary**

Plaintiffs cannot demonstrate any likelihood of success for Count VI, an action to enjoin advancement of expenses and indemnification, because there do not appear to exist any elements for such a cause of action in fact, there does not even appear to be such a cause of action. The Benders do not assert any actual or threatened breach of duty or contract by the Bank or its directors with respect to the exercise of their discretion under 12 C.F.R. §545.121.

Moreover, the indemnification regulation, 12 C.F.R. §545.121, makes indemnification of directors and officers mandatory if a final judgment on the merits is entered in favor of the director or officer. 12 C.F.R. §545.121(c)(1); *see also* OTS Opinion Letter, 1989 WL 1114183 (October 6, 1989), attached hereto as Exhibit A; *and see Waldoboro Bank v. American Caus. Co.*, 775 F.Supp. 432, 433-34 (D. Me. 1991)("[i]ndemnification is *required* . . . where there is a final judgment on the merits in the officer's or director's favor.")(emphasis in original). As esTablished throughout this Brief, Defendants are likely to win a favorable final judgment on the merits of the substantive Counts I through V because the allegations made by the Benders cannot be proven by the facts of this case. Therefore, the Benders are not likely to succeed on the merits of whether indemnification is appropriate.

Finally, only in cases not covered by 12 C.F.R. §545.121(c)(1), such as settlement or final judgment not on the merits or not favorable to the Defendants, must a majority of

disinterested board members determine whether the Defendants acted in good faith. 12 C.F.R. §545.121(c)(2). In such a circumstance, no court can magically divine—and the Benders cannot argue a likelihood of success on—whether a majority of disinterested board members[15] will determine, if presented with this issue of indemnification, that the Defendants acted in good faith. A request for the extraordinary remedy of a preliminary injunction based on such improbable speculation must fall on deaf judicial ears. *Sampson v. Murray*, 415 U.S. 61, 81 (1974); *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969).

Accordingly, the Benders cannot make a "clear showing" that they will likely succeed on the merits of Count VI.

## V. PLAINTIFFS CANNOT SHOW IRREPARABLE INJURY

Because Plaintiffs cannot show a likelihood of success on the merits, their Application for Preliminary injunctive relief should be denied. *See Time Warner Entertainment Co. v. F.C.C.*, 810 F. Supp. 1302, 1304 (D.D.C. 1992) (stating that "a significant failure of proof with respect to any element may warrant the refusal of *pendente lite* relief and require the movant to await the conclusion of the case"). Even if this Court determines that Plaintiffs are likely to succeed on the merits of their claims, Plaintiffs cannot show sufficient irreparable harm for any of the claims upon which they seek injunctive relief.

The *sine qua non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable injury to the Plaintiff. *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93 (D.D.C. 2003). In order to make a clear showing of irreparable injury, the Movant must demonstrate to the Court "that the harm caused by the non-moving party's conduct is

[15] As this Court noted in the February 9, 2006 Scheduling conference, it will be impossible to find any truly disinterested Directors with respect to this litigation. Hearing Transcript, at p. 17, line 24-p. 18, line 4; *see also Independence Federal Savings Bank v. Bender*, 326 F.Supp.2d 36, 49 (D.D.C. 2004)(noting that "Bender Group" of Directors are interested in advancing Mr. Bender's interests.").

irreparable in nature." *Brown v. Chote*, 411 U.S. 452, 456 (1973). The irreparable harm requirement will be met only if a plaintiff "demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d. Cir. 2000).

A. **Denial of Relief Will Not Cause Irreparable Injury to Plaintiffs**Alleged Section 13(d) Violations do not Justify Remedy Sought

The obvious remedy for failing to file a Schedule 13D is a requirement that such a filing be made. There is no irreparable injury connected with the failure to make a Schedule 13D filing, assuming a filing was even required. The remedy for a violation should be in proportion to the wrong alleged. *Liberty Nat'l. Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 565 (11th Cir. 1984). In *Liberty*, an issuer of securities brought an action seeking to require a shareholder who allegedly filed false and misleading Schedule 13D's to divest itself of stock holdings in issuer and refrain from voting its shares until divestiture was complete. *Id.* at 548. The Court stated that:

> Section 13(d) creates an affirmative duty in a person after he has acquired more than five percent of the shares of an issuer to file a form for purely information purposes. *It strikes us that the obvious antidote for an allegedly false filing is a corrected filing.* Yet Liberty does not request such a remedy. Instead, it seeks to force a major stockholder to unload its vast holdings and to lose its voting power over the shares it owns. The primary effect of such relief, if granted, would be to lower the market price of Liberty shares, which plainly would not be beneficial to shareholders. This result would be plainly contrary to congressional intent in adopting the Williams Act.

*Id.* at 565 (emphasis added).

As this Court has recognized, neutralization of shares is a "harsh" remedy. (TAB 3 at p. 26). Plaintiffs seek a remedy that does not match the violations alleged against Defendants. Thus, Plaintiffs have not met their burden to show irreparable injury.

2. There is an Adequate Remedy at Law for Section 14(a)

A court will ordinarily grant injunctive relief only if another adequate remedy at law is unavailable. *Northern Cal. Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306 (1984). The irreparable harm requirement will be met only if a Plaintiff "demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d. Cir. 2000). Plaintiffs allege irreparable harm for alleged violations of Section 14(a), but also seek monetary damages in their complaint because they have "suffered substantial monetary damages, including the value of the entirety of their investment in IFSB, and all expenses relating to that investment...." *See* Complaint at p. 30. If money damages will suffice, then the injury is not irreparable. Because there is an adequate remedy at law in the form of money damages, Plaintiffs cannot show irreparable harm.

3. Plaintiffs Injury for Alleged By-law Violations is Derivative

As stated above, Plaintiffs injuries, if any, for alleged by-law violations are derivative in nature. A threat of derivative injury does not meet the clear and convincing standard for showing irreparable harm.

4. Plaintiffs have Not Plead any Injury or Irreparable Harm with Respect to Count VI

With regard to Count VI, as noted above, Plaintiffs have not plead any injury or irreparable harm in the Application for Preliminary Injunction or in the Complaint. Moreover, the regulation sets out requirements for reimbursement under certain circumstances which Defendants have met.

## VI. IF INJUNCTIVE RELIEF IS GRANTED, DEFENDANTS AND SHAREHOLDERS WILL SUFFER SUBSTANTIAL HARM

Should this Court grant injunctive relief for Plaintiffs, the Defendant Directors, IFSB and all shareholders will suffer substantial harm. First, voiding the election results will require the Bank to conduct a new election, which will cost the Bank money. Second, voiding the election would deprive IFSB shareholders of their rights as shareholders. For those shareholders whose votes were counted in accordance with how they actually wanted to vote, they will be forced to come to another meeting, or fill out another proxy, and vote their shares over again. Third, if shares voted on proxies are neutralized, those shareholders whose shares are neutralized will be disenfranchised. Yet, they will have done nothing wrong.

With respect to Count VI, an injunction will severely injure Defendants. The individual Defendants in this case have been sued based on allegations related to their participation as directors and officers of the Bank. Many of the Directors' names do not even appear in the substantive allegations of the Complaint or Application for Preliminary Injunction. Yet, if Plaintiffs get their wish, each Defendant will have to come up with a substantial amount of money in order to pay for their defense. Each Defendant will have to decide whether to mortgage their individual reputations and the future of the Bank by settling claims in order to avoid having to expend personal resources for a lawsuit not related to personal matters, but related to their performance as officers and directors of the Bank.

## VII. GRANTING PRELIMINARY INJUNCTIVE RELIEF WOULD BE CONTRARY TO PUBLIC POLICY

Clearly, the public interest would best be served by allowing all of the shareholders to decide the outcome of the election, and not permitting one shareholder to change the election results, particularly when the one shareholder puts his interests in front of his fellow shareholders.

The National Bankers Association agrees with Defendant Directors' position on Mr. Bender and believes it is in the best interest of the shareholders, the Community and the Bank to "protect the unique status of IFSB" as a minority-owned institution. (Fact Tab 16). Therefore, it would be against public interest to allow Plaintiffs the relief requested in their Application.

With respect to Count VI, the public policy favors denying the Application for Preliminary Injunctive Relief. Indemnification, by regulation or agreement, is intended to encourage capable individuals to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their honesty and integrity as directors will be borne by the corporation they serve. *McLean v. International Harvester Co.*, 902 F.2d 372 (5th Cir.1990); *Mooney v. Willys-Overland Motors, Inc.*, 204 F.2d 888 (3d Cir.1953); 13 WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 6045.01 (perm. ed. rev. vol. 1990). The underlying public policy is that people who serve as corporate directors and officers should be able to perform their jobs free of the fear that they will be saddled with personal liability for corporate acts. BISHOP, *Law of Corporate Officers and Directors: Indemnification & Insurance,* § 6.02[1] (1988 and 1992 Supp.). Whether the monetary obligations commensurate with being personally liable for corporate acts arise up-front by way of defensive and litigation costs and expenses or whether they appear at the back-end by way of damages seems to be of no moment. *See* Bishop, *supra* § 6.03[8] (litigation involving corporate executives is often complex and expensive and the executive may be financially incapable of fully and adequately defending himself).

These principles are particularly persuasive when the party suing the directors and officers is also the party trying to impinge on their ability to perform their duties without fear of

personal liability. As Plaintiffs admit in their Opposition to the Bank's Motion to Dismiss, and as Defendants attempted to argue at the Scheduling conference, it is the Benders who will receive the benefit of the Directors and Mr. Batties having to pay their own legal expenses to defend against claims related to the scope of their involvement with the Bank. Opposition at 13. While the Benders have attempted to argue that Count VI is an effort to protect the Bank and the OTS, *see* Opposition at 5, it is really another "attempt to replace certain directors and officials of the Bank for his own benefit." *Independence Federal Savings Bank v. Bender*, 326 F.Supp.2d 36, 49 (D.D.C. 2004). In light of the litigation history between the Benders and the Bank, such a result would greatly discourage Directors from participating on the Board and would fly in the face of the policy behind 12 C.F.R. §545.121.

Finally, the regulation makes indemnification mandatory if certain criteria are met and requires that the OTS have 60-days notice to review a decision to indemnify. Therefore, as the court noted in *Waldoboro Bank v. American Caus. Co.*, 775 F.Supp. 432, 433-34 (D. Me. 1991), the regulation as written affords the OTS a "meaningful review" of indemnification decisions, eliminating the need for this Court to review the conduct of the Directors twice. More importantly, as this Court has previously said, "[t]his Court is not a substitute for OTS." *Independence Federal Savings Bank v. Bender*, 326 F.Supp.2d 36, 48 (D.D.C. 2004) (citing *Pena v. Downey Sav. & Loan, Ass'n*, 929 F.Supp. 1308, 1315 (C.D.Cal.1996). Therefore, this Court should not invoke the extreme remedy of an injunction and substitute its judgment for that of OTS.

VIII. **CONCLUSION**

WHEREFORE, for the reasons set forth above, Plaintiffs Application for Preliminary Injunctive Relief should be denied

Respectfully Submitted,

Dated March 31, 2006

SHOOK, HARDY & BACON L.L.P.

/s/

Peter E. Strand
Carlos E. Provencio
Christine S. Hudson
Hamilton Square
600 14th Street, N.W., Suite 800
Washington, D.C. 20005-2004

Attorneys For Defendants Carolyn Jordan, et al.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of March, 2006, a true and complete copy of the forgoing Response to Memorandum of Points and Authorities in Support of the Benders' Application for Preliminary Injunctive Relief was sent electronically to the following:

Dale A. Cooter, Esq.
Cooter, Mangold, Tompert and Wayson, L.L.P.
5301 Wisconsin Ave, NW
Suite 500
Washington, D.C. 20015
T: (202)537-0700
F: (202)364-3664
*Attorneys for Plaintiffs*

Haig V. Kalbian
888 17th Street, N.W., Suite 1000
The Brawner Building
Washington, D.C. 20006
*Attorney For Defendant Independence Federal Savings Bank*

/s/
Peter E. Strand



130044v3