# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MORTON A. BENDER, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **C.A. No. 1:06cv00092** |
| **CAROLYN D. JORDAN, et al.,** | ) | **(RMC)** |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## [PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION

## FINDINGS OF FACT[1]

---

[1] _Note to the Court:_  Attached hereto are the following supplemental exhibits:

    _Plaintiffs' Supplemental Exhibit 117 - Robert Freedman Letter to John Hall, dated October 21, 2005_

    _Plaintiffs' Supplemental Exhibit 118 - Declaration of Diligence (Capital Process Servers regarding service on Impact Strategies/Judy Smith)_

_In addition, Plaintiffs have attached excerpts from the preliminary injunction hearing transcripts as follows:_

    _Carolyn Jordan - Exhibit A_
    _David Wilmot - Exhibit B_
    _Thomas Batties - Exhibit C_
    _Christopher Chambers - Exhibit D_
    _Raymond Riley - Exhibit E_
    _Robert Freedman - Exhibit F_

1. Plaintiffs Morton A. Bender ("Bender") and Grace M. Bender ("Grace Bender") are residents of the District of Columbia. As joint tenants, they are the beneficial owners of 326,000 shares of common stock of Defendant Independence Federal Savings Bank, and thereby jointly own approximately 21% of the outstanding stock of the Bank. Grace Bender is not an active participant in the matters relevant to this litigation and she is a party solely in her capacity as a joint tenant shareholder with Bender.

2. Independence Federal Savings Bank ("IFSB" or the "Bank") is a federally-chartered savings bank, with its principal place of business in the District of Columbia. The Bank operates four branches in the District of Columbia and one branch in Chevy Chase, Maryland. Its stock is publicly traded on the NASDAQ Stock Exchange and it is under the regulatory jurisdiction of the Office of Thrift Supervision ("OTS").

3. Defendant Carolyn D. Jordan ("Jordan") is a member of the Bank's Board of Directors, and is its Chairman. Defendants David Wilmot ("Wilmot"), Michael J. Cobb ("Cobb"), William B. Fitzgerald, IV ("Fitzgerald"), and Eugene K. Youngentob ("Youngentob") are also members of the Bank's Board of Directors. Defendant Wilmot is the Vice-Chairman of the Board. Defendants Jordan, Wilmot, Cobb, Fitzgerald, and Youngentob are hereinafter collectively referred to as the "Director Defendants."

4. Defendant Thomas L. Batties ("Batties") is acting President and Chief Executive Officer of the Bank.

5. Defendants Jordan, Wilmot, and Batties are all attorneys, and members of the bar of the District of Columbia.

6. The Bank's fiscal year ends on December 31 each year. On April 6, 2004, the Board of Directors of IFSB voted to amend Article II, Section 2 of the Bank's bylaws to set the date of the Bank's annual meeting "within 150 days after the end of the savings bank's fiscal year on the third Wednesday of April . . . or at such other date and time within such 150-day period as the board of directors may determine." The regulations of the OTS require that a Bank's annual meeting be held within 150 days of the end of its fiscal year. 12 C.F.R. §552.6(a). Thus, the 2005 annual meeting should have been held April 20, 2005 (the third Wednesday in April 2005), but in no event later than May 31, 2005 (one day after Memorial Day which was the 150th day after the close of the Bank's fiscal year on December 31, 2004). The 2005 annual meeting was not scheduled to take place before April 20, 2005, but a Special Meeting in lieu of the Annual Meeting of Shareholders was scheduled for May 11, 2005, prior to the May 31, 2005 corporate and regulatory annual shareholder meeting deadline. Thereafter, the meeting was scheduled and re-scheduled, and ultimately, a Special Meeting of the Shareholders was held on October 26, 2006.

### COMMUNICATIONS IN ADVANCE OF THE SCHEDULED MAY 11, 2005 MEETING/ THE MAY 4, 2005 COMMITTEE TO SAVE INDEPENDENCE BANK LETTER

7. In anticipation of the scheduled May 11, 2005 meeting, at which three directors would be elected to the Bank's Board, Bender sent a letter, dated April 26, 2005, to the Bank's corporate secretary giving notice that Bender was nominating two persons for election to the Board. On May 2, 2005, Bender sent a letter to the shareholders setting forth his positions regarding the Bank's performance, and information regarding his nominees.

3

8.  A few days prior to the May 11th meeting, a letter dated May 4, 2005 was sent to shareholders allegedly on behalf of "the Committee to Save Independence Federal Savings Bank." Bishop Clarence Long and Reverend Douglas Moore were identified as sending the letter on behalf of the Committee. Trial Exh. 1 (hereinafter "Committee Letter").

9.  By letters dated May 9, 2005 (Defs. Exh. 209) and May 10, 2005 (Defs. Exh. 210), the OTS notified Bender and IFSB that both the Bender May 2nd letter, and the Committee Letter were the subject of OTS inquiry. The letter to IFSB stated, *inter alia*:

> OTS is beginning an investigation and is requesting the immediate assistance of the Board in gathering the necessary information to determine whether individuals under the jurisdiction of the OTS have committed violations of the above-identified statutes and regulations.
>
> ... . As soon as possible, please provide OTS with any information in the possession of any Board member or member of Management or any employee of Independence regarding the identity of the Committee members and whether any officer, director *or employee* of Independence is affiliated with the Committee or has provided information to the Committee that was included or referenced in the Correspondence.

(Emphasis added).

10.  In the May 10th letter to IFSB, the OTS also suggested that the Bank adjourn the meeting for a brief period due to the Bender correspondence and the Committee Letter. The 2005 annual meeting was convened on May 11, 2005; pursuant to the OTS suggestion, however, no business was conducted at the meeting and the meeting was adjourned.

4

11.  Thereafter, both Bender and IFSB responded to the OTS inquiries outlined in the May 9th

and May 10th letters.  Bender's response, in a letter dated June 20, 2005 (Plaintiffs' Exh. 113), is a

twenty-two page response to the points raised in the OTS May 9th letter to Bender.[2]

12.  After receipt of the May 10th OTS inquiry, the IFSB Board passed a Resolution (Defs.

Exh. 210A), which states in pertinent part:

> [I]n response to the OTS' request in the [May 10th] Letter, the Board determined it should
> clarify for the OTS the Board's position with regard to the Committee [to Save Independence]
> and the [May 4th] Correspondence and to address the OTS' request for information by
> soliciting voluntary disclosure from the Bank's directors, officers *and employees.*

(Emphasis added).  Thereafter, Sheila Finlayson, IFSB counsel and Corporate Secretary, sent a

memorandum to nine IFSB officers, seeking voluntary participation in responding to the OTS inquiry.

(Defs. Exh. 210).[3]  Despite the express language of the Board Resolution, however, beyond the officers

---

[2]  In its Proxy Materials disseminated in advance of the October 26, 2006 meeting, IFSB
Management made several references to the May 9th letter from the OTS to Bender.  See, e.g., Trial
Exh. 2 at page 5 (Bender letter appeared to OTS to be "false and misleading"), page 22 (same), and
page 25 (quoting the OTS May 9th letter language questioning Bender's failure to "take responsibility"
for the failure of the Carver merger).  In their examination of witnesses at the hearing, Defendants relied
on the OTS letter to Bender presumably as support for their contention that Bender is not entitled to the
equitable relief sought here.  See also Individual Defendants' Opposition to Motion for Preliminary
Injunction (Docket # 30), ¶¶16-21.  The Court has therefore reviewed the May 9th OTS letter to
Bender (Defs. Exh. 208), and Bender's detailed response (Pl. Exh. 113) to the OTS letter.  The Court
finds that the language cited by the OTS as potentially false and misleading was neither false nor
misleading.  The Court makes this finding in the course of its weighing of the equities, and further, so
that future IFSB Proxy Materials will not continue to suggest that the Bender May 2005 communication
to shareholders was false or misleading.

[3]  Attached to the memorandum was the three-page version of the Committee Letter.  (Defs.
Exh. 210B).  Two versions of the Committee Letter were distributed, one was three pages, and one
was seven pages.  See OTS letter dated May 10th (Defs. Exh. 209), referring to the two versions.  The
seven page version includes the "Timeline."  See Trial Exh. 1.  Internal Bank e-mails (discussed *infra*)
also refer to two versions of the letter.

and directors, IFSB apparently did not seek any information from other employees in responding to the

OTS inquiry, and only sent the request to officers at the "vice president level up." April 21, 2006

Hearing (Batties) at 143-44.

     13.   IFSB provided its response to the OTS on May 20, 2005 (Defs. Exh. 210D).  Attached

to the letter were the responses from: Mr. Parks (IFSB 009368); Mr. Youngentob (IFSB 009369);

Mr. Fitzgerald (IFSB 009370); Mr. Deckelbaum (IFSB 009371); Mr. Cobb (IFSB 009372); Mr.

Wilmot (IFSB 009373); Ms. Jordan (IFSB 009374); Mr. Isard (IFSB 009375); Ms. Dennison (SVP

operations) (IFSB 009376); Mr. Nathan (VP, Accounting)(IFSB 009377); Ms. Baker (VP, HR &

Compliance)(IFSB 009378); Mr. Parsons (VP, Product Administration)(IFSB 009379); Mr. Morris

(EVP and Chief Financial Officer)(IFSB 009380); Ms. Finalyson (Corporate Counsel and

Secretary)(IFSB 009381); and Mr. Batties (IFSB 009382).[4]  Each of the responses disclaims any

involvement with the Committee or the Committee Letter.

     14.   Defendant Batties's response is as follows:

> Reserving all rights, I have not provided any information to the Committee that was
> included or referenced in the correspondence.  I received a three page letter from the
> "Committee to Save Independence Federal Savings Bank."  In addition, I am aware
> the bank received two communications from Rev. Fauntroy.  Bishop Clarence Long,
> Reverend Douglas Moore and Rev. Walter Fauntroy are all customers of the bank, and
> I have seen them from time-to-time in the bank's main lobby, conducting regular
> banking business.  No discussion or information was discussed or shared regarding
> information included or referenced in the Correspondence.  Copies of the Committee
> letter & correspondence received from Rev. Fauntroy mentioned above, is [sic]
> attached.

---

[4] Ms. Dennison, Mr. Nathan, Ms. Baker, Mr. Parsons, and Mr. Morris are five of the nine
officers identified as addressees of the memorandum.  The other officers apparently did not submit a
response.

Through the focused lens of hindsight, illuminated by the hearing testimony and discovery conducted in this case, it now appears that Defendant Batties' response was carefully crafted to avoid any (what would have been patently untrue) disclaimer of general knowledge about the "independent" existence of the "Committee" or the authorship of the letter.

15.    By letters dated September 14, 2005, the OTS notified Bender (Defs. Exh. 214) and the Bank (Defs. Exh. 215) that no enforcement action would be taken with regard to the May 2nd Bender letter, or the May 4th Committee Letter.

16. Consistent with his response to the OTS, Defendant Batties has denied any involvement in the creation or dissemination of the Committee Letter in his filings in this case. See Batties Answer (Docket # 9), ¶ 58 (Batties denies "participation" in Committee to Save letter); see also Individual Defendants' Opposition to Motion for Preliminary Injunction (Docket # 30), ¶ 23 ("None of the individual Defendants had any involvement in the preparation or the mailing of the letter"); ¶ 27 ("No officer, director or employee of the Bank was involved with the Committee letter").[5]    Batties' denial of involvement with the Committee Letter continued in his testimony at the preliminary injunction hearing. April 21, 2006 Hearing (Batties) at 119-24.

---

[5] *[Note to the Court  : Prior to the receipt of Pl. Exhs. 104-109 (the Chambers' e-mails), Defendants' consistent position (both to the OTS and in this proceeding) was that "No officer, director or employee of the Bank was involved with the Committee Letter." To disprove this contention (now discovered to be blatantly false), Bender retained, at considerable expense, a linguistics expert. That expert conducted an examination in which she compared various bank documents to the Committee Letter and its attachments to determine common authorship. This unnecessary expense was incurred solely as a result of the blatant misrepresentation of the Individual Defendants on the lack of "involvement" of the Bank with the Committee Letter, and their failure to produce the e-mails (Pl. Exhs. 104-109), which clearly implicate Bank personnel, earlier.]*

17. Reverend Fauntroy, Bishop Long and Reverend Douglas testified in this case by deposition designation (pursuant to stipulation of the parties).[6] All of these witnesses denied any involvement with the Committee Letter:

> Reverend Fauntroy testified that he had no role in authorship of the letter, and did not see the letter until the day of his deposition. Fauntroy Tr. 65-69.

> Reverend Long testified that he did not authorize anyone to send the letter on his behalf, and saw it for the first time at the press conference on May 10, 2005. Long Depo. Tr. 26-27. Reverend Long also testified that he did not write the letter, and that he has no idea who wrote it. Long Tr. 36.

> Reverend Moore testified that he has no idea how the letter went out with his name on it; he did not remember seeing it before his deposition. Moore Tr. 37-42.

The Court finds that there is no basis to disbelieve the testimony of these third-party witnesses regarding their involvement in the creation or dissemination of the letter.

18. Plaintiffs' Exhibits 104 through 109 are a series of e-mails provided to counsel for the Plaintiffs on the afternoon of April 20, 2006, the day before the first day of hearings on the preliminary injunction.[7] These e-mails demonstrate that Mr. Christopher Chambers, an attorney and part-time

---

[6] *[Note to the Court : The deposition transcripts referred to herein were submitted to the Court in a separate binder at the April 28, 2006 Hearing.]*

[7] During the course of this litigation, Plaintiffs sought, and the Court issued, a Minute Order for the production of Defendant Batties' computer hard-drive. After the Minute Order was issued on April 13, 2006, and the process of copying the Batties hard-drive was begun, that the e-mails referred to above were produced.

*[Note to the Court : as of the filing of these Proposed Findings of Fact, the hard drive has been copied and searched for certain key words; the results of that search were copied onto a disc and provided to counsel for the Individual Defendants. Counsel for the Defendants are now in the process of reviewing the disc for privilege. Accordingly, the results of the hard-drive search have not yet been provided to Plaintiffs' counsel.*

Bank employee, had contemporaneous knowledge about the "Committee" and the drafting and dissemination of the Committee Letter.  Specifically, Mr. Chambers was involved in communications with Judy Smith of Impact Strategies,[8] the public relations firm retained by the Bank.  These e-mails demonstrate that Mr. Chambers, a Bank employee, had specific knowledge about the creation of the "Committee," the content and the tone of the Committee Letter, as well as the process and timing of the Letter's dissemination.  See, e.g., Pl. Exhs. 104 -109.   The following excerpts from the e-mails demonstrate Mr. Chambers' active involvement in the "Committee" process:

> ... PR and grassroots–lining up folks and implementing the strategy, beginning the tactics. There is now a list of small shareholders, but we must be careful to have the "Committee to" contact them, and of course it's not going to be a question of supporting the current management slate– now it is a question of not selling to [B]ender or his allies.

April 18, 2005 e-mail (Pl. Exh. 106).

> I have some deliverables to Impact Strategies so they may complete their tasks regarding grassroots and media work.

April 22, 2005 e-mail (Pl. Exh. 107)

―――――――――――――――――

*In addition, because so few e-mails have been produced (and as yet it is not known what is on the Batties' hard drive), and because it appears that Bank personnel were regularly communicating with third parties in advance of the scheduled meetings, other e-mails are likely in existence which have not been produced.  The* **Individual Defendants** *have failed to produce any e-mails (or other documents) from their personal files – the Defendants' production of documents appears to be comprised entirely of "Bank files" and even those appear to be woefully incomplete in that very few e-mails seem to have been produced.  In addition, although Mr. Chambers testified that he reviewed drafts of the Committee Letter, no such drafts have been produced.]*

[8]  Once the e-mails were finally produced on April 20th, Plaintiffs immediately sought to serve a subpoena on Ms. Smith and Impact Strategies.  Those efforts were not successful, and it appears that Ms. Smith may have been avoiding service. Pl. Supplemental Exh. 118 (Affidavit of Diligence, executed by Daniel Portnoy, Capital Process). Accordingly, her testimony could not be obtained prior to the close of the evidence on the preliminary injunction.

-------Original message-------

Attached are the latest versions of the two mailings. Please review the letter as there have been several changes made to it.

Also, we need to have signers for the letter. Therefore, please anticipate a call from us to discuss potential signers.

***

Judy [Smith]

[Response from Mr. Chambers] I left you all voicemails this morning. I called and left messages at Long's and Fauntroy's offices to return signatures ASAP. The mailings need to be sent out immediately or revaluated [sic]–as you know we had to send out our proxies (ballots). This means some shareholders are in the process of voting or may have already voted. If we are waiting on signatures past today the effect may be obviated and the cost unjustifiable. Therefore, I would suggest ... you send the packages out this afternoon (as previously discussed with the names in the closing).

May 4, 2005 e-mail (Pl. Exh. 105)

Judy Smith is planning the Committee to Save IFSB-related press conference ASAP. FYI the grass roots packages have gone out (last night). They are not as inflammatory as originally envisioned; they are more akin to shareholder fight-letters. I will forward you the essence of what went out to smaller shareholders ... . Additionally another 1500-1800 smaller letters went out to friends of the bank ... .

***

Consequently ... the fur will be flying. ... Bender's putative nominees have been painted in the Committee mailings as innocent puppets at best, racial traitors at worst, so I would suggest that Carolyn Jordan brief Mr. Parks ... .

May 5, 2005 e-mail (Pl. Exh. 104).[9]

---

[9] The statement "innocent puppets at best, racial traitors at worst" is undeniably based upon language contained on the last page of the "Timeline" attached to the May 4th letter ("Even though those men are African-Americans they are mere puppets of Bender's with no apparent ties to banking, required to do what he tells them").

Today [Doxie McCoy, a shareholder] should have gotten the package from the Committee... .

May 6, 2005 e-mail (Pl. Exh. 109).

19. Mr. Chambers sent Defendant Batties a copy of each of these e-mails (either as an addressee in the "To" line or the "cc" line). They were all sent either to a Batties' IFSB e-mail address or to his home, or to both e-mail addresses.

20. Despite their hearing testimony denying any involvement, the e-mails also suggest that Defendants Wilmot and Jordan (and possibly Fitzgerald) were also involved in (or at least aware of) the "Committee" process. See, e.g., April 22, 2005 e-mail (Pl. Exh. 107)("Pls. note that in addition to Carolyn Jordan of our Board, Director David Wilmot, Esq. wishes to be included in some of these discussions confidentially"); May 5, 2005 e-mail (Pl. Exh. 104)("Bender's putative nominees have been painted in the Committee mailings as innocent puppets at best, racial traitors at worst, so I would suggest that Carolyn Jordan brief Mr. Parks ... . We must make sure that Dave Wilmot and Bill Fitzgerald are playing along with the orchestra rather than tooting their own horns").

21. In his hearing testimony on April 21 and April 28, 2006, Defendant Batties again denied any involvement in the Committee Letter or the activities of the Committee. See generally, April 21, 2006 Hearing (Batties) at 119, 124. He further testified that he did not remember the e-mails from Mr. Chambers; he did not deny receiving the e-mails, but he asserted that he did not read the e-mails until the day before the injunction hearing. April 21, 2006 Hearing (Batties) at 126, 139. He further testified that he did not know if Judy Smith of Impact Strategies was involved in the Committee to Save Independence. April 21, 2006 Hearing (Batties) at 127.

11

22. Defendant Batties testified that approximately 28 employees work in the IFSB headquarters where his office is located, and that Mr. Chambers' desk is outside his office. Ms. Finlayson's desk is also outside his office. April 21, 2006 Hearing (Batties) at 132.

23. Mr. Chambers was deposed on April 27, 2006, and testified at the hearing on April 28, 2006. At the hearing, he testified that believed that Defendant Batties introduced him to Judy Smith of Impact Strategies, and further, that it was at Batties' direction that he dealt with Ms. Smith and Impact Strategies, and for that reason, he sent copies of the e-mails (Pl. Exhs. 104-109) to Batties. April 28, 2006 Hearing (Chambers) at 91-92. Mr. Chambers also admitted that he reviewed drafts of the Committee Letter, made suggestions, and provided information to Impact Strategies ("what they requested to do their job"). April 28, 2006 Hearing (Chambers) at 68-70. The Court finds that based on the contents of the Committee Letter, Mr. Chambers (or some other Bank personnel) must have been the source of confidential Bank documents, from which Impact Strategies obtained information which was included in the Committee Letter.[10]

24. Mr. Chambers also admitted that he had conversations with Defendant Batties about the Committee Letter ("... grass roots, direct mail, lobbying the whole thing"). April 28, 2006 Hearing (Chambers) at 94. The Court finds that in late April and early May 2005, those conversations between Batties and Chambers included discussions about the creation and dissemination of the Committee Letter.

--------

[10] Defendant Batties admitted that some of the information in the Committee Letter and its attachments could only have come from confidential OTS examination reports, which are maintained in the Bank's file. April 21, 2006 Hearing (Batties) at 120-124.

25.  Based upon the content of the Committee Letter and its attachments, when viewed in the context of the e-mails, and Mr. Chambers' testimony, the Court rejects as untruthful Defendant Batties' testimony that he had no involvement in the Committee Letter or the Committee activities.  This finding is supported by the fact that beyond receiving copies of the e-mails, Batties appears also to have been directly involved in the "grass-roots" public relations effort, including contacting Reverend Fauntroy and Bishop Long.  See, e.g., Pl. Exh. 108 ("Thomas might have to make *another* call to one or both [Rev. Fauntroy and Bishop Long]")(emphasis added).  See also  Pl. Exh. 104 ("the bigger shareholders have been contacted ... . I don't know how much you would be involved in that specific aspect of prepatory work, Charlie, but my vote is that you attend, *pending what Thomas decides* ")(emphasis added).[11] The record has not yet been developed enough to determine whether Defendant Batties had any direct role in the Committee Letter (by drafting or editing).  Nevertheless, the record is developed enough for the Court to find that Defendant Batties authorized, and was aware, of Mr. Chambers participation with Impact Strategies in the creation and dissemination of the letter, and the "creation" of the Committee itself.  The Court further finds that Defendant Batties authorized, or was aware, that the "Committee" was being portrayed falsely to the shareholders and the public as an independent association.  See Pl. Exh. 104 ("the Committee to Save IFSB is an independent association"); Trial Exh. 1, Committee Letter ("Acting separately from IFSB, we aim to expose the motivations of those wishing to harm IFSB's mission").

---

[11]  This portion of the May 5th e-mail seems to refer to a "prep session" for friendly shareholders about the Committee Letter.

## BANK AND BENDER COMMUNICATIONS IN ADVANCE OF THE OCTOBER 26, 2005 SPECIAL MEETING OF THE SHAREHOLDERS

26. At its September 9, 2005 special meeting, the Board rescheduled the "Special Meeting in lieu of an Annual Meeting of the Shareholders" of IFSB to be held on October 26, 2005 at 11 a.m., at the Mayflower Hotel in Washington, D.C. ("Shareholders Meeting").

27. Bender's nominees for directors to be elected at the Shareholders Meeting were Osborne George and John Silvaneous Wilson, Jr. ("Bender Nominees").

28. On or about October 3, 2005, Bender sent a letter to the IFSB Shareholders, which *inter alia* identified the Bender Nominees, and explained that the only way to vote for the Bender Nominees was to attend the meeting in person, or to send someone with a legal proxy. The letter also specifically instructed that Bender was not soliciting proxies, and was not able to vote any shares other than his own.

29. On or about October 4, 2005, the Director Defendants and Defendant Batties distributed the Bank's proxy materials to the Shareholders ("Proxy Materials"). See Trial Exh. 2. These Proxy Materials included the Banks Proxy Statement ("Proxy Statement") with ten appendices,[12] a "Notice of Postponement and Rescheduling of Special Meeting of Shareholders," as well as a letter signed by Defendants Jordan and Batties entitled "Update to Our Shareholders" ("Update").

_____

[12] *[Note to the Court : the ten appendices are not included in Trial Exh. 2, but they are identified in Trial Exhibit 2 in the Proxy Statement Table of Contents, page (i). Appendices B, C, G and H are contained in the Defendants' Exhibit Binder as Exhibits 209 (May 9, 2005 letter from OTS to Bender), 210 (May 10, 2005 letter from OTS to IFSB), 214 (September 14, 2005 letter from OTS to Bender), 215 (September 14, 2005 letter from OTS to IFSB)].*

30. As identified in the Proxy Statement at page 28, the Bank's nominees for directors were:

Defendant Fitzgerald, Defendant Wilmot, and Marion O. Greene, Jr. ("Management Nominees").

## OCTOBER 21, 2005 SHAREHOLDER LETTER

31. On October 21, 2005, five days before the Shareholder's Meeting, another letter was sent

to IFSB shareholders. Trial Exh. 3. The Court finds that this letter was originally drafted by one of the

signatories to the letter, Mr. Gilbert Douglass, who is an IFSB shareholder. Douglass Tr. at 78. Mr.

Douglass testified that he faxed his letter to "Chris" at IFSB with edits (Trial Exh. 89), and he does not

know how the letter got finalized, or how his signature (and that of Ms. McPhail) got on the final letter.

He further testified that he did not put the letters in the mail, or pay for the postage. See generally,

Douglass Dep. Tr. at 97 -104. Ms. McPhail also testified that she did not know how her signature got

on the letter that was mailed. McPhail Tr. at 38. The Court finds that the "Chris" referred to by Mr.

Douglass is Christopher Chambers, who testified that he reviewed the letter, made some suggestions,

and made arrangements for the letter to be finalized and mailed by Impact Strategies . See April 28,

2006 Hearing (Chambers) at 79-85.

## THE THOMPSON AND DOLEY SHARES

32. Harold Doley's testimony was presented by deposition designations.[13] He testified that he

is a friend of Defendant Jordan's, and "talks to her all the time.". Doley Tr. at 159. Although in his

---

[13] Service of the deposition subpoena on Mr. Doley was eventually obtained by order from the United States District Court for the Southern District of New York. Mr. Doley produced no documents at his deposition. H. Doley Tr. at 4, 8-9.

deposition testimony he denied any role in the firm of "Doley Securities" other than "founder," various documents produced pursuant to subpoena by other parties (Logan Delany and IVS, Inc.) reveal that he is the "CEO/President" of Doley Securities, LLC.  <u>See</u> Trial Exh. 58; <u>see also</u> Trial Exh. 56 (IVS 00133-138).

      33.  On or about March 3, 2005, Doley Securities, LLC entered into an agreement to purchase all of the IFSB shares owned by Carver Bancorp, Inc. ("Carver") for $10.50 per share.  Trial Exh. 58 ("Securities Sale Agreement").  The Securities Sale Agreement was executed by Harold Doley on behalf of Doley Securities, LLC.  Trial Exh. 58.  At the time, Carver owned 150,000 shares, or 9.47% of the total IFSB shares outstanding.  <u>See</u> Trial Exhs. 58 and 59.  Prior to the Doley Securities purchase of the Carver shares, "Doley [Securities, LLC] and its affiliates own[ed] 3,834 shares of IFSB [stock]."  Trial Exh. 59.

      34.  Some of the Carver shares purchased by Doley Securities were retained by Doley Securities; some were sold to Logan Delany, who is Mr. Doley's neighbor; the remainder were sold to clients of Doley Securities.  Doley Tr. 92-95; Tr. Exhs. 59 and 60.  Among the documents produced by Mr. Delany (in response to Plaintiffs' subpoena) was a document entitled: "'Shareholder Participants' – Independence Federal Savings Bank."  Tr. Exh. 67.  The document identifies the following "Participants"[14]:

| | |
|---|---|
| Cecilia Robert | 8,000 |
| Cheron Gaspard | 7,000 |
| Doley Securities, Inc. | 11,700 |

---

[14] The Proxies voted by Mr. Doley at the Shareholders Meeting, Tr. Exh. 56 (IVS 00128-00149) reflect the same entities and the same number of shares.

| | |
|---|---|
| Doley Securities Inventory Account | 18,400 |
| Doley Securities S.D.M.-CR. | 10,500 |
| I.R.A.-F.B.O. - Logan D. Delany, Jr. | 19,047 |
| Logan D. Delany, Jr. | 2,800 |
| Logan D. Delany, Jr. | 785 |
| Majestic Life Insurance Company | 57,453 |
| Majestic Mortuary | 9,500 |
| Resthaven Memorial Park | 9,500 |

The Participants together own 154,685 shares of IFSB stock (hereinafter the "Participant Shares"), which is in excess of 5%, and just under 10% of the total IFSB's shares outstanding. Neither Doley Securities nor any other Participant has ever filed a Form 13D regarding their IFSB stock ownership with the OTS. Trial Exh. 2 at pp. 20-21 (IFSB Proxy Statement); May 4, 2006 Hearing (Freedman) at 89.

35. Jeffrey Thompson is an IFSB shareholder who is a friend and client of Defendant Wilmot. Thompson Tr. at 12-25. He and Defendant Cobb are also partners at the same accounting firm. Thompson Tr. at 9-10. Mr. Thompson's testimony was presented by his deposition.

36. Beginning in early August 2005, and during the 45-day period immediately prior to the September 26, 2005 Record Date for the Shareholders' Meeting, Thompson purchased 98,600 shares of IFSB stock; the 13D filed by Thompson in late September 2005 indicated that he owned 111,600 shares, which is 7.2% of IFSB stock. Trial Exh. 42.

37. Bender and his counsel Robert Freedman met with Thompson and his counsel Daniel Weitzel on October 19, 2005. May 4, 2006 Hearing (Freedman) at 13. During that meeting, Bender gave Thompson a list of shareholders that Bender believed would vote for the Bender Nominees (Trial Exh. 68), and also a "To Do" List (Trial Exh. 81).

38.  On the evening of October 25, 2005, Doley was contacted by Defendant Jordan, and Defendant Wilmot was connected to the call.  Doley Tr. at 158-159.  Logan Delany was with Doley at his home during the call.  Delany Tr. at 27-28.  During this conversation, the parties discussed a sale of the Participant Shares, to be arranged by Wilmot. Doley Tr. 158-162; cf Delany Tr. at 28-29 (Mr. Delany recalled that the discussion about Wilmot putting together a group to purchase the shares did not take place until the next day, when Doley called him from the shareholders meeting).

39.  On the evening of October 25, 2005, Delany understood that his shares and "the Doley shares" would be voted for the Bender Nominees.  Delany Tr. at 42-43.

40.  As of the morning of October 26, 2005, Delany intended that Robert Isard, who held his proxy, would vote the Delany shares for the Bender Nominees.  Delany Tr. at 72.  Doley traveled to Washington, D.C. to attend the meeting in person.

41.  The Shareholders' Meeting was scheduled to start at 11 a.m. on October 26, 2005. Defendant Wilmot postponed the start of the meeting, based on the unilateral decision of Defendant Jordan, without any Board resolution or other authority for a postponement.  April 21, 2006 Hearing (Jordan) at 8.  Wilmot told the shareholders assembled at the meeting (and this Court) that the reason for the delay was for IFSB counsel Rober Royer to consult with the OTS as to "how we should rule" on the two challenges submitted by Bender regarding the Master Ballot and the broker votes.  Mr. Royer told a different story: he testified that his calls to the OTS were *not* to seek advice, but rather, to simply advise the OTS that the meeting was delayed.  Royer Tr. at 68.  Mr. Royer acknowledged that at least one of the reasons for the delay was to wait for Mr. Doley to arrive.  Royer Tr. at 51-52.

42. At some point on October 26, 2005, Doley called Delany and told him that "people from the community" were saying that if Bender "takes over the bank," they will withdraw their deposits; Doley suggested to Delany that "maybe we should vote for management." Delany Tr. at 37-39. At this point however, Delany was still committed to having his shares voted for the Bender Nominees. Id.

43. Once Doley finally arrived at the Mayflower Hotel, Defendant Jordan invited him to lunch at the Prime Rib. April 21, 2006 Hearing (Jordan) at 34-35.

44. Eventually, Jordan and Doley were joined at the Prime Rib by Defendant Wilmot and Mr. Royer, IFSB. Royer Tr. at 75. During this lunch, Defendant Wilmot and Doley discussed a purchase whereby either Wilmot, or his client Thompson, would purchase the Participant Shares. Delany Tr. at 39-40; Doley Tr. at 184-185; Royer Tr. at 76. The price per share which was discussed was either $17.00 (Thompson Tr. at 110-111) or $18.00 (Delany Tr. at 39-40; Doley Tr. 184-185). Doley and Wilmot also reached an agreement on a down payment of $1.00 per share. Delany Tr. at 50-51; see also Doley Tr. at 184-185.

45. At some point before the Shareholders Meeting was convened at 3 p.m., Doley had reached an agreement in principle with Wilmot and Jordan to sell the Participant Shares at $18.00 per share. Delany Tr. at 39-40. On that same day, IFSB shares were trading on the open market, and closed at approximately $11.50 per share.[15] A condition of the purchase of the shares was that the Participant Shares had to vote for the Management Nominees. Delany Tr. at 39-40; 44; see also Trial Exhs. 70-77 (this condition was reflected in the drafts of the purchase agreement, which provided that

---

[15] The historical share price is publically available on the IFSB website.

the Seller agreed to deliver a proxy to the Purchaser for purposes of voting the shares at the October 26th Shareholders Meeting).

46.  Doley again called Delany, and told Delany that he was going to vote for the Management Nominees, and Delany should also. Delany Tr. at 43-44. Because the Participant Shares were owned beneficially by Doley Securities and its clients, Harold Doley obtained proxies from those clients to vote on their behalf. It appears (from the facsimile legend) that Logan Delany faxed his proxies appointing Harold Doley to Doley Securities at 11:49 a.m. (from New York) on October 26th. Trial Exh. 56 (IVS 00145, 147, 149).[16] Mr. Delany testified that in deciding how to vote, he considered the Committee Letter and the McPhail/Douglass Letter "in corroboration with what Doley was telling me, that there were a bunch of people who might withdraw their deposits if Bender won." Delany Tr. at 133; see also Delany Tr. at 46 (in deciding to vote shares for Management Nominees, took into consideration what Doley had told him about people withdrawing deposits if Bender won).

47.  The Delany proxies, and proxies representing the other Participant Shares, were then faxed from Doley Securities in New Orleans to the Mayflower Hotel, on October 26, 2005, between 12:47 and 12:55 p.m. (presumably Central Time). Trial Exh. 56 (IVS 00129 - 00150). Because this is around 2 p.m. Eastern Time, it is likely that these proxies were faxed to the Mayflower after Doley reached an agreement with Wilmot and Jordan.

48.  The Participant Shares were voted with full authority for the Management Nominees. See Trial Exh. 56.

---

[16] Mr. Delany executed various proxies, appointing Robert Isard, Defendant Wilmot, and Mr. Doley to vote his shares. See Trial Exhs. 62 and 63; Delany Tr. at 66-72.

49.   In their trial testimony, Defendants Jordan and Wilmot denied their involvement in any agreement to purchase the Participant Shares.  See, e.g., April 21, 2006 Hearing (Jordan) at 24 (does not recall talking to Doley on October 25, 2005), 26 (denies any discussion of stock sale), 35 (when Royer arrived at the Prime Rib, did not talk about Bank, votes or the meeting), 38 (when Wilmot joined the lunch party, did not talk about the Bank), 39 (heard "snippets" of conversation regarding the stock sale; did not inquire); April 21, 2006 Hearing (Wilmot) at 76 (would take information and have potential purchasers deal with Doley directly), 77-78 (stands by his deposition testimony that he was not involved in the purchase of the Doley stock); 78 (has no knowledge about the details of the purchase because he was not privy to them; ***does not know anything about the down payment***), 94-95 (there was no discussion about the down payment), 94 (no discussion how Doley was to vote), 94 (did not speak to Thompson or anyone on his behalf regarding the purchase of the Doley shares), 103 (did nothing to facilitate the sale of the Doley stock). [17]

50.   The Court rejects as untruthful Defendant Jordan's testimony that she never spoke to Doley about the purchase of shares, as well as her testimony that on the way to the restaurant, and while at the restaurant, that she did not speak to Doley about the Bank, the purchase of shares, or how

---

[17] Similarly, in their Opposition to the Preliminary Injunction Motion (Docket # 30), the Individual Defendants asserted at Paragraph 51: "No director, officer, employee or agent of IFSB was directly involved in the negotiations between Mr. Doley and Mr. Thompson." Yet, somehow there is abundant documentary evidence that negotiations took place, and an agreement was reached: draft agreements; a cashiers' check for $165,000; new Delany proxies; and the Participant Shares being voted for the Management Nominees.  Curiously, there is *no* evidence that Mr. Doley and Mr. Thompson (or any attorney acting on their behalf) had *any* contact or communications with *each other* on October 25th or 26th.  Indeed, Mr. Thompson testified that other than meeting him for the first time at the Mayflower,  he had no conversations or discussions with Doley on October 26th.  Thompson Tr. at 108-110.

he was going to vote the shares for which he held a proxy. <u>Compare</u> April 21, 2006 Hearing (Jordan) at 26-39, <u>with</u> Doley Tr. at 184-185.

51. The Court also rejects as untruthful Defendant Wilmot's testimony that he was not involved in the details of the share purchase. Wilmot's testimony conflicts with that of both Royer (IFSB attorney) and Thompson. Wilmot testified that at lunch, Doley said that *he* had been talking to Thompson, and that the Doley and Thompson attorneys were in discussions. April 21, 2006 Hearing (Wilmot) at 93. This evidence is refuted by Royer, who testified at deposition that the position of the "stock buyer" was being "articulated" by Wilmot during the lunch. Royer Tr. at 83. Wilmot also testified that Doley had been speaking to Thompson "for months." April 21, 2006 Hearing (Wilmot) at 109. Thompson testified that his first conversation with Doley was sometime after October 19, 2005, the day Thompson met with Bender and Freedman. Thompson Tr. at 109.

52. In addition to the deposition testimony of third party witnesses Delany, Thompson and Doley describing the details of conversations on October 25th and October 26th, documents produced by Messrs. Delany and Thompson provide strong evidence that an agreement in principal for the purchase of the Participant Shares was reached during the course of the discussions on the evening of October 25th and the lunch on October 26th.[18] Both Mr. Delany and Mr. Thompson produced various

---

[18] The Court is troubled by the fact that these documents (the draft purchase agreements and the series of checks) were not produced by Defendant Wilmot. Mr. Delany's deposition was held on April 13th, about one week before the first day of injunction hearings, and Mr. Thompson's deposition was held on April 18th, just 3 days before the injunction hearing. If not for Mr. Thompson's and Mr. Delany's compliance with the subpoenas *duces tecum* directed to them, these documents would have never seen the light of day. It was the production of the Adams National Bank cashiers check by Mr. Thompson that led Plaintiffs to issue the subpoenas to BB&T Bank and United Bank.

drafts of a share purchase agreement, some with Wilmot's name as the purchaser, and some with Mr.

Thompson's name as the purchaser; the earliest draft is dated October 24, 2005. See, e.g., Trial Exhs.

66, 69, 70-77. At least one draft of the agreement was sent by e-mail to Defendant Wilmot's assistant

("[a]t the request of David") by Mr. Weitzel (counsel for Mr. Thompson) no later than 8:33 p.m. on

October 25, 2005. Tr. Exh. 70. In addition, at his deposition, Mr. Thompson produced an Adams

National Bank cashiers check dated October 26, 2005, in the amount of $165,000, made payable to

David Wilmot, and apparently endorsed by David Wilmot. Trial Exh. 78.

53. At the hearing on April 21, 2006, Mr. Wilmot identified the account the check was

deposited into as a BB&T trust account. April 21, 2006 Hearing (Wilmot) at 105, 106, 108. After the

April 21st hearing, Plaintiffs issued a subpoena to BB&T Bank, and upon receipt of the BB&T records,

another subpoena was issued to United Bank, to obtain information about the trail of the funds

originating with the Adams National Bank cashiers check. See Plfs. Exhs. 114, 115, 116.

54. The $165,000 Adam's National Bank cashiers check received from Thompson (Tr. Exh.

78) was endorsed by Wilmot and deposited into a Harmon, Wilmot & Brown account at BB&T Bank

(see Tr. Exh. 78 and Pl. Exh. 114). Two checks totaling $165,000 were drawn on BB&T, made

payable to "David Wilmot." Pl. Exh. 114 (BB&T 0031-34). These two checks were deposited into

two accounts at United Bank in the name of "David Wilmot & Associates." Pl. Exhs. 115 and 116.

55. The documents produced by United Bank include a cashiers' check dated October 26,

2005, in the amount of $163,000 and made payable to Harold Doley. Pl. Exh. 115 (United Bank

0186). Because Mr. Doley did not produce documents, and Defendant Wilmot produced no

documents relating to the this transaction (other than those contained in Defs. Exh. 231)[19] it has not yet been determined whether this check was actually transmitted to Mr. Doley.

56.  On November 14, 2005, the $163,000 cashiers check was then deposited (by a split deposit) into the two United Bank "David Wilmot & Associates" accounts, neither of which is identified as an escrow account.[20]  The timing on the "re-deposit" of this check is consistent with Mr. Delany's testimony that his and Doley's counsel advised them within "one or two weeks after the meeting" that they could not pursue the transaction because of a problem with "short swing profit." Delany Tr. at 53-56, 150.

## THE SHAREHOLDERS MEETING

---

[19] *[Note to the Court : the documents attached to Defs. Exh. 231 were not produced to counsel for Plaintiffs by Defendant Wilmot or his counsel until the morning of the hearing on May 4, 2006 .  By that time, Plaintiffs' counsel had already independently obtained the documents (and provided copies to counsel for the Defendants) by subpoenas to BB&T and United Bank].*

[20]  There are two additional troubling details to this transaction, although they are not material to the Court's finding that Defendants Wilmot, Jordan, and Doley reached an agreement for the purchase of the Participant Shares.  First, the United Bank cashiers check payable to Harold Doley, dated October 26th, was in the amount of $163,000, not $165,000.  Pl. Exh. 115 (United Bank 0186). This suggests that Defendant Wilmot may have retained a "finders fee."  In addition, Mr. Thompson testified that the $165,000 was being held for him in Defendant Wilmot's escrow account.  Thompson Tr. at 148, 160.  Similarly, in response to a question as to what happened to the "$165,000," Defendant Wilmot testified that "it's still sitting in the trust account with other funds we hold for Mr. Thompson." April 21, 2006 Hearing (Wilmot) at 106.  Despite Mr. Thompson's belief, and Wilmot's testimony, it does not appear that either of the "David Wilmot & Associates" accounts (Pl. Exhs. 115 and 116) are trust accounts.  Moreover, Defs. Exh. 231, which includes Defendants' proffered explanation for the flow of the funds originating with the Adams National Bank cashiers check, indicate that at least of portion of the $165,000 is not "still sitting" in any account, let alone a trust account. Beyond the obvious issues of a witness' duty to testify truthfully, coupled with a lawyer's duty of candor to a Court (D.C. Rule Professional Conduct 3.3), there appear to be obvious violations of D.C. Rule of Professional Conduct 1.15, in the way that Defendant Wilmot's bank accounts were used in regard to Mr. Thompson's $165,000.

57. Pursuant to the IFSB Amended By-laws ("By-laws"), shareholders' meetings are conducted pursuant to Robert's Rules of Order ("Robert's Rules"). Pl. Exh. 112, at page 1. In addition, the By-laws provide that it is the duty of Independent Inspector of Election (hereinafter referred to as the "IIOE") to determine all challenges regarding the vote. Id. at page 4.

58. The Shareholders' Meeting was eventually convened at 3 p.m., and lasted approximately half an hour. During the course of the meeting, Bender made two formal proxy challenges to Creighton Dunlop, an employee of IVS, Inc., who was acting as the IIOE. The challenges were based on the counting of broker votes without instruction in favor of the Management Nominees, and the fact that the Master Ballot (which represented proxies received by Management) was to be voted after the closing of the polls, in violation of Section 45 of Robert's Rules. See Trial Exhs. 17 (broker vote challenge) and 18 (Master Ballot challenge). The minutes of the meeting reflect that Mr. Dunlop was not allowed to determine the challenges, as required by the By-laws, because the challenges were ruled "out of order" by Defendant Jordan. Trial Exh. 20 (IFSB 008714); see also C. Dunlop Tr. at 93-94 (although in his experience the Inspector of Elections usually rules on the challenges, Dunlop testified "we did not want to go against the wishes of the Chair"), 114 ("we did not rule on the challenges, and really did not consider the challenges once they were presented to the meeting, and the Chair ruled them out of order").

59. During the May 4th hearing, Defendants took the position (during the examination of Mr. Freedman) that Bender's challenges were procedurally infirm because they should have been raised before the Shareholder's Meeting. Defendant Jordan took the same position in her testimony. April 21, 2006 Hearing (Jordan) at 43. Mr. Freedman testified that he attempted to address the issue in

advance with Mr. Hall, the Bank's counsel, and sought a meeting with Mr. Hall. May 4, 2006 Hearing

(Freedman) at 47-48. In response, Mr. Hall advised Mr. Freedman that the Bank would not allow

such a meeting, and in fact, that "the client" would not even allow Mr. Hall to speak with Mr.

Freedman. May 4, 2006 Hearing (Freedman) at 47-48. [21]

60. Pursuant to the By-laws, proxies solicited on behalf of management must be voted as

directed by the shareholder, or in the absence of direction, as directed by the majority of the Board.

Pl. Exh. 112, at p. 3. Further, pursuant to Robert's Rules, all votes must take place prior to the close

of the meeting. Trial Exh. 19A, at p. 400-401. Management submitted a "Proxy Committee Master

Ballot" during the Shareholders Meeting, but it did not allocate the votes to the Management Nominees.

C. Dunlop Tr. at 15-16, 88-89, 97-98; Trial Exh. 7. Neither the By-laws (Pl. Exh. 112) nor the Proxy

Statement (Trial Exh. 2, pp. 18-19), identify any such "Proxy Committee." All of the Defendant

Directors have signed the Master Ballot as members of the "Proxy Committee."

61. Bender's challenge to the Master Ballot was based on the fact that the Defendant

Directors allocated votes among the Management Nominees after the close of the Shareholders

Meeting. Thus, after the Director Defendants received the report from IVS reflecting the tabulated

ballots and the proxies giving full authority to management (Trial Exh. 12, IVS 00324-325), the

Director Defendants were able to allocate their votes in such a way that ensured the election of two of

---

[21] *[Note to the Court: These conversations are confirmed in a letter sent by Mr. Freedman to Mr. Hall on October 21, 2005. The letter is attached hereto as Pl. Supplemental Exh. 117. Counsel for the Director Defendants contended in his cross-examination of Mr. Freedman that he had not seen such a letter despite the Defendants' "extensive document production request." May 4, 2006 Hearing (Freedman) at 48. The bates-label (MB 00036) affixed to the document confirms that it was in fact produced to counsel for the Defendants.]*

the Management Nominees. This allocation took place on October 28th, two days after the

Shareholders' Meeting. (Trial Exh. 12, IVS 00326-327).

62. Because Bender could not solicit proxies (a determination made in April 2005 by the

OTS), the Director Defendants enjoyed an advantage in allocating votes that was not available to

Bender, or to other shareholders who supported the Bender Nominees. Raymond Riley, the expert

who testified on behalf of the Director Defendants, admitted that the normal pattern of proxy allocation

after the close of the vote was typically done in a proxy contest to avoid "undue advantage after the

votes have been cast." April 28, 2006 Hearing (Riley) at 161.

63. Bender's challenge to the broker votes is based on the following language in the Proxy

Statement:

Q: What will happen if I abstain from voting or fail to vote?

A: ... . If you fail to vote for the election of directors, the votes of those supporting
Bender's nominees will have a greater impact in helping Bender gain operating control
of the Bank.

***

Q: If my broker or other nominee holds my shares for me, will my broker or such other
nominee vote those shares for me?

A: Your broker or other nominee will vote your shares only if you provide instructions on
how to vote to your broker or other nominee. You should instruct your broker or other
nominee on how to vote your shares, using the procedures provided by your broker or
other nominee. **Your broker will not vote your shares without your instructions.**

Trial Exh. 2, p. 11 (emphasis in original).

64. The shares held by brokers were voted by ADP. Trial Exh. 14 (IVS 00096-00124).

According to Mr. Riley, the brokers voted in accordance with the New York Stock Exchange Rule for

an "uncontested election" which allowed them to vote for the Management Nominees without

27

instruction from the beneficial owners. April 28, 2006 Hearing (Riley) at 145-146. This is borne out

by the details of Trial Exh. 14, which shows that on the first day of the "ten day vote" each of the

broker votes were for the Management Nominees, except for those that indicated a "Legal Proxy."

See, e.g., IVS 00097-100. The daily vote totals submitted by ADP changed from the first day votes

only to reflect "Legal Proxies" or the occasional "Abstain." The fact that the brokers were voting "for

management" without instruction is confirmed in an e-mail from Sheila Finlayson dated October 21,

2005:

> NOBO holders have been contacted as well (by DF King) to combat Bender's attempts to
> dissuade these shareholders from voting for management even though the routine broker vote
> has been turned in already (in favor of management). As we mentioned earlier, most of these
> holders will take out legal proxies if they wish to vote against management which would negate
> the broker routine vote that has already been turned in on behalf of their vote.

Pl. Exh. 103. IVS tabulated the broker votes in accordance with the ADP Proxies, and did not verify

whether instructions had or had not been received from the beneficial shareholders. C. Dunlop Tr. at

93-96.

65. Although the "10-day rule" is based on an New York Stock Exchange or Securities and

Exchange Commission rule, Mr. Riley acknowledged that IFSB is regulated by neither organization.

April 28, 2006 Hearing (Riley) at 145. Mr. Riley also testified that in common parlance, because two

slates were in competition, a contest did exist at the IFSB Shareholders Meeting. April 28, 2006

Hearing (Riley) at 146.

66. The Court finds that the broker "routine" votes (giving full authority to Management) were

in violation of the Proxy Statement. Mr. Riley testified that the Proxy Statement Q & A about broker

votes was information upon which the shareholders were entitled to rely. April 28, 2006 Hearing

(Riley) at 143-44. Mr. Riley further testified that in his own experience acting as an Inspector of Elections, he disallowed cumulative voting when it conflicted with the proxy materials disseminated to shareholders. April 28, 2006 Hearing (Riley) at 144. Mr. Freedman testified that of the 940,953 "Full Authority to Cumulate" Proxies (see Trial Exh. 12, IVS 00325), approximately 396,000 shares were voted based upon broker "routine" votes without instruction from the beneficial owner. May 4, 2006 Hearing (Freedman) at 82. Mr. Riley testified that it was not a basis of his opinion that instructions were received, and that it is "unknowable" how many broker votes were cast without instruction from the beneficial owners. April 28, 2006 Hearing (Riley) at 138-39, 157.

67. As a result of the subsequent allocation of the "Full Authority" votes on October 28, 2005, two of the Management Nominees were elected to the IFSB Board. The Court finds that all of the shares voted for the Management Nominees are tainted by the conduct of the Individual Defendants described above, including their involvement in the Committee Letter, the McPhail/Douglass Letter, the agreement for the purchase of the Participant Shares, and the irregularities in the meeting itself.

## ACTING TOGETHER

68. The Court finds that the confluence of the foregoing events and the results of Shareholders' Meeting are not mere serendipity. The Court finds that the Defendants Wilmot, Jordan and Batties were determined to prevent the election of the Bender Nominees, as the first step in ridding the Bank of Bender. As Defendant Batties stated in an e-mail in December 2005 in regard to the Shareholder's

Meeting, "[w]hile the most recent victory was very good, it is not the final nail in mr. bender's coffin. Much work needs to be done to rid the bank of this plague." In advance of the Shareholders' Meeting, the Defendants' approach was two-pronged: to sway the vote by dissemination of misleading correspondence and proxy materials, and to buy the vote by reaching an agreement with Doley for the Participant Shares.

69.  To that end, Defendant Batties retained Impact Strategies for "grass roots" and public relations strategies, which resulted in dissemination of the Committee Letter on May 4, 2005. Both Jordan and Wilmot were also apparently involved in this endeavor (see Pl. Exhs. 104 and 107). Batties, Jordan and Wilmot all participated in, and failed to correct, the misinformation which was submitted to the OTS in response to the May 10, 2005 inquiry about the Committee Letter. That misinformation was repeated in the October 21, 2005 McPhail/Douglas Letter (also with participation by Mr. Chambers and Impact Strategies), and the October 4, 2005 Update and Proxy Statement.

70.  At some time in September 2005, Batties and Jordan sought to convince Doley to vote for the Management Nominees.  Apparently not confident that he would do so, Jordan and Wilmot embarked on a plan to buy the shares.  Given the personal relationships among Doley and Jordan on one hand, and Thompson, Wilmot and Cobb on the other, the Court finds that Thompson's involvement in this matter is not a mere coincidence.  Indeed, Defendant Batties testified that Mr. Thompson asked him to recommend banking counsel, and one of the names he suggested was Mr. Weitzel, who Mr. Thompson retained.  April 21, 2006 Hearing (Batties) at 46.  Similarly, it was

Defendant Batties who waived the conflict and allowed IFSB counsel Mr. Royer to represent Mr.

Doley in an OTS inquiry. Royer Tr. at 95-97.[22]

71. After meeting with Bender on October 19, 2005, Thompson contacted Doley to inquire

about purchasing shares. Thompson Tr. at 81.[23] The transmittal of the draft Purchase Agreement to

Wilmot's assistant, (Trial Exh. 66), the drafts of the purchase agreement with both Wilmot's and

Thompson's names (Trial Exhs. 70-77), the Delany proxies to Wilmot (Trial Exh. 63, 64), combined

with the flow of the $165,000 through various Wilmot accounts (Trial Exh. 78; Pl. Exhs. 114-117),

refute Wilmot's testimony that he was not involved in the agreement to purchase the Participant Shares,

and the resulting vote of those shares for the Management Nominees.[24]

72. The Participant Shares represented approximately 9.9% of IFSB (Trial Exh. 81), and the

Thompson shares represented another 7.19% of IFSB (Trial Exh. 2 at p. 20). Without regard to the

_____

[22] Another troubling aspect of these interrelationships is that Mr. Royer's representation of Mr. Doley in the OTS matter has not been disclosed to the OTS -- Mr. Royer has drafted correspondence to the OTS on Mr. Doley's behalf, without signing the correspondence. Royer Tr. 95-102.

[23] Given Mr. Thompson's testimony on this issue, that the first contact with Doley occurred after the meeting with Bender (Thompson Tr. at 81), the Court rejects Wilmot's testimony that Doley had been speaking to Thompson "for months." April 21, 2006 Hearing (Wilmot) at 109.

[24] *[Note to the Court : The flow of the $165,000 is one of the areas which will require further inquiry by way of deposition prior to the trial on the merits. Mr. Thompson and Defendant Wilmot will have to be deposed further on this issue (given what was revealed by the BB&T and United Bank subpoenas), as well as Ms. Woods, who is Wilmot's assistant, given Defendants' proffer of Defs. Exh. 231. Although Defendants offered to make Wilmot and Woods available for deposition on the afternoon of May 12, 2006, counsel for Plaintiffs declined to "squeeze in" the depositions at that time. Additionally, Wilmot consistently testified that he was not involved in the share purchase transaction, but rather, it was Mr. Weitzel (banking counsel for Mr. Thompson) and Mr. Thompson, acting directly with Mr. Doley. It is likely that Mr. Weitzel will have to be deposed regarding this issue as well].*

issue of "change of control" implicated by a combination in excess of 10% of the shares, the fact that an

agreement was reached whereby the Participant Shares were to be purchased by Thompson or

Wilmot, conditioned on voting the Participant Shares in favor of the Management Nominees, would

have been material information to the IFSB shareholders in deciding whether or not to vote in the

election, and how to vote. This agreement was not disclosed in the Proxy Materials, nor did Wilmot,

Jordan, Doley (or any of the owners of the Participant Shares) file a 13D disclosing their plan, nor did

Thompson amend his 13D. <u>See generally</u> May 4, 2006 Hearing (Freedman) at 89 (no 13D filed by

Doley or his clients).

73. The goal of the foregoing plan was to defeat the election of the Bender Nominees. To

consummate the plan, several additional steps had to be accomplished at (or after) the Shareholders

Meeting: the Participant Shares had to be voted for the Management Nominees; the broker votes

without instruction had to be voted for the Management Nominees; and the Master Ballot proxies had

to be allocated after the close of the Meeting. All of these steps, each in violation of the Proxy

Statement, the Bylaws, or Robert's Rules, were accomplished, and could only be accomplished, with

the approval of Defendants Youngentob, Cobb and Fitzgerald.

74. On October 31, 2005, Batties sent an e-mail to "wfuller" at IFSB, in which he states "*[w]e

are working on a final resolution*   to mr. bender that I hope we can implement within the next week

or so." Pl. Exh. 110 (emphasis added). Although this e-mail is not specific, it is consistent with the

Court's Finding that the Defendants were working together and with others for the express purpose of

defeating the Bender Nominees.

## FALSE AND MISLEADING STATEMENTS

75. In light of the foregoing Findings, the Court finds that the following statements (contained in materials disseminated to the shareholders) are false or misleading, or omit material facts necessary in order to make the statements not false or misleading:

76. The Committee Letter, dated May 4, 2005, is misleading in its entirety because it fails to identify the real source of the letter as IFSB or Impact Strategies, and falsely states that "we are an independent group" and "acting separately from IFSB."[25] In addition, the following statements in the Committee Letter are false or misleading, or omit material information:

  a. "the originally established goals of Independence Federal Savings Bank that have recently been threatened by the personal greed of specific individuals–individuals who have no regard not only for the African American community, small businesses, depositors and local homeowners, but not even for their fellow shareholders in IFSB";

  b. "Acting separately from IFSB, we aim to expose the motivations of those wishing to harm IFSB's mission";

  c. "We must prevent the individuals trying to line their own pockets at the expense of IFSB's important mission and rich history";

  d. "Mr. Bender pursues a personal agenda when he realizes that his reformer allies ... will not allow him to dominate IFSB's affairs. Mr. Bender starts making demands on Management as though he is in control of the bank. Frustrated that he cannot dictate policy ... . He forges ahead with this course in utter disregard for fellow shareholders. ... he will simply use bully tactics and lies ... . These cronies will then do his bidding ... ." (Timeline page 1);

---

[25] The impact of the misrepresentation of the source of this letter is aggravated by the fact that the letter identifies the "senders" as prominent members of the local religious community, who are described as acting "independently."

e.      "the OTS ... acquiesces in Mr. Bender's attempt to seize control of the bank
        without offering a fair price to shareholders or otherwise disclosing to
        customers that he's trying to control their bank.  Thus while Bender's bank
        discriminated with regard to credit and lending ... ." (Timeline page 1-2);

f.      "the OTS-in a move friendly to Mr. Bender and hostile to a minority institution
        designates IFSB as a 'problem institution' in 'troubled condition' ..." (Timeline
        page 2);

g.      "a U.S. District Court finally rebukes him, dismissing his suit and stating that all
        along it was Mr. Bender's strategy to ... scare off other potential merger
        partners like Carver" (Timeline page 2);

h.      "Instead he continues buying shares to vote his cronies onto the Board.  IFSB
        decides to sue Bender for intentionally interfering with the merger deal, plus
        other violations of law.  Again, the OTS sits back and refuses to help IFSB or
        rein in Mr. Bender despite his own violations of law" (Timeline page 3);

i.      "The bank attempts to settle legal action with Mr. Bender ... government
        officials ... have allowed Mr. Bender and his allies to skirt policies and
        practices" (Timeline page 3);

j.      "If it were not for the excessive legal fees caused by Bender, IFSB would have
        shown a net profit for FY2004" (Timeline page 3);

k.      "Although [Bender's nominees to the Board] are both African Americans, they
        are mere puppets of Bender's with no apparent ties to banking, required to do
        what he tells them" (Timeline page 4);

l.       Bender "wished to either merge IFSB into his own 'shakily-run' bank, or
        worse, make it a fiefdom in his local empire, likely with minority faces as fronts,
        until he can otherwise dispose of it" (Morton Bender Background, third bullet
        point);  "He has succeeded in degrading IFSB, driving down the value of the
        bank's shares and attacked the mission of this bank began [sic] in 1968.  With
        the bank's stock degraded by his activities, he can buy it at a cheaper price"
        (Background, fourth bullet point);  "He has ... forced IFSB to sue him ... [h]e
        has engaged in ruinous insurgent tactics, filed misleading securities filings with
        the OTS ... and threatened more lawsuits if he cannot view secret, private
        shareholder ballots so he may bully small and minority shareholders who didn't
        vote in his favor" (Background, fifth bullet point).

77. Similar to the Committee to Letter, the October 21, 2005 McPhail/Douglass letter fails to identify the participation of the Bank's employees and Impact Strategies in its creation and dissemination. In addition, the Court finds that the following statements are also either false or misleading:

> a. the assertion of Bender's "record history involving other banks including a black bank pushed to failure";
>
> b. the assertion of "severe violations of banking law and illegal practices by Bender and his Columbo Bank";
>
> c. the assertion that "[T]he only time we are aware we got into U.S. District Court with Bender – though expensive – Independence Won, Bender Lost!";
>
> d. the assertion that "we can only presume that [the Bender Nominees'] basic qualification, based on past events, is to serve Bender loyally to affect his admitted takeover scheme"; and
>
> e. the assertion that "OTS has behaved so contrary to banking laws, security regulations and sound public policy to facilitate handing *Our Bank* to this Bender character."

78. The October 21st letter's repeated references to the May 9, 2005 letter from the OTS to Bender is misleading in its blatant omission of (or any reference to) the May 10, 2005 OTS letter to IFSB, or the September 14, 2005 letter from the OTS, advising Bender that "after careful consideration of the relevant facts known to OTS" no enforcement action would be taken with regard to the allegations set forth in the OTS's May 9th letter. The omission of any reference to the May 10, 2005 letter to IFSB is particularly misleading, given that evidence in this case has revealed that the OTS was correct in its concern that employees or agents of the Bank were involved in the creation and dissemination of the Committee Letter.

79. The Court finds that various statements in the Update and the Proxy Statement (Trial Exhibit 2), as described below, are false, misleading, or omit material facts..

80. The Update is a letter to the IFSB Shareholders, dated October 4, 2005, and is signed by Defendants Jordan and Batties. Page 2 of the Update refers generally to the letters from the OTS dated May 9, 2005 and May 10, 2005, and the OTS letters dated September 14, 2005. In reference to the September 14th letters, the Update states, "the OTS stated that it has determined not to pursue enforcement action against Morton Bender or against any party ... ." The inference of this statement is that the OTS' inquiry was focused on Morton Bender, and on unnamed other "part[ies]," and that the Bank, its officers, directors and employees had no participation in the events leading up to the OTS inquiry.

81. On pages 5 and 22, the Proxy Statement addresses (in more detail) the letters from the OTS dated May 9, 2005 and May 10, 2005, and the OTS letters dated September 14, 2005. With regard to these letters, the Proxy Statement states on page 5:

> On May 9, 2005, the OTS sent a notice of intent to issue a cease and desist order and assess civil money penalties to Bender stating that he had distributed a letter to shareholders that contained disclosures that appeared to the OTS to be false and misleading (See Appendix B to this proxy statement.) On May 10, 2005, the day before the scheduled May 11, 2005 Annual Meeting, the OTS delivered a letter to the Board of Directors of Independence Federal (see Appendix C to this proxy statement) stating that a community group had also sent a letter with apparent false and misleading statements. Management has advised the OTS that that community group was not associated with the Bank or its management. As a result of these two findings, the OTS stated that it "strongly believes that the Annual Meeting should be postponed to enable the shareholders to receive and evaluate sufficient accurate information to permit each to cast an informed vote."

> Independence Federal cooperated with the OTS and furnished the information requested by the OTS in its May 10, 2005 letter. **By letters dated September 14, 2005, the OTS stated**

36

**that it has determined not to pursue enforcement action with respect to the matters discussed in its letters of May 9 and 10, 2005.**

Trial Exh. 2 at p. 5 (emphasis in original); see also Trial Exh. 2 at p. 22 (basically repeating the same language). The reference to IFSB's "cooperat[ion] with the OTS" is misleading on several grounds. Bender also cooperated, as evidenced by his June 20, 2005 letter to the OTS (Pl. Exh. 113), and the failure to mention Bender's cooperation is misleading. Far more misleading however, is the statement that IFSB cooperated, and "furnished the information requested by the OTS in its May 10, 2005 letter." As set forth above, IFSB limited the information supplied to the OTS to the voluntary responses by the Directors and a limited number of officers. Both the response to the OTS and the description of that response in the Proxy Statement ("Management has advised the OTS that that community group was not associated with the Bank or its management.") are patently misleading, given Mr. Chambers' direct involvement in the Committee Letter, and the Court's conclusion that Mr. Batties was also involved, or at the very least, had knowledge that the letter was drafted and disseminated by Impact Strategies, with Mr. Chambers' participation.

82. The Q&A contained in the Proxy Statement, which requires instructions to brokers, is false and misleading because the Bank failed to tabulate the vote in accordance with that Q&A

83. The Proxy Statement also contains the following false and misleading statements, or omissions of material fact:

  a. the depressed stock is a result of increased expenses, "including a significant portion of legal fees in excess of $3,000,000 alone in 2004, which Independence Federal incurred in its efforts to protect the Bank and its shareholders from Bender's actions" (page 2);

b.      that Bender has sued the Bank's directors "without citing any factual basis. These actions and baseless pejorative statements also damage the Bank's reputation in the community" (page 3);

c.      "Bender ultimately is seeking to acquire Independence Federal as cheaply as possible, *which is directly contrary to the best interests of the other shareholders of Independence Federal.*    As stated in an opinion dated January 15, 2004, by a United States District Court Judge: "Mr. Bender testified quite frankly that he wants to acquire the Bank for the least amount possible.  He agreed that the Board of Directors wants to sell the Bank for the greatest amount possible, for the best benefit to all of the shareholders." (page 3) (Emphasis added);

d.      if the Bender Nominees are elected, Bender will obtain "Controlling Influence" over IFSB "to the Detriment of All Other Shareholders" (page 3);

e.      "it is quite possible that Bender desires a merger of Independence Federal and Colombo Bank" (pages 3-4).

f.      Page 20 of the Proxy Statement fails to identify the Doley- related "Participant Shares" block of stock in its identification of "groups owning in excess of 5%."[26]

84.    The Proxy Statement is also misleading in that it blames Bender for the Bank's expenditure of legal fees.  In response to Bender's objection to the proposed merger with Carver, the Bank embarked on a three-pronged attack in May 2004 (lawsuit, poison pill, holding company restructure) that caused the Bank to incur substantial legal fees and expenses.  To the extent that the Proxy Statement at page 2 implies that "a significant portion" of the 2004 legal fees in excess of $3 million were necessary to "protect" the Bank and its shareholders from Bender, the statement is a blatant distortion: legal fees were incurred as a result of three civil lawsuits against the Bank involving

---

[26] Defendant Wilmot viewed this block of stock as one which Mr. Doley owned or "had control over."  April 21, 2006 Hearing (Wilmot) at 74-75.

the Washington Teachers Union, as well as the litigation instituted in this Court on May 5, 2004 *against* Bender.  Not one of those four cases was instituted by Bender, and only one even involved him.  See generally, Pl. Exh. 113 (MB 5327-5328).  In addition, although the Proxy Materials attribute the failure of the Carver Merger to Bender, it was the OTS that denied the application for the Carver merger.  Even prior to the OTS denial of the merger application however, Carver demanded a lower price than that which had been agreed to, and the IFSB Board refused.  See Pl. Exh. 113 (MB 05339).

85.  The Court finds that the false and misleading statements identified above were material to the shareholders in determining whether to vote, and if so, how to vote, and thus, they have tainted the shareholder vote at the October 26, 2005 meeting.

### THE NEXT MEETING

86.  At the time of her testimony on April 21, 2006, Defendant Jordan testified that the next Annual Meeting of Shareholders was then scheduled for May 17, 2006, "because the OTS always encourages us and tries to get us to do that ... [a]t the earliest day possible."  April 21, 2006 Hearing (Jordan) at 49.  Ms. Jordan also testified that the Board (by a five to four vote) nominated a slate of directors to replace Nelson Deckelbaum and Elliott Hall.  April 21, 2006 Hearing (Jordan) at 49-50.  Defendant Batties is one of the three nominees.  April 21, 2006 Hearing (Jordan) at 50.  Ms. Jordan further testified that the proxy materials for the new meeting are "being worked on."  April 21, 2006 Hearing (Jordan) at 49.   At the April 28, 2006 Hearing, counsel for the Defendant Directors advised the Court that the Annual Meeting would not be held on May 17, 2006, "because of OTS objections to the management proxy materials ... . [Those objections] mirror[] some of the issues in this case, [and so] we do not believe it is unreasonable to assume that the OTS is waiting for [the Court's] ruling in this

case before proceeding on approving the management proxy there." April 28, 2006 Hearing at 7. The Court has most recently been advised by counsel for the Defendant Directors that the Defendant Directors have scheduled the meeting for no earlier than July 17, 2006.


## CONCLUSIONS OF LAW

87.   Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder provide that any person, and any group acting together for the purpose of acquiring, holding, or voting securities of a company, who acquires, either directly or indirectly, the beneficial ownership of more than 5 percent of a class of securities registered under Section 12 of the Exchange Act must, within ten days, file a statement on Schedule 13D with the company's primary regulator and with any exchange where the security is traded.

88.   A Schedule 13D must set forth the purpose of acquiring the issuer's stock, and the acquiring person's plans, intentions and agreements with respect to the issuer.

89.   Rule 13d-101 requires "reporting persons" to describe any contacts, arrangements, understandings, *or relationships* between themselves and any other person with respect to the issuer, "naming the persons with whom such contracts, arrangements, understandings, or relationships have been entered into."

90.   A primary purpose of Section 13(d) is to alert and inform companies, their shareholders and the investing public generally regarding accumulations in stock which might represent a potential

40

shift in corporate control or a potential change in the company's direction, and to compel full disclosure of information critical to shareholders in making informed investment decisions.

91. Rule 13(d)(1) provides that "when two or more persons agree to act together for the purpose of ***acquiring, holding, voting or disposing*** of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of Section 13(d) and (g) of the Exchange Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons." (Emphasis added). Thus, Wilmot and Jordan have violated Section 13(d) of the Exchange Act because they have failed to file a Schedule 13D, setting forth their specific plans and intentions with respect to IFSB, including but not limited to the details of the agreement among Wilmot, Jordan, Doley and Thompson for the purchase of the Participant Shares, which resulted in ***the voting*** of those shares in favor of the Management Nominees.

92. The Defendants' violations of Section 13(d) deprived all IFSB shareholders, including the Benders, from information necessary to ensure a fair vote at the Shareholders' Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly considered by all shareholders. The information which was not provided in any Schedule 13D was essential to informed shareholder decisions with respect to voting IFSB shares at the Shareholder Meeting, and were also material to Bender's own communications with the shareholders.

93. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and the rules and regulations promulgated thereunder, as well as 12 C.F.R. § 569, govern the solicitation of proxies in this case. Pursuant to those statutory and regulatory provisions, no solicitation of a proxy shall be made by means

41

which, *inter alia*, contains any statement that is false or misleading with respect to any material fact, or omits to state any material fact.

94. Pursuant to 17 C.F.R. § 240.14a-9, no solicitation (not limited to proxy materials) may be made by means of any communication which is false or misleading, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

95. Section 14(a) of the Exchange Act, and the rules and regulations promulgated thereunder, demand full and fair disclosure in proxy solicitations, and was enacted to prevent management (or others) from obtaining authorization for corporate action by means of inadequate or misleading disclosures.

96. Pursuant to 17 C.F.R. § 240.14a-9, no solicitation may be made by means of any communication "which is false or misleading," or "which omits to state any material fact necessary in order to make the statements therein not false or misleading." The Committee Letter and the October 21, 2005 are solicitations subject to 17 C.F.R. § 240.14a-9. Both letters solicit support for the Management Nominees, and/or against the Bender Nominees. As set forth above, those solicitations contain false and misleading information, the most fundamental of which is the failure to identify the role of IFSB officers, employees, and agents in the creation and dissemination of those solicitations.

97. The Director Defendants and Defendant Batties have violated Section 14(a) of the Exchange Act by their knowing dissemination of materially misleading Proxy Materials, as described above in the Findings, and, as to Defendant Batties, by his participation in the dissemination of the Committee to Save Letter.

42

98.  The Director Defendants and Defendant Batties' violations of Section 14(a) deprived all IFSB shareholders from information necessary to ensure a fair vote at the Shareholders' Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly considered by all shareholders.

99.  As set forth above, the election of the Management Nominees violated the Proxy Materials, the pertinent IFSB By-laws, and Robert's Rules of Order, by which the Shareholders' Meeting was governed.  As a result, shares in a number material to the outcome of the election were improperly counted in favor of the Management Nominees.  As shareholders, Plaintiffs are entitled to have meetings conducted in accordance with the Proxy Statement, By-laws, 12 C.F.R. §552.6(a), and Robert's Rules of Order.  Plaintiffs were also entitled to have the Bender Nominees voted on in a fair and orderly manner.

100.  As a result of the Director Defendants' and Defendant Batties' actions in violating Section 13(d), violating Section 14(a), and failing and refusing to conduct the election in a fair manner, the Defendants have deprived Plaintiffs and the other shareholders of a fair vote for the election of directors.

101.  The Defendants are in the process of planning the next annual meeting (now apparently set for July 2006), and have nominated two directors (including Defendant Batties) to replace board members Nelson Deckelbaum and Elliott Hall.  As a part of that process, the Defendant Directors and Defendant Batties are in the process of preparing, and will disseminate, new proxy materials.  Plaintiffs have been, and will be irreparably harmed if the annual meeting is allowed to take place before this Court has an opportunity to adjudicate the merits of this dispute, including the invalidation of the

October 26, 2005 Shareholders Meeting. In addition, issues relating to the misstatements and omissions in the October 2005 Proxy Materials, the Committee Letter, and the McPhail/Douglass Letter must be adjudicated prior to the dissemination of any new proxy materials. To allow new proxy materials to be disseminated which repeat the misleading statements, and/or fail to acknowledge the Defendants' complicity in the Committee Letter, and the McPhail/Douglass Letter, will cause Plaintiffs further irreparable harm.

102. Indemnification of officers and directors for Federal Savings Associations is governed by 12 C.F.R. §545.121. Pursuant to that regulation, IFSB may not indemnify its officers and directors "unless the association gives [the OTS] at least 60 days' notice of its intention to make such indemnification."

103. Under 12 C.F.R. §545.121, an association may authorize an advance payment of expenses only if "a majority of the directors of a savings association concludes that, in connection with the action, any person ultimately may become entitled to indemnification." Under the regulation, before making advance payment of expenses, "a majority of the directors" must conclude that the person would ultimately be entitled to indemnification" which involves final judgment on the merits in the person's favor, or if "a majority of the disinterested directors of the savings association determine that he or she was acting in good faith within the scope of his or her employment or authority... ."

104. After this lawsuit was instituted, the five Defendant Directors voted in favor of the Board Resolution to allow advance payment of expenses and legal fees for all of the Defendants in this action. April 21, 2006 Hearing (Jordan) at 48. The four remaining directors voted against advancing fees. None of the Defendant Directors recused themselves from this vote. In that the Director Defendants

44

are not independent (as contemplated by the regulation), the Court finds that the Board Resolution to advance fees should have been approved only if the majority of the directors believed in good faith that *all* of the Director Defendants and Defendant Batties would prevail in this action, and thus, ultimately be entitled to indemnification. In that at least two of the five directors voting in favor of the resolution (Jordan and Wilmot) had to know that their involvement in the matters alleged in the Complaint was such that the likelihood of a final judgment on the merits by Bender was strong, any vote by them to advance fees was in bad faith. Without the votes of Jordan and Wilmot to advance fees, the resolution would have failed by vote of four to three.

105. As set forth above, the evidence to date in this case has demonstrated that the conduct in which the Defendants were involved was willful and intentional, and not performed in good faith, but rather, for the express purpose of injuring Plaintiffs and defeating the Bender Nominees at all costs, *i.e.,* "to rid the bank of this plague." The Jordan and Wilmot vote in favor of the Board resolution to advance fees are thus *ultra vires* . Clearly, the Bank's directors are required to exercise their good faith judgment at all times; the self-serving resolution to advance fees – under the circumstances of this case – is but another bad faith attempt to damage Bender (and the Bank). Because the Court finds that Bender has a strong likelihood of success on the merits, it further finds that it is inappropriate for the Bank to advance fees which may not be recoverable at the conclusion of this case.[27] Accordingly,

---

[27] *[Note to the Court: The regulation requires that each defendant for whom fees are advanced must agree in writing to repay the fees in the event of an adverse outcome. It is unclear whether all of the Individual Defendants have signed such agreements. In any event however, there is no evidence that any of the Individual Defendants are financially able to honor an agreement to repay the fees to the extent such agreements are in existence.]*

the Court hereby enjoins Defendant IFSB from advancing the expenses of the defense of this action on behalf of the Director Defendants or Defendant Batties.

106.   Based on the authorities set forth in the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction (Docket # 3), and the Reply in further support thereof (Docket # 31),  the Court concludes that the Plaintiffs are likely to succeed on the merits of their claims.  The Court finds that based on the exhibits and testimony offered at the April and May hearings, the Plaintiffs have adequately demonstrated the likelihood that the Individual Defendants have violated Section 13(d), Section 14(a), and the applicable IFSB rules for governing shareholder meetings.

107.   The Plaintiffs have been and will continue to be, irreparably harmed by the actions of the Defendants, and Plaintiffs have no adequate remedy at law for any of the Defendants' conduct.

108.   The Defendants will not be irreparably harmed if the Court grants the preliminary injunctive relief sought by the Plaintiffs.

109.   Proper proxy materials cannot be accurately prepared and disseminated, and the next annual meeting should not be held, until this case is adjudicated on the merits.  Thus, the public interest weighs in favor of granting the preliminary injunctive relief requested by the Plaintiffs.

Accordingly, it is this ___ day of _____, 2006, hereby

ORDERED, that the Benders' request for preliminary injunctive relief be, and it hereby is, GRANTED as follows:

ORDERED, that no proxy materials be prepared or disseminated to the shareholders until further order of this Court; and it is further

46

ORDERED, that the Director Defendants shall not cause the Bank to hold an Annual or Special Meeting of the Shareholders until further Order of this Court; and it is further

ORDERED, that  Defendant IFSB shall not indemnify or make advance payments to the Director Defendants and Defendant Batties for any expenses or attorneys fees in  this action; and it is further

ORDERED that this Order shall be filed forthwith in the Clerk's Office and entered of record.

_____
Rosemary M. Collyer
United States District Judge

47

copies to

Dale A. Cooter, Esq.
Donna S. Mangold, Esq.
Cooter, Mangold, Tompert
 & Karas, L.L.P.
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, DC 20015
efiling@cootermangold.com


Haig V. Kalbian, Esq.
Brawner Building
888 17th Street NW
Suite 1000
Washington DC 20006
hkalbian@kalbianhagerty.com


Peter Strand, Esq.
Shook, Hardy & Bacon, L.L.P.
Hamilton Square
600 14th Street, N.W.
Suite 800
Washington, D.C. 20005-2004
pstrand@shb.com

Respectfully submitted,
COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
*Morton A. Bender and Grace M. Bende*  r

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of May 2006, a copy of the foregoing **ORDER**

**GRANTING PRELIMINARY INJUNCTION** was served electronically on:


Haig V. Kalbian, Esq.
Brawner Building
888 17th Street NW
Suite 1000
Washington DC 20006
hkalbian@kalbianhagerty.com

Peter Strand, Esq.
Shook, Hardy & Bacon, L.L.P.
Hamilton Square
600 14th Street, N.W.
Suite 800
Washington, D.C. 20005-2004
pstrand@shb.com




_____/s/_____
Dale A. Cooter