# EXHIBIT A
## EXCERPTS OF 4/21/06 HEARING
## (CAROLYN JORDAN TESTIMONY)

8

1  A.    I don't know if I made it at 11 o'clock.  I don't think

2  so.

3  Q.    Did there come a time when you made a decision that the

4  meeting would not go forward at the appointed hour?

5  A.    Yes.

6  Q.    When?

7  A.    Don't know what time that was.

8  Q.    Well, was it before 11:30?

9  A.    Could have been.  I don't know, I did not check my watch.

10  Q.    So that we're clear, the people are assembled at

11  11 o'clock, you didn't come in and start the meeting, you were

12  in the room next door?

13  A.    Correct.

14  Q.    And among the things that you were doing in the room next

15  door was talking to Mr. Royer, one of the lawyers for the bank,

16  is that right?

17  A.    And Mr. Brooks.

18  Q.    And Mr. Brooks, his partner?

19  A.    Yes.

20  Q.    Is it so that this decision that you made to postpone the

21  meeting you did unilaterally?

22  A.    Yes.

23  Q.    There was no board meeting, no board resolution, you just

24  did it, is that accurate?

25  A.    That's correct on advice of counsel.

1  Q.   Was it of any concern to you is the question to you how

2  they were going to vote?

3  A.   Well, I'm always concerned about how share holders are

4  going to vote but I don't know what you mean by concern.

5      Do you mean did I lose tears over it, did I lose sleep?

6  What are you, what are you looking for?

7  Q.   Now, I want to call your attention to the day before the

8  shareholders' meeting.  Shareholders' meeting was ultimately to

9  happen on the 26th at 11 o'clock.  Did you talk to Harold Doley

10 on the 25th?

11 A.   I don't recollect talking to Mr. Doley on the 25th.

12 Q.   Indeed when your deposition was taken you denied talking

13 to Mr. Doley on the 25th, is that right?

14 A.   I have said I had no recollection.

15 Q.   Have you had an opportunity to think about that since your

16 deposition?  Do you, did you talk to Doley on the 25th is the

17 question?

18 A.   I don't have a recollection of that.

19      MR. COOTER:  Your Honor, I'm going to show the

20 witness what is marked as Exhibit Number 101.  You don't have

21 the book.

22      May I approach the witness?

23      THE COURT:  Yes.

24 BY MR. COOTER:

25 Q.   I think it's in the supplemental book.  Take a look at 101

1    -- one, two, three, four, five times that day.

2       Do you see that?

3    A.    Yes.

4    Q.    And the number that you called in Irvington five times on

5    the 25th is that of Mr. Doley is it not?

6    A.    That is correct.

7    Q.    Now having looked at the long distance records does that

8    refresh your recollection that you were talking to Mr. Doley on

9    the day before the shareholder's meeting?

10   A.    No, it does not.

11   Q.    It does not.  You don't have any reason to challenge these

12   records do you as being --

13   A.    No.

14   Q.    -- as being inaccurate?

15   A.    No, I do not.

16   Q.    Well, isn't it a fact, ma'am, that there was a

17   conversation in the evening on the 25th between yourself and

18   Mr. Doley that was later joined by Mr. Wilmot?

19   A.    I have no recollection of that, that call.

20   Q.    Did you on the 25th discuss the notion that Mr. Doley

21   wanted to sell the stock he controlled?

22   A.    No, I did not.

23   Q.    Did you talk with anyone on that subject on the 25th?

24   A.    No.  I did not.

25   Q.    If the phone records reflect telephone calls do you have

1   any recollection what it was you would have been talking to

2   Harold Doley about the day before the shareholders' meeting?

3   A.   No, I don't recollect it.  As I said, I talk to him very

4   frequently.  I don't recollect anything about what these calls

5   were about.

6   Q.   Well, are you curious, does it strike you as curious as to

7   whether or not the day before the shareholder's meeting you

8   might have been talking about the bank?

9   A.   I don't think so.  There's nothing Mr. Doley doesn't know

10  about this bank.  I mean, we don't have extensive discussions

11  about the bank.

12  Q.   So you never have any discussion, you don't have

13  discussions about the bank, ma'am?

14  A.   Not extended discussions about the bank, no.

15  Q.   Actually --

16  A.   I may have assumed that Mr. Doley had already voted.  And

17  that might be why, you know, there hasn't been discussions.  It

18  didn't occur to me that at that time that he had not voted his

19  shares.

20  Q.   Is it so that whatever the conversations were on the 25th

21  you expected Mr. Doley to come to Washington to be present at

22  the shareholders' meeting the next day at 11 o'clock?

23  A.   That's correct.

24  Q.   So well, if you didn't talk to him how did you know he was

25  coming?

1  A.    Well, I think there's another call down here.  I don't

2  know, he could have told me that before.  Or he could have

3  called me later before the meeting and told me that he was

4  coming to the meeting.

5      I think I had asked him that question before was he coming

6  down and he did not give me an answer, he said he didn't think

7  so or he wasn't sure.

8  Q.    Would you confirm for me that from whatever source you

9  expected Doley to be at the meeting to vote at 11 o'clock on

10  the 26th?

11  A.    Yes, I did.

12  Q.    Did you know how he was going to vote?

13  A.    No, I did not.

14  Q.    Were you curious?

15  A.    You've asked me that question three times.

16          THE COURT:  Well, why don't you answer it this time.

17          THE WITNESS:  I didn't know how he was going to vote.

18  BY MR. COOTER:

19  Q.    Were you curious?

20  A.    I don't ask him those questions in general because he

21  never discloses anything like that to me.

22  Q.    Now, you get to the Mayflower some time before 11 o'clock,

23  right?

24  A.    Yes.

25  Q.    And you're expecting Doley to come and some time before

1   11 o'clock somebody told you Doley was running late.

2      Do you remember that?

3   A.   Correct.

4   Q.   You are in the next room, the adjoining room, you learn

5   Doley is running late and you're having a conversation with

6   Mr. Royer, do you remember that, at 11 or thereabouts?

7   A.   I was having a conversation with someone whoever was in

8   the room with me, but I don't know if it was at that time or

9   not.

10  Q.   Did it include Mr. Royer?

11  A.   I don't know.

12  Q.   Did you tell Mr. Royer Doley is running late in this

13  meeting next door, in the adjoining room.

14  A.   I don't know how that information came into the room.

15  Whether someone told me or whether someone told Mr. Royer, I'm

16  just not quite sure of that.

17     Someone told me he was running late.  It wasn't a big deal

18  at the time because we were already late.  I had no indication

19  that he wouldn't be at the meeting at all so it wasn't a big

20  concern at that time, no.

21  Q.   Is it not so, ma'am, that among the reasons to defer the

22  meeting and continue it was Doley was running late and you

23  wanted to give him an opportunity to get there to vote?

24  A.   I'm not sure that I knew that he hadn't voted.  But we

25  knew that he wanted to make the meeting.

1  Q.   Is it not so that among the reasons the meeting was

2  continued was that Doley was running late?

3  A.   Well, I don't know if that was so.  It wasn't the primary

4  reason.

5  Q.   Was it a reason?

6  A.   It could have been something we took into consideration,

7  but more than likely we were considering the challenges and

8  figuring out what we were going to do about those challenges

9  before the meeting was to begin.

10       MR. COOTER:  Your Honor, I've got the deposition of

11  Mr. Royer.  I'm going to offer this both substantively and by

12  way of impeachment.  One question and one answer.

13     Why wasn't the meeting --

14       MR. STRAND:  Wait, wait, I object.  This is

15  Mr. Royer's testimony?

16       MR. COOTER:  Yes.

17       MR. STRAND:  That's not proper impeachment.  You can

18  submit it later and argue it, but I don't think that we bring

19  it up right now.

20       THE COURT:  I think what you should do is ask the

21  witness questions about would it surprise you.

22       MR. COOTER:  I'm sorry?

23       THE COURT:  You should ask the witness questions

24  about would it surprise you if the Mr. Royer said.

25       MR. COOTER:  I'll do it that way.

1          I apologize.

2    BY MR. COOTER:

3    Q.    Would it surprise you if Mr. Royer testified on this issue

4    there was also an issue of Mr. Doley's arrival?  He had seven

5    or eight percent of the proxies.  We didn't want to

6    disenfranchise a significant number of shareholders from their

7    vote, that's pretty much it.

8          Did you know Royer had said that about why this meeting was

9    continued?

10   A.    No.

11   Q.    Does it surprise you today?

12   A.    No.  I mean, he has a recollection of what went on in his

13   mind.  I have a recollection of what I knew.  They may not be

14   similar.

15   Q.    In any event, there comes a time when Mr. Doley arrives

16   albeit late, do you remember that?

17   A.    Yes.

18   Q.    What time did he get there?

19   A.    I don't know.

20   Q.    Was it before or after you determined to postpone the

21   meeting?

22   A.    I don't recollect that.

23   Q.    You recall your deposition being taken in this case?

24   A.    Yes.

25   Q.    We have a copy for the witness.

1          MR. COOTER:  May we approach the witness for a

2    moment?

3          THE COURT:  Are you going to refresh her

4    recollection?

5          MR. COOTER:  Yes.

6          THE COURT:  All right.

7          MS. MANGOLD:  May I approach, Your Honor?

8          THE COURT:  Yes.

9          MS. MANGOLD:  Thank you, Your Honor.

10   BY MR. COOTER:

11   Q.   I want you to turn to page 91 if you would.  There's a

12   question it begins on line two, just read the answer to

13   yourself.  I'm really interested in that portion of the answer

14   that begins on line 13.  Read those five lines if you would.

15   A.   On page 91?

16   Q.   Yes?

17   A.   And you want me to read line what?

18   Q.   Thirteen through 18.

19   A.   Yes.

20   Q.   Does that refresh your recollection that you made this

21   decision to postpone the meeting, Doley hadn't arrived and he

22   arrived some time after you make this decision to postpone the

23   meeting?

24   A.   Lines 13 to 18 is what you're talking about?

25   Q.   Yeah, did he get there --

1  A.    Ask me the question again?

2  Q.    Did Doley get there after you decided to postpone the

3  meeting?

4  A.    Well, that's what it says, yes.

5  Q.    Is that consistent with your recollection is it not?

6  A.    I assume so.

7          THE COURT:  Wait, wait.

8      Is that consistent with your recollection or not?

9          THE WITNESS:  Well, we sure talk about minutes,

10  things like that, it's not.

11      All I can remember is that he arrived and I don't know

12  how many minutes it was after the meeting or after the decision

13  that he showed up in the room.

14          MR. STRAND:  Your Honor --

15          THE WITNESS:  And he asked me something and I just

16  tried to guess maybe it was five minutes after, maybe it was 10

17  minutes after we delayed the meeting.  I don't recollect it

18  specifically.

19          MR. STRAND:  Your Honor, since you're the only one

20  not looking at the passage, I could hand it up to you if you

21  would like her to read it because the passage is not as clear

22  as perhaps the question would suggest.

23          THE COURT:  All I need is for the witness to answer

24  the question posed.  That's all I need.  She doesn't need any

25  lawyer's assistance with it, she needs to answer the question.

1          She's the chairman of the board of the directors of the

2    bank, she's a lawyer, she can answer the question.

3    BY MR. COOTER:

4    Q.    In any event, when Mr. Doley arrived someone brings him

5    into this room where you were, right?

6    A.    I didn't see anybody bring him into the room.

7    Q.    Well, he ended up in that room where you were?

8    A.    I don't know how he got to that room.

9    Q.    However he got there did he end up there?

10   A.    Yes, he did.

11   Q.    And the two of you leave for the Prime Rib in a taxi cab?

12   A.    Correct.

13   Q.    And tell me if you would, what did you talk about in the

14   cab?

15   A.    Generalities.

16   Q.    What?

17   A.    Generalities.

18   Q.    Did you talk about the bank?

19   A.    No, we did not talk about the bank.

20   Q.    So it's your testimony Mr. Doley shows up in this room,

21   you get in a cab to go to the Prime Rib and you didn't talk

22   about the bank, is that right, that's your testimony?

23   A.    That's my testimony.

24   Q.    You get to the Prime Rib, just the two of you, and you're

25   ushered to a table.  Actually, it was a booth was it not?

35

1  A.    Yeah, well table and a booth.

2  Q.    Large enough for four?

3  A.    Maybe six people could have sat there.

4  Q.    Because you're expecting others isn't that so?

5  A.    No.

6  Q.    The two of you sit down, you're sitting there at the Prime

7  Rib, you're at lunch alone on the day of the shareholders'

8  meeting, what did you talk about?

9  A.    I really recollect anything that we talked about.

10  Q.    Did you talk about the bank?

11  A.    Not to my recollection, no.

12  Q.    So you don't believe that you talked about the bank at

13  lunch, the two of you?

14  A.    Not the two of us.

15  Q.    Mr. Royer joins next.  So now there's the three of you at

16  the Prime Rib, do you remember that?

17  A.    Yes.

18  Q.    Did you talk about the bank?

19  A.    No.

20  Q.    Talk about the meeting?

21  A.    No.

22  Q.    Talk about votes?

23  A.    No.

24  Q.    What did you talk about?

25  A.    Just generalities.  Royer and Mr. Doley talked to each

36

1  other.

2  Q.   Indeed, at your deposition do you recall when asked this

3  you said you probably talked about the opening season for the

4  Washington Nationals, do you remember that?

5  A.   That was, I do recollect that.

6  Q.   So you're talking about baseball but you're not talking

7  about the bank, is that your testimony?

8  A.   That's my testimony.

9  Q.   You're there at the Prime Rib, the three of you, now

10  nobody talking about the bank and you're trying to reach Dave

11  Wilmot, do you remember that?

12  A.   Yes.

13  Q.   Why?

14  A.   To find out how the announcement went with the

15  shareholders, did anybody object, were they all pleased that

16  they were going to have a free lunch.  That kind of thing.

17  Q.   You expected your shareholders to be pleased because the

18  bank was going to buy lunch, is that your testimony?

19  A.   I didn't say that.  I said I wanted to know if they were

20  pleased with having a free lunch and whether anybody objected

21  to us delaying the meeting.

22  Q.   Well, you ultimately did reach Mr. Wilmot on the phone did

23  you not?

24  A.   Yes.

25  Q.   What did you talk about?

1  A.    I asked him about the meeting.

2  Q.    Well, in your deposition is it so that you told me you

3  didn't talk about anything on the phone with Mr. Wilmot?

4  A.    Nothing in specific except what I told you. I just called

5  him to find out how the announcement went at the shareholder

6  meeting.

7  Q.    Did you invite him to lunch?

8  A.    Yes, I asked him what he was doing because I thought he

9  was still over at the hotel but it turned out he wasn't.

10  Q.    He was at his office was he not?

11  A.    Yes.

12  Q.    So you say why don't you come on over here for lunch?

13  A.    Yes.

14  Q.    And he joined you?

15  A.    Yes.

16  Q.    Now they're four of you?

17  A.    Yes.

18  Q.    What you talk about?

19  A.    Well, most of the time these people spend time on their

20  cell phones.  They were not in any general discussion.

21  Q.    Was Mr. Doley on his cell phone that day from the Prime

22  Rib?

23  A.    Yes.

24  Q.    Who was he calling to?

25  A.    I don't know.  He did not disclose that to me.  And

1   generally he got up and left the table, so I don't have any

2   knowledge of that.

3   Q.   When the four of were you at the table, what did you talk

4   about?

5   A.   I don't have any recollection of what we talked about and

6   specific.

7   Q.   Did you talk about the bank?

8   A.   No, that was not the topic of our conversation.

9   Q.   Talk about the shareholders?

10  A.   No, we didn't.  I did not talk about the shareholders with

11  anyone.

12  Q.   Talk about the vote?

13  A.   No, we didn't know what the vote was.  Nothing to talk

14  about.

15  Q.   Did you talk about a potential buyer for Mr. Doley's

16  stock?

17  A.   No, not in any conversation with me.

18  Q.   Did you overhear a conversation with Mr. Doley and any one

19  about a buyer for the stock?

20  A.   I heard snippets of a conversation as I would move around

21  in the room or come back to the table.  There was a discussion

22  of, it was Mr. Doley I guess inquiring whether there would be

23  anyone interested in buying his stock and that he was

24  interested in selling.

25  Q.   You heard Mr. Doley tell someone and the someone is Dave

1  Wilmot is not that he wanted to sell this block of stock that

2  he controlled, right?

3  A.    That he was interested in.

4  Q.    And did Mr. -- how if at all did Mr. Wilmot respond to

5  Mr. Doley's interest in selling this block?

6  A.    I don't remember what his response was.

7  Q.    Well, did you inquire as to what this was all about, this

8  sale about the block of stock at lunch before the shareholders'

9  meeting?

10  A.    No because they were talking about something in the future

11  that didn't concern me.  I wasn't a buyer nor was I a seller so

12  it really wasn't something --

13  Q.    Were you curious as to what this conversation was all

14  about this big block of stock he's going to move just before

15  the shareholders' meeting?

16  A.    No, there was no indication that any block of stock was

17  going to move to my knowledge before the shareholders' meeting.

18  Q.    When you're at the table you told me about this

19  conversation you overheard between Mr. Doley and Mr. Wilmot

20  when the four of you were all sitting there, did you talk about

21  the bank?

22  A.    No.

23  Q.    The four people?

24  A.    No.

25  Q.    So it's your testimony that you left the Mayflower, went

1  different from those rules, then those, the exchange rules

2  would be the ones that you, the brokers would be following.

3  They would not necessarily -- we don't instruct them how they

4  are to count votes.  They do it based on the New York Stock

5  Exchange rules.

6      So it would appear maybe they didn't, they thought this was

7  a contested election.  I don't know why the lawyers did that or

8  why that was on the back of the broker card but it's not

9  accurate.

10  Q.   When these challenges came up in the course of the meeting

11  that you were chairing after 3 o'clock is it so that you simply

12  ruled the challenges out of order?

13  A.   Number one is Mr. Bender had a lot of time to try to put

14  this on the agenda if he wanted to.  It was not on our agenda

15  and it was not something that we had to act on that day.

16  Q.   Did you rule the challenges --

17  A.   I ruled it out of order because he should have been suing

18  the brokers or somebody else on that issue because we don't set

19  those rules.

20  Q.   So that it's --

21  A.   So it was out of order for them to raise that in our

22  meeting.

23  Q.   I'm trying to get at what happened, ma'am.  Is it so he

24  raises the challenges --

25  A.   And was overruled.

1  Q.   And there was a vote was there not?

2  A.   Yes.

3  Q.   And the vote was five to four?

4  A.   Correct.

5  Q.   And all five of the people who voted in favor of that of

6  advancing expenses are defendants in this case?

7  A.   That is correct.  The Bender people on the board voted

8  against it.

9  Q.   All of the directors who are not defendants in the case

10  voted no, is that right?

11  A.   The Bender people, they're the Bender people on the board,

12  they all voted against the expenses.

13  Q.   Did any of the defendants seek to recuse themselves for

14  voting on the issue of whether the bank should advance expenses

15  for them?

16  A.   I don't recollect whether someone, someone could have

17  recused themselves.

18  Q.   You don't what?

19  A.   I don't recollect.

20  Q.   Well, if it was five to four nobody recused?

21  A.   That's so.

22  Q.   Did the issue come up?

23  A.   I don't recollect any.

24  Q.   The lawsuit is filed and we're embarked on discovery.  Is

25  it so that after the lawsuit was filed the bank notwithstanding

1  the pendency of the lawsuit scheduled the next annual meeting?

2  A.    Yes.

3  Q.    Of shareholders?

4  A.    Yes.

5  Q.    When is it scheduled?

6  A.    May 17th.

7  Q.    And is it so that the bank sought to schedule that next

8  meeting of shareholders at the earliest possible date?

9  A.    Absolutely.  The OTS always encourages us and tries to get

10  us to do that.

11  Q.    In connection --

12  A.    At the earliest day possible.

13  Q.    In connection with this next meeting the way the terms of

14  directors work, the people who would be up for reelection among

15  the people who would be up for reelection at the next meeting

16  would be Elliott Hall and Nelson Deckelbaum, right?

17  A.    Right.

18  Q.    You I would suspect, we can short circuit this, you

19  believe them to be the Bender directors to use your phrase?

20  A.    They were elected by Mr. Bender's votes.

21  Q.    If they're up for election at the next meeting just

22  because of the natural way the terms of elections work, right?

23  A.    Yes.

24  Q.    Did the bank nominate a slate?

25  A.    Yes, it did.

1  Q.   Are Mr. Hall or Mr. Deckelbaum on the slate that the bank

2  intends to put forward for the management?

3  A.   No, they're not.

4  Q.   Now so that essentially the way this worked is if this

5  meeting happens in November --

6  A.   November?

7  Q.   Excuse me, in May, I apologize.   If this meeting happens

8  in May the bank intends to if it's successful replace Mr. Hall

9  and Mr. Deckelbaum with directors of the choosing of the

10  majority of the board isn't that so?

11  A.   That's correct.

12  Q.   Who are these folks, these new nominees?

13  A.   James Haynes, Duke Greene, and Thomas Batties.

14  Q.   Thomas Batties.   Was that slate also developed by a five

15  to four vote?

16  A.   I'm sure it was.

17  Q.   All of the defendant directors voting against the notion

18  of Mr. Hall or Mr. Deckelbaum being retained is that so?

19  A.   I don't recollect the actual votes so I don't want to be,

20  I don't remember the exact vote.

21  Q.   Well --

22  A.   But more than likely, the other Bender people voted

23  against it because they vote against everything that we do that

24  Mr. Bender doesn't approve of.

25          THE COURT:   Let me just take a break at this point.