# EXHIBIT B
## EXCERPTS OF 4/21/06 HEARING
## (DAVID WILMOT TESTIMONY)

1  Board of Independence Federal Savings Bank?

2  A.    Yes.

3  Q.    Calling your attention to the evening of October the 25th,
4  the day before the shareholders meeting for the bank which took
5  place on the 26th, did you have occasion to have any
6  conversation with Mr. Harold Doley?

7  A.    Yes.

8  Q.    Describe it?

9  A.    Roughly around 11.

10 Q.    Eleven at night?

11 A.    Eleven at night, shortly after -- again I put the boys to
12 bed, I'm a single parent with two boys.

13       I received a call, I was patched into the call and
14 Mr. Doley was introduced to me on the call.  On the call was
15 Carolyn Jordan who is the chairman, Mr. Doley and myself.

16 Q.    So you're at home, it's 11 o'clock and you get a call from
17 Carolyn Jordan?

18 A.    Well, I got a call, I was patched into the call.  I don't
19 know who originated the call.

20 Q.    In any event, Ms. Jordan and Mr. Doley are on the phone
21 and you join the call?

22 A.    That is correct.

23 Q.    Tell me what was discussed?

24 A.    Mr. Doley introduced myself -- he introduced hisself.  He
25 indicated to me that he was interested in selling shares of

1  stock that he either owned or had control over.

2  He said that he had received an offer from Mr. Bender to
3  purchase the shares, I think he said $18 a share. He talked a
4  lot about his visit with Mr. Bender here in Washington. He
5  talked about Mr. Bender indicated to him what he was trying to
6  do with the bank. And I mainly listened to the conversation, I
7  think it went on for about 15 or 20 minutes.

8  I then indicated to him that I had no interest in
9  purchasing any shares from anyone including Mr. Doley or any
10 one he represented.

11 I offered to give his name to three individuals. The three
12 individuals were Bob Johnson. Mr. Johnson had previously made
13 an attempt to acquire the bank at a dinner a couple of days
14 earlier, he inquired about it, said that he wanted to come back
15 into the bank after he had concluded the purchase of a small
16 bank that he was acquiring. So I thought that he might be
17 interested.

18 I also indicated to him that Mr. Liggen, his mother Cathy
19 Hughes, Radio One, had expressed an interest in the bank and
20 the other person was Jeff Thompson, a person that I represent
21 from time to time in connection with his business.

22 I told him what I would do is take his information. I
23 would give that information to them and have them deal with him
24 directly. That was the extent of the conversation.

25 Q.  So that we're clear, you had this conversation, Ms. Jordan

76

1  participating, and you mentioned these three potential buyers:
2  Mr. Liggen, Mr. Johnson and Mr. Thompson, right?
3  A.    Yes, that's correct.
4  Q.    After you get off this call, did you talk with either, any
5  of these folks, Mr. Johnson that evening, Mr. Johnson,
6  Mr. Liggen or Mr. Thompson?
7  A.    Yes, and allow me to describe.
8      I attempted to reach Mr. Johnson first and was unable to do
9  so, so I left him a message on his answering machine.  I then
10 spoke to Mr. Liggen because I spoke to him next.  We talked
11 about it.
12     He said something of this he would have to discuss with his
13 mother but I gave him the information because I wasn't the
14 person who was going to be either an agent or anything else in
15 connection with this.  I gave him Mr. Doley's contact
16 information and we concluded that call.
17     I attempted to reach Mr. Thompson, was unable to do so
18 immediately and left a message on his cell phone.
19     And then he called me back shortly thereafter.
20 Q.    What time is it on the evening of the 25th is it you're
21 talking to Mr. Thompson about buying the Doley stock?
22 A.    Something around quarter to 12 or so.
23 Q.    What was Mr. Thompson's reaction when you explained to him
24 this potential block of stock that Doley controlled?
25 A.    He indicated to me that he had already been talking to

1   Mr. Doley.  He had been talking to Mr. Doley for some time.
2   They had been talking since August '05 is what he indicated to
3   me and that they were in the process of concluding the deal and
4   that was the end of the conversation.
5   Q.   Well, is it so that when you were asked about this the
6   events of the 25th in your deposition your testimony was that
7   you assumed that Thompson and Doley made contact and you
8   weren't involved, is that so?
9   A.   It was a response to the question as to what happened.  I
10  don't know what happened subsequent to me giving Mr. Thompson
11  that information.  Especially in light of the fact that he
12  indicated to me that he had been in conversation directly or
13  through their lawyers and their lawyers in this case did not
14  include me.
15  Q.   At your deposition and I'll give it to you if you want a
16  copy of it.  At pages 161 through 162 do you recall testifying
17  that you weren't involved in any purchase of the Doley stock by
18  Thompson, do you recall that?
19  A.   I was not involved in any purchase of the Doley stock.  I
20  think I testified at the deposition to that.
21  Q.   You stand by that?
22  A.   I do stand by that.
23  Q.   You testified that after this call on the 25th, this late
24  evening call, you assume Thompson and Doley made contact, you
25  really didn't know because you weren't involved.

1     Do you stand by that?

2  A.    I do stand by that, yes.

3  Q.    That you had no discussion with Thompson about this matter
4  on the 26th, you recall that?

5  A.    I had no discussion with Mr. Thompson about it on the
6  26th, that is correct.

7  Q.    And that your sole contact with Mr. Thompson on the day of
8  the 26th you saw him at the shareholders meeting and you said
9  hi.

10     Do you stand by that?

11  A.    I do stand by that.

12  Q.    You didn't know anything about, you testified at
13  deposition, the details of a Thompson sale, purchase of the
14  Doley stock because you weren't privy.

15     Do you stand by that?

16  A.    I do stand by that.

17  Q.    And you don't know what was discussed according your
18  testimony at deposition about the payment, of a down payment?

19     You stand by that?

20  A.    I do stand by that.

21  Q.    Now in fact, is it not so that on the evening of the 25th,
22  you received a draft contract for the purchase of the Doley
23  stock from someone associated with Mr. Thompson?

24  A.    I did not receive anything on the 25th from Mr. Thompson.

25     MR. COOTER:  Court's indulgence.

1  say he was talking directly.  He said that his lawyers were
2  talking to Mr. Thompson's lawyer.
3  Q.   You understood that the price that these lawyers were
4  talking about was 18 bucks a share, right?
5  A.   He had mentioned that, that's correct.
6  Q.   Which was about fifty percent higher than the market price
7  that day give or take?
8  A.   I don't know what the market price was that day.
9  Q.   Well, was it trading more than 12?
10 A.   I don't know, Mr. Cooter.
11 Q.   Did you understand that the $18 per share was a premium
12 over the market?
13 A.   I didn't get into that.  He was simply making a statement,
14 he made a statement and I didn't respond to the statement.
15 Q.   There was also a discussion was there not about a down
16 payment, a good faith deposit on this purchase?
17 A.   Not with me there wasn't.
18 Q.   Was there a discussion involving a good faith down payment
19 maybe in the range of a hundred and fifty thousand dollars?
20 A.   That didn't take place at the luncheon.
21 Q.   Where did it take place?
22 A.   It didn't take place with me or at the lunch. I don't know
23 where it took place.
24 Q.   Did you have a conversation with anyone about a down
25 payment, cash down payment on the Doley stock that day or the

1  day before?

2  A.  No, I did not.

3  Q.  Was there a discussion at the lunch about how Mr. Doley

4  was going to vote?

5  A.  No, there wasn't any discussion about how he was going to

6  vote.  I assume that he was going to vote for Mr. Bender.

7  Q.  Was there a discussion at the lunch about that, about a

8  condition of any such purchase by Thompson or anyone of the

9  Doley stock that he had to vote for the management that day?

10 A.  I testified to all is what was testified that day.

11 Q.  What's that?

12 A.  What I previously testified to in response to your

13 question, no.

14 Q.  Now by this time had you seen Thompson that day?

15 A.  I saw him when I first got to the meeting.

16 Q.  Just to say hello?

17 A.  That's all because I went in to meet the chairman.

18 Q.  Had you spoken with anyone, either Mr. Thompson or anyone

19 on Mr. Thompson's behalf or anyone associated with Mr. Thompson

20 about this potential purchase of the Doley stock?

21 A.  No, I did not.

22 Q.  And was that the extent, have you told me everything about

23 the extent of your involvement with the potential purchase of

24 the Doley stock by someone?

25 A.  Yes.  But I did not have any involvement in the purchase

1  of the shares of the stock.
2  Q.   I just want to know if I've heard it all.  Your total --
3  A.   My entire discussions what Mr. Doley on the 26th, my
4  entire discussions with Mr. Doley on the 25th.
5  Q.   I want you to turn to Exhibit 63 and 64 which would be in
6  the second volume of the blue book.  Exhibit Number 63 are some
7  proxies signed by Mr. Delaney and if you look at them, they're
8  dated October the 25th, and just by way of example, the second
9  page shows that there was a proxy signed by Mr. Delaney for
10 2800 shares and you were going to hold the proxy.
11     Do you see that?
12 A.   That I was going to hold the proxy.
13 Q.   That's what it says.  David Wilmot with full power of
14 substitution as my proxy representative, do you see that?
15 A.   I need to look at which one you are talking about because
16 there are a couple of proxies here.
17 Q.   Turn to the second page of the exhibit, we'll start with
18 that.
19 A.   Where is that represented?
20         MR. COOTER:  May I approach?
21         THE COURT:  Yes.
22 BY MR. COOTER:
23 Q.   This is the second page.  You see that apparently Delaney
24 signed a proxy giving you proxy for 2800 shares and signed it
25 the day before.

1  the identity of the buyer would not be known to people; i.e.,
2  the OTS?
3  A.  I wasn't the one who did it.  I wasn't the one.  This was
4  done in consultation with his lawyer.  I don't know what they
5  were thinking about, I can't speculate about that.
6  Q.  Did you do anything other than what you have told us so
7  far to facilitate a possible transaction involving the sale of
8  the Doley stock?
9  A.  No, I did not.
10 Q.  I ask you to turn to Exhibit 78.  You testified that when
11 you first got to the Mayflower on the 26th, you said hello to
12 Mr. Thompson, that was it.  Right?
13 A.  That's correct.
14 Q.  And you had no substantive conversation with him about
15 stock or anything else, or anybody on his behalf on the 26th,
16 is that right?
17 A.  That is correct, sir.
18 Q.  I show you Exhibit Number 78.  This is, the first sheet is
19 a fax transmittal sheet from the Adams Bank dated April the
20 17th at 2 o'clock from Bridgette to someone 296-3911.
21     Do you see that?
22 A.  I do.
23 Q.  Whose telephone is that?
24 A.  I'm sorry?
25 Q.  Whose phone number?

1  A.   That is correct.
2  Q.   Why?
3  A.   Well, as Mr. Thompson testified what he did was that he
4  was unable to reach his lawyer on the 26th.  As you know, we
5  hold a trust account for Mr. Thompson, he testified to that,
6  because we represent him.
7       He directed his assistant Bridgette Quinn to transfer funds
8  because he was negotiating a deal he said with Mr. Doley to
9  transfer funds into the trust account to the extent that those
10 funds would be needed for a transaction that he was going to
11 have through his lawyer Mr. Whitesol.
12 Q.   I thought you told me you had no further involvement in
13 this other than these introductory conversations did you?
14 A.   I had no further involvement in it because Mr. Thompson,
15 Mr. Thompson has testified to that, that this was done at the
16 time that I was at the shareholders' meeting.
17 Q.   Did you get the check on the 26th?
18 A.   No.  The check was, that was sent to my secretary with
19 directions that it be put into the trust account.
20 Q.   Did you endorse the check?
21 A.   No, I did not.
22 Q.   Whose endorsement, whose signature is that on what
23 purports to be your endorsement?
24 A.   It's probably Maria Wood, my executive assistant, she's
25 the only one authorized to deposit on my behalf.

1  Q.    I call your attention to --

2           THE COURT:  It's almost two.  I assume you want to --

3           MR. COOTER:  I'm going to stop.

4  BY MR. COOTER:

5  Q.    Did this check get deposited into an account under your

6  control on or about October the 26th?

7  A.    I assume that it did.

8  Q.    What is this account at the Adams Bank, whose name is on

9  it?

10 A.    I don't have an account at the Adams Bank.

11 Q.    Excuse me.  This says for deposit on 516.  What account

12 whose name is on that account?

13 A.    It would be the firms, it would be the trust account

14 that's where it would go in.

15 Q.    This transaction with Mr. Doley didn't happen, right?

16 A.    Uh-huh.

17 Q.    What happened to the 165,000?

18 A.    It's still sitting in the trust account with other funds

19 that we hold for Mr. Thompson.

20 Q.    Why didn't you give it back?

21 A.    Because he instructed us to hold this because there's

22 other transactions that he's doing unrelated to the bank.

23 Q.    Did you know that your office got a check that day for a

24 hundred and sixty-five thousand dollars?

25 A.    No, I did not.

1  Q.   I neglected to ask you, sir.  The check that was deposited
2  into an escrow account, I misread it.  I assume that was an
3  account at Adams.  At what bank?
4  A.   At what bank is the account?
5  Q.   Yeah?
6  A.   I believe it's BB&T.  I believe it's been changed now to
7  -- I will have to check with the office.
8  Q.   It doesn't make any difference.  If I were to look at that
9  picture in time if I wanted to look at the records, it would be
10 the BB&T Bank?
11 A.   I'm pretty sure it was BB&T.
12          MR. STRAND:  I hope we're not making it a bad day?
13          THE COURT:  No.
14                      CROSS EXAMINATION
15 BY MR. STRAND:
16 Q.   There's been some mention of the name Dan Whitesol.  Can
17 you tell us who he is?
18 A.    Dan Whitesol, I understand that he's the attorney for
19 Mr. Thompson.
20 Q.   Has he ever represented you?
21 A.   No, he's not.
22 Q.   Can you recall for us any discussions that you might have
23 had with Mr. Whitesol regarding the purchase agreements that we
24 have been talking about here today?
25 A.   Any discussions that I might have had with Mr. Whitesol?

1  Q.   Yes.  Have you had any?

2  A.   No, I haven't had any discussion with Mr. Whitesol at all.

3  Q.   About the purchase agreements?

4  A.   No, I have not.

5  Q.   Have you talked to him at all about anything to do with

6  the sale of Independence Federal?

7  A.   No.

8  Q.   I believe you indicated that you had one or two

9  conversations with Mr. Thompson regarding stock on the 25th, is

10 that correct?

11 A.   On the 25th.

12 Q.   I don't want to replow a lot of old ground.  But tell me

13 about the first conversation that you had with him.  Was that

14 the one after your call with Mr. Doley?

15 A.   That was the one after the call with Mr. Doley.  Mr. Doley

16 did not inform me during our conversation that he had been in

17 negotiations with Mr. Thompson.

18      When I proffered Mr. Thompson's name as one the individuals

19 that I was going to contact and give them his information for

20 purposes of talking to him, he did not indicate that he had

21 been speaking with Mr. Thompson.  It was only after speaking

22 with Mr. Thompson he informed me that he had already been

23 talking to Mr. Doley for months about the purchase of shares to

24 the bank.

25 Q.   I'm going to put in front of you what has been marked as