# EXHIBIT C
## EXCERPTS OF 4/21/06 HEARING
## (THOMAS BATTIES TESTIMONY)

46

1  Q. Now isn't it so that the meeting was delayed so that
2  somebody could talk to Doley about a deal for the stock?
3  A. Not to my knowledge.
4  Q. Isn't it so that whatever the discussion there was at this
5  lunch at the Prime Rib resulted in Mr. Doley changing proxies
6  that had already been created in favor of these proxies that
7  the IVS people got and these proxies and, give power to Doley.
8     Isn't it so that whatever happened there at lunch resulted
9  in a change of the exiting proxies to ones now tendered to
10 where Doley held the proxy, isn't that so?
11 A. Not to my knowledge.
12 Q. Do you have any reason to believe that the bank had
13 proxies from Doley or from shareholders, excuse me, from
14 shareholders appointing Mr. Doley as the holder of the proxy
15 before approximately 2 o'clock eastern time?
16 A. I would have no information of that.
17 Q. Confirm for me if you would on the issue of the broker
18 non-votes where the proxy statement says to shareholders we're
19 not going to vote, your broker cannot vote for you absent in
20 your instructions, the bank did not treat those votes that way
21 in the final analysis?
22 A. The broker did not treat the votes that way.
23 Q. How did the bank count the broker non-votes?
24 A. As they submitted them.
25 Q. Did the bank count the broker non-votes for the

1  evening of or the day after their meeting in front of the OTS.
2  Q.   Who was involved in either its authorship or transmission?
3  A.   I don't know.
4  Q.   You have no information at all on that, is that right?
5  A.   No.
6  Q.   And who are the members of this committee?
7  A.   As noted at the bottom of the page it's a Bishop Clarence
8  Long, a Rev. Douglas Moore and the entire Committee to Save
9  IFSB.
10 Q.   I understand Bishop Long is a signatory or at least
11 purports to be, Rev. Moore.  Who is the rest of the committee?
12 A.   I don't know.  I believe there's Rev. Fontroy was involved
13 in the committee.
14 Q.   What's the basis for that belief?
15 A.   Because he I think appeared at the protest.
16 Q.   If you turn to the document and if you turn to the page,
17 the third page of the exhibit that's called a time line.  Can
18 you just -- why don't you just by way for ease of example turn
19 to 2000 the section that says 2005, what appears to be
20 typewritten, page 5 of the time line.
21    Would you confirm for me that there's information in the
22 section 2005 that was information that had not been
23 disseminated about the bank outside the bank and its
24 management?
25 A.   May I have a chance to read the document?

1  Q.    Sure.  If you want I'll help you a little bit?
2  A.    Okay.
3  Q.    The first sentence says on the 2005 the OTS finally
4  recognizes IFSB's improvements and accomplishments and that is
5  public record.  You see that?
6  A.    Yes.
7  Q.    There was no public record of any such OTS acknowledgement
8  was there?
9  A.    Not to my recollection.
10 Q.    Whatever recognitions, whatever the state of affairs was
11 as to the OTS would have come either in confidential
12 conversations with the examiners or by way of what's in an
13 examiner report, would you agree with that?
14 A.    Could you repeat the question?
15 Q.    If the OTS was recognizing these accomplishments if it
16 was, it would have had to come either from an OTS
17 representative in conversations with a management or exam
18 report?
19 A.    It would, I would say that it would come from the OTS to
20 whoever the OTS would communicate it to whether it to be
21 management or other people.
22 Q.    The bank though did not release that information to the
23 general public, would you agree with that?
24 A.    That's correct.
25 Q.    Nor did anyone else?

1  A.   As far as I know.

2  Q.   In fact, if you go on, it says that ISFB's board also

3  registers notes, improvements in all phases of operations and

4  that also was information that was internal to the bank not

5  released to the public isn't that so?

6  A.   I would presume so.

7  Q.   So that if the board did such a thing it would have been

8  done by way of minutes and board meetings or resolutions or the

9  like and none of that was in the public domain would you agree?

10 A.   More likely than not, yes.

11 Q.   It says that indeed all outstanding obligations the OTS

12 placed on the bank in 2000 are resolved.

13      That's just false isn't it?

14 A.   I really can't comment on that.  That's a confidential

15 situation between the bank and the OTS.

16 Q.   You testified in deposition, sir, that the statement is

17 false.  Is the statement false?

18 A.   Not all matters related to the 2002 resolution are, were

19 resolved as of 2005.

20 Q.   Now it's also true is it not that there's a section in the

21 last bullet point from the ultimate bullet point on 2005.  ISFB

22 reminds OTS of its oversight duties on Bender and his conduct

23 as delegated to it by the SEC and more importantly that OTS

24 should follow its own policy on preserving and growing a

25 minority bank.

1    Whatever the communications had been on that issue with the
2    OTS were also not in the public domain were they?
3    A.    I really don't recall.  There may have been some of the
4    communication sent to the OTS are made a matter of public
5    record in the reading room.  Then there may have been public
6    comments by officials of the bank to this, regarding some of
7    this.  I'm not positive.
8    Q.    You recall your deposition being taken in this case on
9    page 76, Mr. Strand?
10         MR. STRAND:  Thank you.
11   BY MR. COOTER:
12   Q.    At the bottom on this issue.  I asked you the following
13   question.
14        The way it was done if I understand your testimony was at
15   one or more meetings at the OTS, is that accurate?  That ism
16   this reminding what they're suppose to do.  You said I believe
17   that's correct.
18        Has the bank ever published what happened at those meetings
19   at the OTS as of May of '05?
20        No, not to my knowledge or recollection I should say.  And
21   that's true isn't it?
22   A.    Correct.
23   Q.    So whatever you guys were talking about in these meetings
24   with the OTS the bank had not released to the public would you
25   agree with that?

1  A.    I believe so.

2  Q.    All right.  Now the, there was also -- indulge me just a
3  moment.

4        The bullet point, the ultimate bullet point for 2004 says
5  the bank attempts to settle legal action against Mr. Bender and
6  endeavors to create a team approach with government officials.

7        Whatever settlement discussions there were between the bank
8  and Bender had never been disclosed to the public by anyone had
9  they?

10 A.    Not to my knowledge.

11 Q.    We've seen all of these things that are in this piece that
12 were internal to the bank.

13       My question is how did all of these things end up in this
14 piece of paper drafted by this committee, these things that
15 were in internal to the bank?

16 A.    Is that a question?

17 Q.    Sure was?

18 A.    I don't know.

19 Q.    Have you ever inquired within the bank as to who might
20 have given information like this out?

21 A.    As to the time line I don't really recall seeing the time
22 line.  I remember in my information regarding the committee was
23 really with respect to the first two pages.  I don't recall the
24 time line.

25 Q.    Now when the OTS made inquiry who was involved in this

1  anybody call Rev. Fontroy say look, what's this all about?
2  A.   No.
3  Q.   How about Bishop Long?
4  A.   No.
5  Q.   How about Rev. Moore?
6  A.   No, not to my knowledge.
7  Q.   Now isn't it a fact, sir, the bank was involved in
8  coordinating the production and dissemination of Exhibit Number
9  1 and its attachment?
10 A.   Not to my knowledge.
11 Q.   Are you aware, Mr. Batties, that we were just furnished
12 some e-mails late yesterday afternoon in connection with the
13 document production in this case?
14 A.   Yes.
15 Q.   Have you look at them?
16 A.   Yes.
17 Q.   I call your attention to what is marked as Plaintiff's
18 Exhibit Number 106.
19           MR. COOTER:  And Your Honor, that's in the
20 supplemental book.  You have the little book there?
21           THE COURT:  Is there any objection to the
22 introduction of Exhibit 106?
23           MR. STRAND:  No.
24           MR. COOTER:  I move it.
25           THE COURT:  Then Exhibit Number 106 is admitted.

1  A.   Yes.

2  Q.   Mr. Chambers writes to Ms. Smith and copies you and you

3  got a copy of this didn't you at or about that time?

4  A.   I have, I was on the e-mail distribution list, that's

5  correct.

6  Q.   Do you deny receiving it?

7  A.   I'm sure I received it if it's on the list here.  I don't

8  know that I read it.  I don't recall reading it.

9  Q.   Mr. Chambers writes in part that the first is having

10 something to do apparently with something at the Washington

11 Hilton on Wednesday night.

12      Second, if Thomas hasn't already filled you in there's a

13 conference call this afternoon with OTS.  And it says whatever

14 it says.

15      And then he goes on in the third in what he calls his third

16 paragraph PR and grass roots.  Lining up folks and implementing

17 the strategy, beginning the tactics.  We now have a list of

18 small shareholders but we must be careful to have the quote

19 committee to close quote contact them.

20      Who's this committee to quote?

21 A.   I don't know.

22 Q.   Well, when you got it -- just a moment, sir, listen to the

23 question.

24      When you saw this e-mail making reference to something

25 called the quote committee to, were you curious as to who they

127

1  were?

2  A.    I don't recall reading this e-mail.  I get upwards of a
3  hundred or so e-mails a day.  And during this period of time
4  it's a very busy time period for me.

5  Q.    Do you now know that this quote committee to is in fact
6  the Committee to Save Independence Federal Savings Bank?

7  A.    I don't know.  It may be, it may not be.

8  Q.    Well, you say that you heard that we got this yesterday
9  afternoon.  You read it?

10 A.    Right.

11 Q.    Did you say Mr. Chambers, Christopher, who's this, did you
12 ask?

13 A.    I did not receive this until late yesterday.  I've not
14 seen Mr. Chambers since I read it.

15 Q.    In any event, he appears to be communicating about this,
16 something called the committee to with Ms. Smith.  Was
17 Ms. Smith involved in creating or disseminating anything or
18 coordinating with a committee, outside committee to your
19 knowledge?

20 A.    Not to my knowledge.

21 Q.    Do you believe she was doing that?

22 A.    Based upon what I read here she may have been, I don't
23 know.

24 Q.    If you would turn to Exhibit Number 107.

25        MR. COOTER:  And Your Honor, I move that.

```
 1            THE COURT:  Excuse me.  I need to ask a question,
 2   excuse me.
 3         How many people work for the bank?
 4            THE WITNESS:  Approximately 45 to 50.
 5            THE COURT:  How many work at where you work at
 6   headquarters?
 7            THE WITNESS:  I want to say about 28 or so.
 8            THE COURT:  Thank you.
 9   BY MR. COOTER:
10   Q.   Well, to follow up on the Court's question if I might.
11   Ms. Finlayson has a desk outside your office does she not?
12   A.   It's in the lobby of the bank, that's correct.
13   Q.   Where does Mr. Chambers sit relative to you?
14   A.   Outside in the lobby as well.
15   Q.   So he and Ms. Finlayson are basically there together?
16   A.   I think they're across an aisle way from one another.
17   Q.   Outside your office?
18   A.   To the far right of my office.
19   Q.   In fact, sir, it's true is it not that from time to time
20   you use Ms. Finlayson to compose documents for you?
21   A.   I don't use her to compose, but in situations we have
22   worked collaboratively on documents.
23   Q.   In fact, it's so that from time to time you use
24   Mr. Chambers to compose documents, isn't that so?
25   A.   He's worked on some documents or collaboratively on
```

1  A.   I just received as I said, I just looked at it.  I don't
2  recall getting it on May the 6th or reading it on May the 6th.
3  Q.   When is the first time you ever read it?
4  A.   Last evening.
5  Q.   As to all of these e-mails that you acknowledge were sent
6  to you, it's your testimony that you never read any of them
7  until yesterday?
8  A.   Yes.
9           THE COURT:  I have a another question.
10          Is the Thomas referenced in all of these e-mails you?
11          THE WITNESS:  I presume so, Your Honor, yes.
12          THE COURT:  Thank you.
13 BY MR. COOTER:
14 Q.   How did it come to be that you read them yesterday?
15 A.   Counsel gave them to me.
16 Q.   Well, isn't it a fact that what happened was we were
17 pressing for production of e-mails, they were going to be
18 turned over, and somebody said ouch, you better look at this.
19      Isn't that what happened yesterday?
20 A.   No.
21          MR. STRAND:  Your Honor --
22          THE COURT:  This is cross examination.
23          MR. STRAND:  We've been cordial.
24          THE COURT:  Yes, yes, it's just in front of me, so
25 it's okay.

143

1  A.   That's correct.

2  Q.   And it isn't true is it?

3  A.   I don't know that it isn't true.

4  Q.   There came a time after this letter went out after the OTS

5  made its inquiry when the bank determined to hire Mr. Royer as

6  a lawyer, Robert Royer, is it Robert?

7  A.   Yes.

8  Q.   Robert Royer.  When did the bank first determine to do

9  that?

10 A.   I don't recall the specific date.

11 Q.   Who was it that suggested --

12          THE COURT:  Can I ask another question?

13      Is this the only inquiry the bank made of its personnel

14 as to their involvement in the preparation of the letter from

15 the committee?

16          THE WITNESS:  I believe so, Your Honor.

17          THE COURT:  Thank you.

18          THE WITNESS:  May I?  I think there was a e-mail sent

19 to employees from the vice-president level up inquiring about

20 that per the direction of the board.

21          THE COURT:  And were there any responses?

22          THE WITNESS:  Yes.  There are other affidavits from

23 the board members and from those employees.

24 BY MR. COOTER:

25 Q.   All of which tell the OTS we don't know anything about it,

1  right?

2  A.    Yes.

3  Q.    By the way, I first heard vice-president level up.

4        Is Sheila Finlayson a vice-president?

5  A.    No.  She is now.

6  Q.    Was she then?

7  A.    No.

8  Q.    How about Mr. Chambers?

9  A.    No.

10 Q.    So there is no inquiry made at that level, is that your

11 testimony?

12 A.    I believe there wasn't, I'm not sure.

13 Q.    In any event, after all of this happens the OTS gets the

14 responses and the OTS came back to you.

15       Did they cease this investigation, what did they do?

16 A.    There was further communication from OTS enforcement.  I

17 believe they had conversations with various individuals.

18 Q.    They talk to you?

19 A.    Yes, to my memory.

20 Q.    Did you deny that the bank had involvement in this thing?

21 A.    I told them that I had no knowledge of it.

22 Q.    Now, there came a time after the meeting on the 11th gets

23 continued and after that happened there came a time did there

24 not when the bank determined to hire a lawyer named Robert

25 Royer, is that right?