# EXHIBIT D

## EXCERPTS OF 4/28/06 HEARING
## (CHRISTOPHER CHAMBERS TESTIMONY)

68

1  A.    They had shared the language with me that's true.
2  Q.    So that before it got mailed to shareholders you were
3  receiving one or more drafts and making your suggestions to
4  these folks at the PR firm?
5  A.    That's true. I looked at, you know, and listened to them
6  the way that I did with, they would send Radio copy or
7  advertising models, that's what they did. And they were in
8  charge of putting all of that together.
9  Q.    Now --
10            THE COURT:  Can I ask a question?
11            MR. COOTER:  I'm sorry, sure.
12            THE COURT:  Who gave Impact Strategies the
13  information that they needed in order to put together the
14  letter?
15            THE WITNESS:  I was to send over information to them.
16            THE COURT:  Where would you get it from? I mean, who
17  would tell you to send over information?
18            THE WITNESS:  They just requested it, Impact
19  Strategies requested it.
20            THE COURT:  And some of it was highly confidential.
21  Would you talk to anybody at the bank about sharing such
22  confidential information with the PR firm?
23            THE WITNESS:  I don't recall anything that I saw that
24  I saw was confidential or listed as such specifically.
25  BY MR. COOTER:

1  Q.    Well, we can look at the full document.  Do you have the
2  document up there?
3  A.    You talking about the committee letter?
4  Q.    Yes, right.
5          THE COURT:  You took it off the Elmo.
6          THE WITNESS:  I think I have the notebook here under
7  this notebook.
8          THE COURT:  It's not in that one.  It's in the blue
9  one.  It's in the blue one, it's number one.
10         THE WITNESS:  Yes, sir.
11 BY MR. COOTER:
12 Q.    It says in part if you turn to page 5 of the time line,
13 attached to the letter, says in part the bank finally
14 recognizes IFSB's improvements -- not the bank.  I read it
15 wrong.  My apologies.
16    The OTS finally recognizes the IFSB's improvements and
17 accomplish and that is public record.  The board also registers
18 and notes improvements in all phases of operation and indeed
19 all outstanding obligations the OTS placed on it in the 2002
20 resolution and resolve.
21    There was no public information available was there to your
22 knowledge, sir, which constituted a recognition of the OTS in
23 the improvement of this bank?
24 A.    I don't really know, sir.
25 Q.    Well, isn't it so that any such recognition if there was

70

```
 1  one would have had to come only by way of the exam reports or
 2  in conversation with officials of the OTS, right?
 3  A.    I'm just following your question.
 4  Q.    None of which were public, right?
 5  A.    I'm just following your question.
 6  Q.    Is that, am I right so far?
 7  A.    I really don't know, sir.  I really don't know.
 8  Q.    Did you furnish Impact Strategies in the way that you've
 9  described the information just taking that by way of example
10  that the OTS has recognized some improvements and the board had
11  registered improvements, did you give them that information?
12  A.    I do not recall, sir.  I don't think so.  But I do not
13  recall.
14  Q.    Well, that's if you don't think so then you don't think
15  so?
16  A.    I don't think so.
17  Q.    If you didn't who did?
18  A.    I have no idea.
19  Q.    It had to be somebody at the bank didn't it?
20  A.    I don't even know what this information is, sir.  I just
21  gave them, you know, what they requested to do their job.
22  Q.    Now you've never perceived it to be part of your
23  responsibility have you to correct any misimpression of the
24  government the OTS may have as to the involvement of the bank
25  in this letter?
```

79

1  thing?
2  A.   Yes, I see that.
3  Q.   And somebody crossed that out and says Ozzie Davis would
4  say do the right thing?
5  A.   Right, I see that.
6  Q.   When you say that somebody intended to say as Spike Lee
7  would say do the right thing, you had a comment apparently to
8  Mr. Douglas about it, is that right?
9  A.   I believe I mentioned to him that I think it was actually
10 the character.  I didn't use Ozzie Davis.  I said that I think
11 the character's name was the mayor and I said I think it was
12 the mayor that said that to Spike Lee in the movie and that was
13 basically it.
14 Q.   This movie, you were kind enough yesterday to educate me,
15 this movie Spike Lee wasn't, isn't the one that said that.
16 Spike Lee was some other character and somebody else said that?
17 A.   Yes, somebody else said that to him.  That eventually, you
18 know --
19 Q.   And you told that to Mr. Douglas did you not?
20 A.   Yes.  I believe I said I think it was the mayor said that
21 to Mukey.  I don't know if I used the actor's names and then
22 that was it.
23 Q.   So that I guess if that happened you and I can agree that
24 you saw the letter in draft form before it was sent and
25 commented on it?

1  A.    Yeah, as to that, yes.

2  Q.    Do you recall in the first book, turn to Exhibit Number 3

3  which is the final letter that went out from Ms. McPhail on the

4  signature of Ms. McPhail and Mr. Douglas dated October 21st of

5  '05?

6  A.    Yes, I have it.

7  Q.    Tell me if you would what was the process that was used to

8  turn this draft Exhibit 89 into the final that went out as

9  Exhibit Number 3?

10  A.    If I recall, he seemed to have the whole thing but he said

11  he was going to have trouble getting it out to as many people

12  as he wanted to.

13      I told him that well, you know, there's a PR firm marketing

14  they could do that.  They were already helping with the proxy

15  solicitation based on polling and things like that.

16  Q.    Is it -- I'm sorry, are you finished?

17  A.    Yes, I'm finished.

18  Q.    Is it your testimony that when he said he was having a

19  problem getting the letter out, you offered the assistance of

20  the bank's PR firm Impact Strategies?

21  A.    I mentioned that to him.

22  Q.    And did they assist Mr. Douglas in getting the letter out

23  the door?

24  A.    I'm not sure, I believe so.

25  Q.    How was it, if you know, that this draft letter got turned

1  into final form as it appears in the Exhibit Number 3, the one
2  that actually went out?
3  A.    That I don't know.
4  Q.    Well, isn't it so that it was done either at the bank or
5  Impact Strategies?
6  A.    I assume it was Impact Strategies more than Mr. Douglas, I
7  don't know.
8  Q.    Okay.  In fact, you know that Impact Strategies was
9  assisting Mr. Douglas in this endeavor and actually did the
10 mailing don't you?
11 A.    I believe so.  What we talked about yesterday.
12 Q.    I want to call your attention to Exhibit Number 90.  That
13 would be in the second volume, sir.
14 A.    Okay.
15 Q.    Exhibit Number 90 there are a couple of envelopes, one of
16 which is to Robert Izard who is a shareholder in the bank and
17 that's in handwriting?
18 A.    Yes, sir.
19 Q.    And another of which is to Karen Izard, the same address
20 and that's typed?
21 A.    Yes, sir.
22 Q.    Can you shed any light at all, sir, as to why it is some
23 letters got done in handwriting and others in typed?
24 A.    I have no idea.
25 Q.    Now the mailings if you notice, the mailings if you notice

1  that there's some postage stamps on these letters, copies of
2  Marion Anderson postage stamp?
3  A.    Yes, sir.
4  Q.    They were apparently posted at some location in Maryland,
5  a post office box in Maryland.  Do you see that by the post
6  mark?
7  A.    I see the post mark, yes, sir.
8  Q.    Do you understand that someone associated with either the
9  bank or Impact Strategies arranged for the posting in Maryland?
10 A.    I suppose so, sir.  I don't know about the bank.  Perhaps
11 it was Impact Strategies, I don't know.
12 Q.    Now after this case was filed, the one that brings us here
13 today, when were you aware that there was this case that was
14 filed?
15 A.    In February I guess or around February, I guess.
16 Q.    Do you recall that there came a time when Mr. Douglas came
17 in the bank and you walked up to Mr. Douglas and gave him a
18 copy of the complaint and said look, I think you need to read
19 this?
20 A.    I don't recall that, sir.
21 Q.    You deny it?
22 A.    I don't recall it.
23 Q.    My question is do you deny it?
24 A.    I don't deny it.  There was a lot going on at that point,
25 sir.  My mother had just died.

```
 1  Q.   At some point you got a copy of the complaint and read it,
 2  right?
 3  A.   In preparation for this, yes, sir.
 4  Q.   Well, in February when did you first get it?  If you
 5  learned it had been filed in February when did you get access
 6  to it?
 7  A.   I don't recall, sir.
 8  Q.   Did you read it?
 9  A.   Not all of it, no.  It didn't seem to pertain to me.
10  Q.   Did you read any of it that suggested that there was
11  something pernicious that happened with respect to the
12  committee letter?
13  A.   No.  No, sir.
14  Q.   How about the McPhail letter?
15  A.   You mean the Gilbert Douglas McPhail?
16  Q.   I'm sorry, my apologies?
17  A.   No, sir.
18  Q.   Have you had occasion to discuss the complaint with anyone
19  at Impact Strategies?
20  A.   No, sir.
21  Q.   Have you made inquiry now that you've read it now at this
22  point, right?
23  A.   Sure.
24  Q.   When did you first read it, the complaint?  When did you
25  first read the complaint?
```

1  A.  When did I first read it?

2  Q.  Yes, sir?

3  A.  March, February.

4  Q.  Of this year?

5  A.  I think so.

6  Q.  Yeah, it had to be this year?

7  A.  2006, yeah.

8  Q.  When you read it, first read it in February or March of

9  this year, did you inquire of anyone as to whether or not the

10 allegations were true or any of them true?

11 A.  I left that up to management counsel, sir.  Thirty-five

12 dollars an hour to try to help out part-time.

13 Q.  Did you divulge or discuss with any management official at

14 the bank, the allegations of the complaint?

15 A.  No, sir.

16 Q.  Did you tell them at that point once you read the

17 complaint about the involvement, your involvement and that of

18 Impact Strategies and some of the issues involved here?

19 A.  No, sir.

20 Q.  Why not?

21 A.  I don't know.  I just, it seemed generally that it just

22 nothing applied to me.  There was a lot of stuff about the

23 shareholder's meeting.

24     I think we discussed that yesterday about other

25 shareholders and stock purchases and things like that.  I

1  didn't, it didn't seem like it applied to me.  Everything else
2  didn't seem the Impact Strategy stuff didn't seem as impactive.
3  And I'm not trying to be crass or funny.  That's just the word
4  that came to my head.
5  Q.   Thank you.  I'm not taking any issue with your words.  I
6  have no more questions, sir.
7         THE COURT:  I have a question for you.
8         When you were asked whether you offered Impact
9  Strategies to help Mr. Douglas get this letter out, you
10 eventually agreed with that.
11        And so what I want to know is what does that mean?  Did
12 you call up what's her name Judy Smith?
13        MR. COOTER:  Judy Smith.
14        THE COURT:  Did you call up Judy Smith and say I just
15 want to introduce you by phone to somebody Douglas and he is
16 going to come over and talk to you.
17        How did you affect the introduction or the facilitation
18 of Impact Strategies to help Mr. Douglas?
19        THE WITNESS:  Sure.  To the best of my recollection I
20 called them and I said there's a shareholder and a customer who
21 wants to, you know, put his own message out.  I didn't know
22 about Ms. McPhail at that time.  At least I don't remember.
23 And you know, could you help him?  He just needs some guidance
24 or something like that or some assistance.  And that was
25 basically it.  I don't even know if he met them.

1          THE COURT:  Okay, I have a few more.

2     Who is Sheila Finlayson?

3          THE WITNESS:  She's the counsel and corporate
4    secretary now.  She's a vice-president and counsel.

5          THE COURT:  So officially did you report to her?

6          THE WITNESS:  I reported to a lot of people.  I
7    assisted her but I didn't really report to her.  If she needed
8    help she would ask me.

9          THE COURT:  So who knew what you were doing?  I mean,
10   somebody must have known that you were dealing with Impact
11   Strategies on grass roots.  Who told you to do that?

12         THE WITNESS:  Well, when they were engaged and I
13   assumed they were engaged by Mr. Batties, when everyone was
14   engaged, including the law firm Holland and Knight I suppose.
15   I just went about it like I did my other duties at the bank
16   which was just to basically kind of see if there are any, you
17   know, anything that needed to be taken care of.

18         THE COURT:  Well, I understand that.  But the
19   question that I have is who told you that they had retained
20   Impact Strategies and that you should work with them?

21         THE WITNESS:  Actually, I met Judy Smith at the bank.

22         THE COURT:  So who brought you into a meeting or
23   introduced you to her?

24         THE WITNESS:  If I recall it might have been
25   Mr. Batties but I'm not sure.

1        THE COURT:  I mean, there has to be a person because
2    you're an hourly employee, because you're really an author,
3    you're only doing this on the side here, there has to be
4    somebody who said this is the business of the bank.
5        At the moment we're in a big fight of some kind or
6    another, and so we've hired a grass roots firm and/or a PR firm
7    and we'd like you to make sure that they get what they need.
8        So the question is who told you that?  It can't be that
9    hard.
10       THE WITNESS:  No, it's not actually because
11   Mr. Batties had hired them a while back because I believe there
12   was an elderly lady who use to be on the board who was doing a
13   lot of that.  I don't think -- her name escapes me right now.
14       And he, I wouldn't say he introduced me.  He said oh,
15   this is Judy Smith, they're basically taking over from this
16   lady, you know, just deal with her and then that was it.
17       THE COURT:  So it was Mr. Batties who told you to
18   work with Impact Strategies?
19       THE WITNESS:  Yes.
20       THE COURT:  And that would be why you copied him on
21   your e-mails to them?
22       THE WITNESS:  I copied him also yes, and also because
23   I was talking to Holland and Knight and they were kind of out
24   there as additional counsel to augment Muldoon and Murphy.
25       THE COURT:  And did it occur to you that by including

1          THE WITNESS:  Oh, okay.

2          THE COURT:  They can be passing each other in the
3   hall, hey, I've been dealing with Judy Smith.  I think we are
4   developing a letter, grass roots is coming along well,
5   whatever.

6          THE WITNESS:  Yeah, I did have conversations like
7   that.  I don't recall any detail.

8          I thought you had meant actually sit down conferences.
9   A lot of our talks were kind of on the fly and I said yeah,
10  they're, it might have been as simple as yes, they're out there
11  doing their thing.  They are professional ad, PR and grass
12  roots, direct mail, lobbying the whole thing.

13         He never asked me for any, you know, updates on it and
14  Holland and Knight was doing lobbying with them I believe.  So
15  that's the extent of the contact.  But I don't recall sit down
16  conferences.

17         THE COURT:  No, I wasn't really anticipating that
18  there would have been sit down conferences.

19         THE WITNESS:  Okay, I'm sorry, Your Honor.  I
20  misunderstood.

21         THE COURT:  What about any conversations with Sheila
22  Finlayson about what was going on?  She's the in-house counsel
23  to the bank?

24         THE WITNESS:  Right.  I don't recall any conferences
25  with her about that.