# EXHIBIT E
## EXCERPTS OF 4/28/06 HEARING (RAYMOND RILEY TESTIMONY)

```
 1  Q.    So you put the two of those together, those essentially
 2  were the votes supporting the Bender slate, fair?
 3  A.    Fair.
 4  Q.    How much is the total of that?  Can you figure it out for
 5  me, round figures?
 6  A.    Well, 1,3 -- 1,415 approximately, 1,416.
 7  Q.    A million four fifteen approximately?
 8  A.    Yeah.
 9  Q.    The management under your calculation had how much?  How
10  much did the management have?
11  A.    2,822,850.
12  Q.    Two million what?
13  A.    822, 859.
14  Q.    Now --
15  A.    Plus some director votes that are not a big number.
16  Q.    How many of the 2,000,008 were represented by ADP by ADP
17  votes cast for management by brokers?  How many of the
18  2,000,008?
19  A.    I don't know the answer to that number.
20  Q.    Well, you seem in your chart to say that the number is
21  200,000?
22  A.    No.  I took Mr. Bender's number of his allegation that
23  there were 200,000 votes cast by brokers who had non-responding
24  investors.
25  Q.    Well, isn't it so, sir, to use your words, no one knows
```

139

1  because you can't tell of all of the broker votes how many had
2  instructions and how many didn't have instructions?
3      I understand the 200,000 estimate but to use your words,
4  who knows, can't tell?
5  A.   I would agree, it's an knowable number.
6  Q.   How much were the total broker votes?
7  A.   As I said, I don't know the answer to that question.
8  Q.   Well, have you made an inquiry to try to figure out what
9  the universe is, how many bad votes might be affected by this
10 phenomenon?
11 A.   I don't believe there are any bad votes.  So and I --
12 Q.   If you accept his theory that all of the broker votes for
13 which there are no instructions are bad, what's the number?
14 A.   Well, I don't accept that theory, sir.
15 Q.   I understand you don't.  But I ask you hypothetically to
16 accept it for this question.  How many votes?
17 A.   I have no idea.
18 Q.   Well, how many broker votes were there?
19 A.   The broker votes were not broken out in the report that
20 the inspectors delivered.  They delivered a report of totality
21 reports.
22 Q.   How many total is what I want to know?  How many total
23 broker votes?  Do you know?
24 A.   I have know idea.
25 Q.   Might it be a much bigger number than 200,000?

1  if you want to make a hypothetical that people change their
2  vote, right, it would change the outcome.
3  Q.   Would Doley's votes have given Bender the election?
4  A.   Well, I haven't that arithmetic but it might have.
5  Q.   All right. Now the, and I take it that you will agree
6  with me will you not that when the bank sends out the proxy
7  material shareholders are entitled to rely on the proxy
8  material as being truthful?
9  A.   Yes.
10 Q.   To follow up on the Court's question, there is material in
11 this proxy statement that says that if the beneficial
12 shareholder doesn't tell the broker how to vote, the shares
13 aren't going to be voted, you are aware of that?
14 A.   Absolutely. I saw that, it's in the Q and A.
15 Q.   If you turn to Exhibit Number 2 which is the update proxy
16 material there's some questions and answers what will happen if
17 I abstain from voting or fail to vote. If you failed to vote
18 for the election of directors, the votes of those supporting
19 Bender's nominees will have a greater impact in helping Bender
20 gain control of the bank and that's true, isn't it.
21 A.   That's true.
22 Q.   And then it says if my broker or other nominee holds my
23 shares for me, will my broker or other such nominee vote those
24 shares for me, it says in the last sentence capitalized in bold
25 print -- not capitalized -- bold print your broker will not

1  vote your shares without your instructions.

2      Do you see that?

3  A.  I saw that.

4  Q.  And shareholders were entitled to rely on that to make a

5  decision as to whether or not to instruct their brokers were

6  they not?

7  A.  It was information provided to the shareholders for them

8  to rely upon.

9  Q.  And indeed to respond to the Court's question or comment

10 about smart shareholders and others, I hold a hundred shares of

11 this bank and until today, until I got involved in this, I

12 never knew nothing about this 10 day rule.  And I like to think

13 I'm a smart fellow.

14     You think that I was entitled to rely on the proxy

15 materials in deciding whether or not to withhold my vote?

16 A.  I think you were entitled to make your own decision based

17 upon the proxy materials.

18 Q.  And indeed, sir, in at least one other occasion when you

19 were an inspector of elections the proxy materials that went

20 out from the issuer didn't tell shareholders about cumulative

21 voting and your ruling on that issue was that because there

22 wasn't full disclosure in the proxy materials, the votes

23 shouldn't be counted, you remember your ruling on that?

24 A.  That's the ruling I made.

25 Q.  Because in your view shareholders are entitled to rely on

1   the truth and accuracy of this material, is that right?
2   A.   Well, I ruled that the proxy committee didn't have the
3   authority to accumulate shares because there was no mention of
4   cumulative voting on the proxy.
5   Q.   Is it so that in this case, not some other case, this
6   case, this bank is not subject to the rules of the New York
7   Stock Exchange?
8   A.   Well, it's not a New York Stock Exchange issue.
9   Q.   So it is traded over the counter is it not?
10  A.   I believe so.
11  Q.   So the New York Stock Exchange rules don't necessarily
12  apply to this bank and it's also true is it not that this bank
13  is not regulated by the Securities and Exchange Commission?
14  A.   Well, I'm not a regulatory expert in that field but my
15  understanding is that the OTS applies the SEC rules.
16  Q.   Well, we know from other proceedings that there are some
17  differences in how they do that.  Did you inquire as to whether
18  or not the OTS works select steps with the SEC in how they
19  apply these securities laws here?
20  A.   No, I didn't inquire.
21  Q.   In your testimony you testified that the 10 day rule upon
22  which you made so much mention applies to every company
23  regulated by the New York Stock Exchange or the SEC and this
24  company isn't regulated by the either, will you agree to that?
25  A.   Yeah, I guess I'll agree to that.

1  Q.   In fact, the purpose of this 10 day rule is so that
2  routine matters, to use your word, brokers can vote on routine
3  matters but not on things which are not routine, that's the
4  whole function concept, isn't it?
5  A.   That's the meaning of the rule.
6  Q.   Now in normal parlance, sir, when you have two slates
7  running for election for seats of directors, okay, just in
8  common English would you consider that election contested?
9  A.   Well, under the rules of the process that proxies have
10 handled, that is not a contested election.
11 Q.   I didn't ask you that.  I asked you --
12 A.   It is a very unusual circumstance, right.  Most companies
13 do not allow for directors to be nominated from the floor, all
14 right, or nominated after proxy materials have been submitted.
15 Q.   My question to you, my threshold question to you is in
16 normal use of the words is that a contested election?  I don't
17 care about the 10 day rule.  I don't care about proxy
18 solicitation right now, I care about English.
19      What do you think?
20 A.   I think that two slates were in competition with each
21 other so you have a contest exist.
22 Q.   Now this whole business, if I understand your proxy rule
23 analysis, the whole business about the contested election is
24 that you can't have a contested election unless you have two
25 competing proxy solicitations going out, is that right?

1  Q.    It is the basis of your opinion with respect to how these
2  brokers voted, is it not, that you think ADP had instructions
3  from the beneficial owners of all the stock that was
4  represented by the ADP ballot?
5  A.    I never testified to that.
6  Q.    Is it a basis of your opinion?
7  A.    No.
8  Q.    In fact, it's true is it not that there is no evidence
9  that you're aware of, that you're aware of from any source that
10  indicated that the broker ballots were done pursuant to the
11  instructions of the beneficial owners?
12  A.    I'm not sure I understand your question correctly.  But
13  the only evidence there is that ADP passed a vote along to the
14  meeting.
15  Q.    And we --
16  A.    And knowing what's behind that vote is not visible to the
17  company.
18  Q.    Is not what?
19  A.    Apparently visible to the company.
20  Q.    To which company?
21  A.    To the issuer, the inspector or anybody.
22  Q.    Well, it's not only not apparent to the company, it's not
23  apparent to ADP is it?
24  A.    Well, I'm sorry, I missed that.
25  Q.    When ADP gets whatever it gets from some broker, ADP has

1  Q.   Take a look at the, this is a copy of your report.  You
2  have your report there somewhere.
3           MS. MANGOLD:  It hasn't been marked an Exhibit.
4           MR. COOTER:  We have or have not?
5           MS. MANGOLD:  Have not.
6  BY MR. COOTER:
7  Q.   Turn to page 5 of 6 of your report of April 20th of this
8  year?  On this issue of the use of proxy committee use of
9  master ballot and the allocation two days later by the
10 management, on the bullet point it says proxy committee master
11 ballot.
12      You write the practice of allocating votes in this manner
13 is available to both the management proxy committee, and to a
14 competing proxy committee if one exists.  This proxy insures
15 that neither side in a contested election has an undue
16 advantage after the votes have been cast.
17      Do you see that?
18 A.   Yes.
19 Q.   That process only works if both competing sides have
20 access to the same information at the same time that they're
21 required to allocate their votes, isn't that so?
22 A.   That's what I've said.
23 Q.   Turn to the ADP client proxy, ADP ballot.
24          MS. MANGOLD:  Exhibit 14 D look at page 97.  I'll get
25 that for you.