**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MORTON A. BENDER, et al.        )
        )
       Plaintiff,        )
        )
       vs.        )
        )       Civil Action No. 1:06cv00092
CAROLYN D. JORDAN, et al.        )
        )
       Defendant.        )
        )

**INDIVIDUAL DEFENDANTS' PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW**

I.     **Introduction**

Plaintiffs' have sued five directors and the acting president[1] of Independence Federal Savings Bank[2] as individuals.  Plaintiffs admittedly sued the Bank as a "nominal" defendant.[3] Plaintiffs also sued to enforce rights of all shareholders they claim were affected by the alleged wrongful conduct.[4]  Yet, plaintiffs have not brought derivative claims pursuant to Rule 23.1, Fed. R. Civ. P.  Rather, Plaintiffs bring claims individually against the Individual Defendants. Plaintiffs' now seek preliminary injunctive relief against all defendants based on factual allegations arising under four of the six counts of their Verified Complaint ("Complaint").  That injunctive relief, however, affects not just the Individual Defendants, who have been sued here, but it affects the Bank and all the shareholders as well, who have not been named as real parties

---

[1]     The six individuals named as defendants include directors, Carolyn Jordan, David Wilmot, Michael Cobb, William Fitzgerald, Eugene Youngentob, and acting president of the Bank, Thomas Batties.  Hereinafter, the entire group will be referred to as the "Individual Defendants."

[2]     Independence Federal Savings Bank will be referred to herein as either "IFSB" or the "Bank."

[3]     All parties agree that the Bank is a nominal defendant.  Plaintiffs' counsel conceded the Bank is a nominal defendant at the February 9, 2006 scheduling conference.  (*See* Transcript of February 9, 2005 Status Conference, p. 3, line 13-14)

[4]     *See* Complaint: ¶ 48, p. 17;  ¶ 69, p. 31; Exhibit 24

in interest.

A.     **Injunctive Relief Sought**

Plaintiffs request that the court enter an order that includes the following mandatory injunctive relief:

1.     Requiring the Individual Defendants to comply with § 13(d) of the Exchange Act (15 U.S.C. §78(m)(d)) (and its regulations) ("Section 13(d)") (Memorandum of Points and Authorities in Reply to Defendants' Response to The Bender's Application for Preliminary Injunctive Relief, Docket 31, Filed April 14, 2006, pp. 1-2.) (the "Reply Brief");

2.     Neutralizing the shares that the Individual Defendants allegedly acquired in violation of their §13(d) obligations (*Id.*);

3.     Voiding the results of the October 26, 2005 meeting of shareholders. (*Id).*;

4.     Compelling accurate proxy disclosures under Section 14(a) of the Exchange Act (15 U.S.C. §28(n)(a)) (*Id.*);

5.     Forbidding any further meetings until the alleged procedural irregularities are resolved compelling adherence to the banks by-laws, 12 C.F.R. §552.6(a) and Robert's Rules of Order in any future meetings (*Id.*); and

6.     Preventing Defendant IFSB from indemnifying (or making advance payments to) the Individual Defendants for the expense of this action.  (*Id.*)

B.     **Legal Allegations**

In their Complaint, Plaintiffs seek the foregoing injunctive relief for alleged violations of the following statues and rules:

1.     Section 13(d) of the Exchange Act (15 U.S.C. §78m (d)) and associated rules relating to reporting requirements for persons owning or voting more than 5 percent of the shares of a corporation (Count I);

2.     Section 14(a) of the Exchange Act (15 U.S.C. §78n (a)) and associated rules relating to the solicitation of proxies (Count II);

3.     The By-Laws of the Bank, 12 C.F.R. 552.6(a) and Robert's Rules of Order relating to the conduct of the Bank's annual meeting (Count III); and

4.     12 C.F.R. §54.121 (Count VI) relating to the indemnification and advancement of legal expenses for officers and directors of the bank.

5.     Plaintiffs do not seek injunctive relief related to Counts IV and V of the Complaint.  *See* Memorandum of Points and Authorities in Support of Bender's Application for Preliminary Injunctive Relief, pp. 13, 16, and 27) ("Application").

C.     **Factual Bases For Plaintiffs' Claims**

While there are a myriad of facts related to Plaintiffs' claims, in the end, one or more of the following eight factual matters forms the basis for the allegations Plaintiffs make and the injunctive relief they seek:

1.     A letter sent to shareholders on May 4, 2005 by "The Committee to Save Independence Federal Savings Bank" (Exhibit 1) (the "Committee Letter") *See* Complaint at ¶¶ 14-15, 53, 58-60;

131137v1

2.      The "update to Our Shareholders" and related proxy materials circulated by management on October 4, 2005 (Exhibit 2) (the "Management Proxy") (Complaint at ¶¶ 20-22; 53-56);

3.      A letter sent to shareholders on October 21, 2005 by Katherine McPhail and Gilbert Douglass (Exhibit 3) (the "McPhail/Douglass Letter") (Complaint at ¶¶ 23, 58; 61-63).

4.      Alleged agreements between one or more of the Individual Defendants and Jeffrey Thompson regarding his purchase of Bank stock (the "Thompson Purchase"). (Complaint at ¶¶ 24-27, 46-48).

5.      Alleged agreements between one or more of the Individual Defendants and Harold Doley, Logan Delany and/or Jeffrey Thompson regarding the purchase/sale of bank stock owned or controlled by them and the voting of shares represented by that stock at the October 26, 2005 special meeting of the Bank's shareholders (the "Doley Group Sale") (Complaint at ¶¶ 28-33, 46-48).

6.      Alleged improprieties at the October 26, 2005 shareholder's meeting (the "Shareholder's Meeting") relating to the delivery of proxies to management by brokers and others for which they had not received directions from the beneficial owners.  (Exhibit 18) (the "Undirected Broker Votes Issue").

7.      Alleged improprieties at the Shareholder's Meeting relating to the allocation of shares after the meeting that were voted pursuant to management's master ballot (Exhibit 17) (the "Allocation Issue") (Complaint at ¶¶ 34, 37, and 67-69);

8.     Alleged improprieties at the Shareholder's Meeting relating to the delay in the start of the meeting from 11:00 to 3:00 (the "Meeting Delay"). (Complaint at ¶¶ 32, 34 and 67-69).

D.     **Relationship of Legal and Factual Allegations**

1.     Plaintiffs' eight factual allegations generally relate to one of the counts of their Complaint.

2.     The factual allegations relating to Count I (Section 13(d)) are as follows: (1) the Thompson Purchase; (2) the Doley Group Sale.

3.     The factual allegations relating to Count II (Section 14(a)) are as follows: (1) the Committee Letter; (2) the Management Proxy, including certain alleged false and misleading statements and, specifically, alleged misstatement regarding the voting by brokers of non-directed shares; (3) and the McPhail/Douglass Letter.  Plaintiffs also allege that the information underlying the alleged §13(d) violations set forth in Count I should have been disclosed in the Management Proxy.

4.     The factual allegations relating to Count III (By-Laws of the Bank, 12 C.F.R. 552.6(a) and Robert's Rules of Order) are as follows:  (1) the Undirected Broker Votes Issue; (2) the Allocation Issue; and (3) the Meeting Delay.

5.     Plaintiffs assert Count VI (12 C.F.R. §54.121) (indemnification and reimbursement of litigation related expenses) only against the "nominal" defendant Bank.  The allegations in this count incorporate and rely on the existence of the other alleged wrongful conduct under each of the four counts set forth above.

131137v1

E.     **Defendants' Position**

Plaintiffs have failed to meet the requirements for the award of the preliminary injunctive relief they seek for the following reasons:

1.     Each of the four counts upon which plaintiffs rely is subject to dismissal pursuant to Rule 12(b)(6), Fed. R. Civ. P.  The Individual Defendants' arguments relating to their motion to dismiss three of the four counts under which Plaintiffs seek injunctive relief are set forth in Defendants' Motion to Dismiss Counts I, II, III and IV of Plaintiffs' Complaint (Docket No. 24, Filed February 22, 2006).  Arguments relating to the motion to dismiss Count VI are set forth in Defendant IFSB's Motion to Dismiss Count VI of Plaintiffs' Complaint (Docket No. 25, Filed February 22, 2006).  Both motions were argued on March 28, 2006 and are now pending before the Court;

2.     The record demonstrates that Plaintiffs' have failed to meet their burden of proving with clear evidence a likelihood of success on the merits of their claims;

131137v1

3.     The record further demonstrates that Plaintiffs have failed to meet their burden of proof that the interests of the Plaintiffs outweigh the interests of other shareholders and the Bank, especially in light of the stated objectives and conduct of Mr. Bender.  First, voiding the election results will require the Bank to conduct a new election, which will cost the Bank substantial delay in the next Shareholder's Meeting as well as money.  Second, voiding the election would deprive IFSB shareholders of their rights as shareholders.  For those shareholders whose votes were counted in accordance with how they actually wanted to vote, they will be forced to come to another meeting, or fill out another proxy, and vote their shares over again.  Third, if shares voted on proxies are neutralized, those shareholders whose shares are neutralized will be disenfranchised.  Yet, they will have done nothing wrong.; and

4.     The relief requested by plaintiffs is unavailable under the legal theories set forth in the four counts upon which they rely.  Simply put, the injunctive relief Plaintiffs seek from the Bank results from activities in which the Bank was not alleged to be involved.  It is not even named as to those counts.

Pursuant to the court's request, the Individual Defendants respectfully submit these proposed findings of fact and conclusions of law.

I     **Proposed Conclusions of Law Relating to Defendants Rule 12(b)(6) and 12(b)(1) Motions to Dismiss**[5]

F.     **General Legal Standard For Motions Pursuant to Rule 12(b)(6)**

---

[5]     This proposed conclusion of law are set out first because they will dispose of all or some of Plaintiffs' counts and thereby eliminate the need for further findings by the court.

1.     A 12(b)(6) motion to dismiss for failure to state a claim "tests the legal sufficiency of a complaint."  *Ashford v. District of Columbia*, 306 F. Supp. 2d. 8, 11 (D.D.C. 2004).

2.     When testing a complaint's legal sufficiency under Rule 12(b)(6), the court will construe the facts and all reasonable inferences in the light most favorable to the plaintiff, and a defendant's motion will only be granted if there exists no set of facts by which the plaintiff could succeed. *Wood v. Department of Labor*, 275 F.3d 107, 108 n. 2 (D.C. Cir. 2001).

3.     "The threshold inquiry in resolving a motion to dismiss is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support his or her claims."  *Johnson v. District of Columbia*, No. 04-936(RMC), 2005 WL 1903551, *2 (D.D.C. July 20, 2005).

4.     "The Court must accept as true all of the plaintiff's well-pled factual allegations and draw all reasonable inferences in favor of the plaintiff," *Ashford*, 306 F. Supp. 2d at 11, "it does not need to accept as true any of the plaintiff's legal conclusions," *id*., and "need not accept inferences drawn by the plaintiff if such inferences are unsupported by the facts set out in the complaint." *Johnson*, 2005 WL 1903551, at *2 (internal citations omitted).

G.     **Count I (Section 13(d)) Fails to State Claims Upon Which Relief May be Granted Because there Is No Private Right of Action Under the Statute**

1.     Section 13(d) requires shareholders to file reports when they have acquired a certain percentage of outstanding stock.  15 U.S.C.A. § 78m(d) (2002).

2.     The language in Section 13(d) does not expressly create a private right of action for alleged violations of that section.  "Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security…is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition…file with the Commission, a statement containing such of the following information…"  *Id.*

3.     Under D.C. law, there is no private cause of action for damages under Section 13(d).  "[15 U.S.C. §78m(d)] does not provide a private cause of action [for damages] for its violation."  *Berman v. Metzger*, No. 80-0394, 1981 WL 1596, *2 (D.D.C. Feb. 9, 1981) .[6] Section 13(d) of the Exchange Act merely "requires information to be disclosed as prescribed by the Commission.  It does not purport to create federal rights in favor of identifiable private parties, or to proscribe any conduct as unlawful, or void."  *Id.* at *2.  The *Berman* court thus held that individual shareholders cannot bring a private right of action for damages under Section 13(d).  *Id.* at *1-3 (determining there is <u>no</u> private right of action for damages under Section 13(d)).

4.     The mere allegation of injury will not give rise to a private cause of action.  "As we recently have emphasized, the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person."  *Touche Ross & Co. v. Reddington*, 42 U.S. 560, 568, 99 S.Ct. 2489, 2485 (1979) (citations omitted).

---

[6]     Plaintiffs have acknowledged this by disclaiming any right to seek damages under Count I of their Complaint.  (Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Directors and Thomas Batties' Motion to Dismiss Counts I-IV of the Complaint, (Docket No. 26, Filed Mach 15, 2006, p. 4) ("But that issue is of no moment here because Plaintiffs do not seek *damages* under Section 13(d).")

5.       In some older District Court cases, courts implied a private cause of action to seek injunctive relief.  "Lower courts have, however, recognized in section 13(d) an implied cause of action for injunctive relief. . . . The decisions have been based in large part on the Supreme Court's previously hospitable attitude to private enforcement of the federal securities laws as a 'necessary supplement' to the Commission's enforcement activities. . . ."  *Berman*, 1981 WL 1596,  at *1 (internal citations omitted).

6.       Over the past twenty-five years, however, courts have grown increasingly less willing to imply a private cause of action for injunctive relief.  In particular, two Supreme Court cases signaled the end of efforts to find implied private rights of action except in limited circumstances.  *See Touch Ross*, 42 U.S. at 577, 99 S. Ct. at 2486, (1979) ("We do not now question the actual holding of that case [Borak], but we decline to read the opinion so broadly that virtually every provision of the securities Act gives rise to an implied private cause of action.");  *see also*, *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24, 100 S. Ct. 242, 249 (1979) ("...we hold that there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable").

7.       When a statute or regulation does not expressly provide a private right of action, the Court must determine whether or not one exists.  *Berg v. First Am. Bankshares, Inc*., No. 83-3887, 1985 WL 2232, *8 (D.D.C. Apr. 17, 1985).  In order to determine whether a private right of action exists, courts look to several factors, the most important of which is the

- 10 -

legislative history of the statute.[7] *Id*; *see also*, *Cort v. Ash*, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088 (1975).

8.    Courts have been reluctant to judicially imply a private right of action "unless the language of the pertinent statute either creates or alters civil liabilities and its legislative history contains some expression of Congressional intent to imply a private remedy." *Berman*, 1981 WL 1596, at *1 (internal citations omitted).

9.    The legislative history relating to Section 13(d) does not imply a private cause of action. "[T]his Court concludes that in section 13(d) Congress expressed no intent to create a private right of action for damages." *Id.* at *2. The only reference in the legislative history to enforcement of the new disclosure provisions is an exchange on the House floor in which Representative Moss stated that the proposed legislation would be "part of the responsibility" of the Commission. 114 Cong. Rec. 21483 (1968). Aside from this, the legislative history is silent on the issue of private actions in particular or enforcement in general. *Id.* at *2.

---

[7]    Courts look to the following factors in order to determine whether a private right of action has been implied in a statute: 1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; 2) whether there is any indication of legislative intent, explicit or implicit, to create such a remedy or to deny one; 3) whether the underlying purpose of the legislative scheme is consistent with the remedy requested; and 4) whether the cause of action is traditionally relegated to state law such that it would be inappropriate to infer a cause of action based solely on federal law. *Cort v. Ash*, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088 (1975).

10.     A private cause of action is less likely to be created where alternative means of enforcement exist.  "The Court's conclusion is reinforced by the fact that violations of section 13(d), like violations of other reporting provisions of the 1934 Exchange Act, may be enforced by other means.  Section 21 authorizes the Commissions to investigate suspected violations of any provision of the Exchange Act and seek an injunction in a federal district court against incipient violations…Section 18(a) creates a remedy for purchasers or sellers of securities who rely on false or misleading statements in documents filed with the Commission." *Id*. at *3.

11.     Courts cannot go beyond the remedies available under the Exchange Act of 1934 to tailor relief to particular individuals.  "In sum, although the remedies provided by the 1934 Exchange Act for violations of section 13(d) do not provide plaintiffs with the damages relief they seek, they are the only remedies provided by Congress.  When adding the reporting provision of subsection (d) to the other reporting requirements of section 13, had Congress intended also to create a method of enforcement not previously available, it would have so indicated." *Id*.

12.     In another case, a court in the United States District Court for the District of Columbia has also adopted a restrictive view of causes of action available under Section 13(d), such that a private right of action for injunctive relief is available, if at all, only to an issuer of securities.  *Woodward & Lothrop, Inc. v. Baron*, No. 84-0513, 1984 WL 861, *2 (D.D.C. June 19, 1984).

13.     Though other courts allow issuers of securities to pursue a private right of action under 13(d), this court noted that, in this Circuit, the question is open "as to whether *an issuer of securities* pursuant to Section 12 of the Exchange Act has standing to sue for relief under Section 13(d)." *Indep. Fed. Savings Bank v. Bender*, 332 F. Supp. 2d 203, 213 n.11 (D.D.C. 2004) )

14.     Plaintiffs' interpretation of the *Woodward* case is misplaced.     In *Woodward*, the issue was whether an issuer of securities could bring a cause of action for alleged violations of Section 10(b) of the Exchange Act.  *Woodward*, 1984 WL, at *2.  The Court, in dicta, acknowledged an issuer of securities could bring a private right of action for alleged 13(d) violations, and that the general rule is that purchasers and sellers, not issuers of securities, are the proper parties to raise 10(b) claims.  *Id*.  The court made no mention of  even the possibility that a shareholder could seek to enforce Section 13(d).  In fact, the validity of the Section 13(d) claim was not at issue in that opinion.  *Id*.

15.     This Circuit has never sanctioned a private right of action by individual shareholders for injunctive relief under Section 13(d).  A thorough review of this Circuit's case law reveals no cases allowing individual shareholders to pursue a private right of action for injunctive relief under Section 13(d).

16.     In light of the foregoing, the Court should decline to make new law and imply a private cause of action for injunctive relief under §13(d).  Count I of Plaintiffs' Complaint should be dismissed.

H.     **Count II (Section 14(a)) Fails to State a Claim Upon Which Relief May be Granted Because Plaintiffs have Failed to Plead a Necessary Element, Reliance**

1.     Pursuant to 15 U.S.C. § 78n(a), the SEC promulgated Rule 14a-9, which states in pertinent part that:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....

17 C.F.R. § 240.14a-9(a).

2.     In order for a plaintiff to state a claim under section 14(a), she must set forth well-pleaded allegations showing: 1) a proxy statement contained a material misrepresentation or omission; 2) the material misrepresentation caused the plaintiff injury; and 3) that the proxy solicitation was an essential link in the accomplishment of the transaction. *Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group*, 295 F. Supp. 2d 75, 81-82 (D.D.C. 2003).

3.     In order to show that the proxy solicitation was an essential link in the accomplishment of the transaction, the Complaint must allege shareholder reliance.  *Cowin v. Bresler*, 741 F.2d 410, 427 (D.C. Cir. 1984).

4.    While the reliance requirement still exists, a non-relying plaintiff may bring suit under limited circumstances.  "In *Cowin v. Bresler*, 741 F.2d 410 (D.C. Cir. 1984), the Court of Appeals for the District of Columbia Circuit held that a plaintiff bringing a claim under section 14(a) need not prove his own individual reliance where he claims injury as a consequence of the deception of others.  The Court held that if a plaintiff claims injury because of the deception of others, it is immaterial whether plaintiff himself relied upon the deceptive proxy statement, and requiring reliance by the individual plaintiff in such a situation would serve no legitimate policy."  *Berg*, 1985 WL 2232, at *6.  The *Berg* court went on to conclude that*,* "Based upon these principles, the Court determines that it is unnecessary for plaintiffs to prove their own individual reliance in order to have standing to bring this action under section 14(a)." *Id.*

5.    Contrary to the argument of Plaintiffs, *Cowin* cannot not be read to mean that the requirement of reliance is altogether abrogated.

6.    "Constructive reliance" is available in class action cases.  In *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385 (1970), the Supreme Court adopted a "constructive reliance" principle to be applied in certain situations where a non-relying plaintiff alleges proxy solicitation violations under Section 14(a):

> Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.
>
> *Id*. at 385.

131137v1

7.    The constructive reliance principle has been applied in the context of class action suits "in order to avoid the difficult burden of proving actual reliance by other shareholders." *Berg*, 1985 WL 2232, at *6. *See e.g.*, *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d. Cir. 1973), *cert. denied* 414 U.S. 910 (1973), *on remand* 384 F. Supp. 507 (S.D.N.Y. 1974), *aff'd in part, rev'd in part, vacated in part*, 516 F.2d 172 (2d Cir. 1975), *rev'd* 430 U.S. 1 (1977), *reh. denied* 430 U.S. 976 (1977); *Herbst v. ITT Corp.*, 495 F.2d 1308, 1316 (2d Cir. 1974).

8.    The presumption of constructive reliance where there is a finding of materiality does not exist outside the class action context:

> In *Mills*, *Chris-Craft*, and *Herbst*, the named plaintiffs in a class action suit sought to base their section 14(a) claim upon the reliance of other members of the plaintiff class.  In contrast, in the instant suit, plaintiffs seek to somehow base their claim upon the totally speculative and presumed reliance of other individuals who are not named, not plaintiffs in the suit, not members of a class seeking relief in a class action, and, perhaps, who do not even exist.  *Plaintiffs boldly assert that those unnamed and unidentified individuals who did vote for the merger must have been deceived simply by virtue of the fact that they did vote affirmatively.*

> *Berg*, 1985 WL 2232, at *7.

9.    Individuals who bring a direct action opposed to a class action should not be entitled to the benefits of the constructive reliance principle.  For example, the interests of a plaintiff bringing a direct claim and other shareholders may diverge.  This would lead to the anomalous result where a non-relying plaintiff suing directly would rely on the alleged materiality and constructive reliance of other shareholders to obtain relief for plaintiff that was not in the best interests of the other shareholders.  The class action mechanism contained in Rule 23, Fed. R.Civ.P. (a)(1) addresses this concern by requiring that a class representative will "fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23.  The concerns outlined

- 16 -

above are especially acute where, as here, the plaintiff suing directly seeks to overturn the results

of an election in which a substantial majority of other shareholders voted in favor of candidates

other than those nominated by the plaintiff.

10.    When a non-relying plaintiff brings a direct action that is not a class

action, he or she must allege that other shareholders relied upon the allegedly misleading proxy

statements in order to state a claim upon which relief can be granted.  "Because plaintiffs have

failed to present any evidence whatsoever that any deceived Class A shareholder even exists, and

because the Mills presumption of reliance has generally only been applied in the class action

situation, the Court determines that the constructive reliance principle established by Mills

should not be applied under the circumstances of this particular case."  *Berg*, 1985 WL 2232, at

*7.

11.    In this case, Plaintiffs do not allege that they relied on any of the allegedly

false and misleading statements in the proxy materials at issue in this case.  (Complaint at ¶¶ 50-

65).

12.    Plaintiffs have not alleged in their Complaint that any other shareholder in

fact relied upon the allegedly misleading proxy materials.  *Id.*

13.    Rather, Plaintiffs claim that the "Proxy materials are intended to mislead

the shareholders...," and that "Plaintiffs (and other shareholders and the investing public) have

been, are being, and will continue to be irreparably harmed, in that they are left without material

information...regarding the true interests and purposes of the Director Defendants and Defendant

Batties...." (Complaint at ¶¶ 56, 64).

14.     Plaintiffs claim to have been injured by such representations in that they prevented the "Bender nominees" from being "fairly considered."    (Complaint at ¶ 64). Plaintiffs allege no facts in their Complaint, however, showing that other shareholders relied upon the allegedly misleading proxy statements in deciding how to vote.  (Complaint at ¶¶ 50-65).  In fact, Plaintiffs contend that shareholder reliance is not required.  (Plaintiffs' Response to Motion to Dismiss, at p. 13) ("Plaintiffs did not plead "reliance" because it is not a required element of a Section 14(a) claim.").  In effect, Plaintiffs are saying that *Cowin* eliminated the reliance requirement altogether.  *Cowin* cannot be read to state that proposition.

15.     A plaintiff cannot allege reliance by just any shareholder.  A plaintiff must show reliance by a shareholder whose votes had a "decisive effect" on the outcome.  *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1099 (1990) (citations omitted).

16.     In light of the foregoing, the Court should hold that Plaintiffs have failed to plead reliance and therefore,  Count II of their Complaint must be dismissed.

I.     **Count III (By-Laws of the Bank, 12 C.F.R. 552.6(a) and Roberts Rules of Order) Fails to State a Claim Upon Which Relief may be Granted Because A Cause of Action for By-law Violations Must be Brought Derivatively**

1.     The only case in this District where plaintiffs alleged violations of corporate by-laws involved a derivative claim.  *See* Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., 173 F.2d. 416 (D.C. Cir. 1949).

2.     Plaintiffs bring individual claims against the Individual Defendants.  *See* Complaint at ¶¶ 15, 18, 30, 31).

3.     Plaintiffs have not alleged an individual injury incurred only by them resulting from the alleged violations of the by-laws or Robert's Rules of Order.  Plaintiffs allege that the by-law violations committed by Defendants "deprived Plaintiffs **and the other shareholders** of a fair vote for the election of directors."  *See* Complaint at ¶ 69.

4.     When an injury "'falls equally upon all stockholders' then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively on behalf of the corporation."  *Cowin v. Bresler*, 741 F.2d 410, 414 (D.D.C. 1984). (citations omitted).

5.     As pled in Plaintiffs' Complaint, the allegations in Count III fall equally on all shareholders.  Thus, the claim must be brought derivatively.  (Complaint at ¶¶66-69).

6.     There is no recognized cause of action for failing to follow Robert's Rules of Order in conducting an election.

7.     Moreover, the management of the special meeting is vested in the Board by the by-laws (Ex. 218, Section 3), for the benefit of the Bank and its shareholders.  Any harm arising from a failure to manage the meeting properly falls equally on all shareholders and must be brought derivatively.  *Cowin*,741 F.2d at 414 .

8.     Claims seeking money damages and injunctive relief for "improper management" belong to the corporation and not to the shareholders.  *Cowin v. Bresler*, 741 F.2d 410, 414 (D.D.C. 1984).  This conclusion is supported by "both case law and sound public policy."  *Id.*

131137v1

9.      Compelling a shareholder to bring an action alleging violations of corporate by-laws fosters the purpose behind requiring shareholders to bring a derivative action: preventing mass litigation by individual shareholders and preventing an individual shareholder from benefiting at the expense of fellow shareholders. *Id.*

J.      **Plaintiffs Do Not Seek Injunctive Relief Under Counts IV and V**

1.      Plaintiffs do not seek injunctive relief under either Count IV or Count V. [Cite]  Thus, the court needn't consider these counts at this time.

K.      **Count VI (12 C.F.R. § 54.121) Fails to State a Claim Upon Relief May be Granted Because A Cause of Action to Enforce 12 C.F.R. §545.121 Must Be Brought As a Derivative Claim**

1.      Because Plaintiffs have conceded that the Bank is merely a nominal defendant, and because the Defendant Directors and Mr. Batties have concrete personal interests in the resolution of Count VI, Defendants Jordan, Wilmot, Cobb, Fitzgerald, Youngentob, and Batties joined in this Motion to Dismiss Count VI.

2.      Claims for injury to the Bank, as opposed to an individual shareholder, must be brought derivatively. *Cowin v. Bresler*, 741 F.2d 410, 414 (D.C. 1984).

3.      Here, Plaintiffs do not allege that they will be injured personally in any way, in the absence of declaratory or injunctive relief.   From the language of 12 C.F.R. §545.121, it appears that Plaintiffs allege that the Bank will be injured by improperly advancing expenses associated with their defense of this litigation to Defendants or by indemnifying the directors and officers.

- 20 -

131137v1

4.      Thus, Plaintiffs can only assert that their respective share in the company's value might be diminished, in proportion to their stake in the company, by the improper payments from the Bank's coffers.  Such an injury would implicate the welfare of the Bank and each shareholder only derivatively and in proportion to their respective shares.

5.      Claims seeking money damages and injunctive relief for "improper management" belong to the corporation and not to the shareholders.  *Cowin v. Bresler*, 741 F.2d 410, 414 (D.C. Cir. 1984); *Burman v. Phoenix Worldwide Industries, Inc.*, 384 F. Supp. 2d 316, 338  (D.D.C. 2005).

6.      Where a plaintiff has a generalized complaint about expenditures from the company coffers, no shareholder suffers a harm "independent of that visited upon the corporation and the other shareholders." *Cowin*, 741 F.2d at 414.  In such a case, each shareholder will be injured in proportion to his or her equity ownership, and "each will be made whole if the corporation obtains compensation or restitution from the wrongdoer." *Id*.  (citations omitted).

7.      In order to prevent mass litigation and prevent individual shareholders from benefiting at the expense of their fellow shareholders, courts require that the corporation's claims be brought by the corporation or derivatively by all the shareholders.  *Id*.[8]

---

[8]      A shareholder can maintain an individual action when either "the allegedly wrongful conduct violates a duty to the complaining shareholder independent of the fiduciary duties owed that party along with all other shareholders, or where the conduct causes an injury to the shareholder distinct from any injury to the corporation itself." *Burman*, 384 F. Supp. 2d. at 338.  (citations omitted).  In the first instance, a shareholder may bring an individual claim when the shareholder's relationship to the corporation has been injured in a capacity other than that of a shareholder, such as a creditor. *Cowin*, 741 F.2d at 414.  This first exception involves a situation where a shareholder's right to recovery has nothing to do with his status as a shareholder. *Id*.  The second situation involves wrongs "affecting . . . the stockholders and not the corporation," such as the wrongful withholding of dividends. *Id*.  Plaintiffs' allegations do not fall within either "special injury" exception articulated above.

8.      Plaintiffs brought an individual action against the Bank seeking to have the Bank enjoined from indemnifying the Defendant officers and directors or from advancing litigation expenses to them.  While naming the Bank as the "nominal defendant" for Count VI[9], Plaintiffs complain of how the directors are managing the Bank, particularly with regard to the issue of indemnification and the advance payment of expenses.  Plaintiffs did not bring a derivative claim as is required when challenging the general governance of the corporation. *Cowin*, 741 F.2d at 414; *Burman*, 384 F. Supp. 2d at 338.

9.      In light of the foregoing, the Court should hold that Plaintiffs have failed to state a claim upon which relief can be granted as to Count VI of their Complaint, and that, Count VI of their Complaint must be dismissed

## L.      Count VI (12 C.F.R. § 54.121) Fails to State a Claim Upon Relief May be Granted Because Plaintiffs Claims Relating to Indemnification are Not Ripe

1.      If the matter before the court is not ripe for adjudication, then the court lacks subject matter jurisdiction because there is no Article III "case or controversy."  *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.D.C.1996) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)).  A plaintiff must defend a motion to dismiss, brought under Rule 12(b)(1), by proving by a preponderance of the evidence that the court has jurisdiction to hear its claims.  *See Am. Fed'n of Gov't Employees, AFL-CIO v. Rumsfeld*, 321 F.3d 139, 142 (D.D.C. 2003).

2.      The standard for Constitutional ripeness is clear.  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed

---

[9]      Plaintiffs' counsel referred to Defendant Bank as a "nominal defendant" at the Scheduling Conference in front of this Court on February 9, 2006.  *See* February 9, 2006 Hearing Transcript, Lines 3:13-14.

131137v1

may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citations omitted).  The

plaintiff at least must allege harm that is imminent and certain.  *Ohio Forestry Ass'n, Inc. v.*

*Sierra Club*, 523 U.S. 726, 734 (1998).

3.    The OTS's indemnification regulation, 12 C.F.R. §545.121, makes

indemnification of directors and officers <u>mandatory</u> if a final judgment on the merits is entered in

favor of the director or officer.  12 C.F.R. §545.121(c)(1); *see also* OTS Opinion Letter, 1989

WL 1114183 (October 6, 1989); *and see Waldoboro Bank v. American Caus. Co.*, 775 F.Supp.

432, 433-34 (D. Me. 1991)("[i]ndemnification is *required* . . . where there is a final judgment on

the merits in the officer's or director's favor.")(emphasis in original).[10]  Only in cases not

covered by 12 C.F.R. §545.121(c)(1), such as settlement or final judgment not on the merits or

not favorable to the Defendants, must a majority of disinterested board members determine

whether the Defendants acted in good faith. 12 C.F.R. §545.121(c)(2).    Even then, the

indemnification regulation requires 60-days notice by the Bank to the OTS before

indemnification can be made and allows the OTS to review and object to the indemnification. 12

C.F.R. §545.121(c).

4.    The issue of indemnification is not ripe because there has been no final

judgment or settlement of the matter at issue and there has been no claim for indemnification by

Defendants.  Indemnification can be provided to the Defendants <u>only</u> after a final judgment has

been rendered or settlement has been reached.  12 C.F.R. §545.121(b).

5.    It is possible that no determination of good faith by the Court will ever be

needed, because Defendants could win on the merits, the disinterested board members could vote

---

[10]    Indemnification is defined to include payment of any amount of judgment and reasonable costs and
expenses, including reasonable attorney's fees.  12 C.F.R. §545.121(b)(1) and (2).

to not afford indemnification, or the OTS could disallow it.  Therefore, Plaintiffs have not pled an injury that is sufficiently certain or imminent.

6.     For all the reasons set forth above, Plaintiffs' request that the Bank be enjoined from indemnifying the other Defendants is not ripe and should be dismissed, pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction.

## II.     <u>Proposed General Conclusions of Law Generally Relating to Injunctive Relief</u>

### A.     **The Standards for Entry of Mandatory Preliminary Injunctive Relief**

1.     A Court may issue a preliminary injunction only when the movant demonstrates: "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will [not] substantially injure the other party; and (4) the public interest will be furthered by the injunction."  *Independence Fed. Sav. Bank v. Bender*, 332 F. Supp. 2d 203, 210 (D.D.C. 2004) (citations omitted).

2.     The most important factor is "for the movant to demonstrate a substantial likelihood of success on the merits."  *Id*. (citations omitted).

3.     If the movant "makes a particularly weak showing on one factor...the other factors may not be enough to compensate."  *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 63 (D.D.C. 2004).

131137v1

4.    Although the decision to grant a preliminary injunction is "left largely to the discretion of the trial court, its exercise of that discretion is subject to the Supreme Court's repeated admonition regarding the caution with which the district court should order any injunctive relief." *Sea Containers Ltd. v. Stena Ab*, 890 F.2d 1205, 1208, 281 U.S. App. D.C. 400, 403 (D.C. Cir. 1989).

5.    A preliminary injunction is an extraordinary remedy that will be granted only in extreme cases. *Sampson v. Murray*, 415 U.S. 61, 81 (1974); *Dorfmann v. Boozer*, 414 F.2d 1168, 1173, 134 U.S. App. D.C. 272, 277 (D.C. Cir. 1969).

6.    The movant, "by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968 (1997).

7.    Even when denying a preliminary injunction would harm the movant, Courts must not grant a preliminary injunction if "it would work a great and potentially irreparable harm to the party enjoined, unless an overwhelming case in the Plaintiff's favor is present on the merits and equities of the controversy." *Dorfmann*, 414 F.2d at 1173, 277.

8.    Plaintiffs are requesting this Court to void the results of the election and neutralize certain shares.  Plaintiffs are thus seeking mandatory injunctive relief.  Mandatory injunctive relief is an injunction that would "alter, rather than preserve, the status quo by commanding some positive act."  *Nat'l. Conference on Ministry to the Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (citations omitted).

9.    When seeking mandatory injunctive relief, Plaintiffs "must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *Id*. (citations omitted).

10.    A Court should not issue a mandatory injunction "unless the facts and law clearly favor the moving party." *Id*. (citations omitted). Plaintiffs have not met this heightened burden.

11.    Preliminary injunctions are a form of equitable relief. As such, the rules of equity must be followed. *Washington Metropolitan Area Transit Auth. v. L'Enfant Plaza*, 448 A. 2d 864, 869 (D.C. 1982).

12.    There are several rules of equity in this case, including laches and unclean hands. Under the unclean hands doctrine, "courts of equity have traditionally exercised their discretion to deny relief to parties who have acted in bad faith." *Albergottie v. James*, 470 A. 2d 266, 269 (D.C. Cir. 1983).

13.    The idea of laches developed "to promote diligence and accordingly to prevent the enforcement of stale claims." *Burka*, 400 A.2d at 740. The idea is that "he who demands equity must do it." *Simpson v. D.C. Office of Human Rights*, 597 A.2d 392, 403 (D.C. Cir. 1991) (citations omitted). "Equity aids the vigilant rather than those who slumber on their rights." *Id* (citations omitted). .

14.    Laches can be proven by showing two elements: 1) the defendant has been prejudiced by delay; and 2) the delay was unreasonable. *Russell v. Todd*, 309 U.S. 280, 287, 60 S.Ct. 527, 531, 84 L.Ed. 754 (1940); *Amer. Univ. Park Assoc. v. Burka*, 400 A.2d 737, 740 (D.C. 1979).

15.    In order to invoke laches successfully, the defendant must show "that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned." *Id.* (citations omitted). The burden of proof is on the party seeking to invoke laches. *Id.*

16.    Equity will not make a futile order. *Blank v. La Montagne-Chapman Co.*, 205 N.Y.S. 45 (N.Y.Sup. 1924) (order mandating specific performance of sublease would be futile when lessor is not a party and not bound by order); *Carmichael v. Dan Nance Corp.*, 264 S.E.2d 601 (S.C. 1980)(order requiring lessee to give notice would be futile where lessor had been absent for years); *Munchak Corporation v. Cunningham*, 457 F.2d 721 (4th Cir. 1972)(order mandating payment of bond would be futile when money would be immediately returned).

17.    Plaintiffs seek relief against Individual Defendants for alleged wrongs committed by the Bank and to all shareholders, not just Plaintiffs. "A court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* .845 A.2d 1031, 1039 (Del. 2004).

III.    **Proposed Conclusions of Law, Findings of Fact and Mixed Findings of Fact and Conclusions of Law Relating to Plaintiffs' Eight Factual Theories Fact**[11]

    A.    **Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to the Thompson Purchase (Count I) (Section 13(d)**

    1.    Plaintiffs allege that Defendants "failed to file a Schedule 13D setting forth their specific plans and intentions with respect to IFSB, including but not limited to the details of the alleged undisclosed agreement among the Director Defendants and Defendant Batties to seek to acquire" certain shares.  (15 U.S.C.A. § 78m(d) (2002), *See* Complaint at ¶ 47)

    2.    One of the alleged wrongful agreements claimed by Plaintiffs involved Mr. Jeffrey Thompson.  Plaintiffs made the following claims: 1) Defendants used various delays in the Shareholders' Meeting to arrange for the sale of stock to Mr. Thompson (Complaint at ¶ 24); and 2) Mr. Thompson purchased stock not for investment purposes as stated in his 13D, but to "consolidate votes and to thwart Bender's efforts to get the Bender Nominees elected" (Complaint at ¶ 26).

    3.    The facts applicable to these claims are as follows:

    4.    On or about September 19, 2005, Mr. Jeffrey Thompson, purchased 111,600 shares of IFSB stock on the open market for investment purposes.  (*See* Exhibit 42).

    5.    There is no evidence of any of the Individual Defendants being involved with Thompson in the acquisition.  (Thompson Depo., Lines 24:12-26:14)

---

[11]    This is the fifth time these parties have been before this court.  The court has entered Memorandum Opinions relating to disputes between some or all of these parties on at least three prior occasions.[11]  In each Memorandum Opinion, the court made findings of fact relevant to the issues before the court at that time.  The following facts are relevant to the nine factual allegations made by plaintiffs in support of the pending application for Preliminary Injunctive Relief.

131137v1

6.     Apparently, Mr. Thompson purchased his shares from Millenium although, at the time, he was unaware of that.  (Thompson Depo., Lines27:11-28:3).

7.     Mr. Daniel Hess was a portfolio manager at Millenium.  (Hess Depo., Lines 3:22-24).  Mr. Hess made the decision to sell the Bank shares held by Millenium between August and October, 2005.  (Hess Depo., Lines 20:2-12; 24:22-25:2; Exhibit 42)  Hess never told Bank management how he would vote the Millenium shares.  (Hess Depo., Lines 12:12-13:6; 15:23-16:2; 19:21-20:4).  Mr. Hess did not know who purchased the shares until after Mr. Thompson filed a Schedule 13D.  (Hess Depo., Lines 21:2-9).

8.     On September 28, 2005, Mr. Thompson filed a Schedule 13D with the OTS.  (Exhibit 42).  In his Schedule 13D, Mr. Thompson stated that he, "beneficially owns 111,600 shares of common stock (IFSB) which represents 7.2% of the Issuer common stock."  *Id.*  He went on to say "all purchases of common stock reported herein were made in open market transactions on the NASDAQ Small Cap Stock Market."  Finally, in his Schedule 13D, Mr. Thompson made the following statement:

> "There are no contracts, arrangements, understandings or relationships (legal or otherwise) between Mr. Thompson and any other person with respect to any securities of the Issuer.  Mr. Michael J. Cobb is a member of the Issuer's Board of Directors and is also a 1% stockholder of TCBA [Thompson, Cobb, Bazilio & Associates].  Mr. Thompson has not had any prior discussion or other communication with Mr. Cobb regarding Mr. Thompson's purchase of share of the Common Stock."

9.     Mr. Thompson is a partner in the accounting firm known as Thompson, Cobb, Bazilio & Associates.  A Defendant in this matter, Mr. Michael Cobb, is also a partner in that firm.  Mr. Cobb has testified as follows as regard to his knowledge of Mr. Thompson's purchase of share of IFSB stock:

Q:    When did you first discuss with him the fact that he had or was going to buy stock?

A:    At our October meeting.

Q:    So up until the October meeting, you didn't know he had purchased stock?

A:    That's correct.

Q:    He never discussed it with you?

A:    No, ma'am.

(Cobb Depo., Lines 28:2-10).

10.    Mr. Thompson similarly testified that he never spoke with Michael Cobb regarding the purchase of shares.  (Thompson Depo., Lines 29:1-17).

11.    Mr. Bender testified that, he does not believe Mr. Cobb, Mr. Youngentob, or Mr. Fitzgerald or were aware of Mr. Thompson's purchase of shares.  (May 4, 2006 Hearing Transcript, Bender Testimony at Lines 131:18-132:11).

12.    Mr. Thompson testified that there was no involvement by any of the Individual Defendants in Mr. Thomspon's decision to purchase stock.  (Thompson Depo., Lines 24:12-26:14).

13.    In light of the foregoing, the Court should conclude that there is no likelihood that Plaintiffs will succeed on the merits of their §13(d) claims involving Mr. Thompson's purchase of shares from Millenium.

**B.    Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to the Doley Sale (Meeting Delay) (Count I)**

- 30 -

1.      Plaintiffs allege that Defendants "failed to file a Schedule 13D setting forth their specific plans and intentions with respect to IFSB, including but not limited to the details of the alleged undisclosed agreement among the Director Defendants and Defendant Batties to seek to acquire" certain shares.  (15 U.S.C.A. § 78m(d) (2002); *see* Complaint at ¶ 47)

2.      One of the alleged wrongful agreements claimed by Plaintiffs involved the putative purchase/sale of bank shares held by members of the Doley Group.  Plaintiffs make the following claims: 1) On October 25, 2005, Doley told Bender he would vote for the Bender Nominees (*see* Complaint at ¶ 29); 2) "On October 25, 2005, Doley was contacted by one or more of Defendant Directors or Defendant Batties for the purpose of purchasing the Doley Group Shares.  "Upon information and belief, Doley reached an agreement to sell all of the Doley Group shares… (*see* Complaint at ¶ 30); 3) during the course of discussions with Mr. Wilmot and Ms. Jordan, Doley agreed to sell the Doley Group Shares in exchange for control over the vote of the Doley Group Shares. (*see* Complaint at ¶ 32-33).

3.      The law applicable to these factual allegations is as follows:

4.      Section 13(d), 15 U.S.C. §78(m)(d), requires that any person, who acquires beneficial ownership of enough shares, directly or indirectly, so as to own more than 5% of a registered issuer of stock, must file a Schedule 13D within 10 days of acquiring those shares.

5.      The OTS enforces the SEC rules as to the Bank (15 U.S.C. §78(m)(12)(i)).

6.      The enforcement regulations, promulgated pursuant to 15 U.S.C. §78m, define the relevant terms in determining whether a Schedule 13D must be filed.

7.    The applicable definitions are enumerated in 12 C.F.R. §574.2. Relevant definitions set forth in this regulation include the following:

8.    Acting in concert includes "(2) A combination or pooling of voting or other interests in the securities of an issuer for a common purpose pursuant to any contract, understanding, relationship, agreement or other arrangement, whether written or otherwise. (12 C.F.R. §574.2(c)).

9.    "Controlling shareholder means any person who directly or indirectly or acting in concert with one or more persons or companies, or together with members of his or her immediate family, owns, controls, or holds with power to vote 10 percent or more of the voting stock of a company or controls in any manner the election or appointment of a majority of the company's board of directors." (12 C.F.R. §574.2(g)).

10.    There is a rebuttable presumption of control of a savings association when a person acquires more than 10 percent of any class of voting stock of the savings association and is subject to any control factor. (12 C.F.R. §574.4(b)).

11.    No person can acquire control, as defined in 12 C.F.R. §574.4, without first filing a change of control application and receiving written consent by the OTS or the passage of sixty days. (12 C.F.R. §574.3(b)).

12.    Moreover, OTS regulations prohibit the solicitation of proxies by means of any statement which:

> (c)(1) Contains any statement that is false or misleading with respect to any material fact, or
>     (2) Omits to state any material fact:
>     (i) Necessary in order to make the statements therein not false or misleading or

(ii) Necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter that has subsequently become false or misleading.

(12 C.F.R. §569.4)

13.    A defect in the proxy statement is considered "material" if it "was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384 (1970).

14.    Logic compels the conclusion that a transaction that need not be disclosed under 13(d) cannot be "material" under Section 14(a).

15.    The foregoing rules mean that:  A person acquiring more than 5% of the Bank's shares, but less than 10% of those shares, must file a Schedule 13(d) within ten days after the event; a person acquiring more than 10% of the Bank's shares must file a change in control application before closing the transaction to acquire the shares; and the proxy rules require disclosure when a fact is "material."

16.    The court should make the following findings of fact:

17.    There is no evidence whatsoever that defendants Mr. Batties, Mr. Cobb, Mr. Fitzgerald and/or Mr. Youngentob had knowledge of or anything to do with the Doley Group Sale.

18.    Subsequent to the collapse of merger discussions with Carver Bank, certain clients of Doley Securities purchased shares of stock in IFSB previously held by Carver Bank.  (Doley Depo., Lines 86:13-17).

- 33 -

19.     Carver Bank contacted Mr. Batties and asked if he knew of anyone who wanted to buy its shares of IFSB stock.  (April 21, 2005 Hearing Transcript, at19:15-18 (Jordan)).  Mr. Batties asked Ms. Jordan, who suggested Mr. Doley.  (April 21, 2005 Hearing Transcript, at 19:20-25 (Jordan)).  There is no evidence that any of the Defendants and no employee, officer, director or agent of IFSB was in any way further involved in the purchase of the Carver Bank stock described above.

20.     Since IFSB stock was purchased by customers of Doley Securities, Mr. Bender has, from time to time, approached Mr. Doley offering to acquire the shares of IFSB stock owned by the clients of Doley Securities.  (Doley Depo., Lines 114:9-21)

21.     Mr. Doley and Mr. Bender had numerous discussions about IFSB between the time that the Doley Group purchased the Carver shares and the October 26, 2005 meeting. (Doley Depo., Lines 105:19-24.)

22.     At a benefit dinner in Washington, sometime before the May 11, 2005 meeting, Mr. Bender told Mr. Doley that he would find buyers for any shares of the Carver stock for which he did not have buyers.  (Doley Depo., Lines 104:4-105:11).

23.     Mr. Doley testified that there were "various conversations" in which Mr. Bender said that he would either purchase the Carver shares or have someone purchase them for him and match any price Mr. Doley received.  (Doley Depo., Lines 143:15-144:22).

24.     He also testified that Mr. Bender said he would put Mr. Doley and Mr. Delany on the Board of IFSB.  (Doley Depo., Lines 143:15-24).

25.     There is no clear evidence that Ms. Jordan had anything to do with the Doley Group Sale.  Ms. Jordan's contacts with Mr. Doley were no different in substance or intent than Mr. Bender's. (Doley Depo., Lines 120:13-127:7).  In addition, Mr. Doley never committed to Ms. Jordan to vote his shares for management.  *Id.*

26.     Plaintiffs do not allege that it was wrongful for Mr. Wilmot (or any other person) to purchase shares.  (Complaint at ¶¶ 40-49).  Mr. Bender admitted in deposition that it was not was wrongful for Mr. Wilmot (and others) to oppose Bender's board nominees. (Bender Depo., Lines 8:5-13).

27.     For purposes of their application for preliminary injunctive relief,[12] Plaintiffs allege that the Doley Group Sale was either (1) a violation of OTS change in control filing requirements (§13(d)), and/or (2) a violation of proxy disclosure requirements (§14(a)) for failure to disclose the attempt to accomplish a change in control.  Thus, the alleged §14(a) violation is derivative of the alleged §13(d) violation. (Application at pp. 8-10).

28.     It is undisputed that the sale of the Doley Group Shares was never consummated.[13]  Thus, there is no question of whether there was a *per se* change in control that occurred without the requisite filings and disclosures being made.

29.     Plaintiffs argue that Mr. Wilmot agreed with Mr. Doley (and Mr. Delaney) to vote the Doley Group Shares in favor of management in anticipation of the sale of the Doley Group Shares to Mr. Wilmot. (Complaint at ¶ 33.)

---

[12]     Plaintiffs do not seek injunctive relief for alleged breaches of fiduciary duty (Count IV).

[13]     The checks, cashiers checks, debit memos and credit memos introduced in evidence (Exhibit 114) ultimately establish that no money ever passed hands between either Mr. Thompson or Mr. Wilmot and Mr. Doley.

30.     During a telephone conference on the evening of October 25, 2005, Mr. Doley advised Mr. David Wilmot, vice chairman of the board of directors of IFSB, of his clients' willingness to sell their shares of IFSB stock for $18 per share.  (April 21, 2006 Hearing Transcript, at 74:20-75:24 (Wilmot)).  Subsequent to that telephone conversation, Mr. Wilmot advised certain individuals that there were one or more parties were willing to sell their shares of IFSB stock.  One of the persons that Mr. Wilmot so advised was Mr. Jeffrey Thompson.  (*Id*. at 76:17-77:4).

31.     Mr. Thompson previously had discussed a possible purchase of at least part of the Doley shares with Mr. Doley, but had left the negotiation open-ended.  He considered the purchase of Doley's shares up until October 26, 2005, but never consummated any deal with Mr. Doley.  (Thompson Depo., Lines 80:10-119:4).

32.     Plaintiffs apparently argue that Mr. Wilmot was working with Mr. Thompson to acquire the Doley Group Shares for his own account or as a surrogate for Mr. Thompson.

33.     On October 25 and 26, 2005, there were a total of 1,552,448 shares of Bank stock outstanding.  (Exhibit 2, p. 15)  On October 25 and 26, 2005, Mr. Thompson owned 116,600 shares of bank stock, which constituted 7.2% of the outstanding stock.  (Exhibit 42).  On October 25 and 26, 2005 the 11 members of the Doley Group owned a total of 154,685 shares[14] of bank stock, which constituted 9.96% of the outstanding stock.[15]  (Exhibit 67).  On October 25

---

[14]     See Exhibit 67 from Delany Depo.
[15]     Note that Mr. Delany, whose shares are counted in the above Doley Group total owned 22,632 shares of bank stock constituting 1.46% of the outstanding stock of the Bank.  Mr. Delany expressly disclaims that he is acting in concert with any member of the Doley Group.  (Delany Depo., Lines 102:16-105:16 ).  If Mr. Delany's shares are subtracted from the Doley Group, the percentage of ownership falls to 8.5%.

and 26, 2005, Mr. Wilmot owned 484 shares of bank stock, which constituted .031% of the outstanding stock. (Exhibit 2, p. 28).

34.    There is no clear evidence on this record that the Doley Group was "acting in concert." In addition, Mr. Delany affirmatively disclaims any concert of action with the Doley Group. (Doley Depo., Lines 184:7-19) For purposes of this discussion only, we will assume the Doley Group (including Mr. Delany) was "acting in concert" as defined by 12 C.F.R. §574.2(c).

35.    Plaintiffs argue that Mr. Wilmot was somehow involved in purchasing the Doley group shares or entering into an agreement with Mr. Doley. While the evidence demonstrates that there was no such purchase or agreement consummated, even if we assume for purposes of argument that there was such a purchase or agreement, there was no violation. A purchase by Mr. Wilmot for his own account of all of the Doley Group shares (including Mr. Delany's shares) would have resulted in Mr. Wilmot owning 155,169 shares of bank stock, which would have constituted 9.99% of the outstanding stock.[16] Such a purchase, if it occurred, would require the filing of a Schedule 13D within 10 days subsequent to the date the sale was closed. But, no such sale occurred. Since the total amount of shares would be less than 10%, the rules relating to change in control would not be triggered in any event.

36.    Given the foregoing rules, a purchase by Mr. Thompson, either directly or using Mr. Wilmot as a surrogate, of all of the Doley Group shares would result in Mr. Thompson owning 271,285 shares of bank stock, which constituted more than 17% of the outstanding stock. Such a purchase, if it had occurred, would have required the filing of a Schedule 13D within 10 days of the date the sale was closed. It also would have required the filing of a change in control

---

[16]    Given Mr. Delany's disclaimer of any involvement or agreement, if Mr. Delany's shares are not included the percentage of ownership would fall to less than 8.54%.

application pursuant to 12 C.F.R. §574.3.  But, no such sale occurred and, as a consequence, no filing obligations were triggered.  (Doley Depo., Lines 184:24-185:13).

37.     By rule, parties may discuss the purchase/sale of stock the would result in a change in control under OTS rules so long as the transaction is not closed until after the OTS gives change in control approval.  (15 U.S.C. 78a (13)(d)).  The putative sale of the Doley Group shares at issue here never occurred.  In addition, the draft Purchase Agreements admitted as evidence all contain the following language,

> "Purchaser's obligations to purchase the Transferred Shares is contingent on the receipt by Purchaser of any and all approvals and non-objections deemed necessary for the Purchaser to acquire the Transferred Shares, including, but not by way of limitation, approvals and non-objections from the Office of Thrift Supervision, if any." (*See* Exhibits 66, 69, 70, 71, 72, 73, 74, 75, 76, and 77)

38.     Based on the foregoing, the obligation to file a Schedule 13(d) never arose.  Both the putative sale and OTS approval were expressly contingent events to occur in the future.  Thus, filing obligations, including both the obligation to file after acquisition of more than 5% of the shares as well as any pre-filing requirement for change in control authority, would only have arisen subsequent to October 26, 2005.  When the sale did not close either on October 26 or shortly thereafter, these filing obligations never arose.  Thus, Mr. Wilmot had no obligation, based on his alleged actual acquisition of shares, to file a Schedule 13D or to disclose the putative Doley Group Sale.  Simply put, if the transaction did not occur, it did not need to be disclosed.

39.     Change in control issues may also arise when "there is a combination or pooling of voting or other interests in the securities of an issuer  for a common purpose pursuant to any contract, understanding, relationship, agreement, or other arrangement, whether written or

- 38 -

otherwise," amongst parties controlling more than 10% of the shares of a bank's stock.  (12 C.F.R. §574.2 (c)(2))

40.    Plaintiffs' now appear to allege that there was an agreement between Thompson, Wilmot and/or the Doley Group on how to vote the shares they held.  If such an agreement existed between all three parties, given the percentage of Bank shares involved, such an agreement. would require the filing of a Schedule 13D within 10 days of the date the sale was closed.  It would also require the filing of a change in control application pursuant to 12 C.F.R. §§574.3 and 574.6.

41.    There is no evidence that Mr. Thompson entered into an agreement with any member of the Doley Group or with Mr. Delany as to how to vote their shares.  There is no evidence that Mr. Thompson entered into an agreement with Mr. Wilmot as to how to vote their shares.  Similarly, there is no evidence of a joint agreement between Mr. Thompson, Mr. Wilmot, the members of the Doley Group and Mr. Delany as to how to vote their shares of Bank stock.

42.    As a consequence of the foregoing, there is no evidence that the filing of a Schedule 13D was required or that the filing of a change in control application pursuant to 12 C.F.R. §574.6 was required based on a three-way agreement between Mr. Thompson, Mr. Doley and Mr. Wilmot.

43.    If the Court concludes that there was an agreement between Mr. Wilmot and the Doley Group (including Mr. Delany) as to how they would vote their shares of Bank stock, then such an agreement would require the filing of a Schedule 13D within 10 days after the date the sale was closed.  But, It would not require the filing of a change in control

application pursuant to 12 C.F.R. §574.6 because the agreement would have involved less than 10% of the Bank's shares.

44.    Similarly, if the court concludes that there was an agreement between Mr. Wilmot and Mr. Thompson as to how they would vote their shares of Bank stock, then such an agreement would require the filing of a Schedule 13D within 10 days of the date the sale was closed. It would not require the filing of a change in control application pursuant to 12 C.F.R. §574.6 because the agreement would have involved less than 10% of the Bank's shares.

45.    Given the complexity of the foregoing facts, there is no evidence that any party acted in bad faith in connection with discussions relating to the possible sale of the Doley Group Shares.

46.    The OTS is empowered to enforce violations of either §13(d) (failure to file) or §14(a). (15 U.S.C. 78a(12)(i)). There is no rule allowing the OTS to void the results of an election based on a § 13(d) failure to timely file. *Berman*, 1985 WL 1596, at *3.

47.    In light of the facts, there is no basis to neutralize the Doley Group shares. Nonetheless, neutralization of the Doley Group Shares would not change the outcome of the board election. As the Bank's expert, Mr. Riley, pointed out through Exhibit 230, one of the two management nominees that won seats would have had have received fewer than the 26,269 votes that were cast in favor of Mr. Bender's unsuccessful nominee, Mr. George. Even excluding all the Doley, shares, both of Management's nominees would have had more than 26,269 votes and would have won the seat on the Board. (Ex. 230).

48.    For the reasons set forth above, there is no legal basis to neutralize Mr. Thompson's shares. Neutralization of Mr. Thompson's shares would not change the outcome of the board election in any event. As Mr. Riley pointed out through Exhibit 230, one of the two management nominees that won seats would have had have received fewer than the 26,269 votes that were cast in favor of Mr. Bender's unsuccessful nominee, Mr. George. Even excluding all the Thompson shares, both of Management's nominees would have had more than 26,269 votes and would have won the seat on the Board. (Ex. 230).

49.    For the reasons set forth above, there is no legal reason to neutralize both the Doley Group Shares and Mr. Thompson's shares. In any event, neutralization of both the Doley Group Shares and Mr. Thompson's shares would not change the outcome of the board election in any event. As Mr. Riley pointed out through Exhibit 230, one of the two management nominees that won seats would have had received fewer than the 26,269 votes that were cast in favor of Mr. Bender's unsuccessful nominee, Mr. George. Even excluding all the Doley and Thompson shares, both of Management's nominees would have had more than 26,269 votes and would have won the seat on the Board. (Ex. 230).

50.    Where allegations of improperly voted shares would not affect the outcome of an election, the court should not void the election even if the conduct was egregious. *Haslem v. Carlson*, 124 A. 734, 735 (R.I. 1924). To do so would disenfranchise voters who complied with their obligations.

51.    For these reasons, the court should find that there is no likelihood that Plaintiffs will succeed on the merits of their §13(d) claims involving the purchase of the Doley Group Shares.

**C.    Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to the Committee Letter (Count II)**

1.    Pursuant to 15 U.S.C. § 78n(a), the SEC promulgated Rule 14a-9, which states in pertinent part that:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading

2.    In Count II of their Complaint, Plaintiffs allege that Defendants' Proxy Materials contain "false and misleading statements, or omissions of material fact" that "are intended to mislead the shareholders," and deprive shareholders of "information necessary to ensure a fair vote at the Shareholders' Meeting." *See* Complaint at ¶¶ 55, 56, 64.

3.    Plaintiffs' allegations stem from three different communications: 1) the Proxy Materials disseminated by the Individual Defendants (Complaint ¶¶ 41, 42); 2) a May 4, 2005 letter entitled "Committee to Save Independence Federal Savings Bank (Complaint ¶¶ 22, 23); and 3) an October 21, 2005 letter written to shareholders by Catherine McPhail and A. Gilbert Douglas (Fact ¶¶ 45, 46).

4.    With regard to the Committee Letter, Plaintiffs allege that: 1) the "Committee" letter was drafted "by, or with the assistance of, Defendant Batties (and/or one or more of the Director Defendants), as the level of detail set forth in the letter leads to the inescapable conclusion that it was written by, or in consultation with, Bank management;" (Complaint at ¶ 14); and 2) the letter is full of false and misleading statements (Complaint at ¶¶ 58-60).

5.    The facts relating to these claims are as follows:

6.      On or about April 21, 2005, Mr. Bender filed a proposed letter to all IFSB shareholders with the OTS.  In that filing, Mr. Bender sought OTS review of the letter before sending it to IFSB shareholders.  (See Exhibit 205).

7.      In a letter dated May 2, 2005 (Exhibit 205), the OTS stated that:

The materials [Mr. Bender's proposed letter to IFSB shareholders] contained a number of assertions that appear as statements of undisputed fact while in actuality they constitute matters of opinion.  Care should be taken to insure that all such opinions are properly characterized as such and accommodated by the factual basis they are derived.  Further, a broader terminology should be avoided whenever possible.

8.      The OTS Letter then went on to require certain specific changes to Mr. Bender's proposed letter to stockholders.  (*See*, Exhibit 205)

9.      Subsequently, Mr. Bender submitted a revised version of the shareholder letter to the OTS.  In a letter dated May 2, 2005 (*See* Exhibit 206), the OTS advised Mr. Bender that the revised version of the shareholder letter "did not address a number of comments set forth in the letter dated May 2, 2005."  In that same letter, the OTS also advised counsel for Mr. Bender that, "[y]ou indicated that Mr. Bender intends to mail the latest version of the letter without further OTS staff review."  Mr. Bender's counsel was advised by the OTS that "failure to respond to this request may result in enforcement action." (Exhibit 206).

10.      Notwithstanding the express concerns and warning of the OTS, on or after May 2, 2005 Mr. Bender sent the letter to IFSB stockholders.  (Exhibit 207).  This was the same version of the letter that the OTS had specifically told Mr. Bender not to send.

11.      In a letter dated May 9, 2005, the OTS responded to Mr. Bender's mailing of the letter to IFSB shareholders without prior OTS approval.  (Exhibit 208).  In that letter the OTS made the following statements:

- 43 -

The Office of Thrift Supervision (OTS) is considering whether to issue a cease and desist order, and to assess civil money penalties, against you for false and misleading statements contained in the Definitive Stockholder Letter (Def. Letter) relating to the 2005 Annual Meeting of Independence Federal Savings Bank, Washington, D.C. (Independence or the Bank), mailed by you to shareholders on or about May 2, 2005. The Def. Letter appears to contain false and misleading statements in violation of Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and OTS regulations, 12 C.F.R. Part 569. . . .

12.     On May 4, 2005, a group calling itself The "Committee to Save Independence Federal Savings Bank" (The "Committee" and The "Committee Letter") circulated a letter to some or all of the IFSB shareholders.  (Exhibit 1).

13.     In the wake of Mr. Bender's unauthorized letter and the Committee letter, on May 10, 2005, the OTS sent a letter to the Board of Directors of IFSB.  (Exhibit 209).  In that letter, the OTS voiced concerns regarding the "Committee Letter" and regarding "apparent false and misleading information designed to influence shareholders in favor of [Bender's] alternative slate of directors."  The OTS went on to state that, "[i]n light of the above, OTS believes that a prudent course of action is for the board to postpone the annual meeting for some brief period to allow the shareholders an opportunity to received additional clarifying information."  (Exhibit 209).

14.     Subsequent to the May 10, 2005 letter, the OTS initiated investigations of both the letter sent by Mr. Bender on about May 2, 2005 (Exhibit 207) and the letter sent by the Committee on or about May 4, 2005 (Exhibit 1).

15.     IFSB voluntarily cooperated with the OTS in the investigation.  No director or officer of the Bank was involved with the Committee letter.  (Exhibit 210).

16.    At the hearing on this matter, Mr. Chambers testified that he coordinated with Impact Strategies regarding grass roots efforts to improve the Bank's image in the public. (April 28, 2006 Hearing Transcript, at 56:6-57:-17 (Chambers)).  Mr. Chambers testified that the Letter from the Committee was part of that overall grass roots strategy aimed at the general public.  (April 28, 2006 Hearing Transcript, at 59:15-22 (Chambers)).

17.    The Committee Letter clearly indicates that it was intended for an audience broader than just shareholders.  (Exhibit 1).

18.    It specifically asks its recipients to contact the OTS to urge it to properly exercise its oversight responsibilities and to contact the Mayor, Congresswoman, and Senators to urge that they demand the OTS to exercise its responsibilities. (Exhibit 1).

19.    In fact, it only mentions voting shares once.  (Exhibit 1).

20.    Exhibits 104, 105, 106, 107, 108, and 109 indicate that the grass roots effort, including the Committee Letter, was being directed to the media, Congress, the OTS and over 1,800 people who were not shareholders.  (Exhibits 104-109).

21.    Mr. Batties testified that he was aware of the grass roots effort, but did not have specific knowledge that Mr. Chambers was involved in the Committee Letter or recall receiving emails from Mr. Chambers related to Impact Strategies' efforts. (April 21, 2006 Hearing Transcript, at 125:18-129:17 (Batties)).

22.    On September 14, 2005 the Board of Directors of IFSB received a letter from the OTS.  (Exhibit 215).  It was sent as the culmination  of the OTS' investigation of the Committee Letter of May 4, 2005 (Exhibit 215).  The September 14, 2005 OTS letter to the Board of Directors of IFSB stated as follows:

> I am writing to notify you that, following careful consideration of all the available information and facts relevant to the Committee and the Correspondence, OTS has determined not to pursue enforcement action against any party in connection with this matter.

23.    The quantum of proof required to show whether statement is materially false and misleading is akin to the proof required to prove common law fraud.  *In re U.S. Office Products Securities Litigation*, 326 F. Supp. 2d 68, (D.D.C. 2004).  (in granting a Motion to Dismiss, the Court held that, when a Section 14(a) claim sounds in fraud, the elements of a common law fraud claim apply and that conclusory allegations are not enough);  *see also*, *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 380 (1970).

24.    In order to prove fraud, the plaintiff has the burden to prove: 1) a false statement; 2) in reference to a material fact; 3) made with the knowledge of its falsity; 4) with the intent to deceive; and 5) action is taken in reliance on the misrepresentation.  *Caulfield v. Stark*, 893 A. 2d. 970, 974 (D.C. 2006).  It must be established by clear and convincing evidence, which is not equally consistent with either honesty or deceit.  *Id*.

25.    An omitted fact or misrepresentation is considered material "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available."  *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757, 766 (1976).

26.     Based on the foregoing, Plaintiffs failed to adduce proof that the alleged statements were false and misleading. The only evidence in the record regarding the truth or falsity of statements in the Committee Letter is Mr. Bender's testimony. In that regard, he testified as follows:

27.     Mr. Bender testified that the statement that the Bank had "recently been threatened by the personal greed of specific individuals, individuals who have no regard not only for the African-American community, small business depositors and local homeowners but not even to their fellow shareholders," is false and misleading. Mr. Bender testified that he, in fact, had regard for the African-American community because he "was in the midst of opening a branch in PG County to serve those people." (May 4, 2006 Hearing Transcript, at 94:6-95:2 (Bender)).

28.     It could be argued by a reasonable person that, based on Mr. Bender's numerous lawsuits to wrest control of the Bank away from the African-American management and interference in the Carver merger, Mr. Bender does not appear to have much regard for minorities at IFSB or those fellow shareholders who wish to maintain its minority character and attain the most value for their investment. Moreover, Mr. Bender's motivation for establishing a branch in PG County could be financial and not benevolent. Therefore, his assertion that he in fact has regard for the African community is debatable at best and that statement is not false.

29.     With respect to the falsity of statements in the attachments to the Committee Letter, Mr. Bender testified as follows:

> One of these documents it talks about that I brought a minority bank, I put it out of business. I didn't have anything to do with it. I don't know what they're talking about. They say that I forced them to sue me. That's the most ridiculous

- 47 -

statement ever.  They talked about as a result of their having to sue me they spent over $3,000,000. I asked Mr. Wilmot one day how they paid 3,000,000 when they had an agreement from what I understood for 6 or 700,000 as a guaranteed fee and they could pay the $3,000,000.  I don't understand that.

\* \* \*

It says that the OTS favors me over Independence which is not true, they hand me my hat all the time.  They talked about that I caused them to get a letter from the OTS that they were a troubled institution.  I didn't know about it until after the fact that it had been an issue. It talked about that I was going to close Independence Bank up as a minority bank.  Not so.  I planned in my 13 D so states I was going to keep it as an independent bank, no pun intended, because minority banks has distinct edge over other banks like Colombo Bank and get preferences dealing with governments. They talked about my nominees to the board are my puppets. Not so.  In fact, they voted completely the opposite of what I asked them to vote for.  And that was the Carver merger where I had discussions with them, I thought they should vote against it and I find out ultimately that they voted for it. I told them that they fully share the responsibility, these are the directors that I had elected.  Though I would prefer one thing, they have to do what they're obligated to do.

(May 4, 2006 Hearing Transcript, at 95:9-20; 96:9-97:1 (Bender)).

30.     Mere denials, without evidence to the contrary, is insufficient to meet his burden that any statement was false or misleading.  *Caulfield v. Stark*, 893 A. 2d. at 974.  Additionally, Mr. Bender merely paraphrases and interprets the statements at issue.   For example, the letter does not say that the OTS favors Mr. Bender, as he testifiied.  Instead, it says that a move made by the OTS was "friendly to Mr. Bender and hostile to a minority institution." (Exhibit 1, at 5).

31.     Plaintiffs failed to meet their burden that any statement was false or misleading.

32.    Mr. Bender never treated the Committee Letter as being material to the outcome of the election.   Mr. Bender knew about the alleged false and misleading statements when he received the Committee Letter in May, 2005, but did not sue prior to the election . (May 4, 2006 Hearing Transcript, at 102:4-9 (Bender)).   As such, he slept on his rights for over seven months.  He had five months to file suit or go to the OTS but, admittedly, he failed to do so.

33.    On September 9, 2005, Mr. Bender sued the Bank in order to force the Bank to have the meeting as scheduled that month.  (Ex. 228).  Mr. Bender even alleged in his Complaint that the groups were acting on behalf of the Bank in attempting to influence voting. (ex. 228, at 4).  In his complaint, Mr. Bender discussed the fact that the OTS had requested the postponement of the May meeting because of Mr. Bender's April 29, 2005 letter and the Committee Letter.  (Ex. 228, at 3).

34.    Yet, even though the OTS had not rendered a decision regarding the impact of the Committee letter at the time he filed his complaint, Mr. Bender preferred to forge ahead with the election and not seek to allow more time to pass to eliminate any potential taint. (Ex. 228).

35.    Mr. Bender became aware that, on September 14, 2005, the OTS decided not to take action regarding the Committee Letter, but never challenged that decision in Court. (May 4, 2006 Hearing Transcript, at 104:17-25 (Bender)).

36.    Plaintiffs chose not to try, in their contacts with shareholders, to ameliorate any effect the Committee Letter might have had on shareholders.  (May 4, 2006 Hearing Transcript, at 111:20-112:11 (Bender)).

37.     Plaintiffs had a full and fair opportunity to get their view out in the five months after the letter, but chose to do nothing to change the perception of the recipients of the letter.

38.     Plaintiffs have failed to plead reliance and have proven no actual reliance on the Committee Letter by any shareholder.  The only evidence in the record related reliance is the unsupported statement by Mr. Bender that he thinks someone relied on it.  (May 4, 2006 Hearing Transcript, at 109:6-12 (Bender)).

39.     Plaintiffs have failed to prove materiality based on the total mix of information available to all shareholders.  The Committee letter was sent to shareholders five months prior to the October 26, 2006 Meeting.  Plaintiffs failed to say anything to shareholders in order to combat the allegedly false and misleading statements contained within the Committee letter.  Mr. Bender never filed suit to enjoin the Meeting; in fact, he sued to avoid further delay. As such, Mr. Bender never treated the Committee Letter as material with respect to the October 26, 2005 meeting.

40.     Moreover, there is no evidence that any of the Individual Defendants had direct involvement with the Committee Letter.  At most, Plaintiffs' evidence demonstrated that Mr. Batties received emails regarding the Committee Letter.  Yet Mr. Batties testified that, as he was likely to receive approximately 100 emails a day, he could not recall the emails related to the letter.  (April 28, 2006 Hearing Transcript, 126:24-127:7 (Batties)).  There is no evidence that any other Defendant had any knowledge of or involvement with the Letter.

- 50 -

41. For these reasons, the Court should find that there is no likelihood that Plaintiffs will succeed on the merits of their §14(a) claims involving the Committee Letter because Plaintiffs failed to prove that any statements in the Letter were false and misleading or that the Committee Letter was material with respect to the October 26, 2005 meeting;

42. Further, Mr. Bender was *in pari delicto* by having sent a similarly false and misleading statements contained within the Committee letter or the Board's Proxy Materials. (May 4, 2006 Hearing Transcript, at 112:5-11 (Bender)).

43. Moreover, there is no evidence that any of the Individual Defendants had direct involvement with the Committee Letter. None of the defendants knew about Chamber's involvement. Mr. Batties did not deny receiving copies of emails from Mr. Chambers regarding the grass roots effort by Impact Strategies, but he did not have any involvement in, or recollection about, the Committee letter. (April 28, 2006 Hearing Transcript, Lines 126:2-127:7 (Freedman)).

44. For these reasons, the Court should find that that there is no likelihood that Plaintiffs will succeed on the merits of their §13(d) claims that any of the Individual Director was directly involved with the letter.

D.    **Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to the Management Proxy (Count II)**

1. In Count II of their Complaint, Plaintiffs allege that Defendants' Proxy Materials contain "false and misleading statements, or omissions of material fact" that "are intended to mislead the shareholders," and deprive shareholders of "information necessary to ensure a fair vote at the Shareholders' Meeting." *See* Complaint at ¶¶ 55, 56, 64.

131137v1

2.      With regard to the Management Proxy, Plaintiffs allege that eight statements made in the Management Proxy Statement were false and misleading. (Complaint at ¶ 55).

3.      Plaintiffs also assert that the statement in the Q&A regarding how brokers will vote shares was false and misleading.  Because that statement is an operative fact with regard to the issue of whether the Broker votes were properly voted, it will be discussed in full in the next Section.

4.      The facts relating to these claims are as follows:

5.      On October 4, 2005, the management proxy materials were sent to all IFSB shareholders.  (Exhibit 2).  Prior to being sent to IFSB shareholders, those proxy materials had been submitted on more than one occasion to the OTS for review by the OTS.  (Exhibit 216). The OTS ultimately did not object to the proxy materials forwarded to IFSB shareholders as being false or misleading.

6.      In addition, the OTS forwarded the draft proxy materials to Mr. Bender. (May 4, 2006 Hearing Transcript, at 24:11-25:8 (Freedman)).

7.      Mr. Bender and his counsel had a full opportunity to and did provide comments on the proxy materials.  (Exhibit 216); (May 4, 2006 Hearing Transcript, at 24:11-25:8; 27:13-29:10 (Freedman)).

8.      In fact, by letter dated September 26, 2005, Mr. Bender's counsel submitted comments on the draft proxy statement submitted by the Bank to the OTS. (Exhibit 28).  Mr. Freedman testified that if a statement were false, misleading and material, Mr. Bender's counsel certainly would raise it with the OTS.  (May 4, 2006 Hearing Transcript, at 29:25-30:3(Freedman)).

9.      Plaintiffs only attempted to put on evidence that one of the eight statements plead in the Complaint was false and misleading: "the Bender Nominees are elected, Bender will obtain "Controlling Influence" over IFSB.

10.     In order to demonstrate the that statement was false, Mr. Bender merely refers to the requirement that, for an actual change of control to take place at a savings institution, the OTS must approve the change. (May 4, 2006 Hearing Transcript, at 97:16-25 (Bender)).

11.     Irrespective of whether an actual change of control would take place, Mr. Bender would have had four directors on the Board that he nominated and one director, Mr. Isard, that has consistently aligned himself with Mr. Bender and whom Mr. Bender did not sue in this matter.  Mr. Isard, during his deposition, even aligned himself as being adamantly opposed to Management.  (Isard Depo., Lines 97:22-98:5; 102:5-12).

12.     In Mr. Bender's Application for Change of Control, he specifically stated his goal was to have a majority of the board who are his nominees or who have similar views to his about the future of Independence.  (Exhibit 80, at 4).

13.     Therefore, the statement in the proxy that Mr. Bender would have had a controlling interest was not necessarily false and Plaintiffs failed to meet their burden to demonstrate that it was.

14.     Plaintiffs did not even attempt to adduce any evidence for the remaining seven allegations from the Complaint.  Therefore, they have failed to meet their burden.

15.     Upon seeing the Proxy Statement, Mr. Bender was immediately aware of and dissatisfied with the alleged misstatements. (May 4, 2006 Hearing Transcript, at 37:17-41:4; 118:21-119;  117:3-7 (Bender)).

16.     Mr. Bender never sued to stop the election based on what he alleges are false and misleading statements in the Proxy Statement.  (May 4, 2006 Hearing Transcript, at 117:8-21 (Bender)).

17.     Plaintiffs chose not to try, in their contacts with shareholders, to ameliorate any effect the Proxy Statement might have had on shareholders.  (May 4, 2006 Hearing Transcript, at 117:25-118:20 (Bender)).

18.     Equity requires that Plaintiffs should have asserted their rights prior to the meeting in order to maintain the status quo; as opposed to waiting for the Bank to expend substantial amounts of money on the meeting, the shareholders to travel to Washington to express their wishes in the election, and the Board to have been seated and have managed the Bank under a cloud of doubt cast by the current suit.  *Simpson v. D.C. Office of Human Rights*, 597 A.2d 392, 403 (D.C. Cir. 1991) ("Equity aids the vigilant rather than those who slumber on their rights").

19.     Plaintiffs' delay in pursing their rights, the change in the operative circumstances surrounding the Bank, and the prejudice the delay will cause to the Bank requires that Plaintiffs claims related to the Proxy Statement should be found to not be likely to have success on the merits..

E.     **Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to the McPail/Douglass Letter (Count II)**

1.     Plaintiffs allege that the Individual Defendants violated Section 14(a) of the Securities Exchange Act by participating in the creation or distribution of the McPhail/Douglass Letter.  (Complaint, at ¶¶ 50-53).

- 54 -

2.    With regard to the McPail/Douglass Letter, Plaintiffs allege that: 1) the letter contains false and misleading statements, and omissions of material fact, about Mr. Bender; (Complaint, at ¶ 61-62); 2) the misrepresentations were made with knowledge of their falsity (Complaint at ¶ 63); and 3) the letter was "based on information provided by the Director Defendants and/or Defendant Batties for the express purpose of defaming Bender and misinforming shareholders (Complaint at ¶ 23).

3.    The facts relating to these claims are as follows:

4.    On or about October 21, 2005, Ms. Catherine McPhail and Mr. Gilbert Douglass sent a letter to IFSB shareholders. (Exhibit 3) (The "McPhail/Douglass" Letter).

5.    Mr. Douglass, in his deposition testimony, testified that Mr. Chambers' involvement with the letter was limited to directing Mr. Douglass to someone who could assist in distributing the letter.  (Douglass Depo., Lines 98:14-102:6).

6.    Mr. Chambers admitted to assisting Mr. Douglass identify sources and cites for information, reviewing a draft, and directing Mr. Douglass to someone who could assist in distributing the letter.  (April 28, 2006 Hearing Transcript, at 76:13-81:11 (Chambers)). Mr. Chambers testified that Impact Strategies, the Bank's PR firm, was the entity that assisted Mr. Douglass in distributing the Letter.  (*Id.* at 80:18-81:11 (Chambers)).

7.    Bender knew about the alleged false and misleading statements, but decided to "let it go" (May 4, 2006 Hearing Transcript, at 33:24-35:7 (Freedman)).

8.    Plaintiffs have failed to adduce any evidence that the statements in the Douglass Letter were false or misleading. As the full extent of support for their claim, Mr. Bender testified as follows:

- 55 -

> Well, again they talk about things that I've done which are not correct. And they talk about they don't know who my people are and they're not, that I nominated that they're not qualified which I don't believe is correct. They talked about that again that they got into court with me and that they won after they spent $3,000,000. I don't believe they won anything. They withdrew the case.

(May 4, 2006 Hearing Transcript, at 99:2-9 (Bender)).

9.    Plaintiffs failed to adduce proof that the alleged statements were: 1) a false statement; 2) in reference to a material fact; 3) made with the knowledge of its falsity; 4) with the intent to deceive; and 5) action is taken in reliance on the misrepresentation. *Caulfield v. Stark*, 893 A. 2d. 970, 974 (D.C. 2006).

10.    Plaintiffs have failed to plead actual reliance by either Mr. Bender or any other shareholder, and have proven no actual reliance.

11.    Plaintiffs have failed to prove materiality in the total mix.

12.    None of the defendants had any involvement with the letter. (Douglass Depo., Lines 126:13-128:6; 130:7-17).

13.    The Individual Defendants had no knowledge regarding the author of the letter.

14.    For these reasons, the Court should find that there is no likelihood that Plaintiffs will succeed on the merits of their §13(d) claims that any of the Individual Director was directly involved with the Douglass letter.

F.    **Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to Undirected Broker Votes Issue (Count III)**

1.      Plaintiffs allege that "the election of the management nominees violated the pertinent IFSB Bylaws, as well as Robert's Rules of Order ("Robert's Rules"), by which the Shareholders' Meeting was governed."  *See* Application at p. 24.

2.      Counsel for Plaintiffs submitted a proxy challenge (Exhibit 18) properly directed to the Independent Inspector of Election.  In that challenge, Mr. Bender stated that:

> This challenge is directed to the Independent Inspector of Election (hereinafter referred to at "IIOE") empowered with the responsibility of officiating the Tabulation of votes in connection with the Special Meeting of Shareholders of Independence Federal Savings Bank scheduled to be held on October 26, 2005.
>
> It has come to our attention that brokers behind ADP had discretionary voting rights which remain intact in connection with this meeting even though a contest for director nominees had been know by management for months.
>
> In management's proxy statement it states on page 11 under the heading "Voting" the following:
>
> Q:      If my broker or other nominee holds my shares for me, will my broker or such other nominee vote those share for me?
>
> A:      Your broker or other nominee will vote your share only if you provide instructions on how to vote to your broker or other nominee.  You should instruct your broker or other nominee on how to vote your shares, using the procedures provided by your broker or other nominee.  **Your broker will not vote your shares without your instructions.**
>
> It is believed that the relevant number of uncast broker non-votes are approximately 200,000 and the voting of such shares will have a material impact on the outcome of the election for directors.
>
> I ask that the IIOE not allow these uncast (by shareholders) discretionary votes (i.e. broker non-votes) be counted in favor of management's nominees since the underlying shareholders did not actually cast their votes and their inclusion is directly contrary to the express instructions provided to shareholders in management's proxy statement.

(Exhibit 18).

3.      Plaintiffs allege that the manner in which the broker shares were voted violated the by-laws.  (Complaint, ¶¶ 35-36).  The Plaintiffs have not pled nor alleged that the statement in Management's proxy regarding how broker shares are voted was false and misleading or a violation of Rule 14(a).  Specifically, Plaintiffs pled in there Complaint that it is a violation of by-laws for the Board of the Bank to not vote on how undirected broker shares are voted.  *Id.*

4.      Mr. Ray Riley was qualified and testified as an expert in how shares are held and voted, how proxies are used, and how voted are counted and inspected in corporate elections.  (April 28, 2006 Hearing Transcript, at 96:10-98:25)(Riley)).

5.      During the voting of shares on October 26, 2005, the brokers votes were cast by Brokers on behalf of their beneficial owners, on ADP's proxy.  (April 28, 2006 Hearing Transcript, at 99:3-100:18; 115:10-117:6)(Riley)).

6.      Through reference to the rules of the New York Stock Exchange, registered brokers are permitted to use discretionary authority to vote shares in certain instances. Pursuant to Rule 452 of the New York Stock Exchange ("10-day Rule"), when a broker receives no instructions from its client within 10 days prior to the meeting, the broker may give or authorize the giving of a proxy to vote such stock subject to certain limitations.  (*Id.* at 102:5-13).

7.      When the election is viewed by the broker as "uncontested", the broker can vote shares for which it did not receive instructions on "routine" matters.  Routine matters generally are items such as the election of directors or auditors.  Routine matters never involve changes to the capital structure of the corporation or a merger.  (*Id.* at 102:5-19).

8.     The term "contested" is term of art within the securities industries. Elections are contested when there are two or more proxy committees that present proxy cards in opposition to each other.  (*Id.* at 106:1-107:4; Dunlop Depo., Lines 103:13-104:4)  If there is only one proxy card, then there is only one mechanism for the broker to vote and no "contest" for the vote.  (April 28, 2006 Hearing Transcript, at 106:1-107:4)(Riley)).

9.     In uncontested elections, the broker will vote such shares in favor of all management nominees and routine proposals because there will not be any mechanism for the broker to vote otherwise because there will only be one proxy card. (*Id.* at 106:14-107:4).

10.     The brokers did not consider the election to be "contested" although it was "contentious."  (*Id.* at 109:4-13; Dunlop Depo., Lines 133:12-134:18).  Only Management had distributed proxy materials and solicited votes with a proxy card. (April 28, 2006 Hearing Transcript, at 147:1-148:7)(Riley)).

11.     The broker's instruction card to its customer, the beneficial owner, notified the owner that election was not contested and that the 10-day rule would apply. (Exhibit 82; April 28, 2006 Hearing Transcript, at 111:7-112:16; 120:2-10)(Riley)).

12.     Mr. Riley testified that the Q&A of a proxy statement is merely advisory. (*Id.* at 111:7-21; 117:20-119:10).

13.     The broker's votes are controlled by the agreement between the broker and the customer and  IFSB and the Individual Defendants had no control over this decision by the brokers.  (April 28, 2006 Hearing Transcript, at 111:7-112:16; 120:2-10)(Riley)).

14.     In this instance, the OTS allowed Mr. Bender to solicit votes and publish proxy materials but not solicit proxies with a proxy card. (May 4, 2006 Hearing Transcript, at 36:24-38:25)(Freedman)).

- 59 -

15.    Mr. Bender also was allowed to nominate a slate of directors.  (April 28, 2006 Hearing Transcript, at 147:10-149:23)(Riley)).  That fact, coupled with the fact that he could not solicit proxies created a Catch-22; a situation created by the OTS, not the Bank. (April 28, 2006 Hearing Transcript, at 147:10-149:23)(Riley)).

16.    Mr. Bender filed his Change of Control Application on August 29, 2005—more than a month before the Bank distributed its proxy materials.  (Exhibit 80, at 4.).  In his Amendment 18, Mr. Bender stated his intent attain change of control authority so he could conduct a proxy contest.  (Exhibit 211, at p. 5).

17.    When the Bank prepared its proxy materials, it anticipated that Mr. Bender would file an opposing proxy and the election of directors would be "contested."  ((April 28, 2006 Hearing Transcript, at 34:18-35: 19 (Batties)).  When Mr. Bender failed to file a proxy, the election became uncontested in the eyes of the brokers.

18.    Mr. Bender did not discover this until October 24, 2005.  In an e-mail of that date (Exhibit 25), counsel for Mr. Bender complained to the New York Stock Exchange that ADP, one of the lead brokers, was treating the meeting as a "routine matter for voting purposes." As a consequence, ADP and the other brokers intended to vote shares which they held, and for which they had no instructions from the beneficial owners, in favor of all management nominees and management proposals.

19.    However, notwithstanding the entreaties from counsel for Mr. Bender to the New York Stock Exchange, both the broker dealers and the New York Stock Exchange continued to maintain that the 2005 annual meeting was uncontested.  (Exhibit 25).  By not sending shareholders a proxy statement, Mr. Bender was responsible for the brokers not regarding the election as contested.

20.     OTS caused the problem by precluding Bender from soliciting proxies. Bender failed to appeal that decision even though he had more than 5 months.  (May 4, 2006 Hearing Transcript, at 36:24-41:4 (Freedman); 118:21-119:7 (Bender)).

21.     No customer of any broker has complained.

22.     The inspector of election takes the ADP proxy on its face and could not neutralize shares of a "valid proxy."(April 28, 2006 Hearing Transcript, at 110:4-11)(Riley)).

23.     The statement, "**Your broker will not vote your shares without your instructions,"** if anything benefited Mr. Bender.  If a shareholder wanted to support Mr. Bender, that shareholder could exercise more voting power by securing a legal proxy and affirmatively casting a vote in his favor than by hoping that the broker, in fact, withheld the vote from management.  Therefore, that language should have the effect of encouraging his supporters to vote , and not to rely on the broker.

24.     Management's inclusion of that language in the proxy statement was an innocent mistake.  Inclusion of the statement was not in bad faith. (April 28, 2006 Hearing Transcript, at 34:18-35: 19 (Batties)).

25.     That language appeared in the proxy material for the proposed September 14, 2005 meeting.  (Exhibit 27, at p. 12).  Those materials were distributed on August 25, 2005. (Exhibit 27).

26.     Mr. Bender was permitted by the OTS to review the Bank's draft proxy material before the OTS approved it.  Mr. Bender never complained about that language as being false or misleading.  (*See* Exhibit 28).

27.    Mr. Riley, the Bank's expert, testified that the challenge to how the broker votes were counted was not a valid challenge and should have been denied. (April 28, 2006 Hearing Transcript, at 119:11-16)(Riley)).

28.    Plaintiffs pled in their Complaint that 200,000 broker shares were improperly voted. (Complaint at ¶36). Mr. Freedman testified that Plaintiffs pled that number based purely on a guess. (May 4, 2006 Hearing Transcript, at 81:25-82:21)(Freedman)) Mr. Freedman also testified that all 396,000 broker shares should be disqualified. *Id.* Mr. Freedman was engaged in speculation.

29.    Mr. Riley testified that there is no way of knowing exactly how many broker shares were undirected. (April 28, 2006 Hearing Transcript, at 113:19-115:9)(Riley)). Quantifying the error would require pure speculation. *Id.*

30.    Mr. Riley demonstrated, through Exhibit 230, that even assuming that all 396,000 broker votes were neutralized because of the statement in the Proxy materials, the outcome of the election would not have changed. One of the two management nominees that won seats would have had to have received fewer than the 26,269 votes that were cast in favor of Mr. Bender's unsuccessful nominee, Mr. George. Even excluding all 396,000 broker shares (which is less than the 466,285 shares used in Mr. Riley's calculation on Exhibit 230), both of Management's nominees would have had more than 26,269 votes and would have won the seat on the Board. (Ex. 230).

31.    Accordingly, neutralizing the broker shares, while wholly unsupported by the record, also would be futile.

32.    As discussed above, equity will not make a futile order.  *Blank v. La Montagne-Chapman Co.*, 205 N.Y.S. 45 (N.Y.Sup. 1924); *Carmichael v. Dan Nance Corp.*, 264 S.E.2d 601 (S.C. 1980); *Munchak Corporation v. Cunningham*, 457 F.2d 721 (4th Cir. 1972).

33.    For all the foregoing reasons, the Court should find that there is no likelihood that Plaintiffs will succeed on the merits of their claims involving the Broker Shares.

G.    **Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to Allocation of Votes Issue (Count III) (By-Laws)**

1.    Plaintiffs allege that "the election of the management nominees violated the pertinent IFSB Bylaws, as well as Robert's Rules of Order ("Robert's Rules"), by which the Shareholders' Meeting was governed."  *See* Application at p. 24.

2.    Specifically, Plaintiffs appear to allege that unless Management had allocated its votes prior to the close of the voting at the October 26, 2005 meeting, then Management's votes were improper and should not be counted.  (May 4, 2006 Hearing Transcript, at 71:12-17 (Freedman)).

3.    During the October 26 shareholders meeting, counsel for Mr. Bender properly directed a proxy challenge to the Independent Inspector of Elections, Creighton Dunlop, who had the authority to decide such challenges.  (Dunlop Depo., Lines 111:2-18).  In that challenge, Mr. Bender stated that:

> It has come to our attention that the master ballot representing proxies received by the board of directors may not be voted prior to the closing of the polls.  Pursuant to Section 45 of Robert's Rules of Order, all votes must be received prior to the polls being closed. …
>
> I ask that the IIOE not allow any master ballot casting votes be submitted or altered after the closing of the polls unless the polls are reopened by a majority vote of shares entitled to vote in accordance with Section 45 of Robert's Rules of Order.  (Exhibit 17)

4.      The only evidence that Plaintiffs adduced regarding whether the manner in which Management voted and allocated their shares was the opinion testimony of Mr. Freedman that he thought Robert's Rules required all voting to be complete by the close of the polls and that allocating shares is the same as voting shares.  (May 4, 2006 Hearing Transcript, at 67:20-70:17)(Freedman)).  Mr. Freedman admitted that he is not an expert in Robert's Rules or in inspecting elections. (*Id.* at 67:17-19; 53:11-22).

5.      During the voting on October 26, 2005, the master ballot representing proxies received by the board of directors was cast.  (Exhibits 7, 16).  That ballot provided as follows:

> In lieu of voting as provided above, the undersigned vote as per proxies filed, allocating among management nominees to be named by the undersigned, or a duly appointed representative thereof, upon the announcement by the Inspector of Election of the number of votes that the undersigned has power and authority to vote, all of such votes in a manner that will result in the election of as many of such named management nominees as possible.  The undersigned acknowledge that this vote is intended to provide a reasonable opportunity for the undersigned as holder of proxies to allocate votes among management nominees based on proxies verified by the Inspector of Elections.

6.      As set forth above, this same process had been used in previous years, and was known to Mr. Bender and his counsel, but had not been objected to previously.  (Exhibit 227A-227D).

7.      The master ballot representing proxies received by the Board of Directors was voted during the election and votes were allocated once the IIOE had tabulated the votes.  (Dunlop Depo., Lines 114:21-115:21)

8.      Mr. Bender and his attorneys had known about, and not objected to, the process for more than two years.  (May 4, 2006 Hearing Transcript, at 60:25-62:15)(Freedman)).

- 64 -

9.     Creighton Dunlop, the Inspector for the October 26, 2005 meeting, testified that he had inspected elections for 23 years, inspected dozens of elections with cumulative voting, inspected over 300 contested elections, and over 500 elections in general.

10.     Based on his vast experience, Mr. Dunlop testified that the way Management voted and allocated their shares was not improper. (Dunlop Depo., Lines 115:12-21).  Mr. Dunlop also testified that he did not recall Mr. Bender objecting to the allocation of shares after the close of polls in 2003, when he solicited proxies; and in fact, recalled Mr. Bender utilizing the same procedure that they are currently protesting.  (*Id.*, Lines 119:3-121:17).

11.     Mr. Riley, the Bank's expert, testified that he has inspected over 300 elections.  (April 28, 2006 Hearing Transcript, at 98:5-11)(Riley)).

12.     Mr. Riley also testified that the way in which the Bank voted and allocated its votes was proper under the common practice and within industry standards.  (*Id.* at 129:2-130:10).  Mr. Riley also testified that the language used by Management's Proxy Committee on its ballot, directing the Inspector how the Bank intended to vote its shares, was standard language used in the industry.  (*Id.* at 129:2-22).

13.     It is well recognized in the securities industry that it would be unwise for management to cumulate and allocate votes before the close of the election.  (Dunlop Depo., Lines 106:10-19; 107:8-17).  It is standard practice in a cumulative voting situation for the parties to wait until they have full information from the inspectors of elections before cumulating their votes.  (Dunlop Depo., Lines 109:12-17).  That is precisely what occurred here.  (Dunlop Depo., Lines 109:18-19).

14.    Cumulating and allocating votes prior to the end of the election would mean that management would do so without full information and it would be very easy to make mistakes.  *Id*.

15.    Mr. Riley testified that voting without full information would be tantamount to a breach of a duty to the shareholders who vested Management with the proxy power.  (April 28, 2006 Hearing Transcript, at 123:22-124:17)(Riley)).

16.    Mr. Bender alleges that the process for voting described above violated Section 9 of the IFSB by-laws.  (Exhibit 218 )

17.    The relevant language of Section 9 (Exhibit 218) of the IFSB by-laws provides that, "Proxies solicited on behalf of management shall be voted as directed by the shareholder or, in the absence of such direction as determined by majority of the board of directors."

18.    The master ballot representing proxies received by the board of directors contains the signatures of five (5) members of the Board of Directors of IFSB, a majority. (Exhibits 7)

19.    Mr. Freedman testified that Robert's Rules requires Management to vote within the prescribed time for all shareholders to vote.  (May 4, 2006 Hearing Transcript, at 67:20-68:3)(Freedman)).

20.    IFSB is a federally chartered savings bank, so it is required to employ cumulative voting. (May 4, 2006 Hearing Transcript, at 74:18-19)(Freedman)).

21. The Association's bylaws expressly allow for cumulative voting in an election for the board of directors but does not specify the procedure to be used in allocating the votes. Section 12 of Article II of the bylaws reads as follows:

> **Section 12.  Cumulative Voting.** Every shareholder entitled to vote at an election for directors shall have the right to vote, in person or by proxy, the number of shares owned by the shareholder for as many persons as there are directors to be elected and for whose election the shareholder has the right to vote, or to cumulate the votes by giving one candidate as many votes as the number of such directors to be elected multiplied by the number of shares shall equal or by distributing such votes on the same principle among any number of candidates.

22. Other than the direction provided in Section 12, the Association's bylaws do not address the procedure for allocating cumulative votes. Neither do Robert's Rules of Order which the Association adopts in Section 4 of the bylaws to the extent they do not conflict with OTS regulations or the bylaws. (Exhibit 218).

23. Cumulative voting is addressed in Rule 46 of Robert's Rules of Order and its description is nearly identical to what is in the Association's bylaws. (Exhibit 19A, at 431).

24. The bylaws do, however, in Section 13 provide the Inspectors of Election with broad authority to decide questions relating to the acceptance or rejection of votes. Section 13 cites the duties of Inspectors of Election as including:

> . . . determining the number of shares and the voting power of each shares, the shares represented at the meeting, the existence of a quorum, and the authenticity, validity and effect of proxies; receiving votes, ballots or consents; hearing and determining all challenges and questions in any way arising in connection with the rights to vote; counting and tabulating all votes or consents; determining the result; and such acts as may be proper to conduct the election or vote with fairness to all shareholders."

25.     It is generally held that inspectors of election may, in the exercise of reasonable discretion and for the purpose of enabling all stockholders to vote, keep the polls open beyond the time designated for closing the polls or limited by the board of directors. (See Clopton v. Chandler, 27 Cal. App. 595, 150 P 1012, 1015 (1915); State ex rel. Dunbar v. Hohmann, 248 S.W.2d 49, 52 (Mo. App. 1952); Re Mohawk & Hudson R .R. Co., 19 Wend. 135, 147 (1838); and Smith v. Orange & Rockland Utilities, Inc., 162 Misc.2d 606, 617 N.Y.S. 2d 278, 280 (1994).

26.     The Inspectors of Election appointed by the Association, especially given the broad authority granted in the bylaws (which are similar to those granted the committee on elections in Clopton), has the authority to keep the polls open or to reopen the polls to allow votes to be allocated in accordance with the shareholders' wishes.

27.     This is consistent with the general rule that "... a vote, although actually cast, does not become final until the result of the voting has been announced, until which time any vote may be changed at the will of the voter." 19 C.J.S. § 440(a), citing Zierath Combination Drill Co. v. Croake, 21 Cal. App. 222, 131 P. 335 (1913).   Other jurisdictions have held similarly.  Dynamics Corporation of America v. CTS Corporation, 643 F. Supp. 215, 218 (N.D. Ill. 1986).

28.     This rule is also found in Rule 46 of Robert's Rules of Order, stating that "[a] member has the right to change his vote up to the time the vote is finally announced."

29.     On or about October 28, the independent inspector of election completed Tabulation of the votes and advised IFSB the results of its inspection of the proxies and the determination of their validity, including exclusion of double votes.  (Exhibit 11).

30.     Those results were as follows:

| Nominees for Three-Year Term | For | Withheld |
|---|---|---|
| Williams B. Fitzgerald, IV | 1,439,155 | 7,037 |
| David W. Wilmot,  Esq. | 1,412,322 | 7,037 |
| Marion O. Green, Jr. | 789 | 7,064 |
| Osborne George | 26,269 | -0- |
| John Silvanus Wilson, Jr. | 1,390,246 | -0- |

31.     Therefore, even under Mr. Freedman's assessment of page 400 of Robert's Rule, Management could have voted their shares until October 28, when the inspector announced the vote.  (Exhibit 19A).

32.     Plaintiffs also depend on Mr. Freedman's reading of the by-laws and Robert's Rules to support their assertion that the votes must be allocated before the close of the polls.

33.     Section 4 of the Bank's by-laws require that meetings be conducted in accordance with Robert's Rules of Order, to the extent they do not conflict with an OTS regulation or a by-law.  (Exhibit 218).

34.     Section 8 of the by-laws require the election of directors by plurality voting.  (Exhibit 218).

35.     Mr. Freedman testified that he relied on the part of Section 45 that deals with preferential voting. (May 4, 2006 Hearing Transcript, at 68:4-69:7 (Freedman)).

- 69 -

36.     Robert's Rules of Order, however, clearly makes a clear distinction between preferential voting and plurality voting.  (Exhibit 19A, at 414).  It says, "[T]his type of preferential voting is preferable to an election by plurality . . . ."  Under these Rules, plurality voting is not preferential voting.

37.     Because the by-laws require plurality voting, the part of Section 45 on preferential voting relied on by Mr. Freedman cannot bind the Bank's election.  Robert's Rules only apply to the extent they do not conflict with the by-laws.  (Exhibit 218, at Section 4).

38.     For all these reasons, the Court should find that there is no likelihood that Plaintiffs will succeed on the merits of their claims involving the issue of allocating Management's proxy votes.

H.     **Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to Delay in Start of Meeting** (Count III)

1.     As set forth above, the rescheduled Annual Meeting of Shareholders was scheduled to begin at 11:00 AM on October 26, 2005.

2.     Prior to 11:00 a.m., counsel for Mr. Bender submitted to the Independent Inspector of Election ("IIOE") two formal proxy challenges.  (Exhibits 17 and 18).  Neither of the proxy challenges was on the agenda for the meeting (Exhibit 21), nor had Mr. Bender sought to have the challenges placed on the agenda.  (May 4, 2006 Hearing Transcript at 47:17-25).

3.     Recognizing the contentious nature of the relationship between IFSB management and Mr. Bender, the chairman and vice chairman of the Bank conferred with counsel regarding the two challenges.  (April 21, 2006 Hearing Transcript at 149:11-17).

4.    After conferring, Mr. Wilmot directed Bank counsel to telephone the OTS to advise them of the challenges, and the likelihood that, while the meeting might be delayed, it would go forward not changed, and to confirm whether there was any OTS objection.  Due to the delay caused by the foregoing discussions, a decision was made to recess the meeting for lunch.  When OTS personnel proved to be unavailable by phone, IFSB's regulatory counsel, Mr. Royer, later sent an e-mail to the OTS.  (Exhibit 219).

5.    At about noon on October 26, 2005, Mr. Wilmot advised the persons gathered for the annual meeting that there would be a delay, that lunch would be provided, and that the meeting would resume at 3:00 PM.  At that time, there was no objection made to the delay.  (April 21, 2006 Hearing Transcript, at 86:10-88:8 (Wilmot)).

6.    Mr. Bender would not have objected to a delay, instead hoping that Mr. Doley, who was delayed in arriving, would attend the meeting and be able to vote his the proxies be held for Mr. Bender's nominees.

7.    Mr. Harold Doley missed his plane from New York and was delayed for approximately an hour in arriving at the annual meeting.  That delay, however, was not the reason for recess of the annual meeting.  ( Wilmot).

8.    Mr. Doley and Ms. Jordan, who are friends, went to lunch.  Bank counsel, Mr. Royer, accompanied them.  Later, Ms. Jordan invited Mr. Wilmot, to join them for lunch, which Mr. Wilmot did.

9.    At 3:00 PM, the annual meeting resumed.  At that time, the voting for directors was commenced and concluded.

10.     Prior to the vote on the election of directors, counsel for Mr. Bender verbally made the same two (2) challenges that he had previously provided in writing to the IIOE.  (Dunlop Depo., Lines 111:2-18).

11.     Believing that the objections could only properly be made to the IIOE and not the Chair, and believing that the objections were out of order, the Chairman ruled the objections out of order.  (April 21, 2006 Hearing Transcript, at 10-25)(Jordan)).

12.     The vote was taken and the meeting was then adjourned.  The independent inspector of election took the votes back to his place of business for tallying.  (Exhibit 220).

13.     Plaintiffs alleges that the decision to delay the meeting on October 26, 2005 should have been mad by the entire board.

14.     The By-Laws, section 4, vest the chairperson board discretion to call special meetings, without the vote of the Board.  (Exhibit 218).

15.     Additionally, Section 5 states: "It shall not be necessary to give any notice of the time and place of any meeting adjourned for less than 30 days or of the business to be transacted at the meeting, other than an announcement at the meeting which such adjournment is taken." (Exhibit 218).  No vote of the board is necessary to adjourn a meeting for less than 30 days.

16.     For all these reasons, this Court should find that there is no likelihood of success on the merits of Plaintiffs' claims related to the meeting delay.

IV.     **Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to the Balancing of the Interests of the Parties and the Bank's Other Shareholders**

**LACHES**

1.      Plaintiffs are not entitled to equitable relief because of their unreasonable delay in raising most of the claims raised in this suit and the substantial prejudice the Defendants, the Bank,, and the shareholders will face from tying to re-establish the October, 2005 status quo. *Russell v. Todd*, 309 U.S. 280, 287, 60 S.Ct. 527, 531, 84 L.Ed. 754 (1940); *Amer. Univ. Park Assoc. v. Burka*, 400 A.2d 737, 740 (D.C. 1979).

2.      As discussed at length above, the doctrine of laches should prevent Plaintiffs from benefiting from their dilatory approach to pursuing their rights. Plaintiffs knew of the allegedly false and misleading statements in the Committee Letter and the May proxy material five months prior to the October 26, 2005 meeting. Plaintiffs knew about the Bank's practice of allocating its shares as early as 2003 and should have known of the Undirected Broker Vote issue as early as the August distribution of the proxy materials for the September 14, 2005 meeting date. He knew of the OTS's decision to bar him from soliciting proxies in April, 2005. Plaintiffs knew of the allegedly false statements in the McPhail Letter before the October meeting, but decided to "let it go." Even after the October 26, 2005 meeting, Mr. Bender's counsel stated, "It was a very unfair process, but we want to see the results of the election before we decide what to do next." (Exhibit 226). It was only in January, 2006 that Mr., Bender decided to finally pursue these claims.

3.      In the meantime, the Bank expended a large amount of money to put on the Shareholders Meeting.  The Board has been seated and approved and is governing the affairs of the Bank.  The shareholders took time off to participate in the meeting and properly exercised their rights as shareholders.

4.      Overturning the election, after Mr. Bender waited until 2006 to try to enforce his rights, will invalidate the sitting Board, delay the sitting of the next Board, disrupt the orderly terms of the Board, cause the Bank to re-run the proxy materials and the meeting at great cost to the Bank and its shareholders, damage the reputation of the Bank, and scare potential customers, depositors, and vendors with threats of instability.

5.      Therefore, Plaintiffs interest in belatedly pursuing his claims is far outweighed by the Bank's need for order and certainty.

### IN PARI DELICTO

6.      Mr. Bender should not be afforded equitable relief, because he comes to the Court with unclean hands.

7.      The record is replete with testimony and documents evidencing a pattern by Mr. Bender of engaging in similar or worse behavior than the behavior of which he has accused the Defendants.  Mr. Doley and Mr. Thompson testified that he tried to solicit their votes or buy their shares while he was prohibited from doing so.  He distributed a letter as egregious as the Letters he complains about and circumvented the OTS review process.  His inability to solicit proxies was the result of behavior that the OTS deemed inappropriate in his dealing with Colombo Bank.  He has used the courthouse as an arena to battle the will of the majority of the shareholders who value the traditions of IFSB.

- 74 -

8.      To the extent that the Bank or its shareholder, officers or directors have been defensive in their efforts to preserve the management tradition of the Bank, it is greatly attributable to Mr. Bender's aggressive efforts to take control of the Bank by any means.

9.      Mr. Bender does not represent the interests of most other shareholders who wish to maximize their investment and preserve of pillar of support in the community.  As he described in his Change of Control Application, Mr. Bender would like to acquire shares cheaply and transform the Bank into a sister-institution with his non-minority Colombo Bank.

10.     Therefore, the benefit of the heated battle should not inure to Mr. Bender when he is at more culpable for the escalation.

**FUTILITY**

11.     Equity will not make a futile order.  *Blank v. La Montagne-Chapman Co.*, 205 N.Y.S. 45 (N.Y.Sup. 1924);  *Carmichael v. Dan Nance Corp*., 264 S.E.2d 601 (S.C. 1980); *Munchak Corporation v. Cunningham*, 457 F.2d 721 (4th Cir. 1972).

12.     As demonstrated by Mr. Riley, even if this Court wished to fashion some equitable relief regarding how the shares of stock were voted, no single allegation would have sufficient impact on the election to require the election to be overturned.  In fact, even the combination of the three allegations that were pled in the Complaint and Application for Preliminary Injunctive Relief for which Plaintiffs seek neutralization does not sufficiently impact the election to require a re-vote.

13.     Therefore, this Court should not require a futile act.

INEQUITY

14.    It would be inequitable for this Court to require the Bank and its shareholders to suffer for alleged activities that, if true, were alleged to be performed *ultra vires*. In other words, the wrongs of the individuals should punish the whole of the Bank and its shareholders and depositors.

15.    Similarly, Mr. Bender has sued on his own behalf.  He should not get the benefit of actions that allegedly effected the entire Bank and all the shareholders, who have not complained of any of the acts.  If equitable relief is given to Mr. Bender, all the other shareholders who were allegedly injured would additionally be disenfranchised by a decision that they are not in favor.

16.    For the reasons, the balance of the equities favors denying Mr. Bender's Application for Preliminary Injunctive Relief.

## V.    Proposed Findings of Fact, Conclusions of Law, and Mixed Questions of Law and Fact Relating to The Remedies Plaintiffs' Seek

1.    As set forth above, Plaintiffs seek an Order from this Court embodying six elements of mandatory injunctive relief.  The crux of Plaintiffs' application is their request for a mandatory injunction voiding the results of the October 26, 2005 meeting of shareholders.  Four of the five elements (requiring compliance with Section 13(d) requirements, neutralizing shares, compelling accurate proxy disclosure, and forbidding further meetings) depend on the request to void the results of the meeting.[17]    The fifth element of relief (to prohibit the bank from

---

[17]    *See* Plaintiffs' Application, at 13, 16, 24.  Without redoing the prior election, the relief Plaintiffs' seek is meaningless.  Apparently, Plaintiffs seek retrospective compliance with Sections 13(d) and 14(a), neutralization of shares, and the correction of alleged procedural irregularities, in advance of a new, redone, 2005 shareholder's meeting.  The purpose of the requested relief is to afford Mr. Bender with the assurance that both persons on his board slate will be elected.  Without an order granting a new election, all of the

131137v1

indemnifying the Individual Directors or reimbursing their legal expenses) is derivative of the other four.

2.    Yet, given the current posture of this case, the allegations which Plaintiffs make against the Individual Defendants cannot lead to an Order from this Court voiding the meeting.  The argument is in four parts.

3.    First, Plaintiffs sue for themselves, not the Bank and not other shareholders.  Plaintiffs have brought suit for themselves alone, not as class representatives under Rule 23 and not as derivative plaintiffs under Rule 23.1.

4.    Plaintiffs have been clear in stating that, while the relief they seek may effect others, they sue solely for themselves and to advance their interests.  (May 4, 2006 Hearing Transcript at 140:16-141:10).

---

retrospective relief would be meaningless.  If plaintiffs argue that prospective compliance with the law is all they seek, then the application is also flawed because the issue is not ripe for adjudication, and thus, this Court does not have jurisdiction over the claim.  *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all"(citations omitted)).

131137v1

5.    Second, the Bank is not a party to Counts I, II, or III.  Plaintiffs have described the Bank as a nominal defendant and, in fact, the Bank is only named as a defendant in Count VI of the Complaint relating to indemnification for and advancement of legal expenses in incurred by the Individual Directors in connection with this matter.  The Bank is not named as a defendant in Counts I through V of the Complaint.  And, the injunctive relief sought under Count VI is derivative of the relief sought under Counts I, II and III.  Stated another way, only if the Individual Defendants are held liable under one or more of Counts I, II and III will the relief Plaintiffs seek under Count VI come into play.  The Bank is, just as Plaintiffs suggest, a nominal party.

6.    Third, Plaintiffs have sued the Individual Directors in their individual capacities, not as members of the board of directors of the Bank.  For example, had Plaintiffs brought the claims which they make in this lawsuit to the attention of the board, and had the board refused to take action on behalf of the bank, Plaintiffs could have sued the Individual Defendants derivatively under Rule 23.1 as members of the board and sought relief.[18]  But, in resisting Defendants' motions to dismiss Counts II, III and VI on the grounds that the claims can only be brought derivatively and not individually, Plaintiffs have been adamant that this is not what they seek to do.

---

[18]    And, In so doing, Plaintiffs would have been subject to the requirements of Rule 23.1.

7.     Fourth, Plaintiffs sued the Individual Defendants for acts done outside of their authority as directors.  Count VI conclusively demonstrates that Plaintiffs allege that the actions of the Individual Defendants about which they complain were ultra vires.  Plaintiffs claim that the conduct of the Individual Defendants was both wrongful and in bad faith, so as to preclude indemnification and reimbursement. In effect, Plaintiffs seek a finding that the Individual Defendants were acting outside of the scope of their agency and authority as members of the board of directors of the Bank.

8.     Yet, in seeking an Order voiding the results of the October 26th election and redoing the shareholders meeting, Plaintiffs seek to require remedial actions by the Bank: (1) as a consequence of others acting outside the realm of their authority as Bank directors,  and (2) even though the Bank is not a party to the claims giving rise to the requested relief.

9.     Simply put, individual claims made by individuals against individuals can only result in individual relief.  The Bank and all IFSB shareholders, excluding Bender,, who are all third parties to the claims at issue cannot be enjoined without notice.  *Paramount Pictures Corp. v. Carol Pub Group, Inc.*, 25 F. Supp. 2d 372, 374 ("While a court cannot lawfully enjoin the world at large, an injunction binds a nonparty who has actual notice of an order and acts in concert with the enjoined party); *see also*, *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) ("The proper analysis has been and should remain that … a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation").

10.     In light of the manner in which Plaintiffs have chosen to plead and prosecute their claims, the range of relief they can seek is necessarily limited.  Given that the claims made are by an individual against individuals, assuming that there is a cause of action at all, only relief which is thus limited is available.

11.     For example, if the court concludes that Section 13(d) was violated by one or more of the Individual Defendants, then the only relief available is on a prospective basis and against each Individual, not the Board as a whole or the Bank.  Undoing the results of the last meeting of shareholders is not an option.

VI.     **Conclusions**

WHEREFORE, for the findings of fact and conclusions of law set forth above, Plaintiffs Application for Preliminary Injunctive Relief should be denied.

VII.     **Request for Oral Argument**

Defendants respectfully request oral argument on the Findings of Fact and Conclusions of Law argued in the parties respective submissions.

131137v1

Respectfully Submitted,

Dated May 19, 2006                     SHOOK HARDY & BACON LLP


_____/s/_____
Peter E. Strand

OF COUNSEL                            Carlos E. Provencio
KALBIAN & HAGERTY                     Christie Hudson
                                      Hamilton Square
Haig V. Kalbian                       600 14th St. NW
Mary B. Baker                         Suite 800
Brawner Building                      Washington, DC 20005-2004
888 17th Street, N.W.                 Phone: 202-783-8400
Suite 1000                            Fax: 202-783-4211
Washington, DC 20006-3967
Phone: 202-223-5600                   Attorney for Defendants Jordan, Wilmot, Cobb,
Fax: 202-223-6625                     Fitzgerald, Youngentob, and Batties

Attorney for Defendant Independence Federal
Savings Bank

- 81 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of May, 2006, a true and complete copy of the forgoing **Individual Defendants' Proposed Findings of Fact and Conclusions of Law** was sent electronically to the following:

Dale A. Cooter, Esq.
Cooter, Mangold, Tompert and Wayson, L.L.P.
5301 Wisconsin Ave, NW
Suite 500
Washington, D.C.  20015
T: (202)537-0700
F: (202)364-3664
*Attorneys for Plaintiffs*

Haig V. Kalbian
Mary Baker
888 17th Street, N.W., Suite 1000
The Brawner Building
Washington, D.C. 20006
*Attorney For Defendant Independence Federal Savings Bank*

_____ /s/ _____
Peter E. Strand

- 82 -

131137v1