# EXHIBIT F
## EXCERPTS OF 5/4/06 HEARING
## (ROBERT FREEDMAN TESTIMONY)

1  A.    You can mail it without the OTS approval because they

2  apply the SEC rules but the OTS considers themselves a merit

3  regulator and I think they might have a lot harder time than

4  the SEC would as far if you went ahead and mailed without

5  filing them first.

6  Q.    If you would just answer my question it will go a lot

7  faster.0.

8       You can mail proxy materials without prior approval of OTS?

9  A.    You can, yes.

10  Q.    But you run the risk that if you mail them the OTS is

11  going to come down on you, correct?

12  A.    You do.

13  Q.    Did you attend a meeting on or about October 19th with

14  Mr. Bender, Mr. Jeffrey Thompson, Mr. Whitesol, Mr. Thompson's

15  attorney?

16  A.    Yes.

17  Q.    Did Mr. Bender encourage Mr. Thompson to vote for his

18  slate of directors at any time during that meeting?

19  A.    Yes, he did.

20  Q.    Did Mr. Bender suggest a new path for the bank during the

21  course of that meeting?

22  A.    I don't recall the specifics.  I know Mr. Thompson had

23  asked for the meeting and had asked what Mr. Bender's plans are

24  so that he, I believe he had just recently bought stock and he

25  wanted to know what, how he was going to vote.

1  you were representing Mr. Bender, correct?

2  A.    Yes.

3  Q.    And only Mr. Bender?

4  A.    Yes.

5  Q.    And you were not representing all of the shareholders were

6  you?

7  A.    No.  I was making a challenge on behalf of one

8  shareholder, that's how it is normally done.

9  Q.    Because when you make an objection like this you do it for

10  yourself, not for everybody, correct?

11  A.    Yes.

12  Q.    Now the challenges were not on the agenda were they?

13  A.    Challenges generally are not on the agenda.

14  Q.    That's interesting but what I'd like to know the

15  challenges are in fact not on the agenda Exhibit 21, correct?

16  A.    Correct.

17  Q.    And you did not make any attempt to get the challenges on

18  the agenda did you?

19  A.    I'd like to correct one thing at this point.

20      In my deposition I said that I had just raised it at the

21  meeting.  When I got back to the office, I discussed with my

22  partners and they reminded me that I had sent a letter to John

23  Hall, counsel for the bank, some time before then asking for a

24  meeting to discuss the various problems we were going to have

25  at the meeting.

48

1      And he had set up the meeting, he had agreed to have it.

2   I've known John for 20 years, 25 years.  Honorable guy.  He

3   called me later, said his client wouldn't let him meet with me.

4   Q.   All right.

5   A.   I've got the letter if you need it.

6   Q.   There was an extensive document production request filed

7   in this case by defendants wasn't there on Mr. Bender?

8   A.   Your own bank counsel would have that letter also.

9   Q.   We haven't seen the letter yet?

10  A.   Well, okay, well you all have it.

11  Q.   Fair enough.  I haven't seen it?

12  A.   Okay.  Fair enough.

13  Q.   So your testimony today switching from your deposition --k

14  A.   Yes.

15  Q.   Is that there's a letter out there?

16  A.   I had not remembered that.  I remembered it when I got

17  back.  And I wanted to make sure that I did clarify the record.

18  Q.   All right.  In fact, there were letters out there for

19  years, from years ago weren't there?  Let's look at Exhibit

20  227.

21  A.   What's the date on the -- oh, I see it.

22  Q.   That letter goes all the way back to April 28th, 2003?

23  A.   Right.

24  Q.   We'll talk about that in just a moment in connection with

25  Exhibit 17.

1   voted approximately 200,000 shares, correct?

2   A.   That was a guess.

3   Q.   It was a guess?

4   A.   It was a guess.

5   Q.   Okay.  And you put that in your challenge, your formal

6   challenge 18?

7   A.   Yes.

8   Q.   Did you tell anybody that it was just a guess?

9   A.   No, sir.

10  Q.   What methodology did you undertake, just a wild guess?

11  A.   I think that was an estimate that Mr. Bender came up with.

12  It turned out that it was a lot more than that.

13  Q.   Have you calculated the number now?

14  A.   If you take out the one challenge that I saw in the

15  materials, you have to assume that all of the votes that were

16  cast by the brokers were cast without instructions and

17  therefore, is like 396,000 something like that.

18      If you take a second method and go back and look at the

19  number of votes that are cast on, cast on proposition number

20  two which requires specific instructions, the number is a

21  little bit less but not much.  So it's around that number.

22  Q.   Now in your experience most elections folks don't turn in

23  their instruction cards do they?

24  A.   Well, if they understand, well, yeah.  I don't believe so.

25  But I don't know.

89

1  Q.    Further down it talks about Mr. Doley's comments and that

2  he advised the post that his firm and clients own about

3  12 percent, do you see that?

4  A.    Yes, I do.

5  Q.    Did you ever have a chance, an opportunity to check and

6  see whether he owns 12 percent?

7  A.    I tried to check with the, there was no 13 D filed, with

8  the OTS and I thought maybe by mistake he might have filed it

9  with SEC.  A lot of people make that mistake and think that the

10  SEC takes all 13 Ds.  They don't.  And there was none filed

11  there either.

12  Q.    So there's no 13 D at the SEC?

13  A.    I could not find one.

14        MS. MANGOLD:  That's all the questions I have, Your

15  Honor.

16        THE COURT:  Tell me what's the significance of that?

17  You mean there's no public record as to how much they own?

18        THE WITNESS:  That's correct, Your Honor.

19        THE COURT:  We're talking about Doley, right?

20        THE WITNESS:  Yes, Your Honor.

21        THE COURT:  Doley votes as I understood it his

22  clients shares, it's his clients who own the shares and he just

23  votes them.

24        MS. MANGOLD:  Your Honor, Doley Securities owns some.

25  And in the documents we can point that out in the briefing.  It