ATTACHMENT 1

(WOOD DEPOSITION)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

--------------------------x
MORTON A. BENDER et al.,      :
                             :
        Plaintiffs,          :
                             :
        v.                   : No. 1:06CV00092
                             :
CAROLYN D. JORDAN et al.,     :
                             :
        Defendants.          :
--------------------------x

                              Washington, D.C.

                              Thursday, June 8, 2006

Deposition of

            MARIA A. WOOD

a witness, called for examination by counsel for

Plaintiffs, pursuant to notice and agreement of

counsel, beginning at approximately 2:27 p.m., at

the law office of Cooter Mangold Tompert & Karas,

L.L.P., 5301 Wisconsin Avenue, NW., Washington,

D.C., before Christine Allen of Beta Court Reporting,

notary public in and for the District of Columbia,

when were present on behalf of the respective

parties:

**2**

1  APPEARANCES:
2    On behalf of Plaintiffs:
3      DALE COOTER, ESQUIRE
       DONNA S. MANGOLD, ESQUIRE
4      Cooter Mangold Tompert & Karas, L.L.P.
       5301 Wisconsin Avenue, NW., Suite 500
5      Washington, D.C. 20015
       (202) 537-0700
6
     On behalf of Defendants Jordan et al.:
7
       PETER STRAND, ESQUIRE
8      DAVID WILMOT, ESQUIRE
       Shook Hardy & Bacon, L.L.P.
9      Hamilton Square
       600 14th Street, NW., Suite 800
10     Washington, D.C. 20005-2004
       (202) 783-8400
11
12
13              * * * * *
14
15
16
17
18
19
20
21
22

**3**

1            C O N T E N T S
2  EXAMINATION BY:                    PAGE
3    Counsel for Plaintiffs         4
4    Counsel for Defendants         128
5  FURTHER EXAMINATION BY:
6    Counsel for Plaintiffs         134
7  DEPOSITION EXHIBITS:
8    No. 1 - Notice of Deposition        8
9    No. 2 - Analysis of Money Flow      28
10   No. 3 - Series of Checks            41
11   No. 4 - October 26, 2005, Letter    44
12   No. 5 - Records from United Bank    61
13   No. 6 - October 25, 2005, E-mail    92
14   No. 7 - QMS Invoice                 104
15   No. 8 - October 25, 2005, E-mail    113
16   No. 9 - Calendar Schedule           124
17
18
19              * * * * *
20
21
22

**4**

1            P R O C E E D I N G S
2  Whereupon,
3         MARIA A. WOOD
4  was called as a witness and, having been first
5  duly sworn, was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR PLAINTIFFS
7      BY MR. COOTER:
8      Q   State your name and address for the
9  record if you would, ma'am.
10     A   Maria Antoinette Wood, 1106 Blue
11  Wing Terrace, Upper Marlboro, Maryland 20774.
12     Q   And are you employed?
13     A   Yes.
14     Q   How are you employed?
15     A   I am employed with the firm of
16  Harmon Wilmot Brown and Bagwell.
17     Q   What do you do there?
18     A   I'm an office manager and executive
19  assistant.
20     Q   And who are you an executive
21  assistant to?
22     A   Howard N. Harmon, Omer F. Brown,

**5**

1  David W. Wilmot, and Andrea Bagwell.
2      Q   How many people work in this
3  office, staff people?
4      A   Seven.
5      Q   Seven?  Does that include the
6  lawyers?
7      A   Seven -- yes, there's seven staff
8  including the attorneys and me.  And we do
9  have one tenant.
10     Q   Okay.  So there are how many
11  lawyers in this law firm?
12     A   Four.
13     Q   And three staff people?
14     A   Yes.
15     Q   And you're one of the three?
16     A   Yes.
17     Q   What's your educational background?
18     A   I attended two years at Bowie State
19  College.
20     Q   Okay.  Take me through your
21  employment history, if you would, since high
22  school.  Just tell me wherever you've worked

Beta Court Reporting
(202) 464-2400       www.betareporting.com       (800) 522-2382

6

1  and kinds of jobs you've done.
2      A   For the past 10 years, I've worked
3  at Harmon Wilmot Brown and Bagwell.  Prior to
4  that, I worked for, approximately a year,
5  with a law firm -- I don't even remember --
6      Q   That poor lawyer --
7      A   Yeah, he --
8      Q   His ego is shattered now, whoever
9  it is --
10     A   And I apologize.
11     Q   Don't apologize.  Ma'am, he's not
12  memorable.  Was it a he or a she?
13     A   It was a gentleman.
14     Q   Okay.
15     A   Yeah.  And then prior to that I
16  worked as a temp for National Public Radio.
17     Q   Okay.  Is that your entire work
18  history essentially?
19     A   That -- prior to that, I worked for
20  the United Way Foundation.  I worked with the
21  Institute for Deaf/Blind Retarded Adults.
22     Q   Okay.  And when -- have you been at

7

1  this law firm where you presently work, for
2  10 years?
3      A   A little over 10 years, yes.
4      Q   And what position did you start at?
5  Were you the office manager?
6      A   The same, office manager and
7  executive assistant.
8      Q   Tell me what you do.  What's your
9  -- what are your duties over there?
10     A   I guess that in movie sets they
11  call them Girl Fridays, I do everything
12  there.  I'm the IT person if we have problems
13  with the computer, I take care of all, or
14  most incoming calls --
15     Q   Actually, now we call a personal
16  Friday Girl, so let me correct ma'am.
17     A   I also -- I deal with handling the
18  financial background, any accounts payable or
19  accounts receivable items.  I check the mail.
20  I make sure that hearings and depositions, or
21  whatever are scheduled and are placed on the
22  individual's attorney schedules.  Just about

8

1  everything.  Order supplies --
2      Q   Do you reconcile the bank
3  statements?
4      A   Yes.
5      Q   And do you have a check signing
6  authority on any of the accounts?
7      A   No, I don't.
8      Q   Who is your -- I mean, who is your
9  supervisor there?  Who do you report to?
10     A   I report to all of the attorneys
11  there.
12     Q   My condolences for the little freak
13  fire.  Okay, I'm going to show you what we
14  have marked as Deposition Exhibit Number 1.
15         (Deposition Exhibit No. 1 was
16         marked for identification.)
17     MR. STRAND:  Thanks.
18     THE WITNESS:  Thank you.
19     BY MR. COOTER:
20     Q   Have you ever seen this document
21  before?
22     A   Yes.

9

1      Q   When did you first see it?
2      A   Maybe a little over a week or two
3  about --
4      Q   Now, you understand that you're
5  required to bring -- to search for certain
6  documents to bring them?
7      A   Yes, sir.
8      Q   Did you do that?
9      A   Yes, I did.
10     Q   And so you could provide us?
11     A   The only additional items --
12     Q   What do you mean "additional"?
13     A   Okay.  I've -- I had given most of
14  these bank statements to Mr. Strand, which he
15  has included in Exhibit 231.
16     Q   Okay.
17     A   And the only additional items that
18  I thought were pertinent to this deposition,
19  I've brought here.
20     Q   Well, there are some specifications
21  on the back of the exhibit.
22     A   Okay.

3 (Pages 6 to 9)

10

1    Q   Let's just go through those and
2    then --
3    A   Okay.
4    Q   You know what a document record
5    looks, is that correct, ma'am.
6    A   Yes, sir.
7    Q   Did you search for documents
8    relative to each of these specifications?
9    A   Yes, I did.
10   Q   And so that, by way of example, did
11   you search for documents, any and all
12   documents referring to Harold Doley or Logan
13   Delaney?
14   A   Yes.  And I do not have any
15   documents.
16   Q   Let's just go through them one at a
17   time.  Request number one says you to bring
18   all documents relating to Bender, people
19   nominated by Bender, certain people --
20   Douglas Moore, Fauntroy Long, and Thompson.
21   No, excuse me.
22       Any and all documents referring or

11

1    relating to Thompson concerning any of the
2    following things.  Did you search for such
3    documents?
4    A   Yes.
5    Q   Did you bring them all?
6    A   I've -- I only have one document
7    that would probably -- that -- through my
8    understanding, was pertinent to Mr. Thompson
9    dealing with any of these people.
10   Q   Let me see what you -- what do you
11   think is responsive.  Do you have it with
12   you?
13   A   Yes, I have.
14   Q   Let me see it.
15   A   I'm sorry.
16   Q   Okay.  Now, when you searched for
17   documents, were you searching your personal
18   files, the files of the law firm, or what
19   were you looking -- where were you looking?
20   A   I was searching all files.
21   Q   To include the law firm files?
22   A   Yes, sir.

12

1    Q   Okay.  Number two, you have any --
2    you don't have any documents relating to
3    Doley?  Oh, this one is though related to
4    Doley.  Do you have any other documents
5    relating to Doley?
6    A   No, sir.
7    Q   Number three.  Any and all
8    documents referring, to a reminder received
9    from Thompson?  Do you have all of those
10   documents with you?
11   A   Yes, those are the items that are
12   included in Exhibit 231.
13   Q   Right.  Are there any documents
14   outside what's in 231 that you're aware of?
15   A   No, sir.
16   Q   That are responsive to that
17   request?
18   A   No, sir.
19   Q   Number four, money to Doley.  You
20   -- do you have such documents that are
21   responsive to request number four?
22   A   No, not any additional documents

13

1    that aren't in 231.
2    Q   Okay, 231, by way of example, so
3    that we're clear about this, this is
4    Defendant's Exhibit Number 231, for purposes
5    of the injunction hearing that we're talking
6    about?
7    A   Yes, sir.
8    Q   Number five.  You got any
9    documents?
10   A   Nothing outside of 231.
11   Q   Number six.  You got any documents?
12   A   No.
13   Q   Number seven.  Do you have any
14   documents?
15   A   No.
16   Q   Number eight?
17   A   No, sir.
18   Q   And number nine?
19   A   No, sir.
20   Q   Now, you've given me an e-mail that
21   you produced today, which is an e-mail from
22   -- looks like you to Mr. Doley, dated

4 (Pages 10 to 13)

14

1  October the 25th. Did you bring any other
2  documents today other than this e-mail?
3      A   No.
4          MR. STRAND:  Well, you have these
5  --
6          THE WITNESS:  Oh, I'm sorry, I'm
7  sorry, I do.  I'm sorry.
8          MR. COOTER:  That's okay, that's
9  okay.  It's not a -- don't worry about it.
10         THE WITNESS:  Okay.  Yes, I do.
11         MR. COOTER:  I won't hold you in
12  terms of that.
13         THE WITNESS:  Thank you.
14         MR. COOTER:  The attorney, you are
15  going to have to work her.  Let me see what
16  you've got.  Thanks.
17         THE WITNESS:  Uh-huh.
18         MR. COOTER:  I'm going to ask
19  somebody who is in here just for a copy of
20  these if you have a moment?
21         MR. STRAND:  Dale, we've got a few
22  extra copies.

15

1          SPEAKER:  We got copies.
2          MR. STRAND:  If you want, so we can
3  circulate around.
4          MR. COOTER:  That's fine.
5          MR. STRAND:  And if you want to
6  mark those then we will give you a copy so
7  that we are save time.
8          MR. COOTER:  Okay.  That's fine.
9  You made reference a few times to the
10  Defendant's Exhibit Number 231.  How did you
11  -- were you responsible for compiling the
12  documents in Exhibit 231?
13         THE WITNESS:  I was responsible for
14  submitting this -- the documents that are
15  attached to 231, yes.  Yes, sir.
16         BY MR. COOTER:
17     Q   And when were you first asked to do
18  that?
19     A   Maybe the beginning of May.
20     Q   All right.  Could you confirm for
21  me if you would -- well, I believe it's the
22  obvious, but let's just figure it out.  Did

16

1  all of the documents that were attached to
2  Exhibit 231 exist as of January the 30th of
3  this year?  Do you have them all?
4      A   I would have to look at it.
5      Q   Why don't you take a look?
6      A   And you want to know if these
7  documents existed as of January?
8      Q   Your 231 looks -- what are you
9  looking at?  Your 231 looks a little
10  different than mine.  Oh, I've got multiple
11  copies, that's the problem.
12     A   Right, right.
13     Q   Just confirm for me that all of
14  those documents that are attached to Exhibit
15  number 231, existed -- let me take a quick
16  look myself so it may be dated after January.
17         I know it's a number of documents
18  attached to Exhibit 231.  Some checks dated,
19  October the 26th, and bank records, on or
20  about that time.  Did all of those exist as
21  of -- in your files as of January the 30th,
22  of this year?

17

1      A   Yes.
2      Q   Okay.  There are some --
3      A   Now, what I have to clarify is
4  items such as this check, these checks
5  written on Adams National Bank, those I don't
6  know, because those are not items that I
7  provided.  And I don't have copies of those
8  -- the D.C. Healthcare Systems' check written
9  to Adams Bank.
10     Q   That's right.  Anything that
11  purports to be a record of any account that
12  Mr. Wilmot has access to, that are dated in
13  the October-November-December timeframe,
14  those all existed as of January the 30th.  Is
15  that accurate?
16     A   Yes.
17     Q   Why is it that you first produced
18  those on or about the first part of May of
19  this year?
20     A   Because they were requested, copies
21  of these items were requested from me by Mr.
22  Strand.

5 (Pages 14 to 17)

18

1    Q   Did you know that document
2  production requests were out to Mr. Wilmot
3  prior to that that would have encompassed
4  those items?  Did you know that?
5    A   Yes.
6        MR. STRAND:  Objection to form to
7  the extent that it misstates the record.
8        BY MR. COOTER:
9    Q   Okay.  And why weren't they
10  produced earlier?
11    A   Why weren't what produced?
12    Q   Those documents pursuant to the
13  request to Mr. Wilmot -- if you know.
14    A   I'm sorry, can you -- I'm --
15    Q   Did you know that we had issued
16  document request to Mr. Wilmot prior to his
17  deposition?
18    A   No, I did not.
19    Q   You did not know that?
20    A   No, I did not.
21        MR. COOTER:  Would you like to --
22  maybe not knowing how they have given you

19

1  these documents.  Anyway, just a minute.
2        MR. STRAND:  Dale, I think your 114
3  is just the documents that you received from
4  the bank.
5        MR. COOTER:  And I knew that -- in
6  fact --
7        MR. STRAND:  And 231 is an attempt
8  to filter down those documents to the one
9  that may have actually -- ones that may
10  actually relate to the essence in here,
11  because 114 can be the whole bunch of bank
12  statements that have nothing to do with
13  anything in this case.
14        MR. COOTER:  Can we go off the
15  record?
16        COURT REPORTER:  Okay, off the
17  record.
18        (Recess)
19        COURT REPORTER:  On the record?
20        MR. COOTER:  Yeah.
21        COURT REPORTER:  Okay.
22

20

1        BY MR. COOTER:
2    Q   What is your -- what authority, if
3  any -- do you have any -- over the law firm
4  escrow accounts?  Do you have any level of
5  authority over transactions in the escrow
6  accounts?
7        MR. STRAND:  Objection to form.
8  You mean trust accounts or escrow accounts?
9        MR. COOTER:  Same thing, for my
10  purpose.
11        MR. STRAND:  Okay.
12        BY MR. COOTER:
13    Q   Go ahead.
14    A   Okay.  Do I have any authority?
15    Q   Yeah.  Do you have authority to
16  make disbursements or deposits in and out of
17  the escrow accounts?
18    A   I do make deposits in and out of
19  the escrow accounts.  I do not have the
20  authority to sign checks coming out of that
21  account.
22    Q   I see.  And who writes the checks

21

1  out of -- how many escrow accounts are there
2  in this law firm, as of October-November 19
3  -- 2005?
4    A   There are two.
5    Q   Okay.  Where are they?  Where were
6  they at the time?
7    A   Well, as of -- you -- now, as of
8  October, there have been two.  And in the way
9  -- and I'm saying that because we have BB&T.
10    Q   Okay.  I know about that one.
11    A   And so right now we're transition
12  -- transitioning --
13    Q   You know, let's stick with October.
14    A   Okay.
15    Q   Let's just deal with October --
16    A   Then it was only one.
17    Q   There was one escrow account?
18    A   Right, one.
19    Q   And that was the account at BB&T
20  Bank, right?
21    A   Uh-huh.
22    Q   Okay.

6 (Pages 18 to 21)

22

1     COURT REPORTER:  Is that a yes?
2     THE WITNESS:  Yes, I'm sorry.
3     BY MR. COOTER:
4     **Q    And did there come a time when the**
5  **law firm got an additional escrow account?**
6     A    No, not an additional escrow
7  account, no.
8     **Q    I see.  You moved the escrow**
9  **account from somewhere to somewhere else?**
10    A    We are changing institutions.
11    **Q    I see.  And where is the escrow**
12  **account today?**
13    A    The BB&T account is still open.
14    **Q    I see.  Where -- what account have**
15  **you -- where are you going to open a new**
16  **account, to change institutions?**
17    A    Bank of America.
18    **Q    Okay.  So that between the period**
19  **October 25th of '05, and through until today,**
20  **the law firm only has one escrow account --**
21  **you know what I mean by an escrow account,**
22  **right?**

23

1     A    Yes.
2     **Q    Okay.**
3     A    From -- through the period of
4  October 25th to today we have two; we have
5  two.
6     **Q    What are they?**
7     A    But at -- we have the BB&T and Bank
8  of America.
9     **Q    When did you open the Bank of**
10  **America account?**
11    A    In April.
12    **Q    Of?**
13    A    This year, 2006.
14    **Q    I see.  Why you have -- why you**
15  **continued -- you have two -- why would you**
16  **keep the one at BB&T and open the one at Bank**
17  **of America, if you know?**
18    A    We were not liking our relationship
19  with BB&T, and so we were moving the accounts
20  to Bank of America.  In the process of moving
21  there, there came a glitch with the hold on
22  checks.  So at that point, the partners are

24

1  deciding if they want to go ahead and still
2  move, or if they just want to go back to
3  where they were.
4     **Q    You mean Bank of America was**
5  **starting to hold checks?**
6     A    Yes.
7     **Q    In ways that BB&T hadn't?**
8     A    Exactly.
9     **Q    I see.  And the determination was**
10  to do what?
11    A    It hasn't been determined yet.
12    **Q    Hasn't been?  So what's your**
13  **primary escrow account at this point?  BB&T**
14  **or Bank of America?**
15    A    BB&T.
16    **Q    Okay.  So that we're clear, in the**
17  **month of October, November, and December of**
18  **'05, the only escrow account for this law**
19  **firm was at the BB&T Bank?**
20    A    Yes, sir.
21    **Q    And at some point thereafter, in**
22  **April, you say another escrow account was**

25

1  open at the Bank of America.  Is that right?
2     A    Yes.
3     **Q    And which branch of the Bank of**
4  **America?**
5     A    The branch on Vermont Avenue.
6     **Q    Okay.  So the universal escrow**
7  **account from October to date is BB&T Bank and**
8  **--**
9     A    Yes.
10    **Q    -- and a Bank of America account**
11  **opened in April --**
12    A    Yes.
13    **Q    -- on Vermont Avenue.  Is that**
14  **right?**
15    A    Yes.
16    **Q    There are no other escrow accounts?**
17    A    There are no other escrow accounts.
18    **Q    How long have you known Jeff**
19  **Thompson?**
20    A    For a little over 10 years.
21    **Q    Okay.  And do you have any**
22  **reporting responsibilities to Mr. Thompson?**

7 (Pages 22 to 25)

26

1    A   No, I don't.
2    Q   Did -- does Mr. Thompson have
3  occasion to give you instructions about how
4  to do your job?
5    A   Mr. Thompson -- no, no, he does not
6  tell me how to do my job, no.
7    Q   Okay.  He has no role to play in
8  this law firm, is that --
9    A   No, he does not.
10    Q   Now, I'm going to show you a number
11  of documents -- can we start with this one?
12  Maybe I have -- I may have --
13       MS. MANGOLD:  No, this is ours.
14  This is our -- do you want hers or theirs?
15       MR. COOTER:  I don't care.  I just
16  want the documents to show her.  I want these
17  documents.  I don't care how they are --
18       MS. MANGOLD:  Just take it one at a
19  time.
20       BY MR. COOTER:
21    Q   Did you first -- when did you first
22  learn that Mr. Thompson was to tender money

27

1  to the law firm in October in the amount of
2  $165,000 for anything?
3    A   On the 26th.
4    Q   And how did you learn it?
5    A   His secretary, Bridgette Thompson,
6  called me.
7    Q   And what did she tell you?
8    A   She said that Mr. Thompson was
9  going to be sending over a check that he
10  would like for us to deposit in our trust
11  account, and get a cashier's check for that
12  amount.
13    Q   And when this woman called you from
14  Mr. Thompson's office, what was your
15  response?
16    A   I said okay.
17    Q   Did the woman from Mr. Thompson's
18  office tell you the purpose of the $165,000
19  check?
20    A   No, she didn't.
21    Q   Did you ask?
22    A   No, I didn't.

28

1    Q   Now, we're going to show you what
2  we have marked as the next exhibit.  Okay,
3  there you go.  Okay.  I'll tell you what.
4  We'll mark what is marked as Defendant's
5  Exhibit Number 231 as the next exhibit.  You
6  can take off this one, Number 2.  We'll try
7  and work from this.
8       (Deposition Exhibit No. 2 was
9       marked for identification.)
10       MR. STRAND:  So it's to be Wood
11  Exhibit 2?
12       MR. COOTER:  Uh?  Yeah.
13       MR. STRAND:  Defendant's 231 would
14  be Wood --
15       MR. COOTER:  It becomes Wood 2.
16       MR. STRAND:  Okay.  You finally
17  gave up our numbering system?
18       MR. COOTER:  Which was a mistake to
19  begin with, I suggest.  I want you to turn to
20  Wood Exhibit Number 2.  And you've seen this
21  compilation of documents before, have you
22  not?

29

1       THE WITNESS:  Yes, sir.
2       BY MR. COOTER:
3    Q   You were involved in compiling the
4  documents that were to be used as exhibits?
5    A   Yes, sir.
6    Q   All right.  I want you to take a
7  look at the fifth page into the document.
8  There's a check going on D.C. Healthcare
9  System to Adams National Bank, dated October
10  26, 2005.  When did you first see that?
11    A   Today.
12    Q   So that exhibit -- the first set of
13  exhibits have to do with records of the Adams
14  Bank, and it is your testimony, prior to
15  today you haven't seen the Adams Bank
16  records?
17    A   Yes, sir.
18    Q   Is that right?
19    A   Yes, sir.
20    Q   Take a look at number B.  The first
21  page under Tab B would appear to be the check
22  dated, October the 26th of '05 for $165,000

8 (Pages 26 to 29)

30

1  made out to Mr. Wilmot, drawn out of the
2  Adams Bank.  When did you first see that
3  check?
4      A   On the 26th.
5      Q   Now is this the check that you've
6  made reference to, Thompson's secretary calls
7  and say, "I'm going to issue a check?"
8      A   Yes, sir.
9      Q   "And I want you to get a cashier's
10  check drawn on your escrow account?"
11      A   Yes, sir.
12      Q   And is this the -- was this check
13  delivered to you somehow --
14      A   Yes.
15      Q   -- from Mr. Thompson's office?
16      A   Yes, it was.
17      Q   And how did it come?  Who handed --
18  who gave it to you?
19      A   A messenger.
20      Q   Okay.  Now, this is itself a
21  cashier's check into -- well, this is made
22  out to Mr. Wilmot -- do you see that?

31

1      A   Yes, sir.
2      Q   And if you look at the endorsement
3  on the check, it says, "Endorse here," and
4  then there is a signature.  Whose signature
5  is that?
6      A   Mine.
7      Q   Are you authorized to sign Mr.
8  Wilmot's name to checks?
9      A   Yes.
10      Q   You are?
11      A   By Mr. Wilmot.
12      Q   Did he -- did you talk to him about
13  this check?
14      A   No, I didn't.
15      Q   Now, when the check was delivered
16  and you put it -- and is this -- was this
17  deposited into the escrow account?
18      A   Yes, sir.
19      Q   And did you -- what did you -- once
20  the money -- if I understand what you've
21  said, Thompson's secretary says, "I'm going
22  to give you a check, put it in the escrow,

32

1  and I want you to get a cashier's check from
2  the escrow."
3      A   Yes.
4      Q   Right.  Did you do that?
5      A   No, I didn't.
6      Q   Okay.  Why not?
7      A   Because there were no signers in
8  the office who could sign for that check to
9  be written off of that account.
10      Q   What was it that Mr. Thompson was
11  asking you to get a check or his secretary --
12  he's going to deposit a cashier's check into
13  your escrow account --
14      A   Uh-huh.
15      Q   You want the cashier's check out of
16  your escrow account, right?  Made out to who?
17      A   To Mr. Harold Doley.
18      Q   All right.  So the request from
19  Thompson was, put this check in your escrow
20  account, give me a cashier's check to Mr.
21  Doley from the escrow account, right?
22      A   Yes, sir.

33

1      Q   And was the amount of the escrow
2  account check to Doley to be a $165,000, the
3  same 165?
4      A   No, the check to Mr. Doley was to
5  be a $163,000.
6      Q   What was the explanation for the
7  $2,000 difference?
8      A   There was not.
9      Q   No.  This -- when was it on the
10  26th that you got this call from Mr.
11  Thompson's secretary?  What time of the day?
12      A   I really couldn't give you an exact
13  time in the day.
14      Q   Do the best you can.
15      A   Somewhere midmorning.
16      Q   Midmorning you hear from Thompson's
17  secretary?
18      A   Yes.
19      Q   And where was Mr. Wilmot at the
20  time?
21      A   At a doctor's appointment.
22      Q   Okay.  And did Mr. Wilmot come back

9 (Pages 30 to 33)

34

1  to the office?
2      A   No.
3      Q   At all that day?
4      A   I had not seen Mr. Wilmot on that
5  day.
6      Q   At all?
7      A   At all.
8      Q   So the check comes in, and you
9  deposit it into the BB&T Bank?
10     A   Yes.
11     Q   But you can't produce the check
12  that Mr. Thompson wants for Mr. Doley,
13  because there's nobody to sign it?
14     A   Exactly.
15     Q   And so the money is just sitting
16  there in the BB&T Bank?
17     A   Yes.
18     Q   Did you communicate to Mr. Thompson
19  or his secretary that you're unable to
20  produce this cashier's check that they wanted
21  that day?
22     A   I did let both of them know that

35

1  there were no signers in the office.
2      Q   When you say "both of them," who
3  did you --
4      A   Mr. Thompson and Ms. Thompson --
5  Bridgette Thompson and Jeff Thompson.
6      Q   Are they related?
7      A   I think so.
8      Q   I see.  So you told them there were
9  no signers that day?
10     A   Yes.
11     Q   And what did they say in response?
12     A   They didn't.  They didn't.
13     Q   Well, did they say, "Okay, tomorrow
14  will be okay," or "When will somebody be
15  here"?
16     A   No, when I spoke to Ms. Thompson, I
17  told her that there were no signers in the
18  office.  And she said, "Okay, I'm going to
19  get in touch with Mr. Thompson, and I'll call
20  you back."  When -- interim of her doing
21  that, Mr. Thompson called.
22     Q   Jeff Thompson?

36

1      A   Yes.  And he said, "Maria, I need
2  the check."  And I said, "Okay, but there is
3  no one in the office right now who can sign."
4  And so he said, "Okay, well, I just need the
5  check.  You need to get me the check."  I
6  said, "Okay, well, Jeff, let me see what I
7  can do."  And so --
8      Q   This is all happening on the 26th?
9      A   Right.  And I'm waiting for either
10  one of the partners to come into the office
11  so that they can sign the check.
12     Q   So Thompson says, "But I need the
13  check."
14     A   Right.
15     Q   And you say see -- "I'll see what I
16  can do."
17     A   Right.
18     Q   What happened next, on the 26th?
19     A   So later on in the day, sometime in
20  the afternoon, he's still like spazzing
21  because he wants this check.
22     Q   "He's spazzing," meaning Thompson?

37

1      A   Yeah, he is excited, and he wants
2  this check.  And I said, okay.  So what I do
3  is I have authorization to handle Mr.
4  Wilmot's finances, so I send over a letter.
5      Q   To who?
6      A   To United Bank and I have them draw
7  a cashier's check in the amount that Mr.
8  Thompson asked for from Mr. Wilmot's
9  business account.
10     Q   Did you talk to Mr. Wilmot?
11     A   No.
12     Q   You just did it?
13     A   Yes.
14     Q   Okay.  So you give, and what
15  happened next?  What did you ask the bank to
16  do exactly?
17     A   And Mr. Thompson informed me that
18  he wanted that cashier's check taken over to
19  the Mayflower Hotel.  And so I ask him who
20  would I see -- who would they see at the
21  Mayflower Hotel?  He said he would take care
22  of it, just have it brought it to the

Beta Court Reporting
www.betareporting.com

(202) 464-2400                                      (800) 522-2382

38

1    Mayflower Hotel.
2    **Q    But who were you going to give it**
3    **to, once you got there --**
4    A    Mr. Thompson, I guess.  I'm not
5    sure.  I've never talked to him again after
6    making that messenger call.
7    **Q    That's okay, I just want to make**
8    **sure I understand.  So essentially, in order**
9    **to get around the fact that you didn't have**
10   **any signers on the escrow account, you get a**
11   **$163,000 cashier's check to Mr. Doley on the**
12   **26th, right?**
13   A    Uh-huh.
14   **Q    Out of the United Bank --**
15   A    Uh-huh.
16       COURT REPORTER:  Is that a yes?
17       THE WITNESS:  Yes, I'm sorry.
18       BY MR. COOTER:
19   **Q    And that check was to be delivered**
20   **to somebody at the Mayflower Hotel?**
21   A    Yes.
22   **Q    Where are we in time, ma'am?**

39

1    A    Maybe like between the 2:00 and
2    3:30 hour.
3    **Q    And you arranged for the check at**
4    **the United Bank -- if I hear you correctly?**
5    A    Yes.
6    **Q    And was the check taken -- that**
7    **check, the cashier's check to Doley, was that**
8    **check taken to the Mayflower?**
9    A    Yes.
10   **Q    Who did it?**
11   A    The messenger.
12   **Q    When you say "the messenger," who's**
13   **that?**
14   A    I don't know.
15   **Q    Who are you --**
16   A    Whomever -- Quick Messenger
17   Service.
18   **Q    Okay.  That was what you were**
19   **using, so there's a record of --**
20   A    Yes, sir.
21   **Q    -- whatever Quick Messenger was**
22   **doing that day --**

40

1    A    Yes, sir?
2    **Q    -- it did?**
3    A    Yes, sir.
4    **Q    And when you --**
5        MR. STRAND:  We provided that to
6    you, Mr. Cooter.
7        MR. COOTER:  That's fine.  And when
8    you sent Quick Messenger over to the
9    Mayflower, how would the messenger know who
10   to give it to?  There are a lot of people at
11   the Mayflower, isn't there?
12       THE WITNESS:  Because Mr. Thompson
13   would -- he said that he would make sure that
14   it got taken care of.  So my -- so I told him
15   -- told the messenger to take it over to the
16   Mayflower.
17       BY MR. COOTER:
18   **Q    And give it to who?**
19   A    Who -- I -- he just -- I told him
20   to go to the Mayflower and just ask for Mr.
21   Thompson, because I assumed Mr. Thompson's
22   going to be there since he said he would take

41

1    care of it.
2    **Q    Now -- so the check the $163,000**
3    **check -- let me just see if we can find out**
4    **--**
5        MR. STRAND:  It's E, next to 231,
6    Mr. Cooter.
7        MR. COOTER:  That's all right.
8        MR. STRAND:  Okay.
9        MR. COOTER:  We can -- we'll just
10   go ahead as long as we have this one -- go
11   ahead and mark that the next exhibit if you
12   would.  Exhibit Number 3.
13       (Deposition Exhibit No. 3 was
14       marked for identification.)
15       BY MR. COOTER:
16   **Q    Exhibit Number 3 is a series of**
17   **bank records from the United Bank.  And first**
18   **of all, would you confirm for me that**
19   **whatever these accounts are at the United**
20   **Bank are not escrow accounts?**
21   A    No, they are --
22   **Q    Or client trust accounts.**

11 (Pages 38 to 41)

42

1    A    They are Mr. Wilmot's business
2  accounts.
3    Q    Now, if you look at the second page
4  of this exhibit, it would appear -- back up,
5  back -- on the first page is United Bank
6  cashier's check, up in the top left, for
7  $163,000 to Harold Doley.  You see that?
8    A    Yes.
9    Q    That's dated the 26th.  And where
10  did the money come from to back up that
11  check?
12    A    From Mr. Wilmot's business accounts
13  at United Bank.
14    Q    More -- one or more than one?
15    A    Two accounts.
16    Q    Two different accounts?
17    A    Yes, sir.
18    Q    Why were two different accounts
19  used?
20    A    I just used two different accounts.
21  I really didn't want to take the whole sum
22  out of any one account.

43

1    Q    Why not?
2    A    Because I never do.  That's just
3  the way I've always done between these two
4  accounts.
5    Q    All right.  Okay.  Why -- I
6  understand you say you never do, but why do
7  you never -- I don't -- what --
8    A    Because that was just how Mr.
9  Wilmot had me set it up in the beginning when
10  I first started doing these transactions for
11  them.
12    Q    Are these law firm accounts over
13  there at the United Bank?
14    A    These are Mr. Wilmot's business
15  accounts.  I don't know if they are law firm.
16  They are his business accounts.
17    Q    Why were there two accounts?  Or
18  rather more than two?  How many other were --
19    A    I don't know.  You'd have to ask
20  Mr. Wilmot.  I don't know.
21    Q    Now -- going to show you what we've
22  marked as Exhibit Number 3.

44

1    A    Okay.
2    MR. STRAND:  4.
3    MR. COOTER:  Which is one of these
4  documents I just got today.
5    (Deposition Exhibit No. 4 was
6    marked for identification.)
7    MR. STRAND:  Okay.  If you'll show
8  us what it is, we'll make sure at least we
9  got a copy of it.  Here, Dale, here's one for
10  you.
11    BY MR. COOTER:
12    Q    Exhibit Number 4 is a letter dated,
13  October the 26th of '05, purportedly from Mr.
14  Wilmot to somebody -- to Niki at the United
15  Bank.  Says "I, David Wilmot, request the
16  cashier's check in the amount of $163,000 be
17  got in the following way," and then there's a
18  signature that says David Wilmot.  Who's
19  signature is that?
20    A    Mine.
21    Q    Is it -- did Mr. Wilmot know that
22  you -- do you have a practice of signing his

45

1  name to things?
2    A    Yes, I do.
3    Q    Does he know that you do that?
4    A    Yes, he does.
5    Q    Does he know that you did -- that
6  you were doing this transaction before you
7  did it?
8    A    He did not know that on the day
9  that I did it.
10    Q    It says, "Ms. -- my executive
11  assistant will arrange for the cashier's
12  check."  And so this went over to the bank,
13  which you sent a messenger with a letter and
14  would -- have him wait for the check or have
15  it --
16    A    No, I sent it by fax.
17    Q    This goes out by fax?
18    A    Uh-huh.
19    Q    The cashier's check is entered, or
20  is issued, which is represented by Exhibit 3,
21  $163,000 to Doley.  And that check is taken
22  to the Mayflower, right, by a messenger?

12 (Pages 42 to 45)

46

1    A    Yes, sir.

2    Q    And if you keep -- if you stick

3  with Exhibit Number 3, it indicates that

4  there was an $80,000 -- well, let's just see.

5  On the second page of Exhibit Number 3, there

6  is a check Harmon, Wilmot, and Brown, LLP, it

7  says trust account, $80,000, 10/28, whose

8  signatures are on that trust account check?

9    A    That's Omer Brown, on the back

10  endorsing it or on the front, signing the

11  check?  On the front, signing the check is

12  Omer Brown who is a partner with the firm.

13    Q    And on the back?

14    A    And the on the back, it's my

15  signature.

16    Q    Turn to the next page of the

17  exhibit, there is an $8,300 check -- excuse

18  me, now, there is a $163,000 check.

19  I've seen that -- was more money

20  deposited in the United Bank accounts or one

21  of them to make up for the $165, I see there

22  are --

47

1    A    Yes, sir.

2    Q    Can you find that in this record?

3    A    Not in this one that you gave.

4    MS. MANGOLD:  This is not -- this

5  is another account.  There are two accounts.

6    MR. COOTER:  It's in another

7  account.

8    MR. WILMOT:  It's part of Exhibit 2

9  that you've marked, Mr. Cooter.

10    MR. COOTER:  Yeah, I see that.

11    BY MR. COOTER:

12    Q    $85,000, was apparently written on

13  Harmon, Wilmot, and Brown trust account on

14  the 28th, so there is an $80,000 check and

15  $85,000 check, two different checks drawn on

16  the trust account, both signed by Mr. Brown

17  and deposited into the United Bank account?

18    A    Yes.

19    Q    Why were there two checks written

20  on the trust account as opposed to one?

21    A    Because I put the checks back into

22  Mr. Wilmot's business account, the same way I

48

1  took them out.

2    Q    Now, let's back up, the check --

3  Thompson told you, "I want a check delivered

4  to Doley."  And a $163,000 cashier's check

5  ends up at the Mayflower; excuse me.

6    MR. STRAND:  Excuse me, I object to

7  the form.  I don't believe there is any

8  statement that Mr. Thompson instructed the

9  witness to deliver a check to Mr. Doley.  It

10  misstates the record.

11    BY MR. COOTER:

12    Q    The check is made out to Doley,

13  right?

14    A    Mr. Thompson instructed that the

15  check be made payable to Mr. Doley.

16    Q    And deliver it to the Mayflower

17  Hotel?

18    A    Yes.

19    Q    And you give this to messenger, and

20  they deliver the check the to the Mayflower

21  Hotel?

22    A    Uh-huh.

49

1    Q    Who got the check at the Mayflower?

2    A    I don't know.

3    Q    Have you ever learned who got the

4  check at the Mayflower?

5    A    No, I haven't.

6    Q    Now, so the check is at the

7  Mayflower in somebody's hands, and what's the

8  next involvement you have in this transaction

9  to get these account -- get these trust

10  accounts out of the -- get these two checks

11  out of the trust account, back over to the

12  United Bank, two days later?

13    A    Yes.

14    Q    When is the first time that you

15  discussed this series of transactions,

16  Thompson makes a request to put money in your

17  escrow, get a cashier's check to Doley, send

18  the money to the Mayflower -- that whole set

19  of events and the subsequent checks back into

20  the accounts at the United Bank, when is the

21  first time you talked to Wilmot about it?

22    A    I don't know the exact date, but I

13 (Pages 46 to 49)

50

1  want to say, maybe the week of -- the second
2  week of November.
3      Q   Is it your testimony that you
4  undertake these transactions through Mr.
5  Wilmot's personal accounts, and you didn't
6  tell him about it?
7      A   Yes.
8      Q   Until a couple of weeks later?
9      A   Yes.
10     Q   Now, after the check went to -- I
11  think to the Mayflower, whoever got it, got
12  it, I suppose.
13     A   Uh-huh.
14     Q   Did -- when is the next time that
15  you learned anything having to do about
16  Thompson's $165,000?
17     A   I want to say, on November the
18  13th, or the 12th, and that's when I noticed
19  that I had the check back.
20     Q   Who gave you the check back?
21     A   I do not know, the check was under
22  my blotter, all checks that come into the

51

1  firm, regardless who opens it, what partner,
2  or who opens the mail, or who delivers it,
3  are placed under my blotter, so that I can
4  make those deposits.
5      Q   So you saw that this check that you
6  had issued -- had arranged to have issued to
7  Doley was back on your desk, under your
8  blotter?
9      A   Right.
10     Q   And you don't know who put it
11  there?
12     A   No, I don't.  It wasn't actually
13  brought to me, it was just there when I came
14  in, either on the 13th or the 14th.
15     Q   Okay.  Now the check is there, were
16  you curious as to, why was it that this check
17  that you delivered to Mayflower, all of a
18  sudden reappears under your blotter?
19     A   Yes.
20     Q   And what did you do?
21     A   I called Mr. Thompson's office.
22     Q   Okay.  Who did you talk to?

52

1      A   I talked to Bridgette Thompson.
2      Q   And what did you ask -- what did
3  you say, can you describe this conversation
4  between yourself and Bridgette?
5      A   I just asked her, why was the check
6  returned?  And she said, "Oh, let me talk to
7  Jeff."  I said, "Well, what am I supposed to
8  do with this check, that's returned?"
9          And she said, "I will talk to Jeff,
10  and I'll either call you back, or I'll have
11  Jeff call you back."  And I said, "Okay."
12     Q   All right.  What happened next?
13     A   Mr. Thompson called me.
14     Q   Jeff Thompson?
15     A   Yes, Jeff Thompson called me, and
16  he said --
17     Q   Same day that you find the check
18  under your blotter?
19     A   I don't know if it was on the 13th
20  or the 14th that he called me.  So he called
21  me back, and he said, "Maria, I want you to
22  take the check and deposit it, and we'll use

53

1  it for consultant fees, for the contracts
2  that David has drawn up for me.  And I said,
3  "Okay."
4      Q   All right.  Now, Thompson -- if I
5  understand whatever, he says, "Deposit it,
6  and we'll it for the consultant fees," that
7  David has drawn up for Thompson?
8      A   Right.
9      Q   What consulting fee is he talking
10  about?
11     A   He has contracts with other
12  contractors, and Mr. Wilmot usually oversees
13  those contracts, so we have a contract with
14  Emerge DC, LLP, and we have a contract with
15  Integrated Services.
16     Q   You say, "we," who is the "we?"
17     A   Mr. Thompson does, and Harmon
18  Wilmot -- well, Mr. Wilmot represents Mr.
19  Thompson, so any contracts that Mr. Thompson
20  have, then if we are overseeing those
21  contracts, then we pay out as the invoices
22  are received from those individual

14 (Pages 50 to 53)

54

1   contractors.
2       Q   What accounts do you use to do
3   that, generally?
4       A   We use either the trust account, if
5   the money has been deposited in the trust
6   account, or we use Mr. Wilmot's business
7   account, if the money has been deposited in
8   the business account.
9       Q   Well, do I understand -- I want to
10  make sure I understand what I'm hearing.
11  Your law firm oversees certain accounts that
12  Mr. Thompson has with third parties, right?
13      A   We don't oversee certain accounts.
14  We handle the contract -- drawing up the
15  contracts with them.
16      Q   Once you draw up the contact with
17  these accounts as you mentioned them, does
18  your law firm then have a continuing role to
19  play in connection with processing payments
20  to these people?
21      A   Yes.
22      Q   Does that happen every month, or

56

1   been going on?
2       A   Since I have been working there.
3       Q   Okay, now, Thompson on the -- the
4   day that you get this check under the
5   blotter, he says, "Deposit it," -- give it to
6   me again, exactly what he said?
7       A   He said to go ahead and deposit the
8   check, and we'll pay the consultants from
9   that money.  And I said, "Okay."  And I did
10  what he said.
11      Q   And did you -- where did you
12  deposit the check?
13      A   I deposited the check back into
14  United Bank.
15      Q   Why did you do that, instead of
16  depositing it in the escrow account?
17      A   Because that was where I took the
18  money out of.
19      Q   Did Mr. Thompson know that you were
20  using Mr. Wilmot's personal accounts for
21  this purpose?
22      A   No, I'm -- that I was using Mr.

55

1   periodically, whenever the bills come in?
2       A   It happens whenever it's invoiced,
3   or whenever Mr. Thompson or Bridgette
4   Thompson calls over and says to pay this
5   particular client.
6       Q   And do I understand you to say that
7   your procedure in the law firm for that
8   phenomenon is, sometimes you use the escrow
9   account, and sometimes you use Mr. Wilmot's
10  personal accounts?
11      A   Mr. Wilmot's business account, yes.
12      Q   Does Mr. Wilmot know of that
13  procedure?
14      A   Yes.
15      Q   And how long has that been going
16  on?
17      A   For as long as I have worked there.
18      Q   All right.  And specifically what I
19  mean by that is the use -- at least in part
20  of Mr. Wilmot's personal accounts to pay --
21  to take money from Thompson and pay bills,
22  four times.  And how long has it been -- that

57

1   Wilmot's business account?
2       Q   Yes.
3       A   No, I don't report to Mr. Thompson
4   to tell him which accounts I use.
5       Q   Well, was it -- did anybody ever
6   tell Jeff Thompson, that to your knowledge,
7   well, this has been going on, that monies
8   would come into the law firm, and the law
9   firm would pay bills, that accounts other
10  than the escrow account were being used for
11  that purpose -- did anyone tell him that?
12      A   I don't know if anyone else told
13  him, I did not.
14      Q   In any event, you put the money
15  back in the United Bank?
16      A   Right.
17      Q   And -- if I understand what you've
18  told me, Mr. Thompson said to you, and we'll
19  use the money to pay vendors, Mr. Thompson's
20  vendors, is that right?
21      A   Uh-huh, yes.
22      Q   And did he tell you what vendors to

15 (Pages 54 to 57)

58

1  pay, and in what amount?
2      A   No, he never tells you that ahead
3  of time, he'll just like -- he will tell you
4  as the invoices come in.  "Maria, I'm going
5  to send an invoice over for so and so, and so
6  and so, go ahead and pay that invoice."
7      Q   Why, if you know, is Mr. Thompson
8  using your law firm to send money to your law
9  firm, and have your money -- and have your
10  law firm issue checks to people?
11      A   I don't know.
12      Q   Did you ever discuss that with Mr.
13  Wilmot?
14      A   No, I didn't.
15      Q   Did it ever strike you as odd?
16      A   No.
17      Q   In any event Thompson says, "Okay,
18  we'll pay vendors, we will pay these contract
19  consultants with this money."  That's your
20  testimony as to the day you get the check --
21  the day or the day after you get the check
22  under the blotter?

59

1      A   Yes, sir.
2      Q   And you put the money back in the
3  United Bank account, and how did you -- did
4  you then issue payments from the United Bank
5  account to pay Mr. Thompson's vendors?
6      A   Yes, payments were issued out of
7  that, out of those accounts, yes.
8      Q   Say that, again?
9      A   Yes, payments were issued from that
10  account.
11      Q   And this was done, you say pursuant
12  to Mr. Thompson's instructions?
13      A   Yes.
14      Q   Did Mr. Thompson tell you who to
15  pay, and when?
16      A   Yeah, he tells us when to pay, and
17  he tells us who to pay.
18      Q   After the money finds its way back
19  under your blotter, did -- and once that
20  happened, and the money is back in the United
21  Bank, did Mr. Thompson -- and I understand
22  you told me, he says, "Put the money in the

60

1  account, we will pay vendors with it."
2      A   Uh-huh.
3      Q   And did he then issue subsequent
4  instructions to you, as to what vendors to
5  pay, and in what amount?
6      A   Yes, he did.
7      Q   Who did, how did that happen?  Are
8  there pieces of paper, or did he write you a
9  letter --
10      A   No, he usually will call me on the
11  phone.
12      Q   Thompson?
13      A   Yes, Mr. Thompson or Bridgette,
14  it's not always Mr. Thompson, sometimes she
15  does it under his instruction to call me.
16      Q   Okay.  And is it accurate, did then
17  -- as to any payment that went out of the
18  United Bank accounts, after you put this
19  $163,000 back into the account, were all of
20  the individual payments that went out to Mr.
21  Thompson's vendors, authorized by Mr.
22  Thompson, that is if somebody from his office

61

1  -- say, "Pay 20 grand to that guy, or 30
2  grand to that person?"
3      A   Yes, sir.
4      Q   That was always done, one
5  transaction at a time?
6      A   Yes, sir.
7      Q   Now -- you know --
8          MS. MANGOLD:  Let's mark this with
9  a different set, it may duplicate what Peter
10  has, but let's mark it as another exhibit.
11          MR. COOTER:  Okay then, mark it.
12  Let's mark this.
13          MS. MANGOLD:  Where are we, five?
14          (Deposition Exhibit No. 5 was
15          marked for identification.)
16          THE WITNESS:  Thank you.
17  BY MR. COOTER:
18      Q   Exhibit Number 5, again some
19  records from the United Bank.  And I want you
20  to turn to page -- which is bates number
21  United Bank 02 -- is that an 8 or 0, 89 or
22  09?

16 (Pages 58 to 61)

62

1      09, it looks like.
2      A    0209?
3      Q    Uh-huh.  Yeah, you with me?
4      A    Yes.
5      Q    Okay.  Now that document -- let's
6  see if you and I can agree, this is a check
7  -- this is the -- this is --
8          MR. STRAND:  Excuse me, I don't
9  have 0209 on my set, or maybe I missing
10  something?  How many pages down is it?
11         THE WITNESS:  4th page.
12         MR. COOTER:  4th page in the
13  Exhibit.
14         MR. STRAND:  Okay, thank you.  I
15  note for the record that the Exhibits -- the
16  pages of the Exhibit aren't in numerical
17  order, but go ahead.
18         BY MR. COOTER:
19     Q    Now, this is a copy, these are
20  records reflecting -- well, this is a copy of
21  the check -- the same cashier's check that
22  was issued by the United Bank to Mr. Doley,

63

1  do you see that?
2      A    Yes, sir.
3      Q    This is a picture of the check that
4  ended up under your blotter?
5      A    Yes, sir.
6      Q    Now, if you look at the back of the
7  check, there is a -- what purports to be a
8  signature there, and whose signature is that?
9      A    That is mine.
10     Q    Then it says, "Not for purposes
11  intended."  Do you see that?
12     A    Yes, sir.
13     Q    Who wrote that?
14     A    I did.
15     Q    How did you know to write that?
16     A    Mr. Thompson told me to write that
17  on the back of it.
18     Q    So it's your testimony, Thompson
19  tells you, "Write this, not for purpose
20  intended," this check to Doley, "And
21  redeposit it, and use it to pay some of my
22  bills?"

64

1      A    Yes, sir.
2      Q    You then wrote that -- signed what
3  purported to be Mr. Wilmot's name, right?
4      A    Yes, sir.
5      Q    Put it in the bank.
6      A    Yes.
7      Q    I mean, over at United Bank.
8      A    Yes.
9      Q    And did you issue checks in payment
10  of Mr. Thompson's bills out of that account
11  that were a portion of this $163,000?
12     A    Yes.  We -- well -- checks have
13  been issued to -- but they weren't issued by
14  me.
15     Q    Who were they issued by?
16     A    They were issued by Mr. Wilmot.
17     Q    All right, let's get to that.  We
18  need to do it this way.  Yeah, go back to
19  this -- what you -- what started out as
20  Defendant's 231, which I think is now Number
21  2.
22     A    Okay.

65

1      Q    This is a -- what purports to be an
2  analysis of the money flow, do you see that?
3      A    Yes, sir.
4      Q    And -- if you look at column number
5  1, I just want to -- it says that, "Event
6  sequence number 1, on October the 26th
7  Thompson draws a $165,000 check made payable
8  to the Adams Bank.  You don't know anything
9  about that?
10     A    No, sir.
11     Q    Column Number 2 says, "Thompson
12  uses the money to fund a cashier's check made
13  payable to Wilmot, you don't know anything
14  about that either, you don't know the source
15  of the cashier's check.
16     A    No, I don't.
17     Q    Column Number 3 says, "Wood
18  receives cashier's check form Thompson, dated
19  October the 26th, for -- in the amount of
20  $165,000, and that's the check you took --
21  that's the transactions you've already told
22  me about?

17 (Pages 62 to 65)

66

1  A  Yes, sir.
2  Q  The next says, "Thompson asked Wood
3  to deposit cashier's check to trust account,
4  and draw cashier's check made payable to
5  Doley, from the trust account." I want to --
6  let's just stop there, did Thompson make that
7  request of you?
8  A  Yes, Mr. Thompson did.
9  Q  And is it your testimony that when
10  he did that, and asked for an out coming
11  cashier's check from the trust account, you
12  told Thompson that there weren't anybody
13  there to sign it?
14  A  I told him I would, at the time
15  that he called -- the first two times
16  Bridgette called, there were -- I told her
17  there were no signers in the office, so I
18  could do it yet.  So then a little later in
19  that day, Mr. Thompson called and I tell --
20  still indicated to him that there were no
21  signers in the office, so I didn't have
22  signing privileges.

67

1  Q  This is -- and is this when he was
2  getting spazzed to use your word?
3  A  Yeah, yes.
4  Q  When you say spazzed, what do you
5  mean?
6  A  Like, hyper and everything -- not
7  -- just hyper excited.
8  Q  Okay.  Did you tell Thompson that
9  you were going to use the Wilmot business
10  accounts as opposed to the trust account for
11  this transaction?
12  A  No, at the time that I told him
13  that I couldn't get the check written because
14  there were signers, I did not tell him that,
15  I said, just let me wait and see if anybody
16  comes in, I'll try to take care of this.
17  Q  Now, it says, "She cannot, because
18  there is no one in the office with signature
19  authority."  If you look at the next column,
20  it says, "As an alternative, Thompson asked
21  Wood to draw funds from two Wilmot business
22  accounts, to fund a $163,000 cashier's check

68

1  to Doley, which he does," that's not true, is
2  it?
3  A  I did do that.
4  Q  No, I know you did that, but
5  Thompson didn't ask you to do that, you just
6  did it?
7  A  Yes, he did, when I -- once we ran
8  to the point where I couldn't get a signer,
9  Mr. Thompson was calling me all afternoon
10  back and forth, "Well, has anyone come, have
11  you talked to David, has anybody come," and I
12  said, "No."  And so he said, "Well can't you
13  do it the same way -- can't you do it off
14  David's business account."  And I said,
15  "Well, I can, but just let me see if someone
16  is going to come in."  I did not want to do
17  that if I was putting the money into the
18  trust account, I wanted to take it out of the
19  trust account.
20  Q  I don't blame you, but I want to
21  get clear here, whose idea was it to use --
22  A  Mr. Thompson.

69

1  Q  Mr. Thompson's idea?
2  A  Mr. Thompson's.
3  Q  And at some point you are not
4  getting a signer, he is spazzed.
5  A  And it's getting later.
6  Q  Getting later.  What was your
7  deadline as you understood it, to have this
8  money to the Mayflower?
9  A  My deadline was 4:30, because
10  that's when I get off.
11  Q  Did Mr. Thompson tell you when the
12  money had to be there at Mayflower?
13  A  No, but I did indicate to Mr.
14  Thompson that I was going to leave at 4:30,
15  so I was going to try to get that taken care
16  for him.
17  Q  Okay.  And you understood from the
18  first time that you talked to Jeff Thompson,
19  is it fair that you understood that this
20  cashier's check needed to be at Mayflower
21  that afternoon?
22  A  Yes.

18 (Pages 66 to 69)

70

1    Q   Now, at some point Thompson said,
2  can you do it in Wilmot's business accounts,
3  and what did you say to that when he first
4  brought it up?
5    A   Well, the first time that he
6  brought it up, I said, "Well, I just want to
7  see if any signers are going to come in, I
8  will do it, but I want that to be the last
9  resort, I will," I mean because I have that
10  authority.  And so I just tried to wait to
11  see if anybody was going to comeback to the
12  office who could sign the check.
13    Q   But you don't have -- do you have a
14  signatory authority on that -- on the
15  accounts at the United Bank -- can you sign
16  checks?
17    A   No, I don't, I have personal
18  authority from Mr.  Wilmot.
19    Q   Now, in any event the -- you did
20  whatever it is you did here, and -- turn to
21  the next page of this document.  What
22  purports to be column number 7 says, "Wood

71

1  uses proceeds from debits to two Wilmot
2  accounts to fund the $163,000 cashier's check
3  to payable to Doley," and you did do that, as
4  you told?
5    A   Yes, I did.
6    Q   Wood deposits the original DC
7  Healthcare cashier's check into the trust
8  account, but this says, you did it the next
9  day, is that accurate?
10    A   No, I think it was done that day,
11  but it was after the check would have been
12  put in for like 2:00 o'clock that day, so it
13  reflects on the next day.
14    Q   That's okay, but its your testimony
15  that when the check came in from Thompson to
16  put into the escrow, the --
17    A   Uh-huh.
18    Q   That afternoon the check was
19  deposited in the bank.  I understand if it
20  comes in after sometime, they post it the
21  next day, but is that basically what
22  happened, it was deposited --

72

1    A   Basically, it was -- yeah.
2    Q   Was the cashier's check from
3  Thompson, which was deposited into your
4  escrow account, deposited before or after
5  United Bank cashier's check was issued to
6  Doley?
7    A   It was deposited after.
8    Q   Now, then it says for column --
9  that's column 8, in column 9 it says, "Wood
10  receives Doley's cashier's check and per
11  Thompson's instruction, deposited into the
12  two Wilmot business accounts," that's not
13  quite accurate, is it?  He didn't tell you
14  where to put it, he just told you to put it
15  in the bank, right?
16    A   He told me to put in the -- he told
17  me to put it back in the bank.
18    Q   That's right, he didn't tell you --
19  he didn't give you specific instructions to
20  redeposit it into these accounts at the
21  United Bank?
22    A   I don't recall if he told me that

73

1  or not.
2    Q   Okay, because -- well, he just
3  wanted it in the bank?
4    A   Right.
5    Q   Your -- and it was your
6  determination to put it back there because
7  that's where the money had come from, is that
8  essentially what happened here?
9    A   Yes.
10    Q   Now, that apparently happened on
11  the 14th.  Now, let's just focus on the 14th.
12    A   Okay.
13    Q   By October the 14th of '05 --
14    A   November the 14th.
15    Q   Shoot me, you -- absolutely, bless
16  you.  By November 14, '05, had you told, or
17  had anybody told Mr.  Wilmot what had
18  transpired in and out of his business
19  accounts at the United Bank?
20    A   No, I think -- no, I did not talk
21  to him about what had transpired.
22    Q   Well, did you talk to him about

19 (Pages 70 to 73)

74

1  these -- this money that had come in from
2  Doley and -- excuse me, from Thompson, and
3  the check out to Doley, and all of what had
4  happened there?
5      A   No, I hadn't -- I hadn't.
6      Q   Is it normal for you, ma'am -- for
7  a $165,000 transaction comes in, that's
8  supposed to go in and out of your escrow
9  account, and not to tell somebody?
10     A   It's normal for me to do that for
11  Mr. Thompson?  Yes, it is.
12     Q   Without telling anybody?
13     A   It is not -- I don't know, well,
14  no, I deposit money as it comes in.  I don't
15  have to tell anybody who -- my job is, when
16  checks come in that I deposit them.
17     Q   Well, I understand that, but my
18  question is a bit more specific, a $165,000
19  comes in from Thompson, that's supposed to go
20  into the law firm escrow account, okay.  But
21  you and I can agree that that's a significant
22  transaction?

75

1      A   Yeah, that is a significant
2  transaction.
3      Q   Okay.  And you did deposit the
4  money in the escrow account, right?
5      A   Yes.
6      Q   And then two days later, took the
7  money out of the escrow account in two
8  different checks, 80 and 83, to reimburse Mr.
9  Wilmot's personal accounts?
10     A   Yes.
11     Q   And somebody, you must have told
12  somebody about that transaction, right?
13     A   No, I didn't.
14     Q   Well, how did you get the partner
15  Brown to sign the checks out of the escrow?
16     A   Because Mr. Brown saw, I don't have
17  to report to Mr. Brown about Mr. Wilmot's
18  transaction, as I don't have to report to Mr.
19  Wilmot about Mr. Brown's, but in an effort
20  for me to get it signed, I showed him that I
21  had deposited this money into the trust
22  account, and I had taken monies out of Mr.

76

1  Wilmot's account, and then I put -- was
2  putting it back.
3      Q   You told Brown this?
4      A   Yes, but I did not tell him what
5  client it was for, or anything like that, I
6  just showed him what I was doing.
7      Q   When did Mr. Wilmot first become
8  aware of this Thompson transaction involving
9  a $165,000, to your knowledge?
10     A   Unfortunately, I think it was
11  somewhere around the 13th or the -- yeah, the
12  13th or the 14th.
13     Q   All right.  And how did Mr. Wilmot
14  become aware of this $165,000 Thompson
15  transaction on or about November the 13th?
16     A   Once I talked to Mr. Thompson, he
17  told me to put the money back in Mr. Wilmot's
18  account for the consultants.
19         That's when I told Mr. Wilmot
20  everything that I had done.
21     Q   All right.  And did you do that
22  before you put the money back in the bank?

77

1      A   No, I did it afterwards.
2      Q   Okay.  In any event Thompson tells
3  you, "Put the money back in the bank," and
4  you explained, the money in from Wilmot, or
5  the money in from Thompson, the $165,000, you
6  told him the money went over to the Mayflower
7  that day?
8      A   I think I did, I can't recall
9  though.
10     Q   And did you tell him that a couple
11  of weeks later, the check just reappeared
12  under your blotter?
13     A   Yes.
14     Q   And did you ask him if he knew how
15  that happened?
16     A   Yes.
17     Q   What did he say?
18     A   And he said, "He didn't have the
19  check," so he didn't know.
20     Q   And when you first told him about
21  this transaction, did you express to you that
22  he knew about the transaction involving a

20 (Pages 74 to 77)

78

1  $163,000 check on the Mayflower that day?

2      A    No, he didn't.

3      Q    Was he surprised?

4      A    I think he may have been a little

5  surprised, but he wasn't, like, shocked that

6  I took it upon myself to do that.

7      Q    Now, but in any event, at the time

8  that the check comes back from Mister -- from

9  whoever it came from.

10     A    Uh-huh.

11     Q    I don't know where it came from.

12  When the time the check comes back from

13  wherever it came from, it's to go back into

14  the United Bank, at that point you explained

15  the whole thing to Wilmot?

16     A    I explained it to him, like, right

17  after I put it back in the account after Mr.

18  Thompson --

19     Q    That's fine, what did he say?

20     A    He didn't say anything.

21     Q    Nothing at all?

22     A    I mean, I really don't remember

79

1  exactly what came out of his mount, but he

2  said, "All right, we'll just take care of

3  paying out the vendors for -- "

4      Q    Okay.  Did he know that the amount

5  that the money had been -- gone back into the

6  account at the United Bank when he said that,

7  did you tell him what bank it was in?

8      A    I don't remember if I had told him

9  or not.

10     Q    Now, if you go back to your chart

11  for just a minute or somebody's chart, it

12  says -- you got it there in front of you?

13     A    Yes, sir.

14     Q    Item Number 9, "Wood received Doley

15  cashier's check, and per Thompson's

16  instructions deposited it to two Wilmot

17  business accounts."  And he didn't tell you

18  which account, that's just where the money

19  ended up, right?

20     A    He told me to put them back in

21  David's accounts.

22     Q    Now, personal or escrow?

80

1      A    He said to put them back in David's

2  accounts, and that's what I did, he didn't

3  say, put them back in Harmon, Wilmot and

4  Brown and -- Harmon, Wilmot and Brown

5  accounts.

6      Q    Well, as of the -- at the time that

7  the money goes back in, was it your belief

8  that Mr. Thompson believed the money was in

9  escrow or in personal account?  You don't

10  know either way?

11     A    I don't know what Mr. Thompson

12  believed, no sir.

13     Q    All right.  Anyway you talked to

14  Mr. Wilmot about this, and this intended plan

15  to pay bills for Mr. Thompson with this

16  money?

17     A    Yes.

18     Q    And if you -- and that was done,

19  was it not?

20     A    Yes, sir.

21     Q    Now, turn to the third page of this

22  chart, at the end the last column says,

81

1  "Proceeds from Doley's -- Doley cashier's

2  check deposited in Wilmot business account

3  and used to pay other Thompson vendors."  Do

4  you see that?

5      A    Yes, sir.

6      Q    And I don't know if we have the

7  backup for that, is the backup for those

8  checks included in this package?

9      A    Yes, it's toward the back of the

10  package.

11     Q    Show me if you would, where does it

12  say?

13     MR. STRAND:  They are in Tab J, Mr.

14  Cooter.

15     BY MR. COOTER:

16     Q    Looking at Tab J, do you understand

17  that these checks represent moneys paid from

18  these Wilmot business accounts for Mr.

19  Thompson's vendors?

20     A    Yes.

21     Q    Looking on the first page of

22  Exhibit Number J, or Tab Number J there is a

21 (Pages 78 to 81)

82

1 check to Sandy Allen for 12 -- for September
2 the 1st of '05, for $8,300, and it says
3 consultant fee, who signed that one?
4     MR. STRAND: I think you misspoke,
5 I think you said September, actually you said
6 12 --
7     THE WITNESS: It's December the
8 1st.
9     MR. COOTER: Fine, I'll restate.
10     BY MR. COOTER:
11     Q    There is a check to Sandy Allen for
12 December 1, '05, for $8,300, it's labeled, "A
13 consultant fee." Who signed it?
14     A    That's Mr. Wilmot's signature.
15     Q    What services was Sandy Allen
16 performing?
17     A    I don't know, sir.
18     Q    In any event that's Mr. Wilmot's
19 signature there, right?
20     A    Yes, sir.
21     Q    There is another check January 27,
22 '06, for $8,300, again to Sandy Allen, does

83

1 that have Wilmot's signature?
2     A    Yes, sir.
3     Q    It says consultant, and it's your
4 testimony that these check represent money
5 that was owed not by Mr. Wilmot, but rather
6 by Mr. Thompson?
7     A    Yes, sir.
8     Q    And these moneys were part of the
9 $165,000 that had been deposited in these
10 accounts?
11     A    Yes, sir.
12     Q    Third one, March 6, '06, $8,300,
13 and is that Mr. Wilmot's signature?
14     A    Yes, sir.
15     Q    Again to Sandy Allen, there is
16 another one, April the 6th, looks to me like
17 Sandy Allen gets $8,300 a month, do you see
18 that?
19     A    Yes.
20     Q    And did David Wilmot sign that
21 check too?
22     A    Yes, sir.

84

1     Q    Integrated Urban Solutions, $8,000
2 on April the 6th, on this account, this
3 again, by your testimony, is one of Mr.
4 Thompson's vendors?
5     A    Yes, sir.
6     Q    Is that Mr. Wilmot's signature on
7 that check?
8     A    Yes, sir.
9     Q    And again a consultant. And there
10 is -- what's the name of that Emerge DC?
11     A    Emerge DC.
12     Q    By the way, let's backup for just a
13 minute, who is Integrated Urban Solutions, or
14 what is it?
15     A    It's a consultant of Mr. Thompson.
16     Q    What does it do for him --
17     A    I don't know.
18     Q    But you say whatever contract there
19 is on this issue, was prepared in your law
20 firm between Thompson and Integrated Urban
21 Solutions?
22     A    Between Mr. Thompson and Mr.

85

1 Wilmot, yes?
2     Q    Is Mr. Wilmot involved in any
3 fashion?
4     A    I don't know, sir.
5     Q    What is Emerge DC?
6     A    Another consultant of Mr.
7 Thompson's.
8     Q    And is that Wilmot's signature on
9 that?
10     A    Yes, sir.
11     Q    These are part if Wilmot's -- these
12 are part of the Thompson firms?
13     A    Yes, sir.
14     Q    And the check -- the last check
15 that I have in this package, January 27, '06,
16 $15,000 goes to Emerge DC, is that Mr.
17 Wilmot's signature?
18     A    Yes, sir.
19     Q    Now, I think you testified earlier
20 that these bills would get paid when Thompson
21 or somebody from his office told you to pay?
22     A    Exactly.

22 (Pages 82 to 85)

86

1    Q   Did you prepare these checks?
2    A   No, I did not?
3    Q   How does -- did -- how did the
4  information come from Thompson, pay this bill
5  to Sandy Allen, by the way of example?
6    A   I don't know, it didn't come
7  through me, I don't know.
8    Q   Well, are there invoices that come
9  in, I mean, you --
10   A   No, there were -- there isn't an
11 invoice that came in, it was a phone call.
12   Q   From?
13   A   From, Mr. Thompson's office.
14   Q   To?
15   A   To me, to have her check cut.
16   Q   And what would happen, you would
17 then tell, Mr. Wilmot, Thompson called,
18 wants a check cut to Sandy Allen for $8,300?
19   A   Yes.
20   Q   So it's your testimony that for all
21 these checks that are going out to, what you
22 have testified are Thompson vendors, you get

87

1  specific instructions as to each check.
2  Somebody calls as says, spend something --
3  that amount of money to Sandy Allen, and --
4    A   Yes, sir.
5    Q   Is it -- would that be so -- is it
6  accurate that as of the end of April of this
7  year, Mr. Thompson knew that the $165,00
8  that had been deposited was not sitting in an
9  escrow account somewhere that is being spent?
10   A   I don't -- I can't testify to what
11 Mr. Thompson -- I don't know.
12   Q   Is it accurate that somebody in his
13 office knew that the $165,000 was being used
14 to pay these bills?
15   A   Yes.
16   Q   It's either Thompson or somebody at
17 his office?
18   A   Yes.
19   Q   Was that because you are doing it
20 pursuant to their instructions?
21   A   Yes.
22   Q   Do you have -- have you ever seen

88

1  any invoices from anyone to anyone
2  representing these vendors that Mr.  Thompson
3  wanted to pay, Sandy Allen and Integrated,
4  whatever it is?
5    A   Have I seen any invoices?  Yes.
6    Q   Invoices from Sandy Allen, by way
7  of example?
8    A   No, I haven't seen any from Sandy
9  Allen.
10   Q   How about the -- these other
11 vendors that we just talked about?
12   A   Emerge DC, yes.
13   Q   You have seen invoices?
14   A   Yes.
15   Q   You have copies of those?
16   A   I don't.
17   Q   Where did you see them?
18   A   I have copies of them, I don't have
19 them with me, I'm sorry.
20   Q   The copies of them exist so that --
21 what's the name of it, again?
22   A   Emerge DC.

89

1    Q   So that in your law firm somewhere
2  is an invoice from Emerge DC to someone that
3  represents a bill for which a check was
4  issued on David Wilmot's business account?
5    A   Yes.
6    Q   And if I asked it, you say you
7  don't have any from Sandy Allen?
8    A   No, I don't.
9    Q   Do you have any from Integrated
10 Urban Solutions?
11   A   No, I don't.
12   Q   Are there other vendors, other than
13 the ones that we have talked about, of Mr.
14 Thompson's that are paid by way of Mr.
15 Wilmot's business accounts?
16   A   I'm not sure.
17   Q   Are there other vendors, other than
18 the ones that we've talked about that the law
19 firm escrow account is used to pay the
20 vendors?
21   A   Yes.
22   Q   What other vendors are we talking

23 (Pages 86 to 89)

90

1  about?
2      A   I don't know it off the top of my
3  head, but there are others.
4      Q   Do you have invoices for those?
5      A   I want to say, yes, I do, I want to
6  say that, but I couldn't be sure.
7      Q   So that -- whatever transactions
8  that are through the escrow account, there is
9  some documentation of them in the law firm?
10     A   I would have -- Mr. Thompson may
11 have called and asked me to pay this person,
12 but I do have copies of those checks, that I
13 would have wrote on Mr. Thompson's behalf.
14     Q   I have already done that. Did
15 there come a time when you learned that this
16 money -- that the movement of this money,
17 this $165,000 that started with Thompson and
18 went wherever it went and ended wherever it
19 went, was the subject of enquiry in the law
20 suit between Mr. Bender and the bank?
21     A   Did there come a time when I knew
22 that?

91

1      Q   Yeah.
2      A   Yes.
3      Q   When did you first learn that?
4      A   When Mr. Strand contacted me.
5      Q   When was that?
6      A   I don't remember the exact date.
7      Q   Well, was it in May -- early May?
8      A   Yeah, I want to say that, yeah.
9      Q   And what did Mr. Strand ask of you,
10 what did he tell you?
11     A   That's when he requested, he
12 requested these backup documents.
13     Q   Did you talk to Mr. Wilmot about
14 it?
15     A   I notified Mr. Wilmot that Mr.
16 Strand had asked for these copies.
17     Q   And what did Mr. Wilmot tell?
18     A   "Okay, Maria, give them to him."
19         (Recess)
20     BY MR. COOTER:
21     Q   You ever had your deposition taken
22 before?

92

1      A   No.
2      Q   Heard a lot about them haven't you?
3      A   Yes.
4      Q   Is it what you expected?  Pretty
5  much.
6      A   Yeah, pretty much, yeah.
7      Q   I am going to show you what we'll
8  mark as the next exhibit.
9         (Deposition Exhibit No. 6 was
10         marked for identification.)
11     MR. COOTER:  You want to have that?
12     MR. STRAND:  I got it.
13     MR. COOTER:  What exhibit number we
14 have on that one?
15     MR. STRAND:  Seven.
16     THE WITNESS:  Six.
17     BY MR. COOTER:
18     Q   Okay, Exhibit Number 6 would appear
19 to be a copy of an e-mail from Mr. Weitzel,
20 on Thursday, October the 25th, at 8:30 in the
21 evening to you, at aol.com copy to Jeff
22 Thompson.  Did you receive this e-mail, and

93

1  the attachment -- the attached document on or
2  about October the 25th, at 8:00 p.m. in the
3  evening?
4      A   I did.
5      Q   And the e-mail -- this
6  mwood21564@aol.com is that your personal
7  e-mail account?
8      A   Yes.
9      Q   Is that your law firm e-mail
10 account?
11     A   No.
12     Q   So this is a personal account?
13     A   Yes.
14     Q   And had you ever spoken with Mr.
15 Weitzel before?
16     A   No.
17     Q   Did you know who he was?
18     A   No.  I didn't know who he was.  I
19 just knew from Mr. Thompson that he was going
20 to be sending me something.
21     Q   Okay, now, how did Mr. Weitzel, if
22 you know, just reason it out for me, learn

24 (Pages 90 to 93)

94

1  what your personal e-mail address was?
2      A  I don't know.
3          MR. STRAND:  Objection to the
4  extend it calls for the witness to speculate,
5  go ahead and --
6          MR. COOTER:  Go ahead and
7  speculate.
8          MR. STRAND:  You don't speculate.
9          THE WITNESS:  I don't know.
10      BY MR. COOTER:
11      Q  Now, don't pay attention to him, he
12  just talks too much.  Now you see that this
13  is a memo from Mr. Weitzel, cc: Thompson,
14  and prior to you say you never talked to Mr.
15  Weitzel, didn't know who he was?
16      A  No, I don't remember talking to Mr.
17  Weitzel.
18      Q  You say that prior to receipt of
19  this e-mail, you were expecting an e-mail,
20  based on something you had heard from
21  Thompson?
22      A  No, based on what Mr. Thompson told

96

1      A  We are -- I have always had this
2  e-mail address.  Even coming to work for,
3  Harmon Wilmot and Brown, I had this e-mail
4  address.  We were not Internet ready.  So in
5  the process of us getting ready, I always
6  used my personal e-mail address at work.  And
7  after we got the Harmon Wilmot and Brown
8  e-mail, then I would give that one out, but
9  some people who originally had my old e-mail,
10  would just so use it, because I access it
11  while I am at work.
12      Q  I see.
13      A  I am never at work at 8:30 at
14  night, so -- never, I am never at work at
15  8:30 p.m. at night.
16      Q  You say that with some force,
17  ma'am?
18      A  Yes.  So and I think that he just
19  used that one because that was maybe the
20  first one he had.
21      Q  I accept that.  I am not so
22  interested in why he was sending it to this

95

1  me, he said that he would be sending me an
2  e-mail, he didn't say Mr. Weitzel would.  He
3  said, "Maria, I am going to be sending you an
4  e-mail."
5      Q  And when did he first tell you he
6  was going to send an e-mail?  Now, this, you
7  got this at 8:00 at night on the 25th?
8      A  And I am not sure when he told me.
9      Q  Was it that day some time?
10      A  It could have been.  It could have
11  been.
12      Q  And he said, "I am going to send
13  you an e-mail."
14      A  Yes.
15      Q  And, I don't know, if I were you, I
16  would have said, "Why are you sending me
17  e-mails at home?"
18      A  Well --
19      Q  Didn't you ask him, "Why are you
20  sending me the e-mail?"
21      A  Now, let me explain this.
22      Q  Yeah, that will be fine.

97

1  address --
2      A  Yes.
3      Q  -- versus some other address.
4      A  Right.
5      Q  Thompson comes and he says, "I'm
6  going to send you an e-mail."
7      A  Exactly.
8      Q  And what did you say about that?
9      A  I said, "Okay."  Now, he said, "I
10  am going to send you an e-mail."
11      Q  Uh-huh.
12      A  "And I want you to get it to
13  David."  I said, "Okay."
14      Q  I see.  And did that happen that
15  day or sometime before that day, if you know?
16      A  Did what happen?
17      Q  That Thompson said that he was
18  going to send you an e-mail, "I want you to
19  give it to David."
20      A  I want to say it happened sometime
21  that day.
22      Q  All right.  Now, in the e-mail, did

25 (Pages 94 to 97)

98

1    Thompson send you an e-mail that day?
2        A    No.
3        Q    So you got this thing from Mr.
4    Weitzel?
5        A    Yes.
6        Q    At 8:00 in the evening.  When did
7    you first know that you had it?
8        A    I guess when I opened it.  I was
9    checking my personal e-mail, and I saw it?
10       Q    Well, did you see that on the 25th?
11       A    I don't remember.  I really don't
12   remember.
13       Q    Okay.
14       A    I did see it, and I sent it.
15       Q    Well, that's fine.  It says, "Draft
16   purchase agreement."  And then says, "Ms.
17   Wood, at the request of David, attached are
18   two documents for David's use, signed Dan."
19   And you understood that the David, at the
20   time, was Dave Wilmot, right?
21       A    Yes.
22       Q    And if I understand what you told

99

1    me about your Thompson conservation, when you
2    got this you were supposed to get it to
3    David.
4        A    Yes.
5        Q    And did you?  What did you do?
6        A    Well, I tried to open it, and I
7    could not open the attachment, because I
8    didn't have that software at my home address,
9    so -- I don't remember, I want to say, I
10   would like to say, I forwarded it to Mr.
11   Wilmot, but I don't know if I did.
12       Q    But you told me earlier that you
13   sent it somewhere.  Where did you send it?
14       A    I want to say that, I forwarded it
15   to Mr. Wilmot, but I don't know that I did.
16   I never discussed it with Mr. Wilmot.
17   Unfortunately when I sent it, I did not save
18   it.  So when I went back to work, it wasn't
19   in my new e-mail.  So I didn't -- I want to
20   say, I sent it to him, but I am not sure.
21       Q    Well, wait a minute.  Let's back
22   up.

100

1        A    Uh-huh.
2        Q    E-mail comes in on the evening of
3    the 25th.
4        A    Right.
5        Q    You sent it somewhere?
6        A    Right.
7        Q    Whether you could open it or not?
8    You sent it somewhere?
9        A    I forwarded it.
10       Q    All right.
11       A    Yes.
12       Q    And the only place you would have
13   forwarded it to that night was Wilmot, right?
14       A    Right.
15       Q    Okay.  And when you went in to work
16   the next day, because you didn't save it,
17   after you sent it, it wasn't in your e-mail,
18   by the next morning?
19       A    Right.
20       Q    Okay.  So -- and you didn't know
21   what the attachment was, because you couldn't
22   open it, you just sent it on to David?

101

1        A    Right.
2        Q    Okay.  And so when you come in the
3    next morning it's gone, what happened?  If
4    you've sent something, if you forward
5    something and don't save it, it's off your
6    e-mail?
7        A    I didn't look for it.  I mean --
8    when you open your e-mail, you'll just have
9    your new mail.  Or you'll have mail that
10   you've looked at.  I didn't look for it, and
11   I didn't discuss it with Mr. Wilmot, so --
12       Q    Mr. Wilmot testified earlier that
13   he was in the office that -- he went back to
14   the office between the morning and the
15   afternoon, for -- on the 25th, didn't you see
16   him at all that day?
17       A    On the 25th, I don't --
18       Q    26th, excuse me, the 26th --
19       A    No, I didn't.
20       Q    You did not?
21       A    No, I did not.  I did not see him
22   on the 26th.

26 (Pages 98 to 101)

102

1    Q    Now, so this comes in, you forward
2    it, and did you ever see this email again,
3    before I showed it you now, today?
4    A    I saw it earlier today.
5    Q    When?
6    A    When I was with Mr. Strand and Mr.
7    Wilmot.
8    Q    What did he tell you about it?
9    A    He didn't tell me anything. He
10   just asked me, "Had I seen it before?"
11   Q    What did you tell him?
12   A    And I told him that, I had seen it
13   before.
14   Q    Did you tell him essentially what
15   you told me, or did you tell him something
16   else?
17   A    I told him what I told you, that I
18   saw it before.
19   Q    Now, I am going to show you --
20        MS. MANGOLD:  Maybe we should make
21   a copy of it.
22        MR. COOTER:  I mean, he has got --

103

1        MR. STRAND:  Which one you've got
2    and I've got copies.
3        MR. COOTER:  That says there is
4    something from Quick Messenger.
5        MR. STRAND:  All right, the Quick
6    Messenger invoice.
7        MR. COOTER:  Mark this as the next
8    exhibit, if you would.
9        MR. STRAND:  It's the one with all
10   the handwriting?
11       MR. COOTER:  Yeah.
12       MR. STRAND:  Okay.  There you go
13   Dale.  Which number is it?
14       MR. COOTER:  What is it?  Seven?
15       (Deposition Exhibit No. 7 was
16       marked for identification.)
17       BY MR. COOTER:
18   Q    Exhibit Number 7, would appear to
19   be something from Quick Messenger Service,
20   you see that?
21   A    Yes.
22   Q    I don t know, it looks to me like

104

1    the face page and this invoice as the second
2    page.
3    A    No, this is the first page.
4    Q    What's the first page?
5    A    The top page is the first page.
6    Q    Oh, I see they give you the
7    itemization and then at the end they tell you
8    how much you owe them?
9    A    No, sir, usually there is the
10   perforated part at the top, and that's what
11   you send, when you send your payment in.
12   Q    All right.  In any event these are
13   the records that you have in your files from
14   Quick Messenger, involving the events of the
15   26th of October, is that accurate?
16   A    Yes.
17   Q    Now, calling your attention to the
18   date on the first page, saying -- that says
19   October the 26th, it says, client reference
20   DWW.  Who is DWW?
21   A    David Wilmot.
22   Q    I noticed that in some of the

105

1    others, here you got a client reference,
2    Bagwell that's a client of the law firm, I
3    assume?
4    A    That's an attorney.
5    Q    Cada Vez?
6    A    That's a client.
7    Q    DC HMO?
8    A    That's a client.
9    Q    And why would you use Mr. Wilmot as
10   a client, as reference for a Quick Messenger?
11   A    When some -- this is what we do.
12   In order for me to be able to bill -- the
13   attorney, for these expenses, I divide it
14   into, whose client it is unless the client is
15   actually paying for the messenger themselves,
16   so Cada Vez, they paid their own.  So that's
17   why I put it under them, so because they are
18   a client of Bagwell's, but because they were
19   paying it, I didn't want to charge her for
20   that, at the end if the month when I did her
21   invoice.
22   Q    Well, if I look at these notations

27 (Pages 102 to 105)

106

1  for the 26th, or 27th and the 28th that say,
2  "Client reference DWW, Dave Wilmot," do I
3  understand that he gets charged these as
4  expenses personally?
5      A  He will get charged those -- his
6  clients will get charged those expenses.
7      Q  How do you know, what clients are
8  involved?
9      A  Because I can -- I'll know by the
10  addresses.
11      Q  I see.  Now, here it would appear
12  that on the 26th there are two references to
13  the 26th on the first page, actually there is
14  another one on the back, we'll come back to
15  that one.  But just take the two on the first
16  page.
17      It says, "Client reference DWW, the
18  first reference on the 26th is Maria Zero,
19  Mayflower Hotel, 1127 Connecticut," looks
20  like the guy who delivered it to some guy
21  named Ross, those are his initials.
22      MR. STRAND:  Or maybe a rush

107

1  delivery?
2      THE WITNESS:  It was a rush job.
3      MR. STRAND:  Or Rush Limbaugh
4  delivered it.
5      MR. COOTER:  Then it would be a
6  slow delivery.  Actually you are right, it
7  says Reg and Rush.  So this was a rush
8  delivery to the Mayflower hotel, on the 26th
9  right?
10      A  Yes.
11      Q  It says, "Maria," and it says,
12  "14:25 p.m. rush," and then over on the back
13  it says, "$13.67" that was the charge for
14  that day -- for that delivery, right?
15      A  Yes.
16      Q  And do you understand that this is
17  the delivery of the check to the Mayflower?
18      A  Yes.
19      Q  This is the check that had been
20  issued to Doley.  Right?
21      A  I am assuming so, yes.
22      Q  And the "Maria" is, who?

108

1      A  Me.
2      Q  I see, so this is -- so their
3  notation is -- what you have somebody named
4  Andrea there who asked for Messenger Service
5  every once in a while?
6      A  Whomever calls in.  If David would
7  call in to do a messenger it would be David.
8      Q  Okay, so you called to arrange for
9  this delivery of -- this rush delivery to the
10  Mayflower, at 14:25 p.m.  You understand that
11  that's the time that the package was
12  delivered?
13      A  Yes -- no that's the time that the
14  call was made.
15      Q  Time caller.
16      A  That's the time that we make the
17  telephone call.
18      Q  Okay, you made the call at 2:25
19  p.m. and at the time that you make the call
20  at 2:25 p.m. that afternoon to send this rush
21  to the Mayflower, what happens?  Does Quick
22  Messenger come over, pick it up and go?

109

1      A  Yes, Sir.
2      Q  And in a rush delivery, just
3  explain the process, how long does it take
4  them, once the time you call them they come,
5  they go, they are out the door on a rush.
6      A  They -- I am really -- I want to
7  say in less than an hour.  It is supposed to
8  be in less than an hour.
9      Q  Okay.  Do you know when it was that
10  this finally made it to the Mayflower?
11      A  No, I don't.
12      Q  In any event, this references --
13  that particular delivery references, the
14  delivery of the check to somebody at the
15  Mayflower in the afternoon of 26th, right?
16      A  Right.
17      Q  Now, there is another one says,
18  "Maria 16:05, 1101 15th Street" this is a
19  regular one, what's in 1101 15th Street?
20      A  Mr. Thompson's office.
21      Q  At 2:25 p.m., if you are reading
22  this correctly, you are sending this check

110

1  over to the Mayflower, and then, about an
2  hour and a half -- little bit in an hour and
3  a half later, you are arranging for something
4  to be delivered to Mr. Thompson's office?
5  What was being delivered to Mr. Thompson's
6  office that day?
7      A  I am not arranging for anything to
8  be delivered, but for something to be picked
9  up.
10     Q  I see. So this call reflects that
11 you are going to -- you called Quick
12 Messenger, and said, "Go over to 1101 15th
13 Street, and pick something up." What was the
14 something that was to be picked up?
15     A  I want to say, the cashiers check
16 that Mr. Thompson had.
17     Q  Okay. Might it have been something
18 else, do you know?
19     A  I do not.
20     Q  You really don't remember, do you?
21     A  No, sir.
22     Q  What is 6109 Rosemount Circle in

111

1  Potomac, who is that?
2      A  I don't really remember.
3      Q  Looks like you are looking for
4  something.
5      A  I don't know. Yeah, I couldn't, I
6  don't recall at this point.
7      Q  Cost 50 bucks, must have been --
8      A  Yeah, must have something or the
9  other.
10     Q  You don't know who is out at
11 Potomac?
12     A  No, sir.
13     Q  Who is at 1667 K Street, Northwest?
14     A  I don't recall that off the top of
15 my head.
16     Q  And 1129 Connecticut Avenue, I
17 notice -- excuse me, 1229 Connecticut Avenue,
18 who is there?
19     A  I don't know I would have to look
20 at these addresses.
21     Q  In any way, Quick Messenger has
22 this -- is the messenger service you use, so

112

1  they would have records of all this, I
2  suppose?
3      A  Yes.
4      Q  To include, who this stuff was
5  supposed to be delivered to, right? Did you
6  tell -- I mean -- no matter, it doesn't
7  matter you don't have to speculate about it.
8      A  Okay.
9      Q  Don't worry about it, I'll find out
10 what they would send. Take a look at the
11 next page, it's the document. You got a
12 1351, little before to, on the 26th, you
13 wanted something delivered, this one is rush
14 job 1909 K Street, Northwest. What's in 1909
15 K Street?
16     A  That's the BB&T Bank.
17     Q  Might that be the check, the
18 cashier's check from Thompson to be deposited
19 into the escrow?
20     A  I don't know. I don't know.
21     Q  Well, in any way 1909 K Street is
22 BB&T?

113

1      A  Yes.
2      Q  I am going to show you what we'll
3  mark as the next exhibit, so please review it
4  now, something I just got today.
5          (Deposition Exhibit No. 8 was
6          marked for identification.)
7      MR. COOTER:  What's the number on
8  it?
9      MR. STRAND:  Eight.
10     MR. COOTER:  Deposition Exhibit
11 Number 8 is a copy of something you gave
12 today, which would appear to be an e-mail
13 from you to Mr. Doley on the 25th, at 12:52
14 at night. Did you send this to Mr. Doley,
15 12:52 on the evening of the 25th?
16     MR. STRAND:  Objection to the form,
17 it misstates the document; it's 10:52 Mr.
18 Cooter not 12:52.
19     BY MR. COOTER:
20     Q  You are right, I apologize. You're
21 eyes are better. You're right. This
22 reflects an e-mail from you to Doley, 10:52

29 (Pages 110 to 113)

114

1  at night on the 25th; did you send it on or
2  about that time?
3      A   I assume I did, yes.
4      Q   And it says, "From you to Harold
5  Doley, with a blind copy to Mr. Wilmot."
6  Looks like you sent them to Mr. Wilmot, and
7  a bunch of places, and sent another copy to
8  yourself, that is essentially what happened
9  there?
10     A   Yes.
11     Q   "Mr. Doley, for instructions from
12 David Wilmot, I am forwarding the attached
13 documents for your review.  Please contact
14 Mr. Wilmot directly if you have any
15 questions," and then you left some numbers.
16 Is the first one Mr. Wilmot's home number?
17     A   Mr. Wilmot's mobile number.
18     Q   And the second one?
19     A   His home number.
20     Q   In fact you don't work after 4:30
21 p.m., your words to that effect, why was it
22 that you are sending this e-mail almost 11:00

115

1  o'clock on the 25th.
2      A   I just sent it out because I had
3  talked to Mr. Thompson earlier who told me
4  that he was going to be sending me an e-mail,
5  and that I was to turn around and send that
6  e-mail to Mr. Doley, per David's
7  instructions.
8      Q   I thought you told me that you were
9  forwarding this e-mail to Mr. Wilmot, that
10 evening.
11     A   No, I sent it Mr. Wilmot when I got
12 it from Mr. Weitzel, but I talked to Mr.
13 Thompson, and he told me that he would be
14 sending me an e-mail.  Not that Mr. Weitzel
15 would be sending me an e-mail.
16     Q   Now, what did you send him this --
17 what did you send Mr. Doley?
18     A   I forwarded him the information
19 that Mr. Thompson has sent me, or Mr. Weitzel
20 had sent me.
21     Q   Well, in your e-mail to Mr. Doley
22 have you ever had correspondence with Mr.

116

1  Doley before?
2      A   This is the first and only
3  correspondence.
4      Q   Did you ever talk to Mr. Doley
5  before this?
6      A   Not that I can recall, no.
7      Q   What was your understanding as of
8  the evening of the 25th, who is Harold Doley?
9      A   I did not know.  I just figured he
10 was one of Mr. Thompson's clients.
11     Q   Now, in any event, you send this
12 e-mail to Mr. Doley at 10:52 it says, "Per
13 instructions of Dave Wilmot, I am forwarding
14 the attached documents for your review."
15 When did you receive instructions from
16 Wilmot?
17     A   I never received instructions from
18 Mr. Wilmot, I received that information from
19 Mr. Thompson.
20     Q   Ma'am --
21     A   He told me, once he sends me a
22 e-mail, he wants me to forward that e-mail to

117

1  Mr. Doley, I said "Okay."  He said, "Just
2  tell him that David told -- per David's
3  conversation, that you are to send them this
4  e-mail."  I did exactly what Mr. Thompson
5  said.
6      Q   Well, is it your testimony that
7  when you wrote to Mr. Doley that you had
8  received instructions from Mr. Wilmot to
9  send this to Doley that your statement to
10 Doley in that regard was untrue?
11     A   Yes, it is.
12     Q   And, when it says, "Please contact
13 Mr. Wilmot directly if you have any
14 questions."  Who told you to tell?
15     A   Mr. Thompson told me that.
16     Q   And in any event you sent this to
17 Doley, 8 minutes to 11:00 on the evening of
18 the 25th, you give him Mr. Wilmot's home
19 phone number, and cell phone number, right?
20     A   Yes.
21     Q   And is it accurate that at the same
22 time that you sent this e-mail to Mr. Doley

30 (Pages 114 to 117)

118

1  that night, you also sent it to Mr. Wilmot at
2  his blackberry, and what is DWWDC, what is
3  that?
4      A    That's Mr. Wilmot's AOL address.
5      Q    Okay, so you sent it to his AOL
6  account, and you sent it to his blackberry
7  account, is that right?
8      A    Right.
9      Q    Why?
10     A    Because it had to do -- because I
11 put his name in it, and I wanted him to see
12 it.
13     Q    And you sent those to him that
14 night.
15     A    I sent it to him, if that's the
16 date, yeah.  The time, yes.
17     Q    Okay.  After you sent this e-mail,
18 to Mr. Doley, did you ever have any
19 conversation with any one, about the
20 relationship, if any, between Thompson on the
21 one hand and Doley on the other?
22     A    No.  I wasn't aware of the

119

1  relationship between Mr. Thompson and Doley.
2      Q    Do you know that's an issue in this
3  case?
4      A    I know it now.  I did not know it
5  at that time.
6      Q    When did you first learn it was an
7  issue in this case?
8      A    When Mr. Strand started asking me
9  for this back- up paperwork.
10     Q    And when you learned that it was an
11 issue in this case, did you enquire of
12 anybody as to what the relationship was
13 between Doley on the one hand, and --
14     A    No.
15     Q    -- Thompson on the other?
16     A    No, sir I did not.
17     Q    To include -- did you ever ask Mr.
18 Wilmot about it?
19     A    No, I did not.
20     Q    Do you know what if any
21 relationship there is between Mr. Wilmot and
22 Mr. Doley?

120

1      A    No, I do not.
2      Q    After you sent this e-mail to Mr.
3  Doley, did you ever have any further
4  communications, written or oral, with anybody
5  associated with Harold Doley?
6      A    Not that I can remember, no.
7      Q    Have you ever discussed Mr. Doley
8  with Mr. Thompson?
9      A    No, I have not.
10     Q    Have you ever discussed the events
11 of the shareholders meeting on the 25th of
12 October -- 26th of October, excuse me, at the
13 Mayflower Hotel, with anyone?
14     A    No, I have not.
15     Q    Well, you have talked to Mr. Strand
16 about it haven't you?
17     A    Oh, I've talked to him recently, I
18 am just -- okay, yeah, I misunderstood the
19 question.
20     Q    Have you ever talked to anyone
21 other than Mr. Strand about what happened on
22 the 26th at the Mayflower Hotel?

121

1      A    I talked to both he and Mr. Wilmot
2  about it today.
3      Q    All right, what did Mr. Wilmot tell
4  you happened over there?
5      A    He didn't say anything had
6  happened, he sat in on meeting that me and
7  Mr. Strand were having, before my deposition.
8      Q    But what did you learn happened on
9  the 26th, what did they tell you?
10     A    They didn't tell me anything
11 happened at the meeting; they just told me
12 that this deposition was in reference to
13 things that transpired on that day.
14     Q    Were you curious, about what
15 happened on that day?
16     A    No.
17     Q    Never asked anybody?
18     A    No.
19     Q    I am going to mark, I don't know if
20 we marked this, "To whom it may concern"
21 letter to the United Bank, did we mark this
22 already?

31 (Pages 118 to 121)

122

1    MR. STRAND: You have marked this
2  it is marked as Exhibit Number 4.
3    MS. MANGOLD: Four, okay.
4    BY MR. COOTER:
5    Q   Has anybody other than Mr. Strand
6  talked to you about the fact that you are
7  going to be deposed today?
8    A   Talked to me about the fact that I
9  was going to be deposed today?
10    Q   Or deposed, if not today, sometime
11  in this case?
12    A   When it was previously scheduled,
13  prior to it being scheduled, Mr. Strand's
14  secretary contacted me to try to get a date.
15    Q   Other than Mr. Strand, or his
16  secretary, did anybody talk to you?
17    A   No.
18    Q   You ever talked to Mr. Thompson
19  about any of these things?
20    A   No, I have not.
21    Q   What's the other --
22    A   Bridgette Thompson.

123

1    Q   You ever talk to Bridgette about
2  any of these things?
3    A   No, I have not.
4    Q   All right, I think I asked you if
5  Bridgette and Jeff were related, and you said
6  --
7    A   I want to say they are.
8    Q   Do you know what the relationship
9  is?
10    A   I want to say she's his niece, I
11  think.
12    Q   What's her job over there?
13    A   Oh, I don't know. I just know that
14  she assists Mr. Thompson, I don't know her
15  title.
16    Q   So, Bridgette Thompson works at
17  this office, what's the address?
18    A   1101 15th Street, Northwest.
19    Q   And to the extent that you had
20  conversations with Jeff Thompson on the 25th,
21  26th, 27th, you have told me about all of
22  them at this point?

124

1    A   Yes, sir.
2    Q   Have you told me all of your
3  conversation with Bridgette Thompson, on
4  those dates at this point?
5    A   Yes.
6    Q   Let me take a short recess.
7      (Recess)
8    MR. COOTER: We are going to go
9  ahead, and mark this as the next exhibit,
10  it's a document supposed to be part of a
11  calendar schedule that was furnished to me
12  today for the first time.
13    MR. STRAND: Nine.
14      (Deposition Exhibit No. 9 was
15      marked for identification.)
16    BY MR. COOTER:
17    Q   What is this document?
18    A   This is Mr. Wilmot's schedule for
19  the week of October 25th through the 30th.
20    Q   This would appear, by looking at
21  the bottom, it says, "Lotus Development
22  Corporation," is this some function of Lotus

125

1  Notes?
2    A   Yes.
3    Q   Is that the computer program you
4  use to keep calendars over there?
5    A   Yes, sir.
6    Q   Okay. When did you print this?
7    A   This was printed today.
8    Q   I see that -- a little before one?
9    A   Yes.
10    Q   Curious just about the format of
11  this, it says, "12:00," just looking at the
12  25th, it says "12:00 p.m. -- start 12 p.m.
13  end 1:00 p.m.," that's says, "Good afternoon,
14  I want to remind everybody about the Father's
15  day counsel blah, blah." That would appear
16  to be the text of something. Is that an
17  e-mail text of some sort?
18    A   Yes.
19    Q   Now, so then Mr. Wilmot received an
20  e-mail from some fellow named Ben?
21    A   No, I did.
22    Q   You did. And you just took the

126

1 e-mail and put it on his calendar?
2    A    Usually I would do that.  Cut and
3 paste specific information, so Mr. Wilmot --
4 instead of just giving him, "Oh, you have a
5 Father's day counsel meeting," I'll tell him
6 what is in reference to or who sent it.
7    Q    Mr. Wilmot's e-mail address is
8 what?
9    A    Dwwdc@hwblaw.org.  His personal,
10 and then he has personal, that's his business
11 e-mail.
12    Q    Have you made a search or has
13 anyone, to your knowledge, made a search, for
14 Mr. Wilmot's e-mails on the 25th, 26th, of
15 October?
16    A    I have not.
17    Q    Has anyone to your knowledge?
18    A    I don't know.  Not to my knowledge.
19    Q    Does Mr. Wilmot receive e-mails on
20 a regular basis at the lawfirm.org account?
21    A    I don't know, I don't check his
22 e-mail, so I don't know.

127

1    Q    So he has a law firm e-mail, and he
2 also has -- if I understand this correctly he
3 has got an AOL account?
4    A    Yes.
5    Q    That's on one of these emails that
6 you showed me earlier, and he's got a
7 blackberry account dot net?
8    A    Yes.
9    Q    Okay, we are going to take a short
10 recess.
11        (Recess)
12        MR. COOTER:  I have no more
13 questions except a scathing redirect if you
14 are bold enough to try something?
15        MR. STRAND:  I am not going to try
16 anything; I just got a couple of questions.
17        MS. MANGOLD:  I am leaving.
18        MR. COOTER:  Then you are super
19 bold.
20        MR. STRAND:  I am super bold.
21        MR. COOTER:  Go ahead.
22        EXAMINATION BY COUNSEL FOR DEFENDANTS

128

1        BY MR. STRAND:
2    Q    Just a few questions Ms. Wood.
3 Earlier today, you testified at some length
4 about making payments to various vendors of
5 Mr. Thompson's?
6    A    Yes.
7    Q    How long has that practice been
8 ongoing?
9    A    For as long as I have been at the
10 firm.
11    Q    And how long have you been at the
12 firm?
13        MR. COOTER:  10 years.
14        THE WITNESS:  10 years.
15        BY MR. STRAND:
16    Q    Okay, now we've talked about a
17 trust or escrow account, and also at least
18 Wilmot business accounts, can you tell us
19 which accounts those payments to Mr.
20 Thompson's vendors had been made from over
21 that 10-year period?
22    A    Both of them -- all of those

129

1 accounts.
2    Q    So am I correct to my understanding
3 that the first time that payments were made
4 to Mr. Thompson's vendors out of Mr. Wilmot's
5 operating accounts didn't start in November
6 of 2005?
7    A    No, sir.  No.
8    Q    Let's look at Exhibit 2, which has
9 also been marked as Defendants Exhibit 231,
10 if you could, for a moment.  If you want to,
11 please glance at the documents, attached
12 there too as Exhibits B through J.  You have
13 to look at them real close, but here's my
14 question, are those all documents that you
15 supplied to me?
16    A    Yes, these are.
17    Q    And you gathered those at my
18 request?
19    A    Yes, sir.
20    Q    Now, looking at the first three
21 pages of Exhibit or Defendants Exhibit 231,
22 beginning at sequence step number 3, okay?

33 (Pages 126 to 129)

130

1   A   Yes.

2   Q   Moving from sequence step number 3
3   through the end of the document, do the
4   statements there -- the information there,
5   does that fairly and accurately represent
6   what you understand to be the series of
7   events relating to the flow of money in
8   connection with the Thompson check and the
9   Doley checks that we have been talking about
10  today?

11  A   Yes, sir.

12  Q   And you've reviewed that document?

13  A   Yes.

14  Q   And you confirmed to your
15  satisfaction that the statements there are
16  accurate?

17  A   Yes.

18  Q   And now, there was testimony
19  earlier today about QMS, the pickup service?

20  A   Yes.

21  Q   And there was specific testimony
22  about a delivery to the Mayflower Hotel,

131

1   sometime -- looks like the request went in
2   about 2:25 p.m. but here was a delivery
3   sometime later to the Mayflower Hotel?

4   A   Yes.

5   Q   Do you recall where the pickup was,
6   that was ultimately delivered to the
7   Mayflower Hotel?

8   A   Yes.

9   Q   And where was that pickup?

10  A   United Bank.

11  Q   You've testified at some length
12  about Mr. Thompson or his employee Ms.
13  Thompson, Bridgette Thompson, giving you
14  instructions regarding payments or
15  withdrawals or checks or things of that
16  nature, you recollect what I am talking
17  about?

18  A   Yes.

19  Q   And specifically you've been
20  talking about events, which occurred on or
21  about October 26, 2005?

22  A   Yes.

132

1   Q   Based on your experience, can you
2   tell us whether that particular series of
3   events was a unique situation or whether that
4   had occurred before?

5   A   Business as usual.

6   Q   So I take it, it had occurred
7   before?

8   A   It's a regular occurrence.

9   Q   Okay.  Now, is the $160,000 that
10  was, or thereabouts that was involved in the
11  transactions relating to the 26th, was that
12  the most money that had ever been involved in
13  business as usual with Mr. Thompson?

14  A   No.

15  Q   Can you just give us a rough
16  estimate of the largest amount that you can
17  recall on that type of an arrangement?

18  A   I want to say the largest amount
19  may have been, like, $500,000.

20  Q   And how frequently did Mr. Thompson
21  call you or others and ask for transactions
22  of this type to occur, do you recall?

133

1   A   Regularly.

2   Q   And when you say regularly, once a
3   week, once a month, once a year?

4   A   Is no -- it maybe -- it's just
5   according to what Mr. Thompson is doing at
6   the time.  It may be like once every two
7   months, once every month.  It's according to
8   what invoices, or what he is trying to do.

9   Q   Okay.  So you weren't shocked at
10  this request on October 26th?

11  A   I am never shocked by Mr. Thompson.

12  Q   It was just business as regular?

13  A   Yes, sir.

14      MR. STRAND:  Thank you, I have no
15  further questions.

16      FURTHER EXAMINATION BY COUNSEL FOR
17  PLAINTIFFS

18  BY MR. COOTER:

19  Q   Thompson says, that he delivered a
20  $165,000 to be placed in your escrow account,
21  and he believes that it was placed in your
22  escrow account, and still sits there, is he

34 (Pages 130 to 133)

134

1  lying?

2      A   I don't know.

3      **Q   Okay, thank you.**

4          MR. STRAND:  Yeah, thanks.

5          (Whereupon, at 4:24 p.m., the

6          deposition of MARIA A. WOOD was

7          adjourned.)

8              * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**A**

**able** 105:12
**absolutely** 73:15
**accept** 96:21
**access** 17:12
  96:10
**account** 17:11
  20:21 21:17,19
  22:5,7,9,12,13
  22:14,16,20,21
  23:10 24:13,18
  24:22 25:7,10
  27:11 30:10
  31:17 32:9,13
  32:16,20,21
  33:2 37:9
  38:10 42:22
  46:7,8 47:5,7
  47:13,16,17,20
  47:22 49:9,11
  54:4,6,7,8 55:9
  55:11 56:16
  57:1,10 59:3,5
  59:10 60:1,19
  64:10 66:3,5
  66:11 67:10
  68:14,18,19
  71:8 72:4 74:9
  74:20 75:4,7
  75:22 76:1,18
  78:17 79:6,18
  80:9 81:2 84:2
  87:9 89:4,19
  90:8 93:7,10
  93:12 118:6,7
  126:20 127:3,7
  128:17 133:20
  133:22
**accounts** 7:18,19
  8:6 20:4,6,8,8
  20:17,19 21:1
  23:19 25:16,17
  41:19,20,22
  42:2,12,15,16
  42:18,20 43:4
  43:12,15,16,17
  46:20 47:5

49:10,20 50:5
54:2,11,13,17
55:10,20 56:20
57:4,9 59:7
60:18 67:10,22
70:2,15 71:2
72:12,20 73:19
75:9 79:17,21
80:2,5 81:18
83:10 89:15
128:18,19
129:1,5
**accurate** 17:15
  60:16 71:9
  72:13 87:6,12
  104:15 117:21
  130:16
**accurately** 130:5
**Adams** 17:5,9
  29:9,13,15
  30:2 65:8
**additional** 9:11
  9:12,17 12:22
  22:5,6
**address** 4:8 94:1
  96:2,4,6 97:1,3
  99:8 118:4
  123:17 126:7
**addresses**
  106:10 111:20
**adjourned** 134:7
**Adults** 6:21
**afternoon** 36:20
  68:9 69:21
  71:18 101:15
  108:20 109:15
  125:13
**agree** 62:6 74:21
**agreement** 1:14
  98:16
**ahead** 20:13
  24:1 41:10,11
  56:7 58:2,6
  62:17 94:5,6
  124:9 127:21
**al** 1:3,6 2:6
**Allen** 1:18 82:1

82:11,15,22
83:15,17 86:5
86:18 87:3
88:3,6,9 89:7
**alternative**
  67:20
**America** 22:17
  23:8,10,17,20
  24:4,14 25:1,4
  25:10
**amount** 27:1,12
  33:1 37:7
  44:16 58:1
  60:5 65:19
  79:4 87:3
  132:16,18
**analysis** 3:9 65:2
**Andrea** 5:1
  108:4
**Antoinette** 4:10
**anybody** 57:5
  66:12 67:15
  68:11 70:11
  73:17 74:12,15
  119:12 120:4
  121:17 122:5
  122:16
**Anyway** 19:1
  80:13
**AOL** 118:4,5
  127:3
**aol.com** 92:21
**apologize** 6:10
  6:11 113:20
**apparently**
  47:12 73:10
**appear** 29:21
  42:4 92:18
  103:18 106:11
  113:12 124:20
  125:15
**APPEARANC...**
  2:1
**appointment**
  33:21
**approximately**
  1:15 6:4

**April** 23:11
  24:22 25:11
  83:16 84:2
  87:6
**arrange** 45:11
  108:8
**arranged** 39:3
  51:6
**arrangement**
  132:17
**arranging** 110:3
  110:7
**asked** 15:17 37:8
  52:5 66:2,10
  67:20 89:6
  90:11 91:16
  102:10 108:4
  121:17 123:4
**asking** 32:11
  119:8
**assistant** 4:19,21
  7:7 45:11
**assists** 123:14
**associated** 120:5
**assume** 105:3
  114:3
**assumed** 40:21
**assuming** 107:21
**attached** 15:15
  16:1,14,18
  93:1 98:17
  114:12 116:14
  129:11
**attachment** 93:1
  99:7 100:21
**attempt** 19:7
**attended** 5:18
**attention** 94:11
  104:17
**attorney** 7:22
  14:14 105:4,13
**attorneys** 5:8
  8:10
**authority** 8:6
  20:2,5,14,15
  20:20 67:19
  70:10,14,18

**authorization**
  37:3
**authorized** 31:7
  60:21
**Avenue** 1:17 2:4
  25:5,13 111:16
  111:17
**aware** 12:14
  76:8,14 118:22

**B**

**B** 29:20,21
  129:12
**back** 9:21 24:2
  33:22 35:20
  42:4,5,10 46:9
  46:13,14 47:21
  48:2 49:11,19
  50:19,20 51:7
  52:10,11,21
  56:13 57:15
  59:2,18,20
  60:19 63:6,17
  64:18 68:10
  72:17 73:6
  76:2,17,22
  77:3 78:8,12
  78:13,17 79:5
  79:10,20 80:1
  80:3,7 81:9
  99:18,21
  101:13 106:14
  106:14 107:12
  119:9
**background**
  5:17 7:18
**backup** 81:7,7
  84:12 91:12
**Bacon** 2:8
**Bagwell** 4:16 5:1
  6:3 105:2
**Bagwell's**
  105:18
**bank** 3:12 8:2
  9:14 16:19
  17:5,9 19:4,11
  21:20 22:17

23:7,9,16,20
24:4,14,19
25:1,3,7,10
29:9,14,15
30:2 34:9,16
37:6,15 38:14
39:4 41:17,17
41:20 42:5,13
43:13 44:15
45:12 46:20
47:17 49:12,20
56:14 57:15
59:3,4,21
60:18 61:19,21
62:22 64:5,7
65:8 70:15
71:19 72:5,15
72:17,21 73:3
73:19 76:22
77:3 78:14
79:6,7 90:20
112:16 121:21
131:10
**based** 94:20,22
132:1
**basically** 71:21
72:1
**basis** 126:20
**bates** 61:20
**BB&T** 21:9,19
22:13 23:7,16
23:19 24:7,13
24:15,19 25:7
34:9,16 112:16
112:22
**beginning** 1:15
15:19 43:9
129:22
**behalf** 1:20 2:2,6
90:13
**belief** 80:7
**believe** 15:21
48:7
**believed** 80:8,12
**believes** 133:21
**Ben** 125:20
**Bender** 1:3

10:18,19 90:20
**best** 33:14
**Beta** 1:18
**better** 113:21
**bill** 86:4 89:3
105:12
**bills** 55:1,21
57:9 63:22
64:10 80:15
82:20 87:14
**bit** 74:18 110:2
**blackberry**
118:2,6 127:7
**blah** 125:15,15
**blame** 68:20
**bless** 73:15
**blind** 114:5
**blotter** 50:22
51:3,8,18
52:18 56:5
58:22 59:19
63:4 77:12
**Blue** 4:10
**bold** 127:14,19
127:20
**bottom** 124:21
**Bowie** 5:18
**branch** 25:3,5
**Bridgette** 27:5
35:5 52:1,4
55:3 60:13
66:16 122:22
123:1,5,16
124:3 131:13
**bring** 9:5,6
10:17 11:5
14:1
**brought** 9:19
37:22 51:13
70:4,6
**Brown** 4:16,22
6:3 46:6,9,12
47:13,16 75:15
75:16,17 76:3
80:4,4 96:3,7
**Brown's** 75:19
**bucks** 111:7

**bunch** 19:11
114:7
**business** 37:9
42:1,12 43:14
43:16 47:22
54:6,8 55:14
57:1 67:9,21
68:14 70:2
72:12 73:18
79:17 81:2,18
89:4,15 126:10
128:18 132:5
132:13 133:12

---

### C

**C** 3:1 4:1
**Cada** 105:5,16
**calendar** 3:16
124:11 126:1
**calendars** 125:4
**call** 7:11,15
33:10 35:19
38:6 52:10,11
60:10,15 86:11
108:7,14,17,18
108:19 109:4
110:10 132:21
**called** 1:13 4:4
27:6,13 35:21
51:21 52:13,15
52:20,20 66:15
66:16,19 86:17
90:11 108:8
110:11
**caller** 108:15
**calling** 68:9
104:17
**calls** 7:14 30:6
55:4 87:2 94:4
108:6
**care** 7:13 26:15
26:17 37:21
40:14 41:1
67:16 69:15
79:2
**CAROLYN** 1:6
**case** 19:13 119:3

119:7,11
122:11
**cashiers** 110:15
**cashier's** 27:11
30:9,21 32:1
32:12,15,20
34:20 37:7,18
38:11 39:7
42:6 44:16
45:11,19 48:4
49:17 62:21
65:12,15,18
66:3,4,11
67:22 69:20
71:2,7 72:2,5
72:10 79:15
81:1 112:18
**cc** 94:13
**cell** 117:19
**certain** 9:5
10:19 54:11,13
**change** 22:16
**changing** 22:10
**charge** 105:19
107:13
**charged** 106:3,5
106:6
**chart** 79:10,11
80:22
**check** 7:19 8:5
17:4,8 27:9,11
27:19 29:8,21
30:3,5,7,10,12
30:21 31:3,13
31:15,22 32:1
32:8,11,12,15
32:19,20 33:2
33:4 34:8,11
34:20 36:2,5,5
36:11,13,21
37:2,7,18
38:11,19 39:3
39:6,7,7,8 41:2
41:3 42:6,11
44:16 45:12,14
45:19,21 46:6
46:8,11,11,17

46:18 47:14,15
48:2,3,4,9,12
48:15,20 49:1
49:4,6,17
50:10,19,20,21
51:5,15,16
52:5,8,17,22
56:4,8,12,13
58:20,21 62:6
62:21,21 63:3
63:7,20 65:7
65:12,15,18,20
66:3,4,11
67:13,22 69:20
70:12 71:2,7
71:11,15,18
72:2,5,10 74:3
77:11,19 78:1
78:8,12 79:15
81:2 82:1,11
82:21 83:4,21
84:7 85:14,14
86:15,18 87:1
89:3 107:17,19
109:14,22
110:15 112:17
112:18 126:21
130:8
**checking** 98:9
**checks** 3:10
16:18 17:4
20:20,22 23:22
24:5 31:8
47:15,19,21
49:10,19 50:22
58:10 64:9,12
70:16 74:16
75:8,15 81:8
81:17 86:1,21
90:12 130:9
131:15
**Christine** 1:18
**Circle** 110:22
**circulate** 15:3
**clarify** 17:3
**clear** 13:3 24:16
68:21

**client** 41:22 55:5
76:5 104:19
105:1,2,6,8,10
105:14,14,18
106:2,17
**clients** 106:6,7
116:10
**close** 129:13
**College** 5:19
**Columbia** 1:1,19
**column** 65:4,11
65:17 67:19
70:22 72:8,9,9
80:22
**come** 22:4 30:17
33:22 36:10
42:10 50:22
55:1 57:8 58:4
68:10,11,16
70:7 73:7 74:1
74:16 86:4,6,8
90:15,21 101:2
106:14 108:22
109:4
**comeback** 70:11
**comes** 34:8
67:16 71:20
74:7,14,19
78:8,12 97:5
100:2 102:1
**coming** 20:20
66:10 96:2
**communicate**
34:18
**communicatio...**
120:4
**compilation**
28:21
**compiling** 15:11
29:3
**computer** 7:13
125:3
**concern** 121:20
**concerning** 11:1
**condolences**
8:12
**confirm** 15:20

16:13 41:18
**confirmed**
130:14
**Connecticut**
106:19 111:16
111:17
**connection**
54:19 130:8
**conservation**
99:1
**consultant** 53:1
53:6 82:3,13
83:3 84:9,15
85:6
**consultants** 56:8
58:19 76:18
**consulting** 53:9
**contact** 54:16
114:13 117:12
**contacted** 91:4
122:14
**continued** 23:15
**continuing**
54:18
**contract** 53:13
53:14 54:14
58:18 84:18
**contractors**
53:12 54:1
**contracts** 53:1
53:11,13,19,21
54:15
**conversation**
52:3 117:3
118:19 124:3
**conversations**
123:20
**Cooter** 1:16 2:3
2:4 4:7 8:19
14:8,11,14,18
15:4,8,16 18:8
18:21 19:5,14
19:20 20:1,9
20:12 22:3
26:15,20 28:12
28:15,18 29:2
38:18 40:6,7

40:17 41:6,7,9
41:15 44:3,11
47:6,9,10,11
48:11 61:11,17
62:12,18 81:14
81:15 82:9,10
91:20 92:11,13
92:17 94:6,10
102:22 103:3,7
103:11,14,17
107:5 113:7,10
113:18,19
122:4 124:8,16
127:12,18,21
128:13 133:18
**copies** 14:22
15:1 16:11
17:7,20 88:15
88:18,20 90:12
91:16 103:2
**copy** 14:19 15:6
44:9 62:19,20
92:19,21
102:21 113:11
114:5,7
**Corporation**
124:22
**correct** 7:16
10:5 129:22
**correctly** 39:4
109:22 127:2
**correspondence**
115:22 116:3
**Cost** 111:7
**counsel** 1:13,15
3:3,4,6 4:6
125:15 126:5
127:22 133:16
**couple** 50:8
77:10 127:16
**Court** 1:1,18
19:16,19,21
22:1 38:16
**curious** 51:16
121:14 125:10
**cut** 86:15,18
126:2

**D**

**D** 1:6 4:1
**Dale** 2:3 14:21
19:2 44:9
103:13
**Dan** 98:18
**date** 25:7 49:22
91:6 104:18
118:16 122:14
**dated** 13:22
16:16,18 17:12
29:9,22 42:9
44:12 65:18
**dates** 124:4
**Dave** 98:20
106:2 116:13
**David** 2:8 5:1
44:15,18 53:2
53:7 68:11
83:20 89:4
97:13,19 98:17
98:19 99:3
100:22 104:21
108:6,7 114:12
117:2
**David's** 68:14
79:21 80:1
98:18 115:6
117:2
**day** 33:11,13
34:3,5,21 35:9
36:19 39:22
45:8 52:17
56:4 58:20,21
58:21 66:19
71:9,10,12,13
71:21 77:7
78:1 95:9
97:15,15,21
98:1 100:16
101:16 107:14
110:6 121:13
121:15 125:15
126:5
**days** 49:12 75:6
**DC** 53:14 71:6
84:10,11 85:5

85:16 88:12,22
89:2 105:7
**deadline** 69:7,9
**Deaf/Blind** 6:21
**deal** 7:17 21:15
**dealing** 11:9
**debits** 71:1
**December** 24:17
82:7,12
**deciding** 24:1
**Defendants** 1:7
2:6 3:4 127:22
129:9,21
**Defendant's**
13:4 15:10
28:4,13 64:20
**Delaney** 10:13
**deliver** 48:9,16
48:20
**delivered** 30:13
31:15 38:19
48:3 51:17
106:20 107:4
108:12 110:4,5
110:8 112:5,13
131:6 133:19
**delivers** 51:2
**delivery** 107:1,6
107:8,14,17
108:9,9 109:2
109:13,14
130:22 131:2
**deposed** 122:7,9
122:10
**deposit** 27:10
32:12 34:9
52:22 53:5
56:5,7,12 66:3
74:14,16 75:3
**deposited** 31:17
46:20 47:17
54:5,7 56:13
71:19,22 72:3
72:4,7,11
75:21 79:16
81:2 83:9 87:8
112:18

depositing 56:16
deposition 1:11
  3:7,8 8:14,15
  9:18 18:17
  28:8 41:13
  44:5 61:14
  91:21 92:9
  103:15 113:5
  113:10 121:7
  121:12 124:14
  134:6
depositions 7:20
deposits 20:16
  20:18 51:4
  71:6
describe 52:3
desk 51:7
determination
  24:9 73:6
determined
  24:11
Development
  124:21
difference 33:7
different 16:10
  42:16,18,20
  47:15 61:9
  75:8
directly 114:14
  117:13
disbursements
  20:16
discuss 58:12
  101:11
discussed 49:15
  99:16 120:7,10
District 1:1,1,19
divide 105:13
doctor's 33:21
document 8:20
  10:4 11:6 18:1
  18:16 29:7
  62:5 70:21
  93:1 112:11
  113:17 124:10
  124:17 130:3
  130:12

documentation
  90:9
documents 9:6
  10:7,11,12,15
  10:18,22 11:3
  11:17 12:2,4,8
  12:10,13,20,22
  13:9,11,14
  14:2 15:12,14
  16:1,7,14,17
  18:12 19:1,3,8
  26:11,16,17
  28:21 29:4
  44:4 91:12
  98:18 114:13
  116:14 129:11
  129:14
doing 35:20
  39:22 43:10
  45:6 76:6
  87:19 133:5
Doley 10:12 12:3
  12:4,5,19
  13:22 32:17,21
  33:2,4 34:12
  38:11 39:7
  42:7 45:21
  48:4,9,12,15
  49:17 51:7
  62:22 63:20
  66:5 68:1 71:3
  72:6 74:2,3
  79:14 81:1
  107:20 113:13
  113:14,22
  114:5,11 115:6
  115:17,21
  116:1,4,8,12
  117:1,7,9,10
  117:17,22
  118:18,21
  119:1,13,22
  120:3,5,7
  130:9
Doley's 72:10
  81:1
don 103:22

DONNA 2:3
door 109:5
dot 127:7
Douglas 10:20
Draft 98:15
draw 37:6 54:16
  66:4 67:21
drawing 54:14
drawn 30:1,10
  47:15 53:2,7
draws 65:7
duly 4:5
duplicate 61:9
duties 7:9
DWW 104:20,20
  106:2,17
DWWDC 118:2
Dwwdc@hwb...
  126:9
D.C 1:9,18 2:5
  2:10 17:8 29:8

---

**E**

E 3:1 4:1,1 41:5
earlier 18:10
  85:19 99:12
  101:12 102:4
  115:3 127:6
  128:3 130:19
early 91:7
educational 5:17
effect 114:21
effort 75:19
ego 6:8
eight 13:16
  113:9
either 36:9
  51:14 52:10
  54:4 65:14
  80:10 87:16
email 102:2
emails 127:5
Emerge 53:14
  84:10,11 85:5
  85:16 88:12,22
  89:2
employed 4:12

  4:14,15
employee 131:12
employment
  5:21
encompassed
  18:3
ended 63:4
  79:19 90:18
Endorse 31:3
endorsement
  31:2
endorsing 46:10
ends 48:5
enquire 119:11
enquiry 90:19
entered 45:19
entire 6:17
escrow 20:4,5,8
  20:17,19 21:1
  21:17 22:5,6,8
  22:11,20,21
  24:13,18,22
  25:6,16,17
  30:10 31:17,22
  32:2,13,16,19
  32:21 33:1
  38:10 41:20
  49:17 55:8
  56:16 57:10
  71:16 72:4
  74:8,20 75:4,7
  75:15 79:22
  80:9 87:9
  89:19 90:8
  112:19 128:17
  133:20,22
ESQUIRE 2:3,3
  2:7,8
essence 19:10
essentially 6:18
  38:8 73:8
  102:14 114:8
estimate 132:16
et 1:3,6 2:6
evening 92:21
  93:3 98:6
  100:2 113:15

  115:10 116:8
  117:17
event 57:14
  58:17 65:5
  70:19 77:2
  78:7 82:18
  104:12 109:12
  116:11 117:16
events 49:19
  104:14 120:10
  130:7 131:20
  132:3
everybody
  125:14
exact 33:12
  49:22 91:6
exactly 24:8
  34:14 37:16
  56:6 79:1
  85:22 97:7
  117:4
examination
  1:13 3:2,5 4:6
  127:22 133:16
examined 4:5
example 10:10
  13:2 86:5 88:7
excited 37:1
  67:7
excuse 10:21
  46:17 48:5,6
  62:8 74:2
  101:18 111:17
  120:12
executive 4:18
  4:20 7:7 45:10
exhibit 8:14,15
  9:15,21 12:12
  13:4 15:10,12
  16:2,14,18
  28:2,5,5,8,11
  28:20 29:12
  41:11,12,13,16
  42:4 43:22
  44:5,12 45:20
  46:3,5,17 47:8
  61:10,14,18

62:13,16 81:22
92:8,9,13,18
103:8,15,18
113:3,5,10
122:2 124:9,14
129:8,9,21,21
**exhibits** 3:7 29:4
29:13 62:15
129:12
**exist** 16:2,20
88:20
**existed** 16:7,15
17:14
**expected** 92:4
**expecting** 94:19
**expenses** 105:13
106:4,6
**experience**
132:1
**explain** 95:21
109:3
**explained** 77:4
78:14,16
**explanation**
33:6
**express** 77:21
**extend** 94:4
**extent** 18:7
123:19
**extra** 14:22
**eyes** 113:21
**e-mail** 3:13,15
13:20,21 14:2
92:19,22 93:5
93:7,9 94:1,19
94:19 95:2,4,6
95:13,20 96:2
96:3,6,8,9 97:6
97:10,18,22
98:1,9 99:19
100:2,17 101:6
101:8 113:12
113:22 114:22
115:4,6,9,14
115:15,21
116:12,22,22
117:4,22

118:17 120:2
125:17,20
126:1,7,11,22
127:1
**e-mails** 95:17
126:14,19

**F**

**F** 4:22
**face** 104:1
**fact** 19:6 38:9
114:20 122:6,8
**fair** 69:19
**fairly** 130:5
**fashion** 85:3
**Father's** 125:14
126:5
**Fauntroy** 10:20
**fax** 45:16,17
**fee** 53:9 82:3,13
**fees** 53:1,6
**fellow** 125:20
**fifth** 29:7
**figure** 15:22
**figured** 116:9
**files** 11:18,18,20
11:21 16:21
104:13
**filter** 19:8
**finally** 28:16
109:10
**finances** 37:4
**financial** 7:18
**find** 41:3 47:2
52:17 112:9
**finds** 59:18
**fine** 15:4,8 40:7
78:19 82:9
95:22 98:15
**fire** 8:13
**firm** 4:15 5:11
6:5 7:1 11:18
11:21 20:3
21:2 22:5,20
24:19 26:8
27:1 43:12,15
46:12 51:1

54:11,18 55:7
57:8,9 58:8,9
58:10 74:20
84:20 89:1,19
90:9 93:9
105:2 127:1
128:10,12
**firms** 85:12
**first** 4:4 9:1
15:17 17:17,18
26:21,21 29:10
29:12,20 30:2
41:17 42:5
43:10 49:14,21
66:15 69:18
70:3,5 76:7
77:20 81:21
91:3 95:5
96:20 98:7
104:3,4,5,18
106:13,15,18
114:16 116:2
119:6 124:12
129:3,20
**five** 13:8 61:13
**flow** 3:9 65:2
130:7
**focus** 73:11
**following** 11:2
44:17
**follows** 4:5
**force** 96:16
**form** 18:6 20:7
48:7 65:18
113:16
**format** 125:10
**forth** 68:10
**forward** 101:4
102:1 116:22
**forwarded**
99:10,14 100:9
100:13 115:18
**forwarding**
114:12 115:9
116:13
**Foundation** 6:20
**four** 5:12 12:19

12:21 55:22
122:3
**freak** 8:12
**frequently**
132:20
**Friday** 7:16
**Fridays** 7:11
**front** 46:10,11
79:12
**function** 124:22
**fund** 65:12
67:22 71:2
**funds** 67:21
**furnished**
124:11
**further** 3:5
120:3 133:15
133:16

**G**

**G** 4:1
**gathered** 129:17
**generally** 54:3
**gentleman** 6:13
**getting** 67:2 69:4
69:5,6 96:5
**Girl** 7:11,16
**give** 15:6 26:3
31:22 32:20
33:12 37:14
38:2 40:10,18
48:19 56:5
72:19 91:18
96:8 97:19
104:6 117:18
132:15
**given** 9:13 13:20
18:22
**giving** 126:4
131:13
**glance** 129:11
**glitch** 23:21
**go** 10:1,16 19:14
20:13 24:1,2
28:3 40:20
41:10,10 56:7
58:6 62:17

64:18 74:8,19
78:13 79:10
94:5,6 103:12
108:22 109:5
110:12 124:8
127:21
**goes** 45:17 80:7
85:16
**going** 8:13 14:15
14:18 22:15
26:10 27:9
28:1 29:8 30:7
31:21 32:12
35:18 38:2
40:22 43:21
55:15 56:1
57:7 58:4 67:9
68:16 69:14,15
70:7,11 86:21
92:7 93:19
95:3,6,12 97:6
97:10,18
102:19 110:11
113:2 115:4
121:19 122:7,9
124:8 127:9,15
**Good** 125:13
**grand** 61:1,2
**guess** 7:10 38:4
98:8
**guy** 61:1 106:20
106:20

**H**

**half** 110:2,3
**Hamilton** 2:9
**hand** 118:21
119:13
**handed** 30:17
**handle** 37:3
54:14
**handling** 7:17
**hands** 49:7
**handwriting**
103:10
**happen** 54:22
60:7 86:16

97:14,16
**happened** 36:18
37:15 52:12
59:20 71:22
73:8,10 74:4
77:15 97:20
101:3 114:8
120:21 121:4,6
121:8,11,15
**happening** 36:8
**happens** 55:2
108:21
**Hardy** 2:8
**Harmon** 4:16,22
6:3 46:6 47:1
53:17 80:3,4
96:3,7
**Harold** 10:12
32:17 42:7
114:4 116:8
120:5
**head** 90:3
111:15
**Healthcare** 17:8
29:8 71:7
**hear** 33:16 39:4
**heard** 92:2
94:20
**hearing** 13:5
54:10
**hearings** 7:20
**he'll** 58:3
**high** 5:21
**history** 5:21
6:18
**HMO** 105:7
**hold** 14:11 23:21
24:5
**home** 95:17 99:8
114:16,19
117:18
**hotel** 37:19,21
38:1,20 48:17
48:21 106:19
107:8 120:13
120:22 130:22
131:3,7

**hour** 39:2 109:7
109:8 110:2,2
**Howard** 4:22
**hyper** 67:6,7

___ **I** ___

**idea** 68:21 69:1
**identification**
8:16 28:9
41:14 44:6
61:15 92:10
103:16 113:6
124:15
**include** 5:5
11:21 112:4
119:17
**included** 9:15
12:12 81:8
**including** 5:8
**incoming** 7:14
**indicate** 69:13
**indicated** 66:20
**indicates** 46:3
**individual** 53:22
60:20
**individual's**
7:22
**information**
86:4 115:18
116:18 126:3
130:4
**informed** 37:17
**initials** 106:21
**injunction** 13:5
**Institute** 6:21
**institutions**
22:10,16
**instructed** 48:8
48:14
**instruction**
60:15 72:11
**instructions**
26:3 59:12
60:4 72:19
79:16 87:1,20
114:11 115:7
116:13,15,17

117:8 131:14
**Integrated** 53:15
84:1,13,20
88:3 89:9
**intended** 63:11
63:20 80:14
**interested** 96:22
**interim** 35:20
**Internet** 96:4
**invoice** 3:14
58:5,6 86:11
89:2 103:6
104:1 105:21
**invoiced** 55:2
**invoices** 53:21
58:4 86:8 88:1
88:5,6,13 90:4
133:8
**involved** 29:3
85:2 106:8
132:10,12
**involvement**
49:8
**involving** 76:8
77:22 104:14
**issue** 30:7 58:10
59:4 60:3 64:9
84:19 119:2,7
119:11
**issued** 18:15
45:20 51:6,6
59:6,9 62:22
64:13,13,15,16
72:5 89:4
107:20
**Item** 79:14
**itemization**
104:7
**items** 7:19 9:11
9:17 12:11
17:4,6,21 18:4

___ **J** ___

**J** 81:13,16,22,22
129:12
**January** 16:2,7
16:16,21 17:14

82:21 85:15
**Jeff** 25:18 35:5
35:22 36:6
52:7,9,11,14
52:15 57:6
69:18 92:21
123:5,20
**job** 26:4,6 74:15
107:2 112:14
123:12
**jobs** 6:1
**Jordan** 1:6 2:6
**June** 1:10

___ **K** ___

**K** 111:13 112:14
112:15,21
**Karas** 1:16 2:4
**keep** 23:16 46:2
125:4
**kinds** 6:1
**knew** 19:5 77:14
77:22 87:7,13
90:21 93:19
**know** 10:4 16:6
16:17 17:6
18:1,4,13,15
18:19 21:10,13
22:21 23:17
34:22 39:14
40:9 43:15,19
43:20 44:21
45:3,5,8 49:2
49:22 50:21
51:10 52:19
55:12 56:19
57:12 58:7,11
61:7 63:15
65:8,13,14
68:4 74:13
77:19 78:11
79:4 80:10,11
81:6 82:17
84:17 85:4
86:6,7 87:11
90:2 93:17,18
93:22 94:2,9

94:15 95:15
97:15 98:7
99:11,15
100:20 103:22
106:7,9 109:9
110:18 111:5
111:10,19
112:20,20
116:9 119:2,4
119:4,20
121:19 123:8
123:13,13,14
126:18,21,22
134:2
**knowing** 18:22
**knowledge** 57:6
76:9 126:13,17
126:18
**known** 25:18

___ **L** ___

**labeled** 82:12
**largest** 132:16
132:18
**law** 1:16 5:11
6:5 7:1 11:18
11:21 20:3
21:2 22:5,20
24:18 26:8
27:1 43:12,15
54:11,18 55:7
57:8,8 58:8,8
58:10 74:20
84:19 89:1,18
90:9,19 93:9
105:2 127:1
**lawfirm.org**
126:20
**lawyer** 6:6
**lawyers** 5:6,11
**learn** 26:22 27:4
91:3 93:22
119:6 121:8
**learned** 49:3
50:15 90:15
119:10
**leave** 69:14

leaving 127:17
left 42:6 114:15
length 128:3
  131:11
letter 3:11 37:4
  44:12 45:13
  60:9 121:21
let's 10:1,16
  15:22 21:13,15
  46:4 48:2 61:8
  61:10,12 62:5
  64:17 66:6
  73:11 84:12
  99:21 129:8
level 20:4
liking 23:18
Limbaugh 107:3
little 7:3 8:12 9:2
  16:9 25:20
  66:18 78:4
  110:2 112:12
  125:8
LLP 46:6 53:14
Logan 10:12
long 10:20 25:18
  41:10 55:15,17
  55:22 109:3
  128:7,9,11
look 16:4,5,16
  29:7,20 31:2
  42:3 63:6 65:4
  67:19 101:7,10
  105:22 111:19
  112:10 129:8
  129:13
looked 101:10
looking 11:19,19
  16:9 81:16,21
  111:3 124:20
  125:11 129:20
looks 10:5 13:22
  16:8,9 62:1
  83:16 103:22
  106:19 111:3
  114:6 131:1
lot 40:10 92:2
Lotus 124:21,22

lying 134:1
L.L.P 1:17 2:4,8

## M

mail 7:19 51:2
  101:9,9
making 38:6
  128:4
manager 4:18
  7:5,6
Mangold 1:16
  2:3,4 26:13,18
  47:4 61:8,13
  102:20 122:3
  127:17
March 83:12
Maria 1:12 4:3
  4:10 36:1
  52:21 58:4
  91:18 95:3
  106:18 107:11
  107:22 109:18
  134:6
mark 15:6 28:4
  41:11 61:8,10
  61:11,12 92:8
  103:7 113:3
  121:19,21
  124:9
marked 8:14,16
  28:2,4,9 41:14
  43:22 44:6
  47:9 61:15
  92:10 103:16
  113:6 121:20
  122:1,2 124:15
  129:9
Marlboro 4:11
Maryland 4:11
matter 112:6,7
Mayflower
  37:19,21 38:1
  38:20 39:8
  40:9,11,16,20
  45:22 48:5,16
  48:20 49:1,4,7
  49:18 50:11

51:17 69:8,12
69:20 77:6
78:1 106:19
107:8,17
108:10,21
109:10,15
110:1 120:13
120:22 130:22
131:3,7
ma'am 4:9 6:11
  7:16 10:5
  38:22 74:6
  96:17 116:20
mean 8:8 9:12
  20:8 22:21
  24:4 55:19
  64:7 67:5 70:9
  78:22 86:9
  101:7 102:22
  112:6
meaning 36:22
meeting 120:11
  121:6,11 126:5
memo 94:13
memorable 6:12
mentioned 54:17
messenger 30:19
  38:6 39:11,12
  39:16,21 40:8
  40:9,15 45:13
  45:22 48:19
  103:4,6,19
  104:14 105:10
  105:15 108:4,7
  108:22 110:12
  111:21,22
midmorning
  33:15,16
mine 16:10 31:6
  44:20 63:9
minute 19:1
  79:11 84:13
  99:21
minutes 117:17
missing 62:9
misspoke 82:4
misstates 18:7

48:10 113:17
mistake 28:18
Mister 78:8
misunderstood
  120:18
mobile 114:17
moment 14:20
  129:10
money 3:9 12:19
  26:22 31:20
  34:15 42:10
  46:19 49:16,18
  54:5,7 55:21
  56:9,18 57:14
  57:19 58:8,9
  58:19 59:2,18
  59:20,22 65:2
  65:12 68:17
  69:8,12 73:7
  74:1,14 75:4,7
  75:21 76:17,22
  77:3,4,5,6 79:5
  79:18 80:7,8
  80:16 83:4
  87:3 90:6,16
  130:7 132:12
moneys 81:17
  83:8
monies 57:7
  75:22
month 24:17
  54:22 83:17
  105:20 133:3,7
months 133:7
Moore 10:20
morning 100:18
  101:3,14
MORTON 1:3
mount 79:1
move 24:2
moved 22:8
movement 90:16
movie 7:10
moving 23:19,20
  130:2
multiple 16:10
mwood21564...

93:6

## N

N 3:1,1 4:1,22
name 4:8 31:8
  45:1 64:3
  84:10 88:21
  118:11
named 106:21
  108:3 125:20
National 6:16
  17:5 29:9
nature 131:16
need 36:1,4,5,12
  64:18
needed 69:20
net 127:7
never 38:5 43:2
  43:6,7 58:2
  94:14 96:13,14
  96:14 99:16
  116:17 121:17
  133:11
new 22:15 99:19
  101:9
niece 123:10
night 95:7 96:14
  96:15 100:13
  113:14 114:1
  118:1,14
Niki 44:14
nine 13:18
  124:13
nominated
  10:19
normal 74:6,10
Northwest
  111:13 112:14
  123:18
notary 1:19
notation 108:3
notations 105:22
note 62:15
Notes 125:1
notice 1:14 3:8
  111:17
noticed 50:18

104:22
**notified** 91:15
**November** 24:17
50:2,17 73:14
73:16 76:15
129:5
**number** 8:14
10:17 12:1,7
12:19,21 13:4
13:8,11,13,16
13:18 15:10
16:15,17 26:10
28:5,6,20
29:20 41:12,16
43:22 44:12
46:3,5 61:18
61:20 64:20
65:4,6,11,17
70:22 79:14
81:22,22 92:13
92:18 103:13
103:18 113:7
113:11 114:16
114:17,19
117:19,19
122:2 129:22
130:2
**numbering**
28:17
**numbers** 114:15
**numerical** 62:16
**NW** 1:17 2:4,9

**O**

**O** 3:1 4:1
**object** 48:6
**Objection** 18:6
20:7 94:3
113:16
**obvious** 15:22
**occasion** 26:3
**occur** 132:22
**occurred** 131:20
132:4,6
**occurrence**
132:8
**October** 3:11,13

3:15 14:1
16:19 21:8,13
21:15 22:19
23:4 24:17
25:7 27:1 29:9
29:22 44:13
65:6,19 73:13
92:20 93:2
104:15,19
120:12,12
124:19 126:15
131:21 133:10
**October-Nove...**
21:2
**October-Nove...**
17:13
**odd** 58:15
**office** 1:16 4:18
5:3 7:5,6 27:14
27:18 30:15
32:8 34:1 35:1
35:18 36:3,10
51:21 60:22
66:17,21 67:18
70:12 85:21
86:13 87:13,17
101:13,14
109:20 110:4,6
123:17
**Oh** 12:3 14:6
16:10 52:6
104:6 120:17
123:13 126:4
**okay** 5:10,20
6:14,17,22
8:13 9:13,16
9:22 10:3
11:16 12:1
13:2 14:8,9,10
15:8 17:2 18:9
19:16,21 20:11
20:14 21:5,10
21:14,22 22:18
23:2 24:16
25:6,21 26:7
27:16 28:2,3
28:16 30:20

32:6 33:22
35:13,14,18
36:2,4,6 37:2
37:14 38:7
39:18 41:8
43:5 44:1,7
51:15,22 52:11
53:3 56:3,9
58:17 60:16
61:11 62:5,14
64:22 67:8
69:17 71:14
73:2,12 74:20
75:3 77:2 79:4
91:18 92:18
93:21 97:9,13
98:13 100:15
100:20 101:2
103:12 108:8
108:18 109:9
110:17 112:8
117:1 118:5,17
120:18 122:3
125:6 127:9
128:16 129:22
132:9 133:9
134:3
**old** 96:9
**Omer** 4:22 46:9
46:12
**once** 31:19 38:3
54:16 59:19
68:7 76:16
108:5 109:4
116:21 133:2,3
133:3,6,7
**ones** 19:9 89:13
89:18
**ongoing** 128:8
**open** 22:13,15
23:9,16 25:1
99:6,7 100:7
100:22 101:8
**opened** 25:11
98:8
**opens** 51:1,2
**operating** 129:5

**opposed** 47:20
67:10
**oral** 120:4
**order** 8:1 38:8
62:17 105:12
**original** 71:6
**originally** 96:9
**outside** 12:14
13:10
**oversee** 54:13
**overseeing** 53:20
**oversees** 53:12
54:11
**owe** 104:8
**owed** 83:5
**o'clock** 71:12
115:1

**P**

**P** 4:1
**package** 81:8,10
85:15 108:11
**page** 3:2 29:7,21
42:3,5 46:5,16
61:20 62:11,12
70:21 80:21
81:21 104:1,2
104:3,4,5,5,18
106:13,16
112:11
**pages** 62:10,16
129:21
**paid** 81:17 85:20
89:14 105:16
**paper** 60:8
**paperwork**
119:9
**part** 17:18 47:8
55:19 83:8
85:11,12
104:10 124:10
**particular** 55:5
109:13 132:2
**parties** 1:21
54:12
**partner** 46:12
51:1 75:14

**partners** 23:22
36:10
**paste** 126:3
**pay** 53:21 55:4
55:20,21 56:8
57:9,19 58:1,6
58:18,18 59:5
59:15,16,17
60:1,5 61:1
63:21 80:15
81:3 85:21
86:4 87:14
88:3 89:19
90:11 94:11
**payable** 7:18
48:15 65:7,13
66:4 71:3
**paying** 79:3
105:15,19
**payment** 60:17
64:9 104:11
**payments** 54:19
59:4,6,9 60:20
128:4,19 129:3
131:14
**people** 5:2,3,13
10:18,19 11:9
40:10 54:20
58:10 96:9
**perforated**
104:10
**performing**
82:16
**period** 22:18
23:3 128:21
**periodically**
55:1
**person** 7:12 61:2
90:11
**personal** 7:15
11:17 50:5
55:10,20 56:20
70:17 75:9
79:22 80:9
93:6,12 94:1
96:6 98:9
126:9,10

personally 106:4
pertinent 9:18
  11:8
Peter 2:7 61:9
phenomenon
  55:8
phone 60:11
  86:11 117:19
  117:19
pick 108:22
  110:13
picked 110:8,14
pickup 130:19
  131:5,9
picture 63:3
pieces 60:8
place 100:12
placed 7:21 51:3
  133:20,21
places 114:7
Plaintiffs 1:4,14
  2:2 3:3,6 4:6
  133:17
plan 80:14
play 26:7 54:19
please 113:3
  114:13 117:12
  129:11
point 23:22
  24:13,21 68:8
  69:3 70:1
  78:14 111:6
  123:22 124:4
poor 6:6
portion 64:11
position 7:4
post 71:20
Potomac 111:1
  111:11
practice 44:22
  128:7
prepare 86:1
prepared 84:19
present 1:20
presently 7:1
pretty 92:4,6
previously

122:12
primary 24:13
print 125:6
printed 125:7
prior 6:3,15,19
  18:3,16 29:14
  94:14,18
  122:13
privileges 66:22
probably 11:7
problem 16:11
problems 7:12
procedure 55:7
  55:13
proceeds 71:1
  81:1
process 23:20
  96:5 109:3
processing 54:19
produce 34:11
  34:20
produced 13:21
  17:17 18:10,11
production 18:2
program 125:3
provide 9:10
provided 17:7
  40:5
public 1:19 6:16
purchase 98:16
purported 64:3
purportedly
  44:13
purports 17:11
  63:7 65:1
  70:22
purpose 20:10
  27:18 56:21
  57:11 63:19
purposes 13:4
  63:10
pursuant 1:14
  18:12 59:11
  87:20
put 31:16,22
  32:19 47:21
  49:16 51:10

57:14 59:2,22
60:18 64:5
71:12,16 72:14
72:14,16,17
73:6 76:1,17
76:22 77:3
78:17 79:20
80:1,3 105:17
118:11 126:1
putting 68:17
  76:2
p.m 1:15 93:2
  96:15 107:12
  108:10,19,20
  109:21 114:21
  125:12,12,13
  131:2 134:5

## Q

QMS 3:14
  130:19
question 74:18
  120:19 129:14
questions
  114:15 117:14
  127:13,16
  128:2 133:15
quick 16:15
  39:16,21 40:8
  103:4,5,19
  104:14 105:10
  108:21 110:11
  111:21
quite 72:13

## R

R 4:1
Radio 6:16
ran 68:7
reading 109:21
ready 96:4,5
real 129:13
really 33:12
  42:21 78:22
  98:11 109:6
  110:20 111:2
reappeared

77:11
reappears 51:18
reason 93:22
recall 72:22 77:8
  111:6,14 116:6
  131:5 132:17
  132:22
receipt 94:18
receivable 7:19
receive 92:22
  116:15 126:19
received 12:8
  19:3 53:22
  79:14 116:17
  116:18 117:8
  125:19
receives 65:18
  72:10
recess 19:18
  91:19 124:6,7
  127:10,11
recollect 131:16
reconcile 8:2
record 4:9 10:4
  17:11 18:7
  19:15,17,19
  39:19 47:2
  48:10 62:15
records 3:12
  16:19 29:13,16
  41:17 61:19
  62:20 104:13
  112:1
redeposit 63:21
  72:20
redirect 127:13
reference 15:9
  30:6 104:19
  105:1,10 106:2
  106:17,18
  121:12 126:6
references
  106:12 109:12
  109:13
referring 10:12
  10:22 12:8
reflecting 62:20

reflects 71:13
  110:10 113:22
Reg 107:7
regard 117:10
regarding
  131:14
regardless 51:1
regular 109:19
  126:20 132:8
  133:12
regularly 133:1
  133:2
reimburse 75:8
relate 19:10
related 12:3
  35:6 123:5
relating 10:18
  11:1 12:2,5
  130:7 132:11
relationship
  23:18 118:20
  119:1,12,21
  123:8
relative 10:8
remember 6:5
  78:22 79:8
  91:6 94:16
  98:11,12 99:9
  110:20 111:2
  120:6
remind 125:14
reminder 12:8
report 8:9,10
  57:3 75:17,18
REPORTER
  19:16,19,21
  22:1 38:16
reporting 1:18
  25:22
represent 81:17
  83:4 130:5
represented
  45:20
representing
  88:2
represents 53:18
  89:3

**request** 10:17
  12:17,21 18:13
  18:16 32:18
  44:15 49:16
  66:7 98:17
  129:18 131:1
  133:10
**requested** 17:20
  17:21 91:11,12
**requests** 18:2
**required** 9:5
**resort** 70:9
**respective** 1:20
**response** 27:15
  35:11
**responsibilities**
  25:22
**responsible**
  15:11,13
**responsive** 11:11
  12:16,21
**restate** 82:9
**Retarded** 6:21
**returned** 52:6,8
**review** 113:3
  114:13 116:14
**reviewed** 130:12
**right** 12:13
  15:20 16:12,12
  17:10 21:11,18
  21:20 22:22
  25:1,14 29:6
  29:18 32:4,16
  32:18,21 36:3
  36:9,14,17
  38:12 41:7
  43:5 45:22
  48:13 51:9
  52:12 53:4,8
  54:12 55:18
  57:16,20 64:3
  64:17 72:15,18
  73:4 75:4,12
  76:13,21 78:16
  79:2,19 80:13
  82:19 97:4,22
  98:20 100:4,6

100:10,13,14
  100:19 101:1
  103:5 104:12
  107:6,9,14,20
  109:15,16
  112:5 113:20
  113:21 117:19
  118:7,8 121:3
  123:4
**role** 26:7 54:18
**Rosemount**
  110:22
**Ross** 106:21
**rough** 132:15
**rush** 106:22
  107:2,3,7,12
  108:9,20 109:2
  109:5 112:13

**S**

**S** 2:3 3:1 4:1
**Sandy** 82:1,11
  82:15,22 83:15
  83:17 86:5,18
  87:3 88:3,6,8
  89:7
**sat** 121:6
**satisfaction**
  130:15
**save** 15:7 99:17
  100:16 101:5
**saw** 51:5 75:16
  98:9 102:4,18
**saying** 21:9
  104:18
**says** 10:17 31:3
  31:21 36:12
  44:15,18 45:10
  46:7 53:5 55:4
  56:5 58:17
  59:22 63:10
  65:5,11,17
  66:2 67:17,20
  70:22 71:8
  72:8,9 79:12
  80:22 82:2
  83:3 87:2 97:5

98:15,16 103:3
  104:18,19
  106:17 107:7
  107:11,11,13
  109:17 114:4
  116:12 117:12
  124:21 125:11
  125:12,13
  133:19
**scathing** 127:13
**schedule** 3:16
  124:11,18
**scheduled** 7:21
  122:12,13
**schedules** 7:22
**school** 5:22
**search** 9:5 10:7
  10:11 11:2
  126:12,13
**searched** 11:16
**searching** 11:17
  11:20
**second** 42:3 46:5
  50:1 104:1
  114:18
**secretary** 27:5
  30:6 31:21
  32:11 33:11,17
  34:19 122:14
  122:16
**see** 9:1 11:10,14
  14:15 20:22
  22:8,11,14
  23:14 24:9
  29:10 30:2,22
  35:8 36:6,15
  36:15 37:20,20
  41:3 42:7 46:4
  46:21 47:10
  62:6 63:1,11
  65:2 67:15
  68:15 70:7,11
  81:4 83:17
  88:17 94:12
  96:12 97:14
  98:10,14
  101:15,21

102:2 103:20
  104:6 106:11
  108:2 110:10
  118:11 125:8
**seen** 8:20 28:20
  29:15 34:4
  46:19 87:22
  88:5,8,13
  102:10,12
**send** 37:4 49:17
  58:5,8 95:6,12
  97:6,10,18
  98:1 99:13
  104:11,11
  108:20 112:10
  113:14 114:1
  115:5,16,17
  116:11 117:3,9
**sending** 27:9
  93:20 95:1,3
  95:16,20 96:22
  109:22 114:22
  115:4,14,15
**sends** 116:21
**sent** 40:8 45:13
  45:16 98:14
  99:13,17,20
  100:5,8,17,22
  101:4 114:6,7
  115:2,11,19,20
  117:16,22
  118:1,5,6,13
  118:15,17
  120:2 126:6
**September** 82:1
  82:5
**sequence** 65:6
  129:22 130:2
**series** 3:10 41:16
  49:15 130:6
  132:2
**service** 39:17
  103:19 108:4
  111:22 130:19
**services** 53:15
  82:15
**set** 29:12 43:9

49:18 61:9
  62:9
**sets** 7:10
**seven** 5:4,5,7,7
  13:13 92:15
  103:14
**shareholders**
  120:11
**shattered** 6:8
**shocked** 78:5
  133:9,11
**Shook** 2:8
**Shoot** 73:15
**short** 124:6
  127:9
**show** 8:13 26:10
  26:16 28:1
  43:21 44:7
  81:11 92:7
  102:19 113:2
**showed** 75:20
  76:6 102:3
  127:6
**sign** 20:20 31:7
  32:8 34:13
  36:3,11 66:13
  70:12,15 75:15
  83:20
**signatory** 70:14
**signature** 31:4,4
  44:18,19 46:15
  63:8,8 67:18
  82:14,19 83:1
  83:13 84:6
  85:8,17
**signatures** 46:8
**signed** 47:16
  64:2 75:20
  82:3,13 98:18
**signer** 68:8 69:4
**signers** 32:7
  35:1,9,17
  38:10 66:17,21
  67:14 70:7
**significant** 74:21
  75:1
**signing** 8:5

44:22 46:10,11
66:22
**sir** 9:7 10:6
  11:22 12:6,15
  12:18 13:7,17
  13:19 15:15
  24:20 29:1,5
  29:17,19 30:8
  30:11 31:1,18
  32:22 39:20
  40:1,3 42:17
  46:1 47:1 59:1
  61:3,6 63:2,5
  63:12 64:1,4
  65:3,10 66:1
  79:13 80:12,20
  81:5 82:17,20
  83:2,7,11,14
  83:22 84:5,8
  85:4,10,13,18
  87:4 104:9
  109:1 110:21
  111:12 119:16
  124:1 125:5
  129:7,19
  130:11 133:13
**sits** 133:22
**sitting** 34:15
  87:8
**situation** 132:3
**six** 13:11 92:16
**slow** 107:6
**software** 99:8
**Solutions** 84:1
  84:13,21 89:10
**somebody** 14:19
  35:14 38:20
  44:14 60:22
  74:9 75:11,12
  85:21 87:2,12
  87:16 108:3
  109:14
**somebody's** 49:7
  79:11
**sorry** 11:15 14:6
  14:7,7 18:14
  22:2 38:17

88:19
**sort** 125:17
**source** 65:14
**spazzed** 67:2,4
  69:4
**spazzing** 36:20
  36:22
**SPEAKER** 15:1
**specific** 72:19
  74:18 87:1
  126:3 130:21
**specifically**
  55:18 131:19
**specifications**
  9:20 10:8
**speculate** 94:4,7
  94:8 112:7
**spend** 87:2
**spent** 87:9
**spoke** 35:16
**spoken** 93:14
**Square** 2:9
**staff** 5:3,7,13
**start** 7:4 26:11
  125:12 129:5
**started** 43:10
  64:19 90:17
  119:8
**starting** 24:5
**State** 4:8 5:18
**statement** 48:8
  117:9
**statements** 8:3
  9:14 19:12
  130:4,15
**STATES** 1:1
**step** 129:22
  130:2
**stick** 21:13 46:2
**stop** 66:6
**Strand** 2:7 8:17
  9:14 14:4,21
  15:2,5 17:22
  18:6 19:2,7
  20:7,11 28:10
  28:13,16 40:5
  41:5,8 44:2,7

48:6 62:8,14
  81:13 82:4
  91:4,9,16
  92:12,15 94:3
  94:8 102:6
  103:1,5,9,12
  106:22 107:3
  113:9,16 119:8
  120:15,21
  121:7 122:1,5
  122:15 124:13
  127:15,20
  128:1,15
  133:14 134:4
**Strand's** 122:13
**Street** 2:9
  109:18,19
  110:13 111:13
  112:14,15,21
  123:18
**strike** 58:15
**stuff** 112:4
**subject** 90:19
**submitting**
  15:14
**subsequent**
  49:19 60:3
**sudden** 51:18
**suggest** 28:19
**suit** 90:20
**Suite** 2:4,9
**sum** 42:21
**super** 127:18,20
**supervisor** 8:9
**supplied** 129:15
**supplies** 8:1
**suppose** 50:12
  112:2
**supposed** 52:7
  74:8,19 99:2
  109:7 112:5
  124:10
**sure** 7:20 38:5,8
  40:13 44:8
  54:10 89:16
  90:6 95:8
  99:20

**surprised** 78:3,5
**sworn** 4:5
**system** 28:17
  29:9
**Systems** 17:8

**T**

**t** 3:1,1 103:22
**Tab** 29:21 81:13
  81:16,22
**take** 5:20 7:13
  16:5,15 26:18
  28:6 29:6,20
  37:21 40:15,22
  42:21 52:22
  55:21 67:16
  68:18 79:2
  106:15 109:3
  112:10 124:6
  127:9 132:6
**taken** 37:18 39:6
  39:8 40:14
  45:21 69:15
  75:22 91:21
**talk** 31:12 37:10
  51:22 52:6,9
  73:20,22 91:13
  116:4 122:16
  123:1
**talked** 38:5
  49:21 52:1
  68:11 69:18
  76:16 80:13
  88:11 89:13,18
  94:14 115:3,12
  120:15,17,20
  121:1 122:6,8
  122:18 128:16
**talking** 13:5
  53:9 89:22
  94:16 130:9
  131:16,20
**talks** 94:12
**telephone**
  108:17
**tell** 5:22 7:8 26:6
  27:7,18 28:3

50:6 57:4,6,11
  57:22 58:3
  59:14 66:19
  67:8,14 69:11
  72:13,18 74:9
  74:15 76:4
  77:10 79:7,17
  86:17 91:10,17
  95:5 102:8,9
  102:11,14,15
  104:7 112:6
  117:2,14 121:3
  121:9,10 126:5
  128:18 132:2
**telling** 74:12
**tells** 58:2 59:16
  59:17 63:19
  77:2
**temp** 6:16
**tenant** 5:9
**tender** 26:22
**terms** 14:12
**Terrace** 4:11
**testified** 4:5
  85:19 86:22
  101:12 128:3
  131:11
**testify** 87:10
**testimony** 29:14
  50:3 58:20
  63:18 66:9
  71:14 83:4
  84:3 86:20
  117:6 130:18
  130:21
**text** 125:16,17
**thank** 8:18
  14:13 61:16
  62:14 133:14
  134:3
**thanks** 8:17
  14:16 134:4
**theirs** 26:14
**thereabouts**
  132:10
**thing** 20:9 78:15
  98:3

**things** 11:2 45:1
121:13 122:19
123:2 131:15
**think** 11:11 19:2
35:7 50:11
64:20 71:10
73:20 76:10
77:8 78:4 82:4
82:5 85:19
96:18 123:4,11
**third** 54:12
80:21 83:12
**Thompson**
10:20 11:1,8
12:9 25:19,22
26:2,5,22 27:5
27:8 32:10,19
34:12,18 35:4
35:4,5,5,16,19
35:21,22 36:12
36:22 37:8,17
38:4 40:12,21
48:3,8,14
49:16 52:1,13
52:14,15 53:4
53:7,17,19,19
54:12 55:3,4
55:21 56:3,19
57:3,6,18 58:7
58:17 59:14,21
60:12,13,14,22
63:16,18 65:7
65:11,18 66:2
66:6,8,12,19
67:8,20 68:5,9
68:22 69:11,14
69:18 70:1
71:15 72:3
74:2,11,19
76:8,14,16
77:2,5 78:18
80:8,11,15
81:3 83:6
84:15,20,22
85:12,20 86:4
86:17,22 87:7
87:11,16 88:2

90:10,17 92:22
93:19 94:13,21
94:22 97:5,17
98:1 99:1
110:16 112:18
115:3,13,19
116:19 117:4
117:15 118:20
119:1,15 120:8
122:18,22
123:14,16,20
124:3 130:8
131:12,13,13
132:13,20
133:5,11,19
**Thompson's**
27:14,17 30:6
30:15 31:21
33:11,16 40:21
50:16 51:21
57:19 59:5,12
60:21 64:10
69:1,2 72:11
79:15 81:19
84:4 85:7
86:13 89:14
90:13 109:20
110:4,5 116:10
128:5,20 129:4
**thought** 9:18
115:8
**three** 5:13,15
12:7 129:20
**Thursday** 1:10
92:20
**time** 10:17 15:7
16:20 21:6
22:4 26:19
33:11,13,20
38:22 49:14,21
50:14 58:3
61:5 66:14
67:12 69:18
70:5 78:7,12
80:6 90:15,21
95:9 98:20
108:11,13,15

108:16,19
109:4 114:2
117:22 118:16
119:5 124:12
129:3 133:6
**timeframe** 17:13
**times** 15:9 55:22
66:15
**title** 123:15
**today** 13:21 14:2
22:12,19 23:4
29:11,15 44:4
102:3,4 113:4
113:12 121:2
122:7,9,10
124:12 125:7
128:3 130:10
130:19
**told** 35:8,17
40:14,15,19
48:3 57:12,18
59:22 63:16
65:21 66:12,14
66:16 67:12
71:4 72:14,16
72:16,22 73:16
73:17 75:11
76:3,17,19
77:6,20 79:8
79:20 85:21
94:22 95:8
98:22 99:12
102:12,15,17
102:17 115:3,8
115:13 116:21
117:2,14,15
121:11 123:21
124:2
**tomorrow** 35:13
**Tompert** 1:16
2:4
**top** 42:6 90:2
104:5,10
111:14
**touch** 35:19
**transaction** 45:6
49:8 61:5

67:11 74:7,22
75:2,12,18
76:8,15 77:21
77:22
**transactions**
20:5 43:10
49:15 50:4
65:21 90:7
132:11,21
**transition** 21:11
**transitioning**
21:12
**transpired** 73:18
73:21 121:13
**tried** 70:10 99:6
**true** 68:1
**trust** 20:8 27:10
41:22 46:7,8
47:13,16,20
49:9,11 54:4,5
66:3,5,11
67:10 68:18,19
71:7 75:21
128:17
**try** 28:6 67:16
69:15 122:14
127:14,15
**trying** 133:8
**turn** 28:19 46:16
61:20 70:20
80:21 115:5
**two** 5:18 9:2
12:1 21:4,8
23:4,5,15
42:15,16,18,20
43:3,17,18
47:5,15,19
49:10,12 66:15
67:21 71:1
72:12 75:6,7
79:16 98:18
106:12,15
133:6
**type** 132:17,22

——————
**U**
——————
**Uh** 28:12

**Uh-huh** 14:17
21:21 32:14
38:13,15 45:18
48:22 50:13
57:21 60:2
62:3 71:17
78:10 97:11
100:1
**ultimately** 131:6
**unable** 34:19
**understand** 9:4
31:20 38:8
43:6 53:5 54:9
54:10 55:6
57:17 59:21
71:19 74:17
81:16 98:22
106:3 107:16
108:10 127:2
130:6
**understanding**
11:8 116:7
129:2
**understood** 69:7
69:17,19 98:19
**undertake** 50:4
**Unfortunately**
76:10 99:17
**unique** 132:3
**United** 1:1 3:12
6:20 37:6
38:14 39:4
41:17,19 42:5
42:13 43:13
44:14 46:20
47:17 49:12,20
56:14 57:15
59:3,4,20
60:18 61:19,21
62:22 64:7
70:15 72:5,21
73:19 78:14
79:6 121:21
131:10
**universal** 25:6
**untrue** 117:10
**Upper** 4:11

Beta Court Reporting
www.betareporting.com
(202) 464-2400      (800) 522-2382

**Urban** 84:1,13
84:20 89:10
**use** 52:22 54:2,4
54:6 55:8,9,19
57:4,19 63:21
67:2,9 68:21
96:10 98:18
105:9 111:22
125:4
**uses** 65:12 71:1
**usual** 132:5,13
**usually** 53:12
60:10 104:9
126:2

___

**V**

v 1:5
**various** 128:4
**vendors** 57:19
57:20,22 58:18
59:5 60:1,4,21
79:3 81:3,19
84:4 86:22
88:2,11 89:12
89:17,20,22
128:4,20 129:4
**Vermont** 25:5
25:13
**versus** 97:3
**Vez** 105:5,16

___

**W**

W 5:1
**wait** 45:14 67:15
70:10 99:21
**waiting** 36:9
**want** 15:2,5 16:6
24:1,2 26:14
26:16,16 28:19
29:6 30:9 32:1
32:15 38:7
42:21 48:3
50:1,17 52:21
54:9 61:19
65:5 66:5
68:16,20 70:6
70:8 90:5,5

91:8 92:11
97:12,18,20
99:9,14,19
105:19 109:6
110:15 123:7
123:10 125:14
129:10 132:18
**wanted** 34:20
37:18 68:18
73:3 88:3
112:13 118:11
**wants** 34:12
36:21 37:1
86:18 116:22
**Washington** 1:9
1:17 2:5,10
**wasn't** 51:12
78:5 99:18
100:17 118:22
**way** 6:20 10:10
13:2 21:8 43:3
44:17 47:22
59:18 64:18
68:13 80:10
84:12 86:5
88:6 89:14
111:21 112:21
**ways** 24:7
**week** 9:2 50:1,2
124:19 133:3
**weeks** 50:8
77:11
**Weitzel** 92:19
93:15,21 94:13
94:15,17 95:2
98:4 115:12,14
115:19
**went** 45:12
50:10 60:17,20
77:6 90:18,18
90:19 99:18
100:15 101:13
131:1
**weren't** 18:9,11
64:13 66:12
133:9
**we'll** 28:4,6 41:9

44:8 52:22
53:6 56:8
57:18 58:18
79:2 92:7
106:14 113:2
**we're** 13:3,5
21:11 24:16
28:1
**we've** 14:21
43:21 89:18
128:16
**Wilmot** 2:8 4:16
5:1 6:3 17:12
18:2,13,16
30:1,22 31:11
33:19,22 34:4
37:10 43:9,20
44:14,15,18,21
46:6 47:8,13
49:21 53:12,18
53:18 54:16
65:13 67:9,21
70:18 71:1
72:12 73:17
75:19 76:7,13
76:19 77:4
78:15 79:16
80:3,4,14 81:2
81:18 83:5,20
85:1,2 86:17
91:13,15,17
96:3,7 98:20
99:11,15,16
100:13 101:11
101:12 102:7
104:21 105:9
106:2 114:5,6
114:12,14
115:9,11
116:13,16,18
117:8,13 118:1
119:18,21
121:1,3 125:19
126:3,19
128:18
**Wilmot's** 31:8

37:4,8 42:1,12
43:14 47:22
50:5 54:6 55:9
55:11,20 56:20
57:1 64:3 70:2
75:9,17 76:1
76:17 82:14,18
83:1,13 84:6
85:8,11,17
89:4,15 114:16
114:17 117:18
118:4 124:18
126:7,14 129:4
**Wing** 4:11
**Wisconsin** 1:17
2:4
**withdrawals**
131:15
**witness** 1:13 4:4
8:18 14:6,10
14:13,17 15:13
22:2 29:1
38:17 40:12
48:9 61:16
62:11 82:7
92:16 94:4,9
107:2 128:14
**woman** 27:13,17
**Wood** 1:12 4:3
4:10 28:10,14
28:15,20 65:17
66:2 67:21
70:22 71:6
72:9 79:14
98:17 128:2
134:6
**word** 67:2
**words** 114:21
**work** 5:2 6:17
7:1 14:15 28:7
96:2,6,11,13
96:14 99:18
100:15 114:20
**worked** 5:22 6:2
6:4,16,19,20
55:17
**working** 56:2

**works** 123:16
**worry** 14:9
112:9
**write** 60:8 63:15
63:16,19
**writes** 20:22
**written** 17:5,8
32:9 47:12,19
67:13 120:4
**wrote** 63:13 64:2
90:13 117:7

___

**X**

x 1:2,7

___

**Y**

**yeah** 6:7,15
19:20 20:15
28:12 37:1
47:10 59:16
62:3 64:18
67:3 72:1 75:1
76:11 91:1,8,8
92:6,6 95:22
103:11 111:5,8
118:16 120:18
134:4
**year** 6:4 16:3,22
17:19 23:13
87:7 133:3
**years** 5:18 6:2
7:2,3 25:20
128:13,14

___

**Z**

**Zero** 106:18

___

**$**

**$13.67** 107:13
**$15,000** 85:16
**$160,000** 132:9
**$163,000** 33:5
38:11 41:2
42:7 44:16
45:21 46:18
48:4 60:19
64:11 67:22
71:2 78:1

**$165** 46:21
**$165,000** 27:2,18
  29:22 33:2
  50:16 65:7,20
  74:7,18 76:9
  76:14 77:5
  83:9 87:7,13
  90:17 133:20
**$2,000** 33:7
**$500,000** 132:19
**$8,000** 84:1
**$8,300** 46:17
  82:2,12,22
  83:12,17 86:18
**$80,000** 46:4,7
  47:14
**$85,000** 47:12,15

**0**

**0** 61:21
**02** 61:21
**0209** 62:2,9
**05** 22:19 24:18
  29:22 44:13
  73:13,16 82:2
  82:12
**06** 82:22 83:12
  85:15
**09** 61:22 62:1

**1**

**1** 3:8 8:14,15
  65:5,6 82:12
**1st** 82:2,8
**1:00** 125:13
**1:06CV00092**
  1:5
**10** 6:2 7:2,3
  25:20 128:13
  128:14
**10-year** 128:21
**10/28** 46:7
**10:52** 113:17,22
  116:12
**104** 3:14
**11:00** 114:22
  117:17

**1101** 109:18,19
  110:12 123:18
**1106** 4:10
**1127** 106:19
**1129** 111:16
**113** 3:15
**114** 19:2,11
**12** 82:1,6 125:12
**12th** 50:18
**12:00** 125:11,12
**12:52** 113:13,15
  113:18
**1229** 111:17
**124** 3:16
**128** 3:4
**13th** 50:18 51:14
  52:19 76:11,12
  76:15
**134** 3:6
**1351** 112:12
**14** 73:16
**14th** 2:9 51:14
  52:20 73:11,11
  73:13,14 76:12
**14:25** 107:12
  108:10
**15th** 109:18,19
  110:12 123:18
**16:05** 109:18
**165** 33:3
**1667** 111:13
**19** 21:2
**1909** 112:14,14
  112:21

**2**

**2** 3:9 28:6,8,11
  28:15,20 47:8
  64:21 65:11
  129:8
**2:00** 39:1 71:12
**2:25** 108:18,20
  109:21 131:2
**2:27** 1:15
**20** 61:1
**20005-2004** 2:10
**20015** 2:5

**2005** 3:11,13,15
  21:3 29:10
  129:6 131:21
**2006** 1:10 23:13
**202** 2:5,10
**20774** 4:11
**231** 9:15 12:12
  12:14 13:1,2,4
  13:10 15:10,12
  15:15 16:2,8,9
  16:15,18 19:7
  28:5,13 41:5
  64:20 129:9,21
**25** 3:13,15
**25th** 14:1 22:19
  23:4 92:20
  93:2 95:7
  98:10 100:3
  101:15,17
  113:13,15
  114:1 115:1
  116:8 117:18
  120:11 123:20
  124:19 125:12
  126:14
**26** 3:11 29:10
  131:21
**26th** 16:19 27:3
  29:22 30:4
  33:10 36:8,18
  38:12 42:9
  44:13 65:6,19
  101:18,18,22
  104:15,19
  106:1,12,13,18
  107:8 109:15
  112:12 120:12
  120:22 121:9
  123:21 126:14
  132:11 133:10
**27** 82:21 85:15
**27th** 106:1
  123:21
**28** 3:9
**28th** 47:14 106:1

**3**

**3** 3:10 41:12,13
  41:16 43:22
  45:20 46:3,5
  65:17 129:22
  130:2
**3:30** 39:2
**30** 61:1
**30th** 16:2,21
  17:14 124:19

**4**

**4** 3:3,11 44:2,5
  44:12 122:2
**4th** 62:11,12
**4:24** 134:5
**4:30** 69:9,14
  114:20
**41** 3:10
**44** 3:11

**5**

**5** 3:12 61:14,18
**50** 111:7
**500** 2:4
**5301** 1:17 2:4
**537-0700** 2:5

**6**

**6** 3:13 83:12
  92:9,18
**6th** 83:16 84:2
**600** 2:9
**61** 3:12
**6109** 110:22

**7**

**7** 3:14 70:22
  103:15,18
**783-8400** 2:10

**8**

**8** 1:10 3:8,15
  61:21 72:9
  113:5,11
  117:17
**8:00** 93:2 95:7
  98:6
**8:30** 92:20 96:13

**96:**15
**80** 75:8
**800** 2:9
**83** 75:8
**89** 61:21

**9**

**9** 3:16 72:9
  79:14 124:14
**92** 3:13