## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MORTON A. BENDER, et al., | ) |
| | ) |
|       Plaintiffs, | ) |
| | ) |
|    v. | ) |
| | )    C.A. No. 1:06cv00092 |
| CAROLYN D. JORDAN, et al., | )    (RMC) |
| | ) |
|       Defendants. | ) |
| _____ | ) |

## FIRST AMENDED COMPLAINT

Plaintiffs Morton A. Bender and Grace M. Bender, by and through their undersigned counsel, hereby bring their First Amended Complaint against Defendants Carolyn D. Jordan, David Wilmot, Michael J. Cobb, William B. Fitzgerald, IV, Eugene K. Youngentob, Thomas Batties and Independence Federal Savings Bank, and state as follows:

### JURISDICTION

1.  This action arises under Section 13(d) of the Exchange Act, 15 U.S.C. §78m(d), Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and the rules and regulations promulgated thereunder; 12 C.F.R. § 569; and 12 C.F.R. §545.121.  Subject matter jurisdiction is conferred by Section 27 of the Exchange Act, 15 U.S.C. §78aa, and  28 U.S.C. §1331. Jurisdiction of common law claims is based on 28 U.S.C. §1367 and pendent jurisdiction.

2.   Venue in this district is proper under 28 U.S.C. §1391(b).

**PARTIES**

3.   Plaintiffs Morton A. Bender ("Bender") and Grace M. Bender ("Grace Bender") are residents of the District of Columbia.  Plaintiffs, as joint tenants, are the beneficial owners of 326,000 shares of common stock of Defendant Independence Federal Savings Bank, and thereby jointly own approximately 21% of the outstanding stock of the Bank.  Grace Bender is not an active participant in the matters relevant to this litigation and she is a party solely in her capacity as a joint tenant shareholder with Bender.

4.   Independence Federal Savings Bank ("IFSB" or the "Bank") is a federally-chartered savings bank, with its principal place of business in the District of Columbia.  The Bank operates four branches in the District of Columbia and one branch in Chevy Chase, Maryland.  Its stock is publicly traded on the NASDAQ Stock Exchange and it is under the regulatory jurisdiction of the Office of Thrift Supervision ("OTS").

5.   Defendant Carolyn D. Jordan ("Jordan") is a resident of the state of Maryland.  Jordan is a member of the Bank's Board of Directors, and is its Chairman.

6.   Defendant David Wilmot ("Wilmot") is a resident of the District of Columbia.  Wilmot is a member of the Bank's Board of Directors.

7.   Defendant Michael J. Cobb ("Cobb") is a resident of the District of Columbia.  Cobb is a member of the Bank's Board of Directors, and is Secretary of the Board.

8.   Defendant William B. Fitzgerald, IV ("Fitzgerald") is a resident of the District of Columbia.  Fitzgerald is a member of the Bank's Board of Directors.

9.   Defendant Eugene K. Youngentob ("Youngentob") is a resident of Montgomery County, Maryland.  Youngentob is a member of the Bank's Board of Directors.

10.   Defendants Jordan, Wilmot, Cobb, Fitzgerald, and Youngentob are hereinafter collectively referred to as the "Director Defendants."

11.   Defendant Thomas L. Batties ("Batties") is a resident of the District of Columbia.  At all times relevant hereto, Batties was acting President and Chief Executive Officer of the Bank.

**FACTUAL BACKGROUND**

*The Delays of the Shareholders' Meeting
and the Committee to Save Independence*

12.   The Bank's fiscal year ends on December 31 each year.  On April 6, 2004, the Board of Directors of IFSB voted

to amend Article II, Section 2 of the Bank's bylaws to set the date of the Bank's annual meeting "within 150 days after the end of the savings bank's fiscal year on the third Wednesday of April . . . or at such other date and time within such 150-day period as the board of directors may determine." The regulations of the OTS require that a Bank's annual meeting be held within 150 days of the end of its fiscal year. 12 C.F.R. §552.6(a). Thus, the annual meeting should have been held April 20, 2005 (the third Wednesday in April 2005), but in no event later than May 31, 2005 (one day after Memorial Day which was the 150th day after the close of the Bank's fiscal year on December 31, 2004). The 2005 annual meeting was not scheduled to take place before April 20, 2005, but a Special Meeting in lieu of the Annual Meeting of Shareholders was scheduled for May 11, 2005, prior to the May 31, 2005 corporate and regulatory annual shareholder meeting deadline. In anticipation of the scheduled May 11, 2005 meeting, at which three directors would be elected to the Bank's Board, Bender sent a letter, dated April 26, 2005, to the Bank's corporate secretary giving notice that Bender was nominating two persons for election to the Board. On May 2, 2005, Bender sent a letter to the shareholders setting forth his positions

regarding the Bank's performance, and information regarding
his nominees.

13.   A few days prior to the May 11th meeting, a letter
dated May 4, 2005 was sent to shareholders allegedly on behalf
of "the Committee to Save Independence Federal Savings Bank."
Bishop Clarence Long and Reverend Douglas Moore were
identified as sending the letter on behalf of the Committee
(hereinafter "Committee Letter").  As set forth below, the
letter is full of faulty and misleading statements, coupled
with undisguised character assassination ("Morton Bender's
Background").

14.   In an article printed in the Washington Post,
Defendant Batties denied any involvement with the Committee.

15.    By letters dated May 9, 2005 and May 10, 2005, the
OTS notified Bender and IFSB that both the Bender May 2nd
letter, and the Committee Letter were the subject of OTS
inquiry.

16.    In the May 10th letter to IFSB, the OTS also
suggested that the Bank adjourn the meeting for a brief period
due to the Bender correspondence and the Committee Letter.
The 2005 annual meeting was convened on May 11, 2005; pursuant
to the OTS suggestion, however, no business was conducted at
the meeting and the meeting was adjourned.

17.   Thereafter, both Bender and IFSB responded to the OTS inquiries outlined in the May 9th and May 10th letters. Bender's response was contained in a twenty-two page letter to the OTS dated June 20, 2005.

18.   After receipt of the May 10th OTS inquiry, the IFSB Board passed a Resolution and sought voluntary disclosure from the Bank's directors, officers *and employees.*   Thereafter, Sheila Finlayson, IFSB counsel and Corporate Secretary, sent a memorandum to nine IFSB officers, seeking voluntary participation in responding to the OTS inquiry.  Despite the express language of the Board Resolution, however, beyond the officers and directors, IFSB apparently did not seek any information from other employees in responding to the OTS inquiry, and only sent the request to officers at the "vice president level up."

19.   IFSB provided its response to the OTS on May 20, 2005, and all officers and directors responding, including all of the Defendants, denied any knowledge or involvement with the Committee or the Committee Letter.

20.   By letters dated September 14, 2005, the OTS notified Bender and the Bank that no enforcement action would be taken with regard to the May 2nd Bender letter, or the May 4th Committee Letter.

21.  Despite the denial of involvement by Batties and the other Defendants, Mr. Christopher Chambers, an attorney and part-time Bank employee, had contemporaneous knowledge about the "Committee" and the drafting and dissemination of the Committee Letter.  Specifically, Mr. Chambers was involved in communications with Judy Smith of Impact Strategies, the public relations firm retained by the Bank.  Mr. Chambers, a Bank employee under the supervision of Defendant Batties, had specific knowledge about the creation of the "Committee," the content and the tone of the Committee Letter, as well as the process and timing of the Letter's dissemination.

22.  Defendant Batties had retained Impact Strategies, and consulted with Mr. Chambers about their ongoing activities.  Further, upon information and belief, Defendants Wilmot and Jordan (and possibly Fitzgerald) were also involved in (or at least aware of) the "Committee" process.

23.  The Committee Letter included information obtained from confidential OTS examination reports, which are maintained in the Bank's file.

24.  Further, Defendant Batties authorized, or was aware, that the "Committee" was being portrayed falsely to the shareholders and the public as an independent association.

7

*Bank and Bender Communications in Advance of the October 26, 2005 Special Meeting of the Shareholders*

25.  At its September 9, 2005 special meeting, the Board rescheduled the "Special Meeting in lieu of an Annual Meeting of the Shareholders" of IFSB to be held on October 26, 2005 at 11 a.m., at the Mayflower Hotel in Washington, D.C. ("Shareholders Meeting").

26.  Bender's nominees for directors to be elected at the Shareholders Meeting were Osborne George and John Silvaneous Wilson, Jr. ("Bender Nominees").

27.  On or about October 3, 2005, Bender sent a letter to the IFSB Shareholders, which *inter alia* identified the Bender Nominees, and explained that the only way to vote for the Bender Nominees was to attend the meeting in person, or to send someone with a legal proxy.  The letter also specifically instructed that Bender was not soliciting proxies, and was not able to vote any shares other than his own.

28.  On or about October 4, 2005, the Director Defendants and Defendant Batties distributed the Bank's proxy materials to the Shareholders ("Proxy Materials").  These Proxy Materials included the Banks Proxy Statement ("Proxy Statement") with ten appendices, a "Notice of Postponement and Rescheduling of Special Meeting of Shareholders," as well as a letter signed by Defendants Jordan and Batties entitled

8

"Update to Our Shareholders" ("Update"). As detailed below, both the Update and the Proxy Statement contained inaccurate and misleading information about the Bender Nominees, Bender's regulatory filings, and his intentions to obtain majority ownership and control of the Bank, as set forth in detail below. As such, they violate Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), 12 C.F.R. § 569, and 17 C.F.R. § 240.14a-9.

29. As identified in the Proxy Statement at page 28, the Bank's nominees for directors were: Defendant Fitzgerald, Defendant Wilmot, and Marion O. Greene, Jr. ("Management Nominees").

30. The Update stated that "if Bender is successful in electing his two nominees to the Board, the Majority Directors believe that Bender will gain control of Independence Federal without having to purchase any additional shares of Independence Federal Stock."

### October 21, 2005 Shareholder Letter

31. On October 21, 2005, five days before the Shareholder's Meeting, another letter was sent to IFSB shareholders. The letter makes false allegations of Bender's "record history involving other banks including a black bank pushed to failure," and "severe violations of banking law and

illegal practices by Bender and his Columbo Bank."  The letter also provides "[T]he only time we are aware we got into U.S. District Court with Bender – though expensive – Independence Won, Bender Lost!"  These statements (among others in the letter) are untrue. Although the letter was originally drafted by one of the signatories to the letter, Mr. Gilbert Douglass (an IFSB shareholder), neither Mr. Douglanss, nor the other signatory of the letter, Catherine McPhail, placed their signature on the final letter.  Mr. Christopher Chambers was also involved in this letter: he reviewed it, made some suggestions, and arranged to have the letter finalized and mailed by Impact Strategies.

### *The Agreement to Purchase the Participant Shares*

32. On or about March 3, 2005, Doley Securities, LLC ("Doley Securities")(an entity affiliated with Harold Doley ("Doley")) entered into an agreement to purchase all of the IFSB shares owned by Carver Bancorp, Inc. ("Carver") for $10.50 per share.  ("Securities Sale Agreement").  The Securities Sale Agreement was executed by Doley on behalf of Doley Securities.  At the time, Carver owned 150,000 shares, or 9.47% of the total IFSB shares outstanding.  Prior to the Doley Securities purchase of the Carver shares, Doley

10

Securities and its affiliates owned 3,834 shares of IFSB stock.

33.  Some of the Carver shares purchased by Doley Securities were retained by Doley Securities; some were sold to Logan Delany ("Delany"), who is Doley's neighbor; the remainder were sold to clients of Doley Securities.  These Doley-related shareholders of IFSB stock are hereinafter collectively referred to as "Participants."  The Participants together own 154,685 shares of IFSB stock (hereinafter the "Participant Shares"), which is in excess of 5%, and just under 10% of the total IFSB's shares outstanding.  Neither Doley Securities nor any other Participant has ever filed a Form 13D regarding their IFSB stock ownership with the OTS.

34.  Jeffrey Thompson is an IFSB shareholder who is a friend and client of Defendant Wilmot.  He and Defendant Cobb are also partners at the same accounting firm.

35.  Beginning in early August 2005, and during the 45-day period immediately prior to the September 26, 2005 Record Date for the Shareholders' Meeting, Thompson purchased 98,600 shares of IFSB stock; the 13D filed by Thompson in late September 2005 indicated that he owned 111,600 shares, which is 7.2% of IFSB stock.

11

36.    Bender and his counsel Robert Freedman met with Thompson and his counsel Daniel Weitzel on October 19, 2005. During that meeting, Bender gave Thompson a list of shareholders that Bender believed would vote for the Bender Nominees, and also a "To Do" List.

37.    On the evening of October 25, 2005, Doley was contacted by Defendant Jordan, and Defendant Wilmot was connected to the call.  Delany was with Doley at his home during the call.  During this conversation, the parties discussed a sale of the Participant Shares, to be arranged by Wilmot.

38.    On the evening of October 25, 2005, Delany understood that the Participant Shares would be voted for the Bender  Nominees.

39.    As of the morning of October 26, 2005, Delany intended that Robert Isard, who held his proxy, would vote the Delany shares for the Bender Nominees.  Doley traveled to Washington, D.C. to attend the meeting in person.

40.    The Shareholders' Meeting was scheduled to start at 11 a.m. on October 26, 2005.  Defendant Wilmot postponed the start of the meeting, based on the unilateral decision of Defendant Jordan, without any Board resolution or other

authority for a postponement.  At least one of the reasons for the delay was to wait for Mr. Doley to arrive.

41.  At some point on October 26, 2005, Doley called Delany and told him that "people from the community" were saying that if Bender "takes over the bank," they will withdraw their deposits; Doley suggested to Delany that "maybe we should vote for management."  At this point however, Delany was still committed to having his shares voted for the Bender Nominees.

42.  Once Doley finally arrived at the Mayflower Hotel, Defendant Jordan invited him to lunch at the Prime Rib Restaurant.

43.  Eventually, Jordan and Doley were joined at the Prime Rib by Defendant Wilmot and Mr. Royer, IFSB counsel. During this lunch, Defendant Wilmot and Doley discussed a purchase whereby either Wilmot, or his client Thompson, would purchase the Participant Shares.  The price per share which was discussed was either $17.00 or $18.00.  Doley and Wilmot also reached an agreement on a down payment of $1.00 per share.

44.  At some point before the Shareholders Meeting was convened at 3 p.m., Doley had reached an agreement in principle with Wilmot and Jordan to sell the Participant

13

Shares at $18.00 per share.  On that same day, IFSB shares
were trading on the open market, and closed at approximately
$11.50 per share.  A condition of the purchase of the shares
was that the Participant Shares had to vote for the Management
Nominees.

45.  Doley again called Delany, and told Delany that he
was going to vote for the Management Nominees, and Delany
should also.  Because the Participant Shares were owned
beneficially by Doley Securities and its clients, Harold Doley
obtained proxies from those clients to vote on their behalf.
In deciding how to vote, Mr. Delany considered the Committee
Letter and the McPhail/Douglass Letter in corroboration with
what Doley had told him about people withdrawing deposits if
Bender won.

46.  Proxies representing the Participant Shares
(including from Delany), were then faxed from Doley Securities
in New Orleans to the Mayflower Hotel, on October 26, 2005,
between 12:47 and 12:55 p.m. (presumably Central Time).
Because this is around 2 p.m. Eastern Time, it is likely that
these proxies were faxed to the Mayflower after Doley reached
an agreement with Wilmot and Jordan.

47.  Upon information and belief, a cashiers check in the
amount of $163,000 was delivered to Doley at the Mayflower

Hotel.  A cashiers check in the amount of $165,000 from one of Mr. Thompson's businesses was deposited into a bank account used by Defendant Wilmot's law firm, and in a convoluted series of transactions through several bank accounts controlled by Defendant Wilmot or law firms of which he is a member, the $165,000 cashiers check provided the funds for the $163,000 cashiers check delivered to Doley.

48.  The Participant Shares were voted with full authority for the Management Nominees.  No 13D was filed by any of the Director Defendants indicating their intention to purchase shares or gain control of the Participant Shares to vote in favor of the Management Nominees.  Moreover, the above-described acquisition of the Participant Shares, or proxies for those shares, was without prior OTS approval required for increasing the Director Defendants' ownership/control of the company over 10%.

49.  About one or two weeks after the Shareholders' Meeting" Delany and/or Doley received legal advice that they could not pursue the transaction because of a problem with "short swing profit."

50. On November 14, 2005, the $163,000 cashiers check (which was payable to Doley) was then deposited (by a split

deposit) into two United Bank "David Wilmot & Associates" accounts.

### *The Shareholders Meeting*

51.   Pursuant to the IFSB Amended By-laws ("By-laws"), shareholders' meetings are conducted pursuant to Robert's Rules of Order ("Robert's Rules").   In addition, the By-laws provide that it is the duty of the Independent Inspector of Election (hereinafter referred to as the "IIOE") to determine all challenges regarding the vote.

52.   The Shareholders' Meeting was eventually convened at 3 p.m., and lasted approximately half an hour.   During the course of the meeting, Bender made two formal proxy challenges to Creighton Dunlop, an employee of IVS, Inc., who was acting as the IIOE.   The challenges were based on the counting of broker votes without instruction in favor of the Management Nominees, and the fact that the Master Ballot (which represented proxies received by Management) was to be voted after the closing of the polls, in violation of Section 45 of Robert's Rules.   The minutes of the meeting reflect that Mr. Dunlop was not allowed to determine the challenges, as required by the By-laws, because the challenges were ruled "out of order" by Defendant Jordan.

16

53.   On behalf of Plaintiff Bender, Mr. Freedman had attempted to address the issues in advance with John Hall, the Bank's counsel, and sought a meeting with Mr. Hall.  In response, Mr. Hall advised Mr. Freedman that the Bank would not allow such a meeting, and in fact, that "the client" would not even allow Mr. Hall to speak with Mr. Freedman.

54.   Pursuant to the By-laws, proxies solicited on behalf of management must be voted as directed by the shareholder, or in the absence of direction, as directed by the majority of the Board.  Further, pursuant to Robert's Rules, all votes must take place prior to the close of the meeting.  Management submitted a "Proxy Committee Master Ballot" during the Shareholders Meeting, but it did not allocate the votes to the Management Nominees. Neither the By-laws nor the Proxy Statement identify any such "Proxy Committee."  All of the Defendant Directors signed the Master Ballot as members of the "Proxy Committee."

55.   Bender's challenge to the Master Ballot was based on the fact that the Defendant Directors allocated votes among the Management Nominees after the close of the Shareholders Meeting.  Thus, after the Director Defendants received the report from IVS reflecting the tabulated ballots and the proxies giving full authority to management, the Director

17

Defendants were able to allocate their votes in such a way
that ensured the election of two of the Management Nominees.
This allocation took place on October 28th, two days after the
Shareholders' Meeting.

56.  Because Bender could not solicit proxies (a
determination made in April 2005 by the OTS), the Director
Defendants enjoyed an advantage in allocating votes that was
not available to Bender, or to other shareholders who
supported the Bender Nominees.

57.  Pursuant to the voting procedures set forth in the
Proxy Statement, as to those Shareholders who chose not to
vote to elect directors, neither their brokers nor any other
person could vote in their place.  The shares held by brokers
were voted by ADP.  Despite the information in the Proxy
Statement, the brokers voted in accordance with the New York
Stock Exchange Rule for an "uncontested election" which
allowed them to vote for the Management Nominees without
instruction from the beneficial owners.  IVS tabulated the
broker votes in accordance with the ADP Proxies, and did not
verify whether instructions had or had not been received from
the beneficial shareholders.

58.  These broker "routine" votes (giving full authority
to Management) were in violation of the Proxy Statement, which

18

was information upon which the shareholders were entitled to rely in deciding to vote, or not vote. Of the 940,953 "Full Authority to Cumulate" Proxies, approximately 396,000 shares were voted based upon broker "routine" votes without instruction from the beneficial owner.

59. As a result of the subsequent allocation of the "Full Authority" votes on October 28, 2005, two of the Management Nominees were elected to the IFSB Board. The failure to comply with the By-laws, the representations set forth in the Proxy Statement, and Robert's Rules was done for the express purpose of denying Bender's rights to have a fair and informed vote on the Bender Nominees. All of the shares voted for the Management Nominees are tainted by the conduct of the Individual Defendants described above, including their involvement in the Committee Letter, the McPhail/Douglass Letter, the agreement for the purchase of the Participant Shares, and the irregularities in the Shareholders' Meeting itself.

### *Acting Together*

60. The foregoing events and the results of Shareholders' Meeting are not mere serendipity. Defendants Wilmot, Jordan and Batties were determined to prevent the election of the Bender Nominees, as the first step in ridding

19

the Bank of Bender.   In advance of the Shareholders' Meeting, the Defendants' approach was two-pronged: to sway the vote by dissemination of misleading correspondence and Proxy Materials, and to buy the vote by reaching an agreement with Doley for the Participant Shares.

61.   To that end, Defendant Batties retained Impact Strategies for "grass roots" and public relations strategies, which resulted in dissemination of the Committee Letter on May 4, 2005.   Batties, Jordan and Wilmot all participated in, and failed to correct, the misinformation which was submitted to the OTS in response to the May 10, 2005 inquiry about the Committee Letter.   That misinformation was repeated in the October 21, 2005 McPhail/Douglas Letter (also with participation by Mr. Chambers and Impact Strategies), and the October 4, 2005 Update and Proxy Statement.

62.   At some time in September 2005, Batties and Jordan sought to convince Doley to vote for the Management Nominees. Apparently not confident that he would do so, Jordan and Wilmot embarked on a plan to buy the shares.   Given the personal relationships among Doley and Jordan on one hand, and Thompson, Wilmot and Cobb on the other, Thompson's involvement in this matter is not a mere coincidence.

63. The Participant Shares represented approximately 9.9% of IFSB, and the Thompson shares represented another 7.19% of IFSB. The agreement for the purchase of those shares (or to vote the shares in favor of the Management Nominees) violated the Change in Bank Control Act, 12 U.S.C. § 1817(j), and OTS regulations thereunder (12 CFR §§ 574.2(a), 574.2(b), 574.3(b), 574.4 (b)(i) and (c), and 12 CFR § 574.4 (d)(i);in addition, the fact that an agreement was reached whereby the Participant Shares were to be purchased by Thompson or Wilmot, conditioned on voting the Participant Shares in favor of the Management Nominees, would have been material information to the IFSB shareholders in deciding whether or not to vote in the election, and how to vote. This agreement was not disclosed in the Proxy Materials, nor did Wilmot, Jordan, Doley (or any of the owners of the Participant Shares) file a 13D disclosing their plan, nor did Thompson amend his 13D.

64. The goal of the foregoing plan was to defeat the election of the Bender Nominees. To consummate the plan, several additional steps had to be accomplished at (or after) the Shareholders Meeting: the Participant Shares had to be voted for the Management Nominees; the broker votes without instruction had to be voted for the Management Nominees; and the Master Ballot proxies had to be allocated after the close

of the Meeting.  All of these steps, each in violation of the Proxy Statement, the Bylaws, or Robert's Rules, were accomplished, and could only be accomplished, with the approval of Defendants Youngentob, Cobb and Fitzgerald.

### COUNT I

### (VIOLATIONS OF SECTION 13(d) OF THE EXCHANGE ACT - DIRECTOR DEFENDANTS AND DEFENDANT BATTIES)

65.  Plaintiffs incorporate herein by reference paragraphs 1-64 as if fully set forth herein.

66.  Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder provide that any person, and any group acting together for the purpose of acquiring, holding, or voting securities of a company, who acquires, either directly or indirectly, the beneficial ownership of more than 5 percent of a class of securities registered under Section 12 of the Exchange Act must, within ten days, file a statement on Schedule 13D with the company's primary regulator and with any exchange where the security is traded.

67.  A Schedule 13D must set forth the purpose of acquiring the issuer's stock, and the acquiring person's plans, intentions and agreements with respect to the issuer.

68.  Rule 13d-101 requires "reporting persons" to describe any contacts, arrangements, understandings, or

relationships between themselves and any other person with respect to the issuer, "naming the persons with whom such contracts, arrangements, understandings, or relationships have been entered into."

69.   A primary purpose of Section 13(d) is to alert and inform companies, their shareholders and the investing public generally regarding accumulations in stock which might represent a potential shift in corporate control or a potential change in the company's direction, and to compel full disclosure of information critical to shareholders in making informed investment decisions.

70.   Rule 13(d)(1) provides that "when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of Section 13(d) and (g) of the Exchange Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons."

71.   By no later than October 26, 2005 and possibly substantially earlier, the Director Defendants and Defendant Batties had agreed to act together as a group with non-parties Thompson and Doley (together with the owners of the

23

Participant Shares), for the undisclosed purposes of
(i)opposing the election of the Bender Nominees, voting the
Defendants' IFSB shares, together with the Thompson and
Participant Shares, against the Bender Nominees, and
persuading other shareholders to vote against the Bender
Nominees; (ii) depriving those IFSB shareholders who voted in
favor of the Bender Nominees the opportunity of a fair
election of the Bender Nominees; (iii) supporting the efforts
of Jordan to continue controlling the IFSB Board despite a
dismal record of mismanagement and negligence.

72.  The Director Defendants and Defendant Batties have
violated section 13(d) of the Exchange Act because they have
failed to file a Schedule 13D, or any amendments to an
existing 13D, setting forth their specific plans and
intentions with respect to IFSB, including but not limited to
the details of the undisclosed agreement among the Director
Defendants, Defendant Batties and Thompson to seek to acquire
the Participant Shares (or to vote their proxies) by purchase
or otherwise; the undisclosed agreement to purchase the
Participant Shares; the undisclosed (and related) agreement
with Thompson regarding his votes (or the delivery of his
proxies) for the Management Nominees; and the undisclosed
agreement with Doley (on behalf of the Participant Shares)

24

regarding the delivery of their proxies for the Management Nominees.

73.    The Defendants' violations of Section 13(d) deprived all IFSB shareholders from information necessary to ensure a fair vote at the Shareholders' Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly considered by all shareholders.  Accordingly, the election of the Management Nominees is irreparably tainted, and the results of the meeting are therefore void.  Plaintiffs (and other shareholders and the investing public) have been, are being, and will continue to be irreparably harmed, in that they are left without material information, to which they are lawfully entitled, regarding the true interests and purposes of Defendants' efforts to control IFSB for their own interests, and to defeat the Bender Nominees.  The information which was not provided in any Schedule 13D was essential to informed shareholder decisions with respect to voting IFSB shares at the Shareholder Meeting, and were also material to Bender's own communications with the shareholders.

74.    Plaintiffs have no adequate remedy at law.

**COUNT II**

**(VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT
and 12 C.F.R. § 569 –
DIRECTOR DEFENDANTS AND DEFENDANT BATTIES)**

25

75.  Plaintiffs incorporate herein by reference paragraphs 1-74 as if fully set forth herein.

76.  Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and the rules and regulations promulgated thereunder, as well as 12 C.F.R. § 569, govern the solicitation of proxies in this case.  Pursuant to those statutory and regulatory provisions, no solicitation of a proxy shall be made by means which, *inter alia*, contains any statement that is false or misleading with respect to any material fact, or omits to state any material fact.  Moreover, pursuant to 17 C.F.R. § 240.14a-9, no solicitation (not limited to proxy materials) may be made by means of any communication which is false or misleading, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

77.  Section 14(a) of the Exchange Act, and the rules and regulations promulgated thereunder, demand full and fair disclosure in proxy solicitations, and was enacted to prevent management (or others) from obtaining authorization for corporate action by means of inadequate or misleading disclosures.

78.  As set forth above, prior to the Shareholders' Meeting, the Director Defendants and Defendant Batties

26

distributed Proxy Materials to the IFSB shareholders on behalf
of IFSB Management.  In addition, Defendants Batties, Wilmot
and Jordan (and possibly Fitzgerald) also participated in,
authorized, or knew about the communications from at least two
groups of shareholders, as described above (*i.e.,* the May 4,
2005 letter by "the Committee to Save Independence Federal
Savings Bank," and the October 21, 2005 letter allegedly
signed by Catherine McPhail and A. Gilbert Douglas).

79.  The Bank's Proxy Materials included the Update,
which was a letter to the IFSB Shareholders, dated October 4,
2005, and signed by Defendants Jordan and Batties.  Page 1 of
the Update states, "here is Bender's plan as disclosed in
Amendment 18 to his Schedule 13D ... ."  Immediately following
that statement, the Update lists the "Banks' Belief of
Bender's Intentions" which purports to identify what Bender
intends to do, leaving the reader with the mistaken impression
that those "beliefs" are taken directly from Bender's 13D
Amendment 18.  The "Bank's Beliefs" are attributed to the
"Majority Directors," who are described in the Update as the
"directors other than the three directors whose elections were
primarily attributable to the nomination and/or vote of Morton
Bender"; the Majority Directors are specifically identified in

the Proxy Statement as Jordan, Cobb, Fitzgerald, Wilmot and Youngentob.

80.    Various statements in the Update and the Proxy Statement, are false, misleading, or omit material facts.

81.    The Update is a letter to the IFSB Shareholders, dated October 4, 2005, and is signed by Defendants Jordan and Batties.  Page 2 of the Update refers generally to the letters from the OTS dated May 9, 2005 and May 10, 2005, and the OTS letters dated September 14, 2005.  In reference to the September 14th letters, the Update states, "the OTS stated that it has determined not to pursue enforcement action against Morton Bender or against any party ... ."  The inference of this statement is that the OTS' inquiry was focused on Morton Bender, and on unnamed other "part[ies]," and that the Bank, its officers, directors and employees had no participation in the events leading up to the OTS inquiry.

82.    On pages 5 and 22, the Proxy Statement addresses (in more detail) the  letters from the OTS dated May 9, 2005 and May 10, 2005, and the OTS letters dated September 14, 2005.  With regard to these letters, the Proxy Statement states on page 5:

> On May 9, 2005, the OTS sent a notice of intent to issue a cease and desist order and assess civil money penalties to Bender stating that he had distributed a letter to shareholders that contained disclosures that appeared to

28

the OTS to be false and misleading (See <u>Appendix B</u> to
this proxy statement.)  On May 10, 2005, the day before
the scheduled May 11, 2005 Annual Meeting, the OTS
delivered a letter to the Board of Directors of
Independence Federal (see <u>Appendix C</u> to this proxy
statement) stating that a community group had also sent a
letter with apparent false and misleading statements.
Management has advised the OTS that that community group
was not associated with the Bank or its management.  As a
result of these two findings, the OTS stated that it
"strongly believes that the Annual Meeting should be
postponed to enable the shareholders to receive and
evaluate sufficient accurate information to permit each
to cast an informed vote."

Independence Federal cooperated with the OTS and
furnished the information requested by the OTS in its May
10, 2005 letter.  **By letters dated September 14, 2005,
the OTS stated that it has determined not to pursue
enforcement action with respect to the matters discussed
in its letters of May 9 and 10, 2005.**

The reference to IFSB's "cooperat[ion] with the OTS" is

misleading on several grounds.  Bender also cooperated, as

evidenced by his June 20, 2005 letter to the OTS, and the

failure to mention Bender's cooperation is misleading.  Far

more misleading however, is the statement that IFSB

cooperated, and "furnished the information requested by the

OTS in its May 10, 2005 letter."  As set forth above, IFSB

limited the information supplied to the OTS to the voluntary

responses by the Directors and a limited number of officers.

Both the response to the OTS and the description of that

response in the Proxy Statement ("Management has advised the

OTS that that community group was not associated with the Bank

or its management.") are patently misleading, given Mr.

Chambers' direct involvement in the Committee Letter, and the

fact that Mr. Batties was also involved, or at the very least,

had knowledge that the letter was drafted and disseminated by

Impact Strategies, with Mr. Chambers' participation.

83.    The Q&A contained in the Proxy Statement, which

indicated that broker votes would not be counted without

instructions from the beneficial shareholders, was false and

misleading.  Internal Bank correspondence from October 21,

2005 indicated that the Bank intended to count the broker

routine votes in favor of the Management Nominees, in

violation of the information in the Q&A that no such votes

would be counted without instructions.  In fact, the Bank did

count the broker routine votes in favor of the Management

Nominees.

84.    The Proxy Statement also contains the following

false and misleading statements, or omissions of material

fact:

       a.    the depressed stock is a result of increased
           expenses, "including a significant portion of
           legal fees in excess of $3,000,000 alone in
           2004, which Independence Federal incurred in its
           efforts to protect the Bank and its shareholders
           from Bender's actions" (page 2);

       b.    that Bender has sued the Bank's directors
           "without citing any factual basis.  These
           actions and baseless pejorative statements also

30

damage the Bank's reputation in the community"
(page 3);

    c.    "Bender ultimately is seeking to acquire
Independence Federal as cheaply as
possible, *which is directly contrary to the
best interests of the other shareholders of
Independence Federal.*  As stated in an
opinion dated by a January 15, 2004, by a United
States District Court Judge: "Mr. Bender
testified quite frankly that he wants to
acquire the Bank for the least amount
possible.  He agreed that the Board of
Directors wants to sell the Bank for the
greatest amount possible, for the best
benefit to all of the shareholders." (page
3) (Emphasis added);

    d.    if the Bender Nominees are elected, Bender will
obtain "Controlling Influence" over IFSB "to the
Detriment of All Other Shareholders" (page 3);

    e.    "it is quite possible that Bender desires a
merger of Independence Federal and Colombo Bank"
(pages 3-4).

    f.    Page 20 of the Proxy Statement fails to identify
the Doley- related "Participant Shares" block
of stock in its identification of "groups owning
in excess of 5%."

85.    The Proxy Statement is also misleading in that it
blames Bender for the Bank's expenditure of legal fees.  In
response to Bender's objection to the proposed merger with
Carver, the Bank embarked on a three-pronged attack in May
2004 (lawsuit, poison pill, holding company restructure) that
caused the Bank to incur substantial legal fees and expenses.
To the extent that the Proxy Statement at page 2 implies that
"a significant portion" of the 2004 legal fees in excess of $3

31

million were necessary to "protect" the Bank and its
shareholders from Bender, the statement is a blatant
distortion: legal fees were incurred as a result of three
civil lawsuits against the Bank involving the Washington
Teachers Union, as well as the litigation instituted in this
Court on May 5, 2004 *against* Bender.  Not one of those four
cases was instituted by Bender, and only one even involved
him.  In addition, although the Proxy Materials attribute the
failure of the Carver Merger to Bender, it was the OTS that
denied the application for the Carver merger.  Even prior to
the OTS denial of the merger application however, Carver
demanded a lower price than that which had been agreed to, and
the IFSB Board refused.

86.  The Proxy Materials were intended to mislead the
shareholders that the election of the Bender Nominees would
result in a situation where Bender, as the joint owner of 21%
of the Bank's shares, would be allowed to dictate its future,
to his personal benefit, and the benefit of Colombo Bank, to
the detriment of the remaining shareholders, from whom Bender
will not purchase stock.

87.  As set forth above, non-party Thompson increased his
shareholdings in IFSB by 98,000 shares in the 45 days
immediately prior to the September 26, 2005 Record Date, which

increased his ownership in IFSB to 7.2%.  Upon information and belief, prior to the mailing of Proxy Materials on or about October 4, 2005, the  Director Defendants and Defendant Batties had reached an agreement among themselves, and with Thompson, for Thompson to acquire these additional shares, and to vote his shares in favor of the Management Nominees, or to give his proxy to the Director Defendants.  This agreement provided the Director Defendants with control of approximately 9% of IFSB, and would have been material information to the IFSB shareholders in deciding whether or not to vote in the election, and how to vote.  The agreement with Thompson was not disclosed in the Proxy Materials.

88.  As set forth above, the Director Defendants and/or Defendant Batties also participated in the communications from at least two groups of shareholders, the May 4, 2005 letter by "the Committee to Save Independence Federal Savings Bank," and the October 21, 2005 letter purportedly sent  by Catherine McPhail and A. Gilbert Douglas.  Pursuant to 17 C.F.R. § 240.14a-9, no solicitation may be made by means of any communication "which is false or misleading," or "which omits to state any material fact necessary in order to make the statements therein not false or misleading."  The May 4, 2005 letter and the October 21, 2005 are solicitations subject to

33

17 C.F.R. § 240.14a-9.  Both letters solicit support for board nominees supported by the Director Defendants, and/or against the board nominees supported by Bender.

89.  The May 4, 2005 Committee Letter contains numerous false and misleading statements, or omissions of material fact.  Moreover, it is misleading in its entirety because it fails to identify the real source of the letter as IFSB or Impact Strategies, and falsely states that "we are an independent group" and "acting separately from IFSB."  In addition, the following statements in the Committee Letter are false or misleading, or omit material information:

 a.  "the originally established goals of Independence Federal Savings Bank that have recently been threatened by the personal greed of specific individuals– individuals who have no regard not only for the African American community, small businesses, depositors and local homeowners, but not even for their fellow shareholders in IFSB";

 b.  "Acting separately from IFSB, we aim to expose the motivations of those wishing to harm IFSB's mission";

 c.  "We must prevent the individuals trying to line their own pockets at the expense of IFSB's important mission and rich history";

 d.  "Mr. Bender pursues a personal agenda when he realizes that his reformer allies ... will not allow him to dominate IFSB's affairs.  Mr. Bender starts making demands on Management as though he is in control of the bank.  Frustrated that he cannot dictate policy ... .  He forges ahead with this course in utter disregard for

fellow shareholders. ... he will simply use
bully tactics and lies ... .  These cronies will
then do his bidding ... ." (Timeline page 1);

e.     "the OTS ... acquiesces in Mr. Bender's attempt
to seize control of the bank without offering a
fair price to shareholders or otherwise
disclosing to customers that he's trying to
control their bank.  Thus while Bender's bank
discriminated with regard to credit and lending
... ." (Timeline page 1-2);

f.     "the OTS-in a move friendly to Mr. Bender and
hostile to a minority institution designates
IFSB as a 'problem institution' in 'troubled
condition' ..."  (Timeline page 2);

g.     "a U.S. District Court finally rebukes him,
dismissing his suit and stating that all along
it was Mr. Bender's strategy to ... scare off
other potential merger partners like Carver"
(Timeline page 2);

h.     "Instead he continues buying shares to vote
his cronies onto the Board.  IFSB decides
to sue Bender for intentionally interfering
with the merger deal, plus other violations
of law.  Again, the OTS sits back and
refuses to help IFSB or rein in Mr. Bender
despite his own violations of law"
(Timeline page 3);

i.     "The bank attempts to settle legal action with
Mr. Bender ... government officials ... have
allowed Mr. Bender and his allies to skirt
policies and practices" (Timeline page 3);

j.     "If it were not for the excessive legal
fees caused by Bender, IFSB would have
shown a net profit for FY2004"  (Timeline
page 3);

k.     "Although [Bender's nominees to the Board] are
both African Americans, they are mere puppets of
Bender's with no apparent ties to banking,

required to do what he tells them" (Timeline page 4);

l.    Bender "wished to either merge IFSB into his own 'shakily-run' bank, or worse, make it a fiefdom in his local empire, likely with minority faces as fronts, until he can otherwise dispose of it" (Morton Bender Background, third bullet point);  "He has succeeded in degrading IFSB, driving down the value of the bank's shares and attacked the mission of this bank began [sic] in 1968.  With the bank's stock degraded by his activities, he can buy it at a cheaper price" (Background, fourth bullet point);  "He has ... forced IFSB to sue him ... [h]e has engaged in ruinous insurgent tactics, filed misleading securities filings with the OTS ... and threatened more lawsuits if he cannot view secret, private shareholder ballots so he may bully small and minority shareholders who didn't vote in his favor" (Background, fifth bullet point).

90.  Similar to the Committee to Letter, the October 21, 2005 McPhail/Douglass letter fails to identify the participation of the Bank's employees and Impact Strategies in its creation and dissemination.  In addition, the following statements are also either false or misleading:

a.  the assertion of Bender's "record history involving other banks including a black bank pushed to failure";

b. the assertion of  "severe violations of banking law and illegal practices by Bender and his Columbo Bank";

c.  the assertion that  "[T]he only time we are aware we got into U.S. District Court with Bender – though expensive – Independence Won, Bender Lost!" ;

> d.  the assertion that "we can only presume that
> [the Bender Nominees'] basic qualification,
> based on past events, is to serve Bender loyally
> to affect his admitted takeover scheme"; and
>
> e.  the assertion that "OTS has behaved so
> contrary to banking laws, security regulations
> and sound public policy to facilitate handing
> ***Our Bank*** to this Bender character."

91.  The October 21st letter's repeated references to the May 9, 2005 letter from the OTS to Bender is misleading in its blatant omission of (or any reference to) the May 10, 2005 OTS letter to IFSB, or the September 14, 2005 letter from the OTS, advising Bender that "after careful consideration of the relevant facts known to OTS" no enforcement action would be taken with regard to the allegations set forth in the OTS's May 9th letter.  The omission of any reference to the May 10, 2005 letter to IFSB is particularly misleading, given that employees or agents of the Bank were involved in the creation and dissemination of the Committee Letter.

92.  The misrepresentations and omissions made in the foregoing communications were made with knowledge of their falsity.  The Director Defendants and Defendant Batties have violated Section 14(a) of the Exchange Act by their knowing dissemination of materially misleading Proxy Materials, and as to Defendants Batties, Jordan and Wilmot, by their participation in (or knowledge about) the dissemination of the

37

materially misleading May 4, 2005 and October 21, 2005 shareholder letters, as described above.

93.    The false and misleading statements identified above were material to the shareholders in determining whether to vote, and if so, how to vote, and thus, they have tainted the shareholder vote at the October 26, 2005 meeting.

94.    The Director Defendants and Defendant Batties' violations of Section 14(a) deprived all IFSB shareholders from information necessary to ensure a fair vote at the Shareholders' Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly considered by all shareholders.    Accordingly, the election of the Management Nominees is irreparably tainted, and the results of the meeting are therefore void.    Plaintiffs (and other shareholders and the investing public) have been, are being, and will continue to be irreparably harmed, in that they are left without material information, to which they are lawfully entitled, regarding the true interests and purposes of the Director Defendants and Defendant Batties' efforts to control IFSB for their own interests, and to defeat the Bender Nominees.    The misstatements and omissions in the Proxy Materials and May 4th and October 21st letters were material and

38

were essential to informed shareholder decisions with respect to voting at the Shareholder Meeting.

## COUNT III

### (OTHER VIOLATIONS TAINTING ELECTION OF MANAGEMENT NOMINEES – DIRECTOR DEFENDANTS AND DEFENDANT BATTIES)

95. Paragraphs 1 through 94 are incorporated herein by reference as if fully set forth herein.

96. As set forth above, the election of the Management Nominees violated the pertinent IFSB By-laws, as well as Robert's Rules of Order, by which the Shareholders' Meeting was governed. As a result, shares in a number material to the outcome of the election were improperly counted in favor of the Management Nominees.

97. As shareholders, Plaintiffs are entitled to have meetings conducted in accordance with the By-laws, 12 C.F.R. §552.6(a), and Robert's Rules of Order. Plaintiffs were also entitled to have the Bender Nominees voted on in a fair and orderly manner.

98. As a result of the Director Defendants' and Defendant Batties' actions in failing and refusing to conduct the election in a fair manner, the Defendants have deprived Plaintiffs and the other shareholders of a fair vote for the

election of directors.  Accordingly, the election of the
Management Nominees is irreparably tainted, and the results of
the meeting are therefore void.  Plaintiffs (and other
shareholders) have been, are being, and will continue to be
irreparably harmed, by the defeat of one of the Bender
Nominees (George Osbourne) and the election of the Management
Directors in a meeting which failed to be conducted in a
proper manner.

### COUNT IV

**(BREACH OF FIDUCIARY DUTY BY DIRECTOR DEFENDANTS AND BATTIES
and CONSPIRACY TO BREACH FIDUCIARY DUTY)**

99.  Paragraphs 1 through 98 are incorporated herein by
reference as if fully set forth herein.

100.  As directors and officers, the Director Defendants
and Batties owe a fiduciary duty of care and loyalty to the
Bank's shareholders, including the Plaintiffs.

101.  Through their actions set forth above, the
Defendant Directors and Defendant Batties have breached their
fiduciary duty owed to Plaintiffs, who are minority
shareholders of the Bank.  As set forth above, the Defendant
Directors and Defendant Batties have provided incomplete and
misleading information to the shareholders to defeat the
Bender Nominees, and have failed to properly conduct the

40

Shareholders' Meeting and properly count the votes for the election of Directors.

102.   The conduct described in Counts I through III above was for the express purpose of causing the defeat of the two Bender Nominees, and the election of the Management Nominees. Upon information and belief, and in furtherance of the plan to defeat the Bender Nominees, Defendants Jordan and Wilmot entered into the agreement with Thompson and Doley to purchase the Participant Shares, and to cause those shares to be voted in favor of the Management Nominees.  This agreement was in violation of the Change in Bank Control Act, 12 U.S.C. § 1817(j), and OTS regulations thereunder.

103.   The agreement to purchase the Participant Shares was an instrumental part of the agreement of the Director Defendants and Defendant Batties to defeat the Bender Nominees, and was either approved in advance by the other Defendant Directors and Batties, or was ratified by those Defendants at a later time.

104.   In furtherance of their efforts to convince Doley to sell the Participant Shares, Jordan and/or Wilmot improperly threatened Doley that if the Bender Nominees were elected, there would be a "run on the bank."

41

105. In violation of the fiduciary duty owed to the Plaintiffs, the Director Defendants and Batties' sole purpose in engaging in the above-described violations of the federal securities and banking laws, as well as IFSB By-laws and procedures, was to prevent any control of IFSB from passing to Plaintiffs.  As such, the injury suffered by Plaintiffs is an injury not suffered by the corporation or the other shareholders, and Plaintiffs' entire investment in IFSB has been put at risk.

106. The Director Defendants and Defendant Batties' breach of fiduciary duty has deprived all IFSB shareholders from information necessary to ensure a fair vote at the Shareholders' Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly considered by all shareholders.  Accordingly, the election of the Management Nominees is irreparably tainted, and the results of the meeting are therefore void.  Plaintiffs (and other shareholders and the investing public) have been, are being, and will continue to be irreparably harmed, in that they are left without material information, to which they are lawfully entitled, regarding the true interests and purposes of the Director Defendants and Defendant Batties' efforts to control IFSB for their own interests, and to defeat the Bender

42

Nominees.  Plaintiffs (and other shareholders) have been, are being, and will continue to be irreparably harmed, by the defeat of one of the Bender Nominees (George Osbourne) and the election of the Management Directors in a meeting which failed to be conducted in a proper manner.

### COUNT V

This Count has been omitted in the First Amended Complaint.

### COUNT VI

**(DECLARATORY JUDGMENT THAT IFSB BE RESTRAINED FROM INDEMNIFYING THE OTHER DEFENDANTS FOR COSTS AND ATTORNEYS FEES FOR THIS ACTION)**

107.  Plaintiffs incorporate herein by reference paragraphs 1-106 as if fully set forth herein.

108.  Indemnification of officers and directors for Federal Savings Associations is governed by 12 C.F.R. §545.121.  Pursuant to that regulation, IFSB may not indemnify its officers and directors "unless the association gives [the OTS] at least 60 days' notice of its intention to make such indemnification."

109.  In Counts I through V above, Plaintiffs bring claims against the Director Defendants and Defendant Batties for causes of action arising out of the wrongful and

43

intentional acts of those Defendants.  Under 12 C.F.R. §545.121, an association may authorize an advance payment of expenses only if "a majority of the directors of a savings association concludes that, in connection with the action, any person ultimately may become entitled to indemnification." Under the regulation, before making advance payment of expenses, "a majority of the directors" must conclude that the person would ultimately be entitled to indemnification" which involves final judgment on the merits in the person's favor, or if "a majority of the disinterested directors of the savings association determine that he or she was acting in good faith within the scope of his or her employment or authority... ."

110.  The allegations set forth above involve conduct that was wilful and intentional, and not performed in good faith, but rather, for the express purpose of injuring Plaintiffs and defeating the Bender Nominees.  Nevertheless, the IFSB Board has in fact passed a resolution authorizing advance payment of expenses to the Defendant Directors and Defendant Batties;Upon information and belief, the vote was 5 to 4, with all of the Defendant Directors voting in favor of the resolution.  Thereafter, substantial sums (exceeding $500,000) have been paid on Defendants behalf.

111.  This Court has now made its preliminary injunction findings.  Because the Court has determined that Plaintiffs are likely to succeed in this action, any further advancing of fees is patently improper.

112.  Accordingly, Plaintiffs seek a declaration from this Court that Defendant IFSB be restrained from indemnifying or otherwise advancing the expenses of the defense of this action to the Director Defendants or Defendant Batties.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an appropriate order granting injunctive and declaratory relief, and specifically, that the Court:

(A)  grant preliminary and permanent injunctive relief requiring the Director Defendants and Defendant Batties to comply with Section 13(d) of the Exchange Act, and the regulations thereunder, fully disclosing their plans and purposes concerning IFSB;

(B)  grant preliminary and permanent injunctive relief requiring the Director Defendants and Defendant Batties to comply with 14(a) of the Exchange Act, and the regulations thereunder, and 12 C.F.R. § 569 to disclose to the shareholders, in any future solicitations, the falsity and misleading nature of the 2005 Proxy Materials, the May 2005

45

Committee to Save Correspondence, and the October 2005 Letter to Shareholders, and to further disclose Defendants' and the Bank's involvement in the May and October 2005 correspondence.

(C)  grant injunctive relief voiding the election results of the October 26, 2005 Shareholders' Meeting;

(D)  grant injunctive relief preventing the Director Defendants from causing the Bank to hold an Annual or Special Meeting of the Shareholders until further Order of this Court;

(E)  grant injunctive relief requiring the Defendants and the Bank to conduct any future Annual or Special Meeting of the Shareholders in conformance with Roberts Rules of Order and the Bank's Bylaws, and to enjoin any further allocation of votes after the closing of the polls, and to enjoin the counting of broker routine votes for Management Nominees in the absence of express direction from the beneficial shareholder.

(F)  grant injunctive relief neutralizing all of the Participant Shares and the Thompson Shares in any future election of Directors;

(G)  grant injunctive relief preventing Defendant IFSB from indemnifying (or making advance payments to) the Director Defendants and Defendant Batties for the expenses of this action;

(H)  award Plaintiffs their attorneys' fees and costs of this action;

(I)  grant such other and further relief as may be appropriate.

Respectfully submitted,


COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


_____/s/_____

Dale A. Cooter, Bar No.227454
Donna S. Mangold, Bar No. 358851
5301 Wisconsin Ave., N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
*Morton A. Bender and Grace M.*
*Bender*

47