**Allegations Relied on by Plaintiffs' in Their Rule 11 Motion for Fees**

**Paragraph 14**:

Allegation – A few days prior to the May 11th meeting, a letter dated May 4, 2005 was sent to shareholders allegedly on behalf of the "the Committee to Save Independence Federal Savings Bank." Upon information and belief, this letter was drafted by, or with the assistance of, Defendant Batties (and/or one or more of the Director Defendants), as the level of detail set forth in the letter leads to the inescapable conclusion that it was written by, or consultation with, Bank management. Some of the information contained in the letter could only have come from confidential OTS examination reports, which are maintained in the Bank's file. The letter is full of faulty and misleading statements, coupled with undisguised character assassination ("Morton Bender's Background").

Answer – Defendant admits that a letter was sent to shareholders dated May 4, 2005. Defendant denies the remaining allegations set forth in paragraph 14.

**Paragraph 19**:

Allegation – On or about October 3, 2005, Bender sent a letter to the IFSB Shareholders, which *inter alia* identified the Bender Nominees, and explained that the only way to vote for the Bender Nominees was to attend the meeting in person, or to send someone with a legal proxy. The letter also specifically instructed that Bender was not soliciting proxies, and was not able to vote any shares other than his own.

Answer – Defendant admits that Bender sent a letter to shareholders on or about October 3, 2005. Defendant denies the remaining allegations set forth in paragraph 19.

**Paragraph 20**:

Allegation – On October 4, 2005, the Director Defendants and Defendant Batties submitted the Bank's proxy Materials to the Shareholders ("Proxy Materials"). These Proxy Materials included the Bank Proxy Statement ("Proxy Statement") with ten appendices, a "Notice of Postponement and Rescheduling of Special Meeting of Shareholders," as well as a letter signed by Defendants Jordan and Batties entitled "Update to our Shareholders" ("Update"). Both the Update and the Proxy Statement contained inaccurate and misleading information about the Bender Nominees, Bender's regulatory filings, and his intentions to obtain majority ownership and control of the Bank, as set forth in detail below. As such, they violate Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), 12 C.F.R. § 569, and 17 C.F.R. § 240.14a-9.

Answer – Defendant admit that on October 4, 2005 letter was sent to the shareholders containing the Bank's proxy materials with appendices and a letter titled "Update to our Shareholders." Defendant denies the remaining allegations set forth in paragraph 20.

140980v1

**Paragraph 21**:

Allegation – As identified in the Proxy Statement at page 28, the Bank's nominees for directors are: Defendant Fitzgerald, Defendant Wilmot, and Marion O. Greene, Jr. ("Management Nominees").

Answer – Defendant admits the allegations set forth in paragraph 21.

**Paragraph 22**:

Allegation – The Update states that "if Bender is successful in electing his two nominees to the Board, the Majority Directors believe that Bender will gain control of Independence Federal without having to purchase any additional shares of Independence Federal Stock."

Answer – Defendant admits the allegations set forth in paragraph 22.

**Paragraph 23**:

Allegation – On October 21, 2005, a letter was sent to all IFSB shareholders, purportedly drafted by Catherin McPhail and A. Gilbert Douglas, two shareholders who supported the Management Nominees.  This letter contained inaccurate and defamatory statements about Bender and his intentions and, upon information and belief, was based on information provided by the Director Defendants and/or Defendant Batties for the express purpose of defaming Bender and misinforming the other shareholders.  The letter makes false allegations of Bender's "record history involving other banks including a black bank pushed to failure," and "severe violations of banking law and illegal practice by Bender and His Columbo Bank."  The letter also provides "[T]he only time we are aware we got into U.S. District Court with Bender – though expensive – Independence Won, Bender Lost!"  These statements (among others in the letter) are untrue.

Answer – Defendant admits that Catherine McPhail and A. Gilbert Douglas sent a letter to shareholders of IFSB dated October 21, 2005.  Defendant denies the remaining allegations set forth in paragraph 23.

**Paragraph 24**:

Allegation – Upon information and belief, in an effort to ensure the election of the Management Nominees to the Board, the Director Defendants and Defendant Batties also used the various delays in the Shareholders' Meeting to arrange for the sale of IFSB stock to Jeffrey Thompson ("Thompson"), who is the Chairman and Chief Executive of an accounting firm in which Defendant Cobb is also a shareholder.

Answer – Defendant denies the allegations set forth in paragraph 24.

**Paragraph 26**:

Allegation – Upon information and belief, Thompson, at all times relevant herein, was acting in concert with Cobb and the other Director Defendants and Defendant Batties to further their agenda for IFSB, including, but not limited to, electing the Management Nominees, and defeating the Bender Nominees.  It appears that the 13D filed with the OTS on behalf of Thompson in September 2005 was faxed to the OTS by the law firm of Muldoon Murphy Aguggia ("Muldoon Murphy"), the same law firm that is counsel to IFSB.  The 13D filed by Thompson states that the purpose of his stock purchases was "for investment purposes."  13D, Item 4.  Upon information and belief, however, the real reason for the purchases was to consolidate votes for the Management Nominees, and to thwart Bender's efforts to get the Bender Nominees elected.

Answer – Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegation that the 13D filed by Thompson states that the purpose of his stock purchases was "for investment purposes."  Defendant denies the remaining allegations set forth in paragraph 26.

**Paragraph 27**:

Allegation – Upon information and belief, at some time either prior to, or during the vote at the Shareholders' Meeting, Thompson's attorney, Daniel Weitzel, delivered Thompson's proxy to John Hall, an attorney with Muldoon Murphy, counsel for IFSB.  The delivery of the proxy resulted in all 111,600 of Thompson's shares being voted for the Management Nominees.  The delivery of the proxy to Hall was not in compliance with the Bank's own instructions for delivery of proxies set forth in the Proxy Statement, violated IFSB By-laws, and was done for the express purpose of avoiding a fair vote on Bender's candidates.

Answer – Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations set forth in paragraph 27, and therefore, denies the same.  (Mr. Wilmot and Ms. Jordan)

Answer – Defendant admits that Thompson's attorney delivered Thompson's proxy to John Hall, IFSB's counsel and agent.  Defendant denies the remaining allegations set forth in paragraph 27.  (Mr. Batties)

**Paragraph 28**:

Allegation – As of October 25, 2005, the day prior to the Shareholders' Meeting, Harold Doley ("Doley"), along with a group of affiliated persons or entities ("the Doley Group"), owned in excess of 12% of IFSB stock ("the Doley Group Shares").  Upon information and belief, the Dole Group acquired its IFSB shareholdings from Carver Bancorp, Inc. ("Carver").  Despite their combined ownership percentage in excess of 12%, neither Doley nor any other member of the Doley Group has ever filed a Form 13D regarding their IFSB stock ownership with the OTS.

3

Answer – Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations set forth in paragraph 28, and therefore, denies the same.

**Paragraph 29**:

Allegation – On October 25, 2005, Doley told Bender that he was willing to allow Bender to vote the Doley Group Share in favor of the Bender Nominees, or would give Bender his proxy. Bender told Doley he was not allowed to accept proxies, and told Doley he would have to give his proxy to someone else.

Answer – Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations set forth in paragraph 29, and therefore, denies the same.

**Paragraph 30**:

Allegation – Upon information and belief, on October 25, 2005, Doley was contacted by one or more the Director Defendants or Defendant Batties for the purpose of purchasing the Doley Group Shares. Upon information and belief, Doley reach an agreement with one or more of these Defendants to sell all of the Doley Group Share for $17.00 per share. On that same day, IFSB shares were trading on the open market, and closed at approximately $11.50 per share.

Answer – Defendant denies the allegations contained in paragraph 30.

**Paragraph 31**:

Allegation – On the morning of October 26, 2005, Bender spoke with Logan Delaney, an associate of Mr. Doley, who told Bender about the agreement for the purchase of the Doley Group Share. Later that morning, Bender again spoke to Doley, who assured Bender that he would vote the Doley Group Share for the Bender Nominees. Upon information and belief, the deal for the purchase of the Doley Group Shares was not complete at this time.

Answer – Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations set forth in paragraph 31, and therefore, denies the same.

**Paragraph 32**:

Allegation – The Shareholders' Meeting was scheduled to start at 11 a.m. on October 26, 2005. Defendant Wilmot postponed the start of the meeting, without any Board resolution or other authority for a postponement. Defendants Jordan and Wilmot used this delay to continue to gather votes for the Management Nominees, and to take Doley to lunch at the Prime Rib Restaurant. The purpose of the lunch was to persuade Doley to assign the proxies related to the Doley Group Shares to the Director Defendants, or to complete the deal for the sale of the shares. Upon information and belief, during the course of their discussions, Jordan and/or Wilmot told Doley that if he voted for the Bender Nominees, there would be a "run on the bank". Upon information and belief, at some point before the Shareholders Meeting resumed at 3 p.m., Doley finalized his deal with one or more of the Director Defendants to sell the Doley Group Shares at

4

$18.00 per share.  Because the Doley Group Shares represent in excess of 10% of the share of IFSB, the acquisition of control of IFSB in this matter was in violation of the Change in Bank Control Act, 12 U.S.C. § 1817(j), and OTS regulations thereunder.

Answer – Defendant admits that the Shareholders' meeting was scheduled to start at 11 a.m. on October 26, 2005.  Defendant further admits that the start of the Shareholders' Meeting was postponed until 3 p.m.  Defendant denies all of the remaining allegations contained in paragraph 32.

**Paragraph 33**:

Allegation – Upon information and belief, because the Doley Group members were the record owners of the stock as of the Record Date (September 26, 2005), the Director Defendants did not complete the purchase of the share on October 26, 2005, but rather promised Doley a $175,000 down payment.  In exchange for the promise of the down payment, Doley gave the Director Defendants control over the Doley Group Shares, and those shares were subsequently voted for the Management Nominees. No 13D was filed by any of the Director Defendants indicating their intention to purchase shares or gain control the Doley Group Share to vote in favor the Management Nominees.  Moreover, the above—described acquisition of the Doley Group shares, or proxies for those shares for those shares, was without prior OTS approval required for increasing the Director Defendants' ownership/control of the company over 10%.

Answer – Defendant denies all of the allegations set forth in paragraph 33.

**Paragraph 39**:

Allegation – After the meeting, Bender spoke with Doley, who indicated that his share purchase agreement was still being negotiated, but consistent with that agreement, the Doley Group Shares were voted for the Management Nominees.

Answer – Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations set forth in paragraph 39, and therefore, denies the same.

**Paragraph 46**:

Allegation – By no later than October 26, 2005 and possibly substantially earlier, the Director Defendants and Defendant Batties had agreed to act together as a group with non-parties Thompson and the Doley Group, for the undisclosed purposes of (i) opposing the election of the Bender Nominees, voting the Defendants' IFSB share, together with the Thompson and Doley Group Shares, against the Bender Nominees, and persuading other shareholders to vote against the Bender Nominees; (ii) depriving those IFSB shareholders who voted in favor the Bender Nominees the opportunity of a fair election of the Bender Nominees; (iii) supporting the efforts of Jordan to continue controlling the IFSB Board despite a dismal record of mismanagement and negligence.

Answer – Defendant denies all of the allegations set forth in paragraph 46.

140980v1

**Paragraph 47**:

Allegation – The Director Defendants and Defendant Batties have violated section 13(d) of the Exchange Act because they have failed to file a Schedule 13D, or any amendments to an existing 13D, setting forth their specific plans and intentions with respect to IFSB, including but not limited to the details of the undisclosed agreement among the Director Defendants and Defendant Batties to seek to acquire the Doley Group Shares by purchase or otherwise; the undisclosed agreement to purchase the Doley Group Shares; the undisclosed agreement with Thompson regarding his votes (or the deliver of his proxies) for the Management Nominees, as more fully described below in Paragraph 57; and the undisclosed agreement with the Doley Group regarding the delivery of their votes (or the deliver of their proxies) for the Management Nominees.

Answer – Defendant denies all of the allegations set forth in paragraph 47.

**Paragraph 51**:

Allegation – Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and the rules and regulations promulgated thereunder, as well as 12 C.F.R. § 569, govern the solicitation of proxies in this case.  Pursuant to those statutory and regulatory provisions, no solicitation of a proxy shall be made by means which, *inter alia*, contains any statement that is false or misleading with respect to any material fact, or omits to state any material fact.  Moreover, pursuant to 17 C.F.R. § 240.14a-9, no solicitation (not limited to proxy materials) may be made by means of any communication which is false or misleading, or which omits to state any materials fact necessary in order to make the statements therein not false or misleading.

Answer – To the extent the allegations of this Paragraph refer to statutes or regulations, those statutes or regulations speak for themselves, and any characterizations thereof are denied.  Defendant refers to the statute or regulation as the best evidence of its contents.

**Paragraph 52**:

Allegation – Section 14(a) of the Exchange Act, and the rules and regulations promulgated thereunder, demand full and fair disclosure in proxy solicitations, and was enacted to prevent management (or others) from obtaining authorization for corporate action by means of inadequate or misleading disclosures.

Answer – To the extent the allegations of this Paragraph refer to statutes or regulations, those statues or regulations speak for themselves, and any characterizations thereof are denied.  Defendant refers to the statute or regulation as the best evidence of its contents.

**Paragraph 53**:

Allegation – As set forth above, prior to the Shareholders' Meeting, the Director Defendants and Defendant Batties distributed Proxy Materials to the IFSB shareholders on behalf of IFSB

6

Management.  In addition, and upon information and belief, the Defendant Batties and/or the Director Defendants also participated in the communications from at least two groups of shareholders, as described in Paragraphs 14 and 23 above (i.e., the May 4, 2005 letter by "the Committee to Save Independence Federal Savings Bank," and the October 21, 2006 letter signed by Catherine McPhail and A. Gilbert Douglas).

Answer – Defendant admits that Proxy Materials were submitted to IFSB shareholders on behalf of IFSB Management.  Defendant denies the remaining allegations set forth in paragraph 53.

**Paragraph 54**:

Allegation – As set forth above, the Bank's Proxy Materials included the Update, which was a letter to the IFSB Shareholders, dated October 4, 2005, and signed by Defendants Jordan and Batties.

Answer – Defendant admits that the Bank's Proxy Materials included a letter sent to shareholders, and that it was signed.  Defendant further admits that the Update states, "here is Bender's plan as disclosed in Amendment 18 to this Schedule 13D …;" and that the "Majority Directors" are "directors other than the three directors whose elections were primarily attributable to the nomination and/or vote of Morton Bender."  Defendant denies all of the remaining allegations set forth in Paragraph 54.

**Paragraph 55**:

Allegation – *By way of partial example only,* the Proxy Statement contains the following false and misleading statements, or omissions of material fact:

   a. "Bender is a substantial reason the price for Independence Federal Common stock has fallen to the $11.75 per share price" (page 2);

   b. "Bender's opposition to the Carver Merger and his other actions are a substantial reason for the failure of the Carver Merger" (page 2);

   c. the depressed stock is a result of increase expenses, "including a significant portion of legal fees in excess of $3,000,000 alone in 2004, which Independence Federal incurred in its efforts to protect the Bank and its shareholders from Bender's actions" (page 2);

   d. "Bender has [refused to purchase shares from all shareholders] at a price which is competitive" (page 2);

   e. if the Bender Nominees are elected, Bender will obtain "Controlling Influence" over IFSB "to the Detriment of All Other Shareholders" (page 3);

   f. that Bender has sued the Bank's directors "without citing any factual basis.  These actions and baseless pejorative statements also damage the Bank's reputation in the

7

      community" (page 3);

    g. "it is quite possible that Bender desires a merger of Independence Federal and Colombo Bank" (pages 3-4).

    h. Page 20 of the Proxy Statement fails to identify the block of stock owned by the Doley Group in its identification of "groups owning in excess of 5%."

Answer – Defendant denies each and every allegations set forth in paragraph 55, and all subparts thereto.

**Paragraph 56**:

Allegation – The Proxy Materials are intended to mislead the shareholders that the election of the Bender Nominees will result in a situation where Bender, as the joint owner of 21% of the Bank's shares, will be allowed to dictate its future, to his personal benefit, and the benefit of Colombo Bank, to the detriment of the remaining shareholders, from who Bender will not purchase stock. The Proxy Materials blame Bender for the failure of the merger with Carver, and virtually every problem at the Bank, including increase operating expenses and decreased stock price. At no place in the Proxy Materials does the Bank Management (*i.e.,* the Director Defendants and Defendant Batties) inform the Shareholders of its own role in the poor performance of the Bank. By way of material omission, it was the Bank's three-pronged attack in May 2004 (lawsuit, poison pill, holding company restructure) that was improper and ill-fated, and expensive to the Bank. All Mr. Bender did to prompt this multi-million dollar legal attack was to voice his objection to the proposed merger with Carver. Despite the picture painted in the Proxy Materials, the Bank's capital was diminished by continuing poor operating performance, notwithstanding its legal expenses. To the extent that the Proxy Statement implies that "a significant portion" of the 2004 legal fees in excess of $3 million were necessary to "protect" the Bank and its shareholders from Bender, the statement is a blatant distortion: legal fees were incurred as a result of three civil lawsuits against the Bank involving the Washington Teachers Union, as well as the litigation instituted in this Court May 5, 2004 against Bender. Not one of those four cases were instituted by Bender, and only one even involved him. In addition, although the Proxy Materials attributed the failure of the Carver Merger to Bender, it was the that OTS denied the application for the Carver merger. Even prior to the OTS denial of the merger application however, Carver demanded a lower price than that which had been agreed to, and the IFSB Board refused.

Answer – Defendant denies all of the allegations set forth in paragraph 56.

**Paragraph 57**:

Allegation – As set forth above, non-party Thompson increased his shareholding in IFSB by 98,000 shares in the 45 days immediately prior to the September 26, 2005 Record Date, which increased his ownership in IFSB to 7.2%. Upon information and belief, prior to the mailing of Proxy Materials on or about October 4, 2005, the Director Defendants and Defendant Batties had reached an agreement among themselves, and with Thompson, for Thompson to acquire these

8

additional shares, and to vote his shares in favor of the Management Nominees, or to give his proxy to the Director Defendants. This agreement provided the Director Defendants with control of approximately 9% of IFSB, and would have been material information to the IFSB shareholders in deciding whether or not to vote in the election, and how to vote. The agreement with Thompson was not disclosed in the Proxy Materials.

Answer – Defendant is without sufficient information or knowledge to form a belief as to the truth of the allegations that Thompson increased his shareholdings in IFSB by 98,000 share in the 45 days immediately prior to the September 26, 2005 Record Date, which increased his ownership in IFSB to 7.2%. Defendant denies the remaining allegations set forth in paragraph 57.

**Paragraph 58**:

Allegation – As set forth above, upon information and belief, the Director Defendants and/or Defendant Batties also participated in the Communications from at least two groups of shareholders, the May 4, 2005 letter by the "the Committee to Save Independence Federal Savings Bank," and the October 21, 2005 letter purportedly sent by Catherine McPhail and A. Gilbert Douglas. Pursuant to 17 C.F.R. § 204.14a-9, no solicitation may be made by means of any communication "which is false or misleading," or "which omits to state any material fact necessary in order to make the statements therein not false or misleading." The May 4, 2005 letter and the October 21, 2005 are solicitations subject to 17 C.F.R. § 240.14a-9. Both letters solicit support for board nominees supported by the Director Defendants, and/or against the board nominees supported by Bender.

Answer – Defendant denies all of the allegations set forth in paragraph 58.

**Paragraph 59**:

Allegation – *By way of partial example only,* the May 4, 2005 letter contains the following false and misleading statements, or omissions of materials fact:

   a. "the originally established goals of Independence Federal Savings Bank that have recently been threatened by the personal greed of specific individuals- individuals who have no regard not only for the African American community, small businesses, depositors and local homeowners, but not even for their follow shareholders in IFSB";

   b. "Acting separately from IFSB, we aim to expose the motivations of those wishing to harm IFSB's mission";

   c. "We must prevent the individuals trying to line their own pockets at the expense of IFSB's important mission and rich history";

   d. "urge [the OTS] to exercise their oversight responsibilities and prevent individuals who have no regard for our community from dismantling IFSB";

9

e. "Mr. Bender pursues a personal agenda when he realizes that his reformer allies … will not allow him to dominate IFSB's affairs.  Mr. Bender starts making demands on management as though he is in control of the bank.  Frustrated that he cannot dictate policy … .  He forges ahead with this course in utter disregard for fellow shareholders. … he will simply use bully tactics and lies … .  These cronies will then do his bidding … ." (Timeline page 1);

f. "the OTS … acquiesces in Mr. Bender's attempt to seize control of the bank without offering a fair price to shareholders or otherwise disclosing to customer that he's trying to control their bank.  Thus while Bender's bank discriminated with regard to credit and lending … ." (Timeline page 102);

g. "Mr. Bender continues his baseless attacks on this new management and the Board" (Timeline page 2);

h. "the OTS-in a move friendly to Mr. Bender and hostile to a minority institution designates IFSB as a 'problem institution' in 'troubled condition' …" (Timeline page 2);

i. "Egging by the OTS actions, by December, 2003 Mr. Bender is … engaging in ruinous insurgent tactics" (Timeline page 2);

j. "a U.S. District Court finally rebukes him, dismissing his suit and stating that all along it was Mr. Bender's strategy to … scare off other potential merger partners like Carver" (Timeline page 2);

k. "Mr. Bender is allowed to continue his ware on the bank and obtain more stock.  IFSB is even prevented from undertaking the most routine transactions, such as forming a bank holding company without the blessing of large rebel shareholders, namely Mr. Bender" (Timeline page 2);

l. "Instead he continues buying share to vote his cronies onto the Board.  IFSB decides to sue Bender for intentionally interfering with the merger deal, plus other violations of law.  Again, the OTS sits back and refuses to help IFSB or rein in Mr. Bender despite his own violations of :aw" (Timeline page 3);

m. "The Bank attempts to settle legal action with Mr. Bender … government officials … have allowed Mr. Bender and his allies to skirt policies and practices" (Timeline page 3);

n. "if it were not for the excessive legal fees caused by Bender, IFSB would have shown a net profit for FY2004" (Timeline page 3);

o. "Although [Bender's nominees to the Board] are both African Americans, they are mere puppets of Bender's with no apparent ties to banking, required to do what he

140980v1

tells them" (Timeline page 4).

Answer – Defendant denies all of the allegations set forth in paragraph 59

**Paragraph 60**:

Allegation – Attached to the May 4th "Committee to Save" letter was a document entitled "Morton Bender's Background." The entirety of this document is full of false and misleading statements, many repeating the same themes identified above. Examples of some of the other statements include the following: Bender "wished to either merge IFSB into his own 'shakily-run' bank, or worse, make it a fiefdom in his local empire, likely with minority faces as fronts, until he can otherwise dispose of it" (Background, third bullet point); "He has succeeded in degrading IFSB, driving down the value of the bank's shares and attacked the mission of this bank began [sic] in 1968. With the bank's stock degraded by his activities, he can buy it at a cheaper price" (background, fourth bullet point); "He has … forced IFSB to sue him … [h]e has engaged in ruinous insurgent tactics, filed misleading securities filings with the OTS … and threatened more lawsuits if he cannot view secret, private shareholder ballots so he may bully small and minority shareholders who didn't vote in his favor" (Background, fifth bullet point).

Answer – Defendant admits that an attachment entitled "Morton Bender's Background" was attached to a May 4th letter. Defendant denies all of the remaining allegations set forth in paragraph 60.

**Paragraph 61**:

Allegation – Similar to the May 4th "Committee to Save" letter, the October 21, 2005 letter makes false allegations of Bender's "record history involving other banks including a black bank pushed to failure," and "severe violations of banking law and illegal practices by Bender and his Columbo Bank." The letter also provides "[T]he only time we are aware we got into U.S. District Court with Bender – the though expensive – Independence Won, Bender Lost!" This statement (among others in the letter) is patently untrue. Examples of other false and/or misleading statements are the following: "we can only presume that [the Bender Nominees'] basic qualification, based on past events, is to serve Bender loyally to affect his admitted takeover scheme." "We wonder aloud why OTS has behaved so contrary to banking laws, security regulations and sound public policy to facilitate handing **Our Bank** to this Bender character?"

Answer – Defendant denies all of the allegations set forth in paragraph 61.

**Paragraph 62**:

Allegation – The October 21st letter's repeated references to the May 9, 2005 letter from the OTS to Bender is misleading in its blatant omission of (or any reference to) the September 14, 2005 letter from the OTS, attached as Appendix G to the Bank's Proxy Statement. The September 14th letter advise Bender that "after careful consideration of the relevant facts know to OTS" no

enforcement action would be taken with regard to the allegations set forth in the OTS's May 9th letter.

Answer – Defendant denies all of the allegations set forth in paragraph 62.

**Paragraph 63**:

Allegation – The misrepresentations and omissions made in the foregoing communications were made with knowledge of their falsity. The Director Defendants and Defendant Batties have violated Section 14(a) of the Exchange Act by their knowing dissemination of materially misleading Proxy Materials, and upon information and belief, as to Defendant Batties, by his participation in the dissemination of the materially misleading May 4, 2005 and October 21, 2005 shareholder letters, as described above.

Answer – Defendant denies all of the allegations set forth in paragraph 62.

**Paragraph 64**:

Allegation – The Director Defendants and Defendant Batties' violations of Section 14(a) deprived all IFSB shareholders from information necessary to ensure a fair vote of Shareholders' Meeting, and deprived the Plaintiffs of an election where the Bender Nominees were fairly considered by all shareholders. Accordingly, the election of the Management Nominees is irreparably tainted, and the results of the meeting are therefore void. Plaintiffs (and other shareholders and the investing public) have been, are being, and will continue to be irreparably harmed, in that they are left without material information, to which they are lawfully entitled, regarding the true interests and purposes of the Director Defendants and Defendant Batties' efforts to control IFSB for their own interests, and to defeat the Bender Nominees. The misstatements and omissions in the Proxy Materials and May 4th and October 21st letters are material and were essential to informed shareholder decisions with respect to voting at the Shareholder Meeting.

Answer – Defendant denies all of the allegations set forth in paragraph 64.

**Paragraph 65**:

Allegation – As a result of the aforesaid violations of Section 14(a) and the regulations thereunder, and 12 C.F.R. § 569, Plaintiffs have suffered substantial monetary damages, including the value of the entirety of their investment in IFSB, and all expenses relating to that investment, including but not limited to funds expended in furtherance of Plaintiffs' efforts to elect the Bender Nominees.

Answer – Defendant denies all of t he allegations set forth in paragraph 65.

140980v1

**Paragraph 73**

Allegation – The conduct described in Counts I through III above was the express purpose of causing the defeat of the two Bender Nominees, and the election of the Management Nominees. Upon information and belief, and in furtherance of the plant to defeat the Bender Nominees, Defendant Jordan and Wilmot entered into the agreement to purchase the Doley Group Shares, which is in excess of 10% of the Bank' stock.  This purchase was in violation of the Change in Bank Control Act, 12 U.S.C. § 1817(j), and OTS regulation thereunder.

Answer – Defendant denies all of the allegations set forth in paragraph 73.

**Paragraph 74**:

Allegation – The agreement to purchase the Doley Group Share was an instrumental part of the agreement of the Director Defendants and Defendant Batties to defeat the Bender Nominees, and was either approved in advance the other Defendants Directors and Batties or was ratified by those Defendants at a later time.

Answer – Defendant denies all of the allegations set forth in paragraph 74.

**Paragraph 75**:

Allegation – In furtherance of their efforts to convince Doley to sell the Doley Group Share, Jordan and/or Wilmot improperly threatened Doley that if the Bender Nominees were elected, there would be a "run on the bank."

Answer – Defendant denies all of the allegations set forth in paragraph 75.

140980v1