## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MORTON A. BENDER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 06-92 (RMC) |
| | ) |
| CAROLYN D. JORDAN, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Mr. and Mrs. Morton A. Bender, dissident shareholders, sued five members of the Board of Directors of Independence Federal Savings Bank ("Bank" or "IFSB") and its Acting President[1] for alleged violations of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq*. The Court issued a preliminary injunction in the Benders' favor and Defendants appealed. The appeal was withdrawn before briefs were filed. The Benders now seek their attorneys' fees and costs in the amount of $1,211,579.38, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(c). *See* Mot. for Att'y Fees [Dkt. # 96].

---

[1] The original Defendants in this action included Carolyn D. Jordan, chairman of the Board of Directors; David Wilmot, vice chairman; Board members Michael J. Cobb, William B. Fitzgerald, IV, and Eugene K. Youngentob; Acting President and Chief Executive Officer, Thomas L. Batties; and the Bank as a nominal defendant. Directors Cobb, Fitzgerald, and Youngentob resigned from the Board in August-September 2006 and were dismissed by motion of the Plaintiffs. Ms. Jordan and Mr. Wilmot resigned from the Board in early 2007 and sold their stock in IFSB. Mr. Batties resigned as Acting President and CEO in June 2006 but maintained a consulting relationship with the Bank until December 31, 2006. He too has sold his stock in the Bank. Only Ms. Jordan and Messrs. Wilmot and Batties remain as Defendants and the Plaintiffs seek sanctions only against them, not any of their former co-defendants or their counsel. Pls.' Mem. in Supp. of Mot. for Fees and Costs ("Pls.' Mem.") at 2 n.2.

## I. FACTS

The current lawsuit represents only one of a number of suits for control of the Bank, filed by the Bank and its Board of Directors or Mr. Bender over a period of years.[2]   In this case, the Court issued a preliminary injunction on July 21, 2006, enjoining Defendants and the Bank from holding shareholder meetings or disseminating proxy materials until further order of the Court because of improprieties associated with an October 2005 Shareholders' Meeting. *Bender v. Jordan*, 439 F. Supp. 2d 139 (D.D.C. 2006).   Although Defendants immediately appealed, they withdrew the appeal before briefs were filed.   Thereafter, the Court dismissed the suit as moot in light of changed circumstances. *See* Dkt. # 90. The Court's July 2006 Memorandum Opinion on the preliminary injunction thereby became the final word on events surrounding the 2005 Shareholders' Meeting. Certain ancillary matters having since been resolved (*i.e.*, litigation between the Bank and the remaining defendants, *see* Dkt. ## 102-103 & 112-113), the motion for attorneys' fees and costs is ready for decision.

## II. LEGAL STANDARDS

The Benders assert that the very Answers to their Amended Complaint filed by the remaining Defendants violated Rule 11(b), Fed. R. Civ. P., the touchstone for liability under the PSLRA.  That Rule provides, in relevant part:

> Representations to the Court.  By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances

---

[2] *Bender v. Jordan*, 570 F. Supp. 2d 37, 39 n.2 (D.D.C. 2008)) sets forth the history of litigation between these parties.

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> . . .
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). Rule 11(c) provides that a court may sanction any party or attorney for failure to comply with Rule 11(b). Using Rule 11(b) as its standard, the PSLRA requires a court to consider sanctions for abusive litigation:

> In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) . . . as to any complaint, responsive pleading, or dispositive motion.
>
> If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) . . . as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 . . . .

15 U.S.C. § 78u-4(c)(1) & (2). The statute presumes that the court should award attorney fees as a sanction when there is a violation of Rule 11(b). *Id.* § 78u-4(c)(3). If a responsive pleading or dispositive motion fails to comply with Rule 11(b) "an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation" should be granted. *Id.* § 78u-4(c)(3)(A)(1). Two circumstances can overcome the presumption in favor of an award of

attorney fees: awarding fees would "impose an unreasonable burden on that party or attorney and would be unjust," while failure to award fees would not impose a greater burden on the party in whose favor sanctions would be ordered; or "the violation of Rule 11(b) . . . was *de minimis*." *Id.* § 78u-4(c)(3)(B)(i) & (ii).

"[W]hen the Rule 11 proceeding is commenced by motion filed by one of the parties, the courts have, without exception, held counsel [and, under the PSLRA, the parties themselves] to an objective standard of reasonableness." *Lucas v. Spellings*, 408 F. Supp. 2d 8, 10 (D.D.C. 2006) (citations omitted); *Independence Federal Savings Bank v. Bender*, 230 F.R.D. 11, 17 (D.D.C. 2005) (citing *Gurary v. Winehouse*, 235 F.3d 792, 797 (2d Cir. 2000)) (noting that the "PSLRA does not alter substantive standards but circumscribes judicial discretion to conduct the Rule 11 analysis and in imposing sanctions"). The Benders contend that these Defendants flagrantly violated Subsections (3) and (4) of rule 11(b) in that their defenses or other factual contentions in their Answers did not have evidentiary support and their denials of the Complaint's factual contentions were not warranted. *See* Pls.' Mem. at 3.

Rule 11(c)(1) provides that if the court determines that Rule 11(b) has been violated, it should impose sanctions on "any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "The sanction should be imposed on the persons – whether attorneys . . . or parties – who have violated the rule or may be determined to be responsible for the violation." *Id.* Advisory Committee Note (1993) (subdivisions (b) and (c)); *see Reynolds v. The U.S. Capitol Police Board*, 357 F. Supp. 2d 19, 23-24 (D.D.C. 2004) ("Parties and their counsel may be sanctioned by the Court for violations of Rule 11."); *see also Rafferty v. NYNEX Corp.*, 60 F.3d 844, 852 (D.C. Cir. 1995) (holding that "once the district court finds that a pleading is not well

grounded in fact . . . , Rule 11 *requires* that sanctions of some sort be imposed" (emphasis in original; internal quotation marks and citations omitted)); *Carswell v. Airline Pilots Ass'n In'l*, 248 F.R.D. 325, 327 (D.D.C. 2008) (sanctioning both party and counsel for a pleading that lacked reasonable factual support).

The Benders are clear that they do not move for sanctions against counsel for the Defendants or dismissed co-Defendants but only against the remaining Defendants themselves. *See* Pls.' Mem. at 2 n.2. As to Ms. Jordan and Messrs. Wilmot and Batties, the Benders allege that they made false representations "both on paper and in testimony during the preliminary injunction hearing." Pls.' Mem. at 2. "On paper" is explained to mean paragraphs 14, 19, 20, 23, 26-28, 30, and 32-33 of the Defendants' Answers. *See* Pls.' Mem. at 3, 4, 6, & 7; Defendant Batties' Answer [Dkt. # 9]; Defendant Jordan's Answer [Dkt. # 12]; Defendant Wilmot's Answer [Dkt. # 13] (collectively, "Defs.' Answers").[3]

The Defendants argue that they had a right to present a defense and that their Answers were objectively reasonable. They note that "Rule 11 was not intended to penalize a party whose interpretation of the evidence is eventually proved wrong; the question is whether there was a reasonable basis for the interpretation initially . . . ." *Crawford v. Deutsche Bank AG*, 271 F. Supp. 2d 829, 834 (E.D. Va. 2003).

## III. ANALYSIS

Below are the answers the Benders relied upon in their motion for attorneys' fees along with the Court's findings of fact with respect to each allegation at issue.

---

[3] Rule 11 and the PSLRA provide for sanctions where pleadings filed with the Court lack a reasonable factual basis and therefore are not means by which Plaintiffs can challenge Defendants' testimony.

**Paragraph 14:**

*Allegation*:

A few days prior to the May 11th meeting, a letter dated May 4, 2005 was sent to shareholders allegedly on behalf of "the Committee to Save Independence Federal Savings Bank." Upon information and belief, this letter was drafted by, or with the assistance of, Defendant Batties (and/or one or more of the Director Defendants), as the level of detail set forth in the letter leads to the inescapable conclusion that it was written by, or in consultation with, Bank management. Some of the information contained in the letter could only have come from confidential OTS examination reports, which are maintained in the Bank's file. The letter is full of faulty and misleading statements, coupled with undisguised character assassination ("Morton Bender's Background").

Compl. [Dkt. # 1] ¶ 14.[4]

*Answers*: Defendants admitted that a letter was sent to shareholders dated May 4, 2005. Defendants denied all remaining allegations set forth in paragraph 14. Defs.' Answers ¶ 14.

*Court Findings*: Upon the specific direction of Mr. Batties, Christopher Chambers, an attorney and part-time Bank employee, worked with Judy Smith of Impact Strategies, a public relations firm retained by the Bank, to provide information for the Committee Letter and to set its tone and arrange its mailing. The three alleged signatories, all prominent African American clergy in Washington, D.C., testified that they had nothing to do with preparing the letter. Not only did Mr. Batties instruct Mr. Chambers to work with Ms. Smith, but Mr. Chambers sent copies of all e-mails between himself and Ms. Smith to Mr. Batties. Mr. Chambers also talked with Mr. Batties directly about his efforts.

---

[4] Plaintiffs filed an Amended Complaint on September 26, 2006 [Dkt. # 68], but the Amended Complaint was dismissed as moot and the Court's July 21, 2006 Memorandum Opinion contains the final findings of fact in this case. Accordingly, the Answers Plaintiffs challenge are those made with respect to the original Complaint.

> [T]he Court conclude[d] that Mr. Batties authorized and was aware of Mr.
> Chambers' participation in the creation and mailing of the Committee Letter.
> . . . Further, the Court [found] that Mr. Batties authorized and was aware that
> the Committee was being portrayed falsely to shareholders and the public as
> an independent group. . . . Further, the Court [found] that it is more likely
> than not that certain Directors of the Bank were, at a minimum, informed of
> the Committee Letter before its mailing.

*Bender v. Jordan*, 439 F. Supp. 2d 139, 150 (D.D.C. 2006) (internal citations omitted). Mr. Batties

admitted that some of the information in the Committee Letter and its attachments could only have

come from confidential OTS examination reports, which are maintained in the Bank's files. *Id.* at

149.

Therefore, contrary to Defendants' explicit denial in their Answers, the Letter from the

Committee to Save IFSB was drafted with the assistance of Mr. Batties and in consultation with some

Bank directors. It appears from the emails that Ms. Jordan was fully involved and Mr. Wilmot may

have been. In addition, some of the information in the Letter admittedly came from OTS reports in

the Bank's files. The blatant denial of facts known to two or all Defendants violated Rule 11(b) as

there was no reasonable factual basis for them. *See Crawford*, 271 F. Supp. 2d at 834.

**Paragraph 19**:

*Allegation*:

On or about October 3, 2005, Bender sent a letter to the IFSB
Shareholders, which *inter alia* identified the Bender Nominees, and
explained that the only way to vote for the Bender Nominees was to
attend the meeting in person, or to send someone with a legal proxy.
The letter also specifically instructed that Bender was not soliciting
proxies, and was not able to vote any shares other than his own.

Compl. ¶ 19.

*Answer*s: Defendants admitted that Bender sent a letter to shareholders on or about

October 3, 2005. Defendants denied the remaining allegations set forth in paragraph 19. Defs.'

Answers ¶ 19.

> *Court Findings*:
>
> On October 3, 2005, Mr. Bender sent a letter to IFSB shareholders which identified his nominees for directors as Osborne George and John Silvaneous Wilson Jr. ('Bender Nominees'). The letter explained that Mr. Bender was not soliciting proxies and that the only way to vote for the Bender nominees was to attend the meeting in person or to send someone with a legal proxy.

*Bender*, 439 F. Supp. at 151 (internal citation omitted).

Defendants state now that their denial of the allegations concerning the text of the October 3, 2005, letter from Mr. Bender was because the document speaks for itself. Of course, their Answers said no such thing. The proof, however, was easy to present and the Court finds that any violation of Rule 11 was *de minimis*.

> **Paragraph 20**:
>
> *Allegation*:
>
> On October 4, 2005, the Director Defendants and Defendant Batties submitted the Bank's proxy Materials to the Shareholders ("Proxy Materials"). These Proxy Materials included the Bank's Proxy Statement ("Proxy Statement") with ten appendices, a "Notice of Postponement and Rescheduling of Special Meeting of Shareholders," as well as a letter signed by Defendants Jordan and Batties entitled "Update to our Shareholders" ("Update"). Both the Update and the Proxy Statement contained inaccurate and misleading information about the Bender Nominees, Bender's regulatory filings, and his intentions to obtain majority ownership and control of the Bank, as set forth in detail below. As such, they violate Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), 12 C.F.R. § 569, and 17 C.F.R. § 240.14a-9.

Compl. ¶ 20.

*Answers*: "Defendant[s] admit[ted] that an October 4, 2005 letter was sent to the shareholders containing the Bank's proxy materials with appendices and a letter titled 'Update to our

Shareholders.'  Defendant[s] den[y] the remaining allegations set forth in paragraph 20."  Defs.'

Answers ¶ 20.

*Court Findings*: "The Bank distributed its proxy materials to shareholders on October

4, 2005.  The Bank's nominees for directors were Marion O. Greene Jr. and Defendants Fitzgerald and

Wilmot ('Management Nominees')."  *Bender*, 439 F. Supp. 2d at 151.  The Proxy Materials

incorrectly informed shareholders that "[i]f you fail to vote for the election of directors, the votes of

those supporting Bender's nominees will have a greater impact in helping Bender gain operating

control of the Bank" and "[y]our broker will not vote your shares without your instructions."  *Id.* at

158 (citation omitted).  "Both of these [statements] were incorrect and votes cast by brokers who were

not instructed on how to vote were all counted for the Management Nominees, in an amount of

approximately 396,000 shares." *Id.* at 156.

While the Proxy Materials contained seriously incorrect statements, without any

reasonable basis in fact, the errors found by the Court were not those identified in the allegations in

the Complaint.  Rather, those points alleged to have been erroneously answered only represented Mr.

Bender's legal position, to which the Defendants could properly respond with a denial.  There is no

Rule 11 violation with respect to Defendants' Answers to paragraph 20.

**Paragraph 23:**

*Allegation*:

On October 21, 2005, a letter was sent to all IFSB shareholders,
purportedly drafted by Catherine McPhail and A. Gilbert Douglas, two
shareholders who supported the Management Nominees.  This letter
contained inaccurate and defamatory statements about Bender and his
intentions and, upon information and belief, was based on information
provided by the Director Defendants and/or Defendant Batties for the
express purpose of defaming Bender and misinforming the other
shareholders.  The letter makes false allegations of Bender's "record

> history involving other banks including a black bank pushed to failure," and "severe violations of banking law and illegal practice by Bender and his Columbo Bank."  The letter also provides "[T]he only time we are aware we got into U.S. District Court with Bender – though expensive – Independence Won, Bender Lost!"   These statements (among others in the letter) are untrue.

Compl. ¶ 23.

*Answers*: Defendants admitted that Catherine McPhail and A. Gilbert Douglas sent a letter to shareholders of IFSB dated October 21, 2005, and denied the remaining allegations contained in paragraph 23.  Defs.' Answers ¶ 23.

*Court Findings*:

> On October 21, 2005, a letter was sent to shareholders by Gilbert Douglas and Catherine McPhail, IFSB shareholders.  Mr. Douglas drafted the letter with input from Mr. Chambers, who "responded positively" when Mr. Douglas suggested sending a letter.  Mr. Chambers reviewed and commented upon one or more drafts of the letter, put Mr. Douglas in contact with Impact Strategies so that the letter could be mailed, and helped Mr. Douglas find citations to bank documents for the text.   "[I]t did not occur" to Mr. Chambers that the Committee Letter had forced a postponement of the May 11 shareholders' meeting and that sending another letter might not be a good idea.

*Bender*, 439 F. Supp. 2d at 151-52 (internal citations omitted).

At a minimum, Paragraph 23 of the Answers submitted by Defendants lacked a reasonable factual basis in certain respects.  The Douglas/McPhail letter was "based on information provided by the Director Defendants and/or Defendant Batties."  Mr. Chambers' work with Impact Strategies took place at the specific direction and with the specific knowledge of Mr. Batties.  The Defendants' Answers denying these facts were unreasonable and violated Rule 11(b).

**Paragraph 26:**

*Allegation*:

Upon information and belief, [Jeffrey] Thompson, at all times relevant herein, was acting in concert with [Michael J.] Cobb and the other Director Defendants and Defendant Batties to further their agenda for IFSB, including, but not limited to, electing the Management Nominees, and defeating the Bender Nominees.  It appears that the 13D filed with the OTS on behalf of Thompson in September 2005 was faxed to the OTS by the law firm of Muldoon Murphy Aguggia ("Muldoon Murphy"), the same law firm that is counsel to IFSB.  The 13D filed by Thompson states that the purpose of his stock purchases was "for investment purposes."  13D, Item 4.  Upon information and belief, however, the real reason for the purchases was to consolidate votes for the Management Nominees, and to thwart Bender's efforts to get the Bender Nominees elected.

Compl. ¶ 26.

*Answer*s:  "Defendants [are] without sufficient information or knowledge to form a belief as to the truth of the allegation that the 13D filed by Thompson states that the purpose of his stock purchases was 'for investment purposes.'  Defendants deny the remaining allegations set forth in paragraph 26."  Defs.' Answers ¶ 26.

*Court Findings*: To the extent that these allegations concerned Mr. Thompson's activities in August-September 2005, the Court made no findings.  To the extent that these allegations concerned Mr. Thompson's activities in October 2005, the Court made the findings detailed below.  Neither set of findings is consistent with the allegations of the Complaint and the Court cannot find that Defendants' denials violated Rule 11(b).

**Paragraph 27:**

*Allegation*:

Upon information and belief, at some time either prior to, or during the

vote at the Shareholders' Meeting, Thompson's attorney, Daniel Weitzel, delivered Thompson's proxy to John Hall, an attorney with Muldoon Murphy, counsel for IFSB. The delivery of the proxy resulted in all 111,600 of Thompson's shares being voted for the Management Nominees. The delivery of the proxy to Hall was not in compliance with the Bank's own instructions for delivery of proxies set forth in the Proxy Statement, violated IFSB By-laws, and was done for the express purpose of avoiding a fair vote on Bender's candidates.

Compl. ¶ 27.

*Answer*s: Mr. Wilmot and Ms. Jordan stated that they "[were] without sufficient information or knowledge to form a belief as to the truth of the allegations set forth in paragraph 27, and, therefore, den[ied] the same." Defs. Wilmot and Jordan's Answers ¶ 27. Mr. Batties "admit[ted] that Thompson's attorney delivered Thompson's proxy to John Hall, IFSB's counsel and agent" but denied the remaining allegations of paragraph 27. Def. Batties' Answer ¶ 27.

*Court Findings*: The Defendants denied that Mr. Thompson's shares were all voted for the Management Nominees to the IFSB Board but they clearly knew that, indeed, all had been so voted. *See Bender*, 439 F. Supp. 2d at 162. Their denials of this fact had no reasonable factual basis. Beyond that point, the Court made no specific findings and cannot fault the Defendants for their general denials.

### Paragraph 28:

*Allegation*:

As of October 25, 2005, the day prior to the Shareholders' Meeting, Harold Doley ("Doley"), along with a group of affiliated persons or entities ("the Doley Group"), owned in excess of 12% of IFSB stock ("the Doley Group Shares"). Upon information and belief, the Doley Group acquired its IFSB shareholders from Carver Bancorp, Inc. ("Carver"). Despite their combined ownership percentage in excess of 12%, nether Doley nor any other member of the Doley Group has ever filed a Form 13D regarding their IFSB stock ownership with the OTS.

Compl. ¶ 28.

*Answers*:  Defendants claimed to be without sufficient information or knowledge to form a belief as to the truth of the allegations set forth in paragraph 28, and therefore denied them. Defs.' Answers ¶ 28.

*Court Findings*:  "All told, the Doley [Group] together owned 154,685 shares of IFSB stock, which was just under 10% of the total shares outstanding.  Neither Doley Securities nor any of the Doley [Group] has ever filed a Form 13D with OTS."  *Bender*, 439 F. Supp. 2d at 152.

As detailed below, the Doley Group Shares were of intense interest to the Board and Mr. Batties.  It is not possible that all of the Defendants, who controlled the Bank's records, were "without sufficient information or knowledge" to know the amount of stock held by the Doley Group or that members of the Doley Group had acquired their stock from Carver Bancorp.  The actions of these Defendants belie such ignorance.

The Complaint alleged that the Doley Group held 12% of the Bank's stock and the Court found that it held just under 10%.  There is no evidence in the record to indicate, one way or the other, whether any of these Defendants would have known whether Mr. Doley or anyone else in the Doley Group ever filed a Form 13D with OTS.  Though it would have been more appropriate for Defendants to have denied outright the allegation that the Doley Group held 12% of the Bank's stock rather than due to lack of knowledge, the Court finds no fault with Defendants' general denials of the remaining allegations of paragraph 28.

**Paragraph 29**:

*Allegation*: "On October 25, 2005, Doley told Bender that he was willing to allow Bender to vote the Doley Group Shares in favor of the Bender Nominees, or would give Bender his

proxy.  Bender told Doley he was not allowed to accept proxies, and told Doley he would have to give

his proxy to someone else."  Compl. ¶ 29.

*Answers*:  Defendants claimed to be without sufficient information or knowledge to

form a belief as to the truth of the allegations set forth in paragraph 29, and therefore denied the same.

Defs.' Answers ¶ 29.

*Court Findings*:  The Court made no findings with respect to the allegations of

Paragraph 29.  The Court cannot find that the denials of this paragraph were in bad faith or erroneous,

as there is no evidence in the record as to how these Defendants might have known the details of

conversations between Messrs. Bender and Doley.

**Paragraph 30:**

*Allegation*:

Upon information and belief, on October 25, 2005, Doley was contacted by one or more of the Director Defendants or Defendant Batties for the purpose of purchasing the Doley Group Shares.  Upon information and belief, Doley reached an agreement with one or more of these Defendants to sell all of the Doley Group Shares for $17.00 per share.  On that same day, IFSB shares were trading on the open market, and closed at approximately $11.50 per share.

Compl. ¶ 30.

*Answer*: Defendants denied the allegations contained in paragraph 30.  Defs.' Answers

¶ 30.

*Court Findings*:

On the evening of October 25, 2005, Mr. Doley was contacted by Ms. Jordan, who then connected Mr. Wilmot to the call at approximately 11 p.m.  The parties discussed the sale of the Doley Participants' shares, to persons suggested by Mr. Wilmot.  (Wilmot suggested Jeffrey Thompson, Bob Johnson, and a Mr. Liggen). Immediately upon hanging

up the telephone, Mr. Wilmot called Mr. Thompson and left a message, talked directly to Mr. Liggen, and then talked to Mr. Thompson.

The evidence shows that Mr. Thompson was willing to purchase the Doley [Group] stock, at $18 per share (well above market), conditioned upon Mr. Doley's voting all shares for the Management Nominees. However, a combination of the Doley [Group] stock and the stock Mr. Thompson already owned would exceed 10% of the Bank's outstanding shares; no such agreement could be reached without prior OTS approval. Apparently for this reason, Mr. Thompson directed his counsel, Daniel Weitzel, to prepare a purchase agreement for the Doley [Group] stock with Mr. Wilmot's name on it as the purchaser. Mr. Weitzel forwarded the purchase agreement to Marie Wood, Mr. Wilmot's assistant, by email to her home on the evening of October 25, 2005. Ms. Wood then forwarded Mr. Weitzel's email and attached draft purchase agreement to Mr. Doley during the evening of October 25, 2005. When Mr. Wilmot talked to Mr. Thompson "shortly after talking to Mr. Doley" around 1 a.m. on October 26, 2005, Mr. Thompson explained his plan. Mr. Wilmot testified that he responded, "[Y]ou can't do that."

*Bender*, 439 F. Supp. 2d at 152-53 (internal citations omitted).

Thus, Ms. Jordan called Mr. Doley on the evening of October 25, 2005, and joined Mr. Wilmot into the call to discuss how the shares controlled by Mr. Doley might be sold for $18 and voted for the Management Nominees. Defendants' blatant denials of the Complaint allegations had no factual basis and violated Rule 11(b).

**Paragraph 31:**

*Allegation*:

On the morning of October 26, 2005, Bender spoke with Logan Delaney [sic], an associate of Mr. Doley, who told Bender about the agreement for the purchase of the Doley Group Shares. Later that morning, Bender again spoke to Doley, who assured Bender that he would vote the Doley Group Shares for the Bender Nominees. Upon information and belief, the deal for the purchase of the Doley Group Shares was not complete at this time.

Compl. ¶ 31.

*Answers*:  Defendants claimed to be without sufficient information or knowledge to form a belief as to the truth of the allegations set forth in paragraph 31, and therefore denied them. Defs.' Answers ¶ 31.

*Court Findings*:  There is no evidence in the record to suggest that these Defendants had knowledge of any conversations between Messrs. Bender and Delany or Doley.  Their denials, therefore, were not violative of Rule 11(b).  However, "the deal for the purchase of the Doley Group Shares was not complete at that time," as the Court's further fact-finding made clear.  Defendants' denial of the last sentence of the Complaint allegation had no factual basis.

**Paragraph 32:**

*Allegation*:

The Shareholders' Meeting was scheduled to start at 11 a.m. on October 26, 2005.  Defendant Wilmot postponed the start of the meeting, without any Board resolution or other authority for a postponement.  Defendants Jordan and Wilmot used this delay to continue to gather votes for the Management Nominees, and to take Doley to lunch at the Prime Rib Restaurant.  The purpose of the lunch was to persuade Doley to assign the proxies related to the Doley Group Shares to the Director Defendants, or to complete the deal for the sale of the shares.  Upon information and belief, during the course of their discussions, Jordan and/or Wilmot told Doley that if he voted for the Bender Nominees, there would be a "run on the bank."  Upon information and belief, at some point before the Shareholders Meeting resumed at 3 p.m., Doley finalized his deal with one or more of the Director Defendants to sell the Doley Group Shares at $18.00 per share.  Because the Doley Group Shares represent in excess of 10% of the shares of IFSB, the acquisition of control of IFSB in this matter was in violation of the Change in Bank Control Act, 12 U.S.C. § 1817(j), and OTS regulations thereunder.

Compl. ¶ 32.

*Answer*: "Defendant[s] admit[ted] that the Shareholders' Meeting was scheduled to

start at 11 a.m. on October 26, 2005.   Defendant[s] further admit[ted] that the start of the

Shareholders' Meeting was postponed until 3 p.m.   Defendant[s] denie[d] all of the remaining

allegations contained in Paragraph 32."  Defs.' Answers ¶ 32.

> *Court Findings*:
>
> [T]he start of the meeting was delayed to 3 p.m. by the unilateral action
> of Ms. Jordan [not Mr. Wilmot].  As soon as Mr. Doley arrived, he was
> whisked away by Ms. Jordan to lunch at the Prime Rib, a local
> restaurant, even though the Bank was buying lunch for all shareholders
> at the Mayflower Hotel because the meeting was delayed. . . .
>
> Mr. Royer and then Mr. Wilmot joined Ms. Jordan and Mr. Doley at
> the Prime Rib.  A discussion ensued concerning whether there was a
> buyer for the stock Mr. Doley controlled.  Messrs. Wilmot and Doley
> discussed a purchase whereby either Mr. Wilmot or a group assembled
> by Mr. Wilmot would purchase the Doley [Group] shares.  The price
> per share under discussion was either $17.00 or $18.00.  A down
> payment of $1.00 per share was also discussed.  An integral part of the
> sale agreement required Mr. Doley to vote the shares he controlled for
> the Management Nominees.  Mr. Doley called Mr. Delany and said
> that he was going to vote for the Management Nominees and that Mr.
> Delany should do so as well.  Mr. Doley told Mr. Delany "that there
> were a bunch of people from the community saying if Bender takes
> over the Bank, they were going to withdraw their money." . . . In one
> call, Mr. Doley told Mr. Delany that he had been promised a deposit
> worth $1 per share. . . .
>
> Proxies representing the Doley [Group] shares were faxed from Doley
> Securities in New Orleans to the Mayflower Hotel on October 26,
> 2005, between 12:47 and 12:55 p.m. (presumably Central Time).  They
> were then voted by Mr. Doley for the Management Nominees.
> At his deposition, Mr. Thompson produced an Adams National Bank
> cashier's check dated October 26, 2005, in the amount of $165,000,
> made payable to David Wilmot, and apparently endorsed by Mr.
> Wilmot. . . . [T]his check was deposited into an escrow account at Mr.
> Wilmot's firm, and a cashier's check dated October 26, 2005, in the
> amount of $163,000 and made payable to Harold Doley, was issued by
> United Bank . . . .  The Court finds, based on the evidence of record,
> that the check to Mr. Doley was designed to provide the $1 per share
> earnest money.  It constitutes a clear and tangible piece of evidence

> that there was an agreement to sell the Doley [Group] shares on
> October 25, 2005.

*Bender*, 439 F. Supp. 2d at 153-55 (internal citations omitted).

The Defendants' flat denials that any of the foregoing occurred could not have been advanced in good faith or in ignorance of the facts, given their prominent roles, especially those of Ms. Jordan and Mr. Wilmot. To the extent that Defendants denied the facts found by the Court and not appealed, they lacked reasonable factual support and are in violation of Rule 11(b).

**Paragraph 33:**

*Allegation*:

> Upon information and belief, because the Doley Group members were the record owners of the stock as of the Record Date (September 26, 2005), the Director Defendants did not complete the purchase of the shares on October 26, 2005, but rather promised Doley a $175,000 down payment. In exchange for the promise of the down payment, Doley gave the Director Defendants control over the Doley Group Shares, and those shares were subsequently voted for the Management Nominees. No 13D was filed by any of the Director Defendants indicating their intention to purchase shares or gain control of the Doley Group Shares to vote in favor of the Management Nominees. Moreover, the above-described acquisition of the Doley Group shares, or proxies for those shares, was without prior OTS approval required for increasing the Director Defendants' ownership/control of the [Bank] over 10%.

Compl. ¶ 33.

*Answer*: Defendants denied all of the allegations set forth in paragraph 33. Defs.' Answers ¶ 33.

*Court Findings*: As outlined above, the evidence at the preliminary injunction hearing revealed that the Director Defendants did not complete the purchase of the shares on October 26, 2005, but promised a check in the amount of $165,000, and a check in the amount of $163,000, made

payable to Harold Doley, was issued that day.  It is clear that Mr. Doley agreed to vote for the Management Nominees as a condition of sale over lunch on October 26, 2005.  *See Bender*, 439 F. Supp. 2d at 154-55.  The Court also specifically found that this activity violated the Exchange Act. *Id.* at 163.

There was no reasonable factual support for the Defendants to deny that "[i]n exchange for the promise of the down payment, Doley gave the Director Defendants control over the Doley Group Shares, and those shares were subsequently voted for the Management Nominees," nor that "[n]o 13D was filed by any of the Director Defendants indicating their intention to purchase shares or gain control of the Doley Group Shares to vote in favor of the Management Nominees." Additionally, Defendants were aware that there was no prior OTS approval.  These denials are in violation of Rule 11.

**Paragraph 39**:

*Allegation*:  "After the meeting, Bender spoke with Doley, who indicated that his share purchase agreement was still being negotiated, but consistent with that agreement, the Doley Group Shares were voted for the Management Nominees."  Compl. ¶ 39.

*Answers*:  Defendants claimed to be without sufficient information or knowledge to form a belief as to the truth of the allegations set forth in paragraph 39, and therefore denied the same. Defs.' Answers ¶ 39.

*Court Findings*:  While the Court credited Mr. Bender's testimony and Mr. Doley's deposition testimony that this conversation between them occurred, the record contains no evidence supporting a finding that these Defendants were privy to that conversation.  Their denials of the content of the conversation — which was what was alleged — did not violate Rule 11(b) even if they

knew the truth of the matters communicated by Mr. Doley to Mr. Bender.

**Paragraph 46**:

*Allegations*:

By no later than October 26, 2005 and possibly substantially earlier, the Director Defendants and Defendant Batties had agreed to act together as a group with non-parties Thompson and the Doley Group, for the undisclosed purposes of (i) opposing the election of the Bender Nominees, voting the Defendants' IFSB shares, together with the Thompson and Doley Group Shares, against the Bender Nominees, and persuading other shareholders to vote against the Bender Nominees; (ii) depriving those IFSB shareholders who voted in favor of the Bender Nominees the opportunity of a fair election of the Bender Nominees; (iii) supporting the efforts of Jordan to continue controlling the IFSB Board despite a dismal record of mismanagement and negligence.

Compl. ¶ 46.

*Answers*:  Defendants denied all of the allegations set forth in paragraph 46.  Defs.' Answers ¶ 46.

*Court Findings*:  The Court's findings are outlined above.  While it is true that these Defendants acted together as something of a cabal to oppose Mr. Bender's Nominees and elect the Management Nominees by all means, fair and foul, the Court cannot find that these Defendants' denials in paragraph 46 of their Answers violated Rule 11(b) because of the general nature of the allegations.

**Paragraph 47**:

*Allegation*:

The Director Defendants and Defendant Batties have violated section 13(d) of the Exchange Act because they have failed to file a Schedule 13D, or any amendments to an existing 13D, setting forth their specific plans and intentions with respect to IFSB, including but not limited to

> the details of the undisclosed agreement among the Director Defendants and Defendant Batties to seek to acquire the Doley Group Shares by purchase or otherwise; the undisclosed agreement to purchase the Doley Group Shares; the undisclosed agreement with Thompson regarding his votes (or the delivery of his proxies) for the Management Nominees . . . ; and the undisclosed agreement with the Doley Group regarding the delivery of their votes (or the delivery of their proxies) for the Management Nominees.

Compl. ¶ 47.

*Answers*: Defendants denied all of the allegations set forth in paragraph 47. Defs.' Answers ¶ 47.

*Court Findings*: As outlined above, the Court specifically found that Defendants violated section 13(d) of the Exchange Act when it "indisputably failed to [file a Schedule 13D]" upon acquiring control of the Doley Group's shares. *Bender*, 439 F. Supp. 2d at 163. Defendants' denials in this regard violated Rule 11.

### Paragraph 73:

*Allegation*:

> The conduct described in Counts I through III above was for the express purpose of causing the defeat of the two Bender Nominees, and the election of the Management Nominees. Upon information and belief, and in furtherance of the plan to defeat the Bender Nominees, Defendants Jordan and Wilmot entered into the agreement to purchase the Doley Group Shares, which is in excess of 10% of the Bank's stock. This purchase was in violation of the Change in Bank Control Act, 12 U.S.C. § 1817(j), and OTS regulations thereunder.

Compl. ¶ 73.

*Answers*: Defendants denied all of the allegations set forth in paragraph 73. Defs.' Answers ¶ 73.

*Court Findings*: The Court made no specific findings with respect to the Change in

Bank Control Act. The Court's findings with respect to remaining allegations in this paragraph are outlined above, and while the Court agrees that these Defendants acted together to oppose Mr. Bender's Nominees and elect the Management Nominees, the Court cannot find that the Defendants' denials in paragraph 73 of their Answers violated Rule 11(b) because of the general nature of the allegations.

**Paragraph 74**:

*Allegations*: "The agreement to purchase the Doley Group Shares was an instrumental part of the agreement of the Director Defendants and Defendant Batties to defeat the Bender Nominees, and was either approved in advance by the other Defendant Directors and Batties, or was ratified by those Defendants at a later time." Compl. ¶ 74.

*Answers*: Defendants denied all of the allegations set forth in paragraph 74. Defs.' Answers ¶ 74.

*Court Findings*: The Court made no findings about the actions of former defendants (Michael J. Cobb, William B. Fitzgerald, IV, and Eugene K. Youngetob) and the Benders released them from this suit in September 2006 without liability. The remaining allegations in paragraph 74 are too general for the Defendants' denials to constitute a violation of Rule 11.

**Paragraph 75**:

*Allegations*: "In furtherance of their efforts to convince Doley to sell the Doley Group Shares, Jordan and/or Wilmot improperly threatened Doley that if the Bender Nominees were elected, there would be a 'run on the bank.'" Compl. ¶ 75.

*Answers*: Defendants denied all of the allegations set forth in paragraph 75. Defs.' Answers ¶ 75.

*Court Findings*:  While the Court found that someone had told Mr. Doley, while at the Prime Rib, that many people were planning to withdraw their money from the Bank if the Bender Nominees were elected, *see Bender*, 439 F. Supp. 2d at 154, it was not clear who made the statement or that it constituted a "threat" to Mr. Doley.  On this record, the Court cannot find that these Defendants denials were violative of Rule 11(b).

## IV. CONCLUSION

The Benders argue that multiple Answers to their Complaint were so materially and inexcusably wrong as a matter of fact that the Benders should recover the entirety of their attorney fees and costs for this litigation.  As outlined above, however, the argument over-states the record. It also mis-states the law, which permits recovery only for the work associated with those Answers or other pleadings that had no basis in fact.

Nonetheless, it is accurate to say that these Defendants denied factual allegations going to the heart of the Benders' Complaint, *i.e.*, allegations concerning their involvement with the Committee to Save the Bank Letter, the McPhail/Douglas letter, and the Doley Group Shares, as well as the misleading nature of some of the statements in the Bank's proxy statement.  Once these denials were advanced, the Benders were put to significant expense to prove that the denials were unwarranted and without any evidentiary support.  As detailed above, the Defendants are susceptible to a sanction under the PSLRA and Rule 11(c) for this conduct.

Out of the eighteen Answers the Benders challenge, the Court has found that nine were false.  The Court further finds that five constitute significant violations of Rule 11(b). Those five went to the heart of the matter: the direct involvement of Ms. Jordan and Messrs. Batties and Wilmot in the Committee Letter, the McPhail/Douglas Letter, the false statements in the September proxy materials,

and, most critically, the shenanigans with the Doley Group shares and votes.  The Court has reviewed the fee statements submitted by the Benders and finds that the hours and fees were reasonable.[5] However, a full recovery of fees is inappropriate under the statute.  As a sanction for their violations of Rule 11(b), the Court will award one-half of their fees and all of their costs to the Benders, *i.e.*, $605,711.50 in fees and $156.00 in costs, for a full award of $605,867.50.[6]  *See* Mot. for Att'y Fees, Ex. A (Declaration of Dale A. Cooter); *Id.,* Exs. B-D (billing records/invoices). Each Defendant shall be severally liable for one-third.  A memorializing Order accompanies this Memorandum Opinion.


Date:    January 20, 2010                                    _____/s/_____
                                                             ROSEMARY M. COLLYER
                                                             United States District Judge

---

[5]  Defendants offer no argument to the contrary.

[6] The Court has reduced this amount by one cent to $605,867.49 to make it evenly divisible by three.